*A.P. Pollution Board vs. M.V. Nayadu:*
*2001(2) SCC 62*

Exhibit 2



MANU/SC/2953/2000

Equivalent Citation: JT2000(Suppl3)SC322, 2000(8)SCALE23, 2000(3)SCALE354, (2001) 2SCC62, [2000]Supp5SCR249

IN THE SUPREME COURT OF INDIA

Civil Appeal Nos. 368-71, 372 and 373 of 1999

Decided On: 01.12.2000

Appellants: A.P. Pollution Control Board Ii
Vs.
Respondent: Prof. M.V. Nayudu (Retd.) and Ors.

Hon'ble Judges/Coram:
M. Jagannadha Rao, J.

Counsels:
R.N. Trivedi, Additional Solicitor General Nikhil Nayyar, Urmila Sirur P.S. Narasimha and P. Sridhar, Advs

Subject: Environment

Subject: Constitution

Acts/Rules/Orders:
Constitution of India ; Water Act

Cases Referred:
A.P. Pollution Control Board (I) v. Prof. M.V. Nayudu, MANU/SC/0032/1999; Narmada Bachao Andolan v. Union of India, MANU/SC/0640/2000; Bandhua Mukti Morcha v. Union of India, MANU/SC/0051/1983; Portugal v. F.C. Council; Lopez Ostra v. Spain, 303 ECt HR 1994; Yanomani Indians v. Brazil, Inter Amer CHR 7615 OEA/Ser LV/II/66 D 10 rev 1 (1985); Minors Opasa v. Department of Environment and Natural Resources ILR (1994)173 ; Furtdepublico v. Mayor of Bugatagrande and Ors.; Wildlife Society of Southern Africa and Ors. v. Minister of Environmental Affairs and Tourism of the Republic of South Africa and Ors. (1996) 9 BCLR 1221 (Tk) : 1996 SL 30

Citing Reference:

Relied On                                                    9

Prior History:
Appeal From the Judgment and Order dated 1-5-1998 of the Andhra Pradesh High Court in WP Nos. 16969, 17832 and 18681 of 1997 and 2215 of 1998

Disposition:
Appeal Allowed

Case Note:

Environment - industry - Section 25 of Water (Prevention and Control of Pollution) Act, 1974 - whether respondent entitled to proceed with establishing industry and could plead equities or rely on principle of promissory estoppel in spite of prohibition contained in Section 25 that industries not be established without consent of

appellant Board - Appellate Authority erred that because of approval of plan by panchayat or conversion of land use by Collector or grant of letter of intent by Central Government case for applying principle of promissory estoppel be applied - industry cannot seek no objection certificate (NOC) after violating policy decision of Government - held, respondent entitled to proceed with establishing industry.

Subject Category :
LETTER PETITION AND PIL MATTER - WATER POLLUTION : INDUSTRIAL, DOMESTIC, SEWAGE, RIVERS AND SEA

JUDGMENT

M. Jagannadha Rao, J.

1. On an earlier occasion, in this very case, this Court in A.P. Pollution Control Board (1) v. Prof. M.V. Nayudu MANU/SC/0032/1999 : [1999]1SCR235 (dated 27.1.1999) referred to the 'precautionary principle' and the new rule of 'burden of proof in the matter of environmental pollution. This Court in that judgment emphasised the need for scientific inputs before adjudicating complicated issues of pollution to environment. The said approach of this Court was based upon contemporary trend in the adjudication of environmental matters in various countries and was not intended to restrict the powers of this Court under Article 21 of the Constitution of India to safeguard environment from pollution.

2. Our efforts to get at the best scientific evidence on the issues involved in the case, have yielded satisfactory results in the sense that we have today greater confidence about the correctness of our conclusions and further that this is a fit case for affirming the orders of the appellant (Andhra Pradesh Pollution Control Board) not to grant 'consent' to the seventh respondent (M/s. Surana Oils & Derivatives (India) Ltd.) under the statute for establishing its industry. We are now more sure that, on facts, this is a pre-eminently fit case which requires grant of an injunction to prevent irreversible pollution to the drinking water reservoirs of Osman Sagar and Himayaat Sagar catering to the needs of over 50 lakhs people, in Hyderabad and Secunderabad.

3. Drinking water is of primary importance in any country. In fact, India is a party to the Resolution of the UNO passed during the United Nations Water Conference in 1977 as under:

> All people, whatever their stage of development and their social and economic conditions, have the right to have access to drinking water in quantum and of a quality equal to their basic needs.

Thus, the right to access to drinking water is fundamental to life and there is a duty on the State under Article 21 to provide clean drinking water to its citizens.

4. Adverting to the above right declared in the aforesaid Resolution, in Narmada Bachao Andolan v. Union of India MANU/SC/0640/2000 : AIR2000SC3751 , Kirpal J observed:

> Water is the basic need for the survival of human beings and is part of right of life and human rights as enshrined in Article 21 of the Constitution of India....

There is therefore need to take into account the right to a healthy environment along with the right to sustainable development and balance them.

5. Competing human rights to healthy environment and sustainable development:

> There is building up, in various countries, a concept that right to healthy environment and to sustainable development are fundamental human rights implicit in the right to 'life'.



6. Our Supreme Court was one of the first Courts to develop the concept of right to 'healthy environment' as part of the right to "life" under Article 21 of our Constitution. See Bandhua Mukti Morcha v. Union of India MANU/SC/0051/1983 : [1984]2SCR67 . This principle has now been adopted in various countries today.

7. In today's emerging jurisprudence, environmental rights which encompass a group of collective rights are described as "third generation" rights. The "first generation" rights are generally political rights such as those found in the International Convention on Civil & Political Rights while "second generation" rights are social and economic rights as found in the International Covenant on Economic, Social and Cultural Rights. "Right to Healthy Environment". (See Vol.25) 2000 Columbia Journal of Environmental Law by John Lee P.283, at pp.293-294 fn.29)

8. The right to sustainable development has been declared by the UN General Assembly to be an inalienable human right (Declaration on the Right to Development) (1986). The 1992 Rio Conference declared that Human beings are at the center of concerns for sustainable development. Human beings are entitled to a healthy and productive life in harmony with nature. (Principle 1). In order to achieve "sustainable development, environmental protection shall constitute an integral part of development process and cannot be considered in isolation of it". The 1997 Earth Summit meeting of 100 nations in New York reflected the above principles. The European Court of Justice, emphasised in Portugal v. E.C. Council, the need to promote sustainable development while taking into account the environment. 3 C.M.L.R.331 (1997) (ibid Columbia Journal of Environmental Law, p. 283.

9. In Lopez Ostra v. Spain (303-C, Eur. Ct. H.R. (Ser.A) 1994), the European Court at Strasbourg has held that the result of environmental degradation might affect an individual's well being so as to deprive him of enjoyment of private and family life. Under Article 8 of the European Convention, everyone is guaranteed the right to respect for his private and family life. (See also, Powell A Rayner v. U.K. 172 Eur. Ct H.R. 5 (1990). The Inter-American Commission on Human Rights has found a similar linkage (Yanomani Indians v. Brazil) (Inter-Amer. C.H.R. 7615 OEA/Ser.L.V/II/66 Doc. 10 rev. 1 (1985). The Commission found that Brazil had violated the Yanomani Indians' right to life by not taking measures to prevent the environmental damage. The Philippine Supreme Court dealt with the action against Government not to continue licensing agreements permitting deforestation so that the right to a 'balanced and healthful ecology in accordance with the rhythm and harmony of nature' is not affected. (Minors Opasa v. Department of Environment and Natural Resources 33, I.L.M. 173(I994). The judgment was based on 'intergenerational responsibility'. In Furtdepublico v. Mayor of Bugatagrande and Ors. the Constitutional Court of Columbia (17.6.1992) held in favour of the right to healthy environment as a fundamental human right and treated the right as part of customary international law. The Court permitted popular action mechanism. The Supreme Court of South Africa, in a recent case in Wildlife Society of Southern Africa and Ors. v. Minister of Environmental affairs and Tourism of the Republic of South Africa and Ors. (Dt.27.6.1996) (1996) 9 BCLR 1221 (Tk); 1996 SACLR L 30 dealt with the right to healthy environment. About 60 nations since 1990 have recognised in their constitutions a right to a healthy environment as a corollary duty to defend the environment. (Columbia Journal of Environmental Law, ibid PP.318-319).

10. Thus, the concept of a healthy environment as a part of the fundamental right to life, developed by our Supreme Court, is finding acceptance in various countries side by side with the right to development.

Events after 27.1.99 judgment:

11. We shall now refer to the events subsequent to our order dated 27.1.99. They are as follows:

> The question is whether in the event of the seventh respondent being permitted to establish its industry within 10 Kms. of the lakes -notwithstanding the Government's policy to the contrary and the refusal of the appellant Board to grant



NOC - there is likelihood of serious pollution to the drinking water in these lakes. This Court in its judgment dated 27.1.99 referred the said question to the National Environmental Appellate Authority (constituted under the National Environmental Appellate Authority Act, 1997) for its opinion. The said authority visited the site of the industry at Peddashpur village near Hyderabad and submitted a detailed and exhaustive report to this Court, after receiving oral and documentary evidence. The Report went against the seventh respondent industry. The industry filed objections to the said Report.

12. When the matter was thereafter heard, the seventh respondent industry relied upon an order passed by the appellant-Board on 16.7.97, suggesting that if certain safeguards were provided by the industry to prevent pollution, NOC could be granted. The said order had to be passed at one stage by the Board because of the direction of the Government of Andhra Andhra contained in an order granting exemption from the 10 KM rule.

13. Before this Court heard arguments on the merits on the question of validity of the exemption granted by the Government, this Court wanted to first ascertain - without prejudice to the contentions of the parties - whether the precautions which were suggested by the appellant Board on 16.7.97 pursuant to the directive of the State Government would be adequate and whether any further precautions were to be taken. The limited question relating to adequacy or otherwise of the "safeguards" as stated above was then referred to another expert body, namely, the University Department of Chemical Technology, (Autonomous), Matunga, Bombay, headed by Prof. D.N. Bhowmick. It was stated in the said order of this Court that Prof. Bhowmick could take the assistance of the National Geophysical Research Institute, Hyderabad (hereinafter called the 'NGRI').

14. Thereafter, Dr. Bhowmick submitted his Report dated 16.8.2000 together with a report of June 2000 furnished by the NGRI, Hyderabad. In as much as the Reports - particularly, that of NGRI- had gone against the 7th respondent - industry, it again filed objections thereto.

15. We then finally heard learned Additional Solicitor General of India, Sri R.N. Trivedi for the appellant Board and of Sri P.S. Narasimha for the writ petitioner (respondent 1) who supported the appellant and Sri A. Subba Rao, learned Counsel for the 7th respondent- industry. Thus, we have now the Report of the National Environmental Appellate Authority, the Report of Dr. Bhowmick, (Bombay) and the Report of the National Geophysical Research Institute, (NGRI) Hyderabad.

16. Basic facts leading to the grant of exemption:

> We may now refer to certain basic facts. The Ministry of Forests and Environment, Union of India issued a Notification dated 27.9,88 listing various industries as hazardous and included them in a 'Red' list. Item 37 of the said list of hazardous industries is the industry which produces 'Vegetable oils including solvent extracted oils'. The above notification was expressly stated to be issued by the Government of India in exercise of its powers vested under the Water (Prevention and Control of Pollution) Act, 1974, the Air (Prevention and Control of Pollution) Act, 1981 and the Water (Prevention and Control of Pollution) Cess Act 1977 and the Environment (Protection) Act, 1986, directing that whenever any industry sought consent from the Pollution Control Boards, the said Boards, "while processing the consent application, should decide, keeping in view the pollution - causing potential of the industry, as to which category the industry belongs.

17. Consequent to the directive of the Union Government the State of Andhra Pradesh initially issued notification in GO 192 dated 31.3.94 (Municipal Administration). Therein, the State Government relied upon the interim report of an Expert Committee of the Hyderabad Metropolitan Water Supply and Sewerage Board, called HMWSSB), and prohibited industries being located within 10 K.M. of the two reservoirs.



18. In spite of the prohibition contained in GO 192 dated 31.3.94 prohibiting industries within 10 KM. of the reservoirs, the seventh respondent industry purchased land of 12 acres on 26.9.95 in Peddashpur village situated on the outskirts of Hyderabad, within 10 KM of the reservoirs. Initially, the industry applied for consent from the appellant Board in November 1995, through the Industries Department of the State Government. The State of Andhra Pradesh, by letter dated 28.11.95, wrote to the Government of India on 28.11.95, recommending grant of letter of intent in relaxation of 10 K.M. rule, subject to the industry obtaining NOC from the appellant Board. On 9.1.96, Government of India gave letter of intent but required the industry to obtain No Objection Certificate from the environmental authority of the State.

19. At that stage, the Government re-affirmed the 10 K.M, prohibition in GO 111 dated 8.3.96, after obtaining the second interim report of the HMWSSB. Consequent thereto, in the pre-scrutiny by the Single Window Clearance Committee Meeting of the Pollution Control Board held on 24.5.96, the application of the industry stood rejected because of the 10 K.M. prohibition.

20. Undeterred, the industry proceeded to obtain permission from the Gram Panchayat on 31.5.96 for establishing a 'factory'. Even though, on 31.5.96 the Commissioner of Industries, specifically informed the industry that it should better select an alternative site, instead of heeding to the said advice, the industry obtained permission of the District Collector on 7.9.96 for change of land use from agricultural to non-agricultural use. It then proceeded to execute various civil works in spite of the 10 k.m. prohibition rule.

21. Thereafter, the Industry proceeded further with construction of civil works and then applied to the appellant Board on 7.4.97 under Section 25 of the Water Act for permission to establish the factory. One of the bye-products mentioned in the said application was:

> Glycerine, spent bleaching earth and carbon and spent nickel catalysts.

22. On 1.6.97, the appellant Board wrote to the Commissioner of Industries that the industry would be generating 'nickel' catalyst and other pollutants which could find their way to the lakes either directly or indirectly. Even the solid waste such as activated carbon bleaching earth and sodium sulphate might find entry during rainy season from the storage yard resulting in polluting to lakes.

23. In spite of the said opinion of the appellant Board, the Commissioner of industries, in his letter dated 6.6.97 stated that there would be no liquid effluent or acidic fumes and that the limited aqueous effluent was totally biodegradable and the solid wastes were disposable.

24. On 25.6,97, the appellant Board once again rejected the application of the industry inasmuch as the said industry was in the 'Red' list annexed to the Notification dated 1.2.89 of the Ministry of Forests & Environment, Government of India.

25. Confronted with the above problems, the industry approached the State Government on 24.6.96 seeking exemption from the 10 k.m. rule contained in GO. 11 1 dated 8.3.96 on the ground that it had invested huge amounts to establish the industry and that it had almost completed the civil works, and had purchased machinery and installed the same. The State Government, in spite of the prohibitory directions issued by it earlier, issued GO. 153 dated 3.7.97 granting exemption from GO 111 dated 8.3.96 on the ground that the Government of India had issued letter of intent on 9.1.96, that the Commissioner of Industries, in his letter dated 6.6.97 opined that there would be no liquid effluents and that the solid wastes would be disposable. Government then granted exemption stating as follows:

> The Government had considered the matter in its entirety and feel that if proper control over treatment of aqueous and solid wastes is exercised, then there can be no objection to setting up of the industry under reference at the proposed site.

The Government then directed the Board to prescribe conditions for treatment/ disposal of



aqueous/solid waste.

26. Compelled by the above direction, the appellant Board passed an order on 16.7.97 requiring various precautions to be taken by the industry. (In fact, after 8.3.96, Government of Andhra Pradesh issued GO 181 dated 7.8.1997 modifying GO 153 dated 3.7.97 and clarifying that the exemption granted did not relate to para (1) of GO 111 but related only to para 3(f)), that para being the one which related to the 10 K.m. prohibition.

27. Meanwhile, the Society for Preservation of Environment and Quality Life (SPEQL) filed W.P. 16969/97 for quashing the exemption order in GO 153 dated 3.7,97 and obtained stay on 25,7.97.

28. The appellant-Board stuck to its decision to refuse NOC. On 30,7.97, it finally rejected the application for NOC relying upon GO 111 dated 8.3.96 and also upon the Government of India's notification dated 1.2.89 which showed this type of industry in its 'Red' list. The Board stated that it was not desirable to locate such an industry in the catchment area in view of GO. 111 dated 8.3.96. It also referred to the fact that earlier the Board had already rejected the NOC on 24.5.96 at the pre-scrutiny level.

29. Aggrieved by the order of rejection dated 30.7.97 of the appellant Board, the seventh-respondent industry filed appeal under Section 28 of the Water Act, 1974 before the appellate authority. For the first time, in the said appeal, it filed an affidavit of Prof. M. Santappa, (a former Vice Chancellor) who was the then Scientific Officer of the Tamil Nadu Pollution Control Board. The said opinion was in favour of the industry.

30. By order dated 5.1.98, the appellate authority (presided over by a retired Judge of the A.P. High Court) allowed the appeal and set aside the orders of the Board. It held that the categorisation into 'Red' as made by the Government of India on 1.2.89 was applicable only to the industries set up in the Doon valley. It relied on the affidavit of Prof, M. Santappa to the affect that the industry had adopted the latest technology which was eco-friendly and that the Chairman of the Board of Directors of the industry was Dr. Siddhu, formerly Director General of CS1R, that the technology was obtained by the industry from the Indian Institute of Chemical Technology, Hyderabad (HCT) which issued a certificate that the industry will not discharge any acidic effluents and solid wastes, and that they could be collected in M.S. Drums mechanically. The appellate authority referred to Dr. Santappa's report which staled that none of the bye products would fall on ground and that the conditions laid down by the Technical Committee of the appellant Board on 16.7.97 would be fulfilled. There would be no liquid effluents or acidic fumes as certified by IICT. The nearest spread would be 8.5 Kms. There was no possibility of seepage into the reservoirs. The appellate authority also held that principle of 'promissory estoppel' applied inasmuch as permission for change of land-use was given and permission to erect factory was also given. It was brought to the notice of the said appellate authority that under the Water Act, long before the State Government issued the prohibiting notification, there was an earlier categorisation dated 27.9.88 made by the Government of India showing 'Vanaspati Hyde generated vegetable oils for industrial purposes' in the red category. Even so, the appellate authority allowed the appeal of the 7th respondent filed under Section 28 of the Water (Prevention and Control of pollution) Act, 1974 and directed NOC to be issued by the appellant,

31. Writ petition 2215/98 was a PIL case filed for quashing the order dated 5.1.98 of the appellate authority. The said writ petition and the writ petition of SPEQL (WP. 16969/97 already referred to) and the W.P. 11803/98 filed by the respondent-industry seeking mandamus against the appellant Board for grant of NOC, were all disposed of by the High Court on 1.5.98, upholding the orders of the appellate authority and directing grant of NOC by the appellant.

32. The present appeals have arisen out of the said judgment. We first rendered the judgment dated 27.1.99 as stated earlier. We have already set out the subsequent facts relating to the reference made by this Court to the National Environmental Appellate Authority on the main point relating to pollution and also to its report dated 25.6.99. Further, we have said that this Court then made a further reference by order dated 5.5.2000 to the University-Department of



Chemical Technology, Bombay and the latter submitted its Report dated 16.8.2000 together with Report of National Geophysical Research Institute, Hyderabad of June, 2000.

33. The following points arise for consideration:

(1) Whether, in view of Sections 2(b), 3(2) and 5 of the Environment (Protection) Act, 1986 and the notification issued by the Central Government on 27.9.88 and the further notification issued by the State Government on 31.3.94 and 8.3.96 as delegate of the Central Government, totally prohibiting location of following industries in an 'area', it was permissible for the State Government to issue an exemption on 3.7.97 for an individual hazardous industry within the area, even if it be by way of asking the industry to provide safeguards?

(2) Whether, in view of Sections 2(e), 2(k), 17, 18 and 19 of the Water (Prevention and Control of Pollution) Act, 1974, if the State Government had issued notification totally prohibiting polluting industries in the area, and if the State Pollution Board had rejected the request for location of a polluting industry within the area, it was permissible for the Government to grant exemption for a single industry within the prohibited area?

(3) Whether in the light of the Reports of (a) the National Environment Appellate Authority, New Delhi, (b) the University Department of Chemical Technology, Bombay and (c) the National Geophysical Research Institute, Hyderabad, the 7th respondent industry could claim exemption from the 10 KM. prohibition and whether such an exemption could have been granted? (4) Whether in spite of the prohibition contained in Section 25 of the Water (Prevention & Control of Pollution ) Act, 1974 that industries should not be established without consent of the appellant-Board, the seventh respondent could have proceeded with establishing the industry and could plead equities or rely on the principle of promissory estoppel?

(5) On the question of establishment of 'Environmental Courts', to what extent, the States and Union Territories have taken steps to have environmental scientists/experts in the various environmental tribunal or appellate bodies, as directed in the earlier judgment?

(6) To what relief?

Points 1 and 2:

34. It is necessary first to refer to the following provision of the Environment (Protection) Act, 1986. Under Section 2(b), 'environmental pollution' means any solid, liquid or gaseous substance present in such concentration may be, or tend to be, injurious to environment. Section 2(e) defines 'hazardous substance' as any substance or preparation which, by reason of its chemical or physic-chemical properties or handling, is liable to cause harm to human being, other living creatures, plants, micro-organism, property or the environment. Section 3 refers to the extensive process of the Central Government to take measures to protect and improve environment. Sub-clause (2) permits measures to be taken (see Clause (v)) by imposing

> restriction of areas in which industries, operations or processes or class of industries, operations or processes shall not be carried out or shall be carried out subject to certain safeguards.

35. Section 5 deals with the power of the Central Government, to issue directions to any person, officer or any authority and such person, officer or authority shall be bound to comply with such conditions. Explanation to Section 5 clarifies that the said power to issue directions includes the power to direct:



    (a) the closure, prohibition or regulation of any industry, operation or process; or

    (b) stoppage or regulation of the supply of electricity or water or any other service.

36. The notification of the Central Government dated 27.9.1988 (Ministry of Forests and Environment) was issued expressly in exercise of powers of the Central Government under the Environment (Protection) Act, 1986 the Water (Prevention and Control of Pollution) Act, 1974 and the Air (Prevention and Control of Pollution) Act, 1981. It stated that industries were being classified in lists 'Red, Orange and Green' and that "when an industry seeks consent from the Pollution Control Board, as required by the above Acts, the Board which processing the consent application should decide, keeping in view the pollution causing potential of the industry, as to which category, the 'environmental safeguards' should be determined". This is a general notification. Item 37 in the red list refers to an industry producing 'vegetable oils including solvent extracted oil'. No doubt, the subsequent notification dated 1.2.1989 as pointed out by the appellate authority under Section 28 related to red category industries for the Doon Valley and was issued under Section 3(2)(v) of the Environment (Protection) Act, 1986 and Rule 5(3)(d) of the Environment (Protection) Rules, 1986 for the purpose of restricting industrial units in Doon Valley. Even assuming that notification dated 1.2.99 did not apply to Andhra Pradesh, the notification dated 27.9.08 and the State Government's notification in GO 111 dated 8.3.96 are sufficient for the present purposes.

37. As pointed out in para 2(c) of the Rejoinder affidavit of the appellant-Board, the power to issue directions under Section 5 of the Environment (Protection) Act, 1986 and its Environment (Protection) Rules, 1986 were amended in 1988 (S.O. 152-E) were delegated to the State of Andhra Pradesh in 1988 in S.O. 152-E. The said notification reads as follows:

    S.O.No.152(E) dated 10.2.1988: In exercise of the powers conferred by Section 23 of the Environment (Protection) Act, 1986 the Central Government hereby delegates the powers vested in it under Section 5 of the act to the State Governments of Andhra Pradesh, Assam, Bihar, Gujarat, Haryana, Himachal Pradesh, Karnataka, Kerala, Madhya Pradesh, Mizoram, Orissa, Rajasthan, Sikkim and Tamil Nadu subject to the condition that the Central Government may revoke such delegation of powers in respect of all or any one or more of the State Government or may itself invoke the provisions of Section 5 of the Act, if in the opinion of the Central Government such a course of action is necessary in public interest.

38. The State of Andhra Pradesh could therefore issue orders in GO 111 dated 8.3.96 prohibiting the location of industries in specified areas.

39. In our view, GO 192 dated 31.3.1994 and GO 111 dated 8.3.1996 are therefore referable to the said delegated authority permitting the State Government to impose "total prohibition" of polluting industries to be located within 10 Kms. of the two reservoirs. The notification dated 31.3.1994 prohibited any polluting industries, Major Hotels, residential colonies or other establishments that generate pollution in the catchment areas of these two lakes within 10 Kms radius from the full tank level. The appellant Board and the MD of the Hyderabad Water Supply and Sewage Board, the HUDA and the Collector of three Districts, Mehboobnagar, Ranga Reddy and Hyderabad were directed to scrupulously protect the water in the two lakes from imminent danger of pollution. GO 111 dated 8.3.1996 (Municipal Administration and Urban Development Department) issued in modification of GO 192 dated 31.3.1994 re-iterated the same prohibition as follows in clause 3(0. It stated:

    3(i): To prohibit polluting industries, major hotels, residential colonies or other establishments that generate pollution in the catchment of the lakes up to 10 Kms., from full tank level of the lakes as per list in Annexure 1.

    3(e): To prohibit pollution industries within 10 Kms., radius (in both on upstream and down stream side of the lakes to prevent acidification of lakes due to air



pollution.

3(f): There shall be total prohibition of location of industries in the prohibited zone."

40. The above notification was issued after approval by the Chief Secretary or the Chief Minister. Item 38 thereof refers to Peddashpur Village, which is within 10 KM of these two reservoirs.

41. As stated earlier, on 3.7.1997, the State Government (Industries and Commerce) Department issued notification granting "exemption" from the 10 KM rule mentioned in GO 111 dated 8.3.96 later amended by GO 181 dated 7.8.1997 as exempting para 3(0 of GO 111 and directed A.P. Pollution Control Board:

to prescribe conditions for treatment/disposal of aqueous/solid wastes.

The result of exemption from the purview of para 3(f) of GO. 111 dated 8.3.96 was that the seventh respondent industry could be located within 10 KM of the lakes. The question is whether this exemption can be valid ?

42. Under Section 3(2)(v) above extracted, the Central Government or the State Government as its delegate, could issue directions as permitted by Section 5. Now Section 3(2)(v) permits restriction specifying "areas" in which industrial operations or processes shall not be carried out or shall be carried out subject to certain safeguards. The notification issued by the State Government in GO 111 dated 8.3.96 falls within the first part i.e. where industries shall not be carried out. This is a total prohibition within 10 KM of the two reservoirs. When such a prohibition was in force, the State Government could not obviously grant any exemption to a specified industry like the seventh respondent, located within the 'area'. Nor was it permissible for the State to direct the appellant-Board to prescribe conditions for grant of NOC,

43. Coming to the provisions of the Water Act, 1974, it is clear that in view of Sections 2(e), 2 (k) read with Sections 17 and 18 of the Water Act, the fundamental objective of the statute is to provide clean drinking water to the citizens. Having laid down the policy prohibiting location of any industries within 10 Kms under GO 111 dated 8.3.1996, the State could not have granted exemption to the 7th respondent industry, nor to any other industry, from any part of the main GO 111 dated 8.3.96. Section 19 permitted the State to restrict the application of the Water Act, 1974 to particular area, if need be, but it did not enable the State to grant exemption to a particular industry within the area prohibited for location of polluting industries. Exercise of such a power in favour of a particular industry must be treated as arbitrary and contrary to public interest and in violation of the right to clean water under Article 21 of the Constitution of India.

44. The above reasoning given by us does not mean that exemption can be given to all industries within a particular radius of the reservoirs unmindful of the possible danger of pollution to the lakes. In fact, exemption granted even to a single major hazardous industry may itself be sufficient to make the water in the reservoirs totally unsafe for drinking water purposes. Government could not pass such orders of exemption having dangerous potential, unmindful of the fate of lakhs of citizens of the twin cities to whom drinking water is supplied from these lakes. Such an order of exemption carelessly passed, ignoring the 'precautionary principle', could be catastrophic.

45. Therefore, the GO 153 dated 3.7.97 granting exemption must be held to be without statutory backing and also wholly arbitrary and violative of Article 21. Points 1 and 2 are decided against the 7th respondent.

Point 3:

46. In our earlier judgment in A.P. Pollution Control Board (I) v. Prof. M.V. Nayndu and Ors. MANU/SC/0032/1999 : [1999]1SCR235 , this Court had occasion to refer to the basis of the



precautionary principle and to explain the basis and content of the very principle. This Court also explained the new principle of burden of proof.

47. Therefore, it was for the 7th respondent industry to establish that there would be no danger of pollution to the two reservoirs even if the industry was established within 10 Km radius of the said reservoirs. In the present proceedings, the 7th respondent has failed to discharge the said onus.

48. Before the State Government, the industry produced no expert opinion except to say that it had got the new technology from the Indian Institute of Chemical Technology, Hyderabad (IICT) and it relied on a statement of Dr. Siddhu, Chairman of the 7th respondent and formerly Director General of CSIR. The affidavit of Dr. Santappa was produced only before the appellate authority under Section 28 of the Water Act, 1974.

49. But, in the light of the subsequent reports now obtained by this Court, the position is quite clear. We shall now refer in some detail to the three exhaustive reports furnished by the National Environmental Appellate Authority, New Delhi (NEAA), Dr. Bhowmick of Bombay and the NGRI.

50. (A) Report of National Environmental Appellate Authority, New Delhi (NEAA):

The said authority was presided over by a retired Judge of the Supreme Court of India, Sri Justice N. Venkatachala.

51. The NEAA framed two points (a) and (b):

(a)(i) Is the respondent-industry a hazardous industry or?

(ii) What is the pollution potentiality of the respondent industry, taking into account, the nature of the products, its effluents and its location?

(iii) Whether the operation of the industry is likely to affect the sensitive catchment area resulting in pollution of the Himayat Sagar and Osman Saga: lakes supplying drinking water to the twin cities of Hyderabad and Secunderabad?

52. On point (a)(i), it noticed that the industry is to use, among 12 major items, - 70 Kgs. of nickel based catalyst (Pellets) per day and that the raw material is to be stored atleast for 30 days. It observed that according to Chapter 8.0 of NFPA, Hazard classification, the raw materials used by the industry are serious health hazards, highly inflammable and re-active at elevated temperatures and pressures. Four items, Nickel, Ammonia, Methanol and Hydrochloric Acid are used in the process. After referring to the various plants and processes, the NEAA referred to the provisions of the Factories Act (as amended in 1987) and Section 2(cb) defining 'hazardous processes and Schedule I thereof in which item 25 refers to 'extraction of oils and fats from vegetable and animal sources" as hazardous processes. It referred to Rule 2(h) of the 'Manufacture, Storage and Import of Hazardous Chemicals Rules, 1989' issued under the Environment (Protection) Act, 1986. It referred to the provisions in the Environment (Protection) Act, Section 2(e), 2(b) and 2(d). It agreed that merely because an industry is hazardous does not by itself debar it but then Section 8 of that act would come into play. It answered question (i) in the affirmative that the industry is hazardous.

53. On point a(ii), it referred to the definition of 'pollution' in Section 2(c) of the Water Act, Section 2(0 which defines 'sewage effluent' and Section 2(k) which defines 'trade effluent' and observed that the 'pollution potential' of the industry was to be assessed. After referring to the effluents -Commercial Castor oil, Bleaching earth, Activated carbon. Nickel catalyst, Hyflo supercel, Sulphuric Acid, Caustic Soda, Methanol, Calcium Oxide, Alum - in all 1463 MTs per month and noticed that the monthly requirement of Hydrogen was 76 500 NM. As the industry is coal based, large quantity coal is required. It would produce huge quantities of BSS, HCO, HSA, Methyl, Fatty acids, Epoxidise, Glyceren etc. Hydroxy Stearic Acid, methyl Hydroxy Stearic



Acid and methanol are serious health hazardous. Items in part II list of Schedule I to the 'Manufacture, Storage and Import of Hazardous Chemicals Rules, 1989' are the raw materials and RW2 (Dr. G.S. Siddhu) in his evidence agreed that these are hazardous (toxic) chemicals. The solid effluents generated every day are (i) spent bleaching earth 1250 Kgs, (ii) spent bleaching carbon 250 kgs, (iii) spent nickel catalyst '15 kgs. and (iv) sodium sulphate 3820 Kgs. (12-HSA) and 170 kgs. (from CME). Monthly turn out of effluents will be 400 MT. Every day 55 kgs. of nickel is consumed. Every day, 27,830 litres of water are to be used and normally the effluent will carry all these hazardous substances, including nickel. 'As it is, said that the water used could be reused for cultivation of lands in the premises of the industry, the toxic chemicals which get lodged in the surface layers of the soil will flow down in storm run offs or percolate into the ground water, to ultimately reach the water body of the two reservoirs. The NEAA further stated that Dr. Santappa in his evidence as RW-1 made admissions regarding gaseous effluents-fly ash, $SO_2$ $CO_2$ Oxides of Nitrogen, Oxides of Sulphur and suspended particulate matter. The solid and liquid effluents could reach the lakes through seepage. The factory cannot be located in the catchment area because run-offs due to rain will carry hazardous material along surface and through seepage. The NEAA adverted to the 'Drainage Basic Analysis' by the Central Ground Water Board, to the effect that the Basin "has moderate run-off and moderately high permeability of the terrain. As such the amount of infiltration is considerably high". The said Report shows that rainfall in 796 mm (heaviest being 1326 mm) and there is every likelihood of the solids being "transported down along the gradient". The said Report of Central Ground Water Board, referred to "dolerite dykes" in the vicinity and the possibility of flow even more. Having regard to the location of the dyke and the speed and angle, the polluted water could reach Himayat Sagar which is hardly 2 m bgl. since the dam height is 1763.50 feet. Satellite maps of NSRA were also examined and relied for this purpose. Among the substances stored are nickel, sulphuric acid, HCA, which are well-known 'hazardous' substances.

54. The NEAA pointed out that the 'Engineering Package' provided by the IICT to the industry (Ex. p. 29) as found in the agreement with the I1CT, "does not refer at all to the nature of pollutants to be generated in this industry or to the methods adopted to control them, as asserted by RW2". The NEAA pointed out that in fact clause 17(5) of Annexure IV to the agreement stated that 'the scope of supply (engineering package) does not include design of effluent treatment system'. On this ground the article in IICT Bulletin (Ex.R 1) was rejected by the NEAA.

55. The NEAA also referred to the Report of the three man Technical Committee of the Andhra Pradesh Pollution Control Board consisting of Dr. J.M. Dave (PW 3) and that "accidents and human failure are the most probable causes for spillage and it is unrealistic to give a 'zero spillage', and specially to their report on 'nickel' and held that the respondent industry has high pollution potentiality under issue a(ii).

56. The NEAA, then took up issue (b) as to the likelihood of the industry affecting the sensitive catchment area. It referred to the Expert Committee Report of the HMWSSB and its recommendations which led to the issuance of the GO 192 dated 31.3.94 and GO 111 dated 8.3.96. The NEAA concluded that the "establishment of any chemical industry, carries with it, the imminent dangers of the chemicals or chemical effluents polluting the water of Himayat Sagar and Osman Sagar,

57. Thus, the exhaustive Report of the NEAA has gone against the 7th respondent industry.

(B) Report of Bombay University Department of Chemical Technology headed by Dr. Bhowmick:

58. The Department of Chemical Technology, Bombay University, in its Report dated 16.8.2000 have gone into the other aspects as to what should be the safeguards to be taken by the industry if the appellant-Board's letter dated 16.7.97 is to be applied. Dr. Bhowmick suggested that 'No nickel catalyst whether present in any solid waste or in any solution be allowed to spill on floor/ground. The process should not emit gaseous harmful vapours. Adequate and ready safety measures must be made available for accidental leakage/ spillage situations. They then gave six suggestions - storage tanks to be surrounded by bunds; that it is. not advisable to use



hydrochloric acid but sulphuric acid may be used. Again, accidental leakage of ammonia will be catastrophic. Alternately, hydrogen gas may be brought in cylinders. He expressed doubts about plate and frame filter press or of leaf filters. Quantity of methanol stored should not exceed more than a week's requirement. The floor washing water should pass through oil traps and thin properly treated in an effluent treatment plant. If salt and ionic impurities are not removed, it may produce ground water contamination.

(C) Report of National Geophysical Research Institute, Hyderabad

59. Finally, the NGRI, Hyderabad has given a very detailed and exhaustive report about "IMPACT OF DYKE". They conducted (i) field investigations, (ii) Hydro geological studies, (iii) Geophysical investigation, (iv) Electric Resistively investigation (v) Magnetic survey and (vi) Tracer studies. The Report is a voluminous one.

60. The final conclusion after an exhaustive analysis of various types of data "from results of multi- parameter investigations carried out in the area, is that hydraulic connectivity exists across the dolerite dyke located between Chouderguda and Sirsilmuktha/facilitating the ground water movement.... In the post monsoon scenario, the groundwater table will go up and thereby may result in more groundwater flow across the dyke.

61. Our conclusion on the basis of these Reports:

> In the light of the above exhaust he scientific Reports of the National Environmental Appellate Authority, New Delhi the Department of Chemical Technology, Bombay University and the National Geophysical Research Institute, Hyderabad - it cannot be said that the two lakes will not be endangered. The package of the IICT - which did not deal with the elimination of effluent effects, the opinion of Dr. Santappa, the view of Director of Industries, and the view of the Government of Andhra Pradesh must be held to be base on insufficient data and not scientifically accurate.

62. It is no doubt stated by the 7th respondent that it is prepared to adopt the safety measures suggested by the appellant Board on 1.7.97 and also those suggested by Dr. Bhowmick, by trying to see that during storage of raw materials and after release of the hazardous liquids, they are put in containers and removed.

63. In respect of these drinking water reservoirs which cater to the needs of about 70 or 80 lakhs population, we cannot rely upon a bare assurance that care will be taken in the storage of serious hazardous materials. Nor can we rely on an assurance that these hazardous substances would be effectively removed without spillage. It is, in our view, not humanly possible for any department to keep track whether the pollutants are not spilled over. This is exactly where the 'precautionary principle' comes into play. The chance of an accident, within such close proximity of the reservoirs cannot be ruled out, as pointed out in the Reports. Thus, we are led to the inference that there is a very great risk that these highly hazardous material could seep into the earth and reach the tanks, after passing through the dolerite dykes, as pointed by the National Geophysical Research Institute, Our inference from facts and the reports is that of a reasonable person, as pointed out in the main judgment in A.P. Pollution Board v. Prof. M.V. Nayudu.

64. On the basis of the scientific material now obtained by this Court from three highly reputed sources, this is certainly not a fit case for directing grant of NOC by the Pollution Control Board. It is not also possible to hold that the safeguards suggested by the appellant Board - pursuant to the direction of the Government dated 3.7,97, will be adequate, in the light of the Reports. We therefore hold that in the facts of this case, the Board could not be directed to suggest safeguards and there is every likelihood that safeguards could fail either due to accident, as stated in the report, or due to human error. We, therefore, hold on point 3 against the 7th respondent-industry.

Point 4:



65. This point deals with the principle of promissory estoppel applied by the appellate authority, on the ground that once building permission and permission for change of land use were granted, the appellant Board could not refuse NOC, The learned Additional Solicitor General, Sri R.N. Trivedi referred to the amendment to Section 25(1) in this connection.

66. Under Section 25(1) of the Water (Prevention and Control of Pollution) Act, 1974 as it original stood, Sub-section (1) thereof read as follows:

> Section 25(1): Subject to the provisions of this section, no person shall, without the previous consent of the State Board, bring into use any new or altered outlet for the discharge of sewage or trade effluent into a stream or well or begin to make any new discharge of sewage or trade effluent into a stream or well'.

67. By Central Act 53/1988, the sub-section was amended and reads as follows:

> Section 25(1): Subject to the provisions of this section, no person shall, without the previous consent of the State Board - (a) establish or take any steps to establish any industry, operation or process, or any treatment and disposal system or any extension or addition thereto, which is likely to discharge sewage or trade effluent into a stream or well or sewer or on land (such discharge being hereafter in this section referred to as discharge of sewage) or (b) bring into use any new or altered outlet for the discharge of sewage, or (c) bring to make any new discharge or sewage….

68. After the amendment, the prohibition now extends even to 'establishment' of the industry of taking of steps for that process and therefore before consent of the Pollution Board is obtained, neither can the industry be established nor any steps can be taken to establish it.

69. The learned Additional Solicitor General of India, Sri Trivedi is right in contending that the 7th respondent industry ought not to have taken steps to obtain approval of plans by the Gram Panchayat, nor for conversion of land use by the Collector, nor should it have proceeded with civil work in a installation of machinery. The action of the industry being contrary to the provisions of the Act, no equities can be claimed.

70. The learned Appellate Authority erred in thinking that because of the approval of plan by the Panchayat, or conversion of land use by the Collector or grant of letter of intent by the Central Government, a case for applying principle of "promissory estoppel" applied to the facts of this case. There could be no estoppel against the statute. The industry could not therefore seek an NOC after violating the policy decision of the Government. Point 4 is decided against the 7th respondent accordingly.

Point 5:

71. In this Court's earlier judgment dated 27.1.99, this Court referred to the need for constituting environmental Courts, tribunals, or appellate bodies comprising of environmental scientists/experts as members. We had then referred to the need to constitute Environmental Courts as done in New South Wales in Australia. In this Court's earlier judgment, responses of various States and Universities were called for in this behalf. Some States & Union Territories have responded but several have not responded.

72. We may in this connection refer to the recent report entitled 'Environmental Court Project' published on 18.2.2000 by a Research team at the Department of Land Economy, University of Cambridge, UK, headed by Prof. Malcoum Grant. (See Journal of Planning and Environment, May, 2000 p.453 titled 'The use for Environmental Courts'). The aim of the team was to explore the concept of an Environmental Court in the light of the experience in other jurisdictions and in Australia and New Zealand in particular. The concepts referred to in the Report are

> (a) a specialist and exclusive jurisdiction;



(b) a power to determine merits appeals;

(c) vertical and horizontal integration, by this is meant a wide environmental jurisdiction which integrates both subject matter and different types of legal proceedings;

(d) ball marks of a Court or tribunal;

(e) dispute resolution powers, it is pointed out that this Court extend to disputes over the formulation of policy as well as more traditional adjudication;

(f) expertise, the members would be specialist in environmental matters;

(g) access, there would be broad rights of access to the Court;

(h) informality of procedures - such as the use of alternative dispute resolution procedures;

(i) costs - this is linked to the need for access and involves means of overcoming the problem of high costs inhibiting access; or

(j) capacity for innovation.

73. The Report puts forward a proposal for a two-tier Environmental Court. The Court would have jurisdiction and powers including judicial review and civil procedure powers while dealing with environmental matters.

74. Inasmuch as most of the statutes dealing with Environment are by Parliament, we would think that the Law Commission could kindly consider the question of review of the environmental laws and the need for Constitution of Environmental Courts with experts In environmental law, in addition to-judicial members, in the light of experience in other countries. Point 5 is decided accordingly.

Point 6:

75. Learned Counsel for the seventh respondent referred to the existence of several other industries within the 10 k.m. radius of the two reservoirs, which have been granted permission earlier. According to him, these industries are also polluting 'industries. In our view, the Environmental (Protection) Act, 1986 and the Water Act, 1974 and the Air Act, 1981 have enough provision applicable not only to new industries proposed to be established but also to existing industries.

76. The State of Andhra Pradesh is therefore directed hereby to identify these industries located within 10 K.M. radius of these two lakes and to take action in consultation with the A.P. Pollution Control Board to prevent pollution to the drinking water in these two reservoirs. The State and the Board shall not permit any polluting industries within the 10 km radius. A report shall be submitted to this Court by the State of Andhra Pradesh in this behalf within four months from today, in regard to the pollution or pollution potential of industries, if any, existing within 10 K.M. of the lakes. After the Report is received, the matter may be listed. Point 6 is decided accordingly.

77. In the result, the appeals are allowed, the judgment of the High Court and the order of the appellate authority under Section 28 of the Water Act, 1974 are set aside and the order of the appellant Board refusing permission to the seventh respondent under Section 25 of the Water Act is restored.

78. Before parting, with the case, we acknowledge the excellent Reports submitted to this Court



by the three expert bodies on the basis of scientific/ technological research of a very high order. The amount of hard work done by these three bodies is commendable. But for these expert reports it would have been very difficult for this Court to resolve the complicated scientific issues involved in this case, with confidence. It will be open to the three expert bodies (1) National Environmental Appellate Authority, New Delhi (2) The University Department of Chemical Technology (Autonomous), Matunga, Bombay headed by Dr. Bhowmick and (3) The National Geophysical Research Institute, Tarnaka, Hyderabad, to submit their list of expenses or fee, if any, to the State of Andhra Pradesh, through the appellant Board. If any claims for monies are made, the same shall be paid by the State of Andhra Pradesh.

79. Appeals are allowed as stated above. No costs.

80. List the matter after 4 months, after the Report of the State of Andhra Pradesh as directed above, is received.

© Manupatra Information Solutions Pvt. Ltd.