**IN THE UNITED STATES DISTRICT COURT**      **1:15 – CV – 00612**
**FOR THE DISTRICT OF COLUMBIA**

**BUDHA ISMAIL JAM & OTHERS**      ...     **Plaintiffs**

**Versus**

**INTERNATIONAL FINANCE CORPORATION**  ...     **Defendant**

**CORRECTED DECLARATION OF RITIN RAI**

I, RITIN RAI an Advocate, having an office at C-443, Defence Colony, New Delhi - 24, India submit this Corrected Declaration to include the language required by 28 U.S.C. § 1746, which was inadvertently omitted from my declaration of 18 September 2015. Except for the title, this paragraph, the date and the addition of the required language, this declaration is identical to my previous declaration. I again state as follows:

1.     I currently practice as an Advocate appearing in Courts and Tribunals in New Delhi, with a focus on commercial and corporate disputes. My educational qualifications and legal experience are as follows.

2.     After an undergraduate degree in Economics from St. Stephen's College, Delhi University (1992), I completed my Bachelor of Laws (LL.B) from Delhi University (1995). I was enrolled as an Advocate with the Bar Council of India in 1995 entitling me to practice in courts across India. I was subsequently awarded the Radhakrishanan British Chevening scholarship to study for the Bachelor of Civil Laws degree at the University of Oxford (1997) and thereafter, I obtained an LL.M. from the Harvard Law School (1998).

3.     After graduating from Harvard Law School in 1998, I passed the New York State Bar Examination in July 1998 and I was admitted as an Attorney in New York State in 1999. I joined Jones Day, Reavis & Pogue (now Jones Day) in Cleveland, Ohio and practiced as an associate in the Business Practice Group from September 1998 to July 2000. I relocated to India in July 2000 to Pathak & Associations (now P&A Law Offices), an Indian law firm and

practiced principally in the M&A and cross-border corporate finance areas. In January 2004, I transitioned to a litigation practice and joined the Chambers of Ashok H. Desai, a Senior Advocate and former Attorney General for India. I also began my own practice at that time and now practice independently.

4.    I have been requested by EarthRights International, counsel for the Plaintiffs, to make this statement in relation to certain Indian law issues arising out the Plaintiffs' claims against International Finance Corporation (**IFC**), the Defendant. In particular, the purpose of my statement is to set out the Indian law position in respect of claims founded on the torts of negligence, nuisance (public and private) and trespass.

5.    In order to make this statement, I have reviewed the following documents:

(i)    The class action complaint dated 23 April 2015 filed by the Plaintiffs in the United States District Court for the District of Columbia for damages and equitable relief;

(ii)    The Defendant's Memorandum of Law dated 1 July 2015 in support of its motion to dismiss; and

(iii)    The affidavit of Cyril Shroff (the **Statement of Cyril Shroff**) dated 1 July 2015 containing his opinion of matters on Indian law.

6.    Insofar as the content of this statement is within my personal knowledge, it is true. Insofar as it is not within my personal knowledge, it is true to the best of my knowledge, information and belief. I verify that the contents of my statement are true and correct.

7.    Nothing in this statement is intended to waive privilege in any of the matters to which I refer.

8.    Attached to this statement is a true bundle of documents to which I will refer in this statement.

**INDIAN LAW ISSUES ADDRESS IN THIS STATEMENT**

9.    As stated above, the present complaint against IFC is founded, among others, on the torts of negligence, nuisance (public and private) and trespass. I have been requested to make this statement in relation to the availability of remedies founded on these torts in Indian law and to address the analysis of these torts, as contained in the Statement of Cyril Shroff.

A.    **NEGLIGENCE**

*Tort of Negligence*

10.   The tort of negligence is recognized in Indian law. In *Jay Laxmi Salt Works (P) Ltd. v. State of Gujarat*,[1] the Supreme Court of India adopted the following definition:

> *"11. 'Negligence' ordinarily means failure to do statutory duty or otherwise giving rise to in damage, undesired by the defendant, to the plaintiff. Thus its ingredients are —*
>
> *(a) a legal duty on the part of A towards B to exercise care in such conduct of A as falls within the scope of the duty;*
> *(b) breach of that duty;*
> *(c) consequential damage to B."*[2]

11.   Similarly, in *Rajkot Municipal Corporation v. Manjulben Jayantilal Nakum and Ors.*,[3] the Supreme Court of India identified the following contours of negligence:

> *"12. ... The question whether duty exists in a particular situation involves determination of law. Negligence would in such acts and omissions involve an unreasonable risk of harm to others. The breach*

---

[1] (1994) 4 SCC 1.

[2] Ibid ¶ 11. See also, *Jacob Mathew v. State of Punjab and Anr* (2005) 6 SCC 1, ¶ 10-12.

[3] (1997) 9 SCC 552.

> *of duty causes damage and how much is the damage should be comprehended by the defendant. Remoteness is relevant and compensation on proof thereof requires consideration. The element of carelessness in the breach of the duty and those duties towards the plaintiff are important components in the tort of negligence. Negligence would mean careless conduct in commission or omission of an act connoting duty, breach and the damage thereby suffered by the person to whom the plaintiff owes. Duty of care is, therefore, crucial to understand the nature and scope of the tort of negligence."*[4]

### Analysis of the Claim of Tort of Negligence contained in the Statement of Cyril Shroff

12.    Although I agree with the ingredients for an action of negligence contained in the Statement of Cyril Shroff, I am unable to agree with the conclusion that "under Indian law, no duty is cast upon the lender, under the theory of negligence to ensure that the borrower does not violate environmental norms".[5]

13.    The issue of whether a duty of care exists in a particular fact situation is determined on a case by case analysis. In fact, the Supreme Court of India has repeatedly cautioned against limiting the concept of duty of care. It has held that the concept of duty, its reasonableness, the standard of care required cannot be put in strait-jacket.[6]

14.    Although in *Rajkot Municipal Corporation v. Manjulben Jayantilal Nakum & Ors.*,[7] (a case relied on in the Statement of Cyril Shroff) the Supreme Court found, on the facts of that case, that the municipal corporation did not owe a duty of care to the plaintiff's husband who died on account of a tree falling on him, the Court reached a different conclusion in *Municipal Corporation of Delhi v. Sushila Devi & Ors.*[8] In that case too, a branch of a tree owned by the municipal authority fell and resulted in a death. The plaintiffs rested their case not on any statutory duty on the part of the municipal authority but on

---

[4] Ibid ¶ 12.

[5] Statement of Cyril Shroff, ¶ 54.

[6] *Jay Laxmi Salt Works (P) Ltd v. State of Gujarat* (1994) 4 SCC 1, ¶ 11.

[7] (1997) 9 SCC 552, ¶ 63

[8] (1999) 4 SCC 317.

4

its failure or negligence to perform a duty under common law. The Supreme Court of India found that "the law is well settled that if there is a tree standing on the defendant's land which is dried or dead and for that reason may fall and the defect is one which is either known or should have been known to the defendant, then the defendant is liable for any injury caused by the fall of the tree"[9] and upheld the decision of the High Court "...holding the Municipal Corporation negligent in performing its duty under the common law and therefore liable in damages to the plaintiffs for the injury caused to the deceased by fall of the branch of the tree and the consequences flowing therefrom".[10]

15.    I would therefore place reliance on the Supreme Court's observation in *Rajkot Municipal Corporation v. Manjulben Jayantilal Nakum and Ors.* that a person is under a duty of care not to create a source of danger to the safety and well-being of public and property that he could reasonably foresee would be potentially affected by such danger[11] as identifying the principle on which a duty of care is founded – viz., foseeability.  If such danger is in fact caused and damage is suffered, a cause of action arises, making the defendant liable to pay damages.[12]

16.    In the present fact situation (and based on the averments in the class action complaint), it appears that IFC had foreseen that the Tata Mundra project would potentially have adverse environmental and social impacts. It had listed the project as a 'Category A' project which indicates that the project is 'expected to have significant adverse social and/or environmental impacts that are diverse, irreversible, or unprecedented'.[13]  The Plaintiffs in the present case were such persons likely to be affected by the foreseen impacts of the project as their lives and livelihoods are dependent on areas located in close proximity to the project. In such a situation, I am unable to conclude that, under Indian law, IFC owed no duty of care to persons likely to be

---

[9] Ibid ¶ 13.

[10] Ibid ¶ 14.

[11] (1997) 9 SCC 552, ¶ 13.

[12] Ibid ¶ 13.

[13] Complaint, ¶ 129.

affected by the plant's impacts or that (as Mr. Shroff concludes) "no duty is cast upon the lender under the theory of negligence to ensure that the borrower does not violate environmental norms".[14]

17.     In the decisions of the National Green Tribunal referred to in the Statement of Cyril Shroff viz., *Vitthal Gopichand Bhungase v. The Gangakhed Sugar and Energy Ltd.*,[15] and *Ramubhai Kariyabhai Patel & Ors. v. Union of India & Ors.*,[16] the Tribunal found industries to be liable for negligence as their actions resulted in pollution in the surrounding areas. However, in both cases the Tribunal does not discuss (or reject) liability of any other party other than the polluting industry.  In that respect therefore, the cases do not enable me to reach the conclusion reached in the Statement of Cyril Shroff.

18.     Although I have not found cases against a lender for acts of the borrower, I am not aware of any statutory provisions or case law pursuant to which Indian law would impose a separate set of rules of tortious liability to lenders' acts.  I may refer to three judgments of the Supreme Court of India to support the claim made by the plaintiffs in the present case and to analyse the manner in which Indian law addresses itself to situations where more than one defendant may be liable.

19.     In *Municipal Corporation of Delhi, Delhi v. Association of Victims of Uphaar Tragedy and Ors.*,[17] the Supreme Court was concerned with a case where a fire in a cinema theatre had led to the death of 59 patrons and injury to 103 patrons.  The High Court of Delhi had identified the causes that led to the calamity and held the theatre owner, the Delhi Vidyut Board (the state electricity board), the Municipal Corporation of Delhi and the licensing authority responsible for the fire tragedy.  The Supreme Court confirmed the liability imposed on the theatre owner. It also found the Delhi Vidyut Board to be negligent in the maintenance of the transformers which led to the root cause of the incident, namely, the starting of the fire, and accordingly held the

---

[14] Statement of Cyril Shroff, ¶ 54.
[15] O.A. No. 30 of 2013
[16] O.A. No. 87 of 2013.
[17] (2011) 14 SCC 481.

Delhi Vidyut Board liable. The Court also examined the liability of the Municipal Corporation of Delhi and the licensing authority and in the facts of the case, found that no liability could be affixed on them as there was no close or direct proximity between them and the cause of fire.[18]   The judgment is instructive to explain that multiple parties can be held liable if a duty of care exists and if there is causation.

20.   The Supreme Court of India in *New India Assurance Company Limited v. Zuari Industries Limited & Ors.*[19] discussed the meaning of 'proximate cause' in the context of a fire causing damage to the property of the plaintiff.  The Court while relying on decisions of foreign courts concluded that "proximate cause is not the cause which is nearest in time or place but the active and efficient cause that sets in motion a train or chain of events which brings about the ultimate result without the intervention of any other force working from an independent source".[20] Although the discussion in this judgment refers to "the" proximate cause, I read the judgment as contemplating the possibility that there can be, in a given case, more than a proximate cause for a particular outcome.

21.   In *Pramod Malhotra & Ors. v. Union of India & Ors.,*[21] a claim was made against the Reserve Bank of India (**RBI**) alleging that it breached its duty of care in issuing a license to Sikkim Banking Limited (**SBL**) despite being aware of deficiencies and irregularities in the functioning of SBL.  Depositors of SBL claimed damages on account of this breach of the duty of care.  On the facts of the case, the Court declined to impose liability on the RBI holding that "RBI did not have day-to-day management or control on SBL". Further, the relationship of RBI with creditors or depositors of SBL was not such that it would be just or reasonable to impose a liability in negligence on RBI.[22] This case demonstrates that a party may be liable if it is found to be in control of a tortfeasor or if its relationship with the plaintiff is such that it would be just or

---

[18] Ibid ¶55.

[19] (2009) 9 SCC 70.

[20] Ibid ¶ 14.

[21] (2004) 3 SCC 415.

[22] Ibid ¶ 25.

reasonable to impose a liability in negligence on that party.   Thus, although control is an indicia on which liability can be found, even absent control, liability can be affixed depending on the nature of the relationship between the defendant and the plaintiff.

22.     Applying these principles to the present case, notwithstanding wrongs that may also be alleged against any other entity, IFC may be held liable for the damage suffered by the Plaintiffs.  From the facts stated in the complaint it appears that the Tata Mundra project would not have been possible without the funds extended by IFC. Not only has IFC substantially funded the Tata Mundra project, it also enabled additional funding for the project; exercised substantial control over its design and construction, including preventive and mitigation measures and continues to exercise substantial control over the project.[23]  In the ultimate analysis, the finding that a duty of care exists will be a finding of fact.

23.     As stated by me above, I am unable to conclude that no duty of care is cast on a lender to potential plaintiffs in respect of a project financed by a lender. Further, in light of the factors described above, it is not possible to conclude that an Indian court would not find, as a matter of fact, that IFC owed a duty of care to the plaintiffs in respect of consequences that were forseeable. The argument gets fortified by the environmental and social action planwhich was made a necessary condition to the loan advanced by IFC to Coastal Gujarat Power Limited (**CGPL**).  To the extent the plaintiffs are able to establish that there was a breach of this duty of care, a Court may find that Indian law affords a remedy and hold IFC liable.

24.     I am therefore unable to agree with Mr. Shroff's conclusion that "no duty is cast upon the lender under the theory of negligence to ensure that the borrower does not violate environmental norms".[24]

---

[23] Complaint Section IV.
[24] Statement of Cyril Shroff, ¶ 54.

**B.    NUISANCE**

25.    Indian courts have found various forms of environmental pollution to constitute nuisance under the law: effluent released from an alcohol factory onto a public street;[25] emission of carbon black from a rubber factory;[26] use of loudspeakers and amplifiers;[27] noise produced by the non-stop operation of the oil mill engines[28] and flour mills;[29] exploitation of groundwater from residential areas for commercial purposes and plying heavy vehicles in the early mornings in residential areas;[30] stench from a toilet;[31] and smoke emitted from a furnace using steam coal.[32]

26.    The Supreme Court of India in *Vasant Manga Nikumba v. Baburao Bhikanna Naidu*[33] has held that "nuisance is an inconvenience which materially interferes with the ordinary physical comfort of human existence".[34] The Court added that nuisance is not capable of precise definition.[35] This was reiterated by the Court subsequently in *State of Madhya Pradesh v. Kedia Leather*, where the Court relied on a statement made in the Halbury's Laws of England:

> *"even at the present day there is not entire agreement as to whether certain acts or omissions shall be classed as nuisances or whether they do not rather fall under other divisions of the law of tort."*[36]

---

[25] *Municipal Council, Ratlam v. Vardichand and Others* (1980) 4 SCC 162.

[26] *P.C. Cherian v. State of Kerala* MANU/KE/0090/1981.

[27] *Noise Pollution (V), In Re* (2005) 5 SCC 733.

[28] *Sri Gopal Saha v. Sri Uttam Saha* 2013 (4) GLT 990.

[29] *Datta Mal Chiranji Lal v. L. Ladli Prasad and Anr.* AIR 1960 All 632.

[30] *R. Kumaravel Gounder v. The Sub Divisional Executive Magistrate Sub Collector, Hosur* 2012(4) CTC 661.

[31] *Abdul Hakim & Anr. v. Ahmad Khan* AIR 1985 MP 88.

[32] *Mahmood Ilahi v. Smt. Dayawati and Anr.* 1989 (15) ALR 158.

[33] (1995) Supp (4) SCC 54.

[34] Ibid ¶3.

[35] Ibid.

[36] (2003) 7 SCC 389, ¶8.

27.   For nuisance to be established, the plaintiff has to establish damage – actual or potentially imminent. In *Rafat Ali v. Sugni Bai*,[37] the Supreme Court of India held that suffering of damage must be proved in a case of nuisance unless it can be presumed by law to exist. For the damage to amount to actionable nuisance, it must be substantial or at least of some significance.[38] If the damage is insignificant or evanescent or trivial, it would not be actionable nuisance.[39] The Court then extracted a passage from the Halsbury's Laws of England wherein it was stated that 'the damage need not consist of pecuniary loss, but it must be material or substantial, that is, it must not be merely sentimental, speculative or trifling, or damage that is merely temporary, fleeting or evanescent'.[40]

28.   There is limited discussion in Indian case law on the issue of causation of nuisance. Section 268, Indian Penal Code (**IPC**) holds a person responsible for any act or illegal omission that *causes* injury, danger, obstruction or annoyance to be guilty of public nuisance. Under Section 133 Code of Criminal Procedure (**CrPC**), the Magistrate issues orders to the person *causing* the nuisance.  My review of relevant case law did not reveal a discussion on the meaning and ambit of the word 'cause'. Causation of nuisance could, potentially, include material or significant contribution that facilitated the completion of the acts that caused the nuisance. The acts may have been committed by a different entity but the lender could also be held separately liable for its material contribution in committing the nuisance. In the present fact situation, without IFC's loan CGPL could not have undertaken the acts which are causing the nuisance, and therefore IFC could be held liable as the lender.

29.   In Indian law, nuisance is of two kinds: (1) public nuisance and (2) private nuisance. The Supreme Court of India has distinguished between the two in *Rafat Ali v. Sugni Bai-*

---

[37] (1999) 1 SCC 133.
[38] Ibid ¶16.
[39] Ibid.
[40] Ibid.

> *"Nuisance as understood in law is broadly divided into two classes – public nuisance and private nuisance. The former consists of some acts or omissions which result in violation of rights which one enjoys in common with other members of the public. But the latter i.e., private nuisance, is one which interferes with a person's use and enjoyment of immovable property or some right in respect of it."*[41]

30.   The distinction between the two lies in the quantum of annoyance, discomfort, and injury.[42] Furthermore, Indian courts while relying on English authorities have held that public nuisance is always a criminal offence; but a private nuisance need not always be.[43] In other words, all acts constituting public nuisance are unlawful acts; those which constitute private nuisances are not necessarily unlawful.

### Public Nuisance

31.   Public nuisance is defined in Section 268 of the IPC. Section 268, IPC states:

> *"A person is guilty of a public nuisance who does any act or is guilty of an illegal omission which causes any common injury, danger or annoyance to the public or to the people in general who dwell or occupy property in the vicinity, or which must necessarily cause injury, obstruction, danger or annoyance to persons who may have occasion to use any public right.*
>
> *A common nuisance is not excused on the ground that it causes some convenience or advantage."*

32.   As can be seen from the definition of public nuisance, to prove that a particular action is a public nuisance, it is not necessary to prove that it hazardous to health. It is adequate to show that it causes annoyance to the public.[44] The statute does not place definitional constraints on who could be the person liable for public nuisance and therefore any person who causes the annoyance falls within the mischief of the statute.

---

[41] (1999) 1 SCC 133, ¶14.

[42] *Vasant Manga Nikumba v. Baburao Bhikanna Naidu* (1995) Supp (4) SCC 54, ¶3.

[43] *Dhannalal and Anr. v. Thakur Chittarsingh Mehtapsingh* AIR 1959 MP 240; *Mahmood Ilahi v. Smt. Dayawati and Anr.* 1989 (15) ALR 158.

[44] *P.C. Cherian v. State of Kerala* MANU/KE/0090/1981.

33.    In Indian law remedies for public nuisance are found in general laws: the
       IPC,[45] the CrPC,[46] and the Code of Civil Procedure (**CPC**);[47] special laws: such
       as Water (Prevention and Control of Pollution) Act 1974, and the Air
       (Prevention and Control of Pollution) Act 1981, and local laws: such as the
       rent control laws and laws governing functions and powers of municipalities.
       The remedies, depending on the legal provision invoked, could be a penalty in
       the form of fine or imprisonment; an injunction or restraint order;
       cancellation or modification of regulatory approvals, etc. These actions can be
       brought by private parties as well as the State.

### Private Nuisance

34.    Indian courts have generally relied on English authorities to define private
       nuisance and its parameters.[48] The Punjab and Haryana High Court in *Ram
       Lal v. Mustafabad Oil and Cotton Ginning Factory and Ors*.[49] found that the
       noise and vibrations emitting from the defendant's machinery had caused
       damage to the plaintiff's property and amounted to actionable nuisance. The
       High Court while granting a permanent injunction, enumerated certain

---

[45] IPC, Section 290 and Section 291.

[46] CrPC, Section 133 to 144. These provisions confer powers on a Magistrate to injunct or
restrain the public nuisance. The Supreme Court in a landmark judgment in *Municipal
Council, Ratlam v. Vardichand* ((1980) 4 SCC 162, ¶ 13) discussed the import of Section 133
CrPC is detail. It held:

> "*Section 133 CrPC is categoric, although reads discretionary. Judicial discretion
> when facts for its exercise are present, has a mandatory import. Therefore, when the
> sub-Divisional Magistrate, Ratlam, has, before him, information and evidence,
> which disclose the existence of a public nuisance and, on the materials placed, he
> considers that such unlawful obstruction or nuisance should be removed from any
> public place which may be lawfully used by the public, he shall act. Thus, his judicial
> power shall, passing through the procedural barrel, fire upon the obstruction or
> nuisance, triggered by the jurisdictional facts. The Magistrate's responsibility under
> Section 133 CrPC is to order removal of such nuisance within a time to be fixed in the
> order.*"

[47] CPC, Section 91. The suit under this provision may be instituted by the Advocate General, or
by two or more persons with the leave of the Court. Such persons need not have suffered
special damage due to the public nuisance.

[48] *Dhannalal and Anr. v. Thakur Chittarsingh Mehtapsingh* AIR 1959 MP 240; *Mahmood
Ilahi v. Smt. Dayawati and Anr.* 1989 (15) ALR 158; *Abdul Hakim & Anr. v. Ahmad Khan*
AIR 1985 MP 88.

[49] AIR1968 P&H 399.

principles based on its review of English and Indian case law to determine actionable (private) nuisance. It held that the degree or the extent of the annoyance or the inconvenience is to be considered; and each case depended largely on its own facts as annoyance or inconvenience is difficult to measure exactly.[50] The Court also held that 'a substantial fear or reasonable apprehension of danger, may constitute a nuisance'.[51]

35.    The Allahabad High Court has held that the consequences of the activity have to be of substantial magnitude, and cannot be trivial to amount to actionable nuisance. The test applied by the Court was "the test of ascertaining the reaction of a reasonable person according to the ordinary usage of mankind living in a particular society in respect of the thing complained of".[52] Elaborating on the test, the Court held that the reasonable person does not include "hyper sensitive persons" or "persons attuned to a dainty mode of living".[53] Further, the Court held that while determining whether a particular act is causing discomfort, the location of the property is a relevant circumstance.[54]

36.    The judgment of the High Court of Madras in *Pakkle and Ors. v P. Aiyasami Ganapathi and Ors.*[55] highlighted another aspect of private nuisance. It held that interference with some easement or quasi-easement or other right used or enjoyed in connection with land could also constitute nuisance.[56] In that case, the plaintiffs had filed a suit to restrain the defendants from laying salt pans around a tank as the plaintiffs and other villagers used the water from the tank to drink and bathe, and to bathe their cattle, and the defendants' actions were rendering the water unusable. The Court held that even though the plaintiffs did not own the tank (it was owned by the government), the plaintiffs had established a common right to use the tank water, and therefore

---

[50] Ibid ¶25.
[51] Ibid.
[52] *Dr. Ram Baj Singh v. Babulal* AIR 1982 All 285, ¶12.
[53] Ibid ¶19.
[54] Ibid ¶13.
[55] AIR 1969 Mad 351.
[56] Ibid ¶3.

any interference in the enjoyment of that right would give rise to a cause of action. It ruled in favour of the plaintiff and issued an injunction against the defendant. The Court dismissed claims by the defendant that since there were other persons who were responsible for making the waters of the tank brackish, an injunction against them alone cannot be passed.[57] A similar defence taken by the defendants in *Shanmughavel Chettiar and Ors. v. Sri Ramkumar Ginning Firm* was dismissed by the Madras High Court.[58] The defendants in that case wanted to set up brick kilns and the plaintiff was seeking an injunction as the kilns were potentially hazardous to his cotton ginning firm situated nearby. The Court ruled in favour of the plaintiff, and also held that it was no defence for the defendants to state that there were other brick kilns in the neighbourhood and therefore they should also be permitted.[59]  These cases highlight that multiple defendants may be liable for a particular act of nuisance.

37.    The remedy for private nuisance lies in criminal and civil law. In criminal law, while the IPC and CrPC provisions only deal with public nuisance, special and local laws do provide remedy for private nuisance. For example, under Section 43 of the Air (Prevention and Control of Pollution) Act 1981, a complaint may be filed in the Court of the Metropolitan Magistrate or a Judicial Magistrate First Class in case of emissions by units beyond permissible limits. In civil law, the plaintiff may file a suit under the Specific Relief Act 1963 or under Order XXXIX, Rule 1 and 2, CPC, seeking an injunction for abatement of nuisance and/or damages.[60] In *Kuldip Singh v. Subhash Chander Jain & Ors.*, the Supreme Court of India held that "[i]n order to obtain an injunction it must be shown that the injury complained of as present or impending is such as by reason of its gravity, or its permanent character, or both, cannot be adequately compensated in damages".[61]

---

[57] Ibid ¶4.

[58] AIR 1987 Mad 28.

[59] Ibid ¶29.

[60] *Kachrulal Bhagirath Agrawal and Ors. v. State of Maharashtra and Ors.* (2005) 9 SCC 36.

[61] (2000) 4 SCC 50, ¶9.

### *Analysis of the Claim of Nuisance Contained in the Statement of Cyril Shroff*

38.     The Statement of Cyril Shroff concludes "that an operator of the plant can be liable for nuisance if it is established that the operator is continuously releasing polluted air and water in the community".[62] The opinion refers to case law to support the conclusion (contained at paragraph 67) that "there is no legal basis for asserting these claims against a lender, such as IFC...". I discuss the case law mentioned in the Statement of Cyril Shroff below:

39.     In *Wali Uddin and Anr. v. State of U.P. and Anr.*,[63] the High Court of Allahabad was faced with a claim of nuisance, as the defendant's manufacturing unit was causing noise and leading to cracks in the buildings in the locality. The Court while relying on several English authorities provides various definitions for public and private nuisance and concludes that the nuisance complained of constituted public nuisance. The Court's final verdict – to stay proceedings under the CrPC – was based on the ground that the existence of a public right had to be first determined by a civil court, and the Magistrate could not have proceeded without an appropriate inquiry under Section 137, CrPC. Given the facts, the Court was not required to determine causation or the issue of liability. It appears that the Statement is relying on this judgment principally to provide a definition for nuisance based on English law.

40.     The High Court of Gujarat in *Ushaben Navinchandra Trivedi and Anr. v. Bhagyalaxmi Chitra Mandir and Ors.*[64] found that the mere fact that the defendant's movie shocked the plaintiffs' religious sentiments did not amount to an infringement of any legal right and therefore the question of granting an injunction did not arise as it was not clear that the exhibition of the film would be a nuisance. As the Court did not find in favour of the plaintiffs, the issue of liability was not considered. The Statement appears to rely on this

---

[62] Statement of Cyril Shroff, ¶ 56.
[63] 1988 AWC 25 All.
[64] AIR 1978 Guj 13.

judgment to identify two elements of the tort. Beyond the identification of elements of tort, the relevance of this case to the present matter may be limited as it did not deal with nuisance in the context of damage to the environment or physical discomfort or injury.

41.   The Supreme Court of India in *Balwant Singh v. Commissioner of Police & Ors.*[65] was principally concerned with the issue of noise pollution as a form of nuisance. It relied extensively on a previous decision of the Court in *Noide Pollution (V), In re,*[66] and gave orders for strict compliance of the Court's directions in that judgment. The statement appears to rely on the judgment to the extent that it states that a person affected by nuisance could seek remedy against those who caused such nuisance. The judgment does not discuss the issue of causation or of liability any further, and therefore its relevance to the present matter is limited.

42.   The statement relies on two judgments of the National Green Tribunal. In the first one, *Kehar Singh v State of Haryana,*[67] the applicant filed an application under Section 14 of the National Green Tribunal Act 2010 challenging the construction of a Sewage Treatment Plant in close proximity to a residential area, a temple and agricultural land. Besides causing severe environmental harm and hurting religious sentiments, the applicant claimed that the plant did not have the necessary regulatory approval (commonly known as the environmental clearance under the EIA Notification 2006). The Tribunal found that the plant did fall under the category of projects that required a prior environmental clearance and directed it to obtain the clearance before further activities. The judgment does not discuss the law on nuisance. The Statement appears to rely on this judgment to state that the claims had been brought against the operator of the plant, and not the lender.   An environmental clearance under the EIA Notification 2006 has to be sought by the project proponent, i.e. the operator, and therefore the applicant may have decided to implead the operator as a party to the case. Whether a lender could have been held liable for the omission on part of the plant's operator to obtain

---

[65] (2015) 4 SCC 801.
[66] (2005) 5 SCC 733.
[67] MANU/GT/0067/2013.

the environmental clearance is a question not addressed at all in the judgment as it was not likely raised in the application.

43. The second decision of the National Green Tribunal, in *SK Shetye and Leonardo Rodrigues v Ministry of Environment and Forests*,[68] deals with the operations of a Municipal Solid Waste (MSW) plant and its status of compliance with the relevant Municipal Solid Waste (Management and Handling) Rules 2000. The Tribunal found the plant and the Municipal Council not to be in compliance with the relevant rules, and issued directions for time bound actions by the plant operator and the concerned regulatory agencies. It also directed the parties to deposit costs which would be used for environmental restoration. Although the judgment does not clarify, it follows from the judgment that the parties were directed to pay for the failure to comply with, and ensure compliance of, MSW Rules. This judgment also does not discuss the law on nuisance. The Statement appears to rely on it to the extent the operator of the plant was held liable, and not the plant's lenders. But it is pertinent that the judgment does not discuss the liability of the operator's lender/s, if any, and it is quite possible that the same had not been raised by the applicants in the first place.

44. From a review of the case law relied on in the Statement, I conclude that the case law does not rule out the lender's liability for the actions of the person or entity causing the nuisance. None of the case law discussed in the Statement substantively dealt with the issue of causation and subsequent liability, and therefore I am unable to agree with the conclusion reached in the Statement of Cyril Shroff that "there is no legal basis for asserting these claims against a lender".[69]

45. Although my review of case law of the Supreme Court of India, the High Courts and the National Green Tribunal has not revealed any precedent for lender's liability in case of nuisance caused by a project financed by it, it has also not revealed any precedent that affirmatively excludes such form of

---

[68] MANU/GT/0060/2014.

[69] Statement of Cyril Shroff, ¶ 67.

liability.  The ordinary principles of causation discussed above would apply even to analyse liability for the tort of nuisance.

## C.   TRESPASS

46.  Trespass may be committed (1) by entering upon the land of the plaintiff, or (2) by remaining there, or (3) by doing an act affecting the sole possession of the plaintiff, in each case without justification.[70] The present case would fall in the third type of trespass. Criminal trespass is a crime under Section 441 of the Indian Penal Code, but I do not address criminal trespass in this statement.

47.  In *Abdul Gani v. Saduram*,[71] the Rajasthan High Court while considering whether discharge of filthy water on plaintiff's land amounted to trespass by the defendant, distinguished between nuisance and trespass and held:

> *"Nuisance is usually created by acts done by the defendant on the land in occupation or in some place of public resort, adjoining or in the neighbourhood of the land in occupation of the plaintiff, trespass occurs by entry upon or remaining upon the land in possession of the plaintiff or by placing or projecting any material object upon it in each case without lawful jurisdiction. The present case would have been a pure case of nuisance if the discharge of filthy water had collected on the land of the defendant and caused an unlawful interference with the plaintiff's use or enjoyment of his 'gali' or other property such as by emitting foul smell etc. But since the spout throws water on the plaintiff's land, it amounts to trespass and the tortious act continues as long as the discharge of filthy water otherwise continues. It is a continuing wrong and until it repairs into a right by prescription, the cause of action continues..."*

48.  The judgment was finally in favour of the defendant on the ground of, acquiescence by the plaintiff, and therefore the question of liability did not arise in the judgment. But the point of law in terms of what constitutes trespass was clearly stated.

---

[70] Justice GP Singh, RATANLAL & DHIRAJLAL: THE LAW OF TORTS (26th edn, LexisNexis Butterworths Wadhwa Nagpur, 2010) 386.
[71] 1977 WLN 641.

49. In India, the tort of trespass in actionable *per se* and there is no requirement to show evidence of damage. This is distinguishable from the tort of private nuisance which is actionable only on proof of damage being shown.[72] The Kerala High Court in *HMT Ltd. v. TK Simon*[73] held:

> "*If the interference is direct and controlled by the defendant's volition, it is a case of trespass to land. For example, if the defendant were to cross onto the land of the plaintiff or if the defendant were to construct a building in his own property in such a way as to project into the neighbouring land of the plaintiff or if the defendant were to dump garbage or other waste in the plaintiffs land or to cause any physical object or noxious substance to cross the boundary onto the plaintiffs land or discharge filthy water upon the plaintiffs land or erect a sign - board projecting into the super incumbent air space of the plaintiff, then the defendant could be said to have committed trespass to land. This is based on the distinction that the injury caused is direct and not consequential and the defendant had control over the act complained of.*"

50. In this case the defendant company was not found liable for the damage caused to the plaintiff's property by a tree growing in the defendant's land due to lack of evidence that the defendant could have anticipated the mishap in any way.

### Analysis of the Claim of Trespass Contained in the Statement of Cyril Shroff

51. The Statement of Cyril Shroff relies on a judgment of the Supreme Court of India in *Laxmi Ram Pawar v. Sitabai Balu Dhotre and Another,*[74] wherein the Court was considering the issue of eviction and whether the definition of occupier under the law applicable to the subject property included a trespasser. The Court considers the definition of trespass, trespass *ab initio*, and continuing trespass and relies on various authorities for the same. It comes to the conclusion that occupier includes trespasser and therefore necessary statutory approval was required before eviction proceedings could commence. The Statement appears to rely on this judgment to make the point

[72] *HMT Ltd. v. TK Simon* 2009 (2) KLJ 545.
[73] Ibid.
[74] (2011) 1 SCC 356.

19

that if a complainant can prove encroachment on land owned by him, he can take action against the encroacher – but not the lender. It may be stated that the judgment relied on does not discuss liability for trespass, as the issue did not arise from the facts of the case.

52. The second judgment quoted by the opinion is a judgment of the National Green Tribunal and as the opinion itself states is not entirely relevant to the present fact situation as it deals with physical encroachment. From an extensive review of case law of the National Green Tribunal it appears that the Tribunal is yet to make a pronouncement which deals substantively on the tort of trespass and liability arising from it.

### *Remarks in Conclusion*

53. Based on my review of Indian law, I am unable to conclude that Indian law excludes lender liability.  If the elements of each tort – negligence, nuisance and trespass – are established in the facts of the case, a lender may be held liable.

54. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Signed:      _Ritin Rai_
             Ritin Rai


Dated:       28 October 2015

## INDEX OF STATUTORY PROVISIONS AND JUDGMENTS

[1]     Section 91 of the Code of Civil Procedure 1908

[2]     Sections 133 - 144 of the Code of Criminal Procedure, 1973

[3]     Sections 268, 290 and 291 of the Indian Penal Code

[4]     Relevant provisions of the Air (Prevention and Control of Pollution) Act, 1981

[5]     Jay Laxmi Salt Works (P) Ltd. v. State of Gujarat (1994) 4 SCC 1

[6]     Rajkot Municipal Corporation v. Manjulben Jayantilal Nakum and Others (1997) 9 SCC 552

[7]     Jacob Mathew v. State of Punjab and Another (2005) 6 SCC 1

[8]     Municipal Corporation of Delhi v. Sushila Devi (Smt) and Others (1999) 4 SCC 317

[9]     Vitthal Gopichand Bhungase v. The Gangakhed Sugar and Energy Ltd. (MANU/GT/0076/2014)

[10]    Ramubhai Kariyabhai Patel and Others v. Union of India, through Secretary and Others (MANU/GT/0012/2014)

[11]    Municipal Corporation of Delhi, Delhi v. Uphaar Tragedy Victims Association and Others (2011) 14 SCC 481

[12]    New India Assurance Company Limited v. Zuari Industries Limited and Others (2009) 9 SCC 70

[13]    Pramod Malhotra and Others v. Union of India and Others (2004) 3 SCC 415

[14]    Municipal Council, Ratlam v. Shri Vardichan and Others (1980) 4 SCC 162

[15]    P. C. Cherian v. State of Kerala (MANU/KE/0090/1981)

[16]    Noise Pollution (V), In Re (2005) 5 SCC 733

[17]    Sri Gopal Saha v. Sri Uttam Saha (MANU/GH/0310/2013)

[18]    Datta Mal Chiranji Lal v. L. Ladli Prasad and Anr. (MANU/UP/0184/1960)

[19]    R. Kumaravel Gounder v. The Sub Divisional Executive magistrate Sub Collector, Hosur, Krishnagiri District and The Commissioner, Hosur Municipality, Hosur, Krishnagiri District (MANU/TN/0646/2012)

[20]    Abdul Hakim and Anr. v. Ahmad Khan (MANU/MP/0016/1985)

[21]    Mahmood Ilahi v. Smt. Dayawati and Anr. (MANU/UP/0910/1988)

[22]    Vasant Manga Nikumba and Others v. Baburao Bhiknna Naidu (Deceased) by LRS. And Another 1995 Supp (4) SCC 54

[23]    State of M.P. v. Kedia Leather & Liquor Ltd. and Others (2003) 7 SCC 389

[24]    Rafat Ali v.Sugni Bai and Others (1999) 1 SCC 133

[25]    Dhannalal    and    Anr.    v.    Thakur    Chittarsingh    Mehtapsingh (MANU/MP/0078/1959)

[26]    Ram Lal v. Mustafabad Oil and Cotton Ginning Factory and Ors. (MANU/PH/0089/1968)

[27]    Dr. Ram Baj Singh v. Babulal (MANU/UP/0286/1982)

[28]    Pakkle and Ors. v. P. Aiyasami Ganapathi and Ors. (MANU/TN/0215/1969)

[29]    Shanmughavel    Chettiar    and    Ors.    v.    Sri    Ramkumar    Ginning    Firm (MANU/TN/0109/1987)

[30]    Kachrulal Bhagirath Agrawal and Others v. State of Maharashtra and Others (2005) 9 SCC 36

[31]    Kuldip Singh v. Subhash Chander Jain and Others (2000) 4 SCC 50

[32]    Wali Uddin and Anr. v. State of U.P. and Anr. (MANU/UP/0414/1987)

[33]    Ushaben Navinchandra Trivedi and Anr. v. Bhagyalaxmi Chitra Mandir and Ors. (MANU/GJ/0057/1978

[34]    Balwant Singh v. Commissioner of Police and Others (2015) 4 SCC 801

[35]    Kehar    Singh    v.    State    of    Haryana,    Through    the    Secretary (MANU/GT/0067/2013)

[36]    Mr. S. K. Shetye and Mr. Leonordo Rodrigues v. Ministry of Environment and Forests, through the Secretary and Ors. MANU/GT/0060/2014

[37]    Abdul Gani v. Saduram and Ors. (MANU/RH/0530/1977)

[38]    Laxmi Ram Pawar v. Sitabai Balu Dhotre and Another (2011) 1 SCC 356

Declaration of Ritin Rai

Exhibit 1

# The
# Code of Civil
# Procedure, 1908

*along with*

STATE AND HIGH COURT AMENDMENTS

*with*

SHORT NOTES AND SUBJECT INDEX

*with*
SHORT NOTES



Universal
Law Publishing Co. Pvt. Ltd.
NEW DELHI - INDIA

    (c) judicial settlement including settlement through Lok Adalat; or

    (d) mediation.

(2) Where a dispute has been referred—

    (a) for arbitration or conciliation, the provisions of the Arbitration and Conciliation Act, 1996 (26 of 1996) shall apply as if the proceedings for arbitration or conciliation were referred for settlement under the provisions of that Act;

    (b) to Lok Adalat, the Court shall refer the same to the Lok Adalat in accordance with the provisions of sub-section (1) of section 20 of the Legal Services Authority Act, 1987 (39 of 1987) and all other provisions of that Act shall apply in respect of the dispute so referred to the Lok Adalat;

    (c) for judicial settlement, the Court shall refer the same to a suitable institution or person and such institution or person shall be deemed to be a Lok Adalat and all the provisions of the Legal Services Authority Act, 1987 (39 of 1987) shall apply as if the dispute were referred to a Lok Adalat under the provisions of that Act;

    (d) for mediation, the Court shall effect a compromise between the parties and shall follow such procedure as may be prescribed.]

*Special case*

**90. Power to state case for opinion of Court.**—Where any persons agree in writing to state a case for the opinion of the Court, then the Court shall try and determine the same in the manner prescribed.

[1]*[Public nuisances and other wrongful acts affecting the public]*

**91. Public nuisances and other wrongful acts affecting the public.**—[2][(1) In the case of a public nuisance or other wrongful act affecting, or likely to affect, the public, a suit for a declaration and injunction or for such other relief as may be appropriate in the circumstances of the case, may be instituted,—

    (a) by the Advocate-General, or

    (b) with the leave of the Court, by two or more persons, even though no special damage has been caused to such persons by reason of such public nuisance or other wrongful act.]

(2) Nothing in this section shall be deemed to limit or otherwise affect any right of suit which may exist independently of its provisions.

[3]**92. Public charities.**—(1) In the case of any alleged breach of any express or constructive trust created for public purposes of a charitable or religious nature, or where the direction of the Court is deemed necessary for the administration of any such trust, the Advocate-General, or two or more persons having an interest in the trust and having obtained the [4][leave of the Court] may institute a suit, whether contentious or not, in the principal Civil Court of original jurisdiction or in any other Court empowered in that behalf by the State

1. Subs. by Act 104 of 1976, sec. 30, for the former heading (w.e.f. 1-2-1977).

2. Subs. by Act 104 of 1976, sec. 30, for sub-section (1) (w.e.f. 1-2-1977).

3. Section 92 shall not apply to any religious trust in Bihar, *See* Bihar Act 1 of 1951.

4. Subs. by Act 104 of 1976, sec. 31 for "consent in writing of the Advocate-General" (w.e.f. 1-2-1977).

**11. Property attached before judgment not to be re-attached in execution of decree.**—Where property is under attachment by virtue of the provisions of this order and a decree is subsequently passed in favour of the plaintiff, it shall, not be necessary upon an application for execution of such decree to apply for a re-attachment of the property.

[1]**[11A. Provisions applicable to attachment.**—(1) The provisions of this Code applicable to an attachment made in execution of a decree shall, so far as may be, apply to an attachment made before judgment which continues after the judgment by virtue of the provisions of rule 11.

(2) An attachment made before judgment in a suit which is dismissed for default shall not become revived merely by reason of the fact that the order for the dismissal of the suit for default has been set aside and the suit has been restored.]

*HIGH COURT AMENDMENT*

**Madras.**—In Order XXXIX, after Rule 11A, *insert* the following rule, namely:—

"11B. *Order of attachment to be communicated to the registering officer.*—Any order of attachment passed under rule 5 or 6 of this order and any order raising the attachment passed under rule 9 of this order shall be communicated to the registering officer within the local limits of whose jurisdictions the whole or any part of the immovable property completed in such order, is situate."

[*Vide* Tamil Nadu Government Gazette, Pt. III, Sec. 2, dated 15th July, 1987.]

**12. Agricultural produce not attachable before judgment.**—Nothing in this Order shall be deemed to authorize the plaintiff to apply for the attachment of any agricultural produce in the possession of an agriculturist, or to empower the Court to order the attachment or production of such produce.

[2]**[13. Small Cause Court not to attach immovable property.**—Nothing in this Order shall be deemed to empower any Court of Small Causes to make an order for the attachment of immovable property.]

*HIGH COURT AMENDMENT*

**Kerala.**—In Order XXXVIII, in rule 13, for the words "Court of Small Causes", substitute the words "Court exercising Small Cause jurisdiction".

[*Vide* Notification No. B1-3312/58, dated 9th June, 1959.]

ORDER XXXIX

TEMPORARY INJUNCTIONS AND INTERLOCUTORY ORDERS

*Temporary injunctions*

**1. Cases in which temporary injunction may be granted.**—[3][***] Where in any suit it is proved by affidavit or otherwise—

      (a)  that any property in dispute in a suit is in danger of being wasted, damaged or alienated by any party to the suit, or wrongfully sold in execution of a decree, or

---

1. Ins. by Act 104 of 1976, sec. 85 (w.e.f. 1-2-1977).
2. Ins. by Act 1 of 1926, sec. 4.
3. Rule 1 renumbered as sub-rule (1) of that rule by Act 46 of 1999, sec. 30 and section 30 of the Act 46 of 1999, by which it was so re-numbered, has been omitted by Act 22 of 2002, sec. 16 (w.e.f. 1-7-2002).

    (b) that the defendant threatens, or intends, to remove or dispose of his property with a view to [1][defrauding] his creditors,

[2][(c) that the defendant threatens to dispossess, the plaintiff or otherwise cause injury to the plaintiff in relation to any property in dispute in the suit,]

the Court may by order grant a temporary injunction to restrain such act, or make such other order for the purpose of staying and preventing the wasting, damaging, alienation, sale, removal or disposition of the property [2][or dispossession of the plaintiff, or otherwise causing injury to the plaintiff in relation to any property in dispute in the suit] as the Court thinks fit, until the disposal of the suit or until further orders.

[3][***]

### HIGH COURT AMENDMENTS

**Andhra Pradesh.**—For Order XXXIX, for rule 1, substitute the following rule, namely:—

"1. Where in any suit it is proved by affidavit or otherwise—

    (a) that any property in dispute in a suit is in danger of being wasted, damaged or alienated by any party to the suit, or wrongfully sold in execution of a decree, or

    *(b) that the defendant threatens, or intends to remove or dispose of his property with a view to defraud his creditors; or*

    (c) that the defendant threatens to dispossess the plaintiff, or otherwise cause injury or loss to the plaintiff,

the Court may by order grant a temporary injunction to restrain such act or make such other order for the purpose of staying and preventing the wasting damaging alienation sale, removal or disposition of the property, or dispossessing or otherwise causing injury or loss as the Court thinks fit, until the disposal of the suit or until further orders." (w.e.f. 26-7-1956).

**Calcutta.**—In Order XXXIX,—

    (a) renumber rule 1 as sub-rule (1) thereof; and

    (b) after sub-rule (1) as so renumbered, insert the following sub-rules, namely:—

"(2) In case of disobedience, or of breach of the terms of such temporary injunction or order, the Court granting the injunction or making such order may order the property of the person guilty of such disobedience or breach to be attached, and may also order such person to be detained in the civil person for a term not exceeding six months, unless in the meantime the Court directs his release.

(3) The property attached under sub-rule (2) may, when the Court considers it fit so to direct, be sold and, out of the proceeds, the Court may award such compensation to the injured party as it finds proper and shall pay the balance, if any, to the party entitled thereto." (w.e.f. 3-2-1933)

**Gauhati.**—Same as in Calcutta.

**Kerala.**—Order XXXIX,—

    (a) renumber rule 1 as sub-rule (1) thereof;

    (b) in sub-rule (1) as so renumbered, in clause (a), after the words "wrongfully sold", insert the words "or delivered";

---

1. Subs. by Act 104 of 1976, sec. 86 "for defraud" (w.e.f. 1-2-1977).
2. Ins. by Act 104 of 1976, sec. 86 (w.e.f. 1-2-1977).
3. Sub-rule (2) ins. by Act 46 of 1999, sec. 30 and section 30 of the Act 46 of 1999, by which it was so inserted, has been omitted by Act 22 of 2002, sec. 16 (w.e.f. 1-7-2002).

(c) after sub-rule (1) as so renumbered, inset the following sub-rule, namely:—

"(2) In case of disobedience of any order passed under sub-rule (1) the Court granting injunction may proceed against the person guilty of such disobedience under sub-rules (3) and (4) of rule 2 of this Order." (w.e.f. 9-6-1959)

**Orissa.**—Same as in Patna.

**Patna.**—In Order XXXIX, in rule 1, at the end, insert the following provisos, namely:—

"Provided that no such temporary injunction shall be granted if it would contravene the provisions of section 56 of the Specific Relief Act (Act 1 of 1877):

Provided further that an injunction to restrain a sale, or confirmation of a sale, or to restrain delivery of possession, shall not be granted except in a case where the applicant cannot lawfully prefer, and could not lawfully have preferred, a claim to the property or objection to the sale, or to the attachment preceding it, before the Court executing the decree."

## COMMENTS

(i) The interlocutory orders are made in aid of final orders and not vice versa. No interlocutory order will survive after the original proceeding comes to an end; *Shipping Corporation of India Ltd.* v. *Machado Brothers*, AIR 2004 SC 2093.

(ii) No ex-parte relief by way of injunction or stay especially with respect to public *project and schemes or economic policies or schemes should be granted. It is only when the Court is satisfied for good and valid reasons,* that there will be irreparable and irretrievable damage can an injunction be issued after leaving all the parties; *Balco Employees Union* v. *Union of India*, AIR 2002 SC 350.

**2. Injunction to restrain repetition or continuance of breach.**—(1) In any suit for restraining the defendant from committing a breach of contract or other injury of any kind, whether compensation is claimed in the suit or not, the plaintiff may, at any time after the commencement of the suit, and either before or after judgment, apply to the Court for a temporary injunction to restrain the defendant from committing the breach of contract or injury complained, of, or any breach of contract or injury of a like kind arising out of the same contract or relating to the same property or right.

(2) The court may by order grant such injunction, on such terms as to the duration of the injunction, keeping an account, giving security, or otherwise as the court thinks fit.

[1][***]

## STATE AMENDMENTS

**Madhya Pradesh.**—In Order XXXIX, in rule 2, in sub-rule (2), insert following proviso, namely—

"Provided that no such injunction shall be granted—

(a) where no perpetual injunction could be granted in view of the provisions of section 38 and section 41 of the Specific Relief Act, 1963 (47 of 1963); or

(b) to stay, the operation of an order for transfer, suspension, reduction in rank, compulsory retirement, dismissal, removal or otherwise termination of service of, or taking charge from, any person appointed to public service and post in connection with the affairs of the State including any employee of any company or Corporation owned or controlled by the State Government; or

(c) to stay, any disciplinary proceeding, pending or intended or, the effect of any adverse entry against any person appointed to public service and post in connection with the affairs of the State including any employee of the company owned or controlled by the State Government; or

(d) to restrain any election; or

---

1. Sub-rules (3) and (4) omitted by Act 104 of 1976, sec. 86 (w.e.f. 1-2-1977).

(e) to restrain any auction intended to be made or, to restrain the effect of any auction made by the Government; or to stay the proceedings for the recovery of any dues recoverable as land revenue unless adequate security is furnished;

and any order for injunction granted in contravention of these provisions shall be void."

[*Vide* Madhya Pradesh Act 29 of 1984, sec. 8 (w.e.f. 14-8-1984).]

Uttar Pradesh.—In Order XXXIX, in rule 2, in sub-rule (2), insert the following proviso:—

"Provided that no such injunction shall be granted—

(a) where no perpetual injunction could be granted in view of the provisions of section 38 and section 41 of the Specific Relief Act, 1963 (47 of 1963), or

(b) to stay the operation of an order for transfer, suspension, reduction in rank, compulsory retirement, dismissal, removal or otherwise termination of service of, or taking charge from, any employee including any employee of the Government, or

(c) to stay any disciplinary proceeding pending or intended or, the effect of any adverse entry, against any employee of the Government, or

(d) to affect the internal management of affairs of any educational institution including a University, or a Society, or

(e) to restrain any election, or

(f) to restrain, any auction intended to be made or, the effect of any auction made, by the Government *[unless adequate security is furnished], or

(g) to stay the proceedings for the recovery of any dues recoverable as land revenue unless adequate security is furnished, or

(h) in any matter where a reference can be made to the Chancellor of a University under any enactment for the time being in force;

and any order for injunction granted in contravention of these provisions shall be void."

[*Vide* Uttar Pradesh Act 57 of 1976, sec. 13 (w.e.f. 1-1-1977). * Ins. by Notification, dated 3rd February, 1981 (w.e.f. 3-10-1981).]

## COMMENTS

Appeal against injunction Order—Powers of Court—The High Court cannot set aside the order of injunction granted by trial Court without discussing the material on record and recording a contrary finding; *Sree Jain Swetambar Terapathi Vid(s)* v. *Phundan Singh*, AIR 1999 SC 2322.

[1]**[2A. Consequence of disobedience or breach of injunction.**—(1) In the case of disobedience of any injunction granted or other order made under rule 1 or rule 2 or breach of any of the terms on which the injunction was granted or the order made, the Court granting the injunction or making the order, or any Court to which the suit or proceeding is transferred, may order the property of the person guilty of such disobedience or breach to be attached, and may also order such person to be detained in the civil prison for a term not exceeding three months, unless in the meantime the Court directs his release.

(2) No attachment made under this rule shall remain in force for more than one year, at the end of which time, if the disobedience or breach continues, the property attached may be sold and out of the proceeds, the Court may award such compensation as it thinks fit to the injured party and shall pay the balance, if any, to the party entitled thereto.]

---

1. Ins. by Act 104 of 1976, sec. 86 (w.e.f. 1-2-1977).

Declaration of Ritin Rai

Exhibit 2

# Universal's
# Criminal
# Manual

*Containing*
## Code of Criminal Procedure, 1973
as amended by
The Code of Criminal Procedure
(Amendment) Act, 2010 (41 of 2010)

## Indian Penal Code (45 of 1860)
as amended by
The Information Technology (Amendment)
Act, 2008 (10 of 2009)

## Indian Evidence Act, 1872
as amended by
The Information Technology (Amendment)
Act, 2008 (10 of 2009)

## RITIN RAI
ADVOCATE
C-443 DEFENCE COLONY
NEW DELHI-110024



**Universal**
Law Publishing Co. Pvt. Ltd.
NEW DELHI - INDIA

# PART I
## The Code of Criminal Procedure, 1973

(a)   with the sanction of the Central Government where such person is an officer or member of the armed forces;

(b)   with the sanction of the State Government in any other case.

(2) (a) No Executive Magistrate or police officer acting under any of the said sections in good faith;

(b) no person doing any act in good faith in compliance with a requisition under section 129 or section 130;

(c) no officer of the armed forces acting under section 131 in good faith;

(d) no member of the armed forces doing any act in obedience to any order which he was bound to obey,

shall be deemed to have thereby, committed an offence.

(3) In this section and in the preceding sections of this Chapter,—

(a)   the expression "armed forces" means the military, naval and air forces, operating as land forces and includes any other Armed Forces of the Union so operating;

(b)   "officer", in relation to the armed forces, means a person commissioned, gazetted or in pay as an officer of the armed forces and includes a junior commissioned officer, a warrant officer, a petty officer, a non-commissioned officer and a non-gazetted officer;

(c)   "member", in relation to the armed forces, means a person in the armed forces other than an officer.

### B.—*Public nuisances*

**133. Conditional order for removal of nuisance.**—(1) Whenever a District Magistrate or a Sub-divisional Magistrate or any other Executive Magistrate specially empowered in this behalf by the State Government, on receiving the report of a police officer or other information and on taking such evidence (if any) as he thinks fit, considers—

(a)   that any unlawful obstruction or nuisance should be removed from any public place or from any way, river or channel which is or may be lawfully used by the public; or

(b)   that the conduct of any trade or occupation, or the keeping of any goods or merchandise, is injurious to the health or physical comfort of the community, and that in consequence such trade or occupation should be prohibited or regulated or such goods or merchandise should be removed or the keeping thereof regulated; or

(c)   that the construction of any building, or, the disposal of any substance, as is likely to occasion conflagration or explosion, should be prevented or stopped; or

(d)   that any building, tent or structure, or any tree is in such a condition that it is likely to fall and thereby cause injury to persons living or carrying on business in the neighbourhood or passing by, and that in consequence the removal, repair or support of such building, tent or structure, or the removal or support of such tree, is necessary; or

   (e)  that any tank, well or excavation adjacent to any such way or public place should be fenced in such manner as to prevent danger arising to the public; or

   (f)  that any dangerous animal should be destroyed, confined or otherwise disposed of,

such Magistrate may make a conditional order requiring the person causing such obstruction or nuisance, or carrying on such trade or occupation, or keeping any such goods or merchandise, or owning, possessing or controlling such building, tent, structure, substance, tank, well or excavation, or owning or possessing such animal or tree, within a time to be fixed in the order—

   (i)  to remove such obstruction or nuisance; or

   (ii)  to desist from carrying on, or to remove or regulate in such manner as may be directed, such trade or occupation, or to remove such goods or merchandise, or to regulate the keeping thereof in such manner as may be directed; or

   (iii)  to prevent or stop the construction of such building, or to alter the disposal of such substance; or

   (iv)  to remove, repair or support such building, tent or structure, or to remove or support such trees; or

   (v)  to fence such tank, well or excavation; or

   (vi)  to destroy, confine or dispose of such dangerous animal in the manner provided in the said order;

or, if he objects so to do, to appear before himself or some other Executive Magistrate subordinate to him at a time and place to be fixed by the order, and show cause, in the manner hereinafter provided, why the order should not be made absolute.

(2) No order duly made by a Magistrate under this section shall be called in question in any Civil Court.

*Explanation.*—A "public place" includes also property belonging to the State, camping grounds and grounds left unoccupied for sanitary or recreative purposes.

**134. Service or notification of order.**—(1) The order shall, if practicable, be served on the person against whom it is made, in the manner herein provided for service of a summons.

(2) If such order cannot be so served, it shall be notified by proclamation, published in such manner as the State Government may, by rules, direct, and a copy thereof shall be stuck up at such place or places as may be fittest for conveying the information to such person.

**135. Person to whom order is addressed to obey or show cause.**—The person against whom such order is made shall—

   (a)  perform, within the time and in the manner specified in the order, the act directed thereby; or

   (b)  appear in accordance with such order and show cause against the same.

**136. Consequences of his failing to do so.**—If such person does not perform such act or appear and show cause, he shall be liable to the penalty prescribed in that behalf in section 188 of the Indian Penal Code (45 of 1860), and the order shall be made absolute.

**137. Procedure where existence of public right is denied.**—(1) Where an order is made under section 133 for the purpose of preventing obstruction, nuisance or danger to the public in the use of any way, river, channel or place, the Magistrate shall, on the appearance before him of the person against whom the order was made, question him as to whether he denies the existence of any public right in respect of the way, river, channel or place, and if he does so, the Magistrate shall, before proceeding under section 138, inquire into the matter.

(2) If in such inquiry the Magistrate finds that there is any reliable evidence in support of such denial, he shall stay the proceedings until the matter of the existence of such right has been decided by a competent Court; and, if he finds that there is no such evidence, he shall proceed as laid down in section 138.

(3) A person who has, on being questioned by the Magistrate under sub-section (1), failed to deny the existence of a public right of the nature therein referred to, or who, having made such denial, has failed to adduce reliable evidence in support thereof, shall not in the subsequent proceedings be permitted to make any such denial.

**138. Procedure where he appears to show cause.**—(1) If the person against whom an order under section 133 is made appears and shows cause against the order, the Magistrate shall take evidence in the matter as in a summons-case.

(2) If the Magistrate is satisfied that the order, either as originally made or subject to such modification as he considers necessary, is reasonable and proper, the order shall be made absolute without modification or, as the case may be, with such modification.

(3) If the Magistrate is not so satisfied, no further proceedings shall be taken in the case.

**139. Power of Magistrate to direct local investigation and examination of an expert.**—The Magistrate may, for the purposes of an inquiry under section 137 or section 138—

    (a)   direct a local investigation to be made by such person as he thinks fit; or

    (b)   summon and examine an expert.

**140. Power of Magistrate to furnish written instructions, etc.**—(1) Where the Magistrate directs a local investigation by any person under section 139, the Magistrate may—

    (a)   furnish such person with such written instructions as may seem necessary for his guidance;

    (b)   declare by whom the whole or any part of the necessary expenses of the local investigation shall be paid.

(2) The report of such person may be read as evidence in the case.

(3) Where the Magistrate summons and examines an expert under section 139, the Magistrate may direct by whom the costs of such summoning and examination shall be paid.

**141. Procedure on order being made absolute and consequences of disobedience.—**(1) When an order has been made absolute under section 136 or section 138, the Magistrate shall give notice of the same to the person against whom the order was made, and shall further require him to perform the act directed by the order within a time to be fixed in the notice, and inform him that, in case of disobedience, he will be liable to the penalty provided by section 188 of the Indian Penal Code (45 of 1860).

(2) If such act is not performed within the time fixed, the Magistrate may cause it to be performed, and may recover the costs of performing it, either by the sale of any building, goods or other property removed by his order, or by the distress and sale of any other movable property of such person within or without such Magistrate's local jurisdiction and if such other property is without such jurisdiction, the order shall authorise its attachment and sale when endorsed by the Magistrate within whose local jurisdiction the property to be attached is found.

(3) No suit shall lie in respect of anything done in good faith under this section.

**142. Injunction pending inquiry.—**(1) If a Magistrate making an order under section 133 considers that immediate measures should be taken to prevent imminent danger or injury of a serious kind to the public, he may issue such an injunction to the person against whom the order was made, as is required to obviate or prevent such danger or injury pending the determination of the matter.

(2) In default of such person forthwith obeying such injunction, the Magistrate may himself use, or cause to be used, such means as he thinks fit to obviate such danger or to prevent such injury.

(3) No suit shall lie in respect of anything done in good faith by a Magistrate under this section.

**143. Magistrate may prohibit repetition or continuance of public nuisance.—**A District Magistrate or Sub-divisional Magistrate, or any other Executive Magistrate empowered by the State Government or the District Magistrate in this behalf, may order any person not to repeat or continue a public nuisance, as defined in the Indian Penal Code (45 of 1860), or any special or local law.

*C.—Urgent cases of nuisance or apprehended danger*

**144. Power to issue order in urgent cases of nuisance or apprehended danger.—**(1) In cases where, in the opinion of a District Magistrate, a Sub-divisional Magistrate or any other Executive Magistrate specially empowered by the State Government in this behalf, there is sufficient ground for proceeding under this section and immediate prevention or speedy remedy is desirable, such Magistrate may, by a written order stating the material facts of the case and served in the manner provided by section 134, direct any person to

abstain from a certain act or to take certain order with respect to certain property in his possession or under his management, if such Magistrate considers that such direction is likely to prevent, or tends to prevent, obstruction, annoyance or injury to any person lawfully employed, or danger to human life, health or safety, or a disturbance of the public tranquillity, or a riot, or an affray.

(2) An order under this section may, in cases of emergency or in cases where the circumstances do not admit of the serving in due time of a notice upon the person against whom the order is directed, be passed *ex parte*.

(3) An order under this section may be directed to a particular individual, or to persons residing in a particular place or area, or to the public generally when frequenting or visiting a particular place or area.

(4) No order under this section shall remain in force for more than two months from the making thereof:

Provided that, if the State Government considers it necessary so to do for preventing danger to human life, health or safety or for preventing a riot or any affray, it may, by notification, direct that an order made by a Magistrate under this section shall remain in force for such further period not exceeding six months from the date on which the order made by the Magistrate would have, but for such order, expired, as it may specify in the said notification.

(5) Any Magistrate may, either on his own motion or on the application of any person aggrieved, rescind or alter any order made under this section, by himself or any Magistrate subordinate to him or by his predecessor-in-office.

(6) The State Government may, either on its own motion or on the application of any person aggrieved, rescind or alter any order made by it under the proviso to sub-section (4).

(7) Where an application under sub-section (5), or sub-section (6) is received, the Magistrate, or the State Government, as the case may be, shall afford to the applicant an early opportunity of appearing before him or it, either in person or by pleader and showing cause against the order, and if the Magistrate or the State Government, as the case may be, rejects the application wholly or in part, he or it shall record in writing the reasons for so doing.

### COMMENTS

(1) Order under section 144 is amenable to writ jurisdiction on violation of any Fundamental Right; *Gulam Abbas* v. *State of Uttar Pradesh*, AIR 1981 SC 2198: (1981) Cr LJ 1835.

(2) As far as possible customary right of a community should not be disturbed; *Gulam Abbas* v. *State of Uttar Pradesh*, AIR 1981 SC 2198: (1981) Cr LJ 1835.

[1]**[144A. Power to prohibit carrying arms in procession or mass drill or mass training with arms.**—(1) The District Magistrate may, whenever he considers it necessary so to do for the preservation of public peace or public safety or for the maintenance of public order, by public notice or by order, prohibit in any area within the local limits of his jurisdiction, the carrying of arms in any procession or the organising or holding of, or taking part in, any mass drill or mass training with arms in any public place.

1. Ins. by Act 25 of 2005, sec. 16.

# PART II
## The Indian Penal Code
### (45 of 1860)

Case 1:15-cv-00612-JDB Document 24-1 Filed 11/10/15 Page 39 of 288

**267. Making or selling false weight or measure.**—Whoever makes, sells or disposes of any instrument for weighing, or any weight, or any measure of length or capacity which he knows to be false, in order that the same may be used as true, or knowing that the same is likely to be used as true, shall be punished with imprisonment of either description for a term which may extend to one year, or with fine, or with both.

CLASSIFICATION OF OFFENCE

Punishment—Imprisonment for 1 year, or fine, or both—Cognizable—Non-bailable—Triable by any Magistrate—Non-compoundable.

CHAPTER XIV

OF OFFENCES AFFECTING THE PUBLIC HEALTH, SAFETY, CONVENIENCE, DECENCY AND MORALS

**268. Public nuisance.**—A person is guilty of a public nuisance who does any act or is guilty of an illegal omission which causes any common injury, danger or annoyance to the public or to the people in general who dwell or occupy property in the vicinity, or which must necessarily cause injury, obstruction, danger or annoyance to persons who may have occasion to use any public right.

A common nuisance is not excused on the ground that it causes some convenience or advantage.

**269. Negligent act likely to spread infection of disease dangerous to life.**—Whoever unlawfully or negligently does any act which is, and which he knows or has reason to believe to be, likely to spread the infection of any disease dangerous to life, shall be punished with imprisonment of either description for a term which may extend to six months, or with fine, or with both.

CLASSIFICATION OF OFFENCE

Punishment—Imprisonment for 6 months, or fine, or both—Cognizable—Bailable—Triable by any Magistrate—Non-compoundable.

**270. Malignant act likely to spread infection of disease dangerous to life.**—Whoever malignantly does any act which is, and which he knows or has reason to believe to be, likely to spread the infection of any disease dangerous to life, shall be punished with imprisonment of either description for a term which may extend to two years, or with fine, or with both.

CLASSIFICATION OF OFFENCE

Punishment—Imprisonment for 2 years, or fine, or both—Cognizable—Bailable—Triable by any Magistrate—Non-compoundable.

COMMENTS

HIV infection

In a case the petitioner has raised the question whether a person suffering from HIV (+) contracting marriage with a willing partner after disclosing the factors of disease to that partner will be committing an offence under sections 269 and 270.

The court held that there was no need for this cast to go further and declare in general as to what rights and obligations arise in such context as to right to privacy or confidentiality or whether such persons are entitled to be married or not or in the event such persons marry they would commit an offence under law or whether such right is

**290. Punishment for public nuisance in cases not otherwise provided for.—** Whoever commits a public nuisance in any case not otherwise punishable by this Code, shall be punished with fine which may extend to two hundred rupees.

### CLASSIFICATION OF OFFENCE

Punishment—Fine of 200 rupees—Non-cognizable—Bailable—Triable by any Magistrate—Non-compoundable.

**291. Continuance of nuisance after injunction to discontinue.—**Whoever repeats or continues a public nuisance, having been enjoined by any public servant who has lawful authority to issue such injunction not to repeat or continue such nuisance, shall be punished with simple imprisonment for a term which may extend to six months, or with fine, or with both.

### CLASSIFICATION OF OFFENCE

Punishment—Simple imprisonment for 6 months, or fine, or both— Cognizable-Bailable—Triable by any Magistrate—Non-compoundable.

[1][**292. Sale, etc., of obscene books, etc.—**[2][(1) For the purposes of sub-section (2), a book, pamphlet, paper, writing, drawing, painting, representation, figure or any other object, shall be deemed to be obscene if it is lascivious or appeals to the prurient interest or if its effect, or (where it comprises two or more distinct items) the effect of any one of its items, is, if taken as a whole, such as to tend to deprave and corrupt person, who are likely, having regard to all relevant circumstances, to read, see or hear the matter contained or embodied in it.]

[3][(2)] Whoever—

    (a) sells, lets to hire, distributes, publicly exhibits or in any manner puts into circulation, or for purposes of sale, hire, distribution, public exhibition or circulation, makes, produces or has in his possession any obscene book, pamphlet, paper, drawing, painting, representation or figure or any other obscene object whatsoever, or

    (b) imports, exports or conveys any obscene object for any of the purposes aforesaid, or knowing or having reason to believe that such object will be sold, let to hire, distributed or publicly exhibited or in any manner put into circulation, or

    (c) takes part in or receives profits from any business in the course of which he knows or has reason to believe that any such obscene objects are for any of the purposes aforesaid, made, produced, purchased, kept, imported, exported, conveyed, publicly exhibited or in any manner put into circulation, or

    (d) advertises or makes known by any means whatsoever that any person is engaged or is ready to engage in any act which is an offence under this section, or that any such obscene object can be procured from or through any person, or

    (e) offers or attempts to do any act which is an offence under this section,

---

1. Subs. by Act 8 of 1925, sec. 2, for the original section.
2. Ins. by Act 36 of 1969, sec. 2 (w.e.f. 7-9-1969).
3. Section 292 renumbered as sub-section (2) thereof by Act 36 of 1969, sec. 2 (w.e.f. 7-9-1969).

Declaration of Ritin Rai

Exhibit 3

# Universal's
# Criminal
# Manual

*Containing*

**Code of Criminal Procedure, 1973**
as amended by
The Code of Criminal Procedure
(Amendment) Act, 2010 (41 of 2010)

**Indian Penal Code (45 of 1860)**
as amended by
The Information Technology (Amendment)
Act, 2008 (10 of 2009)

**Indian Evidence Act, 1872**
as amended by
The Information Technology (Amendment)
Act, 2008 (10 of 2009)

# RITIN RAI
ADVOCATE
C-443 DEFENCE COLONY
NEW DELHI-110024



**Universal**
Law Publishing Co. Pvt. Ltd.
NEW DELHI - INDIA

# PART I
## The Code of Criminal Procedure, 1973

(a)  with the sanction of the Central Government where such person is an officer or member of the armed forces;

(b)  with the sanction of the State Government in any other case.

(2) (a) No Executive Magistrate or police officer acting under any of the said sections in good faith;

(b)  no person doing any act in good faith in compliance with a requisition under section 129 or section 130;

(c)  no officer of the armed forces acting under section 131 in good faith;

(d)  no member of the armed forces doing any act in obedience to any order which he was bound to obey,

shall be deemed to have thereby, committed an offence.

(3) In this section and in the preceding sections of this Chapter,—

(a)  the expression "armed forces" means the military, naval and air forces, operating as land forces and includes any other Armed Forces of the Union so operating;

(b)  "officer", in relation to the armed forces, means a person commissioned, gazetted or in pay as an officer of the armed forces and includes a junior commissioned officer, a warrant officer, a petty officer, a non-commissioned officer and a non-gazetted officer;

(c)  "member", in relation to the armed forces, means a person in the armed forces other than an officer.

### B.—*Public nuisances*

**133. Conditional order for removal of nuisance.**—(1) Whenever a District Magistrate or a Sub-divisional Magistrate or any other Executive Magistrate specially empowered in this behalf by the State Government, on receiving the report of a police officer or other information and on taking such evidence (if any) as he thinks fit, considers—

(a)  that any unlawful obstruction or nuisance should be removed from any public place or from any way, river or channel which is or may be lawfully used by the public; or

(b)  that the conduct of any trade or occupation, or the keeping of any goods or merchandise, is injurious to the health or physical comfort of the community, and that in consequence such trade or occupation should be prohibited or regulated or such goods or merchandise should be removed or the keeping thereof regulated; or

(c)  that the construction of any building, or, the disposal of any substance, as is likely to occasion conflagration or explosion, should be prevented or stopped; or

(d)  that any building, tent or structure, or any tree is in such a condition that it is likely to fall and thereby cause injury to persons living or carrying on business in the neighbourhood or passing by, and that in consequence the removal, repair or support of such building, tent or structure, or the removal or support of such tree, is necessary; or

    (e)  that any tank, well or excavation adjacent to any such way or public place should be fenced in such manner as to prevent danger arising to the public; or

    (f)  that any dangerous animal should be destroyed, confined or otherwise disposed of,

such Magistrate may make a conditional order requiring the person causing such obstruction or nuisance, or carrying on such trade or occupation, or keeping any such goods or merchandise, or owning, possessing or controlling such building, tent, structure, substance, tank, well or excavation, or owning or possessing such animal or tree, within a time to be fixed in the order—

    (i)  to remove such obstruction or nuisance; or

    (ii)  to desist from carrying on, or to remove or regulate in such manner as may be directed, such trade or occupation, or to remove such goods or merchandise, or to regulate the keeping thereof in such manner as may be directed; or

    (iii)  to prevent or stop the construction of such building, or to alter the disposal of such substance; or

    (iv)  to remove, repair or support such building, tent or structure, or to remove or support such trees; or

    (v)  to fence such tank, well or excavation; or

    (vi)  to destroy, confine or dispose of such dangerous animal in the manner provided in the said order;

or, if he objects so to do, to appear before himself or some other Executive Magistrate subordinate to him at a time and place to be fixed by the order, and show cause, in the manner hereinafter provided, why the order should not be made absolute.

(2) No order duly made by a Magistrate under this section shall be called in question in any Civil Court.

*Explanation.*—A "public place" includes also property belonging to the State, camping grounds and grounds left unoccupied for sanitary or recreative purposes.

**134. Service or notification of order.**—(1) The order shall, if practicable, be served on the person against whom it is made, in the manner herein provided for service of a summons.

(2) If such order cannot be so served, it shall be notified by proclamation, published in such manner as the State Government may, by rules, direct, and a copy thereof shall be stuck up at such place or places as may be fittest for conveying the information to such person.

**135. Person to whom order is addressed to obey or show cause.**—The person against whom such order is made shall—

    (a)  perform, within the time and in the manner specified in the order, the act directed thereby; or

    (b)  appear in accordance with such order and show cause against the same.

**136. Consequences of his failing to do so.**—If such person does not perform such act or appear and show cause, he shall be liable to the penalty prescribed in that behalf in section 188 of the Indian Penal Code (45 of 1860,) and the order shall be made absolute.

**137. Procedure where existence of public right is denied.**—(1) Where an order is made under section 133 for the purpose of preventing obstruction, nuisance or danger to the public in the use of any way, river, channel or place, the Magistrate shall, on the appearance before him of the person against whom the order was made, question him as to whether he denies the existence of any public right in respect of the way, river, channel or place, and if he does so, the Magistrate shall, before proceeding under section 138, inquire into the matter.

(2) If in such inquiry the Magistrate finds that there is any reliable evidence in support of such denial, he shall stay the proceedings until the matter of the existence of such right has been decided by a competent Court; and, if he finds that there is no such evidence, he shall proceed as laid down in section 138.

(3) A person who has, on being questioned by the Magistrate under sub-section (1), failed to deny the existence of a public right of the nature therein referred to, or who, having made such denial, has failed to adduce reliable evidence in support thereof, shall not in the subsequent proceedings be permitted to make any such denial.

**138. Procedure where he appears to show cause.**—(1) If the person against whom an order under section 133 is made appears and shows cause against the order, the Magistrate shall take evidence in the matter as in a summons-case.

(2) If the Magistrate is satisfied that the order, either as originally made or subject to such modification as he considers necessary, is reasonable and proper, the order shall be made absolute without modification or, as the case may be, with such modification.

(3) If the Magistrate is not so satisfied, no further proceedings shall be taken in the case.

**139. Power of Magistrate to direct local investigation and examination of an expert.**—The Magistrate may, for the purposes of an inquiry under section 137 or section 138—

(a) direct a local investigation to be made by such person as he thinks fit; or

(b) summon and examine an expert.

**140. Power of Magistrate to furnish written instructions, etc.**—(1) Where the Magistrate directs a local investigation by any person under section 139, the Magistrate may—

(a) furnish such person with such written instructions as may seem necessary for his guidance;

(b) declare by whom the whole or any part of the necessary expenses of the local investigation shall be paid.

(2) The report of such person may be read as evidence in the case.

(3) Where the Magistrate summons and examines an expert under section 139, the Magistrate may direct by whom the costs of such summoning and examination shall be paid.

**141. Procedure on order being made absolute and consequences of disobedience.**—(1) When an order has been made absolute under section 136 or section 138, the Magistrate shall give notice of the same to the person against whom the order was made, and shall further require him to perform the act directed by the order within a time to be fixed in the notice, and inform him that, in case of disobedience, he will be liable to the penalty provided by section 188 of the Indian Penal Code (45 of 1860).

(2) If such act is not performed within the time fixed, the Magistrate may cause it to be performed, and may recover the costs of performing it, either by the sale of any building, goods or other property removed by his order, or by the distress and sale of any other movable property of such person within or without such Magistrate's local jurisdiction and if such other property is without such jurisdiction, the order shall authorise its attachment and sale when endorsed by the Magistrate within whose local jurisdiction the property to be attached is found.

(3) No suit shall lie in respect of anything done in good faith under this section.

**142. Injunction pending inquiry.**—(1) If a Magistrate making an order under section 133 considers that immediate measures should be taken to prevent imminent danger or injury of a serious kind to the public, he may issue such an injunction to the person against whom the order was made, as is required to obviate or prevent such danger or injury pending the determination of the matter.

(2) In default of such person forthwith obeying such injunction, the Magistrate may himself use, or cause to be used, such means as he thinks fit to obviate such danger or to prevent such injury.

(3) No suit shall lie in respect of anything done in good faith by a Magistrate under this section.

**143. Magistrate may prohibit repetition or continuance of public nuisance.**—A District Magistrate or Sub-divisional Magistrate, or any other Executive Magistrate empowered by the State Government or the District Magistrate in this behalf, may order any person not to repeat or continue a public nuisance, as defined in the Indian Penal Code (45 of 1860), or any special or local law.

### C.—*Urgent cases of nuisance or apprehended danger*

**144. Power to issue order in urgent cases of nuisance or apprehended danger.**—(1) In cases where, in the opinion of a District Magistrate, a Sub-divisional Magistrate or any other Executive Magistrate specially empowered by the State Government in this behalf, there is sufficient ground for proceeding under this section and immediate prevention or speedy remedy is desirable, such Magistrate may, by a written order stating the material facts of the case and served in the manner provided by section 134, direct any person to

abstain from a certain act or to take certain order with respect to certain property in his possession or under his management, if such Magistrate considers that such direction is likely to prevent, or tends to prevent, obstruction, annoyance or injury to any person lawfully employed, or danger to human life, health or safety, or a disturbance of the public tranquillity, or a riot, or an affray.

(2) An order under this section may, in cases of emergency or in cases where the circumstances do not admit of the serving in due time of a notice upon the person against whom the order is directed, be passed *ex parte.*

(3) An order under this section may be directed to a particular individual, or to persons residing in a particular place or area, or to the public generally when frequenting or visiting a particular place or area.

(4) No order under this section shall remain in force for more than two months from the making thereof:

Provided that, if the State Government considers it necessary so to do for preventing danger to human life, health or safety or for preventing a riot or any affray, it may, by notification, direct that an order made by a Magistrate under this section shall remain in force for such further period not exceeding six months from the date on which the order made by the Magistrate would have, but for such order, expired, as it may specify in the said notification.

(5) Any Magistrate may, either on his own motion or on the application of any person aggrieved, rescind or alter any order made under this section, by himself or any Magistrate subordinate to him or by his predecessor-in-office.

(6) The State Government may, either on its own motion or on the application of any person aggrieved, rescind or alter any order made by it under the proviso to sub-section (4).

(7) Where an application under sub-section (5), or sub-section (6) is received, the Magistrate, or the State Government, as the case may be, shall afford to the applicant an early opportunity of appearing before him or it, either in person or by pleader and showing cause against the order, and if the Magistrate or the State Government, as the case may be, rejects the application wholly or in part, he or it shall record in writing the reasons for so doing.

## COMMENTS

(1) Order under section 144 is amenable to writ jurisdiction on violation of any Fundamental Right; *Gulam Abbas* v. *State of Uttar Pradesh,* AIR 1981 SC 2198: (1981) Cr LJ 1835.

(2) As far as possible customary right of a community should not be disturbed; *Gulam Abbas* v. *State of Uttar Pradesh,* AIR 1981 SC 2198: (1981) Cr LJ 1835.

[1][**144A. Power to prohibit carrying arms in procession or mass drill or mass training with arms.**—(1) The District Magistrate may, whenever he considers it necessary so to do for the preservation of public peace or public safety or for the maintenance of public order, by public notice or by order, prohibit in any area within the local limits of his jurisdiction, the carrying of arms in any procession or the organising or holding of, or taking part in, any mass drill or mass training with arms in any public place.

---

1. Ins. by Act 25 of 2005, sec. 16.

# PART II
## The Indian Penal Code
### (45 of 1860)

Case 1:15-cv-00612-JDB   Document 24-1   Filed 11/10/15   Page 50 of 288

**267. Making or selling false weight or measure.**—Whoever makes, sells or disposes of any instrument for weighing, or any weight, or any measure of length or capacity which he knows to be false, in order that the same may be used as true, or knowing that the same is likely to be used as true, shall be punished with imprisonment of either description for a term which may extend to one year, or with fine, or with both.

### CLASSIFICATION OF OFFENCE

Punishment—Imprisonment for 1 year, or fine, or both—Cognizable—Non-bailable—Triable by any Magistrate—Non-compoundable.

## CHAPTER XIV
### OF OFFENCES AFFECTING THE PUBLIC HEALTH, SAFETY, CONVENIENCE, DECENCY AND MORALS

**268. Public nuisance.**—A person is guilty of a public nuisance who does any act or is guilty of an illegal omission which causes any common injury, danger or annoyance to the public or to the people in general who dwell or occupy property in the vicinity, or which must necessarily cause injury, obstruction, danger or annoyance to persons who may have occasion to use any public right.

A common nuisance is not excused on the ground that it causes some convenience or advantage.

**269. Negligent act likely to spread infection of disease dangerous to life.**—Whoever unlawfully or negligently does any act which is, and which he knows or has reason to believe to be, likely to spread the infection of any disease dangerous to life, shall be punished with imprisonment of either description for a term which may extend to six months, or with fine, or with both.

### CLASSIFICATION OF OFFENCE

Punishment—Imprisonment for 6 months, or fine, or both—Cognizable—Bailable—Triable by any Magistrate—Non-compoundable.

**270. Malignant act likely to spread infection of disease dangerous to life.**—Whoever malignantly does any act which is, and which he knows or has reason to believe to be, likely to spread the infection of any disease dangerous to life, shall be punished with imprisonment of either description for a term which may extend to two years, or with fine, or with both.

### CLASSIFICATION OF OFFENCE

Punishment—Imprisonment for 2 years, or fine, or both—Cognizable—Bailable—Triable by any Magistrate—Non-compoundable.

### COMMENTS

**HIV infection**

In a case the petitioner has raised the question whether a person suffering from HIV (+) contracting marriage with a willing partner after disclosing the factors of disease to that partner will be committing an offence under sections 269 and 270.

The court held that there was no need for this cast to go further and declare in general as to what rights and obligations arise in such context as to right to privacy or confidentiality or whether such persons are entitled to be married or not or in the event such persons marry they would commit an offence under law or whether such right is

**290. Punishment for public nuisance in cases not otherwise provided for.—** Whoever commits a public nuisance in any case not otherwise punishable by this Code, shall be punished with fine which may extend to two hundred rupees.

## CLASSIFICATION OF OFFENCE

Punishment—Fine of 200 rupees—Non-cognizable—Bailable—Triable by any Magistrate—Non-compoundable.

**291. Continuance of nuisance after injunction to discontinue.—** Whoever repeats or continues a public nuisance, having been enjoined by any public servant who has lawful authority to issue such injunction not to repeat or continue such nuisance, shall be punished with simple imprisonment for a term which may extend to six months, or with fine, or with both.

## CLASSIFICATION OF OFFENCE

Punishment—Simple imprisonment for 6 months, or fine, or both—Cognizable-Bailable—Triable by any Magistrate—Non-compoundable.

[1][**292. Sale, etc., of obscene books, etc.—**[2][(1) For the purposes of sub-section (2), a book, pamphlet, paper, writing, drawing, painting, representation, figure or any other object, shall be deemed to be obscene if it is lascivious or appeals to the prurient interest or if its effect, or (where it comprises two or more distinct items) the effect of any one of its items, is, if taken as a whole, such as to tend to deprave and corrupt person, who are likely, having regard to all relevant circumstances, to read, see or hear the matter contained or embodied in it.]

[3][(2) Whoever—

    (a) sells, lets to hire, distributes, publicly exhibits or in any manner puts into circulation, or for purposes of sale, hire, distribution, public exhibition or circulation, makes, produces or has in his possession any obscene book, pamphlet, paper, drawing, painting, representation or figure or any other obscene object whatsoever, or

    (b) imports, exports or conveys any obscene object for any of the purposes aforesaid, or knowing or having reason to believe that such object will be sold, let to hire, distributed or publicly exhibited or in any manner put into circulation, or

    (c) takes part in or receives profits from any business in the course of which he knows or has reason to believe that any such obscene objects are for any of the purposes aforesaid, made, produced, purchased, kept, imported, exported, conveyed, publicly exhibited or in any manner put into circulation, or

    (d) advertises or makes known by any means whatsoever that any person is engaged or is ready to engage in any act which is an offence under this section, or that any such obscene object can be procured from or through any person, or

    (e) offers or attempts to do any act which is an offence under this section,

---

1. Subs. by Act 8 of 1925, sec. 2, for the original section.
2. Ins. by Act 36 of 1969, sec. 2 (w.e.f. 7-9-1969).
3. Section 292 renumbered as sub-section (2) thereof by Act 36 of 1969, sec. 2 (w.e.f. 7-9-1969).

Declaration of Ritin Rai

Exhibit 4



SCC OnLine Web Edition, Copyright © 2015
Page 1        Wednesday, September 16, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts, tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source.

# Air (Prevention and Control of Pollution) Act, 1981[1]

*[Act 14 of 1981]*

*[29th March, 1981]*

An Act to provide for the prevention, control and abatement of air pollution, for the establishment, with a view to carrying out the aforesaid purposes, of Boards, for conferring on and assigning to such Boards powers and functions relating thereto and for matters connected therewith

Whereas decisions were taken at the United Nations Conference on the Human Environment held in Stockholm in June 1972, in which India participated, to take appropriate steps for the preservation of the natural resources of the earth which, among other things, include the preservation of the quality of air and control of air pollution;

And whereas it is considered necessary to implement the decisions aforesaid insofar as they relate to the preservation of the quality of air and control of air pollution;

Be it enacted by Parliament in the Thirty-second Year of the Republic of India as follows :—

— — —

[1] Received the assent of the President on March 29, 1981, published in the Gazette of India, Extra., Part II, Section 1, dt. 30-3-1981, pp. 55-80 [C][P].

© EBC Publishing Pvt.Ltd., Lucknow

**SCC ONLINE**

SCC OnLine Web Edition, Copyright © 2015
Page 1        Wednesday, September 16, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com

**Disclaimer:** While every effort is made to avoid any mistake or omission, this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification is being circulated on the condition and understanding that the publisher would not be liable in any manner by reason of any mistake or omission or for any action taken or omitted to be taken or advice rendered or accepted on the basis of this casenote/ headnote/ judgment/ act/ rule/ regulation/ circular/ notification. All disputes will be subject exclusively to jurisdiction of courts tribunals and forums at Lucknow only. The authenticity of this text must be verified from the original source

## Air (Prevention and Control of Pollution) Act, 1981
### CHAPTER 6 — PENALTIES AND PROCEDURE
#### Section 43. Cognizance of offences

[1]**[43. Cognizance of offences.**—(1) No Court shall take cognizance of any offence under this Act except on a complaint made by—

(*a*) a Board or any officer authorised in this behalf by it; or

(*b*) any person who has given notice of not less than sixty days, in the manner prescribed, of the alleged offence and of his intention to make a complaint to the Board or officer authorised as aforesaid,

and no court inferior to that of a Metropolitan Magistrate or a Judicial Magistrate of the first class shall try any offence punishable under this Act.

(2) Where a complaint has been made under clause (*b*) of sub-section (1), the Board shall, on demand by such person, make available the relevant reports in its possession to that person:

Provided that the Board may refuse to make any such report available to such person if the same is, in its opinion, against the public interest.]

— — —

[1] *Subs.* by Act 47 of 1987 (w.e.f. 1-4-1988).

© EBC Publishing Pvt.Ltd., Lucknow

Declaration of Ritin Rai

Exhibit 5


SCC Online Web Edition, Copyright © 2015
Page 1      Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*a*

*b*

# THE
# SUPREME COURT CASES

### (1994) 4 SCC

*c*

### (1994) 4 Supreme Court Cases 1

(BEFORE KULDIP SINGH AND R.M. SAHAI, JJ.)

JAY LAXMI SALT WORKS (P) LTD.                    ..        Appellant;

*Versus*

STATE OF GUJARAT                                 ..        Respondent.

*d*

Civil Appeal No. 2482(N) of 1972[†], decided on May 4, 1994

**A. Tort Law — 'Tort' — Meaning and ingredients of — Compared with
contract — Test is whether injury or damage occasioned due to failure of duty
to take reasonable care — When actionable — State's liability — 'Strict
liability' and 'fault liability' — Difference between — 'Malfeasance',
'misfeasance' and 'non-feasance' — Malice or bad faith essential element to**
*e*
**constitute — But even without such intention, tortious liability may arise not
only in case of negligence but also in cases of mistake, defective planning or
failure to discharge public duty resulting in loss or damage to common man —
'Reclamation bundh' constructed by State Govt. without heeding to appellant's
request to change the location of weirs so as not to face its factory —
Consequently flood water entering into appellant's factory causing damages
and loss — Applicability of rule in Rylands v. Fletcher — Held, State liable to**
*f*
**pay compensation to appellant — Words and phrases — 'Negligence', meaning
of**

**B. Limitation Act, 1908 — Art. 120 — Tortious liability of State arising
due to negligence, mistake, defective planning or failure to discharge public
duty — Held, Art. 120 attracted — Limitation Act, 1963, Art. 113**

**C. Limitation Act, 1908 — Art. 36 — Not a residuary article and not
applicable to all tortious liabilities — Limitation Act, 1963, Art. 113**

*g*
**D. Limitation Act, 1908 — Art. 36 — When time begins to run — Words
'when' and 'takes place' — Interpretation of — To be construed liberally —
Time starts running when malfeasance, misfeasance or non-feasance occurs, or
when damage took place or when claim for damages lodged within the
prescribed period was rejected — Limitation Act, 1963, Art. 113**

*h*

† From the Judgment and Order dated 13-12-1971 of the Gujarat High Court in F.A No 190 of
1962

SCC Online Web Edition, Copyright © 2015
Page 2      Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

In 1954 the State of Saurashtra, which now is part of State of Gujarat, made a plan for reclamation of vast area of land from saltish water of sea by erecting a 'reclamation bundh' so as to prevent the sea water flowing in several creeks in the area on the seaside of the bundh from flowing further to the claimed site and making the lands in that area saltish. This bundh was completed in the year 1955. The appellant even before the construction of the bundh had been writing to the authorities concerned either to abandon the bundh or to change the location of weirs so as not to face the appellant's factory. But this request had not been acceded to and when there was heavy downpour and the appellant found that the level in the river was rising he ran from one authority to the other requesting them to lessen the level of water and avoid increased flow near his factory with no result. Meanwhile the flood level rose to such an extent that in the night between 4th and 5th July, 1956 that water filtered to the premises of the factory breaking even the protective bundh made by the appellant on the border of its factory. After the flood receded the appellant approached the authorities and the Government for redress and claimed damages of approximately rupees four lakhs. It was asked by the Government to get it privately assessed, and the Chief Engineer Charotar Gram Udhar Sahkari Mandali Limited, submitted a report on 30-8-1956. On 24-8-1956 an Official Committee was appointed and the Committee found that the appellant had suffered a loss of Rs 1,58,735. Since this amount was not paid the appellant filed the suit for damages against the State. Amongst many defences raised the two main were that there was no negligence either in the construction of the bundh or in the action of the officers and the suit was barred by time. In respect of the quantum determined by the Committee it was claimed that it was not acceptable to the State Government. The trial court dismissed the suit as it did not find any negligence as the damage was an act of God. It further found that the suit was barred by time. In the High Court, in view of conflict of opinion between the two Judges who constituted the Bench, the matter was referred to a third Judge who held that the rule of strict liability as enunciated in *Rylands* v. *Fletcher* had not in terms been modified by the Supreme Court in *State of Punjab* v. *Modern Cultivators*; and in any event, the rule of strict liability as enunciated in *Rylands* v. *Fletcher* even as modified, if it is so held to be modified, was not applicable to the facts of the present case and that Article 36 of the Limitation Act, 1908, applied to the present case and as such the suit was barred by time. The High Court granted certificate under Article 133(1)(*a*) stating that the main question was whether the rule in *Rylands* v. *Fletcher* would result in invoking Article 36 of the Limitation Act, 1908 or whether Article 39 or 121 thereof would apply? Allowing the appeal

*Held*:

(1) 'Tort' dictionarily means "breach of duty leading to damage". Same meaning attaches to it in law. In general, torts consist of some act done without just cause or excuse.                                    (Paras 7 and 8)

Salmond on Jurisprudence, *relied on*

The basic ingredients of torts are injury and damage due to failure to observe duty. Although injury and damage may be found in contract as well but the violations which may result in tortious liability are breach of duty primarily fixed by the law while in contract they are fixed by the parties themselves. Further in tort the duty is towards persons generally. In contract it is towards specific person or persons. An action for tort is usually a claim for pecuniary compensation in respect of damages suffered as a result of the invasion of a legally protected interest. But law of torts being a developing law its frontiers are incapable of being strictly barricaded.                                    (Para 8)


® Case 1:15-cv-00612-JDB Document 24-1 Filed 11/10/15 Page 58 of 288
SCC Online Web Edition, Copyright © 2015
Page 3 Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Rylands* v. *Fletcher*, LR (1868) 3 HL 330: [1861-73] All ER Rep 1: 37 LJ Ex 161; *Donoghue* v. *Stevenson*, (1932) AC 562: 1932 All ER Rep 1; *Anns* v. *Merton London Borough Council*, (1978) AC 728: (1977) 2 All ER 492, *referred to*

a

The liability in tort known as 'strict liability', 'absolute liability' or "special use bringing with it increased dangers to others" (*Rylands* v. *Fletcher*) and 'fault liability' are different forms which give rise to action in torts. The difference between 'strict liability' and 'fault liability' arises from presence and absence of mental element. A breach of legal duty wilfully, or deliberately or even maliciously is negligence emanating from fault liability but injury or damage resulting without

b
any intention yet due to lack of foresight etc. is strict liability.          (Para 8)

*Rylands* v. *Fletcher*, LR (1868) 3 HL 330: [1861-73] All ER Rep 1: 37 LJ Ex 161; *Read* v. *J. Lyons & Co Ltd.*, (1947) AC 156: (1946) 2 All ER 471; *Rickards* v. *John Inglis Lothian*, (1913) AC 263. 29 TLR 281; *Bartlett* v. *Tottenham*, (1932) 1 Chancery 114, *referred to*

In between strict liability and fault liability there may be numerous circumstances in which one may be entitled to sue for damages. And it may be

c
partly one or the other or may be both. In a welfare society construction of dam or bundh for the sake of community is an essential function and use of land or accumulation of water for the benefit of society cannot be non-natural user. But that cannot absolve the State from its duty of being responsible to its citizens for such violations as are actionable and result in damage, loss or injury. What is fundamental is injury and not the manner in which it has been caused. 'Strict liability', 'absolute liability', 'fault liability' and 'neighbour proximity' are all

d
refinements and development of law by English Courts for the benefit of society and the common man. Once the occasion for loss or damage is failure of duty, general or specific, the cause of action under tort arises. It may be due to negligence, nuisance, trespass, inevitable mistake etc. It may be even otherwise. In a developed or developing society the concept of duty keeps on changing. They may individually or even collectively give rise to tortious liability. Entire law of

e
torts is founded and structured on morality that no one has a right to injure or harm others intentionally or even innocently. Therefore, it would be primitive to class strictly or close finally the ever-expanding and growing horizon of tortious liability. Even for social development, orderly growth of the society and cultural refineness, the liberal approach to tortious liability by courts is more conducive. Since the appellant suffered loss on facts found due to action of respondent's officers both at the stage of construction of the bundh and failure to take steps even at the last

f
moment it was liable to be compensated.          (Paras 9 and 8)

But to be actionable and get redress from court it must assume legal shape by falling in one or the other statutorily, judicially or even otherwise recognised category of wrong such as negligence. 'Negligence' ordinarily means failure to do statutory duty or otherwise giving rise to damage. The axis around which the law of negligence revolves is duty, duty to take care, duty to take reasonable care. But the concept of duty, its reasonableness, the standard of care required cannot be put in a

g
strait-jacket. It cannot be rigidly fixed. Even improper exercise of power by the authorities giving rise to damage has been judicially developed and distinction has been drawn between power coupled with duty. Where there is duty the exercise may not be proper if what is done was not authorised or not done in the bona fide interest of the public. Thus negligence is only descriptive of those sum total of activities which may result in injury or damage to the other side for failure of duty both legal or due to lack of foresight and may comprise of more than one concepts

h
known or recognised in law, intended or unintended.          (Paras 10 and 11)


SCC OnLine Web Edition, Copyright © 2015
Page 4                Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Donoghue v. Stevenson,* (1932) AC 562: 1932 All ER Rep 1; *David Geddis v. Proprietors of the Bann Reservoir,* (1878) 3 AC 430; *Tate and Lyle Industries Ltd. v. Greater London Council,* (1983) 2 AC 509: (1983) 1 All ER 1159; *Read v. J. Lyons & Co. Ltd.,* (1947) AC 156: (1946) 2 All ER 471, *relied on*

*Winfield on Tort* and *Dias & Markesinis: English Law of Torts, relied on*

Malfeasance and misfeasance necessarily import intention, knowledge and malice. Therefore, they may not be available in every tortious liability arising out of violations of public duty. Evil doing or ill conduct postulates something more than mere omission or commission. Misfeasance is now recognised as imputable to discharge of duty arbitrarily. Non-feasance on the other hand is omission to discharge duty. But the omission to give rise to action in torts must be impressed with same characteristic, namely, malice or bad faith. The expressions 'malfeasance', 'misfeasance' and 'non-feasance' would, therefore, apply in those limited cases where the State or its officers are liable not only for breach of care and duty but it must be actuated with malice or bad faith. Where the State undertakes common law duty its actions may give rise to common law tort. Negligence in performance of duty is only a step to determine if action of Government resulting in loss or injury to common man should not go uncompensated. If construction of bundh is a common law or public duty then any loss or damage arising out of it gives rise to tortious liability not in the conservative sense but certainly in the modern and developing sense. A common man, a man in the street cannot be left high and dry because wrongdoer is State. The basic element of tort is duty. And that comes into play fully when there is a common law duty. Since construction of bundh was a common law duty any injury suffered by a common man was public tort liable to be compensated. The defective planning in construction of a bundh, therefore, may be negligence, mistake, omission but to say that it can only be either malfeasance, misfeasance and non-feasance is not correct.

(Para 14)

*Calveley v. Chief Constable of the Merseyside Police,* (1989) 1 All ER 1025; *Dunlop v. Woollahra Municipal Council,* (1981) 1 All ER 1202: (1982) AC 158, *relied on*

*Black's Law Dictionary; Stroud's Judicial Dictionary, relied on*

(2) It is erroneous to hold that Article 36 is residuary article and applied to all tortious liabilities. Use of expression, "not herein specifically provided for" in Article 36 was to make it residuary article to such wrongs for which limitation was provided in the article but to interpret it as exhaustive of all torts is not in conformity with principle of interpretation nor the scheme and purpose of the enactment. The damages arising out of strict liability or duty to take care or public law duty may not be strictly covered in these expressions. The damage was caused to the appellant not only because of negligence of officers but also because it was due to failure in discharge of public duty and mistake at various stages. Liability in tort may arise without fault. The basic ingredients of torts, namely, injury and damage due to failure to observe duty has been found to have been established. In the conservative sense it was negligence. But in modern sense and present day context it was not only negligence but mistake, defective planning, failure to discharge public duty. It was thus tort not in the narrow sense but in the broader sense to which Article 120 applied. The suit, therefore, could not be thrown out as it was filed beyond two years from the date the incident took place. The substantial question of law if Article 36 was exhaustive of all torts is thus answered in the negative. Further the rule in *Rylands v. Fletcher* has not been modified by the Supreme Court in *Modern Cultivators.* And the article of Limitation Act applicable to the facts of the case was Article 120 and not Article 36.

(Para 15)



SCC Online Web Edition, Copyright © 2015
Page 5    Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

JAY LAXMI SALT WORKS (P) LTD. v. STATE OF GUJARAT          5

*Jadu Nath Dandput* v. *Harı Kar*, (1913) 17 CWN 308: 17 CLJ 206: 18 EC 253; *National Bank of Lahore Ltd.* v. *Sohan Lal Saigal*, AIR 1965 SC 1663: (1965) 3 SCR 293: 35 Comp Cas 604; *State of Punjab* v. *Modern Cultivators*, AIR 1965 SC 17: (1964) 8 SCR 273, *explained*

*Essoo Bhayaji* v. *The Steamship 'Savitri'*, ILR (1886) 11 Bom 133, *distinguished* and *limited*

*Stephen's Commentaries, relied on*

a

b        Even assuming that Article 36 of the Act applied, the suit filed in this case after expiry of two years from the date of the incident, was not barred by time. Under Article 36 the time begins to run, "when the malfeasance, misfeasance or non-feasance takes place". The word 'when' means at what time. 'Take' has many shades of meaning. How it should be understood, precisely, in a set of circumstances depends on the context in which it has been used. Literally speaking it can mean when it happens. The words 'when' and 'takes place' used in Article 36 have to be construed liberally so as not to deprive the person who suffers damages. In wrongs like negligence, strict liability or violation of public duty time

c        begins to run not before the damage takes place. But the computation under the article has to be from malfeasance, misfeasance and non-feasance. The negligence or violation in such duty which results in damage could not furnish the starting point. The cause of action to claim damages arises when the actual loss has taken place. It is thus not the date on which negligence or mistake took place but the date when injury is suffered. But computation has to be from misfeasance or non-feasance etc. that is violation of duty. This duty has to be different than the

d        duty which was the cause of negligence. Therefore in such actions which are latent in nature the aggrieved party has to make a claim for damages and it is the failure in discharge of this duty in this regard which too can furnish the starting point of limitation. Since the authorities refused to pay damages even though it was got assessed at their own direction the computation of the period for filing suit could arise from that date. Otherwise it would cause great injustice. A common man, an

e        average citizen who in a developing country cannot afford to pay huge court fee would be deprived of his just claim only because he was pursuing his remedy vigilantly in the Government of a welfare State.                                    (Para 16)

Therefore the computation for purposes of limitation under Article 36 could commence either from the date when malfeasance, misfeasance or non-feasance occurred or from the date when the damage took place or where claim is lodged within period allowed by law and the damage is ascertained then from the date the

f        claim is rejected. It is the improper performance of duty or arbitrary action of the authorities in not accepting the claim when damage was found by the Official Committee to have taken place. The limitation to file the suit on facts of this case arises from the date the Government refused to pay the amount determined by the Committee. Since the rejection was not communicated nor the copy of the report was supplied despite request the suit could not be said to be barred by time.
                                                                      (Para 17)

g        The decree and order passed by the two courts below are set aside. The suit of the appellant for Rs 1,58,735, the amount of damage determined by the trial court which was neither appealed from nor objected to by the respondent is decreed with costs throughout. The respondent shall further pay interest at the rate of 6% per annum from the date of decree till December 1982 and at the rate of 9% per annum from 1982 to December 1992 and at the rate of 12% per annum from January 1993

h        till the amount is paid.                                       (Para 18)
                                                                      R-M/T/13070/C


SCC Online Web Edition, Copyright © 2015
Page 6    Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

6                       SUPREME COURT CASES               (1994) 4 SCC

Advocates who appeared in this case :
   Purnima Bhat Kak, Ms Rina Agarwala and E.C. Agarwala, Advocates, for the
    Appellant;
   S.C. Patel and Anip Sachthey, Advocates, for the Respondent.

The Judgment of the Court was delivered by

    R.M. SAHAI, J.— This appeal by grant of certificate under Article
133(1)(*a*) of the Constitution of India by the High Court of Gujarat raises
substantial question of law about applicability of the period of limitation as
provided in Article 36 of the Limitation Act, 1908† (referred to as 'the Act')
as it stood prior to 1963 to claim of damages founded on negligence. The
High Court was of opinion that the controversy whether Article 36 could
apply to rule laid down in *Rylands* v. *Fletcher*[1] raises a question of general
importance which required to be authoritatively decided by this Court.

    **2.** The certificate granted by the High Court under Article 133(1)(*a*) of
the Constitution was in following terms:

       "The main question involved is that of limitation and whether the
    rule in *Rylands* v. *Fletcher*[1], would result in invoking the provisions of
    Article 36 of the old Limitation Act or whether Article 39 of the Act
    would be the appropriate Article or whether the residuary Article 121
    applies and that is a substantial question of law. This point has not yet
    been decided by any decision of the Supreme Court directly on the point
    and hence is a substantial question of law which is of importance to the
    petitioner before us as well of general public importance and hence the
    certificate is granted under Article 133(1)(*a*) of the Constitution."

    **3.** Although the finding of fact recorded by the High Court that the State
was guilty of negligence has become final since the State did not challenge it
by way of cross appeal or cross objection yet it appears necessary to give a
brief outline of it in order to appreciate the controversy and the legal issues
that arise for consideration in this appeal. In 1954 the State of Saurashtra,
which now is part of State of Gujarat, made a plan for reclamation of vast
area of land from saltish water of sea by erecting a 'reclamation bundh' so as
to prevent the sea water flowing in several creeks in the area on the seaside
of the bundh from flowing further to the claimed site and making the lands
in that area saltish. This bundh was completed in the year 1955. In the very
first monsoon of 1956, due to change of natural course of different streams
in the reclaimed area and its diversion towards the appellant's factory which
was existing from before led to increased flow and discharge of water on
appellant's land and factory. The appellant even before the construction of
the bundh had been writing to the authorities concerned either to abandon the
bundh or to change the location of weirs so as not to face the appellant's
factory. But this request had not been acceded to and when there was heavy
downpour and the appellant found that the level in the river was rising he ran
from one authority to the other requesting them to lessen the level of water

---

†   **Ed.:** Now covered by Art 113 of Limitation Act, 1963
1   LR (1868) 3 HL 330  37 LJ Ex 161 : [1861-73] All ER Rep 1


Case 1:15-cv-00612-JDB Document 24-1 Filed 11/10/15 Page 62 of 288
Page 7        Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

and avoid increased flow near his factory with no result. By the time his running could bring forth any movement the flood level rose to such an

*a*  extent in the night between 4th and 5th July, 1956 that water filtered to the premises of the factory breaking even the protective bundh made by the appellant on the border of its factory. After the flood receded the appellant approached the authorities and the Government for redress and claimed damages of approximately Rupees Four Lakhs. It was asked by the Government to get it privately assessed, and the Chief Engineer Charotar

*b*  Gram Udhar Sahkari Mandali Limited, Vallabh Vidyanagar did submit a report on 30th August, 1956. On 24th August. 1956 an Official Committee was appointed and the Committee found that the appellant had suffered a loss of Rs 1,58,735. Since this amount was not paid the appellant filed the suit for damages against the State. Amongst many defences raised the two main were that there was no negligence either in the construction of the

*c*  bundh or in the action of the officers and the suit was barred by time. In respect of the quantum determined by the Committee it was claimed that it was not acceptable to the State Government. Various issues were framed. The trial court dismissed the suit as it did not find any negligence as the damage was an act of God. It further found that the suit was barred by time. In first appeal in the High Court one of the Judges who constituted the

*d*  Bench and wrote the leading judgment held that the construction of bundh by the State could not be termed as non-natural user as, "the dam was erected over the land and streams of water. The purpose was to save the lands on the reclamation site from becoming useless. Therefore, the dam in question, was just like, which, an owner of a field would erect, where the boundary of his land is eroded by constant flow and rush of water." After discussing the oral

*e*  and documentary evidence in detail the learned Judge held that the act of planning and construction of the bundh was done in a negligent manner and the damages caused to the appellant were ascribable to the negligence of the officers concerned in planning and constructing the bundh. The learned Judge set aside the finding of the trial court that the damage suffered by the appellant was due to an act of God. It was specifically held that the appellant

*f*  proved the negligence on the part of the officers of the then State Government in planning and construction of the bundh as a result of which flood water entered the factory of the appellant on 4th and 5th July, 1956 causing extensive damage. Yet the suit was dismissed as according to the learned Judge the suit could have been filed within 2 years from the date the cause of action arose under Article 36 of the Act. But since the suit was filed

*g*  after 2 years, 11 months and 15 days from the date of the incident it was barred by time. The other Judge who constituted the Bench agreed with learned Judge on the questions of fact but differed on applicability of Article 36 of the Act. He held that article which was applicable to such cases was the residuary Article 120 of the Act, therefore, the suit could have been instituted within 6 years from 5th July, 1956 the date on which the appellant

*h*  suffered damages. In view of difference of opinion between the two learned Judges on question of law the following order was passed :


SCC Online Web Edition, Copyright © 2015
Page 8      Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
------------------------------------------------------------------------------------------------------------

"Since we differ on the questions whether Article 36 applies to the present case or Article 120 applies and whether the rule of strict liability as enunciated in *Rylands* v. *Fletcher*[1] and as modified by the Supreme Court in the *State of Punjab* v. *Modern Cultivators*[2] is applicable to the facts of the present case, this appeal shall have to be under clause 36 of the Letters Patent, referred to third Judge."

The third Judge framed two questions extracted below which according to him arose on difference of opinion between the learned Judges who constituted the Division Bench :

"(1) Whether Article 36 of the Limitation Act, 1908, applies to the present case; or Article 120 applies?; and

(2) Whether the rule of strict liability as enunciated in *Rylands* v. *Fletcher*[1] and as modified by the Supreme Court in *State of Punjab* v. *Modern Cultivators*[2] is applicable to the facts of the present case?"

Both the questions were answered as under :

"(1) Article 36 of the Limitation Act, 1908, applies to the present case and I hold that the suit is barred by limitation.

(2) The rule of strict liability as enunciated in *Rylands* v. *Fletcher*[1] has not in terms been modified by the Supreme Court in *State of Punjab* v. *Modern Cultivators*[2]; and in any event, the rule of strict liability as enunciated in *Rylands* v. *Fletcher*[1] even as modified, if it is so held to be modified, is not applicable to the facts of the present case."

4. Are the answers correct? Was Article 36 as it stood in the relevant period, prior to 1963 exhaustive of torts as held by the High Court? What was the scope of malfeasance, misfeasance and non-feasance? Was the rule of *Rylands* v. *Fletcher*[1] applicable? Has it been modified by our Court in *State of Punjab* v. *Modern Cultivators*[2]? Prior to adverting to these issues it appears appropriate to notice in brief how the High Court grappled with the problem. Mr Justice Sheth who agreed on facts with Mr Justice Desai, was of the opinion that, liability could arise out of malfeasance, misfeasance or non-feasance or even independently of any one of them. But Article 36 applied if it arose out of any one of them only. He thereafter discussed the rule of strict liability as explained by the English Courts in *Rylands* v. *Fletcher*[1], its modification in *Read* v. *J. Lyons & Co. Ltd.*[3] the vicissitudes it suffered subsequently in *Rickards* v. *John Inglis Lothian*[4] and *Bartlett* v. *Tottenham*[5] both on natural and non-natural user of land and artificial collection of goods resulting in injury and various exceptions carved out of it. The learned Judge then discussed the ratio in the *State of Punjab* v. *Modern Cultivators*[2] and observed that the rule of strict liability as modified by this Court entitled the appellant to successfully claim damages.

2   AIR 1965 SC 17: (1964) 8 SCR 273
3   (1947) AC 156: (1946) 2 All ER 471
4   (1913) AC 263: 29 TLR 281
5   (1932) 1 Chancery 114

SCC Online Web Edition, Copyright © 2015
Page 9      Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

JAY LAXMI SALT WORKS (P) LTD. v. STATE OF GUJARAT *(Sahai, J.)*      9

5. Mr Justice Desai did not agree with Mr Justice Sheth on applicability of strict liability as erection of dam by the Government on own land to save other land could not be held to be non-natural user. He, however, held that the act of planning and construction of the bundh in question was done in a negligent manner. He, therefore, set aside the finding of the trial court that it was an act of God. Having held so the learned Judge relied on *Essoo Bhayaji* v. *The Steamship 'Savitri'*[6] and observed as under :

"This decision lays down a principle that for all actions of tort not specifically provided for in other articles of Schedule I, the proper article to apply will be Article 36, which is a residuary article so far as actions based on torts including negligence are concerned. Having considered Articles 19 to 27, we find that they provide for actions in cases of specific types of torts."

And as Article 36 of the Act applied to actions based on negligence, and the suit was filed after two years from the date the cause of action arose the trial court did not commit any error in dismissing the suit as beyond time.

6. When the matter went to the learned third Judge Mr Justice Divan held, that the decision in *Essoo Bhayaji*[6] and *Jadu Nath Dandput* v. *Hari Kar*[7] even though not referred received imprimatur in *National Bank of Lahore Ltd.* v. *Sohan Lal Saigal*[8]. Consequently so far actions in torts were concerned Article 36 was residuary article the period of limitation under which would start from the time the tort took place. The learned Judge was further of opinion that even if question of liability was based on the rule in *Rylands* v. *Fletcher*[1] as modified in *Modern Cultivators*[2] instead of negligence the same result would follow so far as limitation was concerned as liability based on rule of this decision was as much liability in tort as on negligence the only difference being that in the former it is unintended and even independent of negligence. The learned Judge held that, the words, 'malfeasance', 'misfeasance' and 'non-feasance' were to be understood,

"... as synonymous with the compendious expression, 'torts' and therefore they must be read as equivalent to tort and the period of limitation would start from the time when the tort takes place."

7. To determine if the law stated, seemingly, so simply by the learned third Judge yet so broadly, is accurate understanding of the exhaustiveness of the expression used in Article 36 as extending to all kinds of torts it may be necessary to understand the meaning and scope of torts and the width and ambit of the expression used in Article 36. 'Tort' dictionarily means "breach of duty leading to damage". Same meaning attaches to it in law. Salmond has defined it as,

"a civil wrong for which the remedy is a common law action in unliquidated damages and which is not exclusively the breach of a contract or the breach of a trust or other merely equitable obligation."

6   ILR (1886) 11 Bom 133
7   (1913) 17 CWN 308 : 17 CLJ 206 : 18 IC 253
8   AIR 1965 SC 1663: (1965) 3 SCR 293: 35 Comp Cas 604


SCC OnLine Web Edition, Copyright © 2015
Page 10    Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**8.** Winfield has defined tortious law arising from breach of a duty primarily fixed by law; this duty is towards persons generally and its breach is redressable by an action for unliquidated damages. In general, torts consist of some act done without just cause or excuse.

> "The law of torts exists for the purpose of preventing men from hurting one another whether in respect of their property, their presence, their reputations or anything which is theirs."

Injury and damage are two basic ingredients of tort. Although these may be found in contract as well but the violations which may result in tortious liability are breach of duty primarily fixed by the law while in contract they are fixed by the parties themselves. Further in tort the duty is towards persons generally. In contract it is towards specific person or persons. An action for tort is usually a claim for pecuniary compensation in respect of damages suffered as a result of the invasion of a legally protected interest. But law of torts being a developing law its frontiers are incapable of being strictly barricaded. Liability in tort which in course of time has become known as 'strict liability', 'absolute liability', 'fault liability' have all gradually grown and with passage of time have become firmly entrenched. 'Absolute liability' or "special use bringing with it increased dangers to others"(*Rylands* v. *Fletcher*[1]) and 'fault liability' are different forms which give rise to action in torts. The distance (*sic* difference) between 'strict liability' and 'fault liability' arises from presence and absence of mental element. A breach of legal duty wilfully, or deliberately or even maliciously is negligence emanating from fault liability but injury or damage resulting without any intention yet due to lack of foresight etc. is strict liability. Since duty is the primary yardstick to determine the tortious liability its ambit keeps on widening on the touchstone of fairness, practicality of the situation etc. In *Donoghue* v. *Stevenson*[9] a manufacturer was held to be liable to ultimate consumer on the principle of duty to care. In *Anns* v. *Merton London Borough Council*[10] it was, rightly, observed:

> "[T]he broad general principle of liability for foreseeable damage is so widely applicable that the function of the duty of care is not so much to identify cases where liability is imposed as to identify those where it is not,... ."

Truly speaking entire law of torts is founded and structured on morality that no one has a right to injure or harm others intentionally or even innocently. Therefore, it would be primitive to class strictly or close finality (*sic* finally) the ever-expanding and growing horizon of tortious liability. Even for social development, orderly growth of the society and cultural refineness, the liberal approach to tortious liability by courts is more conducive.

**9.** In between strict liability and fault liability there may be numerous circumstances in which one may be entitled to sue for damages. And it may be partly one or the other or may be both. In a welfare society construction

9   (1932) AC 562: 1932 All ER Rep 1
10  (1978) AC 728: (1977) 2 All ER 492


SCC Online Web Edition, Copyright © 2015
Page 11    Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
--------------------------------------------------------------------------------------------------------------------------


of dam or bundh for the sake of community is essential function and use of land or accumulation of water for the benefit of society cannot be

*a*  non-natural user. But that cannot absolve the State from its duty of being responsible to its citizens for such violations as are actionable and result in damage, loss or injury. What is fundamental is injury and not the manner in which it has been caused. 'Strict liability', 'absolute liability', 'fault liability' and 'neighbour proximity' are all refinements and development of law by English Courts for the benefit of society and the common man. Once the

*b*  occasion for loss or damage is failure of duty, general or specific, the cause of action under tort arises. It may be due to negligence, nuisance, trespass, inevitable mistake etc. It may be even otherwise. In a developed or developing society the concept of duty keeps on changing and may extend to even such matters as was highlighted in *Donoghue* v. *Stevenson*[9] where a manufacturer was held responsible for injury to a consumer. They may

*c*  individually or even collectively give rise to tortious liability. Since the appellant suffered loss on facts found due to action of respondent's officers both at the stage of construction and failure to take steps even at the last moment it was liable to be compensated.

**10.** But to be actionable and get redress from court it must assume legal shape by falling in one or the other statutorily, judicially or even otherwise

*d*  recognised category of wrong. That is why the appellant based his claim on negligence. Therefore, it is necessary to determine what is the ambit of it as it was vehemently urged that once the State was found guilty of negligence the appellant could succeed not only by establishing negligence but also approaching the court within the statutory period provided under the Law of Limitation and the courts were precluded from invoking either the rule of

*e*  strict liability or any other concept. According to the learned counsel civil liability should be dealt within the four corners of statutory enactments both for sake of certainty and uniformity irrespective of whether the party benefited was damage. Winfield has defined 'negligence' as under:

" 'Negligence' as a tort is the breach of a legal duty to take care which results the State or an individual. For this submission advanced with

*f*  plausibility it appears necessary to determine how wide or narrow is the ambit of negligence in realm of torts. Can it be strictly compartmentalised? When the State was found reluctant in discharge of its duties or public responsibility then was it negligence alone or it was something more or less?

**11.** 'Negligence' ordinarily means failure to do statutory duty or otherwise giving rise to in damage, undesired by the defendant, to the

*g*  plaintiff. Thus its ingredients are —

> (*a*) a legal duty on the part of A towards B to exercise care in such conduct of A as falls within the scope of the duty;
>
> (*b*) breach of that duty;
>
> (*c*) consequential damage to B."

*h*


SCC Online Web Edition, Copyright © 2015
Page 12    Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

12                    SUPREME COURT CASES                    (1994) 4 SCC

According to Dias,

> "[L]iability in negligence is technically described as arising out of
> damage caused by the breach of a duty to take care."                   *a*

These textbooks thus make it amply clear that the axis around which the law
of negligence revolves is duty, duty to take care, duty to take reasonable
care. But concept of duty, its reasonableness, the standard of care required
cannot be put in strait-jacket. It cannot be rigidly fixed. The right of
yesterday is duty of today. The more advanced the society becomes the more
sensitive it grows to violation of duties by private or even public          *b*
functionaries. Law of torts and particularly the branch of negligence is
consistently influenced and transformed by social, economic and political
development. The rule of strict liability developed by English Courts in
*Rylands* v. *Fletcher*[1] was judicial development of the liability in keeping
with growth of society and necessity to safeguard the interest of a common
man against hazardous activities carried on by others on their own premises   *c*
even though innocently. By conservative standard it could not be termed as
negligence as damage arose not by violation of duty. Yet the law was
expanded to achieve the objective of protecting the common man not by
narrowing the horizon of legal injury but by widening it. In *Donoghue* v.
*Stevenson*[9] the House of Lords held a duty to take care as a specific tort in
itself. Even improper exercise of power by the authorities giving rise to     *d*
damage has been judicially developed and distinction has been drawn
between power coupled with duty. Where there is duty the exercise may not
be proper if what is done was not authorised or not done in the bona fide
interest of the public. In *David Geddis* v. *Proprietors of the Bann
Reservoir*[11] the failure to keep the reservoir clean as a result of blameworthy
negligence leading to overflow was held to be liable for negligence. It was   *e*
reiterated in *Tate and Lyle Industries Ltd.* v. *Greater London Council*[12]. It
was held that where public right was interfered with which resulted in public
nuisance the claim for damages was maintainable. The English Courts have
extended the principle of strict liability to varied situations. Thus the
distinction arising out of damage due to negligence and even without it
rather unintentionally and innocently is a firmly established branch of law of  *f*
tort. In *Read* v. *J. Lyons & Co. Ltd.*[3] it was observed that damage caused by
escape of cattle to another land was a case of pure trespass constituting a
wrong without negligence. Thus negligence is only descriptive of those sum
total of activities which may result in injury or damage to the other side for
failure of duty both legal or due to lack of foresight and may comprise of
more than one concepts known or recognised in law, intended or unintended.     *g*

12. Was the ratio in *Rylands* v. *Fletcher*[1] modified by this Court in
*Modern Cultivators*[2]? If so to what extent? What is its effect on facts of this
case? That was a case where the land of the plaintiff used for silting
operation was flooded due to escape of canal water. It was claimed that in

*h*

11   (1878) 3 AC 430
12   (1983) 2 AC 509: (1983) 1 All ER 1159


SCC Online Web Edition, Copyright © 2015
Page 13    Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

absence of proof of negligence the suit was not liable to be decreed. The Court did not apply the principle laid down in *Rylands* v. *Fletcher*[1] :

a    "That any occupier of land who brings or keeps upon it anything likely to do damage if it escapes is bound at his peril to prevent its escape and is liable for all the direct consequences of its escape, even if he has been guilty of no negligence ... a principle derivatively created from the rule of 'strict liability'... as canal systems are essential to the life of a nation and land that is used as canals is subjected to an ordinary

b    use and not to unnatural use."

The Court preferred to rely on the principle developed by American Courts on canal breaks and applied the principle of 'fault liability' which may even be inferred from circumstances. The view of the High Court, therefore, that the rule of strict liability was modified by this Court in *Modern Cultivators*[2] does not appear to be correct. 'Absolute liability', or 'strict liability' and

c    'fault liability' do not go together.

**13.** With this background it may now be examined if the High Court, even after recording the findings in favour of the appellant, was justified in throwing out the suit because Article 36 is residuary article extending to all kinds of torts. The article as it stood at material time prior to 1963 read as

d    under :

| *"Description of suit* | *Period of limitation* | *Time from which period begins to run* |
|---|---|---|
| 36. For compensation for any malfeasance, misfeasance or non-feasance independent of contract and not herein specially provided for." | Two years | When the malfeasance, misfeasance or non-feasance takes place. |

e

**14.** In *Black's Law Dictionary* the meaning of each of these expressions is explained as under :

"*Malfeasance.*— Evil doing; ill conduct. The commission of some act which is positively unlawful; the doing of an act which is wholly wrongful and unlawful; the doing of an act which person ought not to do

f    at all or the unjust performance of some act which the party had no right or which he had contracted not to do. Comprehensive term including any wrongful conduct that affects, interrupts or interferes with the performance of official duties.

*Misfeasance.*— The improper performance of some act which a man

g    may lawfully do.

*Non-feasance.*— Non-performance of some act which ought to be performed, omission to perform a required duty at all, or total neglect of duty."

*Stroud* defines it as under :

"*Misfeasance.*— There is no such distinct wrongful act known to the

h    law as 'misfeasance'.


SCC Online Web Edition, Copyright © 2015
Page 14        Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Non-feasance.*— The decisions as to 'non-feasance' cannot be invoked to excuse a highway authority from liability for nuisance caused by a defective stud brought on to the highway, not for the purposes of the highway, but for purposes of traffic regulation under the Road Traffic Acts."

The words are undoubtedly of very wide import. They are strong expressions as well. Malfeasance and non-feasance bring into motive, intention, malice etc. Law of torts, however, is not confined and cannot be strictly categorised. Where the State undertakes common law duty its actions may give rise to common law tort. Negligence in performance of duty is only a step to determine if action of Government resulting in loss or injury to common man should not go uncompensated. If construction of bundh is a common law or public duty then any loss or damage arising out of it gives rise to tortious liability not in the conservative sense but certainly in the modern and developing sense. A common man, a man in the street cannot be left high and dry because wrongdoer is State. The basic element of tort is duty. And that comes into play fully when there is a common law duty. Since construction of bundh was a common law duty any injury suffered by a common man was public tort liable to be compensated. Can it be said to be covered in the expressions used in Article 36? Malfeasance and misfeasance necessarily import intention, knowledge and malice, therefore, they may not be available in every tortious liability arising out of violations of public duty. Evil doing or ill conduct postulates something more than mere omission or commission. Misfeasance is now recognised as imputable to discharge of duty arbitrarily. In *Calveley* v. *Chief Constable of the Merseyside Police*[13] it was held that for the tort of misfeasance it was necessary that the public officer must have acted maliciously or with bad faith. In *Dunlop* v. *Woollahra Municipal Council*[14] it was held that without malice the claim for misfeasance could not be accepted. Non-feasance on the other hand is omission to discharge duty. But the omission to give rise to action in torts must be impressed with some characteristic, namely, malice or bad faith. The expressions 'malfeasance', 'misfeasance' and 'non-feasance' would, therefore, apply in those limited cases where the State or its officers are liable not only for breach of care and duty but it must be activated (*sic* actuated) with malice or bad faith. The defective planning in construction of a bundh, therefore, may be negligence, mistake, omission but to say that it can only be either malfeasance, misfeasance and non-feasance is not correct. Observations in *Bhayaji*[6] to the following effect,

"The words 'malfeasance, misfeasance, or non-feasance independent of contract' used in Article 36, are of the widest import, and embrace all possible acts or omissions, commonly known as torts by English lawyers; that is to say, wrongs independent of contract."

13  (1989) 1 All ER 1025
14  (1981) 1 All ER 1202: (1982) AC 158


SCC Online Web Edition, Copyright © 2015
Page 15      Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
--------------------------------------------------------------------------------

were made in a different context and was not intended to be so widely stated as has been understood by the High Court as the Court while examining

a   various articles of Limitation Act for purposes of deciding if the claim was covered in one or the other articles observed :

> "I rather from such a perusal come to the conclusion that it was intended that two years should be the outside time allowed for bringing a suit founded upon tort, except in certain well-defined particular instances."

b   **15.** Similarly *Jadu Nath Dandput* v. *Hari Kar*[7] was a case of illegal distress and carrying of the standing crops. The Court did not agree that it was a case squarely covered under Article 36 as the cause of action arose partly under Article 36 and partly under Article 49. But what impressed the High Court was the extract from *Stephen's Commentaries* to the following effect:

c
> "Personal actions are actions founded either on contracts or on torts; that is to say, they are either actions *ex contractu* or actions *ex delicto*; torts being wrongs independent of contract; and being either (*i*) non-feasances, or the omission of acts which a man was by law bound to do, or (*ii*) malfeasances, or the commission of acts, which were themselves unlawful."

d   That is why it was observed that these decisions even though not noticed received approval in *National Bank of Lahore Ltd.* v. *Sohan Lal Saigal*[8]. Although the Court held that claim for damages for loss of contents from the lockers arose out of breach of contract and it was not a case which could be considered to be covered under tort yet while dealing with argument

e   advanced on Article 36 the Court observed:

> "Article 36 applied to acts or omissions commonly known as torts by English lawyers. They are wrongs independent of contract. Article 36 applies to actions '*ex delicto*' whereas Article 115 applies to actions '*ex contractu*'.

f
> These torts are often considered as of three kinds, viz., non-feasance or the omission of some act which a man is by law bound to do, misfeasance, being the improper performance of some lawful act, or malfeasance, being the commission of some act which is in itself unlawful."

This extract was understood by the High Court as demarcating all violations either as '*ex delicto*' or '*ex contractu*'. But it was erroneous understanding of

g   the decisions to hold that Article 36 was residuary article and applied to all tortious liabilities. The Court itself had taken care by using the word 'often'. Even in England where the law of torts has been developed demarcations have not been frozen so rigidly as has been attempted to be done by the High Court. Use of expression, "not herein specifically provided for" in Article 36 was to make it residuary article to such wrongs for which limitation was

h   provided in the article but the interpretation placed by the High Court that it was exhaustive of all torts, was not in conformity with principle of

SCC Online Web Edition, Copyright © 2015
Page 16 Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

16              SUPREME COURT CASES              (1994) 4 SCC

interpretation nor the scheme and purpose of the enactment. This Court in *National Bank case*[8] extracted the English principle to demonstrate that it was residuary provision to distinguish it from contractual obligations but it could not be narrowed down so as to be exhaustive of all torts. As explained earlier damages arising out of strict liability or duty to take care as was in *Donoghue* v. *Stevenson*[9] or public law duty may not be strictly covered in these expressions. As has been explained earlier the damage was caused to the appellant not only because of negligence of officers but also because it was due to failure in discharge of public duty and mistake at various stages. Liability in tort may arise as observed by Salmond without fault. The basic ingredients of torts, namely, injury and damage due to failure to observe duty has been found to have been established. In the conservative sense it was negligence. But in modern sense and present day context it was not only negligence but mistake, defective planning, failure to discharge public duty. It was thus tort not in the narrow sense but in the broader sense to which Article 120 applied. The suit, therefore, could not be thrown out as it was filed beyond two years from the date the incident took place. The substantial question of law if Article 36 was exhaustive of all torts is thus answered in the negative. Further the rule in *Rylands* v. *Fletcher*[1] has not been modified by our Court in *Modern Cultivators*[2]. And the article of Limitation Act applicable to the facts of the case was Article 120 and not Article 36.

**16.** Even assuming that Article 36 of the Act applied, was the suit filed after expiry of two years from the date the incident took place, barred by time? In other words what is the exact point of time from when the period of limitation has to be computed. The First Schedule to the Act as it then stood made three divisions, first, for suits, second for appeal and third for applications. The nature and description of the suit is mentioned in the 1st column of the Schedule, period of limitation in the 2nd and the time from which the period begins to run in the 3rd and the last column. In contents the former deals when the right to sue accrues, the latter when the right shall come to an end if not exercised within the period provided as it cannot remain uncertain or in doubt or in suspense forever and the last deals with computation, namely, the point from which the limitation begins to run. A look at the entries in the first division would indicate that different point of time has been adopted for different nature of suits. In some it is from the date of the order, in others from the date of knowledge. In yet others when the cause of action accrues etc. For compensation for damages it is linked either with nature of claim, namely, if it is one time of cause of action or recurring cause of action etc. That is why in some of these items the period begins to run from the time and date of the incident and in others from the date of knowledge. In Article 36 the time begins to run,

"when the malfeasance, misfeasance or non-feasance takes place".

The word 'when' means at what time. The time according to finding recorded by the High Court was negligence in act of planning and construction of bundh. When did it take place? 'Take' has many shades of meaning. How it should be understood, precisely, in a set of circumstances


SCC
ONLINE
True Print

---

JAY LAXMI SALT WORKS (P) LTD. v. STATE OF GUJARAT *(Sahai, J.)* 17

depends on the context in which it has been used. Literally speaking it can mean when it happens but that would not be consistent with the purpose of

*a* its use and may defeat the very objective as malfeasance or non-feasance arose not on 4th or 5th July but when dam was started in 1955 and in any case when completed in 1956. At that time there could have been no occasion for the appellant to claim any damages. Therefore, time obviously cannot be said to run either from the date the construction of bundh was commenced or it was completed. Therefore, the computation has to be from

*b* some other point. For instance, where there is a single wrong the time may start running immediately. In cases of assault, battery or death the cause of action may arise immediately. The limitation may be counted from that very point. It is the individual or the single act which by itself furnishes the cause of action. But there may be others where even though injury may have been caused but the cause of action may not arise unless something more happens.

*c* For instance if one accumulates something hazardous on its own premises and it leaks then the cause of action will arise not by accumulation or even by mere leakage but cause of damage and injury. Therefore, the construction of the words 'when' and 'takes place' used in Article 36 has to be construed liberally so as not to deprive the person who suffers damages. In wrongs like negligence, strict liability or violation of public duty time begins to run not

*d* before the damage takes place. But the computation under the article has to be from malfeasance, misfeasance and non-feasance. It has been explained earlier that the negligence or violation in such duty which results in damage could not furnish the starting point. What could be the other point? The cause of action to claim damages arises when the actual loss has taken place. It is thus not the date on which negligence or mistake took place but the date

*e* when injury is suffered. But computation has to be from misfeasance or non-feasance etc. that is violation of duty. This duty has to be different than the duty which was the cause of negligence. Therefore in such actions which are latent in nature the aggrieved party has to make a claim for damages and it is the failure in discharge of this duty in this regard which too can furnish the starting point of limitation. Since the authorities refused *to* pay damages

*f* even though it was got assessed at their own direction the computation of the period for filing suit could arise from that date. Otherwise it would cause great injustice. A common man, an average citizen who in a developing country cannot afford to pay huge court fee would be deprived of his just claim only because he was pursuing his remedy vigilantly in the Government of a welfare State.

*g* **17.** Therefore the computation for purposes of limitation under Article 36 could commence either from the date when malfeasance, misfeasance or non-feasance occurred or from the date when the damage took place or where claim is lodged within period allowed by law and the damage is ascertained then from the date the claim is rejected. It is the improper performance of duty or arbitrary action of the authorities in not accepting the

*h* claim when damage was found by the Official Committee to have taken place. The limitation to file the suit on facts of this case arises from the date



SCC Online Web Edition, Copyright © 2015
Page 18        Tuesday, September 15, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

18                    SUPREME COURT CASES              (1994) 4 SCC

the Government refused to pay the amount determined by the Committee. Since the rejection was not communicated nor the copy of the report was supplied despite request the suit could not be said to be barred by time.

**18.** In the result, this appeal succeeds. The decree and order passed by the two courts below are set aside. The suit of the appellant for Rs 1,58,735, the amount of damage determined by the trial court which was neither appealed from nor objected to by the respondent is decreed with costs throughout. The respondent shall further pay interest at the rate of 6% per annum from the date of decree till December 1982 and at the rate of 9% per annum from 1982 to December 1992 and at the rate of 12% per annum from January 1993 till the amount is paid.

---

### (1994) 4 Supreme Court Cases 18

(BEFORE K. RAMASWAMY AND N. VENKATACHALA, JJ.)

SARDAR SINGH                                    ..        Appellant;

*Versus*

KRISHNA DEVI (SMT) AND ANOTHER                 ..       Respondents.

Civil Appeal No. 2637 of 1994†, decided on April 26, 1994

**A. Registration Act, 1908 — Ss. 17(1)(b) and 49 — 'Non-testamentary instruments' — Award made by private arbitrator which on application made under S. 14 of Arbitration Act made rule of the court under S. 17 of that Act — Held, a 'non-testamentary instrument' within S. 17(1)(b) — Arbitration Act, 1940, Ss. 14 & 17**

**B. Registration Act, 1908 — Ss. 17(1)(b) and 49 — Non-testamentary instrument — Award of private arbitrator — Non-registration of — Effect — Even so it is conclusive between the parties — If it does not create any right, title or interest in praesenti in immovable property of value of Rs 100 or above, its registration not necessary — Whether such instrument intended to avoid registration would depend upon facts and circumstances of each case — Award declaring that appellant and his brother had purchased the property jointly both having half share and the brother being benamidar — Held, award did not create any new right, title or interest in the appellant — Hence award not compulsorily registrable**

**C. Specific Relief Act, 1963 — Ss. 20(1), 10(b) and 12 — Grant of decree for specific performance discretionary — Exercise of discretion whether justified on facts — Regard to equity and justice — Arbitrator awarding that appellant and his brother entitled to half share in a house — Property mutated in the joint name of the two brothers and both in possession and enjoyment of the house — Subsequently agreement of sale of the entire house entered into by appellant's brother with respondent, a neighbour — Held, courts below erred in exercising discretion of granting decree for specific performance of the agreement of sale of the entire house — Respondent should have made enquiries before entering into the agreement — However, having regard to equity and justice, partial enforcement of the contract may be granted —**

---

† From the Judgment and Order dated 21-11-1990 of the Delhi High Court in R.F.A. No. 206 of 1986

Declaration of Ritin Rai

Exhibit 6


SCC Online Web Edition, Copyright © 2015
Page 1      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

552                         SUPREME COURT CASES                    (1997) 9 SCC

### (1997) 9 Supreme Court Cases 552

(BEFORE K. RAMASWAMY AND G.B. PATTANAIK, JJ.)

RAJKOT MUNICIPAL CORPORATION          ..      Appellant;

*Versus*

MANJULBEN JAYANTILAL NAKUM AND OTHERS      ..    Respondents.

Civil Appeal No. 200 of 1997†, decided on January 17, 1997

**A. Tort — Negligence — Misfeasance — Careless breach of duty by public authority — Liability in damages for negligence — When arises — Factors to be considered — Proximity of relationship between the person who suffered damages and the wrongdoer, foreseeability of danger and duty of care owed by the authority must be established — Burden of proof on plaintiff — Plaintiff would not succeed by merely establishing that accident occurred due to negligence i.e. defendant's failure to take reasonable care as ordinary prudent man — Special circumstances which must be taken into account stated — Foreseeability of damage or danger to a person or property must be corelated to public duty of care — Duty of care should be to avoid causing of present or imminent danger created by positive act of the authority — Harm complained of must be of the kind contemplated by the statute — Action for damages would not lie if the statute does not intend to guard the kind of damage suffered or if some other remedy is available or provided by the statute — Deceased while walking on the footpath of a public road struck by a roadside tree suddenly falling on him in a still weather condition resulting in his death — Suit filed by deceased's wife and children claiming damages from the Municipal Corporation on ground of negligence on the part of the Corporation in properly maintaining the roadside trees — Held, Corporation not liable for damages —Proximity of relationship and foreseeability of danger not found — Corporation cannot be expected to have a duty to maintain constant supervision by testing the healthy condition of the trees — Municipalities — Bombay Provincial Municipal Corporations Act, 1949 (59 of 1949) (as applicable in Gujarat), S. 66(8) — Words and phrases — 'Misfeasance' and non-feasance'**

**B. Tort — 'Negligence' — Meaning — Elements of — Words and phrases 'duty'**

**C. Tort — Negligence — Statutory corporations or public authorities — Municipal corporations — When principle of law of negligence applies to them — Situations different when act is one of commission and one of omission — Act not negligent if done in good faith in exercise of and within the limits of the discretion**

**D. Tort — Negligence — Before making a repository of statutory power liable for, the statute as interpreted must impose a statutory duty and confer a private right of action in damages for breach thereof — But common law duty should not be superimposed through process of interpretation — Duty of care when arises, discussed — Foreseeability as a test — Imminent danger theory — The duty of care should not impose an intolerable burden on the authority and prevent it from performing its normal duties**

**E. Interpretation of Statutes — Legislative intent — How to determine**

† From the Judgment and Order dated 20-3-1991 of the Gujarat High Court in F.A. No. 259 of 1980


SCC Online Web Edition, Copyright © 2015
Page 2    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

A roadside tree, which was in a still condition, suddenly fell on the deceased Jayantilal while he was walking on the footpath on the way to his office, as a result of which he sustained injuries on his head and other parts of the body and later died in the hospital. The respondents, being his widow and children, filed the suit for damages in a sum of Rs 1 lakh from the appellant-Corporation. The trial court decreed the suit for a sum of Rs 45,000 finding that the appellant had failed in its statutory duty to check the healthy condition of trees and to protect the deceased from the tree falling on him resulting in his death. On appeal, the Division Bench has held that the appellant has a statutory duty to plant trees on the roadsides as also the corresponding duty to maintain the trees in proper condition. The statutory duty gives rise to tortious liability on the State and as its agent the appellant-Corporation being a statutory authority was guilty of negligence on its part in not taking care to protect the life of the deceased. The respondents cannot be called upon to prove that the tree had fallen due to appellant's negligence. Statutory obligation to maintain trees being absolute, and since the tree had fallen due to its decay, the appellant has failed to prove that the occurrence had taken place without negligence on its part. The appellant failed to make periodical inspection whether the trees were in good and healthy condition subjecting them to seasonal and periodical treatment and examination. Therefore, the appellant had not taken care to foresee the risk of the tree's falling and causing damage to the passers-by. Thus the appellant was liable to pay damages for the death of Jayantilal. The Division Bench accordingly confirmed the decree of the trial court. Allowing the Corporation's appeal by special leave.

*Held* :

Negligence is failure to use such care as a reasonable, prudent and careful person would use, under similar circumstances. It is the doing of some act which a person of ordinary prudence would not have done under similar circumstances or failure to do what a person of ordinary prudence would have done under similar circumstances. Negligence also is an omission to do something which a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do, or the doing of something which a reasonable and prudent man would not do. Negligence would include both acts and omissions involving unreasonable risk of having done harm to another. The breach of the duty must cause damage. How much of the damage to be compensated by the defendant should be attributed to his wilful conduct and how much to his wilful negligence or careless conduct or remissness in performance of duty, are all relevant facts to be considered in a given act or omission in adjudging duty of care. The element of carelessness or the breach of duty and whether that duty is towards the plaintiff or the class of persons to which the plaintiff belongs are important components in tort of negligence. Negligence would, therefore, mean careless conduct in commission or omission of an act, whereby another to whom the plaintiff owed duty of care has suffered damage. The duty of care is crucial in understanding the nature and scope of tort of negligence.                    (Paras 11 and 15)

*Black's Law Dictionary* (6th Edn.), p. 1489, *relied on*

Negligence connotes inadvertence to the consequences of his conduct which can be a measure of behaviour where one person had been careless in that he did not behave as a prudent man would have done whether by advertence or otherwise. The tort of negligence always requires some form of careless conduct which is usually, although not necessarily, the product of inadvertence. Not every careless conduct which causes damage, however, will give rise to an action in tort. The negligence lies in failure to take such steps as a reasonable, prudent man would have taken in the given circumstances. What constitutes carelessness is the conduct and not the

SCC Online Web Edition, Copyright © 2015
Page 3    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

554                         SUPREME COURT CASES                    (1997) 9 SCC

result of inadvertence. Thus negligence in this sense is a ground for liability in tort.
(Paras 17 and 28)

In every case giving rise to tortious liability, tort consists of injury and damage *a*
due to negligence. Claim for injury and damage may be founded on breach of
contract or tort. The liability in tort may be strict liability, absolute liability or special
liability. The degree of liability depends on degree of mental element. The elements
of tort of negligence consist in — (*a*) duty of care; (*b*) duty owed to the plaintiff; (*c*)
careless breach of such duty. Negligence does not entail liability unless the law
exacts a duty in the given circumstances to observe care. Duty is an obligation
recognised by law to avoid conduct fraught with unreasonable risk of damage to *b*
others. The question whether duty exists in a particular situation involves
determination of law.                                                   (Para 12)

The defendant must be under duty of care not to create latent source of physical
danger/damage to the person or property of third party whom he ought to have
reasonably foreseen as likely to be affected thereby. Those latent defects cause
physical danger to the person or the property giving cause of action and the
defendant then is liable to pay damage for tortious liability. It must, therefore, be the *c*
essential element to establish that there is positive act or duty and the defendant is
under that duty. The court is not to create, by process of interpretation, latent source
of physical danger to the person or property of third party when the Act does not
envisage that the defendant ought to have reasonably foreseen him as likely to be
affected thereby.                                                        (Para 17)

The court is required to examine the scope of duty of care which the local *d*
authority owed to the plaintiff. The court is required to consider the object, scope
and breach of the Act viz. Bombay Provincial Municipal Corporations Act, 1949.
Though the statute is of general character, since the Government or local authority is
entrusted with the duty to implement the law, though at its discretion, and if damage
is done in execution thereof, what requires to be examined is whether the aforestated
elements of tort of negligence stand attracted. The court is further required to
consider whether extension of duty of care by the process of interpretation would *e*
elongate the public policy or retard its object or frustrate public policy behind the
statute and the inevitable effect thereof on the affected plaintiff as well as the general
public. No general principle of law is desirable to be laid down as an acid test.
(Para 15)

*Donoghue* v. *Stevenson*, 1932 AC 562 : 1932 All ER Rep 1, HL, *referred to*

While considering whether an action would lie for breach of statutory duty, what *f*
requires to be established, among other things, is that the harm complained of is of
the kind contemplated by the statute. The question emerges as to when would the
breach of statutory duty under a particular enactment give rise to tortious liability?
The statutory duty gives rise to civil action. The statutory negligence is sui generis
and independent of any other form of tortious liability. It would, therefore, be of
necessity to find out from the construction of each statutory duty whether the
particular duty is general duty in public law or private law duty towards the plaintiff.
The plaintiff must show that (*a*) the injury suffered is within the ambit of statute; (*b*) *g*
statutory duty imposes a liability for civil action; (*c*) the statutory duty was not
fulfilled; and (*d*) the breach of duty has caused him injury. These essentials are
required to be considered in each case. The action for breach of statutory duty may
belong to the category of either strict or absolute liability which is required,
therefore, to be considered in the nature of statutory duty the defendant owes to the
plaintiff; whether or not the duty is absolute; and the public policy underlying the *h*
duty. In most cases, the statute may not give rise to cause of action unless it is
breached and it has caused damage to the plaintiff, though occasionally the statute


SCC Online Web Edition, Copyright © 2015
Page 4        Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

may make breach of duty actionable per se. The burden, therefore, is on the plaintiff to prove on balance of probabilities that the defendant owes that duty of care to the plaintiff or class of persons to whom he belongs, that defendant was negligent in the performance or omission of that duty and breach of duty caused or materially contributed to his injury and that duty of care is owed on the defendant. If the statute requires certain protection on the principle of *volenti non fit injuria*, the liability stands excluded. The breach of duty created by a statute, if it results in damage to an individual prima facie, it is tort for which the action for damages will lie in the suit. One would often take the Act, as a whole, to find out the object of the law and to find out whether one has a right and remedy provided for breach of duty. It would, therefore, be of necessity in every case to find the intention of legislature in creating duty and the resultant consequences suffered from the action or omission thereof, which are required to be considered. No action for damages lies if on proper construction of statute, the intention is that some other remedy is available. One of the tests in determining the intention of the statute is to ascertain whether the duty is owed primarily to the general public or community and only incidentally to an individual or primarily to the individual or class of individuals and only incidentally to the general public or the community. If the statute aims at duty to protect a particular citizen or particular class of citizens to which the plaintiff belongs, it prima facie creates at the same time corelative right vested in those citizens of which plaintiff is one; he has remedy for enforcement, namely, the action for damages for any loss occasioned due to negligence or for failure of it. But this test is not always conclusive.                                                     *(Paras 16 and 18)*

*Gorris* v. *Scott*, (1874) 9 Exch 125 : 43 LJ Ex 92; *Kilgollan* v. *William Cooke & Co. Ltd.*, (1956) 1 WLR 527 : (1956) 2 All ER 294, CA, *relied on*

Duty may be of such paramount importance that it is owed to all the public. It would be wrong to think that on an action, the duty could be enforced by way of damages when duty is owed to a section of public and cannot be enforced if an individual sustains damages to whom the Corporation owes no duty and no private interest is infringed. Breach of statutory duty, therefore, requires to be examined in the context in which the duty is created not towards the individual, but has its effect on the right of individual vis-à-vis the society. Statutory duty generally is towards public at large and not towards an individual or individuals and the corelative right is vested in the public and not in private person, even though they may suffer damages. The duty in such a case is to be enforced by way of criminal prosecution or by way of injunction at the suit under Section 192 of CPC or with leave of court under Order 1, Rule 8 CPC by public-spirited person or in any appropriate manner to enforce the right and not by way of private action for damages. In that situation, the legislature, while recognising the private right vested in an injured individual, may intend that it shall be maintained solely by some special remedy provided for a particular case and not by ordinary method of an action for damages as penalty or compensation.
                                                                                  *(Para 19)*

If the statute creates right and remedy, damages are recoverable by establishing the breach of statute as the sole remedy available under the statute. But where a statute merely creates a duty without expressly providing any remedy for breach of it, appropriate remedy, prima facie, is punishment for misdemeanour in respect of the injury to the public and the action for damages in respect of any special damage suffered by an individual. Where special remedy is expressly provided prima facie that was intended to be the only remedy and by implication it excludes the resort to common law. But this is also by no means conclusive. The consideration would be whether the statute intends to award damages for breach of statutory duty. The action for damages will not lie if the damage suffered by him is not of the type intended to

SCC Online Web Edition, Copyright © 2015
Page 5         Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

556                    SUPREME COURT CASES                (1997) 9 SCC

be guarded against. It seems to be contrary to statutory intendment to impose liability upon a public body for a thing for which no reasonable care in the performance of the act concerned could be inferred from the language used in the statute; it ought not to be so construed as to inflict the liability on the public authority unless the purpose sought to be achieved has been wanting due to want of exercise of duty and reasonable care in the performance of duty imposed by the statute.
(Paras 20 and 21)

Ordinarily the principle of the law of negligence applies to public authorities also. They are liable to damages because by a negligent act or failure to act when they are under a duty to act or for a failure to consider whether to exercise a power conferred on them with the intention that it would be exercised if and when public interest requires it. Where the public authority has decided to exercise a power and has done it negligently a person who has acted in reliance on what the public authority has done, may have no difficulty in proving that the damages which he has suffered have been caused by the negligence. Where the damage has resulted from a negligent failure to act there may be greater difficulty in proving causation and requires examination in greater detail. The liability in tort is for the damage done, not for damage merely foreseeable or threatened or imminent.
(Paras 39 and 28)

The general rule is that the public authorities are liable for positive action (misfeasance) but not for omission (non-feasance). In considering the duty of public authority to avoid harm to those likely to be affected by the exercise of power or duty, the courts have evolved the relationship of proximity or neighbourhood nexus which exists between the person who suffered damages and wrongdoer. Where there is allegation of wrongdoing it has to be seen whether the latter reasonably ought to have foreseen that the carelessness on his part, is likely to cause damage to the other. In other words, if it is a reasonable foreseeability that carelessness on the defendant's part will cause damage to the plaintiff, then the defendant is plaintiff's neighbour and prima facie owes towards the plaintiff a duty of care which may, however, be negatived on the ground of public policy or reasonable care taken at the operational stage. The distinction between area of public policy and operational area is a logical and convenient one. Undoubtedly, a public authority is liable for the negligent acts of its servants or agents in carrying out their duties, or exercising their powers, within the operational area, although if the performance of their duties or the exercise of their power involves the exercise of discretion, an act will not be negligent, if it is done in good faith in the exercise of, and within the limits of, the discretion.
(Paras 26 and 27)

Statutory power is not something like a statutory duty. Before the repository of a statutory power can be made liable for negligence for a failure to exercise it, the statute must (either expressly or by implication) impose a duty to exercise the power and confer a private right of action in damages for a breach of the duty so imposed. The question whether the Act confers a private right of action depends upon the interpretation of the provisions of the Act. But by process of statutory interpretation, the courts may not superimpose a general common law duty on a statutory authority in order to give effect to its presumed idea of policy or duty. Common law does not superimpose such a duty on a mere statutory authority. The nature and scope of the common law duty of care owed by a public authority exercising statutory powers must be discerned carefully by reading the provisions of the Act, the object it seeks to achieve and other relevant considerations. The public authority is under a duty to take some action whether or not in exercise of its statutory power or not to prevent injury only if its antecedent acts, have created or increased a risk of injury of that kind. The normal duty of care cannot be a duty to exercise the statutory power to prevent injury to another or otherwise to act in such a way as to prevent injury to

SCC Online Web Edition, Copyright © 2015
Page 6      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

him unless the Act has imposed such a duty or unless the authority has itself created or increased the risk of injury of that kind. In the absence of such a statutory duty, a

a    normal duty of exercise of care cannot arise unless the act actually done in exercise of a statutory power, creates or increases the risk of foreseeable injury to another and then the duty is to do those acts with reasonable care and to take reasonable precautions to prevent that injury from occurring. The duty of care, therefore, must have corelationship to the kind of damage that the plaintiff has suffered and not to the plaintiff or a class of which the plaintiff is a member. These cases relate to private law tort.                                                          (Paras 29 and 40)

b      *Overseas Tankship (U.K.) Ltd.* v. *Morts Dock and Engineering Co. Ltd.*, 1961 AC 388 : (1961) 1 All ER 404 : (1961) 2 WLR 126, *relied on*

The proper approach, therefore, is to consider whether a duty of care situation exists in public law tort which the law ought to recognise and whether in that situation the defendant's conduct was such that he should have foreseen the damage that would be inflicted on the plaintiff. As a general rule of law, one man is under no duty to control another so as to prevent the latter from doing damage to a third. The

c    first question to be considered is whether the plaintiff has established necessary relationship giving rise to the duty of care. The next question is whether there is any negligence at the time when the act in question was committed? The act complained of must have a rational relationship to the damage caused. The tort of negligence does not depend simply on the question of foreseeability. Foreseeability is not the sole criterion nor does the fact that the damage is foreseeable create any onus. What the court would ask or look at is the operational structure of the Act. Is this a

d    situation where a duty does exist towards the plaintiff or the class of persons to which he belongs keeping in mind the nature of the functions and the interest of the community. The further question would be whether the damage to the plaintiff is so foreseeable. In that behalf it must be further seen whether there was sufficiently proximate relationship between the plaintiff and the defendant.               (Para 41)

Each case requires to be examined in the light of the special circumstances, viz.,

e    whether the defendant owed a duty of care to the plaintiff, whether the plaintiff is a person or a class of persons to which the defendant owed a duty of care, whether the defendant was negligent in performing that duty or omitted to take such reasonable care in the performance of the duty, whether damage must have resulted from that particular duty of care which the defendant owed to the particular plaintiff or class of persons. Public authorities discharge public obligations to the public at large. Therefore, it owes a duty of care at common law to avoid causing present or

f    imminent danger to the safety of the plaintiff or a class of persons to which the plaintiff belongs. It is a statutory duty of care under common law which could give rise to actionable claim in the suit of the individual and it is capable of coexistence alongside a statutory duty. The duty of care imposed on a local authority by law may not be put beyond what the statute expects of the local authority or Corporation to perform the duty. The tort of insuperable negligence would emerge from imminent danger created by a positive act. But the duty of care imposed on local authority by

g    law may be gauged from the circumstances in which and the conditions subject to which the duty of care has been imposed on the statutory authority. The imminent danger theory must be viewed keeping at the back of mind the act or conduct creating the danger to the plaintiff or the class of persons to which he belongs and that by negligent conduct the defendant causes damage to the property or person of the plaintiff, though the defendant is not in know of the danger. The defendant also in given circumstances, must owe special responsibility or proximity imposing

h    foreseeable duty to care, to safeguard the plaintiff from the danger or to prevent it from happening.                                                       (Para 57)

SCC Online Web Edition, Copyright © 2015
Page 7       Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

Therefore, there must exist some proximity of relationship, foreseeability of danger and duty of care to be performed by the defendant to avoid the accident or to prevent danger to person of the deceased Jayantilal. The requisite degree of proximity requires to be established by the plaintiff in the circumstances in which the plaintiff was injured. The plaintiff would not succeed by establishing that the accident had occurred due to negligence, i.e., the defendant's failure to take reasonable care as ordinary prudent man, under the circumstances, would have taken and the liability in tort to pay damages had arisen. If the defendant had become aware of the decayed condition or that the tree was affected by disease and taken no action to prevent the accident, it would be actionable, though for non-feasance. Mere appearance of danger gives rise to no liability. Actual damage had occurred before tortious liability for negligence arose. When the defendant is under a statutory duty to take care not to create latent source of physical danger to the property or the person who in the circumstances is considered to be reasonably foreseeable as likely to be affected thereby, the defendant would be liable for tort of negligence. If the latent defect causes actual physical damages to the person, the defendant is liable to damages for tortious liability. The negligent act or omission of the statutory authority must be examined with reference to the statutory provisions, creating the duty and the resultant consequences. The negligent act or omission must be specifically directed to safeguard the public or some sections of the public to which the plaintiff was a member, from the particular danger which has resulted.                    (Para 59)

The exercise of power/omission must have been such that duty of care had arisen to avoid danger. Foreseeability of the danger or injury alone is not sufficient to conclude that duty of care exists. The fact that one could foresee that a failure of the authority to exercise a reasonable care would cause loss to the passers-by itself does not mean that such a duty of care should be imposed on the statutory authority. The statutory authority exercises its public law duty or function. It would be wrong to think that the local authority always owes responsibility and continues to have the same state of affairs. It would be an intolerable burden of duty of care on the authority; otherwise it would detract the authority from performing its normal duties. If he were to gauge the risk of litigation, he would avoid doing public duty of planting and nurturing the trees thinking that it would be a heavy burden on the local authority. It would always cause heavy financial burden on the statutory authority. If the duty of maintaining constant vigil or verifying or testing the healthy condition of trees at public places with so many other functions to be performed, is cast on it, the effect would be that the authority would omit to perform statutory duty. Duty of care, therefore, must be carefully examined and the foreseeability of damage or danger to the person or property must be corelated to the public duty of care to infer that the omission/non-feasance gives rise to actionable claim for damages against the defendant.                    (Para 60)

When a person uses a road or highway, under common law one has a right to passage over the public way. When the defendant creates by positive action any danger and no signal or warnings are given and consequently damage is done, the proximate relationship gets established between the plaintiff and the defendant and the causation is not too remote. Equally, when the defendant omits to perform a particular duty enjoined by the statute or does that duty carelessly, there is proximity between the plaintiff-injured person and the defendant in performance of the duty and when injury occurs or damage is suffered to person or property, cause of action arises to enable the plaintiff to claim damages from the defendant. But when the causation is too remote, it is difficult to anticipate with any reasonable certainty as ordinary reasonable prudent man, to foresee damage or injury to the plaintiff due to


SCC Online Web Edition, Copyright © 2015
Page 8      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

causation or omission on the part of the defendant in the performance or negligence in the performance of the duty.                                                             (Para 61)

*a*     When the defendant was not in know of the discoverable defect or danger and it caused the damage by accident like sudden fall of the tree, it would be difficult to visualise that the defendant had knowledge of the danger and he omitted to perform the duty of care to prevent its fault. There would be no special relationship between the statutory authority and the plaintiff who is a remote user of the footpath or the street by the side of which the trees were planted, unless the defendant is aware of the condition of the tree that it is likely to fall on the footpath on which the *b*  plaintiff/class of persons to which he belongs frequents it. The defendant by his non-feasance is not responsible for the accident or cause of the death since admittedly there was no visible sign that the tree was affected by disease. It had fallen in a still condition of weather.                                                    (Para 58)

In determining the legislative intent, the Court is required to consider three factors, viz., the context and the object of the statute, the nature and precise scope of the relevant provisions and the damage suffered not of the kind to be guarded *c*  against. The object of the Act is to promote facilities of general benefit to the public as a whole in getting the trees planted on roadsides, the discharge of which is towards the public at large and not towards an individual, even though the individual may suffer some harm. The Act does not provide for any sanctions for omission to take action; i.e., planting trees or their periodical check-up when planted. By process of interpretation, the Court would not readily infer creation of individual liability to *d*  a named person or cause of action to an individual, unless the Act expressly says so. While considering the question whether or not civil liability is imposed by a statute, the court is required to examine all the provisions to find out the precise purpose of the Act, scope and content of the duty and the consequential cause of action for omission thereof. Action for damages will not lie in the suit by an injured person if the damage suffered by him is not of the kind intended to be protected by the Act.
                                                                              (Para 6)

*e*     The statute enjoins a power to plant trees on the roadsides or in public places. There is no statutory sanction for negligence in that behalf. But the question is whether the statutory function to plant trees gives rise to a duty of maintaining the trees. In a developing society it is but obligatory on every householder, when he constructs a house and equally for a public authority to plant trees and properly nurture them in a healthy condition so as to protect and maintain the eco-friendly environment. But the question is whether the public authority owes a statutory duty *f*  towards that class of persons who frequent and pass and repass on the public highway or road or the public places. If the local authority/statutory body has neglected to perform the duty of maintaining trees in a healthy condition and when damage, due to fall of the tree occurs, the question emerges whether the neighbour relationship and proximity of the causation and negligence and the duty of care towards the plaintiff have been satisfactorily proved to have existed so as to fasten the defendant with the liability due to tort of negligence. It depends on a variety of *g*  facts and circumstances. It is difficult to lay down any set standards for proof thereof.                                                              (Para 62)

In a situation like the present one where the victim being not aware of the disease/decay, the tree suddenly falls in a still weather condition, no one can anticipate and it is difficult to foresee that a tree would fall suddenly and thereby a person who would be passing by on the roadside, would suffer injury or would die in *h*  consequence. The Corporation or the authority is not liable to be sued for tort of negligence since the causation is too remote. *Novus actus inconveniens* snaps the link and, therefore, it is difficult to establish lack of care resulting in damage and


SCC OnLine Web Edition, Copyright © 2015
Page 9      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

foreseeability of the damage. The case in hand falls in this category. Jayantilal was admittedly passing on the tree on the roadside to attend to his office duty. The tree suddenly fell and he sustained injury and consequently died. It was difficult to foresee that a tree would fall on him.                                                                 (Para 62)

The conditions in India have not developed to such an extent that a Corporation can keep constant vigil by testing the healthy condition of the trees in the public places, roadsides, highways frequented by passers-by. There is no duty to maintain regular supervision thereof, though the local authority/other authority/owner of a property is under a duty to plant and maintain the tree. The causation for accident is too remote. Consequently, there would be no common law right to file suit for tort of negligence. It would not be just and proper to fasten duty of care and liability for omission thereof. It would be difficult for the local authority etc. to foresee such an occurrence. Under these circumstances, it would be difficult to conclude that the appellant has been negligent in the maintenance of the trees planted by it on the roadsides.                                                                 (Para 63)

*Bourhill* v. *Young*, 1943 AC 92 : (1942) 2 All ER 396, HL; *Bolton* v. *Stone*, 1951 AC 850 : (1951) 1 All ER 1078, HL; *Farrugia* v. *Great Western Rly.*, (1947) 2 All ER 565, CA; *Polemis & Furness, Withy & Co. Ltd., Re*, (1921) 3 KB 560 : 1921 All ER Rep 40, CA; *Sheppard* v. *Borough of Glossop*, (1921) 3 KB 132 : 1921 All ER Rep 61, CA; *Groves* v. *Lord Wimborne*, (1898) 2 QB 402 : 67 LJQB 862, CA; *Lonrho Ltd.* v. *Shell Petroleum Co. Ltd.*, 1982 AC 173 : (1981) 2 All ER 456 : (1981) 3 WLR 33, HL; *Hadley* v. *Baxendale*, (1854) 9 Exch 341 : (1843-60) All ER Rep 461; *Haynes* v. *Harwood*, (1935) 1 KB 146 : 1934 All ER Rep 103, CA; *Dorset Yacht Co.* v. *Home Office*, 1970 AC 1004 : (1970) 2 All ER 294 : (1970) 2 WLR 1140, HL; *Kemp & Dougall* v. *Darngavil Coal Co. Ltd.*, (1909) SC 1314; *Geddis* v. *Proprietors of Bann Reservoir*, (1878) 3 AC 430, HL; *Anns* v. *Merton London Borough*, 1978 AC 728 : (1977) 2 All ER 492 : (1977) 2 WLR 1024, HL; *Murphy* v. *Brentwood Distt. Council*, (1991) 1 AC 398 : (1990) 2 All ER 908 : (1990) 3 WLR 414, HL; *Caparo Industries plc.* v. *Dickman*, (1990) 2 AC 605 : (1990) 1 All ER 568 : (1990) 2 WLR 358, HL; *Hill* v. *Chief Constable of West Yorkshire*, 1989 AC 53 : (1988) 2 All ER 238 : (1988) 2 WLR 1049, HL; *Smith* v. *Littlewoods Organisation Ltd.*, 1987 AC 241 : (1987) 1 All ER 710, HL; *London Passenger Transport Board* v. *Upson*, 1949 AC 155 : (1949) 1 All ER 60; *Stovin* v. *Wise (Norfolk County Council, Third Party)*, (1994) 3 All ER 467; *Burton* v. *West Suffolk County Council*, (1960) 2 WLR 745 : (1960) 2 All ER 26 : (1960) 2 QB 72, CA; *Blyth* v. *Birmingham Waterworks Co.*, (1856) 11 Exch 781 : (1843-60) All ER Rep 478; *Fardon* v. *Harcourt-Rivington*, (1932) 146 LT 391 : 1932 All ER Rep 81, HL; *Baxter* v. *Stockton-on-Tees Corpn.*, (1959) 1 QB 441 : (1958) 2 All ER 675 : (1958) 3 WLR 275, CA; *Wilson* v. *Kingston-upon-Thames Corpn.*, (1949) 1 All ER 679, CA; *Noble* v. *Harrison*, (1926) 2 KB 332 : 95 LJKB 813; *Barker* v. *Herbert*, (1911) 2 KB 633 : (1911-13) All ER Rep 509; *Cunliffe* v. *Bankes*, (1945) 1 All ER 459; *Caminer* v. *Northern & London Investment Trust Ltd.*, (1950) 2 All ER 486 : 1951 AC 88, *relied on*

*Hedley Byrne & Co Ltd.* v. *Heller & Partners Ltd.*, 1964 AC 465 : (1963) 2 All ER 575 : (1963) 3 WLR 101, HL; *Governors of the Peabody Donation Fund* v. *Sir Lindsay Parkinson & Co. Ltd.*, 1985 AC 10 : (1984) 3 All ER 529 : (1984) 3 WLR 953, HL; *Leigh and Sillavan Ltd.* v. *Aliakmon Shipping Co Ltd.*, 1986 AC 785 : (1986) 2 All ER 145 : (1986) 2 WLR 902, HL; *Curran* v. *Northern Ireland Co-ownership Housing Assn. Ltd.*, 1987 AC 718 : (1987) 2 All ER 13 : (1987) 2 WLR 1043, HL; *Council of the Shire of Sutherland* v. *Heyman*, (1985) 157 CLR 424 : 60 ALR 1, Aust HC; *Rylands* v. *Fletcher*, (1868) 3 HL 330 : (1861-73) All ER Rep 1; *Yuen Kun-yeu* v. *Attorney General of Hong Kong*, 1988 AC 175 : (1987) 2 All ER 705 : (1987) 3 WLR 776 (PC), *cited*

**F. Tort — Negligence — Misfeasance and non-feasance — Meaning of and distinction between — Words and phrases**



SCC Online Web Edition, Copyright © 2015
Page 10 Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

Case 1:15-cv-00612-JDB Document 24-1 Filed 11/10/15 Page 84 of 288

a There is a distinction between misfeasance (positive action) and non-feasance (omission). Misfeasance is wilful, reckless or heedless conduct in commission of a positive act lawfully done but with improper conduct. Non-feasance means non-performance of some act which ought to be performed or omission to perform required duty or total neglect of duty. In the case of misfeasance, the defendant is the *author* of the source of danger to cause damage due to careless conduct, to the person/property of plaintiff. He has knowledge that the act may give rise to tort but in the case of non-feasance several factors require consideration for giving rise to actionable negligence. (Para 38)

b **G. Tort — Damages — For tortious liability — In absence of statutory law in this regard in India, common law principles evolved in England may be applied in India to the extent of suitability and applicability to Indian conditions (Para 9)**

*Gujarat SRTC v. Ramanbhai Prabhatbhai*, (1987) 3 SCC 234 : 1987 SCC (Cri) 482; *K. Ramadas Shenoy v. Chief Officers, Town Municipal Council, Udipi*, (1974) 2 SCC 506 : AIR 1974 SC 2177; *Stevens v. Midland Counties Rly. Co.*, (1854) 10 Exch 352 : 2 CLR c 1300, *relied on*

**H. Tort — Generally — Statutory corporations — Municipal corporation — Can be held liable and may be sued for wrongs involving fraud, malice as well as for wrong in which intention is immaterial (Para 9)**

*Barwick v. English Jt. Stock Bank*, (1867) 2 Exch 259 : (1861-73) All ER Rep 194; *Cornford v. Carlton Bank Ltd.*, (1900) 1 QB 22 : 69 LJQB 1020, *Glasgow Corpn. v. d Lorimer*, 1911 AC 209 : (1911-13) All ER Rep 131, *relied on*

**I. Tort — Generally — Tort and contract — Distinction (Para 10)**

Sir Percy Winfield: *"Province of the Law of Tort"* p. 32 referred in *"Clerk and Lindsell on Torts"* (Common Law Library Series No. 3) (12th Edn ) Ch I, p. 1, para 1, *relied on*

R-M/TG/17404/S

**Suggested Case Finder Search Text** (*inter alia*) .

e (1) misfeasance or malfeasance or "non-feasance"

(2) negligence

Search again and add:

(tort or damages or compensation or liability)

Advocates who appeared in this case ·
Mukul Mudgal, Advocate, for the Appellant;
f P.S. Narasimha (Amicus curiae), Advocate, for the Respondents.

*Chronological list of cases cited* *on page(s)*
1. (1994) 3 All ER 467, *Storm v Wise (Norfolk County Council, Third Party)* 593a
2 (1991) 1 AC 398 : (1990) 2 All ER 908 (1990) 3 WLR 414, HL, *Murphy v. Brentwood Distt Council* 564d-e, 588e-f
g 3 (1990) 2 AC 605 : (1990) 1 All ER 568 . (1990) 2 WLR 358, HL, *Caparo Industries plc. v Dickman* 589c
4. 1989 AC 53 . (1988) 2 All ER 238 : (1988) 2 WLR 1049, HL, *Hill v. Chief Constable of West Yorkshire* 590d
5. 1988 AC 175 : (1987) 2 All ER 705 : (1987) 3 WLR 776, PC, *Yuen Kun-yeu v. Attorney General of Hong Kong* 589a
h 6. (1987) 3 SCC 234 : 1987 SCC (Cri) 482, *Gujarat SRTC v. Ramanbhai Prabhatbhai* 566e-f, 567f-g

SCC Online Web Edition, Copyright © 2015
Page 11    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

562                         SUPREME COURT CASES                 (1997) 9 SCC

7.  1987 AC 718 : (1987) 2 All ER 13 : (1987) 2 WLR 1043, HL, *Curran* v.
    *Northern Ireland Co-ownership Housing Assn. Ltd.*                588g

8.  1987 AC 241 : (1987) 1 All ER 710, HL, *Smith* v. *Littlewoods Organisation
    Ltd.*                                                         591b-c   *a*

9.  1986 AC 785 : (1986) 2 All ER 145 : (1986) 2 WLR 902, HL, *Leigh and
    Sillavan Ltd.* v. *Aliakmon Shipping Co. Ltd.*                   588f-g

10. (1985) 157 CLR 424 : 60 ALR 1, Aust HC, *Council of the Shire of
    Sutherland* v. *Heyman*                                          588g

11. 1985 AC 10 : (1984) 3 All ER 529 : (1984) 3 WLR 953, HL, *Governors of
    the Peabody Donation Fund* v. *Sir Lindsay Parkinson & Co.
    Ltd.*                                                         588f-g   *b*

12. 1982 AC 173 : (1981) 2 All ER 456 : (1981) 3 WLR 33, HL, *Lonrho Ltd.* v.
    *Shell Petroleum Co. Ltd.*                                       578c

13. 1978 AC 728 : (1977) 2 All ER 492 : (1977) 2 WLR 1024, HL, *Anns* v.
    *Merton London Borough*                            564d-e, 588b, 589a

14. (1974) 2 SCC 506 : AIR 1974 SC 2177, *K. Ramadas Shenoy* v. *Chief
    Officers, Town Municipal Council, Udipi*                       566g   *c*

15. 1970 AC 1004 : (1970) 2 All ER 294 : (1970) 2 WLR 1140, HL, *Dorset
    Yacht Co.* v. *Home Office*                          586a, 587a-b, 588c

16. 1964 AC 465 . (1963) 2 All ER 575 : (1963) 3 WLR 101, HL, *Hedley
    Byrne & Co. Ltd.* v. *Heller & Partners Ltd.*                   588c

17  1961 AC 388 : (1961) 1 All ER 404 : (1961) 2 WLR 126, *Overseas
    Tankship (U.K.) Ltd.* v. *Morts Dock and Engineering Co. Ltd.*  584g-h   *d*

18. (1960) 2 WLR 745 : (1960) 2 All ER 26 : (1960) 2 QB 72, CA, *Burton* v.
    *West Suffolk County Council*                                   593d

19  (1959) 1 QB 441 : (1958) 2 All ER 675 : (1958) 3 WLR 275, CA, *Baxter* v.
    *Stockton-on-Tees Corpn.*                                       596a

20. (1956) 1 WLR 527 : (1956) 2 All ER 294, CA, *Kilgollan* v. *William Cooke
    & Co. Ltd.*                                                    571d-e   *e*

21  1951 AC 850 : (1951) 1 All ER 1078, HL, *Bolton* v. *Stone*   574d, 594b

22  (1950) 2 All ER 486 : 1951 AC 88, *Camner* v. *Northern & London
    Investment Trust Ltd.*                                          597c

23. (1949) 1 All ER 679, CA, *Wilson* v. *Kingston-upon-Thames Corpn*  596c

24  1949 AC 155 . (1949) 1 All ER 60, *London Passenger Transport Board* v.
    *Upson*                                                        592f-g

25. (1947) 2 All ER 565, CA, *Farrugia* v. *Great Western Rly.*   574d-e   *f*

26  (1945) 1 All ER 459, *Cunliffe* v. *Bankes*                    597a

27. 1943 AC 92 : (1942) 2 All ER 396, HL, *Bourhill* v. *Young*   574c-d, 587e-f, 591f-g,
                                                                  594d-e, 595b-c

28  (1935) 1 KB 146 : 1934 All ER Rep 103, CA, *Haynes* v. *Harwood*  585g

29. (1932) 146 LT 391 : 1932 All ER Rep 81, HL, *Fardon* v. *Harcourt-
    Rivington*                                                    595d-e   *g*

30. 1932 AC 562 : 1932 All ER Rep 1, HL, *Donoghue* v. *Stevenson*  564d-e, 579e,
                                                                  584b-c, 588c, 589f

31  (1926) 2 KB 332 . 95 LJKB 813, *Noble* v. *Harrison*          596e-f

32  (1921) 3 KB 560 : 1921 All ER Rep 40, CA, *Polemis & Furness, Withy &
    Co Ltd., Re*                                                   574e

33  (1921) 3 KB 132 : 1921 All ER Rep 61, CA, *Sheppard* v. *Borough of
    Glossop*                                                      575b-c, 593g   *h*

34  (1911) 2 KB 633 : (1911-13) All ER Rep 509, *Barker* v. *Herbert*  596g-h


SCC Online Web Edition, Copyright © 2015
Page 12        Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

RAJKOT MUNICIPAL CORPN. v MANJULBEN JAYANTILAL NAKUM        563
*(K. Ramaswamy, J.)*

35. 1911 AC 209 : (1911-13) All ER Rep 131, *Glasgow Corpn.* v. *Lorimer*        568a-b

*a*  36. (1909) SC 1314, *Kemp & Dougall* v. *Darngavil Coal Co. Ltd.*        587f

37. (1900) 1 QB 22 : 69 LJQB 1020, *Cornford* v. *Carlton Bank Ltd.*        568a

38. (1898) 2 QB 402 : 67 LJQB 862, CA, *Groves* v. *Lord Wimborne*        578a-b

39. (1878) 3 AC 430, HL, *Geddis* v. *Proprietors of Bann Reservoir*        587b, 588a

40. (1874) 9 Exch 125 : 43 LJ Ex 92, *Gorris* v. *Scott*        571d-e

41. (1868) 3 HL 330 : (1861-73) All ER Rep 1, *Rylands* v. *Fletcher*        595f-g, 596f-g

*b*  42. (1867) 2 Exch 259 : (1861-73) All ER Rep 194, *Barwick* v. *English Jt.
        Stock Bank*        568a

43. (1856) 11 Exch 781 : (1843-60) All ER Rep 478, *Blyth* v. *Birmingham
        Waterworks Co.*        595a

44. (1854) 10 Exch 352 : 2 CLR 1300, *Stevens* v. *Midland Counties Rly. Co.*        567h

45. (1854) 9 Exch 341 : (1843-60) All ER Rep 461, *Hadley* v. *Baxendale*        585f-g, 586a

*c*  The Judgment of the Court was delivered by

K. RAMASWAMY, J.— Leave granted.

**2.** This appeal by special leave arising from the judgment of the Division Bench of the Gujarat High Court, dated 20-3-1991 in First Appeal No. 259 of 1980, gives rise to an important question of law of liability for negligence in causing the death of one Jayantilal, the husband of Respondent 1 and *d* father of Respondents 2 to 4 due to sudden fall of a tree while he was passing on the road in Kothi compound of Collectorate on his way to attend to his duties as a Clerk in the Office of the Director of Industries, Rajkot.

**3.** The admitted facts are that the deceased Jayantilal was residing in Padadhri. He used to daily come on a railway season ticket to Rajkot to attend to his office work. On 25-3-1975, while he was walking on the *e* footpath on the way to his office, a roadside tree suddenly fell on him as a result of which he sustained injuries on his head and other parts of the body and later died in the hospital. The respondents filed the suit for damages in a sum of Rs 1 lakh from the appellant-Corporation. The trial court decreed the suit for a sum of Rs 45,000 finding that the appellant had failed in its statutory duty to check the healthy condition of trees and to protect the *f* deceased from the tree falling on him resulting in his death. On appeal, the Division Bench has held that the appellant has a statutory duty to plant trees on the roadsides as also the corresponding duty to maintain the trees in proper condition. While the tree was in a still condition, it had suddenly fallen on the deceased Jayantilal who was passing on the footpath. The statutory duty gives rise to tortious liability on the State and as its agent, the *g* appellant-Corporation being a statutory authority was guilty of negligence on its part in not taking care to protect the life of the deceased. The respondents cannot be called upon to prove that the tree had fallen due to appellant's negligence. Statutory obligation to maintain trees being absolute, and since the tree had fallen due to its decay, the appellant has failed to prove that the occurrence had taken place without negligence on its part. The *h* appellant failed to make periodical inspection whether the trees were in good and healthy condition subjecting them to seasonal and periodical treatment


SCC Online Web Edition, Copyright © 2015
Page 13    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

and examination. Therefore, the appellant had not taken care to foresee the risk of the tree's falling and causing damage to the passers-by. Thus the appellant is liable to pay damages for the death of Jayantilal. The Division Bench accordingly confirmed the decree of the trial court. Thus this appeal by special leave.

**4.** Shri T.U. Mehta, learned Senior Counsel for the Corporation, contended that the High Court is not right in its conclusion that the appellant is having unqualified and absolute duty to maintain the trees and was guilty of not taking reasonable care in maintaining the trees in healthy condition. The burden of proof is on the respondents to prove that there was breach of duty on its part and that the occurrence had taken place for not taking reasonable care. In the nature of the things, it is difficult for the Corporation to inspect every tree to find out whether it is in a healthy or decaying condition. The standard of care is not as high as in the case of breach of a statutory duty as the case where by positive act, the Corporation created a thing which is dangerous and failed to prevent such danger which caused damage to others. It is not enough for the respondents to establish that the appellant was remiss in its periodical treatment to the plants but was careless in the breach of specific legal duty of care towards the deceased Jayantilal. The Corporation could not foresee that a tree would fall all of a sudden when Jayantilal was passing on the footpath. There is no reasonable proximity between the duty of care and the doctrine of neighbourhood laid by the House of Lords in *Donoghue* v. *Stevenson*[1]. The common law liability on the part of a Statutory Corporation is now authoritatively settled in *Murphy* v. *Brentwood Distt. Council*[2] overruling the two-tier test laid down in *Anns* v. *Merton London Borough*[3]. A breach of statutory duty, therefore, does not ipso facto entail Corporation's liability for its failure or of its staff to comply with the statutory duty to protect Jayantilal or the class of persons to which the deceased is a member. There is no liability for negligence unless a legal duty to take care exists towards the deceased Jayantilal or a class of persons, i.e. pedestrians and that duty should be one which the Corporation owed to the plaintiff himself. This should be pleaded and proved which is lacking in the present case. Knowledge of harm likely to occur to the deceased is a prerequisite of liability which must in some sense be foreseeable.

**5.** It was further contended that though the Corporation has a statutory duty to plant trees, no action will lie against it for damages since the indemnity extends not merely to act itself but also to its necessary consequences. The High Court, it was argued, has also committed serious error in its conclusion that the statutory duty of the Corporation to maintain trees carries with it the duty to take care by regular examination of the health of the trees and felling of decaying trees; it lost sight of the fact that it is only a discretionary duty. The legislature did not intend to confer any cause

1 1932 AC 562 : 1932 All ER Rep 1, HL
2 (1991) 1 AC 398 : (1990) 2 All ER 908 : (1990) 3 WLR 414, HL
3 1978 AC 728 : (1977) 2 All ER 492 : (1977) 2 WLR 1024, HL


SCC Online Web Edition, Copyright © 2015
Page 14      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a of action for breach of the statutory duty and none was provided for its breach. The conclusion of the High Court that because of the breach of absolute statutory duty the Corporation was negligent, is not the correct proposition of law.

6. In determining the legislative intent, the Court is required to consider three factors, viz., the context and the object of the statute, the nature and precise scope of the relevant provisions and the damage suffered out of the

b kind to be guarded against. The object of the Act is to promote facilities of general benefit to the public as a whole in getting the trees planted on roadsides, the discharge of which is towards the public at large and not towards an individual, even though the individual may suffer some harm. The Act does not provide for any sanctions for omission to take action; i.e., planting trees or their periodical check-up when planted. By process of

c interpretation, the Court would not readily infer creation of individual liability to a named person or cause of action to an individual, unless the Act expressly says so. While considering the question whether or not civil liability is imposed by a statute, the court is required to examine all the provisions to find out the precise purpose of the Act, scope and content of the duty and the consequential cause of action for omission thereof. Action

d for damages will not lie in the suit by an injured person if the damage suffered by him is not of the kind intended to be protected by the Act.

7. Before issuing notice, this Court directed the appellant to deposit Rs 5000 towards the cost of the respondents to defend the action in this Court, since an important question of law of general importance arises in the case. Accordingly, the said sum came to be deposited. When notice was

e issued, the respondents sent a letter to the Registry stating that apart from the said sum of Rs 5000, additional amount that was decreed by the lower court, should also be directed to be deposited as a condition to defend the case and further costs. Under those circumstances, by Order dated 24-8-1995 we observed that the stand taken by the respondents was unreasonable and not correct. Shri P.S. Narasimha, who was present on that day in this Court, was

f requested to assist the Court as amicus curiae and to receive the above sum of Rs 5000 towards his fee. We directed the counsel to submit their written arguments. Accordingly, the counsel have submitted their written arguments. Shri Narasimha, learned amicus curiae made thorough study on the subject and has given valuable assistance. We place on record our deep appreciation of the pains taken by him. According to the learned counsel, the liability in

g tort which arose in Common Law has been evolved by the courts in England but law has not been well developed in our jurisdiction. In Common Law, there existed duty of foreseeability, proximity, just and reasonable cause and policy. Attempts have been made to identify general theory of liability in tort consistent with causation, fairness, reciprocity and justice, balancing conflicting interests as well as economic efficiency. The tortious liability

h falls into one of the three categories, viz., (*a*) some intentional wrongdoing, (*b*) negligence, and (*c*) strict liability. In this case, we are concerned with


SCC Online Web Edition, Copyright © 2015
Page 15    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

566                    SUPREME COURT CASES                (1997) 9 SCC

negligence on the part of the appellant-Corporation in maintaining the trees
on the roadsides. The principle evolved by the courts in England is that a
reasonable foresight of harm to persons whom it is foreseeable or is likely to      *a*
harm by one's carelessness is essential. For the plaintiff to succeed in an
action for negligence the plaintiff requires to prove that (*i*) the defendant is
under a duty to take care; (*ii*) the burden of proof owed by the plaintiff has
been discharged by the proof of breach of duty; and (*iii*) the breach of the
duty of care is the cause for damage suffered by the plaintiff. Breach of duty
raises factual question whether the required standard of conduct has been      *b*
reached. It is only relevant if a duty of care has been held to exist in law.
Damage similarly is also confined to the enquiry of facts. Duty of care, on
the other hand, is a far more crucial concept as it fixes the boundaries of tort
of negligence. The regulation of duty of care envisaged in *Donoghue's*
*principle*, in its widest terms, has a reasonable foresight of harm to persons
whom it is foreseeable or is likely to be harmed by one's carelessness and      *c*
has in turn made it easy to hold in subsequent cases that there should be
liability for negligently inflicting damage in new situations not covered by
previous case-law because damage was foreseeable. If want of duty of care
is established, there comes to exist foreseeability of the damage and
sufficient proximate relationship between the parties and it must be just and
reasonable to impose such a duty. The legal duty to prove proximity is not      *d*
physical proximity. Proximity is used to describe a relationship between the
parties by virtue of which the defendant can reasonably foresee that his
action or omission is likely to cause damage to the plaintiff of the relevant
type. The relationship refers to no more than the relevant situations of the
parties as a consequence of which such foreseeability of damage may exist.
The English principles of common law are approved and adopted by the      *e*
courts in India on the principles of justice, equity and good conscience. In
support thereof, he relied upon *Gujarat SRTC* v. *Ramanbhai Prabhatbhai*[4]
(SCC at p. 238).

8. The appellant-Corporation owes a duty of care in common law. The
trees and streets vest in the Corporation. It was its responsibility, therefore,
to maintain the trees. The Corporation should have the foresight that trees, if      *f*
neglected to be maintained properly, could cause injury to passers-by. The
findings recorded by the courts below that the appellant has committed a
breach of duty of care is a finding of fact. From the breach of the duty of
care, the entitlement to damages arises to the respondents due to the death of
Jayantilal. The learned counsel also relied upon *K. Ramadas Shenoy* v. *Chief*
*Officers, Town Municipal Council, Udipi*[5] and contended that the answer to      *g*
the question whether an individual who is one of the class for whose benefit
an obligation has been imposed, whether or not enforced in action for
omission to perform the duty, depends upon the language used in the statute.
The injury may be caused either by fulfilment of the duty or omission to

*h*

4 (1987) 3 SCC 234 : 1987 SCC (Cri) 482
5 (1974) 2 SCC 506 : AIR 1974 SC 2177



SCC Online Web Edition, Copyright © 2015
Page 16     Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a carry it out or by negligence in its performance. In the light of the above principles, he submitted that though the duty of the appellant to plant trees is discretionary nonetheless it has a statutory duty to plant the trees and to maintain them under Section 66 of the Bombay Provincial Municipal Corporations Act, 1949 (for short "the Act") and the discretion must be construed to be mandatory duty. By the omission to perform the duty to maintain the trees in a healthy condition or to cut off the trees in decaying

b condition, the Corporation entails liability to make good the loss/damages caused to the respondents. The High Court, therefore, has not committed any error of law warranting interference.

**9.** The diverse contentions give rise to the questions whether the appellant-Corporation owes a duty to care to maintain the trees as a statutory duty and whether the cause of death of Jayantilal has a proximate

c relationship with the negligence giving rise to tortious liability, entailing payment of compensation to the respondents. The marginal note of Section 66 of the Act indicates: "Matters which may be provided for by the Corporation at its discretion." It envisages that the Corporation may in its discretion, provide from time to time, wholly or partly for all or any of the following matters, viz., (*viii*) "the planting and maintenance of trees on

d roadsides and elsewhere". Under Section 202 of the Act, all streets within the city vest in the Corporation and are under the control of the Corporation. The Act does not provide machinery for enforcement of obligations cast under Section 66, nor in the event of failure to discharge those obligations any remedy is provided. By operation of Section 202 read with Section 66, since the trees vest in the Corporation, the Corporation is statutorily

e obligated to plant and maintain trees on the roadsides and elsewhere as a public amenity to ensure eco-friendly environment. An attempt had been made in 1965 to codify the law of tort in a statutory form. The Bill in that behalf, reintroduced in Parliament in 1967, died as stillborn. Therefore, there is no statutory law in India, unlike in England, regulating damages for tortious liability. In the absence of statutory law or established principles of

f law laid by this Court or High Courts consistent with Indian conditions and circumstances, this Court selectely applied the common law principles evolved by the courts in England on grounds of justice, equity and good conscience (vide *Ramanbhai Prabhatbhai case*[4]). Common law principles of tort evolved by the courts in England may be applied in India to the extent of suitability and applicability to the Indian conditions. Let us consider and

g evolve our principles in tune with the march of law in their jurisprudence of liability on tort. It is necessary to recapitulate the development of the principles and law of tort developed by evolutionary process by applying them from case to case and in some cases the statement of law laid by House of Lords, as guiding principles of law on tortious liability. In the formative stage of the development of tortious liability, the Corporation being a

h Corporation aggregate of persons, could not be held liable where liability involved some specific state of mind as was held in *Stevens v. Midland*



SCC Online Web Edition, Copyright © 2015
Page 17      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Counties Rly. Co.*[6] However, it is now well settled that a Corporation can be
held liable and accordingly it may be sued for wrongs involving fraud,
malice, as well as for wrong in which intention is immaterial as was held in
*Barwick v. English Jt. Stock Bank*[7]; *Cornford v. Carlton Bank Ltd.*[8] and
*Glasgow Corpn. v. Lorimer*[9].

10. In Sir Percy Winfield's *Province of the Law of Tort* p. 32 referred in
*Clerk and Lindsell on Torts* (Common Law Library Series No. 3) (12th Edn.)
Chapter I, page 1, para 1 it is stated that "tortious liability arises from the
breach of a duty primarily fixed by the law; such duty is towards persons
generally and its breach is redressable by an action for unliquidated
damages". Duty primarily is fixed by law which on violation, fastens
liability to pay damages. It is personal to the injured. Tort and contract are
distinguishable. In tort, liability is primarily fixed by law while in contract
they are fixed by the parties themselves. In tort, the duty is towards the
persons generally while in contract it is towards specific person or persons.
If the claim depends upon proof of the contract, action does not lie in tort. If
the claim arises, from the relationship between the parties, independent of
the contract, an action would lie in tort at the election of the plaintiff,
although he might alternatively have pleaded in contract. The law of tort
prevents hurting one another. All torts consist of violation of a right in the
plaintiff. Tort law, therefore, is primarily evolved to compensate the injured
by compelling the wrongdoer to pay for the damage done. Since distributive
losses are an inevitable by-product of modern living in allocating the risk,
the law of tort makes less and less allowance to punishment, admonition and
deterrence found in criminal law. The purpose of the law of tort is to adjust
these losses and offer compensation for injuries by one person as a result of
the conduct of another. The law could not attempt to compensate all losses.
Such an aim would not only be overambitious but might conflict with basic
notions of social policy. Society has no interest in mere shifting of loss
between individuals for its own sake. The loss, by hypothesis, may have
already occurred, and whatever benefit might be derived from repairing, the
fortunes of one person is exactly offset by the harm caused through taking
that amount away from another. The economic assets of the community do
not increase and expense is incurred in the process of realisation, as stated
by Oliver Lindel Holmes in his *Common Law* at p. 96 (1881 Edn.). Security
and stability are generally accepted as worthwhile social objects, but there is
no inherent reason for preferring the security and stability of plaintiffs to
those of defendants. Hence, shifting of loss is justified only when there
exists special reason for requiring the defendant to bear it rather than the
plaintiff on whom it happens to have fallen. (Vide *Common Law* of Holmes.)

6 (1854) 10 Exch 352 : 2 CLR 1300
7 (1867) 2 Exch 259 : (1861-73) All ER Rep 194
8 (1900) 1 QB 22 : 69 LJQB 1020
9 1911 AC 209 : (1911-13) All ER Rep 131





SCC OnLine Web Edition, Copyright © 2015
Page 18 Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**11.** In *Black's Law Dictionary* (6th Edn.) at p. 1489, "tort" is defined as a violation of duty imposed by general law or otherwise upon all persons occupying the relation to each other involved in a given transaction. There must always be a violation of some duty owed to plaintiff and generally such a duty must arise by operation of law and not by mere agreement of the parties. "A legal wrong is committed upon the person or property, independent of contract. It may be either (1) a direct invasion of some legal right of the individual; (2) the infraction of some public duty by which special damage accrues to the individual; (3) the violation of some private obligation by which like damage accrues to the individual...." Negligence is failure to use such care as a reasonable, prudent and careful person would use, under similar circumstances. It is the doing of some act which a person of ordinary prudence would not have done under similar circumstances or failure to do what a person of ordinary prudence would have done under similar circumstances. Negligence also is an omission to do something which a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do, or the doing of something which a reasonable and prudent man would not do.

**12.** Negligence and tort have been viewed without elaborately embarking upon the definition of "tort" applicable to varied circumstances and the scope of negligence in its wider perspective. Let us proceed to consider the meaning of "negligence" in the context of tort liability arising in this case. In every case giving rise to tortious liability, tort consists of injury and damage due to negligence. Claim for injury and damage may be founded on breach of contract or tort. We are concerned in this case with tort. The liability in tort may be strict liability, absolute liability or special liability. The degree of liability depends on degree of mental element. The elements of tort of negligence consist in — (*a*) duty of care; (*b*) duty is owed to the plaintiff; (*c*) the duty has been carelessly breached. Negligence does not entail liability unless the law exacts a duty in the given circumstances to observe care. Duty is an obligation recognised by law to avoid conduct fraught with unreasonable risk of damage to others. The question whether duty exists in a particular situation involves determination of law. Negligence would in such acts and omissions involve an unreasonable risk of harm to others. The breach of duty causes damage and how much is the damage should be comprehended by the defendant. Remoteness is relevant and compensation on proof thereof requires consideration. The element of carelessness in the breach of the duty and those duties towards the plaintiff are important components in the tort of negligence. Negligence would mean careless conduct in commission or omission of an act connoting duty, breach and the damage thereby suffered by the person to whom the plaintiff owes. Duty of care is, therefore, crucial to understand the nature and scope of the tort of negligence.

**13.** The question in each case is whether the defendant has been negligent. In determining duty of care, public policy involved in the statute

SCC Online Web Edition, Copyright © 2015
Page 19    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

requires detailed examination. Upon examination, they are required to
further consider whether its extension elongates the public policy or retards
its effectuation or frustrates its object and the inevitable effect thereof on the   *a*
affected plaintiff as well as general public. No general or abstract principle is
desirable to be laid  The careless breach of duty will vary from case to case
and it should not be unduly extended or confined or limited to all situations.
The attending circumstances require evaluation and application to a
particular set of facts of a given case. The standard of care also varies in a
particular factual situation. Defendant must be under a duty of care not to   *b*
create latent source of physical danger to the person or property of third
party whom he ought to reasonably foresee as likely to be effected thereby.
Thus the latent defect causing actual physical damage to the person or
property gives the cause of action and then only the defendant is liable to
pay the damages for tortious liability. It must, therefore, be an essential
element to establish that there is a positive act or a duty and the defendant is   *c*
under duty of care not to create/direct latent source of physical danger to the
person or property of third party whom he ought to reasonably foresee as
likely to be affected thereby.

**14.** Negligence has been viewed in three ways. Firstly involving a
careless state of mind; secondly, a careless conduct; and thirdly, a tort in
itself. Every case giving rise to tortious liability, consists of injury and   *d*
damage done due to negligence. Injury and damage may be found due to
breach of contract or tort. We are concerned in this case with the injury and
damage in tort. Therefore, it is necessary to dwell, in depth, on strict
liability, absolute liability or special liability. In the present case, the
omission alleged is to take care of periodical check-up of the condition of
the trees. The degree of liability depends upon the degree of mental element.   *e*
The elements of tort of negligence, therefore, consist in (*a*) duty of care; (*b*)
duty owed to the plaintiff; and (*c*) it has been carelessly breached.
Negligence does not give rise to liability unless the law fastens the duty of
care in given circumstances. Duty is an obligation recognised by law to
avoid conduct brought with unreasonable risk of damage to another. The
question whether duty consists in a particular situation involves   *f*
determination as a question of law.

**15.** Negligence would include both acts and omissions involving
unreasonable risk of having done harm to another. The breach of duty must
cause damage. How much of the damage to be compensated by the
defendant should be attributed to his wilful conduct and how much to his
wilful negligence or careless conduct or remissness in performance of duty,   *g*
are all relevant facts to be considered in a given act or omission in adjudging
duty of care. The element of carelessness or the breach of duty and whether
that duty is towards the plaintiff or the class of persons to which the plaintiff
belongs are important components in tort of negligence. Negligence would,
therefore, mean careless conduct in commission or omission of an act,
whereby another to whom the plaintiff owed duty of care has suffered   *h*
damage. The duty of care is crucial in understanding the nature and scope of


SCC Online Web Edition, Copyright © 2015
Page 20    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------

tort of negligence. The question in each case is whether the defendant has
a    been negligent in the performance of duty or omission thereof.
Determination of duty of care also involves statutory action which requires
detailed examination. Local authority, when it exercises its public law
function, generally owes no private law duty of care. Duty of care must be
owed to a person or class of persons to which the plaintiff belongs and must
be to avoid causing particular type of injury or damage to his person or
b    property. The court requires to examine the scope of duty of care which the
local authority owes to the plaintiff. The court is required to consider the
object, scope and breach of the Act. Though the statute is of general
character, since the Government or local authority is entrusted with the duty
to implement the law, though at its discretion, and if damage is done in
execution thereof, what requires to be examined is whether the aforestated
c    elements of tort of negligence stand attracted. The court is further required
to consider whether extension of duty of care by the process of interpretation
would elongate the public policy or retard its object or frustrate public policy
behind the statute and the inevitable effect thereof on the affected plaintiff as
well as the general public. No general principle of law is desirable to be laid
down as an acid test.

d    **16.** While considering whether an action would lie for breach of
statutory duty, what requires to be established, among other things, is that
the harm complained of is of the kind contemplated by the statute, as was
held in *Gorris v. Scott*[10] and *Kilgollan v. William Cooke & Co. Ltd.*[11]

**17.** The degree of carelessness in breach of duty would, therefore, vary
from case to case and it should not unduly be extended or confined or
e    limited or circumscribed to all situations. The attending circumstances
require evaluation and application to a given set of facts in the case on hand.
The defendant must be under duty of care not to create latent source of
physical danger/damage to the person or property of third party whom he
ought to have reasonably foreseen as likely to be affected thereby. Those
latent defects cause physical danger to the person or the property giving
f    cause of action and the defendant then is liable to pay damage for tortious
liability. It must, therefore, be the essential element to establish that there is
positive act or duty and the defendant is under that duty. The court is not to
create, by process of interpretation, latent source of physical danger to the
person or property of third party when the Act does not envisage that the
defendant ought to have reasonably foreseen him as likely to be affected
g    thereby. Negligence connotes inadvertence to the consequences of his
conduct which can be a measure of behaviour where one person had been
careless in that he did not behave as a prudent man would have done whether
by advertence or otherwise. The tort of negligence always requires some
form of careless conduct which is usually, although not necessarily, the

h
10 (1874) 9 Exch 125 : 43 LJ Ex 92
11 (1956) 1 WLR 527 : (1956) 2 All ER 294, CA


SCC Online Web Edition, Copyright © 2015
Page 21    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

product of inadvertence. Not every careless conduct which causes damage, however, will give rise to an action in tort. The negligence lies in failure to take such steps as a reasonable, prudent man would have taken in the given circumstances. What constitutes carelessness is the conduct and not the result of inadvertence. Thus negligence in this sense is a ground for liability in tort.

**18.** The question emerges as to when would the breach of statutory duty under a particular enactment give rise to tortious liability? The statutory duty gives rise to civil action. The statutory negligence is sui generis and independent of any other form of tortious liability. It would, therefore, be of necessity to find out from the construction of each statutory duty whether the particular duty is general duty in public law or private law duty towards the plaintiff. The plaintiff must show that (*a*) the injury suffered is within the ambit of statute; (*b*) statutory duty imposes a liability for civil action; (*c*) the statutory duty was not fulfilled; and (*d*) the breach of duty has caused him injury. These essentials are required to be considered in each case. The action for breach of statutory duty may belong to the category of either strict or absolute liability which is required, therefore, to be considered in the nature of statutory duty the defendant owes to the plaintiff; whether or not the duty is absolute; and the public policy underlying the duty. In most cases, the statute may not give rise to cause of action unless it is breached and it has caused damage to the plaintiff, though occasionally the statute may make breach of duty actionable per se. The burden, therefore, is on the plaintiff to prove on balance of probabilities that the defendant owes that duty of care to the plaintiff or class of persons to whom he belongs, that defendant was negligent in the performance or omission of that duty and breach of duty caused or materially contributed to his injury and that duty of care is owed on the defendant. If the statute requires certain protection on the principle of *volenti non fit injuria*, the liability stands excluded. The breach of duty created by a statute, if it results in damage to an individual prima facie, is tort for which the action for damages will lie in the suit. One would often take the Act, as a whole, to find out the object of the law and to find out whether one has a right and remedy provided for breach of duty. It would, therefore, be of necessity in every case to find the intention of legislature in creating duty and the resultant consequences suffered from the action or omission thereof, which are required to be considered. No action for damages lies if on proper construction of statute, the intention is that some other remedy is available. One of the tests in determining the intention of the statute is to ascertain whether the duty is owed primarily to the general public or community and only incidentally to an individual or primarily to the individual or class of individuals and only incidentally to the general public or the community. If the statute aims at duty to protect a particular citizen or particular class of citizens to which the plaintiff belongs, it prima facie creates at the same time corelative right vested in those citizens of which plaintiff is one; he has remedy for enforcement, namely,



SCC Online Web Edition, Copyright © 2015
Page 22      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

RAJKOT MUNICIPAL CORPN. v. MANJULBEN JAYANTILAL NAKUM      573
*(K. Ramaswamy, J.)*

the action for damages for any loss occasioned due to negligence or for

*a*    failure of it. But this test is not always conclusive.

**19.** Duty may be of such paramount importance that it is owed to all the public. It would be wrong to think that on an action, the duty could be enforced by way of damages when duty is owed to a section of public and cannot be enforced if an individual sustains damages to whom the Corporation owes no duty and no private interest is infringed. Breach of

*b*    statutory duty, therefore, requires to be examined in the context in which the duty is created not towards the individual, but has its effect on the right of individual vis-à-vis the society. Statutory duty generally is towards public at large and not towards an individual or individuals and the corelative right is vested in the public and not in private person, even though they may suffer damages. The duty in such a case is to be enforced by way of criminal

*c*    prosecution or by way of injunction at the suit under Section 192 of CPC or with leave of court under Order I, Rule 8 CPC by public-spirited person or in any appropriate manner to enforce the right and not by way of private action for damages. In that situation, the legislature, while recognising the private right vested in an injured individual, may intend that it shall be maintained solely by some special remedy provided for a particular case and not by

*d*    ordinary method of an action for damages as penalty or compensation.

**20.** If the statute creates right and remedy, damages are recoverable by establishing the breach of statute as the sole remedy available under the statute. But where a statute merely creates a duty without expressly providing any remedy for breach of it, appropriate remedy, prima facie, is punishment for misdemeanour in respect of the injury to the public and the

*e*    action for damages in respect of any special damage suffered by an individual. Where special remedy is expressly provided prima facie that was intended to be the only remedy and by implication it excludes the resort to common law. But this is also by no means conclusive. The consideration would be whether the statute intends to award damages for breach of statutory duty. Though general rule is that where a statute creates an

*f*    obligation and enforces performance in a specified manner, performance cannot be enforced in any other manner. It depends on the scope of the Act which creates the obligation and on consideration of the underlying policy of the statute, effect on the individuals is to be carefully examined and analysed as to what the statute has expressly laid down or probably what the statute aims to achieve. The action for damages will not lie if the damage suffered

*g*    by him is not of the type intended to be guarded against.

**21.** If the statute provides that a certain thing must be done, it is a question of interpretation whether the statute aims the thing to be done in all events or merely that the person upon whom the duty is imposed is to use due care and diligence in the performance of duty or that if he fails to perform it, though for no fault of his, he should be free from liability. When

*h*    a duty is created by the statute, breach of which is an actionable tort, the question would be whether the liability is absolute or dependent on wrongful


SCC Online Web Edition, Copyright © 2015
Page 23      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

intent or negligence. It seems to be contrary to statutory intendment to impose liability upon a public body for a thing for which no reasonable care in the performance of the act concerned could be inferred from the language *a* used in the statute; it ought not to be so construed as to inflict the liability on the public authority unless the purpose sought to be achieved has been wanting due to want of exercise of duty and reasonable care in the performance of duty imposed by the statute.

22. It is now a well-settled legal position by court pronouncements in England that a public authority may be subject to common law duty of care *b* when it exercises a statutory power or when there exists a statutory duty. The principle is that when a statutory power is conferred, it must be exercised with reasonable care so that if those who exercise their power could, by reasonable precaution, prevent any injury which has been occasioned and was likely to be occasioned by their exercise and the damage for negligence may be recovered. The above principle has been applied mainly to private *c* acts. To establish negligence, it is necessary to show that duty to take care existed and such duty was owed to the plaintiff in *Bourhill* v. *Young*[12]. The House of Lords laid the test to ascertain whether a duty was owed to the plaintiff to see whether an injury to the plaintiff was the foreseeable result of the defendant's conduct in given circumstances. In *Bolton* v. *Stone*[13], the House of Lords held that the foreseeability must be of reasonable *d* possibilities. It is not necessary to show that the person who suffered damage should have been within the tortfeasor's contemplation as an identified individual as was held in *Farrugia* v. *Great Western Rly.*[14] As long as harm to any person was reasonably foreseeable, it may not matter whether the precise chain of events leading to it was not foreseen as was held in *Polemis & Furness, Withy & Co. Ltd., Re*[15]. *e*

23. However, it has been extended to statutory duties by public authorities and notably for public utilities, exercising the powers under public statutes. Cause of action in negligence arises under the principle of breach of duty of care existing in common law. Unless the statute manifests a contrary intention, public authority which enters upon in exercise of statutory power may place itself in a relationship to the members of the *f* public which imposes a common law duty to take care. A breach of statutory duty may itself give rise to civil cause of action. Existence of a statutory cause of action is generally based on strict liability but it does not exclude liability for breach of common law duty of care unless a statute provides otherwise. Statutory duty and its breach itself may give rise to a separate causation or it may be an evidence of negligence of common law. Therefore, *g* a public authority is not liable at the suit of an individual for damages for

12 1943 AC 92 : (1942) 2 All ER 396, HL
13 1951 AC 850 : (1951) 1 All ER 1078, HL
14 (1947) 2 All ER 565, CA
15 (1921) 3 KB 560 : 1921 All ER Rep 40, CA

*h*


Case 1:15-cv-00612-JPB  Document 24-1  Filed 11/10/15  Page 98 of 288
Page 24          Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

breach of a statutory duty, unless the statute on its true construction
*a* manifests a contrary intention or confers a civil cause of action.

**24.** Generally, a public authority entrusted with no statutory obligation to
exercise a power, does not come under common law duty of care to do so but
by conduct the public authority may place itself in such a situation that it
attracts the duty of care which calls for exercise of the power. Common
illustration is provided by an action in which an authority in the exercise of
*b* its functions, if it had created a danger, thereby subjecting itself to a duty of
care for the safety of others which must be discharged by an exercise of its
statutory power or by giving necessary warnings. It is the conduct of the
authority in creating the danger that attracts the duty of care as envisaged in
*Sheppard* v. *Borough of Glossop*[16]. The statute does not by itself give rise to
a civil action but it forms the formulation on which the common law can
*c* build a cause of action. If the public authority under a statutory duty places
itself in such a position that others may rely on it to take care for their safety
so that the authority comes under a duty of care calling for positive action,
then such a relationship would arise where a person by present or past
conduct, upon which other persons come to rely, creates a self-imposed duty
to take positive action to protect the safety or interest of another or at least to
*d* warn him that he or his interest is at risk or in danger. Reliance by others,
therefore, has been an important element in establishing the existence of
duty of care. The liability in negligence is based on the plaintiff's reliance on
the defendant's taking care in circumstances where the defendant is aware or
ought to be aware of that reliance. Reliance by the plaintiff, therefore, is an
essential element in the action for failure to exercise the power especially
*e* when it is a power coupled with duty.

**25.** There is a distinction between failure to exercise a statutory power
giving causation for damage by positive act of negligence by another and
some accidental occurrence or by omission. When there is a duty to take
precaution against damage occurring to others through the acts of third
parties or through accident/omission of the duty, it may be regarded as
*f* materially causing or materially contributing to the damage should it occur,
subject, of course, to the question whether performance of the duty would
have averted the harm. Duty of care may also exist in relation to
discretionary considerations which stand outside the policy of the statute and
operational factors. In the operational factors, though the statute creates
discretionary function, its omission or action may also give rise to causation
*g* to claim damages. The distinction between policy and operational factors is
not easy to formulate but the dividing line between them has been
recognised as a distinctive determining factor. Public authority is under a
duty of care in relation to decisions which involve or are directed by
financial, economic, social or political factors or constraints. In that behalf,
the duty of care stands excluded or any action that is merely the product of
*h*

16 (1921) 3 KB 132 : 1921 All ER Rep 61, CA


SCC Online Web Edition, Copyright © 2015
Page 25    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------

administrative direction etc. may not provide causation for damages but when the performance of the duty, though couched with discretion, is enjoined on the statutory authority, the question whether the power, if *a* exercised with due care, would have minimised, rather prevented or avoided the damage sustained by the plaintiff, requires to be examined.

**26.** The general rule is that the public authorities are liable for positive action (misfeasance) but not for omission (non-feasance). In considering the duty of public authority to avoid harm to those likely to be affected by the exercise of power or duty, the courts have evolved the relationship of *b* proximity or neighbourhood nexus which exists between the person who suffered damages and wrongdoer. Where there is allegation of wrongdoing it has to be seen whether the latter reasonably ought to have foreseen that the carelessness on his part, is likely to cause damage to the other. In other words, if it is a reasonable foreseeability that carelessness on the defendant's part will cause damage to the plaintiff, then the defendant is plaintiff's *c* neighbour and prima facie owes towards the plaintiff a duty of care which may, however, be negatived on the ground of public policy or reasonable care taken at the operational stage.

**27.** The distinction between area of public policy and operational area is a logical and convenient one as has already been elaborated. Undoubtedly, a public authority is liable for the negligent acts of its servants or agents in *d* carrying out their duties, or exercising their powers, within the operational area, although if the performance of their duties or the exercise of their power involves the exercise of discretion an act will not be negligent, if it is done in good faith in the exercise of, and within the limits of, the discretion.

**28.** At the cost of repetition, we may reiterate that negligence is the omission to do something which a reasonable man, guided upon those *e* considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do. The defendants might have been liable for negligence, if, unintentionally, they omitted to do that which a reasonable person would have done, or did that which a person taking reasonable precautions would not have done. However, as a general rule, a failure to act is not negligence unless there is a *f* duty to act. The duty may arise because of the conduct of the defendant himself or it may be created by statute. Therefore, ordinary principles of law of negligence apply to public authorities. They are liable for damage caused by a negligent failure to act when they are under a duty to act, or for a negligent failure to consider whether to exercise a power conferred on them with the intention that it should be exercised and if and when the public *g* interest requires it. If a public authority has decided to exercise the power, and has done so negligently, a person who has acted by relying on what the public authority has done, may have no difficulty in proving that the damage resulted from a negligent failure to act and there may not be greater difficulty in proving causation. But if the public authority omitted to exercise its discretionary power, there is greater difficulty to prove that *h* causation has arisen. The basic difference, therefore, between causing


SCC Online Web Edition, Copyright © 2015
Page 26      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

something and failure to prevent it from happening must always be kept in
*a* view in deciding the liability for damages resulting from the failure to
perform the statutory or common law duty. The common law would not
impose a duty of care on a public authority in relation to failure to exercise
its power when those powers are exercisable for the benefit of the public
rather than for the benefit of individuals or a class of individuals.

**29.** Statutory power is not something like a statutory duty. Before the
*b* repository of a statutory power can be made liable for negligence for a
failure to exercise it, the statute must (either expressly or by implication)
impose a duty to exercise the power and confer a private right of action in
damages for a breach of the duty so imposed. The question whether the Act
confers a private right of action depends upon the interpretation of the
provisions of the Act. But by process of statutory interpretation, the courts
*c* may not superimpose a general common law duty on a statutory authority in
order to give effect to its presumed idea of policy or duty. Common law does
not superimpose such a duty on a mere statutory authority. The nature and
scope of the common law duty of care owed by a public authority exercising
statutory powers must be discerned carefully by reading the provisions of the
Act, the object it seeks to achieve and other relevant considerations. The
*d* public authority is under a duty to take some action whether or not in
exercise of its statutory power or not to prevent injury only if its antecedent
acts, have created or increased a risk of injury of that kind. The normal duty
of care cannot be a duty to exercise the statutory power to prevent injury to
another or otherwise to act in such a way as to prevent injury to him unless
the Act has imposed such a duty or unless the authority has itself created or
*e* increased the risk of injury of that kind. In the absence of such a statutory
duty, a normal duty of exercise of care cannot arise unless the act actually
done in exercise of a statutory power, creates or increases the risk of
foreseeable injury to another and then the duty is to do those acts with
reasonable care and to take reasonable precautions to prevent that injury
from occurring. The duty of care, therefore, must have corelationship to the
*f* kind of damage that the plaintiff has suffered and not to the plaintiff or a '
class of which the plaintiff is a member.

**30.** In *The Modern Law of Tort*, London, Sweet & Maxwell (1994 Edn.),
K.M. Stanton has discussed the breach of statutory duty, express or
inferential. He has stated at p. 42 that the statutory tort takes a number of
different forms. A number of modern statutes expressly create a detailed
*g* scheme of tortious liability. The conditions for the existence of a duty; the
standard of conduct required and the available defences are all defined. The
law created is part of the mainstream of tort liability. On inferential breach
of statutory duty, he has stated that breach of statutory duty denotes a
common law tortious liability created by courts to allow an individual to
claim compensation for damages suffered as a result of another breaking the
*h* provisions of a statute which does not, on its face provide a remedy in tort. A
tortious remedy is obviously available if a statute says that the remedy may

SCC Online Web Edition, Copyright © 2015
Page 27    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

or may not be implied; if it is implied, it is said that the defendant is liable
under the tort for breach of statutory duty. The most familiar example of this
arises in relation to those areas of industrial safety legislation which have     *a*
traditionally imposed criminal penalties upon an employer for breach of
safety provisions, but have given no express tortious remedy to an employee
injured by such a breach. *Groves* v. *Lord Wimborne*[17] is a leading authority
in support of that liability. At p. 45, he has stated on "*Inferring the tort of
breach of statutory duty; presumptions and principles of construction*" that
breach of duty is of considerable practical importance in view of the volume     *b*
of legislation made by Parliament and there are obvious advantages to be
gained from any technique which assists in the prediction of results. The
criticism of the presumptions must be set against the fact that they are of
considerable antiquity and were approved in Lord Diplock's seminal speech
in *Lonrho Ltd.* v. *Shell Petroleum Co. Ltd.*[18]

31. That the words in the judgment cannot be construed as in the statute     *c*
and the presumptions play only limited role. They will yield to competing
evidence for the contrary result which is found in the statute. The use of
presumption in relation to issues of breach of duty should not be surprising.
The problem is not the normal one faced by those who have to construe
statutes of attributing the particular meaning of form of words. It is the more
difficult one of discerning the intention of the legislature on a matter which     *d*
has not been dealt with expressly. The use of presumptions is ideal in such a
case. A presumption is, in effect, a judicial pronouncement that a particular
result is to be assumed unless the contrary is stated with precision. At p. 50,
it is stated in the "*Obligations imposed to protect a particular class of
persons*" that if a statutory obligation or prohibition was imposed for the
benefit of protection of a particular class of persons a presumption will arise     *e*
that the tort of breach of statutory duty is to be inferred. This presumption is
an exception to the presumption of a non-actionability derived from *positive*
act. It, therefore, only applies to a statute which provides its own
enforcement machinery.

32. This presumption requires the statute to be interpreted to see whether
it was intended to benefit the interests of the public as a whole or a defined     *f*
group of members of the public. At p. 51, he has stated that presumptions are
not decisive. When it has been decided which presumption applies to the
case, it will still be necessary for the court to review the statute in question
in order to determine whether the prima facie result is to be upheld. The
answer must depend upon a consideration of the whole Act and the
circumstances including the pre-existing law in which it was enacted. In the     *g*
conclusion, it is stated at p. 54 that the most significant problems stem from
the difficulty of deciding whether a sufficient alternative remedy exists to
invoke the presumption of non-actionability and in determining whether a
defined class which is intended to have enforceable rights vested in it can be

*h*

17  (1898) 2 QB 402 : 67 LJQB 862, CA
18  1982 AC 173 · (1981) 2 All ER 456 : (1981) 3 WLR 33, HL


SCC Online Web Edition, Copyright © 2015
Page 28    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

RAJKOT MUNICIPAL CORPN v. MANJULBEN JAYANTILAL NAKUM      579
*(K. Ramaswamy, J.)*

a   identified. Existing presumption allows sufficient freedom of manoeuvre for
courts to ensure that sensible decisions are reached. If the courts were to
regard statutes containing no enforcement machinery and all other duties
over which they had any doubt as being passed in the public interest, rather
than as intended to vest rights in a defined class of private individuals; were
to regard the existence of standard common law and administrative law
remedies as raising the presumption of non-actionability and were to keep
b   Lord Diplock's concept of rights vested in the public for highly exceptional
cases, the results would not be very different from those reached by the
existing cases. However, the chance of a new area of breach of statutory duty
appearing would be effectively eliminated. There are, of course, great
practical problems in ensuring that the judiciary adopts a common approach
of this kind. It could probably only be achieved as a result of an authoritative
c   statement given by the House of Lords.

33. Michael A. Jones on *Torts* (4th Edn.) 1995 [Lawman (India) Private
Limited] in Chapter II states under the heading *"Negligence: duty of care"*,
that as a tort, negligence consists of a legal duty to take care and breach of
that duty by the defendant causes damage to the plaintiff. Duty determines
whether the type of loss suffered by the plaintiff in the particular way in
d   which it occurred can ever be actionable. Breach of duty is concerned with
the standard of care that ought to have been adopted in the circumstances,
and whether the defendant's conduct fell below that standard, i.e., whether
he was careless. The division of negligence into duty, breach and consequent
damage is convenient for the purpose of exposition but it can be confusing
because the issues will often overlap. He has elaborated the general
e   principles, viz., the neighbourhood principle as laid down in *Donoghue v.
Stevenson*[1] and has stated at p. 27 that the result would seem to be that
factors which formerly might have been considered at the second stage of
Lord Wilberforce's test, policy considerations which ought to "negative, or
to reduce or to limit the scope of the duty", should be taken into account at
an earlier point when deciding whether a relationship of proximity between
f   plaintiff and defendant exists. The second stage of the test will apply only
rarely, i.e., in a limited category of cases where, notwithstanding that a case
of negligence is made out on the proximity basis, public policy requires that
there should be no liability. This new approach represents a shift of emphasis
rather than a new substantive test for the 'existence of a duty of care. In
future, rather than starting from a prima facie assumption that where a
g   defendant's carelessness causes foreseeable damage, a duty of care will
exist, subject to policy considerations which may negative such a duty. The
courts will determine the duty issue on a case-by-case basis, looking in
particular at the nature of the relationship between parties to determine
whether it is sufficiently proximate. That question is of an intensely
pragmatic character, well suited for gradual development but requiring most
h   careful analysis. The following requirements must be satisfied before a duty
of care is held to exist:

SCC Online Web Edition, Copyright © 2015
Page 29      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

(*i*) Foreseeability of the damage;

(*ii*) a sufficiently proximate relationship between the parties; and

(*iii*) even where (*i*) and (*ii*) are satisfied it must be just and reasonable to impose such a duty.

**34.** At p. 30, he has stated relationship of "Foreseeability and proximity" thus: The concept of foreseeability, i.e., what a hypothetical reasonable man would have foreseen in the circumstances, is ubiquitous in the tort of negligence. It is the foundation of the neighbour principle, but it is also used as a test of breach of duty and remoteness of damage. The fact that particular consequences were unforeseeable may lead to the conclusion that the defendant's behaviour was not careless and even where negligence is patent, damage of an unforeseeable kind will be regarded as too remote and therefore not actionable. This is partly related to the notion of fault liability. It can hardly be said that someone is blameworthy if harm to others could not reasonably have been anticipated. (The other standard to fault liability is whether the conduct was reasonable in the face of foreseeable damage.) It is important to realise, however, that foreseeability is a very flexible concept. One man's reasonable foresight is another man's flight of fancy, and so the bounds of what is foreseeable can be stretched or narrowed as the case may be. The likelihood that a particular event may occur in a given set of circumstances may range from almost certainty to virtual impossibility, and in deciding whether it was foreseeable involves a choice. There is no fixed point on the graph at which the law requires people to take account of a possibility. It is not a totally unprincipled choice since the degree of foreseeability required may be varied with the kind and extent of the damage, and the nature of the relationship between the parties. The loss must be reasonably foreseeable, which may mean that it must be foreseeable as a possibility or probable or more probable than not or likely or very likely. This scope for ambiguity allows the concept of foreseeability to be used as a control mechanism to admit or deny recovery of damages in certain types of cases. This becomes most apparent when the courts feel constrained, either by authority or reasons of policy, to deny liability and do so by relying on an absence of reasonable foreseeability which attributes to the reasonable man an abnormal degree of myopia.

**35.** The proximity is usually used as shorthand for Lord Atkin's neighbour principle. This refers to legal not physical proximity. Physical proximity may be relevant in deciding whether the parties should be treated as neighbours in law, but it is not an essential requirement. On the "principle of duty and unforeseeable plaintiff", the word "duty" is used in, at least, three different senses. First, duty of care may signify the recognition of liability for careless conduct in the abstract — is this type of harm occurring in this kind of situation ever actionable? Where the courts deny liability by holding that there is no duty of care even though the neighbour principle appears to be satisfied they are setting the limits of actionability in negligence as a matter of policy. Foreseeability may be necessary but it is


SCC Online Web Edition, Copyright © 2015
Page 30    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

RAJKOT MUNICIPAL CORPN. v. MANJULBEN JAYANTILAL NAKUM       581
*(K. Ramaswamy, J.)*

not a sufficient criterion of liability. Secondly, even where it is accepted that

a  a particular type of loss is capable of giving rise to liability in negligence, the court may conclude that the defendant did not owe a duty of care to the particular plaintiff if the plaintiff was unforeseeable. The plaintiff cannot rely on a duty that the defendant may have owed to others. The third sense in which the word duty is sometimes used is in the context of breach of duty. Where the question is whether the precautions against a particular risk taken

b  by the defendant fall below the standard that a reasonable man would have undertaken, the court may ask whether the defendant who was under a duty was to take further precautions? Here duty is superfluous, it merely signifies the obligation to be careful by adopting the standard of care of a reasonable man.

c  **36.** On the principle of *"Policy and the function of duty"*, it is to remember that the concept of duty adds nothing to the tort of negligence. In some circumstances, a person is held liable for the negligent infliction of damage, and in other circumstances he is not. In the first set of circumstances it is said that a person owes a duty of care, and in the second set that there is no duty. Duty is merely the logical equivalent of actual legal liability for damage caused by negligence. Thus to say that a duty of care

d  exists is to state as a conclusion that (not as a reason why) this damage ought to be actionable. It is circle to argue that there is no liability because there is no duty. Law has always drawn a distinction between the infliction of harm through some positive action and merely allowing harm to occur by failing to prevent it. This is the distinction between misfeasance and non-feasance, but it is not always easy to make. In many cases an omission may simply be

e  part and parcel of a course of conduct that constitutes a negligent way of acting.

f  **37.** In *Clerk and Lindsell on Torts* (The Common Law Library No. 3) (16th Edn.) — London, Sweet and Maxwell, 1989 it is stated in Chapter 4, para 2 *"Duty of Care Situation"* at p. 429 that no action lies in negligence unless there is damage. In cases of personal injuries damage used to be understood to have been inflicted when injury was sustained by the plaintiff, whether he was aware of it or not. At p. 430, he has stated that the tort of negligence is committed when the damage is sustained, however the date of damage is determined. The duty in negligence, therefore, is not simply a duty not to act carelessly; it is a duty not to inflict damage carelessly. Since

g  damage is the gist of the action, what is meant by "duty of care situation" is that it has to be shown that the courts recognise as actionable the careless infliction of the kind of damage of which the plaintiff complains, on the type of person to which he belongs, and by the type of person to which the defendant belongs. It is essential in English law *that the duty should be established*; the mere fact that a man is injured by another's act gives in

h  itself no cause of action; if the act is deliberate, the party injured will have no claim in law even though the injury is intentional so long as the other

SCC Online Web Edition, Copyright © 2015
Page 31 Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

582                    SUPREME COURT CASES                    (1997) 9 SCC

party is merely exercising a legal right; if the act involves a lack of due care, again no case of actionable negligence will arise unless the duty to be careful exists. In most situations it is better to be careful than careless, but it is quite *a* another thing to elevate all carelessness into a tort. Whether there is liability in the given situation depends on there being careless behaviour by the defendant, causation of damage and foreseeability of that kind of damage to the particular plaintiff. At p. 436, on the doctrine of "*Damage to the person*", it is stated that there is an obvious form of recognised damage and requires no elaboration. Even while the law remained reluctant to recognise *b* economic loss caused by careless false statements, it saw no difficulty in recognising liability for injury to the person caused by them.

38. There is a distinction between misfeasance (positive action) and non-feasance (omission). Misfeasance is wilful, reckless or heedless conduct in commission of a positive act lawfully done but with improper conduct. Non-feasance means non-performance of some act which ought to be performed *c* or omission to perform required duty or total neglect of duty. In the case of misfeasance, the defendant is the *author* of the source of danger to cause damage due to careless conduct, to the person/property of plaintiff. He has knowledge that the act may give rise to tort but in the case of non-feasance several factors require consideration for giving rise to actionable negligence. *d* In *The Law of Torts* by John G. Fleming (8th Edn.) 1992, at p. 435 on the Chapter of "*Public Authorities*", the author has stated that although public authorities enjoy no immunity as such from ordinary tort liability, a protective screen has long remained in the vestigial "non-feasance" rule that mere failure to provide a service or benefit pursuant to statutory authority would ordinarily confer no private cause of action on persons who thereby *e* suffer loss. In an article "*Affirmative Action in the Law of Tort: The case of the Duty to Warn*"* it is stated that the distinction between acts (misfeasance) and omissions (non-feasance) sometimes referred to as pure omissions, though a fundamental one, is not one which is easy to make. F.H. Bohlen suggested that "misfeasance differs from non-feasance in two respects: in the character of the conduct complained of, and second, in the nature of the *f* detriment suffered in consequence thereof". The first aspect relates to the distinction between active misfeasance and passive inactivity; the second to the distinction between causing loss and simply failing to confer a benefit. A defendant who has inflicted a loss on the plaintiff by his negligent action will be liable for the misfeasance. On the other hand, if he has simply allowed harm to occur without preventing it, or failed to confer a benefit on *g* the plaintiff, he will not be liable, as this is considered to be an omission or non-feasance. The conferment of such benefits lies in the province of contract, not tort. At p. 117, he states that tort law has developed in such a way as to allow the imposition of liability for injuries that are not easily described as "damage" or "loss". At p. 119, it is further stated that there are, *h*

* Published in *1989 (48) Camb Law Journal at pp. 115-16*


SCC Online Web Edition, Copyright © 2015
Page 32 Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

RAJKOT MUNICIPAL CORPN v. MANJULBEN JAYANTILAL NAKUM    583
*(K. Ramaswamy, J.)*

however, more practical arguments why misfeasance and non-feasance

*a*  should be treated differently. Imposing liability in cases of non-feasance, it is argued, would be to create liability for an indeterminate class of persons. In situations where a warning could have been given or a rescue effected, there are often a number of people who could have taken the action but did not. There are difficulties in determining which of them should be liable. Moreover, it is unfair to pick out one person from a group of equally

*b*  culpable wrongdoers. When harm is inflicted by a positive act, the wrongdoer is readily identifiable in most cases and there is no group of wrongdoers from which one person has been arbitrarily selected. At p. 120, it is stated that in all tort actions, one of the crucial tasks which a court has to perform is to determine whether the injury which was suffered by the plaintiff was or was not reasonably foreseeable by the defendant. While such

*c*  assessment of risk may be more difficult in some cases of non-feasance than it is in cases of misfeasance, it would be no different in substance. At p. 131, it is stated that the circumstances in which liability can arise for an "omission" are therefore somewhat uncertain and open to widely differing interpretations, both broad and narrow. In addition, the outcome of cases in which an omission is at issue may well be the same whether one deals with

*d*  under general principles or under special rules. It may be that by confining liability for what are conceived of as omissions to specified circumstances, the courts have attempted to emphasise that such liability will only arise in a limited number of situations. But the decisions reached by the application of these special rules often seem artificial and unduly restrictive and the application of general principles does not necessarily mean that liability will

*e*  arise in unlimited circumstances. It would still be necessary to show that there was sufficient proximity between the parties and a reasonably foreseeable danger before a duty of care could arise. In determining this question, the court could take into account a broad range of facts which were relevant and even if the facts suggested that such a duty did exist, it would

*f*  still be permissible to consider whether considerations of policy dictate that the duty should not arise. Thus the court would proceed with caution in areas of doubt or difficulty. In the conclusion, it is stated at p. 137 that if cases dealing with a negligent failure to warn were dealt with by the principles applied in ordinary negligence actions rather than by special rules would depend on whether the failure was considered to be an act or an omission. At

*g*  p. 137, he concluded that the distinction between acts or omissions was developed at a time when the law of negligence was in a relatively primitive state and it was feared that the courts would be overwhelmed with actions alleging omissions. However, the law of negligence is now considerably more sophisticated and "floodgates" arguments are given much less credence than they used to be.

*h*      **39.** It can be seen that ordinarily the principle of the law of negligence applies to public authorities also. They are liable to damages because by a

SCC Online Web Edition, Copyright © 2015
Page 33    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

584                    SUPREME COURT CASES                (1997) 9 SCC

negligent act or failure to act when they are under a duty to act or for a
failure to consider whether to exercise a power conferred on them with the
intention that it would be exercised if and when public interest requires it.   *a*
Where the public authority has decided to exercise a power and has done it
negligently a person who has acted in reliance on what the public authority
has done, may have no difficulty in proving that the damages which he has
suffered have been caused by the negligence. Where the damage has resulted
from a negligent failure to act there may be greater difficulty in proving
causation and requires examination in greater detail. The liability in tort is   *b*
for the damage done, not for damage merely foreseeable or threatened or
imminent. In *Donoghue case*[1] the defendants were manufacturers of
gingerbeer which they bottled. The pursuer had been given one of their
bottles by a friend who had purchased it from a retailer who in turn had
purchased it from the defendants. There was no relationship between the
pursuer and the defendants excepting one arising from the fact that she   *c*
consumed the gingerbeer they had made and bottled. The bottle was opaque,
so that it was impossible to see that it contained the decomposed remains of
a snail. It was sealed and stoppered so that it could not be tampered with
until it was opened in order that the contents should be drunk. The House of
Lords had held that these facts established in law a duty to take care as
between the defendants and the pursuer. The principle laid is thus:   *d*

> "A manufacturer of products which he sells in such a form as to
> show that he intends them to reach the ultimate consumer in the form in
> which they left him, with no reasonable possibility of intermediate
> examination, and with the knowledge that the absence of reasonable care
> in the preparation or putting up of the products will result in an injury to
> the consumer's life or property, owes a duty to the consumer to take that   *e*
> reasonable care."

There must be, and is, some general conception of relations giving rise to a
duty of care, of which the particular cases found in the books are but
instances. The rule that you are to live with your neighbour becomes in law a
duty that you must not injure your neighbour. You must take reasonable care   *f*
to avoid acts or omissions which you can reasonably foresee would be likely
to injure your neighbour. Who, then, in law, is my neighbour? The answer
seems to be persons who are so closely and directly affected by my act that I
ought reasonably to have them in contemplation as being so affected when I
am directing my mind to the acts or omissions which are called in question.
The defendant must be the author of the source of danger/damage to the   *g*
person/property. He must of *ex necessitate rei* have knowledge of hidden
defect.

**40.** In *Overseas Tankship (U.K.) Ltd.* v. *Morts Dock and Engineering Co.
Ltd.*[19] Viscount Simonds, speaking for the Judicial Committee, had laid thus:
(AC at p. 425: All ER pp. 414-15)

                                                                          *h*

---

19  1961 AC 388 : (1961) 1 All ER 404 : (1961) 2 WLR 126


SCC Online Web Edition, Copyright © 2015
Page 34          Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a
"It is, no doubt, proper when considering tortious liability for negligence to analyse its elements and to say that the plaintiff must prove a duty owed to him by the defendant, a breach of that duty by the defendant, and consequent damage. But there can be no liability until the damage has been done. It is not the act but the consequences on which tortious liability is founded.... It is vain to isolate the liability from its context and to say that B is or is not liable, and then to ask for what

b
damages he is liable. For his liability is in respect of that damage and no other. If, as admittedly it is, B's liability (culpability) depends on the reasonable foreseeability of the consequent damage, how is that to be determined except by the foreseeability of the damage which in fact happened — the damage in suit?"

c
The duty of care must, therefore, be with reference to the kind of damage that the plaintiff has suffered and in deference to the plaintiff or class to which the plaintiff is a member. These cases relate to private law tort.

**41.** The proper approach, therefore, is to consider whether a duty of care situation exists in public law tort which the law ought to recognise and whether in that situation the defendant's conduct was such that he should have foreseen the damage that would be inflicted on the plaintiff. As a

d
general rule of law, one man is under no duty to control another so as to prevent the latter from doing damage to a third. The first question to be considered is whether the plaintiff has established necessary relationship giving rise to the duty of care. The next question is whether there is any negligence at the time when the act in question was committed? The act complained of must have a rational relationship to the damage caused. The

e
tort of negligence does not depend simply on the question of foreseeability. Foreseeability is not the sole criterion nor does the fact that the damage is foreseeable create any onus. What the court would ask or look at is the operational structure of the Act. Is this a situation where a duty does exist towards the plaintiff or the class of persons to which he belongs keeping in

f
mind the nature of the functions and the interest of the community. The further question would be whether the damage to the plaintiff is so foreseeable. In that behalf it must be further seen whether there was sufficiently proximate relationship between the plaintiff and the defendant. In *Hadley* v. *Baxendale*[20], the celebrated judgment, the accident can be said to have been the natural and probable result of the breach of duty. That

g
principle was accepted in *Haynes* v. *Harwood*[21] wherein Greer, L.J. had laid thus: (All ER p. 107)

"If what is relied on as novus actus interveniens is the very kind of thing which is likely to happen if the want of care which is alleged takes place, then it is no defence to say that there has been a novus actus interveniens. The whole question is whether or not, to use the words of

h
20 (1854) 9 Exch 341 : (1843-60) All ER Rep 461
21 (1935) 1 KB 146 : 1934 All ER Rep 103, CA


SCC Online Web Edition, Copyright © 2015
Page 35    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

586                    SUPREME COURT CASES                (1997) 9 SCC

the leading case, *Hadley* v. *Baxendale*[20], the accident can be said to be the natural and probable result of the breach."

This principle was further approved by the House of Lords in *Dorset Yacht* *a* *Co.* v. *Home Office*[22] (AC at p. 1028). The facts there were that seven Borstal boys were taken by the officers in charge of the hostel to an island under the control and supervision of three officers. The boys left the island at night and boarded, cast adriffs and damaged the plaintiffs' yacht which was moored offshore. The respondents brought action for damages against the Home Office alleging negligence on the part of the officers-in-charge. The *b* defence was that the officers had no control over the boys. There was no carelessness on their part and that the damage was too remote. Lord Reid while negativing the defence had held that where negligence is involved the *Donoghue principle* laid down by Lord Atkin generally applied. Therein the question was of remoteness of causation between the three agencies involved, viz., the controlling officers, the boys who caused the damage and *c* the plaintiff who suffered the damage. The argument of the Attorney General on behalf of the Home Office was that the officers had no control over the boys. In dealing with that question, Lord Reid in his speech had held that: (AC at p. 1027: All ER p. 298)

> "There is an obvious difference between a case where all the links between the carelessness and the damage are inanimate so that, looking *d* back after the event, it can be seen that the damage was in fact the inevitable result of the careless act or omission and a case where one of the links is some human action. In the former case, the damage was in fact caused by the careless conduct, however unforeseeable it may have been at the time that anything like that would happen. At one time the law was that unforeseeability was no defence.... But the law now is that *e* there is no liability unless the damage was of a kind which was foreseeable....
>
> On the other hand, if human action (other than an instinctive reaction) is one of the links in the chain, it cannot be said that, looking back, the damage was the inevitable result of the careless conduct. No one in practice accepts the possible philosophic view that everything that *f* happens was predetermined. Yet it has never been the law that the intervention of human action always prevents the ultimate damage from being regarded as having been caused by the original carelessness. The convenient phrase *novus actus interveniens* denotes those cases where such action is regarded as breaking the chain and preventing the damage from being held to be caused by the careless conduct. But every day *g* there are many cases where, although one of the connecting links is deliberate human action, the law has no difficulty in holding that the defendant's conduct caused the plaintiff loss."

At (AC) p. 1030 (All ER p. 300), Lord Reid held that:

*h*

22  1970 AC 1004 : (1970) 2 All ER 294 : (1970) 2 WLR 1140, HL

SCC Online Web Edition, Copyright © 2015
Page 36    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

RAJKOT MUNICIPAL CORPN. v. MANJULBEN JAYANTILAL NAKUM      587
(K. Ramaswamy, J.)

> "... I would agree but there is very good authority for the proposition
> that if a person performs a statutory duty carelessly so that he causes
> damage to a member of the public which would not have happened if he
> had performed his duty properly, he may be liable."

Accordingly it was held that *Home Office*[22] was liable for damages on
account of negligence of the *officers*.

**42.** In *Geddis* v. *Proprietors of Bann Reservoir*[23] Lord Blackburn said, at
pp. 455-456:

> "For I take it, without citing cases, that it is now thoroughly well
> established that no action will lie for doing that which the legislature has
> authorised, if it be done without negligence, although it does occasion
> damage to anyone; but an action does lie for doing that which the
> legislature has authorised, if it be done negligently."

**43.** The reason for this we think, is that the legislature deems it to be in
the public interest that things, otherwise justifiable should be done, and that
those who do such things with due care should be immune from liability to
persons who may suffer thereby. But legislature cannot reasonably be
supposed to have licensed those who do such things to act negligently in
disregard of the interests of others so as to cause them needless damage.
Where legislature confers a discretion the position is not the same. Then
there may, and almost certainly, will be errors of judgment in exercising such
a discretion and legislature cannot be imputed to have intended that
members of the public should be entitled to sue in respect of such errors. But
there may be a case when the discretion is exercised so carelessly or
unreasonably that there has been no real exercise of the discretion which
legislature has conferred, the person purporting to exercise his discretion has
acted in abuse or excess of his power. The legislature cannot be supposed to
have granted immunity to persons who do that.

**44.** In *Bourhill* v. *Young*[12] (AC at p. 98: All ER p. 399) Lord Thankerton,
adopting the words of Lord Johnston in *Kemp & Dougall* v. *Darngavil Coal
Co. Ltd.*[23a] laid that

> "the obligee in such a duty must be a person of a class definitely
> ascertained, and so related by the circumstances to the obligor that the
> obligor is bound, in the exercise of ordinary sense, to regard his interest
> and his safety. Only the relation must not be too remote, for remoteness
> must be held as a general limitation of the doctrine".

The learned Law Lord further elaborated that:

> "I doubt whether, in view of the variation of circumstances which
> may exist, it is possible or profitable to lay down any hard and fast
> principle, beyond the test of remoteness as applied to the particular
> case."

23 (1878) 3 AC 430, HL
23a (1909) SC 1314

SCC Online Web Edition, Copyright © 2015
Page 37    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

588                    SUPREME COURT CASES                (1997) 9 SCC

**45.** In *Geddis case*[23] Lord Hatherley had stated at p. 449 that:

"We are not bound, nor entitled, to suppose that they will wilfully do injury by the exercise of the legislative powers which have been given to them; but it appears to me clearly and plainly that they should use every precaution, by the exercise either of their powers created by the Act of Parliament itself, or of their common law powers, to prevent damage and injury being done to others through whose property the works or operations are carried on...."

**46.** On the law of negligence of economic laws in *Anns* v. *Merton London Borough*[3] Lord Wilberforce's dictum of two-test theory which had contributed for the development of law of negligence was elaborated and held (AC at p. 751: All ER p. 498) thus:

"Through the trilogy of cases in this House, *Donoghue* v. *Stevenson*[1], *Hedley Byrne & Co. Ltd.* v. *Heller & Partners Ltd.*[24] and *Dorset Yacht Co.* v. *Home Office*[22], the position has now been reached that in order to establish that a duty of care arises in a particular situation, it is not necessary to bring the facts of that situation within those of previous situations in which a duty of care has been held to exist. Rather the question has to be approached in two stages. First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter, in which case a prima facie duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed or the damages to which a breach of it may give rise."

That two-stage test theories now stand overruled by a seven-member House in *Murphy* v. *Brentwood Distt. Council*[2]. Lord Keith of Kinkel held (AC at p. 461: All ER pp. 914-15) thus:

"I observe at this point that the two-stage test has not been accepted as stating a universally applicable principle. Reservations about it were expressed by myself in *Governors of the Peabody Donation Fund* v. *Sir Lindsay Parkinson & Co. Ltd.*[25] (AC at p. 240), by Lord Brandon of Oakbrook in *Leigh and Sillavan Ltd.* v. *Aliakmon Shipping Co. Ltd.*[26] (AC at p. 815) and by Lord Bridge of Harwich in *Curran* v. *Northern Ireland Co-ownership Housing Assn. Ltd.*[27] In *Council of the Shire of Sutherland* v. *Heyman*[28] the High Court of Australia declined to follow

24  1964 AC 465 : (1963) 2 All ER 575 : (1963) 3 WLR 101, HL
25  1985 AC 10 : (1984) 3 All ER 529 : (1984) 3 WLR 953, HL
26  1986 AC 785 · (1986) 2 All ER 145 : (1986) 2 WLR 902, HL
27  1987 AC 718 : (1987) 2 All ER 13 : (1987) 2 WLR 1043, HL
28  (1985) 157 CLR 424 : 60 ALR 1, Aust HC

SCC Online Web Edition, Copyright © 2015
Page 38 Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Anns*[3] and *Yuen Kun-yeu* v. *Attorney General of Hong Kong*[29] (AC at
a    p. 191)."

Accordingly, it was overruled by separate speeches of the learned Law
Lords. Lord Bridge of Harwich (AC at p. 480: All ER p. 929) held that:

"A second difficulty will arise where the latent defect is not
discovered until it causes the sudden and total collapse of the building,
which occurs when the building is temporarily unoccupied and causes
b    no damage to property except to the building itself. The building is now
no longer capable of occupation and hence cannot be a danger to health
or safety. It seems a very strange result that the building owner should be
without remedy in this situation if he would have been able to recover
from the local authority the full cost of repairing the building if only the
defect had been discovered before the building fell down."

c
**47.** In *Caparo Industries plc.* v. *Dickman*[30] (AC at p. 632) where the
facts were that plaintiff which was a public limited company and had
accomplished the take over of FPCC. It brought an action against its
Directors alleging fraudulent misrepresentation against its auditors claiming
that they were negligent in carrying out audit and in making the report which
d    they were required to do within the terms of Sections 236 and 237 of the
Companies Act. The plaintiff company relied upon the audit report and
suffered a loss. In that behalf, it was held by Lord Oliver of Aylmerton that:
(All ER p. 584)

"The question is, I think, one of some importance when one comes
to consider the existence of that essential relationship between the
e    appellants and the respondent to which, in any discussion of the
ingredients of the tort of negligent, there is accorded the description
'proximity', for it is now clear from a series of decisions in this House
that, at least so far as concerns the law of the United Kingdom, the duty
of care in tort depends not solely upon the existence of the essential
ingredient of the foreseeability of damage to the plaintiff but upon its
f    coincidence with a further ingredient to which has been attached the
label 'proximity' and which was described by Lord Atkin in the course
of his speech in *Donoghue* v. *Stevenson*[1] (AC at p. 581: All ER p. 12) as:

'Such close and direct relations that the act complained of
directly affects a person whom the person alleged to be bound to
take care would know would be directly affected by his careless
g    act.' "

At (AC) p. 633 (All ER p. 585), it was further stated that:

"... the postulate of a simple duty to avoid any harm that is, with
hindsight, reasonably capable of being foreseen becomes untenable
without the imposition of some intelligible limits to keep the law of

h
29 1988 AC 175 · (1987) 2 All ER 705 : (1987) 3 WLR 776, PC
30 (1990) 2 AC 605 · (1990) 1 All ER 568 · (1990) 2 WLR 358, HL

SCC Online Web Edition, Copyright © 2015
Page 39        Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

590                    SUPREME COURT CASES              (1997) 9 SCC

negligence within the bounds of common sense and practicality. Those
limits have been found by the requirement of what has been called a
'relationship of proximity' between plaintiff and the defendant and by
the imposition of a further requirement that the attachment of liability
for harm which has occurred be 'just and reasonable'. But although the
cases in which the courts have imposed or withheld liability are capable
of an approximate categorisation, one looks in vain for some common
denominator by which the existence of the essential relationship can be
tested. Indeed, it is difficult to resist a conclusion that what have been
treated as three separate requirements are, at least in most cases, in fact
merely facets of the same thing, for in some cases the degree of
foreseeability is such that it is from that alone that the requisite
proximity can be deduced, whilst in others the absence of that essential
relationship can most rationally be attributed simply to the court's view
that it would not be fair and reasonable to hold the defendant
responsible. 'Proximity' is, no doubt, a convenient expression so long as
it is realised that it is no more than a label which embraces not a
definable concept but merely a description of circumstances from which,
pragmatically, the courts conclude that a duty of care exists."

**48.** In *Hill* v. *Chief Constable of West Yorkshire*[31], the plaintiff's 20
years' old daughter was attacked at night in a city street of the police area of
which the defendant was the chief constable and died from her injuries. Her
attacker who was convicted of her murder was alleged to have committed a
series of offences of murder and attempted murder against young women in
the area. Action was laid by the appellant-mother claiming damages for the
negligence in apprehending the accused and for the faulty investigation. The
trial court quashed the action on the ground of lack of cause of action and in
appeal it was confirmed. Lord Keith of Kinkel speaking for the House, had
held that: (All ER p. 240)

    "... whether the individual members of the police force, in the course
    of carrying out their functions of controlling and keeping down the
    incidence of crime, owe a duty of care to individual members of the
    public who may suffer injury of person or property through the activities
    of criminals, such as to result in liability in damages, on the ground of
    negligence, to anyone who suffers such injury by reason of breach of
    that duty."

Having posed that question, the House held that:

    "The general sense of public duty which motivates police forces is
    unlikely to be appreciably reinforced by the imposition of such liability
    so far as concerns their function in the investigation and suppression of
    crime. From time to time they make mistakes in the exercise of that
    function, but it is not to be doubted that they apply their best endeavours
    to the performance of it. In some instances the imposition of liability
    may lead to the exercise of a function being carried on in a detrimentally

31 1989 AC 53 : (1988) 2 All ER 238 : (1988) 2 WLR 1049, HL

Case 1:15-cv-00612-JDB   Document 24-1   Filed 11/10/15   Page 114 of 288
SCC Online Web Edition, Copyright © 2015
Page 40      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

defensive frame of mind. The possibility of this happening in relation to the investigative operations of the police cannot be excluded. Further it would be reasonable to expect that if potential liability were to be imposed it would be not uncommon for actions to be raised against police forces on the ground that they had failed to catch some criminal as soon as they might have done, with the result that he went on to commit further crimes. While some such actions might involve allegations of a simple and straightforward types of failure, for example that a police officer negligently tripped and fell while pursuing a burglar, others would be likely to enter deeply into the general nature of a police investigation, as indeed the present action would seek to do."

**49.** *Smith* v. *Littlewoods Organisation Ltd.*[32] is a case of omission in a private law tort relating to economic laws. The defendants purchased a cinema building with the intention of demolishing it and replacing by a supermarket. The cinema after doing some work remained neglected and unattended. Security of the building was from time to time overcome by children and young persons and vandalism took place in and around it including an attempt to set fire to some old films in an adjoining close and an attempt to light a fire in the cinema itself. On 5-7-1976, a fire was deliberately started in the cinema by children or teenagers, as a result of which the cinema got burned down and an adjacent cafe and billiards saloon and a nearby church belonging to the users were seriously damaged. An action was brought against the defendants for damages claiming that the damages to the property was caused due to defendants' negligence in not driving off the children causing the damage. The House rejecting the claim, speaking through Lord Brandon of Oakbrook had held that there should be "careless breach of duty" and that: (All ER p. 713)

"I am of opinion that the occurrence of the behaviour in question was not reasonably foreseeable by Littlewoods. I conclude, therefore, that the general duty of care owed by Littlewoods to the appellants did not encompass the specific duty referred to above."

Lord Griffiths, while concurring at p. 251 in his speech held that "common-sense view should be taken". Lord Mackay of Cashfern, approving Lord Macmillan's speech in *Bourhill* v. *Young*[12] quoted (at AC p. 260: All ER p. 721) that:

"The duty to take care is the duty to avoid doing or omitting to do anything the doing or omitting to do which may have as its reasonable and probable consequence injury to others and the duty is owed to those to whom injury may reasonably and probably be anticipated if the duty is not observed."

As to the negligence, approving Lord Romer, the learned Law Lord held that:

32 1987 AC 241 : (1987) 1 All ER 710, HL

SCC Online Web Edition, Copyright © 2015
Page 41    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

"In my opinion, the appellants can only be fixed with liability if it can be shown that there materialised a risk that ought to have been within the appellants' reasonable contemplation."

It was further stated that: (AC p. 272: All ER p. 730)

"We are therefore thrown back to the duty of care. But one thing is clear, and that is that liability in negligence for harm caused by the deliberate wrongdoing of others cannot be founded simply upon foreseeability that the pursuer will suffer loss or damage by reason of such wrongdoing. There is no such general principle. We have therefore, to identify the circumstances in which such liability may be imposed."

"There was no evidence that Littlewoods (the defenders) knew of these matters" (i.e. of the various intrusions by vandals preceding the one when the fire was started). "Unless they had a duty to inspect there is no basis on which it can be alleged that they ought to have known of them."

It was further observed that:

"... the question whether, in all the circumstances described in evidence, a reasonable person in the position of Littlewoods was bound to anticipate as probable, if he took no action to keep these premises lockfast, that, in a comparatively short time before the premises were demolished, they would be set on fire with consequent risk to the neighbouring properties is a matter for the judges of fact to determine."

It was concluded thus: (AC p. 279: All ER p. 735)

"I wish to emphasise that I do not think that the problem in these cases can be solved simply through the mechanism of foreseeability. When a duty is cast on a person to take precautions against the wrongdoing of third parties, the ordinary standard of foreseeability applies; and so the possibility of such wrongdoing does not have to be very great before liability is imposed. I do not myself subscribe to the opinion that liability for the wrongdoing of others is limited because of the unpredictability of human conduct."

The standard of *scrutiny* by courts and applications of the negligence, proximity and remoteness would be much more rigorously examined in public law tortious liability.

**50.** In *London Passenger Transport Board* v. *Upson*[33] (AC at p. 168), Lord Wright in his speech had stated that a claim for damages for breach of statutory duty intended to protect a person in the position of a particular plaintiff is a specific common law right which is not to be confused in essence with a claim for negligence. The statutory right has its origin in the statute, but the particular remedy of an action for damages is given by a common law in order to make effective, for the benefit of insured plaintiff, his right to the performance by the defendant of the defendant's statutory duty. It is an effective sanction. It is not a claim in negligence in the strict or

33 1949 AC 155 : (1949) 1 All ER 60

Case 1:15-cv-00612-JPB Document 24-1 Filed 11/10/15 Page 116 of 288
SCC Online Web Edition, Copyright © 2015
Page 42        Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

ordinary sense. It is a common law action based on the purpose of the
*a* statute.

**51.** In *Stovin* v. *Wise (Norfolk County Council, Third Party)*[34] the Court
of Appeal was to consider the duty of highway authority to remove the
obstruction of visibility and to cut the trees. The plaintiff was injured when
his motorcycle collided with a car driven by the defendant who was turning
out of a side road. The defendant's visibility was limited to about 100 feet
*b* because a bank on adjacent railway land obstructed her view of the corner.
The highway authority had been issued notice on earlier occasion to have it
removed but it failed to effect it. Under the Highways Act, 1980, action was
laid for damages against the highway authority. It was held by the Court of
Appeal that the statutory duty under Section 41 of 1980 Act did not extend
to carry out work on land not forming part of the highway and highway
*c* authority was not held liable for the damages. It was held that the plaintiff
was not depending upon the exercise of the power that had caused damage.
The existence of that power is merely one of the circumstances which
enabled the defendant to claim that the highway authority came under the
duty of care.

*d* **52.** In *Burton* v. *West Suffolk County Council*[35], a highway authority
carried out certain drainage work on a road to improve its conditions since it
was inadequate to prevent flooding when the road was subjected to heavy
rain. It was the practice of the roadman to put red flags by day and put red
lights by night whenever there was flooding which could be dangerous to
vehicles. In December 1954, after heavy rain and flooding, after the water
*e* had subsided, a patch of ice formed on that part of the road which tended to
keep damp because of inadequate drainage. The red flags and red lights were
put off by the roadman when the water had subsided. The plaintiff was
driving his car along the road when it ran on to the patch of ice causing it to
skid and crash into a tree. The plaintiff was injured and the car was
damaged. In an action for damages though the trial court granted the decree,
*f* on appeal, it was held that failure to provide adequate drainage by not doing
sufficient work was an act of non-feasance for which the highway authority
was not liable, but if the work was done negligently and created a new
danger, the Corporation was liable. It was held that there was no duty on the
defendant to warn the plaintiff of the danger of ice being on the road, and,
therefore, the claim of the plaintiff for damages failed. The principle laid
*g* down in *Sheppard* v. *Borough of Glossop*[16] was approved and applied.

**53.** In *Sheppard case*[16] a street was vested in an urban authority under
the Public Health Act, 1875. On 25-12-1918 at 11.30 p.m., the plaintiff who
was going home by the street missed his way, without negligence strayed on
to the private land, and fell over the retaining wall into the street and was

*h*
34 (1994) 3 All ER 467
35 (1960) 2 WLR 745 : (1960) 2 All ER 26 : (1960) 2 QB 72, CA


SCC Online Web Edition, Copyright © 2015
Page 43 Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

injured. In an action against the authority for negligence in the performance of an alleged duty to light the street sufficiently under Section 161 of the Public Health Act, 1875, it was held that the authority have a discretion and the Act imposes on them no obligation to light the streets in their districts. Consequently, the defendants who had begun were not bound to continue to light the street and that having done up to 9 p.m., they have done nothing to make the street dangerous. They were under no obligation whether by lighting or otherwise to give warning of the danger. It was, therefore, held that the defendants were not liable for damages. In *Bolton case*[13], a cricket ground was enclosed on the side by a seven feet fence. When the play was on in the cricket ground abutting the highway, a person being on a side road of a residential house was passing that way. The ball hit by a player off the cricket ground went up to 70 yards from the fence and 100 yards from the place where the injury occurred. In a suit for damages, the House of Lords held that the club was not liable in damages to the injured person, whether on the ground of negligence or nuisance. Lord Porter at p. 858 had held that undoubtedly, one would know that hitting of a cricket ball out of the ground was an event which might occur and, therefore, *there was a conceivable possibility that someone would be hit by it. But so extreme an obligation of care cannot be imposed in all cases.* If it were, no one could safely drive a motor car since the possibility of an accident could not be overlooked and if it occurred some stranger might well be injured, however careful the driver might be. The dictum of Lord Thankerton in *Bourhill case*[12], namely, "such reasonable care as will avoid the risk of injury to such persons as he can reasonably foresee might be injured by failure to exercise such reasonable care" was applied and held that in the circumstances it would not be possible to foresee the injury to the person passing on the highway. Lord Porter had held that it is not enough that the event should be such as can reasonably be foreseen. The further result that injury is likely to follow must also be such as a reasonable man would contemplate, before he can be convicted of actionable negligence. Nor is the remote possibility of injury occurring enough; there must be sufficient probability to lead a reasonable man to anticipate it. The existence of some risk is an ordinary incident of life, even when all due care has been, as it must be, taken. Lord Normand held at page 860 that it is not the law that precautions must be taken against every peril that can be foreseen by the timorous. The standard of care is that a person is bound to foresee only the reasonable and probable consequences of the failure to take care judged by the standard of the ordinary reasonable man. It is, therefore, not enough for the plaintiff to say that the occupiers of the cricket ground could have foreseen the possibility that a ball might be hit out off the ground by a batsman and might injure people on the road, she must go further and say that they ought, as reasonable men, to have foreseen the probability of such an occurrence. Lord Reid at page 865 has supplied the

SCC Online Web Edition, Copyright © 2015
Page 44    Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

most often quoted definition of negligence laid by Alderson B. in *Blyth* v.

a  *Birmingham Waterworks Co.*[36] (Exch at p. 784) that:

> "Negligence is the omission to do something which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do."

and held

b

> "I think that reasonable men do, in fact, take into account the degree of risk and do not act on a bare possibility as they would if the risk were more substantial."

Lord Macmillan's dictum in *Bourhill case*[12] that:

c

> "The duty to take care is the duty to avoid doing or omitting to do anything the doing or omitting to do which may have as its reasonable and probable consequence injury to others and the duty is owed to those to whom injury may reasonably and probably be anticipated if the duty is not observed". It was held that:

> "... The Court must be careful to place itself in the position of the person charged with the duty and to consider what he or she should have

d  reasonably anticipated as a natural and probable consequence of neglect, and not to given undue weight to the fact that a distressing accident has happened...."

The learned Law Lord also approved the dictum of Lord Dunedin in *Fardon* v. *Harcourt-Rivington*[37] (LT at p. 392: All ER p. 83) that:

> "This is such an extremely unlikely extent that I do not think any

e  reasonable man could be convicted of negligence if he did not take into account the possibility of such an occurrence and provide against it...".

At (AC) p. 867 (All ER p. 1086), it was further held that:

> "What a man must not do, and what I think a careful man tries not to do, is *to create a risk which is substantial*. Of course, there are numerous

f  cases where special circumstances require that a higher standard shall be observed and where that is recognised by the law, but I do not think that his case comes within any such special category. It was argued that this case comes within the principle in *Rylands* v. *Fletcher*[38], but I agree with your Lordships that there is no substance in this argument. In my judgment, the test to be applied here is whether the risk of damage to a

g  person on the road was so small that a reasonable man in the position of the appellants, considering the matter from the point of view of safety, would have thought it right to refrain from taking steps to prevent the danger."

h  36 (1856) 11 Exch 781 : (1843-60) All ER Rep 478
37 (1932) 146 LT 391 : 1932 All ER Rep 81, HL
38 (1868) 3 HL 330 : (1861-73) All ER Rep 1


SCC Online Web Edition, Copyright © 2015
Page 45          Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

It was accordingly held that the cricket board was not liable for damages.

**54.** In *Baxter v. Stockton-on-Tees Corpn.*[39], the plaintiff's husband was killed when a motorcycle which he was riding at night on a highway collided with the kerb of an approach island adjacent to a roundabout. In a suit for damages for the death of her husband against the statutory highway authority for its failure to provide lighting at the approach road, the Court of Appeal held on the assumption that the defendants were in any way at fault in respect of the approach island that fault consisted exclusively of non-feasance and that accordingly if the defendants were to be held liable it could only be by virtue of some express words in the Act under which the road became vested in them. But nothing was found in Section 32 of the Local Government Act, 1929 to impose on an urban authority taking over a county road any special obligation as to the maintenance of the road so as to exclude the ordinary immunity from civil action in respect of mere non-feasance. Therefore, the action of the plaintiff must necessarily fail. In *Wilson v. Kingston-upon-Thames Corpn.*[40], a hole in an asphalt roadway was temporarily repaired by the highway authority by filling it with tar-macadam. The road again became in need of repair, but it was not done. A cyclist riding over the hole was thrown from his cycle and injured. He laid the suit for damages. It was held by the Court of Appeal that the condition of the road was due to non-feasance and not due to misfeasance in repairing the road negligently and, therefore, the highway authority was not liable for damages.

**55.** Let us consider the cases relating to duty of care in planting and maintenance of the trees. In England, every owner of a house or the Corporation, has statutory duty to plant trees and of their upkeep. In that behalf the case-law is as under.

**56.** In *Noble v. Harrison*[41], a branch of a beech tree growing on the defendant's land overhung a highway at a height of 30 feet above the ground. In fine whether the branch suddenly broke, fell upon the plaintiff's vehicle, and damaged it. In an action by the plaintiff claiming in respect of damage to his vehicle, the county court found that neither the defendant nor his servants knew that the branch was dangerous or that the fracture was due to a latent defect not discoverable by any reasonably careful inspection. Reversing the judgment of the county court, it was held that the *Ryland case*[38] principle had no application inasmuch as a tree was not in itself a dangerous thing and to grow trees was one of the natural uses of the soil. Mere fact that the branch overhung the tree passage of the highway and although the branch proved to be a danger the defendant was not liable, inasmuch as he had not created the danger and had no knowledge, actual or imputed, of its existence. The principle laid down in *Barker v. Herbert*[42] was

---

39 (1959) 1 QB 441 : (1958) 2 All ER 675 : (1958) 3 WLR 275, CA
40 (1949) 1 All ER 679, CA
41 (1926) 2 KB 332 : 95 LJKB 813
42 (1911) 2 KB 633 : (1911-13) All ER Rep 509



SCC Online Web Edition, Copyright © 2015
Page 46          Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

applied. At page 338, Rowlatt J. held that I see no ground for holding that
a the owner is to become an insurer of nature, or that default is to be imputed
to him until it appears, or would appear upon proper inspection, that nature
can no longer be relied upon. In *Cunliffe* v. *Bankes*[43], a tree growing on the
defendant's estate fell, owing to its diseased condition, across a highway
running besides the estate. The plaintiff's husband was riding a motorcycle
along the highway when without any negligence on his part, he collided with
b the tree and died of his injuries. The plaintiff's action based on negligence
was brought under the Fatal Accidents Act, 1846 and the Law Reform
(Miscellaneous Provisions) Act, 1934. The trial Judge found the defendant
liable. On appeal, reversing the judgment, the Court of Appeal, House of
Lords held that a person is not liable for nuisance constituted by the state of
his property unless (*a*) he caused it or by the neglect of some duty he allows
c it to arise or when it has arisen without his own act or default, he omits to
remedy it within a reasonable time after he became or ought to have become
aware of it. Therefore, the defendant was not liable. In *Caminer v. Northern
& London Investment Trust Ltd.*[44] the respondents were lessees of a block of
flats in London street which were occupied by the tenants. In the forecourt
of the flats, there was a row of elm trees. On 7-4-1947, the appellants were
d driving past the flats when one of the trees fell on their car, wrecking it and
injuring the appellants. The tree that had fallen was proved to have been due
to a disease of the roots, which was of long standing but the disease had not
taken a normal course and there was no indication from the condition of the
tree above the ground that it was affected by the disease. The tree was about
130 years' old and according to the evidence it was of middle age. It was
e never lopped, topped or pollarded. The action was laid for damages for
omission to take proper care of the trees. The House of Lords, after a
detailed examination of the evidence, held that when there has been no
evidence that the tree was affected with a disease mere possibility of taking
protection was not sufficient as spoken by the expert witnesses. It was,
therefore, held that the respondents were not liable for damages. Lord
f Normand at p. 494 held that:

> "What would a reasonable and prudent landlord have done about the
> tree? There is more than enough evidence of what scientific experts
> would have thought or done, but there is a paucity of evidence about
> what a reasonable and prudent landlord would have done."

It was held that there was no evidence to conclude that a reasonable prudent
g landlord would inspect or cause to be inspected any good-sized tree growing
in a place where unsuspecting persons may lawfully approach it and to take
any protection since there is no external evidence of any injury. Lord
Radcliffe at p. 501 had held that:

h
43 (1945) 1 All ER 459
44 (1950) 2 All ER 486 : 1951 AC 88

SCC Online Web Edition, Copyright © 2015
Page 47        Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

"The accepted test that liability only begins when there is apparent in the tree a sign of danger has the advantage that it seems to ignore, or to a large extent to ignore, the distinction between the spot that is much, and the spot that is little, frequented, but, on the other hand, I think that it does end by making the standard of the expert the test of liability. Anyone can own a tree, there is no qualifying examination, but to how many people in this country can be credited as much general knowledge as will warn them that a tree's top is unusually large, or that it is, in fact, diseased, dangerously or otherwise?"

57. It would thus be seen that each case requires to be examined in the light of the special circumstances, viz., whether the defendant owed a duty of care to the plaintiff, whether the plaintiff is a person or a class of persons to which the defendant owed a duty of care, whether the defendant was negligent in performing that duty or omitted to take such reasonable care in the performance of the duty, whether damage must have resulted from that particular duty of care which the defendant owed to the particular plaintiff or class of persons. Public authorities discharge public obligations to the public at large. Therefore, it owes a duty of care at common law to avoid causing present or imminent danger to the safety of the plaintiff or a class of persons to which the plaintiff belongs. It is a statutory duty of care under common law which could give rise to actionable claim in the suit of the individual and it is capable of coexistence alongside a statutory duty. The duty of care imposed on a local authority by law may not be put beyond what the statute expects of the local authority or Corporation to perform the duty. The tort of insuperable negligence would emerge from imminent danger created by a positive act. But the duty of care imposed on local authority by law may be gauged from the circumstances in which and the conditions subject to which the duty of care has been imposed on the statutory authority. The imminent danger theory must be viewed keeping at the back of mind the act or conduct creating the danger to the plaintiff or the class of persons to which he belongs and that by negligent conduct the defendant causes damage to the property or person of the plaintiff, though the defendant is not in know of the danger. The defendant also in given circumstances, must owe special responsibility or proximity imposing foreseeable duty to care, to safeguard the plaintiff from the danger or to prevent it from happening.

58. But when the defendant was not in know of the discoverable defect or danger and it caused the damage by accident like sudden fall of the tree, it would be difficult to visualise that the defendant had knowledge of the danger and he omitted to perform the duty of care to prevent its fault. There would be no special relationship between the statutory authority and the plaintiff who is a remote user of the footpath or the street by the side of which the trees were planted, unless the defendant is aware of the condition of the tree that it is likely to fall on the footpath on which the plaintiff/class of persons to which he belongs frequents it. The defendant by his non-feasance is not responsible for the accident or cause of the death since


SCC Online Web Edition, Copyright © 2015
Page 48      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
------------------------------------------------------------------------------------------------------

*a*    admittedly there was no visible sign that the tree was affected by disease. It had fallen in a still condition of weather.

**59.** Therefore, there must exist some proximity of relationship, foreseeability of danger and duty of care to be performed by the defendant to avoid the accident or to prevent danger to person of the deceased Jayantilal. The requisite degree of proximity requires to be established by the plaintiff in the circumstances in which the plaintiff was injured. The plaintiff would *b* not succeed by establishing that the accident had occurred due to negligence, i.e., the defendant's failure to take reasonable care as ordinary prudent man, under the circumstances, would have taken and the liability in tort to pay damages had arisen. If the defendant had become aware of the decayed condition or that the tree was affected by disease and taken no action to prevent the accident, it would be actionable, though for non-feasance. Mere *c* appearance of danger gives rise to no liability. Actual damage had occurred before tortious liability for negligence arose. When the defendant is under a statutory duty to take care not to create latent source of physical danger to the property or the person who in the circumstances is considered to be reasonably foreseeable as likely to be affected thereby, the defendant would be liable for tort of negligence. If the latent defect causes actual physical *d* damages to the person, the defendant is liable to damages for tortious liability. The negligent act or omission of the statutory authority must be examined with reference to the statutory provisions, creating the duty and the resultant consequences. The negligent act or omission must be specifically directed to safeguard the public or some sections of the public to which the plaintiff was a member, from the particular danger which has *e* resulted.

**60.** The exercise of power/omission must have been such that duty of care had arisen to avoid danger. Foreseeability of the danger or injury alone is not sufficient to conclude that duty of care exists. The fact that one could foresee that a failure of the authority to exercise a reasonable care would cause loss to the passers-by itself does not mean that such a duty of care *f* should be imposed on the statutory authority. The statutory authority exercises its public law duty or function. It would be wrong to think that the local authority always owes responsibility and continues to have the same state of affairs. It would be an intolerable burden of duty of care on the authority; otherwise it would detract the authority from performing its normal duties. If he were to gauge the risk of litigation, he would avoid *g* doing public duty of planting and nurturing the trees thinking that it would be a heavy burden on the local authority. It would always cause heavy financial burden on the statutory authority. If the duty of maintaining constant vigil or verifying or testing the healthy condition of trees at public places with so many other functions to be performed, is cast on it, the effect would be that the authority would omit to perform statutory duty. Duty of *h* care, therefore, must be carefully examined and the foreseeability of damage or danger to the person or property must be corelated to the public duty of


SCC Online Web Edition, Copyright © 2015
Page 49      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------

care to infer that the omission/non-feasance gives rise to actionable claim for
damages against the defendant.

**61.** It is seen that when a person uses a road or highway, under common   *a*
law one has a right to passage over the public way. When the defendant
creates by positive action any danger and no signal or warnings are given
and consequently damage is done, the proximate relationship gets
established between the plaintiff and the defendant and the causation is not
too remote. Equally, when the defendant omits to perform a particular duty
enjoined by the statute or does that duty carelessly, there is proximity    *b*
between the plaintiff-injured person and the defendant in performance of the
duty and when injury occurs or damage is suffered to person or property,
cause of action arises to enable the plaintiff to claim damages from the
defendant. But when the causation is too remote, it is difficult to anticipate
with any reasonable certainty as ordinary reasonable prudent man, to foresee
damage or injury to the plaintiff due to causation or omission on the part of   *c*
the defendant in the performance or negligence in the performance of the
duty.

**62.** The question, therefore, is whether the respondents in the present
case have established the three essential ingredients? The statute enjoins a
power to plant trees on the roadsides or in public places. There is no
statutory sanction for negligence in that behalf. But the question is whether   *d*
the statutory function to plant trees gives rise to a duty of maintaining the
trees. In a developing society it is but obligatory on every householder, when
he constructs a house and equally for a public authority to plant trees and
properly nurture them in a healthy condition so as to protect and maintain
the eco-friendly environment. But the question is whether the public
authority owes a statutory duty towards that class of persons who frequent   *e*
and pass and repass on the public highway or road or the public places. If the
local authority/statutory body has neglected to perform the duty of
maintaining trees in a healthy condition and when damage, due to fall of the
tree occurs, the question emerges whether the neighbour relationship and
proximity of the causation and negligence and the duty of care towards the
plaintiff have been satisfactorily proved to have existed so as to fasten the   *f*
defendant with the liability due to tort of negligence. It depends on a variety
of facts and circumstances. It is difficult to lay down any set standards for
proof thereof. Take for instance, where a hanging branch of a tree/tree is
gradually falling on the ground. The statutory/local authority fails to take
timely action to have it cut and removed and one of the passers-by dies when
the branch/tree falls on him. Though the injured or the deceased has   *g*
contributed to the negligence for the injury or death, the local authority etc.
is equally liable for its negligence/omission in the performance of the duty
because the proximity is anticipated. Suppose a boy not suspecting the
danger climbs or reaches the falling tree and gets hurt, the defendant would
be liable for tort of negligence. The defect is apparent. Negligence is
obvious, proximity and neighbourhood anticipated and lack of duty of care   *h*
stands established. The plaintiff, in common law action, is entitled to sue for

SCC Online Web Edition, Copyright © 2015
Page 50      Monday, August 24, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------

tort of negligence. The authority will be liable to pay the damages for
*a* omission or negligence in the performance of the duty. Take another
instance, where while 'A' is passing on the road, there is sudden lightning
and thunder and 'A' takes shelter under a tree and the lightning falls on the
tree and consequently 'A' dies. In this illustration, there is no corresponding
obligation or a duty of care on the part of the Corporation or the statutory
authority to warn that 'A' should not take shelter under the tree to avoid
*b* harm to him. Take yet another instance, where a road is being laid and there
is no warning or signal and a cyclist or a motorcyclist during night falls in
the ditch, i.e., place of repair due to negligence on the part of the defendant.
The injury is caused to the victim/vehicle. The plaintiff is entitled to lay suit
for tort of negligence. But in a situation like the present one where the
victim being not aware of the disease/decay, the tree suddenly falls in a still
*c* weather condition, no one can anticipate and it is difficult to foresee that a
tree would fall suddenly and thereby a person who would be passing by on
the roadside, would suffer injury or would die in consequence. The
Corporation or the authority is not liable to be sued for tort of negligence
since the causation is too remote. *Novus actus inconveniens* snaps the link
and, therefore, it is difficult to establish lack of care resulting in damage and
*d* foreseeability of the damage. The case in hand falls in this category.
Jayantilal was admittedly passing on the roadside to attend to his office duty.
The tree suddenly fell and he sustained injury and consequently died. It was
difficult to foresee that a tree would fall on him.

**63.** The conditions in India have not developed to such an extent that a
Corporation can keep constant vigil by testing the healthy condition of the
trees in the public places, roadsides, highways frequented by passers-by.
*e* There is no duty to maintain regular supervision thereof, though the local
authority/other authority/owner of a property is under a duty to plant and
maintain the tree. The causation for accident is too remote. Consequently,
there would be no common law right to file suit for tort of negligence. It
would not be just and proper to fasten duty of care and liability for omission
thereof. It would be difficult for the local authority etc. to foresee such an
*f* occurrence. Under these circumstances, it would be difficult to conclude that
the appellant has been negligent in the maintenance of the trees planted by it
on the roadsides.

**64.** The appeal, therefore, succeeds and is allowed accordingly. The
judgment and decree of the trial court, as affirmed by the High Court, stands
set aside. In the facts of the case, we direct that the amount of Rs 45,000
*g* may not be recovered from the respondents though they are not entitled in
law to the same, since they are too poor and the amount must have already
been spent out. In view of the trouble taken by Shri Narasimha as amicus
curiae, we direct the Corporation to pay him a further sum of Rs 5000
(Rupees five thousand only) within a period of two months from the receipt
of this order.

*h*

Declaration of Ritin Rai

Exhibit 7

a

# THE
# SUPREME COURT CASES

b

(2005) 6 SCC

————

**(2005) 6 Supreme Court Cases 1**

c

(BEFORE R.C. LAHOTI, C.J. AND G.P. MATHUR
AND P.K. BALASUBRAMANYAN, JJ.)

JACOB MATHEW                       . .       Appellant;

*Versus*

STATE OF PUNJAB AND ANOTHER              . .       Respondents.

d

Criminal Appeals Nos. 144-45 of 2004†, decided on August 5, 2005

A. **Penal Code, 1860 — S. 304-A — Death due to criminal medical
negligence — Liability of doctors under — When attracted — Test to be
applied — Special treatment of doctors — Rationale for, discussed in detail
— Held, it must be shown that accused doctor did something or failed to do
something which in the given facts and circumstances no medical
professional in his ordinary senses and prudence would have done or failed
to do — Hazard taken by accused doctor should be of such a nature that
injury which resulted was most likely imminent — On facts, aged patient in
advanced stage of terminal cancer experiencing breathing difficulties about
11 p.m. at night and succumbing due to unavailability of oxygen cylinders
with oxygen, which was sought to be administered by appellant-accused
doctor — Held, it is a case of non-availability of oxygen cylinders for which
hospital may be liable in tort, but appellant cannot be proceeded against
under S. 304-A on parameters of *Bolam test*, (1957) 2 All ER 118, 121 D-F
[set out in para 19 herein] — Medical Practitioners — Criminal Law —
Negligence**

e

f

[**Ed.**: The Supreme Court has made an extensive discussion of the various issues that may
arise in cases of *civil* medical negligence as noted under Short Note J. It would seem that
all the conclusions in respect thereof would be applicable *mutatis mutandis* to cases of
criminal medical negligence, the difference being that all rulings would have to be
considered in the context of the *higher* level of negligence necessary to constitute
criminal negligence.]

g

B. **Penal Code, 1860 — S. 304-A — Death due to administration of
medicine of which knowledge not possessed by doctor, though professed**

h

† From the Judgments and Orders dated 18-12-2002 and 24-1-2003 of the Punjab and Haryana
High Court in Crl. Misc. No. 21940-M of 1999 and Crl. Misc. No. 1984 of 2003


SCC Online Web Edition, Copyright © 2015
Page 2      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

expressly or impliedly, held, prima facie constitutes criminal medical negligence — Medical Practitioners — Medical practice — Criminal Law — Negligence

C. **Medical Practitioners — Medical practice — Prosecution of criminal offences against doctors — Detailed guidelines laid down to protect interest of doctors, and to save them from unwarranted and malicious proceedings — Rationale for, discussed in detail — Penal Code, 1860 — Ss. 304-A, 88, 92 and 93 — Constitution of India — Arts. 142 and 141 — Criminal Trial — Doctors — Criminal Procedure Code, 1973 — Ss. 204, 201-203 and 70**

D. **Penal Code, 1860 — S. 304-A — Nature of negligence required under — Phrase "rash or negligent act" — Scope of — Held, though word "gross" has not been used in S. 304-A, expression "rash and negligent act" in S. 304-A has to be read as qualified by word "grossly" — Reasons for, discussed — Interpretation of Statutes — Subsidiary rules — Casus omissus — Instance of, supplied by court**

E. **Penal Code, 1860 — S. 304-A — Liability under — When attracted — Held, it is necessary that death should have been the direct result of a rash and negligent act of accused, and that act must be the proximate and efficient cause without the intervention of another's negligence — It must be the *causa causans* — It is not enough that it may have been the *causa sine qua non* — Criminal Law — Negligence — Causation**

On 15-2-1995, the informant's father, late Jiwan Lal Sharma was admitted as a patient in a private ward of CMC Hospital, Ludhiana. On 22-2-1995 at about 11 p.m., Jiwan Lal felt difficulty in breathing. The complainant's elder brother, Vijay Sharma who was present in the room contacted the duty nurse, who in her turn called some doctor to attend to the patient. No doctor turned up for about 20 to 25 minutes. Then, Dr. Jacob Mathew, the appellant and Dr. Allen Joseph came to the room of the patient. An oxygen cylinder was brought and connected to the mouth of the patient but the breathing problem increased further. The patient tried to get up but the medical staff asked him to remain in bed. The oxygen cylinder was found to be empty. There was no other gas cylinder available in the room. Vijay Sharma went to the adjoining room and brought a gas cylinder therefrom. However, there was no arrangement to make the gas cylinder functional and in-between, 5 to 7 minutes were wasted. By this time, another doctor arrived who declared that the patient was dead. On the abovesaid report, an offence under Sections 304-A/34 IPC was registered and investigated. On charges having been filed against the two doctors, and their failure to obtain quashment thereof in all the forums below, the appellant was before the Supreme Court by special leave.

Allowing the appeals, the Supreme Court

*Held* :

**Criminal medical negligence**

Indiscriminate prosecution of medical professionals for criminal negligence is counter-productive and does no service or good to society. A medical practitioner faced with an emergency ordinarily tries his best to redeem the patient out of his suffering. He does not gain anything by acting with negligence or by omitting to do an act. Obviously, therefore, it will be for the complainant to clearly make out a case of negligence before a medical practitioner is charged with or proceeded against criminally. A surgeon with shaky hands under fear of

SCC Online Web Edition, Copyright © 2015
Page 3    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

legal action cannot perform a successful operation and a quivering physician cannot administer the end-dose of medicine to his patient. If the hands be trembling with the dangling fear of facing a criminal prosecution in the event of failure for whatever reason — whether attributable to himself or not, neither can a surgeon successfully wield his life-saving scalpel to perform an essential surgery, nor can a physician successfully administer the life-saving dose of medicine. Discretion being the better part of valour, a medical professional would feel better advised to leave a terminal patient to his own fate in the case of emergency where the chance of success may be 10% (or so), rather than taking the risk of making a last ditch effort towards saving the subject and facing a criminal prosecution if his effort fails. Such timidity forced upon a doctor would be a disservice to society.                    (Paras 28, 29 and 47)

The criminal law has invariably placed medical professionals on a pedestal different from ordinary mortals. The Penal Code enacted as far back as in the year 1860 sets out a few vocal examples, in Sections 88, 92 and 93.        (Para 34)

The word "gross" has not been used in Section 304-A IPC, yet it is settled that in criminal law negligence or recklessness, to be so held, must be of such a high degree as to be "gross". The expression "rash or negligent act" as occurring in Section 304-A IPC has to be read as qualified by the word "grossly". To impose criminal liability under Section 304-A, the Penal Code, it is necessary that the death should have been the direct result of a rash and negligent act of the accused, and that act must be the proximate and efficient cause without the intervention of another's negligence. It must be the *causa causans*; it is not enough that it may have been the *causa sine qua non*.        [Paras 48(6) and 38]

To prosecute a medical professional for negligence under criminal law it must be shown that the accused did something or failed to do something which in the given facts and circumstances no medical professional in his ordinary senses and prudence would have done or failed to do. The hazard taken by the accused doctor should be of such a nature that the injury which resulted was most likely imminent.        [Para 48(7)]

A doctor who administers a medicine known to or used in a particular branch of medical profession impliedly declares that he has knowledge of that branch of science and if he does not, in fact, possess that knowledge, he is *prima facie* acting with rashness or negligence.        (Para 40)

*Suresh Gupta (Dr.) v. Govt. of NCT of Delhi*, (2004) 6 SCC 422 : 2004 SCC (Cri) 1785, affirmed

*John Oni Akerele v. R.*, AIR 1943 PC 72 : 44 Cri LJ 569; *Kurban Hussein Mohammedali Rangwalla v. State of Maharashtra*, (1965) 2 SCR 622 : (1965) 2 Cri LJ 550; *Kishan Chand v. State of Haryana*, (1970) 3 SCC 904; *Juggankhan v. State of M.P.*, (1965) 1 SCR 14 : (1965) 1 Cri LJ 763, relied on

*Emperor v. Omkar Rampratap*, (1902) 4 Bom LR 679, held, approved

*Roscoe's Law of Evidence* (15th Edn.), pp. 848-49; "*Speeches and Poems with the Report and Notes on the Indian Penal Code*" by Lord Macaulay (Houghton, Mifflin and Company, published in 1874), pp. 419, 421 & 422; Alan Merry and Alexander McCall Smith in their work *Errors, Medicine and the Law* (Cambridge University Press, 2001), pp. 241-248, relied on

In the present case all the averments made in the complaint, even if held to be proved, do not make out a case of criminal rashness or negligence on the part of the accused-appellant. It is not the case of the complainant that the accused-appellant was not a doctor qualified to treat the patient whom he agreed to treat.



SCC Online Web Edition, Copyright © 2015
Page 4    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

------------------------------------------------------------------------------------------------

4                      SUPREME COURT CASES              (2005) 6 SCC

It is a case of non-availability of oxygen cylinders either because of the hospital having failed to keep available a gas cylinder or because of the gas cylinder being found empty. Then, probably the hospital may be liable in civil law or may be not, but the accused-appellant cannot be proceeded against under Section 304-A IPC on the parameters of the *Bolam test*, (1957) 2 All ER 118, at p. 121 D-F [set out in para 19 herein].                                        (Para 53)

*Guidelines for prosecuting medical professionals for criminal negligence*

The investigating officer and the private complainant cannot always be supposed to have knowledge of medical science so as to determine whether the act of the accused medical professional amounts to a rash or negligent act within the domain of criminal law under Section 304-A IPC. The criminal process once initiated subjects the medical professional to serious embarrassment and sometimes harassment. He has to seek bail to escape arrest, which may or may not be granted to him. At the end he may be exonerated by acquittal or discharge but the loss which he has suffered to his reputation cannot be compensated by any standards. Many a complainant prefer recourse to criminal process as a tool for pressurising the medical professional for extracting uncalled for or unjust compensation. Such malicious proceedings have to be guarded against. The service which the medical profession renders to human beings is probably the noblest of all, and hence there is a need for protecting doctors from frivolous or unjust prosecutions.                                        (Paras 50 and 51)

Statutory rules or executive instructions incorporating certain guidelines need to be framed and issued by the Government of India and/or the State Governments in consultation with the Medical Council of India. So long as it is not done, the following guidelines will be in force which shall govern the prosecution of doctors for offences of which criminal rashness or criminal negligence is an ingredient. A private complaint may not be entertained unless the complainant has produced *prima facie* evidence before the court in the form of a credible opinion given by another competent doctor to support the charge of rashness or negligence on the part of the accused doctor. The investigating officer should, before proceeding against the doctor accused of rash or negligent act or omission, obtain an independent and competent medical opinion preferably from a doctor in government service, qualified in that branch of medical practice who can normally be expected to give an impartial and unbiased opinion applying the *Bolam test*, (1957) 2 All ER 118, at p. 121 D-F [set out in para 19 herein], to the facts collected in the investigation. A doctor accused of rashness or negligence, may not be arrested in a routine manner (simply because a charge has been levelled against him). Unless his arrest is necessary for furthering the investigation or for collecting evidence or unless the investigating officer feels satisfied that the doctor proceeded against would not make himself available to face the prosecution unless arrested, the arrest may be withheld.            (Para 52)

§F. **Penal Code 1860 — S. 304-A — *Res ipsa loquitur* — Nature and scope of — Applicability of the said principle in criminal law — Held, said rule cannot be pressed into service for determining *per se* the liability for negligence in criminal law and case under S. 304-A cannot be decided solely by applying the said rule — Doctrines — Tort — Negligence — Criminal Trial — Appreciation of evidence — Evidence Act, 1872 — S. 114**

[Paras 48(8) and 27]

§ [**Ed.**: *See also* Short Note L, below.]



SCC Online Web Edition, Copyright © 2015
Page 5      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

*Syad Akbar* v. *State of Karnataka*, (1980) 1 SCC 30 : 1980 SCC (Cri) 59, *relied on*

*Krishnan* v. *State of Kerala*, (1996) 10 SCC 508 : 1996 SCC (Cri) 1375, *explained*

*a*   **G. Penal Code, 1860 — Ss. 304-A, 88, 92 and 93 — Criminal negligence — When actionable — Held, to hold existence of criminal negligence it shall have to be found that the rashness was of such a degree as to amount to taking a hazard knowing that the hazard was of such a degree that injury was most likely imminent — Criminal Law — Negligence**

*b*   **H. Penal Code, 1860 — Ss. 304-A, 88, 92 and 93 — Criminal negligence — Ingredients of —** *Mens rea* **in respect of, what is — Nature, scope and instances of, discussed — Held, for negligence to amount to a criminal offence, element of** *mens rea* **must be shown to exist — Further held, it is recklessness that constitutes the** *mens rea* **in criminal negligence — Criminal Law — Negligence**

*c*   **I. Penal Code, 1860 — Ss. 304-A, 88, 92 and 93 — Criminal negligence and negligence in tort/civil law — Meanings of — Degrees of negligence — Held, are jurisprudentially different — To fasten liability in criminal law, degree of negligence has to be higher than negligence enough to fasten liability for damages in civil law i.e. gross or of a higher degree — Jurisprudence — Criminal Law — Negligence — Words and phrases — "Criminal negligence"**

*d*   The jurisprudential concept of negligence differs in civil and criminal law. What may be negligence in civil law may not necessarily be negligence in criminal law. Generally speaking, it is the amount of damages incurred which is determinative of the extent of liability in tort; but in criminal law it is not the amount of damages but the amount and degree of negligence that is determinative of liability. To fasten liability in criminal law, the degree of negligence has to be higher than that of negligence enough to fasten liability for damages in civil law i.e. gross or of a very high degree. Negligence which is *e* neither gross nor of a higher degree may provide a ground for action in civil law but cannot form the basis for prosecution.                   [Paras 12, 13, 38 and 48(5)]

While negligence is an omission to do something which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do; criminal negligence is the *gross and culpable neglect or* *f* *failure* to exercise that reasonable and proper care and precaution to guard against injury either to the public generally or to an individual in particular, which having regard to all the circumstances out of which the charge has arisen, it was the imperative duty of the accused person to have adopted. A clear distinction exists between "simple lack of care" incurring civil liability and "very high degree of negligence" which is required in criminal cases.

(Paras 16, 14 and 17)

*g*   *Riddell* v. *Reid*, (1942) 2 All ER 161 : 1943 AC 1 (HL), *relied on*

For negligence to amount to a criminal offence, the element of *mens rea* must be shown to exist. It is recklessness that constitutes *mens rea* in criminal law as far as negligence is concerned. The moral culpability of recklessness is not located in a desire to cause harm. It resides in the proximity of the reckless state of mind to the state of mind present when there is an intention to cause *h* harm. There is, in other words, a disregard for the possible consequences. The consequences entailed in the risk may not be wanted, and indeed the actor may


SCC Online Web Edition, Copyright © 2015
Page 6      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

hope that they do not occur, but this hope nevertheless fails to inhibit the taking of the risk. Certain types of violation, called optimising violations, may be motivated by thrill-seeking. These are clearly reckless.      [Paras 12, 13 and 48(5)]

In order to hold the existence of criminal rashness or criminal negligence it shall have to be found out that the rashness was of such a degree as to amount to taking a hazard knowing that the hazard was of such a degree that injury was most likely imminent. The element of criminality is introduced by the accused having run the risk of doing such an act with recklessness and indifference to the consequences. The negligence to be established by the prosecution must be culpable or gross and not the negligence merely based upon an error of judgment.                                                      (Paras 14 and 15)

*R. v. Lawrence*, (1981) 1 All ER 974 : 1982 AC 510 : (1981) 2 WLR 524 (HL); *R. v. Caldwell*, (1981) 1 All ER 961 : 1982 AC 341 : (1981) 2 WLR 509 (HL); *Andrews v. Director of Public Prosecutions*, 1937 AC 576 : (1937) 2 All ER 552 (HL); *Syad Akbar v. State of Karnataka*, (1980) 1 SCC 30 : 1980 SCC (Cri) 59; *Bhalchandra Waman Pathe v. State of Maharashtra*, 1968 Mah LJ 423 (SC) : 1968 ACJ 38 : 1968 MPLJ 371 (SC), *relied on*

*Empress of India v. Idu Beg*, ILR (1881) 3 All 776 : (1881) 1 AWN 132, *held approved*

**J. Tort — Negligence — Medical negligence — When actionable — Test for — Approach to be taken in dealing with cases of — Rationale for differential treatment of medical profession, discussed in extenso — Duties undertaken by doctors enumerated — Held, in a claim of medical negligence, it is enough for defendant to show that standard of care and skill attained was that of the ordinary competent medical practitioner exercising an ordinary degree of professional skill — Test for medical negligence laid down in *Bolam case*, (1957) 2 All ER 118, 121 D-F [set out in para 19 herein], held, applicable in India — Further explained in detail when deviation from normal medical practice would amount to evidence of medical negligence — Various issues clarified as to (1) state of knowledge by which standard of care is to be determined, (2) standard of care in case of charge of failure (a) to use some particular equipment, or (b) to take some precaution, (3) enquiry to be made when alleged negligence is (a) due to an accident, or (b) due to an error of judgment in choice of a procedure or its execution — Considerations to be kept in mind by any forum trying issue of medical negligence, specified — Medical Practitioners**

**K. Tort — Negligence — Professional negligence — When actionable — Test for — Held, a professional may be held liable for negligence either (1) when he was not possessed of the requisite skill which he professed to have possessed, or (2) when he did not exercise, with reasonable competence in the given case, the skill which he did possess — Standard to be applied would be that of an ordinary competent person exercising ordinary skill in that profession — Test for professional negligence laid down in *Bolam case*, (1957) 2 All ER 118, 121 D-F [set out in para 19 herein], held, applicable in India — Professional negligence distinguished from occupational negligence**

§**L. Tort — Negligence — Medical negligence — Applicability of principle of *res ipsa loquitur* — Held, simply because a patient has not responded favourably to a treatment given by a physician or a surgery has failed, the doctor cannot be held liable per se by applying doctrine of *res ipsa loquitur* — Doctrines — Medical Practitioners**

§ [*Ed.: See also* Short Note F, above.]

SCC Online Web Edition, Copyright © 2015
Page 7      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Professional negligence*

a    In the law of negligence, professionals such as lawyers, doctors, architects and others are included in the category of persons professing some special skill or as skilled persons generally. Any task which is required to be performed with a special skill would generally be admitted or undertaken to be performed only if the person possesses the requisite skill for performing that task. Any reasonable man entering into a profession which requires a particular level of learning to be called a professional of that branch, impliedly assures the person dealing with him that the skill which he professes to possess shall be exercised with

b    reasonable degree of care and caution. He does not assure his client of the result. A physician would not assure the patient of full recovery in every case. A surgeon cannot and does not guarantee that the result of surgery would invariably be beneficial, much less to the extent of 100%, for the person operated on. The only assurance which such a professional can give or can be understood to have given by implication is that he is possessed of the requisite skill in that branch of

c    profession which he is practising and while undertaking the performance of the task entrusted to him he would be exercising his skill with reasonable competence. This is all what the person approaching the professional can expect. Judged by this standard, a professional may be held liable for negligence on one of two findings: either he was not possessed of the requisite skill which he professed to have possessed, or, he did not exercise, with reasonable competence in the given case, the skill which he did possess. The standard to be applied for

d    judging, whether the person charged has been negligent or not, would be that of an ordinary competent person exercising ordinary skill in that profession. It is not possible for every professional to possess the highest level of expertise or skills in that branch which he practices. A highly skilled professional may be possessed of better qualities, but that cannot be made the basis or the yardstick for judging the performance of the professional proceeded against on indictment

e    of negligence.                                     [Paras 18 and 48(3)]

*Medical negligence*

The subject of negligence in the context of the medical profession necessarily calls for treatment with a difference. There is a marked tendency to look for a human actor to blame for an untoward event, a tendency which is closely linked with the desire to punish. Things have gone wrong and, therefore, somebody must be found to answer for it. An empirical study would reveal that

f    the background to a mishap is frequently far more complex than may generally be assumed. It can be demonstrated that actual blame for the outcome has to be attributed with great caution. For a medical accident or failure, the responsibility may lie with the medical practitioner, and equally it may not. The inadequacies of the system, the specific circumstances of the case, the nature of human psychology itself and sheer chance may have combined to produce a result in

g    which the doctor's contribution is either relatively or completely blameless. The human body and its working is nothing less than a highly complex machine. Coupled with the complexities of medical science, the scope for misimpressions, misgivings and misplaced allegations against the operator i.e. the doctor, cannot be ruled out. One may have notions of best or ideal practice which are different from the reality of how medical practice is carried on or how the doctor functions in real life. The factors of pressing need and limited resources cannot be ruled

h    out from consideration. Dealing with a case of medical negligence needs a deeper understanding of the practical side of medicine. The purpose of holding a

SCC Online Web Edition, Copyright © 2015
Page 8      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------

professional liable for his act or omission, if negligent, is to make life safer and
to eliminate the possibility of recurrence of negligence in future. The human
body and medical science, both are too complex to be easily understood. To hold
in favour of existence of negligence, associated with the action or inaction of a
medical professional, requires an in-depth understanding of the working of a
professional as also the nature of the job and of errors committed by chance,
which do not necessarily involve the element of culpability.      (Paras 31 and 30)

Negligence in the context of the medical profession necessarily calls for a
treatment with a difference. To infer rashness or negligence on the part of a
professional, in particular a doctor, additional considerations apply. A case of
occupational negligence is different from one of professional negligence. A
simple lack of care, an error of judgment or an accident, is not proof of
negligence on the part of a medical professional. So long as a doctor follows a
practice acceptable to the medical profession of that day, he cannot be held liable
for negligence merely because a better alternative course or method of treatment
was also available or simply because a more skilled doctor would not have
chosen to follow or resort to that practice or procedure which the accused
followed. The classical statement of law in *Bolam case*, (1957) 2 All ER 118, at
p. 121 D-F [set out in para 19 herein], has been widely accepted as decisive of
the standard of care required both of professional men generally and medical
practitioners in particular, and holds good in its applicability in India. In tort, it is
enough for the defendant to show that the standard of care and the skill attained
was that of the ordinary competent medical practitioner exercising an ordinary
degree of professional skill. The fact that a defendant charged with negligence
acted in accord with the general and approved practice is enough to clear him of
the charge. It is not necessary for every professional to possess the highest level
of expertise in that branch which he practises. Three things are pertinent to be
noted. Firstly, the standard of care, when assessing the practice as adopted, is
judged in the light of knowledge available at the time (of the incident), and not at
the date of trial. Secondly, when the charge of negligence arises out of failure to
use some particular equipment, the charge would fail if the equipment was not
generally available at that point of time (that is, the time of the incident) on
which it is suggested as should have been used. Thirdly, when it comes to the
failure of taking precautions, what has to be seen is whether those precautions
were taken which the ordinary experience of men has found to be sufficient; a
failure to use special or extraordinary precautions which might have prevented
the particular happening cannot be the standard for judging the alleged
negligence.                              [Paras 48(2), 48(4), 19 and 24]

A person who holds himself out ready to give medical advice and treatment
impliedly undertakes that he is possessed of skill and knowledge for that
purpose. Such a person when consulted by a patient owes him certain duties viz.
a duty of care in deciding whether to undertake the case, a duty of care in
deciding what treatment to be given or a duty of care in the administration of that
treatment. A breach of any of those duties gives a right of action for negligence
to the patient. The practitioner must bring to his task a reasonable degree of skill
and knowledge and must exercise a reasonable degree of care. Neither the very
highest nor a very low degree of care and competence, judged in the light of the
particular circumstances of each case, is what the law requires. The doctor no
doubt has a discretion in choosing the treatment which he proposes to give to the
patient and such discretion is relatively ampler in cases of an emergency.
                                                                    (Para 41)

SCC Online Web Edition, Copyright © 2015
Page 9         Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------

Let it also be noted that a mere accident is not evidence of negligence. "Accident" during the course of medical or surgical treatment has a wider meaning. Care has to be taken to see that the result of an accident which is exculpatory may not persuade the human mind to confuse it with the consequence of negligence. So also an error of judgment on the part of a professional is not negligence *per se*. An error of judgment may, or may not, be negligent; it depends on the nature of the error. If it is one that would not have been made by a reasonably competent professional man professing to have the standard and type of skill that the defendant held himself out as having, and acting with ordinary care, then it is negligent. If, on the other hand, it is an error that a man, acting with ordinary care, might have made, then it is not negligence. Higher the acuteness in emergency and higher the complication, more are the chances of error of judgment. At times, the professional is confronted with making a choice between the devil and the deep sea and he has to choose the lesser evil. The medical professional is often called upon to adopt a procedure which involves higher element of risk, but which he honestly believes as providing greater chances of success for the patient rather than a procedure involving lesser risk but higher chances of failure. Which course is more appropriate to follow, would depend on the facts and circumstances of a given case. The usual practice prevalent nowadays is to obtain the consent of the patient or of the person in-charge of the patient if the patient is not in a position to give consent before adopting a given procedure. So long as it can be found that the procedure which was in fact adopted was one which was acceptable to medical science as on that date, the medical practitioner cannot be held negligent merely because he chose to follow one procedure and not another and the result was a failure.                                    (Paras 25, 33 and 45)

Deviation from normal practice is not necessarily evidence of negligence. To establish liability on that basis it must be shown (*1*) that there is a usual and normal practice; (*2*) that the defendant has not adopted it; and (*3*) that the course in fact adopted is one no professional man of ordinary skill would have taken had he been acting with ordinary care. It is also not enough to show that there is a body of competent professional opinion which considers that the decision of the defendant professional was a wrong decision, if there also exists a body of professional opinion, equally competent, which supports the decision as reasonable in the circumstances. It is also not enough to show that subsequent events show that the operation need never have been performed, if at the time the decision to operate was taken, it was reasonable, in the sense that a responsible body of medical opinion would have accepted it as proper.   (Paras 21, 23 and 25)

No sensible professional would intentionally commit an act or omission which would result in loss or injury to the patient as the professional reputation of the person is at stake. A single failure may cost him dear in his career. Even in civil jurisdiction, the rule of *res ipsa loquitur* is not of universal application and has to be applied with extreme care and caution to the cases of professional negligence and in particular that of the doctors. Else it would be counter-productive. Simply because a patient has not favourably responded to a treatment given by a physician or a surgery has failed, the doctor cannot be held liable *per se* by applying the doctrine of *res ipsa loquitur*.                    (Para 26)

At least three weighty considerations can be pointed out which any forum trying the issue of medical negligence in any jurisdiction must keep in mind. These are: (*i*) that legal and disciplinary procedures should be properly founded on firm, moral and scientific grounds; (*ii*) that patients will be better served if the

SCC Online Web Edition, Copyright © 2015
Page 10        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

real causes of harm are properly identified and appropriately acted upon; and (*iii*) that many incidents involve a contribution from more than one person, and the tendency is to blame the last identifiable element in the chain of causation, the person holding the "smoking gun".                                   (Para 32)

*Maynard* v. *West Midlands Regional Health Authority*, (1985) 1 All ER 635 : (1984) 1 WLR 634 (HL); *Hunter* v. *Hanley*, 1955 SLT 213; *Laxman Balkrishna Joshi* v. *Trimbak Bapu Godbole*, (1969) 1 SCR 206 : AIR 1969 SC 128; *Indian Medical Assn.* v. *V.P. Shantha*, (1995) 6 SCC 651; *Poonam Verma* v. *Ashwin Patel*, (1996) 4 SCC 332; *Achutrao Haribhau Khodwa* v. *State of Maharashtra*, (1996) 2 SCC 634; *Spring Meadows Hospital* v. *Harjol Ahluwalia*, (1998) 4 SCC 39; *Whitehouse* v. *Jordan*, (1981) 1 All ER 267 : (1981) 1 WLR 246 (HL); *State of Haryana* v. *Santra*, (2000) 5 SCC 182, *relied on*

*Bolam* v. *Friern Hospital Management Committee*, (1957) 1 WLR 582 : (1957) 2 All ER 118 (QBD); *Michael Hyde and Associates* v. *J.D. Williams & Co. Ltd.*, 2001 PNLR 233 (CA); *Eckersley* v. *Binnie*, (1988) 18 Con LR 1; *Hucks* v. *Cole*, (1968) 118 New LJ 469, *approved*

*Halsbury's Laws of England* (4th Edn., Vol. 30, para 35); *Charlesworth & Percy on Negligence* (10th Edn., 2001), paras 8.02, 8.03, 8.04 & 8.110; *Jackson & Powell on Professional Negligence*, 3rd Edn., paras 1-04, 1-05 and 1-56; Merry, Alan and McCall Smith, Alexander: *Errors, Medicine and the Law* (Cambridge University Press, 2001), *relied on*

*Black's Law Dictionary*, 7th Edn., *referred to*

**M. Tort — Negligence — Ingredients and actionability — Laid down in detail**

**N. Tort — Negligence — Definition and meaning (jurisprudential and forensic), discussed in extenso — Words and phrases**

The jurisprudential concept of negligence defies any precise definition. In current forensic speech, negligence has three meanings. They are: (*i*) a state of mind, in which it is opposed to intention; (*ii*) careless conduct; and (*iii*) the breach of a duty to take care that is imposed by either common or statute law. All three meanings are applicable in different circumstances but any one of them does not necessarily exclude the other meanings.               (Paras 10 and 11)

Negligence is the breach of a duty caused by omission to do something which a reasonable man guided by those considerations which ordinarily regulate the conduct of human affairs would do, or doing something which a prudent and reasonable man would not do. Negligence becomes actionable on account of injury resulting from the act or omission amounting to negligence attributable to the person sued. The essential components of negligence, as recognised, are three: "duty", "breach" and "resulting damage", that is to say:

(*1*) the existence of a duty to take care, which is owed by the defendant to the complainant;

(*2*) the failure to attain that standard of care, prescribed by the law, thereby committing a breach of such duty; and

(*3*) damage, which is both causally connected with such breach and recognised by the law, has been suffered by the complainant.

If the claimant satisfies the court on the evidence that these three ingredients are made out, the defendant should be held liable in negligence.

[Paras 10, 11 and 48(1)]

Ratanlal & Dhirajlal: *Law of Torts*, (24th Edn., 2002, edited by Justice G.P. Singh), pp. 441-42; *Charlesworth & Percy on Negligence* (10th Edn., 2001), paras 1.01, 1.23 and 1.24, *followed*



SCC Online Web Edition, Copyright © 2015
Page 11      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------

O. **Consumer Protection Act, 1986 — S. 2(1)(g) & (o) — "Deficiency in service" — Scope — Doctors — Held, expression is very widely defined and provides a forum for redressal of grievances against professionals, including doctors**
(Para 9)

*D-M/32721/CR*

Advocates who appeared in this case :

G.E. Vahanvati, Solicitor General, Rakesh Dwivedi, Ashok H. Desai and Vivek K. Tankha, Senior Advocates (Rupinder Singh Suri, Ms Gurvinder Suri, Jagjit Singh Chhabra, Atul Nanda, Additional Advocate-General for State of Punjab, Bimal Roy Jad, P.N. Puri, Maninder Singh, Kirtiman Singh, Saurabh Mishra, Angad Mirdha, Ms Pratibha M. Singh, Devadatt Kamat, Ms Rameeza Hakem, Chinmoy Pradip Sharma, Hrishikesh Barua, Ms Suruchi Suri, Ravinder Narain, Ms Sushma Sharma, Ms Meghalee Barthakur, Ms Kanika Gamber, Rajan Narain, Harekhrishna Upadhyaya, Prashant Kumar, Siddhartha Singh Chauhan, Harsh Pathak, A.A. Maitrya, Praveen Khattar, Ms Sudha Gupta, Avik Datta and V.K. Monga, Advocates) for the appearing parties.

*Chronological list of cases cited*                                              *on page(s)*

1.  (2004) 6 SCC 422 : 2004 SCC (Cri) 1785, *Suresh Gupta (Dr.)* v. *Govt. of NCT of Delhi*                 13*f-g*, 13*g*, 13*g-h*, 14*b-c*, 14*c*, 34*c*, 34*c-d*, 34*d-e*

2.  2001 PNLR 233 (CA), *Michael Hyde and Associates* v. *J.D. Williams & Co. Ltd.*                                              18*g-h*

3.  (2000) 5 SCC 182, *State of Haryana* v. *Santra*                                    30*f*

4.  (1998) 4 SCC 39, *Spring Meadows Hospital* v. *Harjol Ahluwalia*              30*c-d*

5.  (1996) 10 SCC 508 : 1996 SCC (Cri) 1375, *Krishnan* v. *State of Kerala*      22*d-e*

6.  (1996) 4 SCC 332, *Poonam Verma* v. *Ashwin Patel*                             29*f-g*

7.  (1996) 2 SCC 634, *Achutrao Haribhau Khodwa* v. *State of Maharashtra*         30*a-b*

8.  (1995) 6 SCC 651, *Indian Medical Assn.* v. *V.P. Shantha*                     29*b*

9.  (1988) 18 Con LR 1, *Eckersley* v. *Binnie*                                    19*c-d*

10. (1985) 1 All ER 635 : (1984) 1 WLR 634 (HL), *Maynard* v. *West Midlands Regional Health Authority*                                   20*d*

11. (1981) 1 All ER 974 : 1982 AC 510 : (1981) 2 WLR 524 (HL), *R.* v. *Lawrence*                                                 16*d-e*

12. (1981) 1 All ER 961 : 1982 AC 341 : (1981) 2 WLR 509 (HL), *R.* v. *Caldwell*                                                 16*e*

13. (1981) 1 All ER 267 : (1981) 1 WLR 246 (HL), *Whitehouse* v. *Jordan*          30*d*

14. (1980) 1 SCC 30 : 1980 SCC (Cri) 59, *Syad Akbar* v. *State of Karnataka*    17*d-e*, 22*d*

15. (1970) 3 SCC 904, *Kishan Chand* v. *State of Haryana*                         28*a-b*

16. (1969) 1 SCR 206 : AIR 1969 SC 128, *Laxman Balkrishna Joshi* v. *Trimbak Bapu Godbole*                                        28*e-f*, 29*h*

17. (1968) 118 New LJ 469, *Hucks* v. *Cole*                                       20*c*

18. 1968 Mah LJ 423 (SC) : 1968 ACJ 38 : 1968 MPLJ 371 (SC), *Bhalchandra Waman Pathe* v. *State of Maharashtra*                       17*g*

19. (1965) 2 SCR 622 : (1965) 2 Cri LJ 550, *Kurban Hussein Mohammedali Rangwalla* v. *State of Maharashtra*                         27*f-g*

20. (1965) 1 SCR 14 : (1965) 1 Cri LJ 763, *Juggankhan* v. *State of M.P.*         28*b*

SCC Online Web Edition, Copyright © 2015
Page 12     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

21.  (1957) 1 WLR 582 : (1957) 2 All ER 118 (QBD), *Bolam* v. *Friern
        Hospital Management Committee*              19*a*, 19*c*, 19*d*, 21*c*, 30*a*,
                                                    30*f*, 33*e-f*, 35*f*, 36*b*
22.  1955 SLT 213, *Hunter* v. *Hanley*                              20*f*
23.  AIR 1943 PC 72 : 44 Cri LJ 569, *John Oni Akerele* v. *R.*       26*h*
24.  (1942) 2 All ER 161 : 1943 AC 1 (HL), *Riddell* v. *Reid*       17*c-d*
25.  1937 AC 576 : (1937) 2 All ER 552 (HL), *Andrews* v. *Director of Public
        Prosecutions*                                           17*b-c*, 17*d-e*
26.  (1902) 4 Bom LR 679, *Emperor* v. *Omkar Rampratap*            27*g*
27.  ILR (1881) 3 All 776 : (1881) 1 AWN 132, *Empress of India* v. *Idu Beg*   17*g*

The Judgment of the Court was delivered by

   **R.C. LAHOTI, C.J.**— Ashok Kumar Sharma, Respondent 2 herein filed a
first information report with Police Station, Division 3, Ludhiana, whereupon
an offence under Section 304-A read with Section 34 of the Indian Penal
Code (for short "IPC") was registered. The gist of the information is that on
15-2-1995, the informant's father, late Jiwan Lal Sharma was admitted as a
patient in a private ward of CMC Hospital, Ludhiana. On 22-2-1995 at about
11 p.m., Jiwan Lal felt difficulty in breathing. The complainant's elder
brother, Vijay Sharma who was present in the room contacted the duty nurse,
who in her turn called some doctor to attend to the patient. No doctor turned
up for about 20 to 25 minutes. Then, Dr. Jacob Mathew, the appellant before
us and Dr. Allen Joseph came to the room of the patient. An oxygen cylinder
was brought and connected to the mouth of the patient but the breathing
problem increased further. The patient tried to get up but the medical staff
asked him to remain in bed. The oxygen cylinder was found to be empty.
There was no other gas cylinder available in the room. Vijay Sharma went to
the adjoining room and brought a gas cylinder therefrom. However, there was
no arrangement to make the gas cylinder functional and in-between, 5 to 7
minutes were wasted. By this time, another doctor came who declared that
the patient was dead. The latter part of FIR states (as per the translation in
English as filed by the complainant):

   "… the death of my father occurred due to the carelessness of
   doctors and nurses and non-availability of oxygen cylinder and the empty
   cylinder was fixed on the mouth of my father and his breathing was
   totally stopped hence my father died. I sent the dead body of my father to
   my village for last cremation and for information I have come to you.
   Suitable action be done sd/- ---- As per statement of intimator the death
   of Jiwan Lal Sharma has occurred due to carelessness of the doctors and
   nurses concerned and to fit empty gas cylinder."

On the abovesaid report, an offence under Sections 304-A/34 IPC was
registered and investigated. Challan was filed against the two doctors.

   **2.** The Judicial Magistrate First Class, Ludhiana framed charges under
Section 304-A IPC against the two accused persons, both doctors. Both of
them filed a revision in the Court of Sessions Judge submitting that there was
no ground for framing charges against them. The revision was dismissed. The
appellant filed a petition in the High Court under Section 482 of the Code of



SCC Online Web Edition, Copyright © 2015
Page 13          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

Criminal Procedure praying for quashing of FIR and all the subsequent proceedings.

a   **3.** It was submitted before the High Court that there was no specific allegation of any act of omission or commission against the accused persons in the entire plethora of documents comprising the challan papers filed by the police against them. The learned Single Judge who heard the petition formed an opinion that the plea raised by the appellant was available to be urged in defence at the trial and, therefore, a case for quashing the charge was not

b   made out. Vide order dated 18-12-2002, the High Court dismissed the petition. An application for recalling the abovesaid order was moved which too was dismissed on 24-1-2003. Feeling aggrieved by these two orders, the appellant has filed these appeals by special leave.

**4.** According to the appellant, the deceased Jiwan Lal was suffering from cancer in an advanced stage and as per the information available, he was, in

c   fact, not being admitted by any hospital in the country because of his being a case of cancer at the terminal stage. He was only required to be kept at home and given proper nursing, food, care and solace coupled with prayers. But as is apparent from the records, his sons are very influential persons occupying important positions in the Government. They requested the hospital authorities that come what may, even on compassionate grounds their father

d   may be admitted in the hospital for regulated medical treatment and proper management of diet. It was abundantly made clear to the informant and his other relations who had accompanied the deceased that the disease was of such a nature and had attained such gravity, that peace and solace could only be got at home. But the complainant could prevail over the doctors and hospital management and got the deceased admitted as an in-patient.

e   Nevertheless, the patient was treated with utmost care and caution and given all the required medical assistance by the doctors and paramedical staff. Every conceivable effort was made by all the attending staff comprising doctors and nurses and other paramedicals to give appropriate medical treatment and the whole staff danced attendance on the patient but what was ordained to happen, did happen. The complainant and his relations, who were

f   misguided or were under mistaken belief as to the facts, lodged a police report against the accused persons, wholly unwarranted and uncalled for.

**5.** The matter came up for hearing before a Bench of two learned Judges of this Court. Reliance was placed by the appellant on a recent two-Judge Bench decision of this Court in *Suresh Gupta (Dr.) v. Govt. of NCT of Delhi*[1].
The Bench hearing this appeal doubted the correctness of the view taken in

g   *Dr. Suresh Gupta case*[1] and vide order dated 9-9-2004 expressed the opinion that the matter called for consideration by a Bench of three Judges. This is how the case has come up for hearing before this Bench.

**6.** In *Dr. Suresh Gupta case*[1] the patient, a young man with no history of any heart ailment, was subjected to an operation performed by Dr. Suresh

h   Gupta for nasal deformity. The operation was neither complicated nor

SCC Online Web Edition, Copyright © 2015
Page 14    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
------------------------------------------------------------------------------------------------------------------------

serious. The patient died. On investigation, the cause of death was found to be "not introducing a cuffed endo'tracheal tube of proper size as to prevent aspiration of blood from the wound in the respiratory passage". The Bench formed an opinion that this act attributed to the doctor, even if accepted to be true, could be described as an act of negligence as there was lack of due care and precaution. But, the Court categorically held: (SCC p. 430, para 24)

> "For this act of negligence he may be liable in tort but his carelessness or want of due attention and skill cannot be described to be so *reckless or grossly negligent* as to make him criminally liable."

(emphasis in original)

**7.** The referring Bench in its order dated 9-9-2004 has assigned two reasons for their disagreement with the view taken in *Dr. Suresh Gupta case*[1] which are as under:

(*1*) Negligence or recklessness being "gross" is not a requirement of Section 304-A IPC and if the view taken in *Dr. Suresh Gupta case*[1] is to be followed then the word "gross" shall have to be read into Section 304-A IPC for fixing criminal liability on a doctor. Such an approach cannot be countenanced.

(*2*) Different standards cannot be applied to doctors and others. In all cases it has to be seen whether the impugned act was rash or negligent. By carrying out a separate treatment for doctors by introducing degrees of rashness or negligence, violence would be done to the plain and unambiguous language of Section 304-A. If by adducing evidence it is proved that there was no rashness or negligence involved, the trial court dealing with the matter shall decide appropriately. But a doctor cannot be placed at a different pedestal for finding out whether rashness or negligence was involved.

**8.** We have heard the learned counsel for the appellant, the respondent State and the respondent complainant. As the question of medical negligence arose for consideration, we thought it fit to issue notice to the Medical Council of India to assist the Court at the time of hearing which it has done. In addition, a registered Society "People for Better Treatment", Kolkata; the Delhi Medical Council, the Delhi Medical Association and the Indian Medical Association sought for intervention at the hearing as the issue arising for decision is of vital significance for the medical profession. They too have been heard. Mainly, the submissions made by the learned counsel for the parties and the intervenors have centred around two issues: (*i*) is there a difference in civil and criminal law on the concept of negligence?; and (*ii*) whether a different standard is applicable for recording a finding of negligence when a professional, in particular, a doctor is to be held guilty of negligence?

**9.** With the awareness in society, and people in general gathering consciousness about their rights, actions for damages in tort are on the

------

1 *Suresh Gupta (Dr.)* v. *Govt. of NCT of Delhi*, (2004) 6 SCC 422 : 2004 SCC (Cri) 1785



SCC Online Web Edition, Copyright © 2015
Page 15        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

increase. Not only are civil suits filed, the availability of a forum for
grievance redressal under the Consumer Protection Act, 1986 having

*a*  jurisdiction to hear complaints against professionals for "deficiency in
service", which expression is very widely defined in the Act, has given rise to
a large number of complaints against professionals, in particular against
doctors, being filed by the persons feeling aggrieved. Criminal complaints
are being filed against doctors alleging commission of offences punishable
under Section 304-A or Sections 336/337/338 IPC alleging rashness or

*b*  negligence on the part of the doctors resulting in loss of life or injury (of
varying degree) to the patient. The present one is such a case. The order of
reference has enabled us to examine the concept of "negligence", in
particular "professional negligence", and as to when and how it does give rise
to an action under the criminal law. We propose to deal with the issues in the
interests of settling the law.

*c*  ### Negligence as a tort

**10.** The jurisprudential concept of negligence defies any precise
definition. Eminent jurists and leading judgments have assigned various
meanings to negligence. The concept as has been acceptable to Indian
jurisprudential thought is well stated in the *Law of Torts*, Ratanlal & Dhirajlal
(24th Edn., 2002, edited by Justice G.P. Singh). It is stated (at pp. 441-42):

*d*
> "Negligence is the breach of a duty caused by the omission to do
> something which a reasonable man, guided by those considerations
> which ordinarily regulate the conduct of human affairs would do, or
> doing something which a prudent and reasonable man would not do.
> Actionable negligence consists in the neglect of the use of ordinary care

*e*  > or skill towards a person to whom the defendant owes the duty of
> observing ordinary care and skill, by which neglect the plaintiff has
> suffered injury to his person or property. ... the definition involves three
> constituents of negligence: (*1*) A legal duty to exercise due care on the
> part of the party complained of towards the party complaining the
> former's conduct within the scope of the duty; (*2*) breach of the said
> duty; and (*3*) consequential damage. Cause of action for negligence

*f*  > arises only when damage occurs; for, damage is a necessary ingredient of
> this tort."

**11.** According to *Charlesworth & Percy on Negligence* (10th Edn., 2001),
in current forensic speech, negligence has three meanings. They are: (*i*) a
state of mind, in which it is opposed to intention; (*ii*) careless conduct; and

*g*  (*iii*) the breach of a duty to take care that is imposed by either common or
statute law. All three meanings are applicable in different circumstances but
any one of them does not necessarily exclude the other meanings. (para 1.01)
The essential components of negligence, as recognised, are three: "duty",
"breach" and "resulting damage", that is to say:

> (*1*) the existence of a duty to take care, which is owed by the
*h*  > defendant to the complainant;

SCC Online Web Edition, Copyright © 2015
Page 16          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------

16                          SUPREME COURT CASES                    (2005) 6 SCC

    (*2*) the failure to attain that standard of care, prescribed by the law, thereby committing a breach of such duty; and

    (*3*) damage, which is both causally connected with such breach and recognised by the law, has been suffered by the complainant. (para 1.23)

If the claimant satisfies the court on the evidence that these three ingredients are made out, the defendant should be held liable in negligence. (para 1.24)

*Negligence — as a tort and as a crime*

**12.** The term "negligence" is used for the purpose of fastening the defendant with liability under the civil law and, at times, under the criminal law. It is contended on behalf of the respondents that in both the jurisdictions, negligence is negligence, and jurisprudentially no distinction can be drawn between negligence under civil law and negligence under criminal law. The submission so made cannot be countenanced inasmuch as it is based upon a total departure from the established terrain of thought running ever since the beginning of the emergence of the concept of negligence up to the modern times. Generally speaking, it is the amount of damages incurred which is determinative of the extent of liability in tort; but in criminal law it is not the amount of damages but the amount and degree of negligence that is determinative of liability. To fasten liability in criminal law, the degree of negligence has to be higher than that of negligence enough to fasten liability for damages in civil law. The essential ingredient of *mens rea* cannot be excluded from consideration when the charge in a criminal court consists of criminal negligence. In *R.* v. *Lawrence*[2] Lord Diplock spoke in a Bench of five and the other Law Lords agreed with him. He reiterated his opinion in *R.* v. *Caldwell*[3] and dealt with the concept of recklessness as constituting *mens rea* in criminal law. His Lordship warned against adopting the simplistic approach of treating all problems of criminal liability as soluble by classifying the test of liability as being "subjective" or "objective", and said: (All ER p. 982*e-f*)

    "Recklessness on the part of the doer of an act does presuppose that there is something in the circumstances that would have drawn the attention of an ordinary prudent individual to the possibility that his act was capable of causing the kind of serious harmful consequences that the section which creates the offence was intended to prevent, and that the risk of those harmful consequences occurring was not so slight that an ordinary prudent individual would feel justified in treating them as negligible. It is only when this is so that the doer of the act is acting 'recklessly' if, before doing the act, he either fails to give any thought to the possibility of there being any such risk or, having recognised that there was such risk, he nevertheless goes on to do it."

**13.** The moral culpability of recklessness is not located in a desire to cause harm. It resides in the proximity of the reckless state of mind to the state of mind present when there is an intention to cause harm. There is, in

2 (1981) 1 All ER 974 : 1982 AC 510 : (1981) 2 WLR 524 (HL)
3 (1981) 1 All ER 961 : 1982 AC 341 : (1981) 2 WLR 509 (HL)

SCC Online Web Edition, Copyright © 2015
Page 17         Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

other words, a disregard for the possible consequences. The consequences entailed in the risk may not be wanted, and indeed the actor may hope that they do not occur, but this hope nevertheless fails to inhibit the taking of the risk. Certain types of violation, called optimising violations, may be motivated by thrill-seeking. These are clearly reckless.

**14.** In order to hold the existence of criminal rashness or criminal negligence it shall have to be found out that the rashness was of such a degree as to amount to taking a hazard knowing that the hazard was of such a degree that injury was most likely imminent. The element of criminality is introduced by the accused having run the risk of doing such an act with recklessness and indifference to the consequences. Lord Atkin in his speech in *Andrews* v. *Director of Public Prosecutions*[4] stated: (All ER p. 556 C)

> "Simple lack of care such as will constitute civil liability is not enough. For purposes of the criminal law there are degrees of negligence, and a very high degree of negligence is required to be proved before the felony is established."

Thus, a clear distinction exists between "simple lack of care" incurring civil liability and "very high degree of negligence" which is required in criminal cases. In *Riddell* v. *Reid*[4a] (AC at p. 31) Lord Porter said in his speech —

> "A higher degree of negligence has always been demanded in order to establish a criminal offence than is sufficient to create civil liability." (*Charlesworth & Percy, ibid.*, para 1.13)

**15.** The fore-quoted statement of law in *Andrews*[4] has been noted with approval by this Court in *Syad Akbar* v. *State of Karnataka*[5]. The Supreme Court has dealt with and pointed out with reasons the distinction between negligence in civil law and in criminal law. Their Lordships have opined that there is a marked difference as to the effect of evidence viz. the proof, in civil and criminal proceedings. In civil proceedings, a mere preponderance of probability is sufficient, and the defendant is not necessarily entitled to the benefit of every reasonable doubt; but in criminal proceedings, the persuasion of guilt must amount to such a moral certainty as convinces the mind of the Court, as a reasonable man, beyond all reasonable doubt. Where negligence is an essential ingredient of the offence, the negligence to be established by the prosecution must be culpable or gross and not the negligence merely based upon an error of judgment.

**16.** Law laid down by Straight, J. in the case of *Empress of India* v. *Idu Beg*[6] has been held good in cases and noticed in *Bhalchandra Waman Pathe* v. *State of Maharashtra*[7] a three-Judge Bench decision of this Court. It has been held that while negligence is an omission to do something which a

---

4  1937 AC 576 : (1937) 2 All ER 552 (HL)
4a  (1942) 2 All ER 161 : 1943 AC 1 (HL)
5  (1980) 1 SCC 30 : 1980 SCC (Cri) 59
6  ILR (1881) 3 All 776 : (1881) 1 AWN 132
7  1968 Mah LJ 423 (SC) : 1968 ACJ 38 : 1968 MPLJ 371 (SC)


SCC Online Web Edition, Copyright © 2015
Page 18    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------

reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do; criminal negligence is the *gross and culpable neglect or failure* to exercise that reasonable and proper care and precaution to guard against injury either to the public generally or to an individual in particular, which having regard to all the circumstances out of which the charge has arisen, it was the imperative duty of the accused person to have adopted.

**17.** In our opinion, the factor of grossness or degree does assume significance while drawing distinction in negligence actionable in tort and negligence punishable as a crime. To be latter, the negligence has to be gross or of a very high degree.

### Negligence by professionals

**18.** In the law of negligence, professionals such as lawyers, doctors, architects and others are included in the category of persons professing some special skill or skilled persons generally. Any task which is required to be performed with a special skill would generally be admitted or undertaken to be performed only if the person possesses the requisite skill for performing that task. Any reasonable man entering into a profession which requires a particular level of learning to be called a professional of that branch, impliedly assures the person dealing with him that the skill which he professes to possess shall be exercised with reasonable degree of care and caution. He does not assure his client of the result. A lawyer does not tell his client that the client shall win the case in all circumstances. A physician would not assure the patient of full recovery in every case. A surgeon cannot and does not guarantee that the result of surgery would invariably be beneficial, much less to the extent of 100% for the person operated on. The only assurance which such a professional can give or can be understood to have given by implication is that he is possessed of the requisite skill in that branch of profession which he is practising and while undertaking the performance of the task entrusted to him he would be exercising his skill with reasonable competence. This is all what the person approaching the professional can expect. Judged by this standard, a professional may be held liable for negligence on one of two findings: either he was not possessed of the requisite skill which he professed to have possessed, or, he did not exercise, with reasonable competence in the given case, the skill which he did possess. The standard to be applied for judging, whether the person charged has been negligent or not, would be that of an ordinary competent person exercising ordinary skill in that profession. It is not necessary for every professional to possess the highest level of expertise in that branch which he practises. In *Michael Hyde and Associates* v. *J.D. Williams & Co. Ltd.*[8] Sedley, L.J. said that where a profession embraces a range of views as to what is an acceptable standard of conduct, the competence of the defendant is to be judged by the lowest standard that would be regarded as acceptable. (*Charlesworth & Percy, ibid.*, para 8.03.)

8  2001 PNLR 233 (CA)

SCC Online Web Edition, Copyright © 2015
Page 19          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**19.** An oftquoted passage defining negligence by professionals, generally and not necessarily confined to doctors, is to be found in the opinion of McNair, J. in *Bolam* v. *Friern Hospital Management Committee*[9], WLR at p. 586 in the following words: (All ER p. 121 D-F)

> "[W]here you get a situation which involves the use of some special skill or competence, then the test as to whether there has been negligence or not is not the test of the man on the top of a Clapham omnibus, because he has not got this special skill. The test is the standard of the ordinary skilled man exercising and professing to have that special skill. A man need not possess the highest expert skill … It is well-established law that it is sufficient if he exercises the ordinary skill of an ordinary competent man exercising that particular art." (*Charlesworth & Percy, ibid.*, para 8.02)

**20.** The water of *Bolam*[9] test has ever since flown and passed under several bridges, having been cited and dealt with in several judicial pronouncements, one after the other and has continued to be well received by every shore it has touched as neat, clean and a well-condensed one. After a review of various authorities Bingham, L.J. in his speech in *Eckersley* v. *Binnie*[10] summarised the *Bolam*[9] test in the following words: (Con LR p. 79)

> "From these general statements it follows that a professional man should command the corpus of knowledge which forms part of the professional equipment of the ordinary member of his profession. He should not lag behind other ordinary assiduous and intelligent members of his profession in the knowledge of new advances, discoveries and developments in his field. He should have such an awareness as an ordinarily competent practitioner would have of the deficiencies in his knowledge and the limitations on his skill. He should be alert to the hazards and risks in any professional task he undertakes to the extent that other ordinarily competent members of the profession would be alert. He must bring to any professional task he undertakes no less expertise, skill and care than other ordinarily competent members of his profession would bring, but need bring no more. The standard is that of the reasonable average. The law does not require of a professional man that he be a paragon combining the qualities of polymath and prophet." (*Charlesworth & Percy, ibid.*, para 8.04)

**21.** The degree of skill and care required by a medical practitioner is so stated in *Halsbury's Laws of England* (4th Edn., Vol. 30, para 35):

> "*35.* The practitioner must bring to his task a reasonable degree of skill and knowledge, and must exercise a reasonable degree of care. Neither the very highest nor a very low degree of care and competence, judged in the light of the particular circumstances of each case, is what the law requires, and a person is not liable in negligence because someone else of greater skill and knowledge would have prescribed

9 (1957) 1 WLR 582 : (1957) 2 All ER 118 (QBD)
10 (1988) 18 Con LR 1


SCC Online Web Edition, Copyright © 2015
Page 20       Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
SCC ONLINE
True Print

-----------------------------------------------------------------------------------------------------------------

20                          SUPREME COURT CASES                    (2005) 6 SCC

different treatment or operated in a different way; nor is he guilty of
negligence if he has acted in accordance with a practice accepted as
proper by a responsible body of medical men skilled in that particular art,
even though a body of adverse opinion also existed among medical men.

Deviation from normal practice is not necessarily evidence of
negligence. To establish liability on that basis it must be shown (*1*) that
there is a usual and normal practice; (*2*) that the defendant has not
adopted it; and (*3*) that the course in fact adopted is one no professional
man of ordinary skill would have taken had he been acting with ordinary
care."

The abovesaid three tests have also been stated as determinative of
negligence in professional practice by *Charlesworth & Percy* in their
celebrated work on *Negligence* (*ibid.*, para 8.110).

**22.** In the opinion of Lord Denning, as expressed in *Hucks* v. *Cole*[11] a
medical practitioner was not to be held liable simply because things went
wrong from mischance or misadventure or through an error of judgment in
choosing one reasonable course of treatment in preference of another. A
medical practitioner would be liable only where his conduct fell below that of
the standards of a reasonably competent practitioner in his field.

**23.** The decision of the House of Lords in *Maynard* v. *West Midlands
Regional Health Authority*[12] by a Bench consisting of five Law Lords has
been accepted as having settled the law on the point by holding that it is not
enough to show that there is a body of competent professional opinion which
considers that the decision of the defendant professional was a wrong
decision, if there also exists a body of professional opinion, equally
competent, which supports the decision as reasonable in the circumstances. It
is not enough to show that subsequent events show that the operation need
never have been performed, if at the time the decision to operate was taken, it
was reasonable, in the sense that a responsible body of medical opinion
would have accepted it as proper. Lord Scarman who recorded the leading
speech with which the other four Lords agreed quoted (at All ER p. 638*f*) the
following words of Lord President (Clyde) in *Hunter* v. *Hanley*[13], observing
that the words cannot be bettered: (SLT p. 217)

"In the realm of diagnosis and treatment there is ample scope for
genuine difference of opinion and one man clearly is not negligent
merely because his conclusion differs from that of other professional
men…. The true test for establishing negligence in diagnosis or treatment
on the part of a doctor is whether he has been proved to be guilty of such
failure as no doctor of ordinary skill would be guilty of if acting with
ordinary care…."

11  (1968) 118 New LJ 469
12  (1985) 1 All ER 635 : (1984) 1 WLR 634 (HL)
13  1955 SLT 213



SCC Online Web Edition, Copyright © 2015
Page 21     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

Lord Scarman added: (All ER p. 638*g-h*)

*a*
"A doctor who professes to exercise a special skill must exercise the ordinary skill of his speciality. Differences of opinion and practice exist, and will always exist, in the medical as in other professions. There is seldom any one answer exclusive of all others to problems of professional judgment. A court may prefer one body of opinion to the other, but that is no basis for a conclusion of negligence."

His Lordship further added that: (All ER p. 639*d*)

*b*
"[A] judge's 'preference' for one body of distinguished professional opinion to another also professionally distinguished is not sufficient to establish negligence in a practitioner whose actions have received the seal of approval of those whose opinions, truthfully expressed, honestly held, were not preferred."

*c*
**24.** The classical statement of law in *Bolam case*[9] has been widely accepted as decisive of the standard of care required both of professional men generally and medical practitioners in particular. It has been invariably cited with approval before the courts in India and applied as a touchstone to test the pleas of medical negligence. In tort, it is enough for the defendant to show that the standard of care and the skill attained was that of the ordinary competent medical practitioner exercising an ordinary degree of professional skill. The fact that a defendant charged with negligence acted in accord with the general and approved practice is enough to clear him of the charge. Two things are pertinent to be noted. Firstly, the standard of care, when assessing the practice as adopted, is judged in the light of knowledge available at the time (of the incident), and not at the date of trial. Secondly, when the charge of negligence arises out of failure to use some particular equipment, the charge would fail if the equipment was not generally available at that point of time on which it is suggested as should have been used.

*d*

*e*

*f*
**25.** A mere deviation from normal professional practice is not necessarily evidence of negligence. Let it also be noted that a mere accident is not evidence of negligence. So also an error of judgment on the part of a professional is not negligence *per se*. Higher the acuteness in emergency and higher the complication, more are the chances of error of judgment. At times, the professional is confronted with making a choice between the devil and the deep sea and he has to choose the lesser evil. The medical professional is often called upon to adopt a procedure which involves higher element of risk, but which he honestly believes as providing greater chances of success for the patient rather than a procedure involving lesser risk but higher chances of failure. Which course is more appropriate to follow, would depend on the facts and circumstances of a given case. The usual practice prevalent nowadays is to obtain the consent of the patient or of the person in-charge of the patient if the patient is not in a position to give consent before adopting a given procedure. So long as it can be found that the procedure which was in

*g*

*h*
9 *Bolam v. Friern Hospital Management Committee*, (1957) 1 WLR 582 : (1957) 2 All ER 118 (QBD)


SCC Online Web Edition, Copyright © 2015
Page 22      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

fact adopted was one which was acceptable to medical science as on that date, the medical practitioner cannot be held negligent merely because he chose to follow one procedure and not another and the result was a failure.

**26.** No sensible professional would intentionally commit an act or omission which would result in loss or injury to the patient as the professional reputation of the person is at stake. A single failure may cost him dear in his career. Even in civil jurisdiction, the rule of *res ipsa loquitur* is not of universal application and has to be applied with extreme care and caution to the cases of professional negligence and in particular that of the doctors. Else it would be counter-productive. Simply because a patient has not favourably responded to a treatment given by a physician or a surgery has failed, the doctor cannot be held liable *per se* by applying the doctrine of *res ipsa loquitur*.

**27.** *Res ipsa loquitur*†† is a rule of evidence which in reality belongs to the Law of Tort. Inference as to negligence may be drawn from proved circumstances by applying the rule if the cause of the accident is unknown and no reasonable explanation as to the cause is coming forth from the defendant. In criminal proceedings, the burden of proving negligence as an essential ingredient of the offence lies on the prosecution. Such ingredient cannot be said to have been proved or made out by resorting to the said rule (see *Syad Akbar* v. *State of Karnataka*[5]). Incidentally, it may be noted that in *Krishnan* v. *State of Kerala*[14] the Court has observed that there may be a case where the proved facts would themselves speak of sharing of common intention and while making such observation one of the learned Judges constituting the Bench has in his concurring opinion merely stated "*res ipsa loquitur*". Nowhere has it been stated that the rule has applicability in a criminal case and an inference as to an essential ingredient of an offence can be found proved by resorting to the said rule. In our opinion, a case under Section 304-A IPC cannot be decided solely by applying the rule of *res ipsa loquitur*.

**28.** A medical practitioner faced with an emergency ordinarily tries his best to redeem the patient out of his suffering. He does not gain anything by acting with negligence or by omitting to do an act. Obviously, therefore, it will be for the complainant to clearly make out a case of negligence before a medical practitioner is charged with or proceeded against criminally. A surgeon with shaky hands under fear of legal action cannot perform a successful operation and a quivering physician cannot administer the end-dose of medicine to his patient.

**29.** If the hands be trembling with the dangling fear of facing a criminal prosecution in the event of failure for whatever reason — whether attributable to himself or not, neither can a surgeon successfully wield his life-saving scalpel to perform an essential surgery, nor can a physician

---

†† [**Ed.**: *Res ipsa loquitur* literally means "the thing speaks for itself".]
  5  (1980) 1 SCC 30 : 1980 SCC (Cri) 59
 14  (1996) 10 SCC 508 : 1996 SCC (Cri) 1375



Case 1:15-cv-00612-JDB Document 24-1   Filed 11/10/15   Page 148 of 288

JACOB MATHEW v. STATE OF PUNJAB *(Lahoti, C.J.)*          23

a      successfully administer the life-saving dose of medicine. Discretion being the
better part of valour, a medical professional would feel better advised to leave
a terminal patient to his own fate in the case of emergency where the chance
of success may be 10% (or so), rather than taking the risk of making a last
ditch effort towards saving the subject and facing a criminal prosecution if
his effort fails. Such timidity forced upon a doctor would be a disservice to
society.

**30.** The purpose of holding a professional liable for his act or omission, if
b      negligent, is to make life safer and to eliminate the possibility of recurrence
of negligence in future. The human body and medical science, both are too
complex to be easily understood. To hold in favour of existence of
negligence, associated with the action or inaction of a medical professional,
requires an in-depth understanding of the working of a professional as also
the nature of the job and of errors committed by chance, which do not
c      necessarily involve the element of culpability.

**31.** The subject of negligence in the context of the medical profession
necessarily calls for treatment with a difference. Several relevant
considerations in this regard are found mentioned by Alan Merry and
Alexander McCall Smith in their work *Errors, Medicine and the Law*
(Cambridge University Press, 2001). There is a marked tendency to look for a
d      human actor to blame for an untoward event, a tendency which is closely
linked with the desire to punish. Things have gone wrong and, therefore,
somebody must be found to answer for it. To draw a distinction between the
blameworthy and the blameless, the notion of *mens rea* has to be elaborately
understood. An empirical study would reveal that the background to a mishap
is frequently far more complex than may generally be assumed. It can be
e      demonstrated that actual blame for the outcome has to be attributed with
great caution. For a medical accident or failure, the responsibility may lie
with the medical practitioner and equally it may not. The inadequacies of the
system, the specific circumstances of the case, the nature of human
psychology itself and sheer chance may have combined to produce a result in
which the doctor's contribution is either relatively or completely blameless.
f      The human body and its working is nothing less than a highly complex
machine. Coupled with the complexities of medical science, the scope for
misimpressions, misgivings and misplaced allegations against the operator
i.e. the doctor, cannot be ruled out. One may have notions of best or ideal
practice which are different from the reality of how medical practice is
carried on or how the doctor functions in real life. The factors of pressing
g      need and limited resources cannot be ruled out from consideration. Dealing
with a case of medical negligence needs a deeper understanding of the
practical side of medicine.

**32.** At least three weighty considerations can be pointed out which any
forum trying the issue of medical negligence in any jurisdiction must keep in
mind. These are: (*i*) that legal and disciplinary procedures should be properly
h      founded on firm, moral and scientific grounds; (*ii*) that patients will be better
served if the real causes of harm are properly identified and appropriately

SCC Online Web Edition, Copyright © 2015
Page 24      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------

acted upon; and (*iii*) that many incidents involve a contribution from more than one person, and the tendency is to blame the last identifiable element in the chain of causation, the person holding the "smoking gun".

**33.** Accident during the course of medical or surgical treatment has a wider meaning. Ordinarily, an accident means an unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated (see *Black's Law Dictionary*, 7th Edn.). Care has to be taken to see that the result of an accident which is exculpatory may not persuade the human mind to confuse it with the consequence of negligence.

### Medical professionals in criminal law

**34.** The criminal law has invariably placed medical professionals on a pedestal different from ordinary mortals. The Indian Penal Code enacted as far back as in the year 1860 sets out a few vocal examples. Section 88 in the Chapter on General Exceptions provides exemption for acts not intended to cause death, done by consent in good faith for person's benefit. Section 92 provides for exemption for acts done in good faith for the benefit of a person without his consent though the acts cause harm to the person and that person has not consented to suffer such harm. There are four exceptions listed in the section which are not necessary in this context to deal with. Section 93 saves from criminality certain communications made in good faith. To these provisions are appended the following illustrations:

#### Section 88

"*A*, a surgeon, knowing that a particular operation is likely to cause the death of *Z*, who suffers under a painful complaint, but not intending to cause *Z*'s death, and intending, in good faith, *Z*'s benefit, performs that operation on *Z*, with *Z*'s consent. *A* has committed no offence."

#### Section 92

"(*a*) *Z* is thrown from his horse, and is insensible. *A*, a surgeon, finds that *Z* requires to be trepanned. *A*, not intending *Z*'s death, but in good faith, for *Z*'s benefit, performs the trepan before *Z* recovers his power of judging for himself. *A* has committed no offence.

\*                    \*                    \*

(*c*) *A*, a surgeon, sees a child suffer an accident which is likely to prove fatal unless an operation be immediately performed. There is no time to apply to the child's guardian. *A* performs the operation in spite of the entreaties of the child, intending, in good faith, the child's benefit. *A* has committed no offence."

#### Section 93

"*A*, a surgeon, in good faith, communicates to a patient his opinion that he cannot live. The patient dies in consequence of the shock. *A* has committed no offence, though he knew it to be likely that the communication might cause the patient's death."

**35.** It is interesting to note what Lord Macaulay had himself to say about the Indian Penal Code. We are inclined to quote a few excerpts from his speech to the extent relevant for our purpose from "*Speeches and Poems with*


SCC Online Web Edition, Copyright © 2015
Page 25          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

*the Report and Notes on the Indian Penal Code*" by Lord Macaulay (Houghton, Mifflin and Company, published in 1874):

a     "Under the provisions of our Code, this case would be very differently dealt with according to circumstances. If A kills Z by administering abortives to her, with the knowledge that those abortives are likely to cause her death, he is guilty of voluntary culpable homicide, which will be voluntary culpable homicide by consent, if Z agreed to run the risk, and murder if Z did not so agree. If A causes miscarriage to Z, not intending to cause Z's death, nor thinking it likely that he shall cause Z's death, but so rashly or negligently as to cause her death, A is guilty of culpable homicide not voluntary, and will be liable to the punishment provided for the causing of miscarriage, increased by imprisonment for a term not exceeding two years. Lastly, if A took such precautions that there was no reasonable probability that Z's death would be caused, and if the medicine were rendered deadly by some accident which no human sagacity could have foreseen, or by some peculiarity in Z's constitution such as there was no ground whatever to expect, A will be liable to no punishment whatever on account of her death, but will of course be liable to the punishment provided for causing miscarriage.

d     It may be proper for us to offer some arguments in defence of this part of the Code.

    It will be admitted that when an act is in itself innocent, to punish the person who does it because bad consequences, which no human wisdom could have foreseen, have followed from it, would be in the highest degree barbarous and absurd." (p. 419)

e     "To punish as a murderer every man who, while committing a heinous offence, causes death by pure misadventure, is a course which evidently adds nothing to the security of human life. No man can so conduct himself as to make it absolutely certain that he shall not be so unfortunate as to cause the death of a fellow-creature. The utmost that he can do is to abstain from every thing which is at all likely to cause death. No fear of punishment can make him do more than this; and therefore, to punish a man who has done this can add nothing to the security of human life. The only good effect which such punishment can produce will be to deter people from committing any of those offences which turn into murders what are in themselves mere accidents. It is in fact an addition to the punishment of those offences, and it is an addition made in the very worst way." (p. 421)

g     "When a person engaged in the commission of an offence causes death by rashness or negligence, but without either intending to cause death, or thinking it likely that he shall cause death, we propose that he shall be liable to the punishment of the offence which he was engaged in committing, superadded to the ordinary punishment of involuntary culpable homicide.

SCC Online Web Edition, Copyright © 2015
Page 26          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

The arguments and illustrations which we have employed for the purpose of showing that the involuntary causing of death, without either rashness or negligence, ought, under no circumstances, to be punished at all, will, with some modifications, which will readily suggest themselves, serve to show that the involuntary causing of death by rashness or negligence, though always punishable, ought, under no circumstances to be punished as murder." (p. 422)

**36.** The following statement of law on criminal negligence by reference to surgeons, doctors, etc. and unskilful treatment contained in *Roscoe's Law of Evidence* (15th Edn.) is classic:

"Where a person, acting as a medical man, &c., whether licensed or unlicensed, is so negligent in his treatment of a patient that death results, it is manslaughter if the negligence was so great as to amount to a crime, and whether or not there was such a degree of negligence is a question in each case for the jury. In explaining to juries the test which they should apply to determine whether the negligence in the particular case amounted or did not amount to a crime, Judges have used many epithets, such as 'culpable', 'criminal', 'gross', 'wicked', 'clear', 'complete'. But whatever epithet be used and whether an epithet be used or not, in order to establish criminal liability the facts must be such that, in the opinion of the jury, the negligence of the accused went beyond a mere matter of compensation between subjects and showed such disregard for the life and safety of others as to amount to a crime against the State and conduct deserving punishment." (pp. 848-49)

\*          \*          \*

"Whether he be licensed or unlicensed, if he display gross ignorance, or gross inattention, or gross rashness, in his treatment, he is criminally responsible. Where a person who, though not educated as an accoucheur, had been in the habit of acting as a man-midwife, and had unskilfully treated a woman who died in childbirth, L. Ellenborough said that there was no evidence of murder, but the jury might convict of manslaughter. To substantiate that charge the prisoner must have been guilty of criminal misconduct, arising either from the grossest ignorance or the [most?] criminal inattention. One or other of these is necessary to make him guilty of that criminal negligence and misconduct which is essential to make out a case of manslaughter." (p. 849)

### *A review of Indian decisions on criminal negligence*

**37.** We are inclined to, and we must — as duty-bound, take note of some of the relevant decisions of the Privy Council and of this Court. We would like to preface this discussion with the law laid down by the Privy Council in *John Oni Akerele* v. *R.*[15] A duly qualified medical practitioner gave to his patient the injection of sobita which consisted of sodium bismuth tartrate as

---

15 AIR 1943 PC 72 : 44 Cri LJ 569


SCC Online Web Edition, Copyright © 2015
Page 27    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

given in the British Pharmacopoeia. However, what was administered was an overdose of sobita. The patient died. The doctor was accused of manslaughter, reckless and negligent act. He was convicted. The matter reached in appeal before the House of Lords. Their Lordships quashed the conviction. On a review of judicial opinion and an illuminating discussion on the points which are also relevant before us, what Their Lordships have held can be summed up as under:

*a*

(*i*) That a doctor is not criminally responsible for a patient's death unless his negligence or incompetence went beyond a mere matter of compensation between subjects and showed such disregard for life and safety of others as to amount to a crime against the State. (AIR p. 75*a*)

*b*

(*ii*) That the degree of negligence required is that it should be gross, and that neither a jury nor a court can transform negligence of a lesser degree into gross negligence merely by giving it that appellation. … There is a difference in kind between the negligence which gives a right to compensation and the negligence which is a crime. (AIR p. 75*b-c*)

*c*

(*iii*) It is impossible to define culpable or criminal negligence, and it is not possible to make the distinction between actionable negligence and criminal negligence intelligible, except by means of illustrations drawn from actual judicial opinions. (AIR p. 75*c-d*)

*d*

… The most favourable view of the conduct of an accused medical man has to be taken, *for it would be most fatal to the efficiency of the medical profession if no one could administer medicine without a halter round his neck*. (AIR p. 75*e*)          (emphasis supplied)

Their Lordships refused to accept the view that criminal negligence was proved merely because a number of persons were made gravely ill after receiving an injection of sobita from the appellant coupled with a finding that a high degree of care was not exercised. Their Lordships also refused to agree with the thought that merely because too strong a mixture was dispensed once and a number of persons were made gravely ill, a criminal degree of negligence was proved.

*e*

**38.** The question of degree has always been considered as relevant to a distinction between negligence in civil law and negligence in criminal law. In *Kurban Hussein Mohammedali Rangwalla* v. *State of Maharashtra*[16] while dealing with Section 304-A IPC, the following statement of law by Sir Lawrence Jenkins in *Emperor* v. *Omkar Rampratap*[17] was cited with approval: (SCR p. 626 D-E)

*f*

"To impose criminal liability under Section 304-A, Indian Penal Code, it is necessary that the death should have been the direct result of a rash and negligent act of the accused, and that act must be the proximate and efficient cause without the intervention of another's negligence. It

*g*

*h*

16 (1965) 2 SCR 622 : (1965) 2 Cri LJ 550
17 (1902) 4 Bom LR 679


SCC Online Web Edition, Copyright © 2015
Page 28          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------

must be the *causa causans*; it is not enough that it may have been the *causa sine qua non*."

**39.** K.N. Wanchoo, J. (as he then was), speaking for the Court, observed *a* that the abovesaid view of the law has been generally followed by the High Courts in India and was the correct view to take of the meaning of Section 304-A. The same view has been reiterated in *Kishan Chand* v. *State of Haryana*[18].

**40.** In *Juggankhan* v. *State of M.P.*[19] the accused, a registered Homoeopath, administered 24 drops of stramonium and a leaf of dhatura to *b* the patient suffering from guinea worm. The accused had not studied the effect of such substances being administered to a human being. The poisonous contents of the leaf of dhatura were not satisfactorily established by the prosecution. This Court exonerated the accused of the charge under Section 302 IPC. However, on a finding that stramonium and dhatura leaves are poisonous and in no system of medicine, except perhaps the Ayurvedic *c* system, is the dhatura leaf given as cure for guinea worm, the act of the accused who prescribed poisonous material without studying their probable effect was held to be a rash and negligent act. It would be seen that the profession of a Homoeopath which the accused claimed to profess did not permit use of the substance administered to the patient. The accused had no knowledge of the effect of such substance being administered and yet he did *d* so. In this background, the inference of the accused being guilty of a rash and negligent act was drawn against him. In our opinion, the principle which emerges is that a doctor who administers a medicine known to or used in a particular branch of medical profession impliedly declares that he has knowledge of that branch of science and if he does not, in fact, possess that knowledge, he is *prima facie* acting with rashness or negligence. *e*

**41.** *Laxman Balkrishna Joshi* v. *Trimbak Bapu Godbole*[20] was a case under the Fatal Accidents Act, 1855. It does not make a reference to any other decided case. The duties which a doctor owes to his patients came up for consideration. The Court held that a person who holds himself out ready to give medical advice and treatment impliedly undertakes that he is *f* possessed of skill and knowledge for that purpose. Such a person when consulted by a patient owes him certain duties viz. a duty of care in deciding whether to undertake the case, a duty of care in deciding what treatment to be given or a duty of care in the administration of that treatment. A breach of any of those duties gives a right of action for negligence to the patient. The practitioner must bring to his task a reasonable degree of skill and knowledge and must exercise a reasonable degree of care. Neither the very highest nor a *g* very low degree of care and competence, judged in the light of the particular circumstances of each case, is what the law requires. The doctor no doubt has a discretion in choosing the treatment which he proposes to give to the

---

18  (1970) 3 SCC 904
19  (1965) 1 SCR 14 : (1965) 1 Cri LJ 763
20  (1969) 1 SCR 206 : AIR 1969 SC 128

*h*


SCC Online Web Edition, Copyright © 2015
Page 29      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

patient and such discretion is relatively ampler in cases of emergency. In this case, the death of the patient was caused due to shock resulting from

*a* reduction of the fracture attempted by doctor *without taking the elementary caution of giving anaesthesia to the patient*. The doctor was held guilty of negligence and liability for damages in civil law. We hasten to add that criminal negligence or liability under criminal law was not an issue before the Court, as it did not arise and hence was not considered.

**42.** In the year 1996, there are three reported decisions available. *Indian*

*b* *Medical Assn.* v. *V.P. Shantha*[21] is a three-Judge Bench decision. The principal issue which arose for decision by the Court was whether a medical practitioner renders "service" and can be proceeded against for "deficiency in service" before a forum under the Consumer Protection Act, 1986. The Court dealt with how a "profession" differs from an "occupation" especially in the context of performance of duties and hence the occurrence of negligence.

*c* The Court noticed that medical professionals do not enjoy any immunity from being sued in contract or tort (i.e. in civil jurisdiction) on the ground of negligence. However, in the observation made in the context of determining professional liability as distinguished from occupational liability, the Court has referred to authorities, in particular, *Jackson & Powell* and have so stated

*d* the principles, partly quoted from the authorities: (SCC pp. 665-66, para 22)

"**22.** In the matter of professional liability professions differ from other occupations for the reason that professions operate in spheres where success cannot be achieved in every case and very often success or failure depends upon factors beyond the professional man's control. In devising a rational approach to professional liability which must provide

*e* proper protection to the consumer while allowing for the factors mentioned above, the approach of the courts is to require that professional men should possess a certain minimum degree of competence and that they should exercise reasonable care in the discharge of their duties. In general, a professional man owes to his client a duty in tort as well as in contract to exercise reasonable care in giving

*f* advice or performing services. (See *Jackson & Powell on Professional Negligence*, 3rd Edn., paras 1-04, 1-05 and 1-56.)"

**43.** In *Poonam Verma* v. *Ashwin Patel*[22] a doctor registered as a medical practitioner and entitled to practice in homoeopathy only, prescribed an allopathic medicine to the patient. The patient died. The doctor was held to be negligent and liable to compensate the wife of the deceased for the death

*g* of her husband on the ground that the doctor who was entitled to practice in homoeopathy only, was under a statutory duty not to enter the field of any other system of medicine and since he trespassed into a prohibited field and prescribed the allopathic medicine to the patient causing the death, his conduct amounted to negligence *per se* actionable in civil law. *Laxman*

*h*
21 (1995) 6 SCC 651
22 (1996) 4 SCC 332



SCC Online Web Edition, Copyright © 2015
Page 30 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Balkrishna Joshi case*[20] was followed. Vide para 16, the test for determining whether there was negligence on the part of a medical practitioner as laid down in *Bolam case*[9] was cited and approved.

**44.** In *Achutrao Haribhau Khodwa* v. *State of Maharashtra*[23] the Court noticed that in the very nature of medical profession, skills differ from doctor to doctor and more than one alternative course of treatment is available, all admissible. Negligence cannot be attributed to a doctor so long as he is performing his duties to the best of his ability and with due care and caution. Merely because the doctor chooses one course of action in preference to the other one available, he would not be liable if the course of action chosen by him was acceptable to the medical profession. It was a case where a mop was left inside the lady patient's abdomen during an operation. Peritonitis developed which led to a second surgery being performed on her, but she could not survive. Liability for negligence was fastened on the surgeon because no valid explanation was forthcoming for the mop having been left inside the abdomen of the lady. The doctrine of *res ipsa loquitur* was held applicable "in a case like this".

**45.** *Spring Meadows Hospital* v. *Harjol Ahluwalia*[24] is again a case of liability for negligence by a medical professional in civil law. It was held that an error of judgment is not necessarily negligence. The Court referred to the decision in *Whitehouse* v. *Jordan*[25] and cited with approval (at SCC p. 47, para 9) the following statement of law contained in the opinion of Lord Fraser determining when an error of judgment can be termed as negligence: (All ER p. 281*b-c*)

"The true position is that an error of judgment may, or may not, be negligent; it depends on the nature of the error. If it is one that would not have been made by a reasonably competent professional man professing to have the standard and type of skill that the defendant held himself out as having, and acting with ordinary care, then it is negligent. If, on the other hand, it is an error that a man, acting with ordinary care, might have made, then it is not negligence."

**46.** In *State of Haryana* v. *Santra*[26] also the *Bolam*[9] test has been approved. This case too refers to liability for compensation under civil law for the failure of a sterilisation operation performed by a surgeon. We are not dealing with that situation in the case before us and, therefore, leave it to be dealt with in an appropriate case.

**47.** Before we embark upon summing up our conclusions on the several issues of law which we have dealt with hereinabove, we are inclined to quote

20 *Laxman Balkrishna Joshi* v. *Trimbak Bapu Godbole*, (1969) 1 SCR 206 : AIR 1969 SC 128
9 *Bolam* v. *Friern Hospital Management Committee*, (1957) 1 WLR 582 : (1957) 2 All ER 118 (QBD)
23 (1996) 2 SCC 634
24 (1998) 4 SCC 39
25 (1981) 1 All ER 267 : (1981) 1 WLR 246 (HL)
26 (2000) 5 SCC 182


SCC Online Web Edition, Copyright © 2015
Page 31            Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------

JACOB MATHEW v. STATE OF PUNJAB *(Lahoti, C.J.)*            31

some of the conclusions arrived at by the learned authors‡ of *Errors, Medicine and the Law* (pp. 241-48), (recorded at the end of the book in the Chapter titled "*Conclusion*") highlighting the link between moral fault, blame and justice in reference to medical profession and negligence. These are of significance and relevant to the issues before us. Hence we quote:

*a*

(*i*) The social efficacy of blame and related sanctions in particular cases of deliberate wrongdoings may be a matter of dispute, but their necessity — in principle — from a moral point of view, has been accepted. Distasteful as punishment may be, the social, and possibly moral, need to punish people for wrongdoing, occasionally in a severe fashion, cannot be escaped. A society in which blame is overemphasised may become paralysed. This is not only because such a society will inevitably be backward-looking, but also because fear of blame inhibits the uncluttered exercise of judgment in relations between persons. If we are constantly concerned about whether our actions will be the subject of complaint, and that such complaint is likely to lead to legal action or disciplinary proceedings, a relationship of suspicious formality between persons is inevitable. (*ibid.*, pp. 242-43)

*b*

*c*

(*ii*) Culpability may attach to the consequence of an error in circumstances where sub-standard antecedent conduct has been deliberate, and has contributed to the generation of the error or to its outcome. In case of errors, the only failure is a failure defined in terms of the normative standard of what should have been done. There is a tendency to confuse the reasonable person with the error-free person. While nobody can avoid errors on the basis of simply choosing not to make them, people can choose not to commit violations. A violation is culpable. (*ibid.*, p. 245)

*d*

*e*

(*iii*) Before the court faced with deciding the cases of professional negligence there are two sets of interests which are at stake: the interests of the plaintiff and the interests of the defendant. A correct balance of these two sets of interests should ensure that tort liability is restricted to those cases where there is a real failure to behave as a reasonably competent practitioner would have behaved. An inappropriate raising of the standard of care threatens this balance. (*ibid.*, p. 246) A consequence of encouraging litigation for loss is to persuade the public that all loss encountered in a medical context is the result of the failure of somebody in the system to provide the level of care to which the patient is entitled. The effect of this on the doctor-patient relationship is distorting and will not be to the benefit of the patient in the long run. It is also unjustified to impose on those engaged in medical treatment an undue degree of additional stress and anxiety in the conduct of their profession. Equally, it would be wrong to impose such stress and anxiety on any other person performing a demanding function in society. (*ibid.*, p. 247) While expectations from the professionals must be realistic and the expected

*f*

*g*

*h*

‡ [**Ed.**: Alan Merry and Alexander McCall Smith.]

SCC Online Web Edition, Copyright © 2015
Page 32      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

standards attainable, this implies recognition of the nature of ordinary human error and human limitations in the performance of complex tasks. (*ibid*., p. 247)

(*iv*) Conviction for any substantial criminal offence requires that the accused person should have acted with a morally blameworthy state of mind. Recklessness and deliberate wrongdoing, are morally blameworthy, but any conduct falling short of that should not be the subject of criminal liability. Common law systems have traditionally only made negligence the subject of criminal sanction when the level of negligence has been high — a standard traditionally described as gross negligence. In fact, negligence at that level is likely to be indistinguishable from recklessness. (*ibid*., p. 248)

(*v*) Blame is a powerful weapon. Its inappropriate use distorts tolerant and constructive relations between people. Distinguishing between (*a*) *accidents* which are life's misfortune for which nobody is morally responsible, (*b*) *wrongs* amounting to culpable conduct and constituting grounds for compensation, and (*c*) those (i.e. wrongs) calling for punishment on account of being *gross* or of a *very high degree* requires and calls for careful, morally sensitive and scientifically informed analysis; else there would be injustice to the larger interest of the society. (*ibid*., p. 248)                            (emphasis supplied)

Indiscriminate prosecution of medical professionals for criminal negligence is counter-productive and does no service or good to society.

***Conclusions summed up***

**48.** We sum up our conclusions as under:

(*1*) Negligence is the breach of a duty caused by omission to do something which a reasonable man guided by those considerations which ordinarily regulate the conduct of human affairs would do, or doing something which a prudent and reasonable man would not do. The definition of negligence as given in *Law of Torts*, Ratanlal & Dhirajlal (edited by Justice G.P. Singh), referred to hereinabove, holds good. Negligence becomes actionable on account of injury resulting from the act or omission amounting to negligence attributable to the person sued. The essential components of negligence are three: "duty", "breach" and "resulting damage".

(*2*) Negligence in the context of the medical profession necessarily calls for a treatment with a difference. To infer rashness or negligence on the part of a professional, in particular a doctor, additional considerations apply. A case of occupational negligence is different from one of professional negligence. A simple lack of care, an error of judgment or an accident, is not proof of negligence on the part of a medical professional. So long as a doctor follows a practice acceptable to the medical profession of that day, he cannot be held liable for negligence merely because a better alternative course or method of treatment was also

SCC Online Web Edition, Copyright © 2015
Page 33          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



available or simply because a more skilled doctor would not have chosen
to follow or resort to that practice or procedure which the accused
followed. When it comes to the failure of taking precautions, what has to
be seen is whether those precautions were taken which the ordinary
experience of men has found to be sufficient; a failure to use special or
extraordinary precautions which might have prevented the particular
happening cannot be the standard for judging the alleged negligence. So
also, the standard of care, while assessing the practice as adopted, is
judged in the light of knowledge available at the time of the incident, and
not at the date of trial. Similarly, when the charge of negligence arises
out of failure to use some particular equipment, the charge would fail if
the equipment was not generally available at that particular time (that is,
the time of the incident) at which it is suggested it should have been
used.

(*3*) A professional may be held liable for negligence on one of the
two findings: either he was not possessed of the requisite skill which he
professed to have possessed, or, he did not exercise, with reasonable
competence in the given case, the skill which he did possess. The
standard to be applied for judging, whether the person charged has been
negligent or not, would be that of an ordinary competent person
exercising ordinary skill in that profession. It is not possible for every
professional to possess the highest level of expertise or skills in that
branch which he practices. A highly skilled professional may be
possessed of better qualities, but that cannot be made the basis or the
yardstick for judging the performance of the professional proceeded
against on indictment of negligence.

(*4*) The test for determining medical negligence as laid down in
*Bolam case*[9], WLR at p. 586§ holds good in its applicability in India.

(*5*) The jurisprudential concept of negligence differs in civil and
criminal law. What may be negligence in civil law may not necessarily be
negligence in criminal law. For negligence to amount to an offence, the
element of *mens rea* must be shown to exist. For an act to amount to
criminal negligence, the degree of negligence should be much higher i.e.
gross or of a very high degree. Negligence which is neither gross nor of a
higher degree may provide a ground for action in civil law but cannot
form the basis for prosecution.

(*6*) The word "gross" has not been used in Section 304-A IPC, yet it
is settled that in criminal law negligence or recklessness, to be so held,
must be of such a high degree as to be "gross". The expression "rash or
negligent act" as occurring in Section 304-A IPC has to be read as
qualified by the word "grossly".

---

9 *Bolam v. Friern Hospital Management Committee*, (1957) 1 WLR 582 : (1957) 2 All ER 118
   (QBD)
§ [**Ed.**: Also at All ER p. 121 D-F and set out in para 19, p. 19 herein.]

SCC Online Web Edition, Copyright © 2015
Page 34                  Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

*(7)* To prosecute a medical professional for negligence under criminal law it must be shown that the accused did something or failed to do something which in the given facts and circumstances no medical professional in his ordinary senses and prudence would have done or failed to do. The hazard taken by the accused doctor should be of such a nature that the injury which resulted was most likely imminent.

*(8) Res ipsa loquitur* is only a rule of evidence and operates in the domain of civil law, specially in cases of torts and helps in determining the onus of proof in actions relating to negligence. It cannot be pressed in service for determining *per se* the liability for negligence within the domain of criminal law. *Res ipsa loquitur* has, if at all, a limited application in trial on a charge of criminal negligence.

**49.** In view of the principles laid down hereinabove and the preceding discussion, we agree with the principles of law laid down in *Dr. Suresh Gupta case*[1] and reaffirm the same. *Ex abundanti cautela*, we clarify that what we are affirming are the legal principles laid down and the law as stated in *Dr. Suresh Gupta case*[1]. We may not be understood as having expressed any opinion on the question whether on the facts of that case the accused could or could not have been held guilty of criminal negligence as that question is not before us. We also approve of the passage[§§] from *Errors, Medicine and the Law* by Alan Merry and Alexander McCall Smith which has been cited with approval in *Dr. Suresh Gupta case*[1] (noted vide para 27 of the Report).

### *Guidelines — Re: prosecuting medical professionals*

**50.** As we have noticed hereinabove that the cases of doctors (surgeons and physicians) being subjected to criminal prosecution are on an increase. Sometimes such prosecutions are filed by private complainants and sometimes by the police on an FIR being lodged and cognizance taken. The investigating officer and the private complainant cannot always be supposed

---

1 *Suresh Gupta (Dr.) v. Govt. of NCT of Delhi*, (2004) 6 SCC 422 : 2004 SCC (Cri) 1785

§§ [**Ed.:** The following is the said extract from Merry and McCall Smith: *Errors, Medicine and the Law*, cited with approval in *Dr. Suresh Gupta case*, (2004) 6 SCC 422 (at pp. 247-48 of the book):

"Criminal punishment carries substantial moral overtones. The doctrine of strict liability allows for criminal conviction in the absence of moral blameworthiness only in very limited circumstances. Conviction of any substantial criminal offence requires that the accused person should have acted with a morally blameworthy state of mind. Recklessness and deliberate wrongdoing, levels four and five are classification of blame, are normally blameworthy but any conduct falling short of that should not be the subject of criminal liability. Common-law systems have traditionally only made negligence the subject of criminal sanction when the level of negligence has been high — a standard traditionally described as gross negligence.

\*          \*          \*

Blame is a powerful weapon. When used appropriately and according to morally defensible criteria, it has an indispensable role in human affairs. Its inappropriate use, however, distorts tolerant and constructive relations between people. Some of life's misfortunes are accidents for which nobody is morally responsible. Others are wrongs for which responsibility is diffuse. Yet others are instances of culpable conduct, and constitute grounds for compensation and at times, for punishment. Distinguishing between these various categories requires careful, morally sensitive and scientifically informed analysis."]

SCC Online Web Edition, Copyright © 2015
Page 35      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



*a*  to have knowledge of medical science so as to determine whether the act of the accused medical professional amounts to a rash or negligent act within the domain of criminal law under Section 304-A IPC. The criminal process once initiated subjects the medical professional to serious embarrassment and sometimes harassment. He has to seek bail to escape arrest, which may or may not be granted to him. At the end he may be exonerated by acquittal or discharge but the loss which he has suffered to his reputation cannot be compensated by any standards.

*b*    **51.** We may not be understood as holding that doctors can never be prosecuted for an offence of which rashness or negligence is an essential ingredient. All that we are doing is to emphasise the need for care and caution in the interest of society; for, the service which the medical profession renders to human beings is probably the noblest of all, and hence there is a need for protecting doctors from frivolous or unjust prosecutions.

*c*  Many a complainant prefer recourse to criminal process as a tool for pressurising the medical professional for extracting uncalled for or unjust compensation. Such malicious proceedings have to be guarded against.

    **52.** Statutory rules or executive instructions incorporating certain guidelines need to be framed and issued by the Government of India and/or the State Governments in consultation with the Medical Council of India. So

*d*  long as it is not done, we propose to lay down certain guidelines for the future which should govern the prosecution of doctors for offences of which criminal rashness or criminal negligence is an ingredient. A private complaint may not be entertained unless the complainant has produced *prima facie* evidence before the court in the form of a credible opinion given by another

*e*  competent doctor to support the charge of rashness or negligence on the part of the accused doctor. The investigating officer should, before proceeding against the doctor accused of rash or negligent act or omission, obtain an independent and competent medical opinion preferably from a doctor in government service, qualified in that branch of medical practice who can normally be expected to give an impartial and unbiased opinion applying the

*f*  *Bolam*[9] *test* to the facts collected in the investigation. A doctor accused of rashness or negligence, may not be arrested in a routine manner (simply because a charge has been levelled against him). Unless his arrest is necessary for furthering the investigation or for collecting evidence or unless the investigating officer feels satisfied that the doctor proceeded against would not make himself available to face the prosecution unless arrested, the

*g*  arrest may be withheld.

### Case at hand

    **53.** Reverting back to the facts of the case before us, we are satisfied that all the averments made in the complaint, even if held to be proved, do not make out a case of criminal rashness or negligence on the part of the

*h*
───────────────
9 *Bolam* v. *Friern Hospital Management Committee*, (1957) 1 WLR 582 : (1957) 2 All ER 118 (QBD)

SCC Online Web Edition, Copyright © 2015
Page 36        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

accused-appellant. It is not the case of the complainant that the accused-appellant was not a doctor qualified to treat the patient whom he agreed to treat. It is a case of non-availability of oxygen cylinder either because of the hospital having failed to keep available a gas cylinder or because of the gas cylinder being found empty. Then, probably the hospital may be liable in civil law (or may not be — we express no opinion thereon) but the accused-appellant cannot be proceeded against under Section 304-A IPC on the parameters of the *Bolam*[9] *test*.

### Result

**54.** The appeals are allowed. The prosecution of the accused-appellant under Sections 304-A/34 IPC is quashed.

**55.** All the interlocutory applications be treated as disposed of.

———

### (2005) 6 Supreme Court Cases 36

(BEFORE ARIJIT PASAYAT AND H.K. SEMA, JJ.)

Civil Appeal No. 7797 of 2003[†]

A.P. STATE ROAD TRANSPORT
    CORPORATION AND OTHERS      . .     Appellants;

*Versus*

ABDUL KAREEM      . .     Respondent.

*With*

Civil Appeal No. 37 of 2005

D. SHANKER      . .     Appellant;

*Versus*

A.P. SRTC, NIZAMABAD REGION      . .     Respondent.

Civil Appeals No. 7797 of 2003 with No. 37 of 2005,
decided on August 2, 2005

**Labour Law — Reinstatement/Back wages/Arrears — Benefits available to workman as a matter of course on reinstatement — Increments in pay for period of absence — Entitlement to — Held, workman is not entitled to any consequential relief on reinstatement as a matter of course, unless specifically directed by forum granting reinstatement — On facts, there being no such specific direction, merely because workman had been directed to be reinstated without back wages, he could not claim a benefit of increments notionally earned during period of he was out of service — It would be incongruous that a workman, having been held guilty and**

---

9 *Bolam* v. *Friern Hospital Management Committee*, (1957) 1 WLR 582 : (1957) 2 All ER 118 (QBD)

† From the Judgment and Order dated 31-10-2002 of the Andhra Pradesh High Court in WA No. 1209 of 2002

Declaration of Ritin Rai

Exhibit 8

SCC Online Web Edition, Copyright © 2015
Page 1    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**(1999) 4 Supreme Court Cases 317**

(BEFORE A.P. MISRA AND R.C. LAHOTI, JJ.)

Civil Appeal No. 687 of 1986

a

MUNICIPAL CORPORATION OF DELHI          . .          Appellant;

*Versus*

SUSHILA DEVI (SMT) AND OTHERS          . .          Respondents.

*With*

b

Civil Appeal No. 4242 of 1986

SUSHILA DEVI (SMT) AND OTHERS          . .          Appellants;

*Versus*

MUNICIPAL CORPORATION OF DELHI
AND OTHERS          . .          Respondents.

c

Civil Appeals No. 687 of 1986 with No. 4242 of 1986†,
decided on May 7, 1999

A. **Municipalities — Delhi Municipal Corporation Act, 1957 (66 of 1957) —
Ss. 478(1) and 478(2) — Provision in, for notice of suit and limitation period for
filing thereof — Applicability — Held, not applicable to suit filed by legal heirs
of the deceased for damages in torts based on negligence in performance of duty**

d

**under common law — Action was for death consequent to injury caused by fall
of a branch of a dead tree standing beside the road and belonging to the
Corporation, while the deceased was passing on a scooter through that road —
Hence, omission to give the statutory notice did not vitiate the suit in question
and the suit having been filed within two years from the date of accrual of cause
of action was within limitation under Art. 82 of Limitation Act — Torts —
Damages — Suit for, against municipality on account of negligence — Statutory**

e

**notice if necessary — Civil Procedure Code, 1908, Ss. 80(1) and 80(2) —
Provision for notice under and limitation period therefor — Applicability —
Limitation Act, 1963, Art. 82**

B. **Torts — Negligence — Action at common law — Liability of Municipal
Corporation on account of negligence — Dead tree belonging to Municipal
Corporation standing beside the road — Horticulture Department of Municipal
Corporation failing to take necessary precautions for the users of the road**

f

**against the danger posed by the tree — Sudden fall of a branch of such tree on
the head of a scooter rider resulting in his death on the next day — In such
circumstances, High Court rightly held the Municipal Corporation to be
negligent in performing its duty under common law and, hence, liable in
damages to the heirs of the deceased**

On 18-8-1964, *S* and another were going on a scooter when a branch of a
roadside tree, which was a dead and dried one and belonged to the Municipal

g

Corporation, suddenly broke down and hit *S* seriously injuring him. *S* died the next
day in the hospital. In a suit for damages, a Single Judge sitting on the original side
of the Delhi High Court held the Municipal Corporation of Delhi to be liable for
damages in torts and granted a decree of Rs 90,000 by way of compensation payable
to the widow and the children of the deceased. On 17-9-1970 the amount was
deposited by the Municipal Corporation in the court. Cross-appeals were filed before

h

† From the Judgment and Order dated 13-12-1984 of the Delhi High Court in R.F.A. (OS) No.
23 of 1970

SCC Online Web Edition, Copyright © 2015
Page 2      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

318                    SUPREME COURT CASES              (1999) 4 SCC

a Division Bench, which dismissed the Municipal Corporation's appeal but partly allowed the claimants' appeal by enhancing the amount of compensation to Rs 1,44,000 with interest @ 6% p.a. from the date of suit i.e. 5-8-1966 till 17-9-1970. The Division Bench also allowed interest at the rate of 3 per cent per annum on Rs 90,000 from the date of deposit in the court till the date of actual withdrawal of the amount by the claimants and interest at the rate of 6 per cent per annum on Rs 54,000 from 17-9-1970 till payment. Cross-appeals were filed before the Supreme Court as well. Main contentions of the Municipal Corporation were that: (*i*) the suit was bad for want of two months' notice under Section 478(1) of the Delhi Municipal Corporation Act, 1957, and (*ii*) the suit having been filed beyond six months from the date of accrual of cause of action, was time-barred under Section 478(2) of that Act. Moreover, the Municipal Corporation challenged the award of interest. Dismissing both the appeals, the Supreme Court

*Held*:

Section 478(1) is applicable to a suit filed "in respect of any act done or purporting to have been done" in pursuance of the Act or rules, regulations or bye-laws made thereunder. In the instant case the causa proxima, i.e., the immediate cause of action was the fall of the branch of the tree over the head of the deceased. The fall of the branch of the tree cannot be attributed to any act done or purporting to have been done in pursuance of the Act etc. by the Municipal Corporation or any officer or employee thereof. The liability arose and was sought to be enforced by the claimants under the law of torts. The finding recorded in the suit and in the LPA is one of negligence on the part of the Municipal Corporation. To such an action Section 478 does not apply at all. The suit filed within a period of two years from the date of accrual of cause of action was governed by Article 82 of the Limitation Act, 1963 and was well within limitation. The plaintiffs' action was founded in tort. The plaintiffs have not rested their case on any statutory duty on the part of the Corporation and failure or negligence in performing such duty.          (Paras 6 and 7)

The Division Bench has found that the tree in question was a dead tree. It had no bark, foliage or butt. The Division Bench has upheld the trial Judge's finding that the Horticulture Department of the Corporation should have carried out periodical inspections of the trees and should have taken safety precautions to see that the road was safe for its users and such adjoining trees as were dried dead and/or had projecting branches which could prove to be dangerous to the passers-by were removed. This finding is based on evidence.          (Para 8)

The law is well settled that if there is a tree standing on the defendant's land which is dried or dead and for that reason may fall and the defect is one which is either known or should have been known to the defendant, then the defendant is liable for any injury caused by the fall of the tree. More so when it is not the defence of the Municipal Corporation that vis major or an act of God such as a storm, tempest, lightning or extraordinary heavy rain had occurred causing the fall of the branch of the tree and that therefore the Corporation was not liable.          (Para 13)

*Brown* v *Harrison*, 1947 WN 191 : 63 TLR 484; *Hale* v. *Hants*, (1947) 2 All ER 628; *Quinn* v. *Scott*, (1965) 1 WLR 1004 : (1965) 2 All ER 588, *Mackie* v. *Dumbartonshire County Council*, 1927 WN 247; *Municipal Corpn. of Delhi* v. *Subhagwanti*, AIR 1966 SC 1750, *relied on*

*Winfield and Jolowicz on Torts* (13th Edn., 1989, p. 415); *Clerk and Lindsell on Torts* (16th Edn., 1989, pp. 546-547, para 10 122); *Charlesworth & Percy on Negligence* (8th Edn., 1990, p. 668), *referred to*

Therefore, the High Court was right in holding the Municipal Corporation negligent in performing its duty under the common law and therefore liable in damages to the plaintiffs for the injury caused to the deceased by the fall of a branch of the tree and the consequences flowing therefrom.          (Para 14)

SCC Online Web Edition, Copyright © 2015
Page 3     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a
C. **Torts — Damages — Compensation for death consequential to injuries received by scooter rider while passing through a road from sudden fall of a branch of a dead tree standing beside the road and belonging to the municipality — Claim by legal heirs of the deceased — Incident relating to year 1964 — Deceased was aged 30 and earning Rs 1000 per month — High Court, after deducting Rs 200 as deceased's own expenses, computing dependency at Rs 800 per month and adopting a multiplier of 15, quantifying the compensation at Rs 1,44,000 — The amount so quantified, held, very reasonable and did not call for interference** (Para 15)

b     *G.M., Kerala SRTC* v. *Susamma Thomas*, (1994) 2 SCC 176 : 1994 SCC (Cri) 335, *followed*

c
D. **Interest — Additional interest — Compensation — Death of scooter rider consequent to injuries received from sudden fall of a branch of a dead tree standing beside the road and belonging to Municipal Corporation — Compensation awarded by trial court deposited by the Municipal Corporation in the court under the appellate court's direction — Appellate court permitting the claimants to withdraw the same after furnishing necessary security but the claimants could not draw the same due to their failure to furnish security — Appellate court, therefore, directing the Registry to deposit that amount in fixed deposit but Registry omitting to comply — Appellate court ultimately enhancing the amount of compensation — Appellate court, although holding the Municipal Corporation to be not liable for the omission on the part of the Registry, directing the Municipal Corporation to pay interest @ 3% p.a. on the part of the decretal amount deposited by it in the court, from the date of deposit till the date of withdrawal in addition to interest @ 6% p.a. awarded for the pre-deposit period — Award of such additional interest held, called for no interference — Compensation — Additional interest on — Award of — Legality** (Para 16)

d

Cross-appeals dismissed     H-M/21091/CR

e     Advocates who appeared in this case :
Ranjit Kumar and Ms Binu Tamta, Advocates, for the Appellant;
Raju Ramachandran, Senior Advocate (Ms Bina Gupta, Advocate, with him) for the Respondents.

*Chronological list of cases cited*                                              *on page(s)*

f
1. (1994) 2 SCC 176 : 1994 SCC (Cri) 335, *G.M., Kerala SRTC* v. *Susamma Thomas*                                                                      324*b-c*
2. (1965) 1 WLR 1004 : (1965) 2 All ER 588, *Quinn* v. *Scott*          323*b*
3. AIR 1966 SC 1750, *Municipal Corpn. of Delhi* v. *Subhagwanti*     323*c-d*
4. (1947) 2 All ER 628, *Hale* v. *Hants*                                    322*g-h*
5. 1947 WN 191 : 63 TLR 484, *Brown* v. *Harrison*                    322*g*, 323*b*
6. 1927 WN 247, *Mackie* v. *Dumbartonshire County Council*           323*b*

g     The Judgment of the Court was delivered by
R.C. LAHOTI, J.— On 18-8-1964, in the evening, late Suresh Chander and his brother Ramesh Chander were going on a scooter from their office to their residence. The deceased was driving the scooter and his brother was riding his pillion. When they were passing against Sant Permanand Blind Relief Mission Building situated at 20, Alipur Road, a branch of the neem tree standing there suddenly broke down and fell on the head of the deceased. His head was crushed. He was rushed to Irwin Hospital where in

h


SCC Online Web Edition, Copyright © 2015
Page 4          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

spite of medical care and attendance, he died the next day at about 10 a.m. A piece of wood was found embedded in his brain for which a surgery had also to be performed on the deceased.                                    *a*

2. The deceased was survived by a widow, three minor sons and a minor daughter and his mother. All the six brought a suit for damages claiming Rs 3 lakhs. A learned Single Judge sitting on the original side of the High Court held the Municipal Corporation of Delhi liable for damages in torts and granted a decree of Rs 90,000 by way of compensation payable to the widow and the children of the deceased. Two letters patent appeals were *b* preferred. The Municipal Corporation sought for the suit being dismissed while the claimants sought for enhancement in the amount of compensation. The Division Bench dismissed the appeal filed by the Corporation but at the same time partly allowed the appeal preferred by the claimants enhancing the amount of compensation to Rs 1,44,000 payable with interest calculated at the rate of 6 per cent per annum from the date of suit, i.e., 5-8-1966 till *c* 17-9-1970 when the amount was deposited by the Corporation in the court for payment to the successful claimants. The Division Bench also allowed interest at the rate of 3 per cent per annum on Rs 90,000 from the date of deposit in the court till the date of actual withdrawal of the amount by the claimants and interest at the rate of 6 per cent per annum on Rs 54,000 from 17-9-1970 till payment. The reasons for the award of additional interest *d* calculated at the rate of 3 per cent per annum on Rs 90,000 and the legality thereof we shall deal with separately.

3. Both the parties have preferred further appeals to this Court. However, after hearing the learned counsel for the parties, we have found only three contentions worth being dealt with and the same are noted and disposed of hereinafter.                                               *e*

4. The incident took place on 18-8-1964 in consequence whereof late Suresh Chander died on 19-8-1964. Suit for compensation was filed on 5-8-1966 after issuing a legal notice in April 1966. The learned counsel for the Municipal Corporation has submitted that the Municipal Corporation is an authority governed by the Delhi Municipal Corporation Act, 1957 (hereinafter the Act for short) and inasmuch as it was sought to be held *f* liable for failure to perform its duty to take care resulting in an accident, it was necessary for the claimants to have served a legal notice of two months' duration under sub-section (1) of Section 478 of the Act and the suit should have been instituted within a period of six months from the date of accrual of cause of action which having not been done, the suit was barred by time.

5. Section 478 reads as under:                                    *g*

"478. *Notice to be given of suits.*—(1) No suit shall be instituted against the Corporation or against any municipal authority or against any municipal officer or other municipal employee or against any person acting under the order or direction of any municipal authority or any municipal officer or other municipal employee, in respect of any act done, or purporting to have been done, in pursuance of this Act or any rule, regulation or bye-law made *h* thereunder until the expiration of two months after notice in writing has


SCC Online Web Edition, Copyright © 2015
Page 5      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

MUNICIPAL CORPN. OF DELHI v. SUSHILA DEVI *(Lahoti, J.)*        321

a    been left at the municipal office and in the case of such officer, employee or person, unless notice in writing has also been delivered to him or left at his office or place of residence, and unless such notice states explicitly the cause of action, the nature of the relief sought, the amount of compensation claimed, and the name and place of residence of the intending plaintiff, and unless the plaint contains a statement that such notice has been so left or delivered.

b    (2) No suit, such as is described in sub-section (1), shall unless it is a suit for the recovery of immovable property or for a declaration of title thereto, be instituted after the expiry of six months from the date on which the cause of action arises.

(3) Nothing in sub-section (1) shall be deemed to apply to a suit in which the only relief claimed is an injunction of which the object would be defeated by the giving of the notice or the postponement of the institution of the suit."

c    **6.** A bare reading of Section 478(1) shows that its applicability is attracted to a suit filed "in respect of any act done or purporting to have been done" in pursuance of the Act or rules, regulations or bye-laws made thereunder. The learned counsel for the Corporation submitted that an act includes an omission as well. The Court has found an omission on the part of the Municipal Corporation in discharging its duty to take care and therefore
d    under sub-section (2) the limitation for filing the suit was six months from the date of accrual of the cause of action, i.e., 18-8-1964 and 19-8-1964.

**7.** The contention has to be rejected forthwith. The bundle of facts constituting the cause of action which has accrued to the claimants are — the ownership and possession of the tree vesting in the Corporation, its maintenance by the Corporation, fall of the branch of the tree over the
e    deceased and the death consequent to the injury sustained. The causa proxima, i.e., the immediate cause of action is the fall of the branch of the tree over the head of the deceased. The fall of the branch of the tree cannot be attributed to any act done or purporting to have been done in pursuance of the Act etc. by the Municipal Corporation or any officer or employee thereof. The liability has arisen and has been sought to be enforced by the
f    claimants under the law of torts. The finding recorded in the suit and in the letters patent appeal is one of negligence on the part of the Municipal Corporation. To such an action Section 478 does not apply at all. The suit filed within a period of two years from the date of accrual of cause of action was governed by Article 82 of the Limitation Act, 1963 and was well within limitation. The plaintiffs' action was founded in tort. The plaintiffs have not
g    rested their case on any statutory duty on the part of the Corporation and failure or negligence in performing such duty.

**8.** One of the findings recorded in the suit and upheld in the letters patent appeal by the Division Bench is that the tree in question was a dead tree. It had no bark, foliage or butt. On behalf of the plaintiffs, a Botany
h    Professor was examined as an expert witness who testified that a tree which had no bark was dried up and dying. From the testimony of the Garden

SCC Online Web Edition, Copyright © 2015
Page 6      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

322                        SUPREME COURT CASES                (1999) 4 SCC

Superintendent examined on behalf of the Corporation also it was found that
the tree was dead, dried and dangerous. The Deputy Commissioner,
Horticulture examined on behalf of the Corporation admitted that the tree
looked like a partly worn-out tree. The Division Bench has upheld the
finding recorded by the learned trial Judge that the Horticulture Department
of the Corporation should have carried out periodical inspections of the trees
and should have taken safety precautions to see that the road was safe for its
users and such adjoining trees as were dried and dead and/or had projecting
branches which could prove to be dangerous to the passers-by were
removed. This having not been done, the Municipal Corporation has been
negligent in discharging such duty as is owed to the road-users by the
adjoining property-owners, especially the Municipal Corporation. The
finding has been arrived at on appreciation of evidence by the learned trial
Judge as also by the Division Bench and we find ourselves in entire
agreement with the said finding.

**9.** The law is stated in *Winfield and Jolowicz on Torts* (13th Edn., 1989,
p. 415) in these words:

> "If damage is done owing to the collapse of the projection on the
> highway or by some other mischief traceable to it, the occupier of the
> premises on which it stood is liable if he knew of the defect or ought, on
> investigation, to have known of it. At any rate this is the rule with
> respect to a thing that is naturally on the premises e.g. a tree."

**10.** In *Clerk and Lindsell on Torts* (16th Edn., 1989, at pp. 546-547,
para 10.122) the law on trees is summarised as follows:

> "The fall of trees, branches and other forms of natural growth is
> governed by the rules of negligence. When trees on land adjoining a
> public highway fall upon it, the owner is liable if he knew or ought to
> have known that the falling tree was dangerous. He is not bound to call
> in an expert to examine the trees, but he is bound to keep a lookout and
> to take notice of such signs as would indicate to a prudent landowner
> that there was a danger of a tree falling … the landowner held liable
> when the tree which fell had been dying for some years before and had
> become a danger which should have been apparent to an ordinary
> landowner."

**11.** In *Charlesworth & Percy on Negligence* (8th Edn., 1990, at p. 668)
the law is stated in these terms:

> "… when a tree, which had been dying for some years and should
> have been known to be dangerous by an ordinary landowner, fell and
> caused damage, the owner was held liable. (*Brown* v. *Harrison*[1])

**12.** In *Hale* v. *Hants*[2] which is a case of branches of a tree having struck
the windows of an omnibus and a piece of glass having struck the plaintiff in
the eye, it was held that in the absence of any reason to suspect danger from
an overhanging tree or some similar obstruction a driver who is driving close

1  1947 WN 191 : 63 TLR 484
2  (1947) 2 All ER 628


SCC Online Web Edition, Copyright © 2015
Page 7    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

to the kerb when his vehicle is struck by the branch of the tree is not making an unreasonable use of the highway. It was further held that the County

*a* Council should have known that trees grow and throw out their branches and therefore it was their obligation to see that the tree in its natural growth was curbed in such a way as not to hinder the reasonable use of the highway.

**13.** By a catena of decisions, the law is well settled that if there is a tree standing on the defendant's land which is dried or dead and for that reason may fall and the defect is one which is either known or should have been

*b* known to the defendant, then the defendant is liable for any injury caused by the fall of the tree (see *Brown* v. *Harrison*[1], *Quinn* v. *Scott*[3] and *Mackie* v. *Dumbartonshire County Council*[4]). The duty of the owner/occupier of the premises by the side of the road whereon persons lawfully pass by, extends to guarding against what may happen just by the side of the premises on account of anything dangerous on the premises. The premises must be

*c* maintained in a safe state of repair. The owner/occupier cannot escape the liability for injury caused by any dangerous thing existing on the premises by pleading that he had employed a competent person to keep the premises in safe repairs. In *Municipal Corpn. of Delhi* v. *Subhagwanti*[5] a clock tower which was 80 years' old collapsed in Chandni Chowk, Delhi causing the death of a number of persons. Their Lordships held that the owner could not

*d* be permitted to take a defence that he neither knew nor ought to have known the danger. "[T]he owner is legally responsible irrespective of whether the damage is caused by a patent or a latent defect," — said their Lordships. In our opinion the same principle is applicable to the owner of a tree standing by the side of a road. If the tree is dangerous in the sense that on account of any disease or being dead the tree or its branch is likely to fall and thereby

*e* injure any passer-by then such a tree or branch must be removed so as to avert the danger to life. It is pertinent to note that it is not the defence of the Municipal Corporation that *vis major* or an act of God such as a storm, tempest, lightning or extraordinary heavy rain had occurred causing the fall of the branch of the tree and hence the Corporation was not liable.

**14.** In our opinion the High Court was right in holding the Municipal

*f* Corporation negligent in performing its duty under the common law and therefore liable in damages to the plaintiffs for the injury caused to the deceased by fall of the branch of the tree and the consequences flowing therefrom.

**15.** The deceased was aged 30. He was employed in a family business wherefrom he was drawing a salary of Rs 650 per month. The learned trial Judge deducted an amount of Rs 150 per month for expenses incurred on the

*g* self and assessed the dependency at Rs 500 per month. The Division Bench found that apart from salary the deceased was also getting commission on sales. The net income of the deceased was arrived at Rs 1000 per month wherefrom Rs 200 were deducted as expenses on the self. The dependency

*h* 3 (1965) 1 WLR 1004 : (1965) 2 All ER 588
   4 1927 WN 247
   5 AIR 1966 SC 1750


SCC Online Web Edition, Copyright © 2015
Page 8    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------

was assessed at Rs 800 per month. The learned trial Judge as well as the
Division Bench have adopted a multiplier of 15. Thus, the Division Bench
has assessed the quantum of compensation at Rs 1,44,000 in supersession of
Rs 90,000 assessed by the learned trial Judge. Though, the learned counsel
for the Municipal Corporation has assailed the assessment to be on the
higher side and the learned counsel for the claimants has submitted that
keeping in view the better further prospects of the deceased in the family
business, coupled with the youth of the deceased, the monthly income
should have been taken at Rs 1826 but we are of the opinion that the figure
of compensation arrived at by the Division Bench is a very reasonable figure
and calls for no interference. The multiplier has also been correctly adopted.
In the leading case of *Susamma Thomas*[6] this Court adopted a multiplier of
12 when the deceased was aged 39. We do not find any fault with the figure
of compensation having been arrived at Rs 1,44,000. The same is upheld.

**16.** The last point of controversy centres around the award of interest.
The suit having been decreed by the learned trial Judge, the Division Bench
directed the decretal amount to be deposited by the Municipal Corporation in
the court which was done on 17-9-1970. The amount so deposited was
available to be withdrawn by the claimants subject to furnishing security to
the satisfaction of the executing court. The claimants could not furnish the
security and hence could not withdraw the amount. The Division Bench in
the backdrop of such facts directed the amount to be deposited in fixed
deposit so as to earn interest. However, the Registry omitted to comply with
the order and therefore the amount continued to remain in deposit with the
Court. The Division Bench observed that liability for default on the part of
the Registry in carrying out the order of the Court could not be fastened on
the judgment-debtor Municipal Corporation. Still the Division Bench has
directed 3 per cent per annum additional interest to be paid by the Municipal
Corporation to the claimants and thereby made an effort at adjusting the
equities. It cannot be lost sight of that partly the delay in release of the
amount to the claimants is attributable to their failure to furnish the security
as directed by the Division Bench. The claimants have been allowed interest
on the decretal amount from the date of the decree (*sic* suit) though the
amount of compensation was quantified only from the date of the passing of
the decree. In such circumstances, the direction of the Division Bench in the
matter of award of interest is also not liable to be interfered with on
consideration of totality of the circumstances.

**17.** For the foregoing reasons both the appeals are held liable to be
dismissed. Civil Appeal No. 687 of 1986 filed by the Municipal Corporation
of Delhi is dismissed with costs payable by the appellant-Municipal
Corporation to the respondent-claimants. Civil Appeal No. 4242 of 1986
filed by the claimants is dismissed without any order as to costs.

———————

6 *G.M., Kerala SRTC v. Susamma Thomas*, (1994) 2 SCC 176 : 1994 SCC (Cri) 335

Declaration of Ritin Rai

Exhibit 9



MANU/GT/0076/2014

NATIONAL GREEN TRIBUNAL
WESTERN ZONE, PUNE

Application No. 30/2013(WZ)

Decided On: 30.07.2014

Appellants: Vitthal Gopichand Bhungase
Vs.
Respondent: The Gangakhed Sugar and Energy Ltd.

Hon'ble Judges/Coram:
V.R. Kingaonkar, J. (Member (J)) and Dr. Ajay A. Deshpande, Member (E)

Counsels:
For Appellant/Petitioner/Plaintiff: Asim Sarode and Vikas Shinde

For Respondents/Defendant: Subhash Gandhi, Kisan Wagai, D.M. Gupte, Supriya Dangre and
V.V. Mundhe, Field Officer

Subject: Environment

Acts/Rules/Orders:
National Green Tribunal Act, 2010 - Section 14, National Green Tribunal Act, 2010 - Section 15,
National Green Tribunal Act, 2010 - Section 15(1), National Green Tribunal Act, 2010 - Section
15(3), National Green Tribunal Act, 2010 - Section 17, National Green Tribunal Act, 2010 -
Section 18, National Green Tribunal Act, 2010 - Section 20, National Green Tribunal Act, 2010 -
Section 21

Case Note:
Environment - Damages - Compensation for - Present application field for
compensation, on ground that Respondent had discharged effluent waters in lake and
it damaged environment and effected their living due to loss of fisheries - Whether
Respondent was liable to pay compensation - Held, cleared that there were spillage of
molasses from molasses storage tank of Respondent - Such incident occurred as
result of improper construction of molasses storage tank by Respondent - Incident
itself was of such nature that no separate proof for negligent act on part of
Respondent was required to be adduced - Thus, Respondent committed gross
negligence resulting into spillage of molasses that caused environmental damage to
surrounding area including lake - Respondent was liable to restore environmental
damages caused due to incident - However, Applicant failed to prove damages to
fisheries due to said incident - Therefore, Applicant was not entitled for any
compensation and Respondent was directed to pay cost of environment damages -
Application partly allowed. [ paras 20 and 24]

JUDGMENT

1. The Application is filed by one Shri Vitthal Bhungase under Section 14, 15 and 17 of National
Green Tribunal Act, 2010 seeking following reliefs:

(I) Strict actions may kindly be taken against the Respondent No. 1 and 2 for their
roles and involvements in creating the environmental damage, supporting and
assisting the illegal anti-environment Acts.

(II) Directions may kindly be given to the Respondent No. 1 that releasing industrial



wastes, molasses and chemical mixed water must be stopped, so that purity of Mazalgaon Right Canal and Mannath Lake shall be maintained.

(III) Directions may kindly be given to Respondent Nos. 3 to 7 that necessary legal action from time to time against Respondent No. 1 for discharging and spreading pollutant in the Mazalgaon Right Canal and Mannath lake may be taken as per law.

(IV) That fine may kindly be imposed on the Respondent No. 1 and 2 for making pollution, supporting the anti-environmental actions at Mazalgaon Right Canal and Mannath Lake and nearby area.

(V) The Respondent No. 1-Sugar Factory i.e. the Gangakhed Sugar and Energy Ltd., at Vijaynagar, Makhani, Taluka Gangakhed, Dist. Parbhani may kindly be directed that the Applicant and its members may be compensated for the loss sustained by them to the tune of Rs. 60 lacs and to constitute an expert committee to finalize the actual loss sustained by the Applicant and his community members due to pollution in Mannath Lake, Gangakhed Taluka District Parbhani.

(VI) Expenses for filing this Application and expense for legal consultation may also kindly be given to the Applicant from Respondents. The Respondent No. 1-factory and Respondent No. 2 has compelled the Applicant to approach this Hon'ble Tribunal and hence the Respondent may kindly be asked to pay compensation to the Applicant and his community.

(VII) The injunction may kindly be granted so that no person or organization shall throw waste or discharge industrial wastes into the Mazalgaon Right Canal and Mannath Lake. Directions may be given for strict implementation of such Rules framed.

2. The Application is of composite nature alleging continuous non-compliance of environmental norms by Respondent no. 1-Industry and non-performance of obligations by the regulatory and enforcing agencies arrayed as Respondent Nos. 3 to 7 on one hand and seeking environmental damages for pollution of "Mannat lake" and loss of water resources, fisheries and ecology due to discharge of pollutants by the Respondent No. 1. The Applicant claims to be from fishermen community and living on the earnings of the fishing derived from the "Mannat lake". The Applicant is also a member of registered Co-operative Society working for the collective benefit and overall progress of the society members who are dependent on fishing activities carried out in Mannat lake as a source of their livelihood.

3. The Applicant has arrayed M/s. Gangakhed Sugar and Energy Ltd. who have its industrial plants in the vicinity as Respondent No. 1 while Respondent No. 2 is Chairman of Respondent No. 1 industry. Respondent No. 3 is Environment Department, Government of Maharashtra while Respondent No. 4 is Department of Fisheries, Govt. of Maharashtra. The Respondent No. 5 is Collector of Parbhani and Respondent No. 6 is MPCB, an authority which is expected to implement various environmental legislations in the State. Respondent No. 7 is Irrigation Department and is in-charge of said Mannat lake and Mazalgaon Right Canal.

4. The Applicant claims that their Society has been given lease for the fishing rights at Mannat Lake business on contract payment basis by the Fisheries Department, Government of Maharashtra. However, since last three (3) years, the industrial effluents discharge from Respondent No. 1 industry is polluting the water in Mazalgaon Right canal and Mannat lake, causing water pollution and thereby causing a threat to human health, fishery yield and ecology. The Applicant claims that he and the Fisherman Co-operative Society have made regular complaints to various authorities bringing such pollution to their notice for immediate action. It is the grievance of the Applicant that though the authorities have done some paper work but no deterrent and stringent action has been initiated against the Respondent No. 1 and the Pollution is still continuing. The Applicant rely on various communications from these authorities addressed to Respondent No. 1 wherein pollution of the lake and the canal has been



mentioned and also, certain damages caused have been cited by the Irrigation Department for replenishing the water to wipe out the polluted stagnant water, resulted due to into ingress of molasses and other effluent from Respondent No. 1-Industry. Several communications from fisheries department addressed to the Respondent No. 1, specifically high-lighting the probable damages and loss of fisheries on account of water pollution are also referred.

5. The Respondent No. 1 submits that the industry basically has three (3) units namely, sugar unit, distillery unit and co-generation unit. The sugar plant is of 600 MT per day sugar production capacity and is equipped with Effluent Treatment Plant (ETP) capacity of 720 M3 per day which is sufficient to meet the treatment norms stipulated by MPCB. The industry also has 25 hectare of earmarked agricultural land for using the treated effluent for irrigation purpose. The Co-Gen plant has the ETP of 1360 M3 per day capacity. The distillery unit of industry is of 60 kilo liter (KL) per day capacity, which started commercial production in January 2011. This distillery unit is zero discharge industry where the entire effluent i.e. spent wash generated in the industry is fully consumed in boiler as fuel and for that the industry has provided Reverse Osmosis System, multiple effect evaporator followed by incineration boiler. The Industry has invested substantial capital amount for installing the State of Art pollution control system and also, incurring significant expenditure for efficiently operating the same.

6. Respondent No. 1 has also raised objection about maintainability of the Application and questioned as to how the applicant is entitled for the relief claimed. The Respondent No. 1 alleged that though said society was taken over by the Administrator long back, the Applicant has misled this Tribunal by filing this Application without any authority and without any locus-standie. The Applicant has also resorted to making several unsubstantiated personal allegations against Respondent No. 2 which cannot be dealt by this Tribunal, and will be dealt by Respondents separately as per the legal advice.

7. The Respondent No. 1 submits that MPCB i.e. Respondent No. 6 is competent authority for investigating the issues related to industrial pollution, water pollution and loss of ecology as mandated under the Provisions of Water (Prevention and Control of Pollution) Act 1974 and Environmental Protection Act 1986. The Respondent No. 1 submitted that MPCB regularly carries out inspection of the Respondent Industry for verifying the performance of the pollution control system and ensuring compliances of has issued consent conditions and directions. They have placed the visit reports of MPCB dated 17-2-2012, 8-8-2012, 30-10-2012, 17-12-2012, 8-1-2013, 3-9-2013, 21-11-2013 and 21-12-2013 on record which also includes joint visit report to show that there is no discharge of any industrial effluent by the Respondent-industry outside the factory premises and any non-compliance of the consented conditions. The Respondent further submits that MPCB has already submitted the water quality of Mannat lake which is generally in order and there is no evidence of pollution which can affect the fisheries in the lake. It is, therefore, the submission of Respondent No. 1 that the Application has been filed without substantiating the facts and also without any merit which needs intervention of this Tribunal. It is the submission of Respondent No. 1 that the department of fisheries to whom the Applicant has made complaint has not investigated the complaints and assessed the factual position. The authorities have only completed the paper work by warning the factory whenever they received the complaints in this regard.

8. Respondent No. 6-MPCB has filed additional Affidavit in reply claiming that they have filed detailed Affidavit in reply on 29th October 2013. However, during the final arguments on 8-7-2014, it was noticed that this Affidavit is not on record of the Tribunal, further none of contesting parties have been served with this Affidavit. The Tribunal had given time to MPCB to furnish the copies of the same, by end of the day, however, the same has not been submitted by MPCB and therefore, their pleadings only through the additional Affidavit have been considered by the Tribunal. Respondent No. 6-MPCB submits that they have caused a joint inspection of unit No. 1 industry on 17-12-2013 and found that the sugar and co-generation plant and distillery unit were in operation. The Effluent Treatment Plant (ETP) provided to sugar and Co-Gen plant were in operation. The industry was found to be disposing the treated effluent on about 25 hectare land available for the purpose. The effluent quality was found to be in compliance with the regular standards. MPCB submits that they have granted consent to the distillery with a zero discharge condition i.e. Reverse Osmosis System, multiple effect



evaporators followed by re-boiler. The MPCB further submits that the Effluent Treatment Plant (ETP) of sugar unit of Respondent No. 1 is at the upstream and on the corner edge of the land having slope towards Mannat Talav, Akoli Naka and possibility of accidental discharge of treated effluent/untreated effluent drifting in the lake during the rainy season cannot be ruled out.

9. The Respondent No. 7 i.e. Irrigation Department filed an Affidavit on 27th January 2014 and submitted that the Mannat lack is in flow storage tank of 3.00 MM3 capacity with inlet and outlet tank of Mazalgaon Right canal having submergence of about 45 hectare, for fishing and irrigation of about 300 hectare. Respondent-7 submits that the Fishery Department leased out the fishing rights for this lake to Godavari Magasvargiya Matsya Vyavasayi Sahakari Sanstha. Respondent No. 7 further submits that the Applicant is complaining since June 2010 that Respondent No. 1 and 2 are releasing polluted and contaminated effluents in the Mannat lake. Respondent No. 7 has informed the Respondent Nos. 1 and 2 time and again about such complaints of Pollution. Several communications in this regard are annexed, and some of these communications are regarding the receipt of complaints and warning/notices issued. However, some communications like letter dated 23rd July 2014 record the observations of Engineers of the Department that polluted water are being released by Respondent Nos. 1 and 2 in the canal and the lake. This letter also quantified the quantum of water which got polluted.

10. Respondent No. 7 further filed additional Affidavit on 24th March 2014 which mentions that the Respondent-1 admitted fact about the pollution and contamination water in the Mannat lake by their letter dated 2nd September 2010 and 9th September 2010 due to discharge of effluent from their industry and also, agreed for payment of cost of water in Mannat tank, water released for flushing the tank and maintenance and repairs of infrastructure such as gate, roads etc. The Respondent No. 7 released about 16.06 MM3 of water for flushing of tank during 8th September 2010 to 25th September 2010. The Respondent No. 7 therefore submits that they have raised total charges of Rs. 6,33,000/- with interest from 25th September 2010 as cost of restoration of Mannat lake water, due to the release of industrial effluent by the Respondent-1 and the Respondent No. 1 has been requested for payment with reminders from time to time. It is the grievance of Respondent No. 7 that Respondent-1 has not paid this amount towards the environmental damages in terms of loss of water sources in spite of follow up of the department and therefore, Respondent No. 7 pleads that the Tribunal should order such payment of Rs. 16,33,000/- with interest from Respondent No. 1 to Respondent No. 7 towards loss of water which is an important natural resources, due to the indiscriminate effluent discharge by the Respondent No. 1-Industry, leading to pollution of Mannat lake.

11. Considering the rival pleadings and also submissions of learned counsel for parties, following issues are framed for adjudication of the present Application:

    a) Whether the Application is barred by limitation of time?

    b) Whether the Mannat lake is polluted causing loss of fisheries and also resulting into undesirable water quality for fisheries and agricultural use?

    c) Whether the Applicant has made out a case of loss of fisheries due to the deteriorated water quality of Mannat lake due to industrial discharges of Respondent No. 1? If yes, whether the Respondent No. 1 is liable to pay any restitution or compensation costs?

12. We have heard the learned counsel for the parties. We have also carefully perused the documents placed on record. The counsel for the Applicant submits that the Application has been filed under Section 14 and 15 of National Green Tribunal Act, 2010, due to regular indiscriminate discharge of untreated effluent from Respondent No. 1-Industry resulting into pollution of the canal and the Mannat Lake. It is his argument that every incident of untreated effluent released by the Industry is a separate cause of action. He also submits that there is a gross inaction by the Respondent Authorities who have failed to control such pollution. His claim is that though Applicant is not challenging the consent etc. given to the Industry, even by considering the first undisputed incident of untreated effluent discharge of June-July 2010, the Application is within the Limitation period of five (5) years prescribed under Section 15(3) of



National Green Tribunal Act.

13. The Counsel for Respondents have also raised objection that the Application is not supported with Affidavit nor the Applicant has produced any authority from the other claimants for the compensation. He further submits that though the society was dissolved and is under the administrator, the Applicant is mis-leading the Tribunal and also the officials, by signing the papers as an office bearer of the said society. The Tribunal has taken a note of this and we will deal with the issues subsequently.

14. Section 15 of National Green Tribunal Act is clear on question of Limitation. It has been well established that the limitation once start running, cannot be stopped. We find a credible justification in the argument of counsel for the Applicant that with every incident of untreated effluent release it can constitute a fresh cause of action though we are not willing to express or give a final opinion in this regard simply because even otherwise, the first reported incident of untreated effluent discharge occurred in June-July 2010, well within limitation prescribed under section 15 of NGT Act, 2010. Secondly, this Tribunal is competent to deal with the cases related to restitution restoration of environment and also compensation of environmental damages under Section 15 of National Green Tribunal Act and therefore, we are of the opinion that the present Application can be adjudicated by the Tribunal and can be proceeded further with. The Issue-(a) referred above is thus answered accordingly.

15. The Counsel for the Applicant submits that there are regular incidents of untreated effluent discharges by the Respondent No. 1-Industry. He claims that all concerned authorities like Fisheries Department, Irrigation Department and Revenue Department have issued notices to the Respondent-Industry time and again which prove their culpability beyond doubt. He also bring to the notice the letter from Respondent-Industry dated 2nd September 2010 wherein there is a clear admission of the fact that there was leakage from the molasses tank which along with the rain water got mixed with discharges drifted to the Mannat lake thereby polluting the water. He also submitted that the Fisheries Department categorically informed the Respondent No. 1 vide letter dated 25-11-2011 that if the discharge of effluent leading to pollution of the lake will result in to approximate loss of about Rs. Twenty lacs (Rs. 20,00,000/-). The letter also cites earlier communications in this regard with instructions that such indiscriminate discharge should be immediately stopped.

16. The Counsel for Respondent Nos. 1 and 2 fairly admitted that there was an incident of molasses spillage in June-July 2010. On instructions, he further submits that the molasses tank has a capacity of 10,000 M3 and the incident happened because of non-provision of proper base to this molasses tank. His contention is that there is no further incident of any discharge of any type, from the Respondent No. 1-Industry, subsequent to this incident and this has been established through various visit reports of the Pollution Control Board which is the competent authorities to deal with the pollution issues. He cited the joint visit reports of MPCB dated 17-2-2012, 8-8-2012, 30-10-2012, 17-12-2012, 8-1-2013, 3-9-2013, 21-11-2013 and 21-12-2013. He submits that the Industry has provided a State of Art zero discharge facility for distillery unit investing significant amount. His contention is that this system is in regular operation and therefore, there is not even remote possibility that the distillery effluent will be released in environment. He further submits that the sugar and Co-Gen plant have necessary Effluent Treatment Plant and the same is operating efficiently. He submits that MPCB regularly visits the Industry and check the performance of the Pollution Control System. He, therefore, submits that barring the incident of June-July 2010 which was during early commissioning period of the Industry, the Pollution Control System at the Industry is performing efficiently and there is no probability of any incident of such accidental discharges.

17. During the arguments Shri D.M. Gupte, learned Advocate for MPCB relied on this additional Affidavit and further submits that MPCB has time and again inspected the factory premises. The sugar and power plant started somewhere in January 2010 and distillery unit started in August 2010. He further informed that MPCB had issued directions to the industry for accidental discharge in July 2010 and on 18th August 2010 certain interim directions were given. It is the grievance of the MPCB that Respondent No. 1-industry has not submitted the Bank guarantee of Rs. 15 lacs which was stipulated in those directions. He also informed that the Bank guarantee



of Rs. 2,00,000/- (Rs. Two lacs) has been forfeited by the MPCB in past, the details of which could not be produced during the argument.

18. Faced with such conflicting stands, the Tribunal in its order dated 4-12-2013 directed the Collector to depute responsible officer and collect the samples of effluent discharged from the Industry. The said reports were submitted by Affidavit dated 3rd January 2014 and it was observed that the treated effluent was found to be disposed of on the agricultural land leased by the Industry and there was no discharge entering either Akola Nala or Mannat lake. The treated effluent sample also found to be generally within consented standard. The Applicant in further hearing also pleaded about the impact on fisheries and therefore, the Tribunal in its direction dated February 24th, 2014 directed Central Institute Industries of Fisheries Education (CIFE), Versova Mumbai to collect the samples of effluent discharges which may drift towards Mannat lake, from the Respondent Industry and also, samples of said lake and submit status of water quality in lake and status of fisheries in the lake. The CIFE submitted the report during the hearing on March 24th, 2014 which is taken on record. The report is quite comprehensive and deals with analysis and assessment of the quality of effluent of Gangakhed Sugar and Energy Ltd. and water quality and fisheries status of Mannat lake. The conclusions are reproduced as under:

> The quality characteristics of effluent of Gangakhed Sugar and Energy Ltd., Vijaynagar, Makhani, Taluka, Gangakhed, District Parbhani, Maharashtra were within permissible limits. The lake water quality was also within the desirable range to support the fisheries of Mannath Lake.

19. The Counsel for MPCB submitted that the Sugar and Power Industry was given first consent to operate on 10th March 2010 and the distillery unit started in August 2010. He submits that MPCB had investigated the incident of molasses spillage and pollution of Mannat lake and issued some instructions on 26th July 2010. Subsequently, Board also issued interim directions on 18th August 2010 directing some improvements including submission of Bank guarantee of Rs. 15,00,000/- (Rs. Fifteen lacks). The Counsel further informed that this Bank guarantee has not been submitted by the Respondent No. 1-Industry. He further informed that the Board had forfeited Bank guarantee of Rs. 2,00,000/- (Rs. Two lacks) which was deposited with the Board separately. He further submits that subsequent to this incident, Board has regularly inspected the Industry for compliance purpose and the Board has not taken or contemplated any action against the Respondent No. 1 Industry for violation of consent and directions.

20. We may highlight the fact that, admittedly, in the month of June 2010, there was spillage of molasses from the molasses storage tank No. 1 of the Respondent No. 1-Industry. This molasses tank has a total capacity of 10,000 M3. The Counsel for Respondent No. 1 fairly submitted that this spillage occurred due to construction default of not providing the proper base for this storage tank. The result is that the molasses gushed out and spilled over, leading to soil contamination and leachate leading to the nearby canal and Mannat lake. MPCB which has investigated this complaint has not placed on record the quantum of molasses spilled over and the area of the plant and surrounding affected by molasses spill over. These are tale telling facts and circumstances. It is obvious that such incident occurred as a result of improper construction of molasses storage tank by the Respondent No. 1. Nobody can deny that if the molasses storage tank was appropriately constructed and molasses storage was scientifically managed by the Respondent-1, by taking necessary care including provision of dyke walls and emergency spillage control measures, then the incident would not have occurred. The incident itself is of such a nature that no separate proof for "negligent act" on part of the Respondent No. 1 is required to be adduced. This is a case for which principle of res ipsa loquitur is applicable. We have no hesitation, therefore, in holding that the Respondent No. 1 committed gross negligence resulting into spillage of molasses that caused environmental damage to the surrounding area including the canal and Mannat lake. Needless to say, the Respondent No. 1 is liable to restore environmental damages caused due to the incident. The remedy as available under Section 18 of National Green Tribunal Act, 2010 is inclusive of restitution, restoration and of compensation. The adjudication by National Green Tribunal has to be done on Polluters pay principle as enumerated in section 20 of National Green Tribunal Act 2010. We hold, therefore, that the Application will have to be allowed for certain reliefs claimed and proper measures



should be taken to avoid future similar incident.

21. The Polluter Pay's Principal is commonly interpreted as, the Polluter must pay for, the cost of Pollution abatement, cost of environment damage recovery, cost of incident management and compensation costs for the victims of the incident, if any, due to Pollution. It implies that those who caused environmental damage by polluting should pay the costs of reversing that damage and also controlling the further damage. Though the Principle is very simple, its implementation is rather difficult and complex mainly due to the difficulty in identification of the Polluters and apportioning their responsibilities. Another concern, in implementation of this principle is to how the polluter should pay. Even the difficulties in restoring the ecological system, once it is disrupted or contaminated makes the assessment of payment in the terms of loss (loss of bi-diversity, loss of habitat, loss of top soft soil so on and so forth) difficult. Moreover, the payment is, at the end of the day, probably in terms of money. It is well documented that the monetary compensation do not essentially fully make up for ecological loss or loss of resource such as ground water, top soil, biodiversity and therefore, in reality to some degree, at least, the polluter never pays the real cost of the pollution, even if, some restitution or compensation is possible. The environmentalist generally, therefore, advocate the importance of 'Precautionary Principle' over the 'Polluter Pay's Principle' in the enforcement policies. The environment damage costing is an evolving subject and can involve both non market valuation as well as market valuation. There are various methodologies in literature for such environmental damage costing such as methods of direct market method, surrogate market based method, constructed market based methods and experimental methods. In the instant case where the damages are related to change in water quality of Mannat lake, change in the characteristics of agricultural fields and also loss of means of livelihood due to not taking crop in the agricultural fields, a multipronged approach based on above methodologies needs to be taken by this Tribunal.

22. The Counsel for the Respondent Nos. 1 and 2 referred to documents submitted on 24th March 2014 and informed that the said Society even in 2009-10, when Respondent No. 1-Industry was not operational, was in loss as mentioned in the statutory audit. He further refers the same Audit Report wherein it is mentioned that there are no sale of fish conducted by the Society. He further mentions that though there are only 27 members in the year 2010-11, the claim submitted by the Applicant is for 37 members which clearly indicate that the Applicant has conducted a perjury by adding ten (10) names who were not members of the Society in the year 2010-11. He further refers the Audit Report of 2010-11 which mentions the negligence and unawareness of the Board of Directors resulted into loss of production, and no reference is made about the deteriorating water quality of lake. He further brings it to the notice from the various audit reports that the maximum yearly income of the Society is Rs. 45,000/- per year and therefore, claims that even accepting the contention of the compensation, the claim cannot be more than Rs. 45,000/- for one year. The Counsel for Respondent No. 1 also alleges perjury and contempt against the Applicant and mentions that the bills produced from two (2) firms namely Godavari Pravara Fisheries and Rafik Shaikh have been denied by those firms and the same has been put on Affidavit dated 23rd May 2014. He further submits that none of the submissions made by him on affidavit have been denied, responded or challenged by the Applicant, clearly indicating admission of the facts submitted by the Respondent 1 and 2.

23. The Counsel for Respondent 1 and 2 also submits that the water samples collected by any firm or agency which is not collected by the competent authority specified under the Water Act, without following due process listed in Section 21, is not admissible as evidence. He also submits that the compensation claimed has been submitted without any authority or without supporting Affidavit. While closing his argument, the Counsel fairly submits that though they are doing lot of work in the Pollution Control management and also, for the betterment of the Society in the vicinity, they are ready to work for environmental improvement in the area.

24. We are concerned with the issues raised by Counsel of Respondent Nos. 1 and 2. The Counsel for the Applicant submits that the Applicant is unaware of the procedures and might have signed some papers as office bearer of the Society, however, there is no intention to mislead or mis-guide the Tribunal. We have gone through the entire documents and failed to find any credible evidence about the damages to the fisheries due to the said incident. No



doubt, the water quality was deteriorated: however, whether the fisheries stock was affected could not be established by the Applicant and also by the Respondent No. 4. The correspondence from Fisheries department is generally refereeing to the possible effects on fisheries in case of discharge of effluents by the Respondent-1. The fisheries department seems to have not assessed the effect on fisheries through scientific means, if they had seen such probability. In any case, in case of water pollution issues, they should have immediately informed and involved MPCB, who is the specialized organization for the necessary investigations. In the absence of such critical information, we are not inclined to accept the claim made by the Applicant about damage to fisheries. The CIFE, which is specialized agency, also finds that presently the water quality of Mannat Lake is fit for fishery.

25. We, therefore, wish to segregate the culpability of the Respondent No. 1 due to the incident occurred in June-July 2010 into two parts, i.e. towards the restitution/restoration of environment and another is compensation. There is already a report placed on record by the Irrigation Department wherein they have raised a claim of Rs. 16,33,000/- along with in--------- 6% p.a. from date of the bill of demand till date of payment in as a cost of replenishment of the Water and also operation and maintenance charges which was incurred in the afterthought of the said incident. This cost can be taken as a cost of restoration of environment as admittedly, the Pollution of Mannat Lake is agreed even by the Respondent No. 1 and the release of water has been adopted as an emergency measure for remediation of lake water quality. This cost does not include the loss of further revenue from the beneficial use of such water for irrigation or for other purposes.

26. We are not inclined to grant any compensation to the Applicant because he failed to establish loss to his income from fishery. Though we expect the Respondent No. 1 to assist the local fishermen community through Respondent-4, Fisheries Department, to improve their fishery through proper training, guidance and also provision of some infrastructure, as a part of CSR Activities.

27. Accordingly we are inclined to partially allow the Application in following terms:

   a) The Application is partly allowed.

   b) The Respondent No. 1 is directed to strictly comply the consented standard and Respondent No. 6 shall ensure the compliances through regular monitoring. In case of violation, Respondent No. 6 is at liberty to take stringent action, as deemed fit.

   c) The Respondent No. 1 shall pay the cost of replenishment of water in Mannat lake and cost of environment damages in the powers conferred upon this Tribunal vide Section 15(1) of National Green Tribunal Act.

   d) The Respondent No. 1-Industry shall also bear the costs of investigation by the Collector, Parbhani and also Central Industries of Fisheries Education (CIFE). Parbhani.

   e) The Respondent No. 1 is liable to pay Rs. 5,00,000/- (Rs. Five lacks) towards the environment restitution costs to Collector, Parbhani who shall spend this amount for environment awareness initiative and also performances like plantation etc.

   f) The Respondent No. 1 shall pay Rs. 1.0 lakhs to the Applicant as cost of litigation.

   g) All these amounts shall be recovered by Collector, Parbhani from the amount of Rs. 50,00,000/- deposited by the Industry with him, and the balance amount may be refunded to the Respondent-1.

Application is disposed of. No costs.

© Manupatra Information Solutions Pvt. Ltd.

Declaration of Ritin Rai

Exhibit 10



MANU/GT/0012/2014

NATIONAL GREEN TRIBUNAL
(WESTERN ZONE) BENCH, PUNE

Application No. 87/2013(WZ)

Decided On: 18.02.2014

Appellants: Ramubhai Kariyabhai Patel and Others
Vs.
Respondent: Union of India, through Secretary and Others

Hon'ble Judges/Coram:
V.R. Kingaonkar, Member (J) and Dr. Ajay A. Deshpande, Member (E)

Counsels:
For Appellant/Petitioner/Plaintiff: Mr. Parul Gupta and Mr. Rahul Choudhari, Advs.

For Respondents/Defendant: Mr. Viral K. Shah, Adv. for Respondent NoS. 2 & 7, Mr. Ranjan Mukherjee, Adv. for Respondent Nos. 3 & 4, Mr. Rutvik M. Butta, Adv. for Respondent No. 5, Ms. Manda Gaikwad, AGP. for Respondent No. 6

Subject: Environment

Acts/Rules/Orders:
Constitution Of India - Article 47, Constitution Of India - Article 48A, Constitution Of India - Article 51A(g); Environment Protection Act, 1986 - Section 15, Environment Protection Act, 1986 - Section 17, Environment Protection Act, 1986 - Section 5; National Green Tribunal Act, 2010 - Section 14, National Green Tribunal Act, 2010 - Section 15, National Green Tribunal Act, 2010 - Section 18, National Green Tribunal Act, 2010 - Section 20

Cases Referred:
M.C. Mehta and another vs. Union of India and others MANU/SC/0092/1986; Indian Council for Enviro-Legal Action and Ors. vs. Union of India (UOI) and Ors. MANU/SC/1112/1996; M.C. Mehta vs. Kamal Nath and Ors. MANU/SC/0416/2000; Subhash Kumar vs. State of Bihar and Ors. MANU/SC/0106/1991; Vellore Citizens Welfare Forum vs. Union of India and others MANU/SC/0686/1996

Referred Notifications:
MANU/ENVT/0003/1995

Disposition:
Disposed off

Citing Reference:

| | |
|---|---|
| Discussed | 2 |
| Mentioned | 4 |

Case Note:
Environment - Hazardous Waste - Damage to property - Claim of compensation - Present application filed for seeking compensation, on ground that agriculture land was damaged because of waste spread and spilled on, which was due to improper handling of Hazardous Waste (HW) - Whether Applicants entitled for compensation on

manupatra®

ground of damage to agricultural land due to hazardous waste - Held, sufficient evidence to show that due to collapse of wall of industrial unit, hazardous waste gushed out and spilled over - If protective walls were appropriately constructed and HW disposal was scientifically maintained by Respondent, then such incident would not have occurred - Thus, Respondent had committed gross negligence, which resulted into spillage of HW that caused environmental damage to surrounding area, including agricultural lands of Applicants - Therefore, Respondent was liable to restore environment and to pay adequate compensation to Applicants - Application disposed of.

## JUDGMENT

1. The Applicants claim to be farmers and residents of village Kalvad, District Valsad (Gujarat). The Applicants are aggrieved by damage caused to their agricultural fields and surrounding environment because of the toxic waste spread and spilled on 17.7.2012, resulting from improper handling of Hazardous Waste at the Common Hazardous Waste Treatment Storage and Disposal Facility (CHWTSDF) site at Vapi and also the pollution caused due to the said spillage. The present Application is filed under Section 14 and 15 of the National Green Tribunal Act, 2010, since it involves substantial question relating to environment and also involves the prayer for restitution of the environment and compensation commensurate to the damage done to the ecology. The Applicants submit that a Common Effluent Treatment Plant (CETP) and a Common Hazardous Waste Treatment Storage and Disposal Facility (CHWTSDF) has been provided in Vapi Industrial area which are developed, managed and operated by Vapi Waste and Effluent Management Company Ltd. i.e. Respondent No. 4. The Vapi Industrial area is a huge Industrial Complex accommodating hundreds of units, manufacturing various products including hazardous chemicals, pesticides etc. The Applicants submit that the Common Hazardous Waste Treatment Storage and Disposal Facility (CHWTSDF or TSDF) site is located at Phase-IV, GIDC Vapi and was established in the year 1999. The total plot area of facility is about 1,00,000 square meters out of which about 30,000 square meters is the landfill cell area. There are total four (4) cells and cell No. 1 to 3 are already filled.

2. The Applicants submit that on 17-07-2012, the wall of cell No. 4 collapsed and consequently, all the nearby areas of CHWTSDF site were inundated and covered with toxic and hazardous waste, thereby contaminating the agricultural fields of the Applicants, surrounding lands, ground water and the adjoining river Kolak and Bil-khadi, as well as the natural drain passing from nearby this facility. The Applicants have submitted a report of Central Pollution Control Board (CPCB) dated 3rd August 2012 and further averred that as per the CPCB observations; more than 25,000 metric tons of hazardous waste has been spread/washed out in the incident. The Waste spread inside the premises facility and about 20,000 square meters outside area is affected. The area behind the facility in the south, south-east direction comprises of village Karwad, Adarsha Nagar Society and shops of scrap dealers. The CPCB has further mentioned the reasons for the breach in the wall (South side of Cell No. 4) as due to one or more of the following:

    a. Overload of waste disposed at Cell No. 4 (heavy load/pressure increased on the wall due to disposal of more moisture (more than 80%) laden CETP sludge without proper dewatering at CETP Vapi).

    b. Entry of rain water in the cell due to improper cover for the Monsoon purpose.

    c. Improper construction of wall including slope of the wall.

3. The Applicants submit that the GPCB has also issued a show cause notice dated 17-07-2012 to the Respondent No. 4 and to its Directors. According to the Applicants, the Respondents Nos. 3 and 4, due to their sheer negligence have caused immense harm to the environment in and around CHWTSDF site including their agricultural lands, contamination of the soil, ground water, air pollution and the adjoining water bodies namely Bil-Khadi, a natural drain, which meets river Kolak which is the source of water for the people and live-stock in the area. The Applicants, therefore, claim that the Respondents are liable to pay compensation/damages for the loss



caused to the agricultural lands as well as ecology and also, the Respondents are further liable to pay for the restitution of the environment of the area in question. The applicants have relied on following citations:

i) M.C. Mehta and Another V/s. Union of India and others MANU/SC/0092/1986 : (1987) 1 SCC 395" popularly known as Oleum Gas Leak Case.

ii) "Indian Council for Enviro-Legal Action Vrs.

Union of India, MANU/SC/1112/1996 : (1996) 3 SCC 212".

iii) "M.C. Mehta Vrs. Kamal Nath and others, MANU/SC/0416/2000 : (2000) 6 SCC 213".

iv) "Subhash Kumar Vrs. State of Bihar, MANU/SC/0106/1991 : (1991) 1 SCC 598

4. The Applicants have finally prayed for following reliefs:

a. Direct the Respondents to discover all the documents relating to the incident in issue and on the contamination of soil, groundwater and air of the area in question.

b. Appoint a local Commissioner to inquire and inspect the site and quantity the damage caused by the Respondents.

c. Direct that the Respondents No. 3, 4 and 5 are liable for the damage caused to the ecosystem and pay compensation of the loss to ecology and livelihood in accordance with the Polluter pay principle.

d. Direct that the restitution of the area is undertaken in accordance with the Polluter pay principle.

e. Direct the concerned authority to initiate action against the persons responsible under section 15 and 17 of the Environment (Protection) Act, 1986.

5. Respondent 1 is Union of India through MOEF, which has not filed any affidavit or marked presence. However, it has no direct role to play. Respondent 2 is Chief Secretary, Gujarat and Counsel Shri. Viral Shah who also represented Respondent 7 i.e. Gujarat Pollution Control Board, states that he had instructions to appear for R-2 also, though separate affidavit has not been filed. Respondent 3 and 4 are project developer and operator, while Respondent 5 is Gujarat Industrial Development Corporation which has developed the Vapi industrial area. Respondent 6 is Central Pollution Control Board. For the clarity of events, we have sequenced the arguments based on the documents and record available.

6. The Respondent No. 6 has filed Affidavit through Mr. B. Vinod Babu, working as a Scientist 'D', on 23rd May 2013 which primarily emphasized that CPCB has no Role in the Management of and also, enforcement of environment Regulations related to the CHWTSDF. The affidavit is to the effect that it is the GPCB which has the necessary statutory powers to take any action in such cases. It further shows that the CPCB i.e. Respondent No. 6 has no role in either issuing authorization or laying down conditions in the authorization or monitoring of setting up and operation of CHWTSDF or taking action on violation of the rules, except that of role stipulated under Rule 18(2) of Hazardous Waste Rules, which CPCB has already fulfilled.

7. We, however, did not agree with such stance and observed that the Government of India in the Ministry of Environment and Forest has already delegated powers to the Chairman CPCB to take action under Section 5 of Environment Protection Act vide Notification No. SO 157 (E) : MANU/ENVT/0003/1995 dated 27.2.1996. Further the CPCB vide its letter dated 4th June 2012, has issued directions to SPCB's to consider such common facilities as Red Category Industry for



grant of consent under the provisions of Air (Prevention and Control of Pollution) Act, 1981 and Water (Prevention and Control of Pollution) Act, 1974. Needless to say that such incident of Spillage of Hazardous Waste also causes Air, Water and Soil Pollution and therefore, the CPCB cannot abdicate itself from the regulatory responsibility, though, the primary role of enforcement is to be played by SPCB. Under these circumstances, the Tribunal during the hearing on 18th November 2013 noted that the CPCB had conducted an inspection of the accident site on 18th July 2012 itself and therefore, directed CPCB to make its stand clear. In response to this, further Affidavit was filed by CPCB on 19th December 2013 and it has been submitted that soil samples have been collected during December 2nd and 3rd, 2013 for further investigations of the affected area to assess the extent of contamination of remaining area and re-mediation measures required to be taken, if any.

8. The CPCB further submits that CPCB had conducted inspection of the site immediately on 18th July 2012 alongwith the Officers of the GPCB and as GPCB had initiated action under Section 5 of the Environment (Protection) Act, 1986, the Respondent No. 6 (CPCB) did not initiate similar action to avoid duplicity/multiplicity in the issuance of directions U/s. 5 of Environment Protection Act, 1986 though CPCB continued to monitor the situation. The CHWTSDF site was again visited by CPCB officials on 19th June 2013 and also, on December 2nd and 3rd, 2013. The Affidavit further mentions various restoration measures taken by TSDF operators. However, it is observed that it has not been verified or substantiated by CPCB either through documentation or through personal verification. The information submitted in para 5 of the said Affidavit mainly stems from the information provided by operator itself.

9. During its inspection carried out on December 2-3, 2013 the CPCB made following observations:

• No sludge/hazardous wastage was found lying in the affected area in and outside the TSDF;

• There was vegetation (mainly grass) on the affected areas outside the TSDF;

• The damaged cell was repaired and no seepage/leakages observed;

• The Cell No. 4A was in operation wherein waste is being currently disposed, whereas the affected cell No. 4 is not in operation;

• Capping of all Cells of the Secured Landfill i.e. Cell Number, 1, 2,3 and 4 is yet to be done;

• After the incident, the CETP has developed temporary sludge facility (area-1050 sq. mtr.) which can store about 15000 Tons sludge before sending to TSDF, CETP has also up-graded the sludge dewatering capacity from 110 m3/hr. (4 nos. decanters) to 170 m3/hr with addition of two additional decanters (30 m3/hr. capacity each). The CETP has 10 nos. of sludge drying beds (600 sq. mtr. area each);

• In the vicinity located South to South East of TSDF premises, some unauthorized scrap dealers were found engaged in loading/unloading, storage, sorting, washing of various scraps of industrial origin such as plastic, drums etc. contaminated with industrial materials in open area.

The CPCB has further submitted that following issues need to be addressed by the TSDF operator.

• Capping of all exhausted Cells i.e. Cell Number, 1, 2, 3 and 4;

• Installation of setting pond to remove suspended silt from surface run-off water generated from Secured landfill area;



• Fencing of remaining area along the periphery of TSDF site;

• The hazardous waste complying with the concentration limit/criteria should only be disposed directly into secured landfill, as specified in the "Guidelines for proper functioning and up-keep of disposal sites" published by CPCB. If required, pre-treatment facility for stabilization of hazardous waste shall be established.

10. The GPCB i.e. Respondent No. 7 has submitted its Affidavit dated 23rd October 2013 and submitted that on 17-07-2012 the Respondent No. 7 i.e. GPCB had issued Show Cause Notice to Respondent No. 4 and called upon to comply with the directions/instructions mentioned therein and submit Action Taken Report (ATR) within 3 days. Further directions U/s. 5 of the Environment (Protection) Act, 1986 were issued on 25th July 2012 to the Respondent No. 4 and these directions were further amended vide order dated 2nd November 2012. The GPCB further submits that based on the representation made by project proponent along with compliances done, to recall or to keep the directions in abeyance, the earlier directions were revoked on certain conditions vide order dated 26th December 2012.

11. We directed the GPCB to give information about quantification of the Hazardous Waste Disposed, its impact and Environmental damage and therefore, the Respondent No. 7, GPCB filed a further Affidavit on 12th December 2013. The Respondent No. 7 submits that the consent and authorization for the CHWTSDF was valid up to 4-1-2013. It is further submitted that the accident had occurred on 17th July 2012 due to sudden collapsing of the wall of Cell No. 4 and officers of GPCB had immediately rushed to the site on the same day and carried out the monitoring under the provisions of Environment Pollution Laws. It is further submitted that the Board had continuously monitored the situation by regularly visiting the site i.e. on 18-7-2012, 19-7-2012, 20-3-2012, 21-7-2012, 25-7-2012 and 31-7-2012. The GPCB had submitted the results of the sample collected from the Bilkhadi and also some other locations and submits that it is abundantly clear that because of the accident situation had become worst but since immediate corrective steps were ordered and were implemented within 2-3 days, the situation was controlled. To substantiate this, the reports of the samples have been annexed to the reply Affidavit. The visit reports attached with affidavit also showed continuous non-compliance of instructions by the operator of facility, mainly related to operation of facility in rainy season, continuous receipt of HW even after in the incident, non-covering of HW cells even after commencement of rainy season etc.

12. Gujarat Industrial Development Corporation i.e. Respondent No. 5 has filed its Affidavit dated 16th August 2013 mentioning that the GIDC is not at all concerned with the dispute in the matter as raised by the Applicants and GIDC should be directed to be deleted from the array of parties. The GIDC further submits that the Collector, Valsad vide his order dated 22nd May 2013 has decided that an amount of Rs. 3,26,225.34 was payable to farmers which has been paid by Respondent No. 4 to the 21 farmers whose paddy crop was damaged in the land admeasuring 86,306 sq. mtr. And therefore, the present Application has become infructuous. On perusal of this order of the Collector dated 22nd May 2013, it is noticed that said order has been issued under the powers conferred under Section 24 and 29 of the Gujarat Disaster Management Act.

13. During hearing on 20th December, 2013, the learned Counsel for the Respondent Nos. 3 and 4 started final arguments and during course of hearing, this Tribunal sought certain clarifications from all the Respondents as under:

It is necessary to note what was the stock of hazardous wastes in the Cell No. IV, at the relevant time. It is further necessary to know whether the stock of hazardous wastes, which had drifted away was quantified by considering on and average quantification thereof after counting the stock on 26796 MT quality slippage at the site. Thirdly, whether any sampling of the slippage was immediately done and report of analysis of the hazardous waste was collected, either by the Respondent Nos. 3 and 4, at their own, or by the CPCB or the GPCB, separately and any results of such sampling were obtained. We also sought clarification as to whether immediate soil testing was done by collecting the samples from various places of



the soil of the affected land area, in as much as, sample testing appears to have been done of the soil after about one and half year of the incident.

The CPCB, also shall clarify its stand regarding deficiencies, which have been noticed and enumerated in the affidavit. Leave to file additional affidavits granted.

14. Subsequently, the respondent Nos. 3 and 4 filed additional affidavit and so also, the GPCB and the CPCB. The Respondent Nos. 3 and 4 have claimed that drifted quantity of spilled hazardous waste may not exceed approximately 20 MT and also, enclosed certain details including analysis report of the CETP waste at the time of sludge. The Respondent No. 7, GPCB filed further affidavit and though it gave some observations related to quantification of the hazardous waste which might have drifted away into the nearby area and river/Khadi (creek). The relevant paragraphs as clarified by the GPC Bare reproduced as under:

1. In continuation of my earlier affidavit, I beg to point out that on the date of inspection i.e. 17-7-2012, as recorded in the inspection slip/report dated 1 7-7-2012 on breaking wall of Cell No. 4, 25,000 to 35,000 MT of semi-solid hazardous waste is spilled.

It is important to point out that the Gujarat Pollution Control Board and the Central Pollution Control Board jointly inspected the premises on 18-7-2012 and had mentioned in the inspection report/slip that 25,000 MT to 27,000 MT of semisolid hazardous waste is spilled over and on 19-7-2012 again officers of the GPCB has shown that 25,000 to 26,000 MT of semi hazardous waste is spilled over in 4 to 5 acres of land.

2. It is respectfully submitted that from record, which is made available by VWEMCL, the spread sludge is approximately 26,796 MT is spilled over.

15. The GPCB has further enclosed soil sampling reports as well as hazardous waste analysis reports and the water quality samples. The CPCB has also filed affidavit and has submitted analysis reports and soil samples and has also submitted certain recommendations.

16. Considering the above submissions and the records available, following issues have been framed which needs to be answered for the effective disposal of the present Application:

1. Whether the accidental release of hazardous waste due to accident that occurred in midnight of 17.7.2012, has caused environmental damage? If so, what is the nature and scale of such environmental impact?

2. Whether the land of the Applicants have been affected and damaged due to accidental release of hazardous waste? If so:

(a) What is the scale and nature of such impact, including area of impact?

(b) Whether any compensation is due and payable to the Applicants for such adverse impact on the agriculture?

3. Whether adequate steps have been taken to address the environmental damages from such accident by the Respondents?

17. It is an admitted fact that on 17.7.2012, there was an incident of breach in the wall of Cell No. 4, at the TSDF site at Vapi, Gujarat and subsequent spread of waste/sludge (land fillable hazardous waste) in the nearby area. This facility is operated by M/s. Vapi Waste & Effluent Management Company Ltd. i.e. the Respondent Nos. 3 and 4. It is observed from the first report on this incident, prepared by the CPCB, dated 3.8.2012, that about 25,000 to 27,000 MT hazardous waste was spread/washed out in the incident. The waste was spread inside the



premises of the facility as well outside and about 20,000 sq. mtr. outside the area was affected. The CPCB has also mentioned the reasons for such breach due to either overloading of the waste disposal in Cell No. 4, or entry of rainwater in the Cell due to improper cover or improper construction of the wall. It is also submitted by the CPCB that they have collected samples of water at Bilkhadi on 18, 19, 20th July, 2012 and the values reported in the downstream of TSDF shows high concentration of TSS (935), TDS (2626), COD (1399) and BOD (144).

18. The CPCB in its affidavit dated 7.2.2014, has further submitted that they have recently collected soil samples in the area and has concluded that 'soil in affected area may not fall under the category of hazardous waste as such, as per the schedule II of Hazardous Wastes Management Rules 2008'. However, soil in the affected area has higher concentration of total Cd, Cr, Cu, Ni, Pb, Zn and Mn, than outside the affected area. Further, concentration of metals being higher than the aforesaid screening levels, indicates that the site may need detailed assessment of contamination of environmental and human risk thereof Depending upon the risk remediation of contamination, if required, may also be required'. However, the CPCB's affidavit is silent on the quantity of hazardous waste which might have drifted away after the incident and also the area of affected land.

19. The GPCB has also filed analysis reports of the water samples collected subsequent to the accident and it is seen from the reports that there is a qualitative change in the upstream and downstream samples collected from Bhil-khadi and values of the critical parameters like BOD, CDD, SS and TDS are significantly increased subsequent to the accident. The GPCB affidavit submitted on 29th January, 2014, is also silent about the area of affected land and also quantity of hazardous waste, which might have drifted away after the incident. Though earlier affidavit dated 12.12.2013, clearly states that 'it becomes abundantly clear that because of the accident, situation had become worst, but since immediately corrective steps were ordered and implemented within 2-3 days, the situation was controlled'. This affidavit reveals that quantity of sludge slurry accumulated on outside lands subsequent to the accident was 26,796 MT. It further shows that this has been lifted back by the Respondent No. 4, under the instructions of the officers of the Pollution Board.

20. These observations and reports available clearly demonstrate that the spillage of hazardous waste and its further drifting has caused environmental impact on the surrounding environment including adjoining lands and water bodies. The Tribunal records its finding on Issue no 1 referred above in affirmative and further find it necessary to quantify the release of HW and its associated impacts for suitable remedial measures and also, decide the issue of any compensation/restitution.

21. Respondent Nos. 3 and 4 have filed affidavit on 5.1.2014 and submit that on 17.7.2012, earthen bund of Cell No. 4 of TSDF was damaged, resulting into spillage of hazardous waste adjoining to TSDF site and nearby open land in the surrounding areas, Bhilkadi and nearby lands. The total stock of Hazardous waste was 3,46,458 MT in Cell Nos. 3 and 4 as on the date of accident and approximate quantity of sludge in Cell No. 4, was 1,77,000 MT. However, the stock that spilled over from the location of Cell No. 4 was ETP sludge which was washed away with rainwater as slurry. Therefore, it was spread in the nearby area and had gained lot of moisture. The affidavit further mentions that the quantity of 26796 MT of slurry was lifted and stored in four different locations before further treatment and disposal in TSDF. However, significantly this slurry is shown to have a specific gravity of 0.1 which shows that this slurry is nothing more but a liquid and liable to flow away. A specific query was put forth to the Counsel for the Respondent Nos. 3 and 4 that how much time was taken to lift the entire quantity of 26796 MT of slurry and on instructions, he stated that it took about three (3) months for complete retrieval of the slurry. We find it technically very difficult to agree that this particular quantity is the total quantity of hazardous waste which got spilled over after the accident of 17.7.2012. Further, the Affidavit of Respondents 3 and 4 also use the terminology 'washed away with rainwater' while describing the incident. July is basically a rainy season and considering the fact that Vapi is in coastal area and experiencing very heavy rainfall, it is difficult to comprehend such argument. We also find that the CPCB's first report which was prepared immediately after the incident reveals that about 25000 MT "waste" had been spread/washed out in the incident. We put emphasis on the word 'waste' which is different from



'waste slurry'. Considering above submissions in totally wherein it is claimed by the TSDF operators that 26796 MT of slurry was lifted with 0.1 specific gravity, it amounts to 2679.6 MT of hazardous waste.

22. In the absence of factual information available, the Tribunal has to decide on guess work (uncertainty) based on the entire calculation of the quantity of hazardous waste which got drifted away. The Apex court in "A.P. Pollution Control Board vs. Prof. M.V. Nayudu (Retd.) & Others" has held that:

> Uncertainty becomes a problem when scientific knowledge is institutionalised in policy making or used as a basis for decision-making by agencies and courts. Scientists may refine, modify or discard variables or models when more information is available; however, agencies and Courts must make choices based on existing scientific knowledge. In addition, agency decision making evidence is generally presented in a scientific form that cannot be easily tested. Therefore, inadequacies in the record due to uncertainity or insufficient knowledge may not be properly considered….

> The 'uncertainty' of scientific proof and its changing frontiers from time to time has led to great changes in environmental concepts during the period between the Stockholm Conference of 1972 and the Rio Conference of 1992. In Vellore Citizens' Welfare Forum vs. Union of India and Others [MANU/SC/0686/1996 : 1996(5) SCC 647], Hon'ble Apex Court referred to these changes, to the 'precautionary principle' and the new concept of 'burden of proof in environmental matters. Kuldip Singh, J. after referring to the principles evolved in various international Conferences and to the concept of 'Sustainable Development', stated that the Precautionary Principle, the Polluter pays Principle and the special concept of Onus of Proof have now emerged and govern the law in our country too, as is clear from Articles 47, 48A and 51A(g) of our Constitution and that, in fact, in the various environmental statutes, such as the Water Act, 1974 and other statutes, including the Environment (Protection) Act, 1986, these concepts are already implied. The learned Judge declared that these principles have now become part of our law.

23. We may high-light the fact that, admittedly, in the relevant mid-night, the southern side part of the wall of the CETP collapsed. The debris fell outside the premises. The Hazardous Waste gushed out and spilled over. These are tale telling facts and circumstances. It is obvious that such incident occurred as a result of improper maintenance of the TSDF by the Respondent No. 4. Nobody can deny that if protective walls were appropriately constructed and HW disposal is scientifically maintained by the Respondent No. 4 then the bizarre incident would not have occurred. The incident itself is of such nature that no separate proof for of "negligent act" on part of the Respondent No. 4 is required to be adduced. This is a case in which Principle of Res ipsa loquitur is applicable. We have no hesitation, therefore, in holding that the Respondent No. 4 committed gross negligence which resulted into the spillage of Hazardous Waste that caused environmental damage to the surrounding area, including agricultural lands of the Applicant. Needless to say, the Respondent Nos. 3 and 4 are liable to restore the environment as well as to pay adequate compensation to the Applicants. The remedy as available under Section 18 of the National Green Tribunal Act is inclusive of restitution and compensation. The adjudication by the National Green Tribunal has to be done on Polluter Pay's Principle as enumerated in Section 20 of the National Green Tribunal Act 2010. We hold, therefore, that the Application will have to be allowed for the reliefs claimed and proper measures should be taken to avoid future similar incidents.

24. The Polluter Pay's Principal is commonly interpreted as: the Polluter must pay for the cost of Pollution abatement, cost of environment recovery, cost of incident management and compensation costs for the victims of the damages, if any, due to Pollution. It implies that those who caused environment damage by polluting should pay the costs of reversing that damage and also controlling the further damage. Though the Principle is very simple, its implementation is rather difficult and complex mainly due to the difficulty in identification of the Polluters and apportioning their responsibilities. Another concern, in implementation of this principle is to how



the polluter should pay. Even the difficulties in restoring the ecological system, once it is disrupted or contaminated makes the assessment of payment in the terms of loss (loss of bi-diversity, loss of habitat, loss of top soil, so on and so forth) difficult. Moreover, the payment is, at the end of the day, probably a monetary one. It is well documented that the monetary compensation do not essentially fully make up for ecological loss or loss of resource such as ground water, top soil, biodiversity and therefore, in reality to some degree, at least, the polluter never pays the real cost of the pollution, even if, some restitution or compensation is possible. The environmentalist generally, therefore, advocate the importance of 'Precautionary Principle' over the 'Polluter Pay's Principle' in the enforcement policies. The environment damage costing is an evolving subject and can involve both non market valuation as well as market valuation. There are various methodologies in literature for such environmental damage costing such as methods of direct market method, surrogate market based method, constructed market based method and experimental method. In the instant case where the damages are related to change in water quality of Bhilkhadi, change in the characteristics of agricultural fields and also loss of means of livelihood due to not taking crop in the agricultural fields, a multi-pronged approach based on above methodologies needs to be taken by this Tribunal. These are detailed in following paras.

25. We have given anxious thought to the relevant aspects of the matter, hypothetical loss sustained by the Applicants and possible degradation of the fertility of the soil due to spillage of the hazardous waste. In our opinion, it will be proper to award compensation to each Applicant on following counts:

    1. Actual loss

    2. Probable future loss

    3. Non-pecuniary damages (mental harassment)

    4. Loss due to fertility of soil.

The most relevant document and record available on these aspects is the District Collector's order dated May 22, 2013, which has been agreed and complied by Respondent 3 and 4 by making necessary payment. We, therefore, propose to use the information and formula used by Collector in arriving at quantification of the compensation.

26. Considering the submissions made and referred to above by the CPCB and GPCB and the operators and locating the missing links, we need to deal with this uncertainty by developing some empirical co-relations within the available information and data, essentially keeping above principles in mind, and even at the risk of little over-estimating the quantities for remediation of the environment. We therefore will have to estimate the quantity of drifted HW using the observations of CPCB that about 25000 MT of hazardous waste was slipped over after the incident. The typical design criterion of TSDF allows the moisture content to be about 40 to 60 %., and therefore considering the moisture content even at conservative level being 40%, the HW quantity spilled over is likely to be about 10,000 MT. The facility operators were able to retrieve only 2679.6 MT of hazardous waste (with 0.1 specific gravity).Therefore, the quantity of hazardous waste, which got released into environment is a difference between these values i.e. 7320.4 MT. Further, the reports of the water quality at Bilkhadi and soil testing reports submitted by the GPCB and CPCB clearly establish beyond doubt that accidental release of hazardous waste from the accident on 17.7.2012, has resulted into environmental damages, particularly of water quality of Bhilkhadi and also contamination of soil in adjoining lands.

27. We have perused various documents on record to ascertain and assess the damages caused to the agricultural lands of the Applicants and to quantify the damages. It is observed for the order passed by the District Collector, Valsad dated 22-5-2013 that the agricultural land of 8-63-03 Hectare has been affected due to the accident and spillage of the Hazardous Waste. The Collector has also issued orders for compensation of Rs. 3,26,225=34 to 21 farmers as mentioned in the annexure of the Report. It is observed that this compensation has been made



for the damages on account of non-utilization of the agricultural land in one season. This compensation has been awarded by the Collector under the powers conferred on him by Section 24 and 29 of Gujarat Disaster Management Act. It is therefore clearly evident that this compensation is not for environmental damages as envisaged under the NGT Act, 2010, including loss of agricultural value of the affected agricultural lands. It is a kind of solatium given to the farmers as urgent remedial response under the special scheme. The arguments of the Respondent 3 and 4 that the Collector has already awarded compensation and therefore, no further claim needs to be entertained by this Tribunal, is therefore not acceptable and stands rejected. It is further observed that the agricultural lands are affected and damaged due to the spillage of HW from the CHWTSDF due to the accident on 17.7.2012. Hence the Issue at No. 2 referred to above is answered by in the affirmative.

28. It is also clear from the CPCB's Affidavit dated 7th February 2014 that during the site Inspection of 2nd and 3rd December 2013, there was vegetation (mainly grass) from the affected area out side the TSDF. This finding shows that the affected land has not been and could not be used for the designated agricultural purposes. This Tribunal is aware that this could be due to various reasons. However, the contamination of the agricultural land soil as reported in the said CPCB Affidavit could be a more probable reason for non-use of the agricultural land, even subsequent to the year 2012. The Tribunal, therefore, finds it appropriate and justifiable, on the Polluter Pay's Principle that the Respondents No. 3 and 4 need to pay the proportionate compensation for the damages to the affected farmers including the ten (10) Applicants as per the formula and amount derived by the District Collector in the above order, for the years 2013 and 2014.

29. We also inquired whether the GPCB has carried out any assessment as per the Rule 25(1) and 25(2)B of the Hazardous Waste Rules 2008. For the clarity, said Rule are reproduced herein-under:

> Rule 25(1): The occupier, importer, transporter and operator of the facility shall be liable for all damages caused to the environment or third party due to improper handling of the hazardous waste or disposal of the hazardous wastes.

> 25(2): The occupier and the operator of the facility shall be liable to pay financial penalties as levied for any violation of the provisions under these rules by the State Pollution Control Board with the prior approval of the Central Pollution Control Board.

30. It is observed from this provision that the State Pollution Control Board has the necessary powers to assess the damages. However, the reply-affidavit filed by the GPCB is silent on this aspect. We express our anguish for not using these legal provisions by the GPCB in such serious environmental accident. It is observed from the CPCB report, wherein possible reasons for collapsing of retaining wall have been mentioned, that the poor operation of TSDF is the main possible reason for the collapse. It is also observed from the GPCB visit reports that the TSDF operator has non-complied with the conditions of Authorisation and also the instructions given by GPCB in various visit reports. We therefore find it surprising that GPCB has not taken any credible legal action like prosecution in spite of repeated non-compliances by the operators (Respondent Nos. 3 and 4).

31. However, we have noted that the accident occurred on 17.7.2012, has been investigated by the GPCB by deploying additional manpower and also carrying out water quality analysis tests and soil analysis tests, besides deputing additional manpower so as to investigate environmental damages due to such accident. This entire exercise has been done at the costs of the public exchequer, and therefore, the accident and its after effects needs to be considered on 'Polluter Pay's Principle' which has been accepted as Law of the Land, in the context of Judgments of the Apex Court. We, therefore, feel it necessary that all the expenditure related to investigation, control, management and remediation, if any, of the accidental spillage and drifting of HW in the instant case which has been incurred by the GPCB and CPCB shall be recovered from the Respondent Nos. 3 and 4.



32. It has been submitted by CPCB that there are certain improvements which are required to be implemented by TSDF. We have also, noted various non compliances reported by GPCB in its various visit reports, mainly related to high moisture content, entry of rain water in cells, non-covering the cells in rainy season etc. We are concerned about such non-compliances by TSDF, as these facilities have been developed as specialized facilities to handle and safely dispose of the hazardous waste received from member industries, and as such they are expected to follow the strict protocol and comply with the conditions of Authorisation, in their operations. CPCB has mentioned requirement of pre-treatment unit at the TSDF. The Counsel for Respondent 3 and 4 on instructions, submitted that the HW from member industries is accepted at TSDF only if the same is as per the norms set in the agreement and if the HW is not as per norms, then the HW is not accepted at the TSDF and the individual member is responsible for disposal of HW. We are not much concerned with such proposition as this will finally result in unscientific disposal of HW. Considering the above discussion, the Application is partly allowed in terms as shown herein below:

1) The Respondent Nos. 3 and 4 shall deposit an amount of Rs. 10,00,000/- (Rs. Ten lakhs) towards the Environmental damages due to the un-scientific disposal of about 7320.4 metric ton of Hazardous Waste with the Collector Valsad, who shall create a separate account for this amount and shall use it for an effective and urgent response to deal with any Environmental damages/risk/accident which might be reported in the District Valsad and more specifically, in Vapi Industrial area. This amount is to be spent at the discretion of the Collector, Valsad, however, he is directed to adopt principle of austerity and ensure the effective and efficient use of such amount. This amount shall be deposited by the Respondent Nos. 3 and 4 with the Collector's office within one (1) month.

2) The Respondent Nos. 3 and 4 shall pay the compensation to the affected farmers as identified by Collector in his order dated 22.5.2013, towards:

i. Actual loss, equal to the amount identified by Collector in his order dated May 22, 2013

ii. Probable future loss equal to double the said amount identified by Collector.

iii. Non-pecuniary damages: equal to said amount identified by Collector.

iv. Loss of soil fertility: equal to the amount identified by Collector.

This amount shall be deposited by the Respondent 3 and 4, with the Collector, Valsad within a period of one month, who shall ensure the proper distribution of the amount among affected farmers in next one month. In case this amount and also the amount at point 1 above is not deposited within four (4) weeks, the Collector, Valsad shall immediately arrange for attachment of property of the Respondents 3 and 4 with stock and barrel, in order to recover such amount without waiting for any further order and report to this Tribunal about the action taken in the matter.

3) Respondent Nos. 3 and 4 shall deposit an amount of Rs. 5,00,000/- (Five lakhs) with the GPCB within next 15 days, towards the expenditure of monitoring, sampling/analysis, investigations and supervision conducted by GPCB and CPCB. The GPCB and CPCB may finalize their claim within next fifteen (15) days and if any additional amount is required to be claimed from the Respondent Nos. 3 and 4, the same shall be paid by the Respondent Nos. 3 and 4 in next one (1) month.

4) The Respondent 3 and 4 shall deposit an amount of Rs. 10,00,000/- with GPCB who shall immediately undertake the study of contamination of the affected areas including the agricultural lands and also the water bodies, particularly the sludge



which may have been accumulated at bunds in Bilkhadi in order to evolve the comprehensive remediation program with the technical assistance of CPCB and any other expert agency, if required. We expect that GPCB/CPCB shall complete the exercise of evolving remediation plan, in next 2 months.

The remediation activities at the affected agricultural areas shall be completed in next 6 months. The entire cost of evolving the remediation program and also, the actual remediation activities shall be borne by Respondent 2 and 3.

5) GPCB shall issue directions to the TSDF to carry-out improvements in operations, including provision of pre-treatment and also incorporating the recommendations of CPCB, in next 15 days which shall be complied by TSDF with within next 3 months. GPCB shall specifically review the arrangements of TSDF that if the HW sent by member is not as per norms, the same is rejected and the individual member is responsible for its disposal.

6) GPCB and CPCB shall immediately undertake efforts for capacity building within their organizations and also, other SPCBs for scientific handling of such accidents, through training and preparation of guidelines and manuals, particularly enforcement of Rule 25(1) and (2) of HW Rules, 2008. This is utmost essential to develop such capacity in SPCBs and CPCB as they are the scientific and technical organizations having responsibility to handle such environmental hazards and therefore, it is necessary to ensure adoption of suitable scientific tools and techniques to develop suitable response to such accidents. GPCB and CPCB shall take suitable steps in next 3 months.

7) The Respondents shall pay Rs. 10,000/- to each Applicant as costs.

The Application is accordingly disposed of.

© Manupatra Information Solutions Pvt. Ltd.

Declaration of Ritin Rai

Exhibit 11

SCC Online Web Edition, Copyright © 2015
Page 1       Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*a*

**4.** Having perused the two office memorandums placed by the learned Senior Counsel for the Union of India and the Department of Chemicals and Fertilizers, we deem it proper to direct the Secretaries of two ministries to file their affidavits within four weeks indicating therein as to within what time the revised list of the National List of Essential Medicines (NLEM) will be added in Schedule I of the Drugs (Price Control) Order, 1995. A comprehensive revised list of the National List of Essential Medicines (NLEM) be also produced along with affidavit to be filed on behalf of the Ministry of Family and Welfare.

*b*

**5.** List the case on 17-11-2011 for further hearing.

Court Masters

————

*c*

### (2011) 14 Supreme Court Cases 481

(BEFORE R.V. RAVEENDRAN AND K.S.P. RADHAKRISHNAN, JJ.)

MUNICIPAL CORPORATION OF DELHI,
DELHI                                          . .       Appellant;

*Versus*

*d*

UPHAAR TRAGEDY VICTIMS ASSOCIATION
AND OTHERS                                     . .       Respondents.

Civil Appeals Nos. 7114-15 of 2003[†] with Nos. 7116 of 2003 and 6748 of 2004, decided on October 13, 2011

*e*

A. **Constitution of India — Arts. 21, 32, 226 and 136 — Constitutional/ Public law torts — Public law liability due to infringement of public law rights by public authorities/officials, especially fundamental rights arising from acts or inaction or dereliction of duty or from violation or breach of statutory duties by public authorities — Conditions precedent for incurring liability under public law — If rule of strict liability applies**

*f*

**— *Constitutional Tort I*: Constitutional/Public law tort of negligence; *Constitutional Tort II*: Constitutional/Public law tort of breach of regulatory/ other statutory duties; and *Constitutional Tort III*: Constitutional/Public law tort of breach of public safety statutory duties — *Constitutional Torts I & II* if can be distinguished from *Constitutional Tort III* — Art. 21 if can be read into all public safety legislations, hence leading to imposition of strict liability in public law for breach of public safety statutory duties i.e. *Constitutional Tort III* if a strict liability tort**

*g*

**— Compensation/Damages/Punitive damages — Ingredients and essence of, and mode of assessment and apportionment — "Constitutional tort" — Terminology of, mooted**

*h*

† From the Judgment and Order dated 24-4-2003 of the High Court of Delhi at New Delhi in CWPs Nos. 4567 of 1999 and 3335 of 1997

SCC Online Web Edition, Copyright © 2015
Page 2     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

— *Per Raveendran, J.* (*Radhakrishnan, J. partly disagreeing*) deficiency in performance of statutory duties by public authorities or their actions which are contrary to law or ultra vires, do not by themselves attract liability to pay compensation/damages, unless the deficiency in performance of statutory duties is: (i) coupled with mala fides/malice or conscious abuse (i.e. they commit *Constitutional Tort II*), or (ii) direct negligence on the part of the public authority is established and it was a proximate cause of injuries/death of victims (i.e. they commit *Constitutional Tort I*) — Merely on ground that public authorities concerned could have performed their duties better or more efficiently, they cannot be made liable to pay compensation — Strict liability doctrine not applicable — Hence, MCD and licensing authority exonerated as requirements of neither *Constitutional Tort I* nor *Constitutional Tort II* were satisfied in their cases, while DVB held liable as its case satisfied requirements of *Constitutional Tort I* — Cases where damages have been awarded for direct negligence on part of statutory authority or cases involving doctrine of strict liability cannot be relied upon in present case to fasten liability upon MCD or licensing authority — Even so, observations of High Court with regard to dereliction of duty and non-application of mind in performance of their functions and duties by the licensing authority and MCD, affirmed — But that does not lead to monetary liability

— *Per Radhakrishnan, J.*, public law causes of action to claim compensation for breach of fundamental rights are often described as "constitutional torts" — Constitutional courts in such situations are expected to vindicate the parties constitutionally, compensate them for resulting harm and also to deter future misconduct — However, this public law power/constitutional power to grant compensation is seldom exercised merely due to violation of some statutory provisions resulting in monetary loss to the claimants — Most cases in which this public law/constitutional power has been exercised are where there is intense serious violation of personal liberty, right to life or violation of human rights

— Furthermore, *per Radhakrishnan, J.* (*disagreeing*), due to action or inaction of State or its officers, if fundamental rights of a citizen are infringed, then public law liability of State, its officials and instrumentalities for constitutional torts, is strict — Strict liability for constitutional torts does not call for a finding of intent or negligence — In such cases the highest degree of care is expected from private and public bodies, especially when impugned conduct causes physical injury or harm to persons — Question whether law imposes strict liability on State and its officials primarily depends upon purpose and object of legislation and court must generally look at the statute and its provisions and determine whether legislature in its wisdom intended to give rise to a cause of action in damages and whether claimant is intended to be so protected — However, in a case where life and personal liberty have been violated, absence of statutory provision for compensation is of no consequence — Violation of Art. 21 of Constitution is always actionable, and it has to be read into all public safety statutes, since prime object of public safety legislation is to protect the individual and to

MCD v. UPHAAR TRAGEDY VICTIMS ASSN.                483

compensate him for loss suffered (i.e. if *Constitutional Tort III* is committed by public officials) — Hence, duty of care expected of public bodies or officials under public safety statutes is very high compared to that expected under merely regulatory statutes — When one looks at various provisions of Cinematograph Act, 1952 and Rules made thereunder, Delhi Building Regulations and Electricity laws, duty of care of officials was high and liabilities strict [Ed.: As per this reasoning, MCD and the licensing authority could not have been exonerated, and they would have been liable for committing *Constitutional Tort III*]

— In the present case, cinema theatre owners (licensees): (i) raising parapet wall much higher than that permitted in plan sanctioned by Municipal Corporation (MCD), (ii) making, contrary to Cinematograph Rules, alterations in balcony of cinema theatre severely impeding exit, (iii) permitting overcrowding of cars in parking place, and (iv) illegally installing a number of additional seats in balcony — State Electricity Board (DVB), unauthorisedly and without providing statutory safety measures, installing high power transformer in ground floor walled-in parking area of theatre — Transformer catching fire, fire then spreading to parked cars, etc. and huge quantity of noxious smoke and poisonous gases emanating, not being able to escape from ground floor due to it having been walled-in, reaching various parts of theatre, and especially filling up balcony area — 59 cinema spectators trapped in balcony dying due to asphyxiation and 103 suffering injuries — In such circumstances, licensing authority (Delhi Police in this case) or MCD not liable to pay compensation — But, negligence in maintaining and repairing transformer by DVB in accordance with provisions of Electricity Act and Rules being proximate cause of the accident having been established, both DVB and theatre owners (licensees), were jointly and severally liable to compensate the victims — DVB having not challenged its liability to pay 15% of compensation as apportioned to it by High Court, 85% of compensation awarded herein directed to be paid by theatre owners — Further, additional compensation awarded in suits, if any filed, also to be payable by theatre owners

— Decision herein given under public law, held, no bar to any criminal proceedings based on same evidence — Entertainment, Amusement and Leisure — Cinematograph Act, 1952 — Ss. 10, 11, 12 and 16 — Delhi Cinematograph Rules, 1981 (as amended in 1994) — Rr. 3, 14, 15 and Sch. I — Delhi Cinematograph Rules, 1953, Rr. 1 to 7

B. Constitution of India — Arts. 21, 226 and 32 — Constitutional/Public law tort of breach of public safety statutory duties — New tort of, posited, *per Radhakrishnan, J.* — Constitutional Law — Constitutional torts

C. Constitutional Law — Constitutional torts — Public law torts — What are — Nature and scope of — Concurrent liability of public bodies in public law and private law for various torts, compared and contrasted, *per Radhakrishnan, J.* — Various torts available both in private and public law against public bodies being negligence, breach of statutory duty, misfeasance in public office, etc. — Liability for breach of regulatory statutory duties (not being public safety statutory duties), when arises, explained [See also *Shortnote A*]

SCC Online Web Edition, Copyright © 2015
Page 4    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------

484                          SUPREME COURT CASES                  (2011) 14 SCC

— *Private law causes of action* generally enforced by claimants against public bodies are negligence, breach of statutory duty, misfeasance in public office, etc. — Breach of statutory duty is conceptually separate and independent from other related torts such as negligence though an action for negligence can also arise as a result of cursory and mala fide exercise of statutory powers — To decide whether breach of statutory duty is actionable, court must generally look at the statute and its provisions and determine whether legislature in its wisdom intended to give rise to a cause of action in damages and whether claimant is intended to be protected — In all common law jurisdictions, as in India, there is a lot of uncertainty as to when private law or tort claims may be raised against public bodies for negligence or violation of statutory duties

— The above private law causes of action are distinct from *public law power of constitutional courts* to entertain monetary claims arising out of violation of statutory provisions by public authorities which infringe fundamental rights i.e. constitutional torts — Claim for compensation in public law is for compensating claimants for deprivation of fundamental rights, which has nothing to do with private law claims in tort or claims in an ordinary civil court — There is unanimity (unlike the uncertainty in respect of private law compensation claims for breach of statutory duties) in all common law jurisdictions that constitutional courts have a duty to protect fundamental rights and mitigate damage caused — Tort Law — Breach of statutory duty — Scope of relief in tort law vis-à-vis relief under public law — Constitution of India, Arts. 21, 14, 19, 226 and 32

D. Constitutional Law — Constitutional torts — Public law torts of breach of statutory duty — Need for comprehensive legislation covering, inter alia, breach of fundamental rights — Held (*per Radhakrishnan, J.*), absence of such legislation is giving rise to divergent approaches being adopted by different courts which in turn is resulting in arbitrary determination of compensation — Sophisticated jurisprudence developed by European Court of Justice (ECJ) highlighted — Framing of appropriate legislation in India commended — Constitution of India — Arts. 300, 21, 226, 32 and 136 — Human Rights Act, 1998 (UK) — S. 6 — Tort Law — Breach of statutory duty

E. Tort Law — Causation — Principles of causation — "But for" test — Transformer installed by Electricity Board (DVB) in breach of statutory safeguards in ground floor stilt parking area of cinema theatre catching fire — Leaked transformer oil catching fire and fire then spreading to cars parked nearby, again in breach of rules and regulations (Cause 1 attributable to theatre owners) — Noxious and poisonous fumes and smoke emanating from fire, instead of escaping into atmosphere, getting trapped in stilt parking area since parapet wall thereof, in breach of sanctioned plan, had been raised right up to ceiling by theatre owners (Cause 2 attributable to theatre owners) — From there, trapped fumes/smoke going into balcony area via chimney effect — Smoke also travelled to air conditioner ducts and was sucked in and released into auditorium — Only patrons in balcony area getting trapped inside balcony since all exits had been blocked except for one exit, again in breach of rules and regulations (Cause 3 attributable to

SCC Online Web Edition, Copyright © 2015
Page 5    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------

theatre owners) — Also, exit signs had stopped operating or were not visible — Hence, only patrons trapped in balcony area dying due to asphyxiation and getting injured

— Theatre owners contending that entire liability should be placed on DVB as it had installed transformer in breach of statutory safeguards, and which was the cause of fire and thus cause of deaths and injuries — Held, theatre owners must be held liable on principle of "but for causation" — Even if one of the above three causes attributable to theatre owners had been absent, calamity would not have occurred — No one on ground floor or second floor of theatre was injured — Deaths and injuries of patrons in balcony area were on account of negligence and greed on part of theatre owners in respect of all three causes, and but for their acts/omissions, same would not have been caused — DVB and theatre owners held jointly and severally liable to the extent of 15% and 85%, respectively — Penal Code, 1860 — Ss. 304, 304-A and 302 — Delhi Cinematograph Rules, 1981 — Rr. 10, 12 and 5 — Cinematograph Act, 1952, Ss. 10, 14 and 15

F. **Infrastructure Laws** — Energy and Power — Electricity Rules, 1956 — Rr. 29, 30, 42, 46, 47, 50, 50-A, 51 and 5 — Transformer installed in cinema theatre in breach of statutory requirements, catching fire, which ultimately led to catastrophic death of large number of patrons while watching a film — Liability to pay compensation of authority responsible (DVB) for installing transformer in such manner — Held, negligence on part of DVB in not maintaining transformers and repairs led to root cause of incident i.e. starting of the fire — As direct negligence on DVB's part was established and was a proximate cause for injuries and deaths of victims, DVB held jointly and severally liable along with theatre owners to compensate victims, liability being to the extent of 15% and 85%, respectively — Tort Law — Breach of Statutory Duty — When actionable in damages

G. **Constitution of India** — Arts. 226, 32, 136 and 21 — Compensation — Grant of, in public law remedy, held, no bar to criminal proceedings based on same evidence — Criminal Procedure Code, 1973, S. 357

These appeals related to the fire at Uphaar Cinema Theatre in Green Park, South Delhi which occurred on 13-6-1997, resulting in the death of 59 patrons and injury to 103 patrons. During the matinee show of a newly released film, on 13-6-1997 the patrons of the cinema hall, which was full, were engrossed in the film. Shortly after the interval, a transformer of Delhi Vidyut Board (DVB) installed in the ground floor stilt parking area of Uphaar Cinema, caught fire. The oil from the transformer leaked and found its way to the passage outside where many cars were parked. The burning oil spread the fire to nearby cars and from there to the other parked cars.

The burning of: (*i*) the transformer oil, (*ii*) the diesel and petrol from the parked vehicles, (*iii*) the upholstery material, paint and other chemicals of the vehicles, and (*iv*) foam and other articles stored in the said parking area generated a huge quantity of fumes and smoke which consisted of carbon monoxide and several poisonous gases. As the ground floor parking was covered all round by walls, and the air was blowing in from the entry and exit points, the smoke and noxious fumes/smoke could not find its way out into the open

SCC Online Web Edition, Copyright © 2015
Page 6      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

atmosphere and was blown towards the staircase leading to the balcony exit. On account of the chimney effect, the smoke travelled up. Smoke also travelled to the air conditioner ducts and was sucked in and released into the auditorium. The smoke and the noxious fumes stagnated in the upper reaches of the auditorium, particularly in the balcony area. By then the electricity went off and the exit signs were also not operating or visible.

The patrons in the balcony who were affected by the fumes, were groping in the dark to get out. The central gangway in the balcony that led to the entrance foyer could have been an effective and easy exit, but it was closed and bolted from outside, as that door was used only for entry into the balcony from the foyer. The patrons therefore groped through towards the only exit situated on the left side top corner of the balcony. The staircase outside the balcony exit which was the only way out was also full of noxious fumes and smoke. They could not get out of the staircase into the foyer as the door was closed and locked. This resulted in death of 59 persons in the balcony and stairwell due to asphyxiation by inhaling the noxious fumes/smoke. Another 103 patrons were injured in trying to get out.

The first respondent is an association of the victims of Uphaar Tragedy. The members of the Association were either those who were injured in the fire or were relatives/legal heirs of those who were killed in the fire. The Association filed a writ petition before the High Court. They highlighted the shocking state of affairs existing in the cinema building at the time of the incident and the inadequate safety arrangements made by the owners. They described the several violations by the owners of the cinema of the statutory obligations placed on theatre owners under law, for prevention of fire hazards in public places. They highlighted the acts of omission and commission by the public authorities concerned, namely, DVB, MCD, Delhi Fire Force and the licensing authority being Delhi Police in this case. They alleged that these authorities not only failed in the discharge of their statutory obligations, but acted in a manner which was prejudicial to the public interest by failing to observe the standards set under the statute and the rules framed for the purpose of preventing fire hazards; that they issued licences and permits in complete disregard of the mandatory conditions of inspection which were required to ensure that the minimum safeguards were provided in the cinema theatre. They pointed out that most of the cinema theatres were and are being permitted to run without any proper inspection and many a time without the required licences, permissions and clearances. They therefore sought adequate compensation for the victims of the tragedy and punitive damages against the theatre owner, DVB, MCD, Delhi Fire Force and the licensing authority (Delhi Police) for showing callous disregard to their statutory obligations and to the fundamental and indefeasible rights guaranteed under Article 21 of the Constitution of India of the theatre-going public, in failing to provide safe premises, free from reasonably foreseeable hazards. They claimed compensation and other reliefs.

The High Court held the Uphaar Cinema Owners (theatre owner) liable to the extent of 55%, and DVB, MCD and the licensing authority (Delhi Police) responsible to the extent of 15% each for the fire tragedy. It exonerated the Delhi Fire Force.

SCC Online Web Edition, Copyright © 2015
Page 7    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

The High Court directed payment of compensation to the legal heirs of 59 patrons who had died, and also to the 103 persons who were injured. The High Court determined a uniform compensation of Rs 18 lakhs payable in the case of deceased who were aged more than 20 years, and 15 lakhs each in the case of those deceased who were less than 20 years of age. It also awarded a compensation of Rs 1,00,000 to each of the 103 injured persons. It also awarded interest at the rate of 9% per annum on the compensation from the date of filing of the writ petition to the date of payment. The High Court directed that while paying compensation the ex gratia amount wherever paid should be deducted. The High Court directed that the theatre owners shall pay Rs 2.5 crores as punitive damages, being the income earned from installing extra 52 seats unauthorisedly during the period 1979 to 1996. The said amount was ordered to be paid to the Union of India for setting up a Central Accident Trauma Centre.

DVB accepted the judgment of the High Court and deposited 15% of the total compensation. The theatre owners, Delhi Police and MCD did not accept the impugned judgment and filed these appeals. MCD denied any liability. The licensing authority i.e. Delhi Police contended that the theatre owners should be made liable for payment of the entire compensation. The theatre owners urged two contentions, namely, that their share of liability should have been far less than 55% and that the rates of compensation fixed were excessive.

The following questions arose for consideration before the Supreme Court:

(*i*) Whether MCD and the licensing authority could be made liable to pay compensation to the victims?

(*ii*) What should be the apportionment of liability?

(*iii*) Whether the compensation awarded was excessive?

(*iv*) Whether the award of punitive damages of Rs 2.5 crores against the theatre owners was justified?

Allowing the appeals of MCD and Delhi Police (the licensing authority) and partly allowing the appeal of the theatre owners, the Supreme Court

*Held* :

### *Per Raveendran, J.*

It would not be correct to assume that every minor infraction of public duty by every public officer would commend the court to grant compensation in a petition under Articles 226 and 32 of the Constitution by applying the principle of public law proceeding. The Court in exercise of extraordinary power under Articles 226 and 32 of the Constitution would not award damages against public authorities merely because they have made some order which turns out to be ultra vires, or there has been some inaction in the performance of the duties, unless there is malice or conscious abuse.                (Para 45)

*Rabindra Nath Ghosal* v. *University of Calcutta*, (2002) 7 SCC 478, *followed*

It is not proper to award damages against public authorities merely because there has been some inaction in the performance of their statutory duties or because the action taken by them is ultimately found to be without authority of law. In regard to performance of statutory functions and duties, the courts will not award damages unless there is malice or conscious abuse or direct negligence on the part of the public authority is established and it was a proximate cause for the injuries to and death of victims. Merely on the ground that the public

SCC Online Web Edition, Copyright © 2015
Page 8      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



488                    SUPREME COURT CASES              (2011) 14 SCC

authorities concerned could have performed their duties better or more efficiently, they cannot be made liable to pay compensation. Cases where damages have been awarded for direct negligence on the part of the statutory authority or cases involving doctrine of strict liability cannot be relied upon in this case to fasten liability against MCD or the licensing authority. Though the observations of the High Court in regard to the shortcomings in the performance of their functions and duties by the licensing authority and to a limited extent by MCD are affirmed, but that does not lead to monetary liability.    (Paras 51 to 56)

> *Just* v. *British Columbia*, (1989) 2 SCR 1228 (Can SC); *Union of India* v. *United India Insurance Co. Ltd.*, (1997) 8 SCC 683; *East Suffolk Rivers Catchment Board* v. *Kent*, 1941 AC 74 : (1940) 4 All ER 527 (HL); *Murphy* v. *Brentwood District Council*, (1991) 1 AC 398 : (1990) 3 WLR 414 : (1990) 2 All ER 908 (HL), *followed*
>
> *Geddis* v. *Bann Reservoir Proprietors*, (1878) 3 App Cas 430 (HL); *Holland* v. *Saskatchewan*, 2008 SCC 42 : (2008) 2 SCR 551 (Can SC); *R. (Can.)* v. *Saskatchewan Wheat Pool*, (1983) 1 SCR 205 (Can SC), *relied on*
>
> *Anns* v. *Merton London Borough Council*, 1978 AC 728 : (1977) 2 WLR 1024 : (1977) 2 All ER 492 (HL), *held, overruled*
>
> *Rajkot Municipal Corpn.* v. *Manjulben Jayantilal Nakum*, (1997) 9 SCC 552; *X (Minors)* v. *Bedfordshire County Council*, (1995) 2 AC 633 : (1995) 3 WLR 152 : (1995) 3 All ER 353 (HL); *R.* v. *Governor of Parkhurst Prison, ex p Hague*, (1992) 1 AC 58 : (1991) 3 WLR 340 : (1991) 3 All ER 733 (HL), *considered*

**Acts/Omissions of Uphaar Cinema owners**

The High Court has rightly held the theatre owners liable for their acts/omissions. Though the starting of the fire in the transformer happened due to the negligence of DVB, but if the theatre owner had taken the necessary usual precautions and security measures expected of a theatre owner, even if the transformer had caught fire, it would not have spread to nearby cars or other stored articles nor would the balcony and staircases have become a death trap on account of the fumes.                                    (Paras 13 and 27)

The theatre owners are principally liable due the following:

*(i) Illegal parking in stilt floor*:

The theatre owner was permitting the patrons to park their cars in a haphazard manner, particularly in the central passage. Instead of restricting the cars to be parked in that floor to 15 and leaving the central passage, the owner permitted the entire passage to be used for parking the vehicles, thereby increasing the parking capacity from 15 to 35. Parking of vehicles in front of the three electrical rooms increased the fire hazard. If the passageway for cars had been kept free of parking as per the sanctioned plan, the fire in the transformer room would not have spread to the cars and the entire calamity could have been avoided.                                                   (Para 14.3)

*(ii) Raising of parapet wall in ground floor stilt parking instead of the permissible 3 ft height, up to ceiling*:

The stilt floor plan (sanctioned in 1972) for the parking sanctioned a three feet high parapet wall along the ramp which was situated to the rear of the transformer room. If the said parapet wall had not been raised to the ceiling, the entire space above it would have been open and in the event of any fire in the transformer room or anywhere in the stilt floor parking, the fumes/smoke could have dispersed into the atmosphere and not into the balcony by the chimney effect. The intention of raising the height of the wall from three to twelve feet

SCC Online Web Edition, Copyright © 2015
Page 9    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

was to use the area between the wall and the transformer room for commercial purposes.                                                    (Para 14.1)

*(iii) Closing one exit in balcony and reducing the width of gangways*:

Making alterations in the balcony, contrary to the Cinematograph Rules by closing the gangway/aisle on one side and closing/blocking one of the exits by construction of an owner's box in front of the right side exit impeded the free and quick exit of the occupants of balcony as everyone had to use the sole exit on the left side. The delay made them victims of asphyxiation due to the poisonous/noxious gases which had collected in the balcony. Furthermore, the exit light, ground light, side light, emergency lights and public address system were all non-functional, adding to the delay, confusion and chaos, making it very difficult to get out of the balcony which was dark and full of smoke/fumes, adding to the deaths.                                     (Paras 14.2, 22 and 23)

Even if one of the three causes for which the theatre owner was responsible, was absent, the calamity would not have occurred.                (Para 27)

*(iv) Contumacious conduct*:

If the theatre owners had not unjustly and by misrepresenting the facts, obtained an interim stay in the year 1983 which continued up to the date of the incident and as a consequence though the irregularities and violations of safety measures had been noticed and brought to the notice of theatre owners, they had not rectified them and the continued violations resulted in the incident.
                                                                        (Para 14.4)

*Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234, *partly affirmed*

*Isherdas Sahni & Bros.* v. *Delhi Admn.*, AIR 1980 Del 147, *referred to*

**Acts/Omissions of DVB**

The High Court has rightly held DVB (the Electricity Board) liable for the following acts/omissions. DVB violated several provisions of the Electricity Act and the Rules. It had not obtained the approval of the Electrical Inspector for installation of the transformer in the theatre as required under the Rules. The Rules required that the floor of the transformer room should be at a higher level than the surrounding areas and there should be a channel for draining of oil with a pit so that any leaking oil would not spread outside, increasing the fire hazard, and also to ensure that water did not enter the transformer. The transformer had to be checked periodically and subjected to regular maintenance and was supposed to have appropriate covers. The connecting of wires was supposed to be by crimping and not by hammering. The negligence on the part of DVB in not maintaining the transformers and repairs led to the root cause of the incident, namely, the starting of the fire.                               (Para 12)

*Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234, *partly affirmed*

The contention of the theatre owners that the entire liability should be placed upon DVB has no merit. In fact none in the main hall (ground floor of the theatre) died. Those on the second floor also escaped. It is only those in the balcony trapped in noxious fumes, who died of asphyxiation. The deaths were on account of the negligence and greed on the part of the theatre owners and but for their acts/omissions, the catastrophe would not have occurred.      (Para 57)


SCC Online Web Edition, Copyright © 2015
Page 10        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

### Liability of MCD

The High Court held MCD liable for the following acts/omissions. The sanctioned plan issued in 1972 to the theatre owners was for construction of a three feet high parapet wall in the stilt parking area. That though the theatre owners raised the said wall up to ceiling height of 12 feet in violation of the Rules, MCD failed to point out this violation between 1994 to 1997 (the incident having occurred in 1997) and take action against the theatre owners and kept renewing their licence and issuing no-objection certificates (NOCs) and thus the High Court held that MCD was liable for the incident. However, MCD has rightly submitted that it had no role to play in regard to sanctioning or not objecting to the increasing of the height of the parapet wall. MCD was not the inspecting authority till 1994 when the Cinematograph Amendment Rules, 1994 were amended by Notification dated 3-5-1994. It was only thereafter that the report/certificate of MCD about the structural features of the building and whether the Rules in that behalf had been duly complied with, became a condition precedent for renewing the annual licence or even granting a temporary lease by the licensing authority. There was no structural change, modification or deviation after 1994 in the theatre. When MCD inspected the theatre in and post 1994, it would have seen a theatre which was running for more than 20 years and that there was no recent change. In the circumstances, MCD cannot be found fault with for not objecting to the 12 ft high parapet wall. As far as the structural features and deviations and defects are concerned, the licensing authority relied upon MCD for expert opinion after 3-5-1994. MCD cannot be made liable to compensate the victims of the fire tragedy on the ground that it was required to give an inspection report or on the ground that it gave a no-objection certificate on 25-9-1996 for renewal of licence for 1996-1997.    (Paras 15, 16 and 39 to 41)

*Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234, *reversed on this point*

### Liability of Licensing Authority (Delhi Police)

All cinema theatres in Delhi were required to get their licences renewed annually by moving an application in writing to the licensing authority. While granting renewal, the licensing authority was required to satisfy itself that the theatre owner had complied with the provisions of the Cinematograph Act and the Delhi Cinematograph Rules framed thereunder. Hence, the High Court held the licensing authority liable for the following acts/omissions. It held that the licensing authority owed a duty to ensure that the cinema theatre had complied with all the requirements of the Cinematograph Act and the Rules and to obtain the necessary NOCs from MCD, Delhi Fire Force and Electrical Inspector. If there was any violation, the High Court held that the licensing authority ought not to have renewed the licence. It held that the licensing authority failed to note the violations/deviations and take remedial action. The High Court held the licensing authority liable as it did not discharge its statutory functions and went on issuing temporary permits for periods of two months each, for a period of more than 13 years when the Rules clearly contemplated that temporary permits could not be renewed for a period of more than six months.    (Paras 7, 8 and 17)

*Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234, *reversed on this point*



SCC Online Web Edition, Copyright © 2015
Page 11      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a  The position of the licensing authority and MCD is different. They were not the owners of the cinema theatre. The cause of the fire was not attributable to them or anything done by them. Their actions/omissions were not the proximate cause for the deaths and injuries. The licensing authority and MCD were merely discharging their statutory functions (that is granting licence in the case of the licensing authority and submitting an inspection report or issuing an NOC by MCD). In such circumstances, merely on the ground that the licensing authority and MCD could have performed their duties better or more efficiently, they cannot be made liable to pay compensation to the victims of the tragedy. There is

b  no close or direct proximity of the acts of the licensing authority and MCD to the fire accident and the death/injuries of the victims. But there was close and direct proximity between the acts of the theatre owner and DVB to the fire accident resulting in the deaths/injuries of victims. In view of the well-settled principles in regard to public law liability, in regard to discharge of statutory duties by the public authorities which do not involve mala fides or abuse, the High Court

c  committed a serious error in making the licensing authority and MCD liable to pay compensation to the victims jointly and severally with the theatre owner and DVB.                                                                  (Para 55)

d  The cases where damages have been awarded for direct negligence on the part of the statutory authority or cases involving doctrine of strict liability cannot be relied upon in this case to fasten liability against MCD or the licensing authority. The position of DVB is different, as direct negligence on its part was established and it was a proximate cause for the injuries to and death of victims. It can be said that insofar as the theatre owners and DVB are concerned, there was contributory negligence.                                      (Para 54)

e  As the licensing authority and MCD are not liable, therefore, the liability will be 85% of the theatre owners and 15% of DVB.  (Paras 57 and 76.1 & 76.4)

If DVB has deposited any amount in excess it shall be entitled to receive back the same from any amount in deposit or to be deposited.      [Para 76.5(g)]

f  However, the exoneration of MCD and the licensing authority is only in regard to monetary liability to the victims. The observations of the High Court that the performance of duties by the licensing authority and by MCD (in their limited sphere) was mechanical, casual and lackadaisical are however, affirmed. There is a tendency on the part of these authorities to deal with the files coming before them as requiring mere paperwork to dispose them. They fail to recognise the object of the law or rules, the reason why they are required to do certain acts and the consequences of non-application of mind or mechanical disposal of the application/requests which come to them. There is a lack of safety culture and lack of the will to improve performance. The compliance with the procedure and rules is mechanical. Thus, the observations of the High Court in regard to the

g  shortcomings in the performance of their functions and duties by the licensing authority and to a limited extent by MCD are affirmed. But that does not lead to monetary liability.                                              (Para 56)

h  Moreover, the decisions of the High Court and the Supreme Court in the present case having been rendered in a public law jurisdiction, will not come in the way of any pending criminal proceedings being decided with reference to the evidence placed on record in such proceedings.          [Para 76.5(i)]

SCC Online Web Edition, Copyright © 2015
Page 12      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*Per Radhakrishnan, J. (partly disagreeing)*

Private law causes of action generally enforced by claimants against public bodies and individuals are negligence, breach of statutory duty, misfeasance in public office, etc. Negligence as a tort is a breach of legal duty to take care which results in damage or injury to another. Breach of statutory duty is conceptually separate and independent from other related torts such as negligence though an action for negligence can also arise as a result of cursory and mala fide exercise of statutory powers.                                                      (Para 78)

These present matters relate to the powers of the constitutional courts in entertaining monetary claims raised by the victims against the violation of statutory provisions by the licensing authorities, theatre owners and others, affecting the fundamental rights guaranteed to them under the Constitution. The constitutional courts in such situations are expected to vindicate the parties constitutionally, compensate them for the resulting harm and also to deter future misconduct. The constitutional courts seldom exercise their constitutional powers to examine a claim for compensation merely due to violation of some statutory provisions resulting in monetary loss to the claimants. Most of the cases in which courts have exercised their constitutional powers are when there is intense serious violation of personal liberty, right to life or violation of human rights.
(Para 80)

In England and other common law jurisdictions also there is a lot of uncertainty as to when private law or tort claims may be raised against public bodies for negligence or violation of statutory duties. But when one looks at the issues from the point of view of violation of fundamental rights, such as personal liberty, deprivation of life, etc. there is unanimity in approach by the courts in India, UK and USA and various other countries, that the constitutional courts have a duty to protect those rights and mitigate the damage caused. Violations of such rights are often described as constitutional torts.          (Paras 89 and 91)

Due to the action or inaction of the State or its officers, if the fundamental rights of a citizen are infringed, then the liability of the State, its officials and instrumentals, is strict. A claim raised for compensation in such a case is not a private law claim for damages, under which the damages recoverable are large. The claim made for compensation in public law is for compensating the claimants for deprivation of life and personal liberty which has nothing to do with a claim in private law in tort in an ordinary civil court.          (Para 96)

A strict liability in tort, private or constitutional does not call for a finding of intent or negligence. In such a case the highest degree of care is expected from private and public bodies, especially when the conduct causes physical injury or harm to persons. In several situations, where officials are dealing with hazardous or explosive substance, the maxim res ipsa loquitur applies.      (Paras 97 and 84)

The question as to whether the law imposes a strict liability on the State and its officials primarily depends upon the purpose and object of the legislation as well. When activities are hazardous and if they are inherently dangerous the statute expects the highest degree of care and if someone is injured because of such activities, the State and its officials are liable even if they could establish that there was no negligence and that it was not intentional. Public safety legislations generally fall in that category of breach of statutory duty by a public authority. To decide whether the breach is actionable, the court must generally


SCC Online Web Edition, Copyright © 2015
Page 13    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

MCD v. UPHAAR TRAGEDY VICTIMS ASSN.                    493

look at the statute and its provisions and determine whether the legislature in its wisdom intended to give rise to a cause of action in damages and whether the claimant is intended to be protected.                                            (Para 97)

*a*

But in a case where life and personal liberty have been violated, the absence of any statutory provision for compensation in the statute is of no consequence. Right to life guaranteed under Article 21 of the Constitution of India is the most sacred right preserved and protected under the Constitution, violation of which is always actionable and there is no necessity of statutory provision as such for preserving that right. Article 21 of the Constitution of India has to be read into all

*b*

public safety statutes, since the prime object of public safety legislation is to protect the individual and to compensate him for the loss suffered. The duty of care expected from the State or its officials functioning under public safety legislation is therefore very high compared to the statutory powers and supervision expected from the officers functioning under the statutes like the Companies Act, the Cooperative Societies Act and such similar legislations.

*c*

When one looks at the various provisions of the Cinematograph Act, 1952 and the Rules made thereunder, the Delhi Building Regulations and the Electricity laws the duty of care on officials was high and the liabilities strict.          (Para 98)

*Devaki Nandan Prasad v. State of Bihar*, (1983) 4 SCC 20 : 1983 SCC (L&S) 495; *Khatri (2) v. State of Bihar*, (1981) 1 SCC 627 : 1981 SCC (Cri) 228; *Rudul Sah v. State of Bihar*, (1983) 4 SCC 141 : 1983 SCC (Cri) 798; *Nilabati Behera v. State of Orissa*, (1993) 2 SCC 746 : 1993 SCC (Cri) 527; *Union of India v. Prabhakaran Vijaya Kumar*,

*d*

(2008) 9 SCC 527 : (2008) 3 SCC (Cri) 813; *Rylands v. Fletcher*, (1868) LR 3 HL 330 : (1861-73) All ER Rep 1 (HL); *Henderson v. Henry E. Jenkins & Sons*, 1970 AC 282 : (1969) 3 WLR 732 : (1969) 3 All ER 756 (HL), *followed*

*Sebastian M. Hongray v. Union of India*, (1984) 3 SCC 82 : 1984 SCC (Cri) 407; *Bhim Singh v. State of J&K*, (1985) 4 SCC 677 : 1986 SCC (Cri) 47; *Saheli v. Commr. of Police*, (1990) 1 SCC 422 : 1990 SCC (Cri) 145; *Inder Singh v. State of Punjab*, (1995) 3 SCC 702 : 1995 SCC (L&S) 857 : (1995) 30 ATC 122 : 1995 SCC (Cri) 586; *Radha Bai*

*e*

v. *UT of Pondicherry*, (1995) 4 SCC 141 : 1995 SCC (L&S) 942 : (1995) 30 ATC 196; *LDA v. M.K. Gupta*, (1994) 1 SCC 243; *Delhi Domestic Working Women's Forum v. Union of India*, (1995) 1 SCC 14 : 1995 SCC (Cri) 7; *Gudalure M.J. Cherian v. Union of India*, 1995 Supp (3) SCC 387 : 1995 SCC (Cri) 925; *Sube Singh v. State of Haryana*, (2006) 3 SCC 178 : (2006) 2 SCC (Cri) 54, *relied on*

*Lloyde v. West Midlands Gas Board*, (1971) 1 WLR 749 : (1971) 2 All ER 1240 (CA), *approved*

*f*

*Anns v. Merton London Borough Council*, 1978 AC 728 : (1977) 2 WLR 1024 : (1977) 2 All ER 492 (HL), *held, overruled*

*State of Rajasthan v. Vidhyawati*, AIR 1962 SC 933; *Kasturi Lal Ralia Ram Jain v. State of U.P.*, AIR 1965 SC 1039 : (1965) 2 Cri LJ 144; *N. Nagendra Rao & Co. v. State of A.P.*, (1994) 6 SCC 205 : 1994 SCC (Cri) 1609; *Donoghue v. Stevenson*, 1932 AC 562 : 1932 All ER Rep 1 (HL); *X (Minors) v. Bedfordshire County Council*, (1995) 2 AC 633 : (1995) 3 WLR 152 : (1995) 3 All ER 353 (HL); *Barrett v. Enfield London Borough*

*g*

*Council*, (2001) 2 AC 550 : (1999) 3 WLR 79 : (1999) 3 All ER 193 (HL); *Phelps v. Hillingdon London Borough Council*, (2001) 2 AC 619 : (2000) 3 WLR 776 : (2000) 4 All ER 504 (HL), *considered*

*Murphy v. Brentwood District Council*, (1991) 1 AC 398 : (1990) 3 WLR 414 : (1990) 2 All ER 908 (HL); *Caparo Industries Plc. v. Dickman*, (1990) 2 AC 605 : (1990) 2 WLR 358 : (1990) 1 All ER 568 (HL); *Associated Provincial Picture Houses Ltd. v. Wednesbury Corpn.*, (1948) 1 KB 223 : (1947) 2 All ER 680 (CA), *referred to*

*h*

U.K. Law Commission Consultation Paper No. 187 (2008); *Negligence, Public Bodies and Ruthlessness*, (2009) 72 Modern Law Review 961-98, *considered*

SCC Online Web Edition, Copyright © 2015
Page 14      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

The need for a comprehensive legislation dealing with the tortious liability of the State and its instrumentalities has been highlighted by the Indian Supreme Court and the academic world on various occasions and it is high time that we develop a sophisticated jurisprudence of public law liability. Due to lack of legislation, the courts dealing with the cases of tortious claims against the State and its officials are not following a uniform pattern while deciding those claims, and this at times leads to undesirable consequences and arbitrary fixation of compensation amount. Rapid changes are taking place all over the world to uphold the rights of citizens against wrongs committed by statutory authorities and local bodies. Despite the concern shown by the Indian Supreme Court, it is unfortunate that no legislation has been enacted to deal with such situations in India. It is hoped that utmost attention would be given by the legislature for bringing in appropriate legislation to deal with claims in public law for violation of fundamental rights guaranteed to the citizens at the hands of the State and its officials.                                                   (Paras 109 and 112)

*Kasturi Lal Ralia Ram Jain* v. *State of U.P.*, AIR 1965 SC 1039 : (1965) 2 Cri LJ 144;
*Anufrijeva* v. *Southwark London Borough Council*, 2004 QB 1124 : (2004) 2 WLR 603 : (2004) 1 All ER 833 (CA), *referred to*

[**Ed.**: The new constitutional law/public law tort of breach of public safety statutory duties crafted herein by Hon'ble Radhakrishnan, J. (classified above as *Constitutional Tort III*), as an independent tort within the larger class of the tort of breach of statutory duty, it is humbly submitted, is not only a landmark development in Indian Public Law, but in Public Law per se, and even in Tort Law. There is indeed a great deal of confusion in all jurisdictions as to when a breach of statutory duty will be actionable in damages in the manner that any other tort is, whether in private law or in public law. However, this new tort crafted by Radhakrishnan, J. has many merits. Firstly, it is most easily identified: one simply has to identify statutory duties which involve public safety, or, public safety legislation. A "public safety duty" is again simply defined as a duty where physical injury or harm is likely to be caused to any section of the public if the duty is not discharged properly and adequately. As soon as a public safety statutory duty or statute is identified, Article 21 of the Constitution has to be read into those public safety statutory provisions/statutes, and a strict liability i.e. a liability which calls for no finding of intent or negligence is immediately fastened on the public authorities/officials who are supposed to discharge those public safety statutory duties.

In the present case, 59 citizens were suffocated to death and 103 injured because of the complete failure of the licensing authority and MCD to discharge their public safety statutory duties, which could have been quite easily discharged. The violations of all applicable public safety norms, and even basic norms of good sense were so flagrantly violated by the theatre owners, that even one visit by a responsible officer from either the licensing authority or MCD would have made it manifestly clear to either authority how dangerous the Uphaar cinema theatre was to public safety.

As far as causation of these deaths and injuries is concerned (since strict liability does still require causation to be established), the acts of omission of the licensing authority and MCD satisfy the "but for" test of causation applied in this very learned judgment to reject the claim for exoneration by the theatre owners: *see* paras 27 and 57 and *Shortnote E*. In fact, it is humbly submitted, all the three factors which contribute to the "but for" causation in respect of the theatre owners are equally attributable to the acts of omission of the licensing

SCC Online Web Edition, Copyright © 2015
Page 15      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

authority and MCD. Had either the licensing authority or MCD made even one honest visit to Uphaar Cinema Theatre, the illegal parking in the stilt floor would not have persisted; the parapet wall raised to the ceiling in the stilt parking area would not have persisted; and most glaringly, the fact that the balcony had only one exit would not have persisted *but for* their acts of omission. In fact, it is recorded by Hon'ble Raveendran, J. in para 56 that:

> "... performance of duties by the licensing authority and by MCD was mechanical, casual and lackadaisical. There is tendency on the part of these authorities to deal with files coming before them as requiring mere paperwork to dispose them. They fail to recognise the object of the law or rules, the reason why they are required to do certain acts and the consequences of non-application of mind or mechanical disposal of the application/requests which come to them ... there is a lack of safety culture and lack of the will to improve performance. The compliance with the procedure and rules is mechanical."

It is humbly submitted that such complete failure to discharge public safety statutory duties must sound in damages against the public authorities concerned which then must necessarily be made recoverable personally from the public officials who were in harness at the time, either from their salaries or their pensions, if they have retired. Otherwise how else will a "safety culture" ever come into existence amongst Indian public officials? Wherefrom will come "the will to improve performance"? How will an accountability standard be established?

If her sentinel on the qui vive will not monetarily punish apathetic mechanical file-pushing public servants, and hold them accountable, to whom will the Indian citizen turn?

After all, public servants in India enjoy constitutionally protected privileges, rights and extremely generous pension rights as compared to the ordinary citizenry which pays the taxes which fund these rights and privileges of public servants and authorities. Even though there are rulings to the effect that if a State authority is found liable for damages/costs, then the same *can* be recovered personally from the officials concerned, yet the time has come where *Constitutional Torts III* are involved, to make it the rule *in every such case* that the damages will be mandatorily recovered personally from the public servants concerned. *See especially* in this regard *Arvinder Singh Bagga* v. *State of U.P.*, (1994) 6 SCC 565 : 1995 SCC (Cri) 29 and *Mehmood Nayyar Azam* v. *State of Chhattisgarh*, (2012) 8 SCC 1 : (2012) 2 SCC (L&S) 449 : (2012) 3 SCC (Cri) 733 wherein compensation was awarded against the State for infraction of Article 21 of the Constitution and directed to be recovered personally from the officials concerned.

See also *LDA* v. *M.K. Gupta*, (1994) 1 SCC 243 (which is the locus classicus on the issue of recoverability personally from public officials concerned) and *GDA* v. *Balbir Singh*, (2004) 5 SCC 65, wherein compensation was directed for misfeasance in public office and directed to be recovered personally from the officials concerned. See also *HUDA* v. *Darsh Kumar*, (2005) 9 SCC 449; *HUDA* v. *K.C. Kad*, (2005) 9 SCC 469; *HUDA* v. *Nirmal Mittal*, (2005) 9 SCC 473; *HUDA* v. *Rekha Sharma*, (2005) 9 SCC 457; *HUDA* v. *Seema Handa*, (2005) 9 SCC 494; *HUDA* v. *Vijay Aggarwal*, (2005) 9 SCC 446; *Keshav Baljee* v. *Bangalore Development Authority*, (2010) 14 SCC 398; *Maninderjit Singh Bitta* v. *Union of India*, (2012) 4 SCC 568; *Maninderjit Singh Bitta* v. *Union of India*, (2011) 11 SCC 315; *Central Coop. Consumers' Store Ltd.* v. *Labour Court, H.P.*, (1993) 3 SCC 214 : 1993 SCC (L&S) 748 : (1993) 24 ATC 773; *Commr. of*

*Customs (Port)* v. *Cosmo Steel (P) Ltd.*, (2007) 15 SCC 619; *Punjab & Haryana High Court Bar Assn.* v. *State of Punjab*, (1996) 4 SCC 742; *Research Foundation for Science* v. *Union of India*, (2005) 13 SCC 659; *State of A.P.* v. *Food Corpn. of India*, (2004) 13 SCC 53 : 2006 SCC (L&S) 873; *Dayal Singh* v. *State of Uttaranchal*, (2012) 8 SCC 263 : (2012) 2 SCC (L&S) 583 : (2012) 3 SCC (Cri) 838; *Common Cause* v. *Union of India*, (1996) 6 SCC 530; *Shivsagar Tiwari* v. *Union of India*, (1996) 6 SCC 558; *Common Cause* v. *Union of India*, (1999) 6 SCC 667 : 1999 SCC (Cri) 1196. In all these cases compensation/costs were awarded against the State and the same were directed to be recovered personally from the officials concerned. *See also* Art. 136, '*(i)*(2) Public officials — Personal liability for costs imposed for abuse of process' p. 852 et seq. in **Vol. 8**, Complete Digest of Supreme Court Cases, 2nd Edn.]

**H. Constitution of India — Arts. 21, 226, 32, 136 and 142 — Compensation in public law for breach of fundamental rights i.e. for constitutional torts — Relevant factors and quantum of compensation that may be awarded — Compensation in public law remedy, held (*per curiam*), need not be merely palliative, it can be monetary amount for wrong done, albeit excluding any amount recoverable in civil action for tortious liability — Exemplary damages so as to have deterrent effect, held, are also permissible — But, compensation awarded in respect of large group of deceased persons, as distinct from single individual, in public law remedy should not be based on any assumptive high income but should be a uniform amount reserving liberty to claimants to approach civil court to claim additional amount — Compensation granted in public law remedy (but not any ex gratia payment) would then be adjustable against amount to be awarded by civil court**

**— Absence of proper yardstick or statutory formula for assessing compensation and resultant absence of uniformity — Impropriety of strictly applying principles of compensation formulated for ordinary or private law torts — Held *per Radhakrishnan, J.*, constitutional courts invoke their extraordinary jurisdiction in exceptional cases where violation of fundamental rights, particularly right to life or personal liberty, is very serious — Courts have to devise their own methodology to assess compensation in a given case — Need stressed for standardising approach to be adopted uniformly in all cases — Need for legislation — Reiterating concern already shown by Supreme Court, hope and trust expressed that appropriate law would be made for the said purpose**

**— On facts held, it was unrealistic to presume for purpose of compensation that every purchaser of cinema ticket for balcony was a person belonging to high income group — Hence, keeping in view facts and circumstances of case and also the need to provide deterrent, compensation of Rs 18 lakhs for each deceased aged above 20 yrs and Rs 15 lakhs for the rest awarded by High Court reduced to Rs 10 lakhs and Rs 7.5 lakhs respectively — Award of Rs 1 lakh to each injured, by High Court, upheld — Award of interest @ 9% p.a. from date of filing of writ petition, upheld**

SCC Online Web Edition, Copyright © 2015
Page 17     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*a*
— Victims or LRs of victims, granted liberty to resort to remedy of suit, if not satisfied with compensation awarded herein — However, in special facts and circumstances of the present case, and in order to do complete justice, LRs of deceased, permitted instead, to approach Registrar General, High Court for decision in the manner specified, in accordance with the principle laid down in *Sarla Verma*, (2009) 6 SCC 121 — Words and Phrases — "Constitutional torts" — Public Law — Constitutional torts

*b*
I. **Constitution of India — Arts. 21, 226 and 136 — Compensation in public law — Award of interest — Interest @ 9% p.a. from date of filing of writ petition to date of payment as awarded by High Court, upheld**

*c*
J. **Constitution of India — Arts. 21, 226, 32, 142 and 136 — Compensation in public law for breach of fundamental rights i.e. for constitutional torts — Death of victims — Assessment of compensation — Relevant factors: (1) deceased's age, (2) his income, and (3) number of dependants (in order to deduct personal expenses of deceased) — Flat deduction of one-third in case of a large group consisting of 59 persons dying in a cinema hall tragedy — Held, compensation could be determined on the basis of first two factors, after applying flat deduction — Amount of compensation to be arrived at, by applying multiplier to annual loss of dependency as per principle laid down in *Sarla Verma*, (2009) 6 SCC 121**

*d*

*e*
K. **Constitution of India — Arts. 21, 226, 32, 142 and 136 — Compensation in public law for breach of fundamental rights i.e. for constitutional torts — Supreme Court's power to do complete justice by passing any decree or order — Direction issued to High Court for summary determination of compensation, instead of requiring claimants to approach civil court having monetary jurisdiction — Held, summary determination is possible in death cases whereas in injury cases principles for determination are different and detailed enquiry is required through civil suit — Appropriate compensation by way of public law remedy awarded in a case where 59 persons died and 103 were injured due to fire in a cinema theatre premises — Liberty given to affected persons to seek additional**

*f*
**compensation by filing civil suit if they so desire — However, in death cases, litigants saved from prolonged litigation by directing High Court to decide additional compensation in summary determination**

*Held* :

### Per Raveendran, J.

*g*
What can be awarded as compensation by way of public law remedy need not only be a nominal palliative amount, but something more. It can be by way of awarding monetary amounts for the wrong done or by way of exemplary damages, exclusive of any amount recoverable in a civil action based on tortious liability.                                                          (Para 64)

*h*
*Rudul Sah* v. *State of Bihar*, (1983) 4 SCC 141 : 1983 SCC (Cri) 798; *Nilabati Behera* v. *State of Orissa*, (1993) 2 SCC 746 : 1993 SCC (Cri) 527; *Sube Singh* v. *State of Haryana*, (2006) 3 SCC 178 : (2006) 2 SCC (Cri) 54, *followed*

SCC Online Web Edition, Copyright © 2015
Page 18 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------

498                          SUPREME COURT CASES                    (2011) 14 SCC

But in the present case it is improper to assume without any basis, that every person who visits a cinema theatre and purchases a balcony ticket would be a high income group person. In the year 1997, Rs 15,000 per month as assumed by the High Court, was rather a high income. The movie which was playing when the present tragedy occurred was a new movie with patriotic undertones. It is known that zealous movie-goers, even from low income groups, would not mind purchasing a balcony ticket to enjoy the film on the first day itself. To make a sweeping assumption that every person who purchased a balcony class ticket in 1997 should have had a monthly income of Rs 15,000 and on that basis apply a high multiplier of 15 to determine the compensation at a uniform rate of Rs 18 lakhs in the case of persons above the age of 20 years and Rs 15 lakhs for persons below that age as a public law remedy may not be proper.          (Para 64)

While awarding compensation to a large group of persons by way of public law remedy it will be unsafe to use a high income as the determinative factor. The proper course would be to award a uniform amount keeping in view the principles relating to the award of compensation in public law remedy cases while reserving liberty to the legal heirs of the deceased victims to claim an additional amount in duly constituted proceedings wherever they were not satisfied with the amount awarded. Taking note of the facts and circumstances, the amount of compensation awarded in public law remedy cases and the need to provide a deterrent, the award of Rs 10 lakhs in the case of persons aged above 20 years and Rs 7.5 lakhs in regard to those who were 20 years or below who died as on the date of the incident, would be appropriate. The award of Rs 1 lakh each in the case of injured persons however, is not disturbed. The amount awarded as compensation will carry interest at the rate of 9% per annum from the date of the writ petition as ordered by the High Court, and liberty is reserved to the victims or the LRs of the victims as the case may be to seek higher compensation wherever they are not satisfied with the compensation. Any increase in compensation that is awarded in such other duly constituted proceedings shall be borne by the licensee (theatre owner) exclusively.
[Paras 65 and 76.5(*a*) to (*c*)]

While disbursing the compensation amount, any ex gratia payment made by the Central Government/Delhi Government shall not be taken into account.
[Para 76.5(*f*)]

*Nilabati Behera v. State of Orissa*, (1993) 2 SCC 746 : 1993 SCC (Cri) 527, *distinguished on facts*

Having regard to the special facts and circumstances of the case it is proposed to do complete justice. The calamity resulted in the death of 59 persons and injury to 103 persons. The matter related to a ghastly fire incident of 1997. The respondent Victims' Association has been fighting the cause of victims for more than 14 years. If at this stage, the victims are required to individually approach the civil court and claim compensation, it will cause hardship, apart from involving huge delay, as the matter will be fought in a hierarchy of courts. The incident is not disputed. The names and identity of the 59 persons who died and 103 persons who were injured are available and is not disputed.          (Para 66)


SCC Online Web Edition, Copyright © 2015
Page 19      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

Insofar as death cases are concerned the principle of determining compensation is streamlined by several decisions of the Supreme Court. If three factors are available the compensation can be determined. The first is the age of the deceased, the second is the income of the deceased and the third is number of dependants (to determine the percentage of deduction for personal expenses). For convenience the third factor can also be excluded by adopting a standard deduction of one-third towards personal expenses. Therefore just two factors are required to be ascertained to determine the compensation in 59 individual cases. First is the annual income of the deceased, two-thirds of which becomes the annual loss of dependency and second the age of the deceased which will furnish the multiplier in terms of *Sarla Verma case*. The annual loss of dependency multiplied by the multiplier will give the compensation.                    (Para 67)

*Sarla Verma v. DTC*, (2009) 6 SCC 121 : (2009) 2 SCC (Cri) 1002 : (2009) 2 SCC (Civ) 770, *applied*

As this is a comparatively simple exercise the Registrar General of the Delhi High Court is directed to receive applications in regard to death cases, from the claimants (legal heirs of the deceased) who want a compensation in excess of what has been awarded, that is, Rs 10 lakhs/Rs 7.5 lakhs. Such applications should be filed within three months from today. He shall hold a summary inquiry and determine the compensation. Any amount awarded in excess of what is hereby awarded as compensation shall be borne exclusively by the theatre owner. To expedite the process the claimants concerned and the theatre owner with their respective counsel shall appear before the Registrar without further notice. For this purpose the claimants and the theatre owner may appear before the Registrar on 10-1-2012 and take further orders in the matter. The hearing and determination of compensation may be assigned to any Registrar or other Senior Judge nominated by the learned Chief Justice/Acting Chief Justice of the Delhi High Court. As far as the injured are concerned if they are not satisfied with the sum of Rs 1 lakh which has been awarded it is open to them to approach the civil court for claiming higher compensation and if they do so within 3 months from today, the same shall be entertained and disposed of in accordance with law. It is not possible to refer the injury cases for summary determination like death cases, as the principles are different and determination may require a more detailed enquiry.                    [Paras 67, 68 and 76.5(*d*) & (*e*)]

***Per Radhakrishnan, J.***

A constitutional court can award monetary compensation against the State and its officials for its failure to safeguard fundamental rights of citizens but there is no system or method to measure the damages caused in such situations. Quite often the courts have a difficult task in determining damages in various fact situations. The yardsticks normally adopted for determining the compensation payable in private tort claims are not as such applicable when a constitutional court determines the compensation in cases where there is violation of fundamental rights guaranteed to its citizens.                    (Para 99)

There is no straitjacket formula for computation of damages and there is no uniformity or yardstick followed in awarding damages for violation of fundamental rights. Various expressions have been used by the Supreme Court in


SCC Online Web Edition, Copyright © 2015
Page 20      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

this regard. In one case the terminology used was "palliative" for measuring the damages and the formula of "ad hoc" was applied. In another case the expression used for determining the monetary compensation was "exemplary" costs and the formula adopted was "punitive". In another case, the expression used was "compensation" and the method adopted was "tortious formula". In yet another case the expression used was "monetary compensation". The formula adopted was "cost to cost" method. Courts have not therefore adopted a uniform criterion since no statutory formula has been laid down.                    (Para 100)

Constitutional courts all over the world have to overcome these hurdles. Failure to precisely articulate and carefully evaluate a uniform policy as against the State and its officials would at times tend the court to adopt rules which are applicable in a private law remedy for which courts and statutes have evolved various methods, such as loss of earnings, impairment of future earning capacity, medical expenses, mental and physical suffering, property damage, etc. Adoption of those methods as such in computing the damages for constitutional torts may not be proper.                    (Para 101)

Legal liability in damages exists solely as a remedy in a private law action in tort which is generally time-consuming and expensive, and hence when fundamental rights are violated the claimants prefer to approach constitutional courts for speedy remedy. The constitutional courts, of course, shall invoke their jurisdiction only in extraordinary circumstances when serious injury has been caused due to violation of fundamental rights, especially under Article 21 of the Constitution of India. In such circumstances the Court can invoke its own methods to determine the quantum of compensation to be awarded depending upon the facts and circumstances of each case.                    (Para 103)

*D.K. Basu* v. *State of W.B.*, (1997) 1 SCC 416 : 1997 SCC (Cri) 92, *relied on*

*Rudul Sah* v. *State of Bihar*, (1983) 4 SCC 141 : 1983 SCC (Cri) 798; *Sebastian M. Hongray* v. *Union of India*, (1984) 3 SCC 82 : 1984 SCC (Cri) 407; *Bhim Singh* v. *State of J&K*, (1985) 4 SCC 677 : 1986 SCC (Cri) 47; *Delhi Domestic Working Women's Forum* v. *Union of India*, (1995) 1 SCC 14 : 1995 SCC (Cri) 7, *referred to*

**L. Constitution of India — Arts. 226, 32, 136 and 21 — Compensation/ Damages — Restitution as punitive measure — Disgorgement of gains/ profits of wrongdoer — Restitution by recovering income illegally earned by tortfeasor — Imposition of damages on basis of actual income or profits earned — Theatre owner illegally installing additional seats in balcony thereby obstructing quick escape of cinema-viewers in case of any mishappening — 59 viewers dying and 103 injured due to fire breaking out in theatre premises — Installation of additional seats resulting in closing of one exit and narrowing of gangway/aisle, was one of major causes due to which viewers could not quickly come out of balcony — High Court's order denying to theatre owners profits of illegally installed seats, held, really not punitive but restitutionary — Said order upheld, but, on basis of average income per seat with average 50% of occupancy of the number of such seats for the entire relevant period, punitive damages of Rs 2.5 crores, reduced to Rs 25 lakhs — Tort Law — Compensation/Damages — Restitutionary damages — Restitution — Disgorgement of gains of wrongdoer**

SCC Online Web Edition, Copyright © 2015
Page 21      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

*a*   M. **Constitution of India — Arts. 21, 226, 32, 142 and 136 — Compensation in public law for breach of fundamental rights i.e. for constitutional torts — Compensatory and punitive damages — Different purposes — Compensating victim, held, *per Radhakrishnan, J.,* is main purpose of former while deterrence is function of latter**

*b*   N. **Constitution of India — Arts. 21, 226, 32, 142 and 136 — Compensation in public law for breach of fundamental rights i.e. for constitutional torts — Punitive damages — Relevant factors, held, *per Radhakrishnan, J.,* are: (1) contumacious conduct, (2) nature of statute, (3) gravity of wrong, (4) wanton disregard of safety requirements, (5) shocking or outrageous conduct, etc. — Practice followed in US also indicated — Further held, there must be direct nexus between wrongdoing and injury**

*c*   O. **Restitution — Restitutionary damages — Quantification of — Disgorgement of gains/profits of wrongdoer — Need for realistic assessment of**

*Held* :

   **Per Raveendran, J.**

*d*   The High Court has stated that the theatre owners should be made liable to pay punitive damages to the extent of profit which it would have earned by selling tickets in regard to extra seats unauthorisedly and illegally sanctioned by the authorities and installed by the theatre owner.                    (Para 69)

*e*   All the 52 additional seats cannot be held to be illegal as their continuance was permitted by the High Court. What were illegal seats were the 15 seats that were added by securing an order dated 4-10-1980. The remaining 37 seats were found to be valid by the authorities. Therefore, if at all the theatre owner is to be made liable to reimburse the profits earned from illegal seats, it should be only in regard to these 15 seats and the eight seats in the Owner's Box which was the cause for closing one of the exits. The High Court also wrongly assumed that the ticket value to be Rs 50 from 1979 to 1996, because it was Rs 50 in the year 1997 for a balcony seat. Another erroneous assumption made is that for all shows on all the days, all these additional seats would be fully occupied. On a realistic

*f*   assessment, (at a net average income of Rs 12 per seat with average 50% occupancy for 23 seats) the profits earned from these seats for 17 years would at best be Rs 25,00,000.                    (Para 70)

*g*   What has been awarded by the High Court is not exactly punitive damages with reference to the magnitude or capacity of the enterprise. All that the High Court pointed out was that the theatre owner has installed additional seats illegally. That illegality contributed to the cause for the death and injuries, as they slowed down the exiting of the occupant's balcony. If people could have got out faster (which they could have if the gangway was wider as before, and if there had been two exits as before, instead of only one) many would not have died of asphyxiation. Therefore the theatre owner is not only liable to pay compensation for the death and injuries, but should, in the least be denied the

*h*   profits/benefits out of their illegal acts. In that sense it is not really punitive, but a kind of negative restitution. Therefore, the liability of the theatre owner to return

SCC Online Web Edition, Copyright © 2015
Page 22    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------

and reimburse the profits from the illegally installed seats is upheld in principle, but the same is reduced from Rs 2.5 crores to Rs 25 lakhs. The award of the said sum, as additional punitive damages, covers two aspects. The first is because the wrongdoing is outrageous, in utter disregard of the safety of the patrons of the theatre. The second is the gravity of the breach requiring a deterrent to prevent similar further breaches.                                [Paras 72 and 76.5(*h*)]

> *M.C. Mehta* v. *Union of India*, (1987) 1 SCC 395 : 1987 SCC (L&S) 37, *relied on*
> *Rylands* v. *Fletcher*, (1868) LR 3 HL 330 : (1861-73) All ER Rep 1 (HL), *cited*

**Per Radhakrishnan, J.**

Constitutional courts' actions not only strive to compensate the victims and vindicate their constitutional rights, but also to deter future constitutional misconduct without proper excuse or with some collateral or improper motive. The constitutional courts can in appropriate cases of serious violation of life and liberty of the individuals award punitive damages. However, the same generally requires the presence of malicious intent on the side of the wrongdoer i.e. an intentional doing of some wrongful act.                          (Para 104)

Compensatory damages are intended to provide the claimant with a monetary amount necessary to recoup/replace what was lost, since damages in tort are generally awarded to place the claimants in the position he would have been in, had the tort not taken place; which are generally quantified under the heads of general damages and special damages. Punitive damages are intended to reform or to deter the wrongdoer from indulging in conduct similar to that which formed the basis for the claim. Punitive damages are awarded when the wrongdoer's conduct was egregiously deceitful.                          (Para 105)

Several factors may be involved in determining the punitive damages such as contumacious conduct of the wrongdoer, the nature of the statute, gravity of the fault committed, the circumstances, etc. Punitive damages can be awarded when the wrongdoers' conduct "shocks the conscience" or is "outrageous" or there is a wilful and "wanton disregard" for safety requirements. Normally, there must be a direct connection between the wrongdoer's conduct and the victim's injury.
                                                                (Para 108)

> *Rookes* v. *Barnard*, 1964 AC 1129 : (1964) 2 WLR 269 : (1964) 1 All ER 367 (HL);
> *Attorney General* v. *Blake*, (2001) 1 AC 268 : (2000) 3 WLR 625 : (2004) 4 All ER 385
> (HL); *BMW of North America Inc.* v. *Gore*, 134 L Ed 2d 809 : 517 US 559 (1996); *Philip
> Morris USA* v. *Williams*, 166 L Ed 2d 940 : 549 US 346 (2007), *considered*

**P. Constitution of India — Art. 21 — Preventive measures against fire at public places — Need for prompt disaster management — Suggestions given to Government for consideration and implementation in the light of lessons learnt from Uphaar Cinema Tragedy of 13-6-1997 in Delhi — Alertness and preparedness at all times, even in "non-disaster periods", held, are key to efficient disaster management — Tort Law — Disaster Management Act, 2005, S. 1(3)**                                           **(Para 74)**

**Q. Tort Law — Disaster Management Act, 2005 — S. 1 and Statement of Object and Reasons — Necessity of prompt enforcement of all provisions of the Act, emphasised**                                           **(Para 73)**


SCC Online Web Edition, Copyright © 2015
Page 23      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

R. **Entertainment, Amusement and Leisure — Cinemas — Cinema theatres — Fire accidents — Safety measures against — Supreme Court's suggestions to Government for consideration**                **(Para 75)**

D-H-K-M/48860/SVRL

Advocates who appeared in this case :

P.P. Malhotra and Ms Indira Jaising, Additional Solicitors General, A.K. Ganguli, K.T.S. Tulsi, Brijender Chahar and R.S. Suri, Senior Advocates [Sanjib Sen, Praveen Swarup, Ms Anuja Chopra, Rajan Narain, Jayant K. Mehta, Ravinder Singh, Maheen Pradhan, Sandeep Phogat, Prem Malhotra, Mukul Gupta, Vishnu B. Saharya (for M/s Saharya & Co.), Vinay Garg, Shailendra Sharma, Ms Asha G. Nair, Ms Anil Katiyar, S.N. Terdal, Ms Jyoti Chahar, Ms Rekha Pandey, Ms Sushma Suri, D.S. Mahra, Apoorve Karal, Chaitanya, Manu Sharma, Debesh Panda, C.K. Ganguli, K.S. Prasad, Sanjeev Kr. Dubey, Jamal Akhtar, Chetan Chawla, Gaurav Sharma and Vanshdeep Dalmia, Advocates] for the appearing parties.

*Chronological list of cases cited*                                *on page(s)*

1. (2009) 6 SCC 121 : (2009) 2 SCC (Cri) 1002 : (2009) 2 SCC (Civ) 770, *Sarla Verma* v. *DTC*                                531*b-c*, 531*d*

2. (2008) 9 SCC 527 : (2008) 3 SCC (Cri) 813, *Union of India* v. *Prabhakaran Vijaya Kumar*                                543*d-e*, 543*e*

3. 2008 SCC 42 : (2008) 2 SCR 551 (Can SC), *Holland* v. *Saskatchewan*                                525*c-d*

4. 166 L Ed 2d 940 : 549 US 346 (2007), *Philip Morris USA* v. *Williams*                                546*f*

5. (2006) 3 SCC 178 : (2006) 2 SCC (Cri) 54, *Sube Singh* v. *State of Haryana*                                529*f-g*, 542*d-e*

6. 2004 QB 1124 : (2004) 2 WLR 603 : (2004) 1 All ER 833 (CA), *Anufrijeva* v. *Southwark London Borough Council*                                547*d-e*

7. 2003 ACJ 1631 (Del) : (2003) 104 DLT 234, *Assn. of Victims of Uphaar Tragedy* v. *Union of India* **(partly reversed)**                                505*a*, 510*f*, 516*d-e*, 528*d-e*, 536*e*, 536*f*

8. (2002) 7 SCC 478, *Rabindra Nath Ghosal* v. *University of Calcutta*                                523*d*

9. (2001) 2 AC 619 : (2000) 3 WLR 776 : (2000) 4 All ER 504 (HL), *Phelps* v. *Hillingdon London Borough Council*                                540*f*, 541*b*

10. (2001) 2 AC 550 : (1999) 3 WLR 79 : (1999) 3 All ER 193 (HL), *Barrett* v. *Enfield London Borough Council*                                540*d*, 540*f*, 541*b*

11. (2001) 1 AC 268 : (2000) 3 WLR 625 : (2004) 4 All ER 385 (HL), *Attorney General* v. *Blake*                                546*c-d*

12. (1997) 9 SCC 552, *Rajkot Municipal Corpn.* v. *Manjulben Jayantilal Nakum*                                524*a*

13. (1997) 8 SCC 683, *Union of India* v. *United India Insurance Co. Ltd.*                                525*e*

14. (1997) 1 SCC 416 : 1997 SCC (Cri) 92, *D.K. Basu* v. *State of W.B.*                                544*f*, 544*g-h*

15. 134 L Ed 2d 809 : 517 US 559 (1996), *BMW of North America Inc.* v. *Gore*                                546*e-f*

16. (1995) 4 SCC 141 : 1995 SCC (L&S) 942 : (1995) 30 ATC 196, *Radha Bai* v. *UT of Pondicherry*                                542*d-e*

17. (1995) 3 SCC 702 : 1995 SCC (L&S) 857 : (1995) 30 ATC 122 : 1995 SCC (Cri) 586, *Inder Singh* v. *State of Punjab*                                542*d*

18. 1995 Supp (3) SCC 387 : 1995 SCC (Cri) 925, *Gudalure M.J. Cherian* v. *Union of India*                                542*d-e*

SCC Online Web Edition, Copyright © 2015
Page 24      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------

504                    SUPREME COURT CASES                (2011) 14 SCC

19. (1995) 2 AC 633 : (1995) 3 WLR 152 : (1995) 3 All ER 353 (HL), *X
     (Minors)* v. *Bedfordshire County Council*          524*d-e*, 524*e-f*, 540*c*

20. (1995) 1 SCC 14 : 1995 SCC (Cri) 7, *Delhi Domestic Working Women's
     Forum* v. *Union of India*                          542*d-e*, 545*c*

21. (1994) 6 SCC 205 : 1994 SCC (Cri) 1609, *N. Nagendra Rao & Co.* v. *State
     of A.P.*                                             538*g-h*, 539*d-e*

22. (1994) 1 SCC 243, *LDA* v. *M.K. Gupta*              542*d-e*

23. (1993) 2 SCC 746 : 1993 SCC (Cri) 527, *Nilabati Behera* v. *State of
     Orissa*                                             529*c-d*, 530*e*, 542*e*

24. (1992) 1 AC 58 : (1991) 3 WLR 340 : (1991) 3 All ER 733 (HL), *R.* v.
     *Governor of Parkhurst Prison, ex p Hague*           524*f-g*

25. (1991) 1 AC 398 : (1990) 3 WLR 414 : (1990) 2 All ER 908 (HL), *Murphy*
     v. *Brentwood District Council*                      526*a*, 540*a-b*

26. (1990) 2 AC 605 : (1990) 2 WLR 358 : (1990) 1 All ER 568 (HL), *Caparo
     Industries Plc.* v. *Dickman*                        540*b-c*, 541*f*

27. (1990) 1 SCC 422 : 1990 SCC (Cri) 145, *Saheli* v. *Commr. of Police*     542*d*

28. (1989) 2 SCR 1228 (Can SC), *Just* v. *British Columbia*          525*a*

29. (1987) 1 SCC 395 : 1987 SCC (L&S) 37, *M.C. Mehta* v. *Union of India*     532*g*

30. (1985) 4 SCC 677 : 1986 SCC (Cri) 47, *Bhim Singh* v. *State of J&K*     542*d*, 544*g-h*

31. (1984) 3 SCC 82 : 1984 SCC (Cri) 407, *Sebastian M. Hongray* v. *Union of
     India*                                               542*d*, 544*g*

32. (1983) 4 SCC 141 : 1983 SCC (Cri) 798, *Rudul Sah* v. *State of Bihar*     529*a-b*,
                                                          542*b*, 544*f-g*

33. (1983) 4 SCC 20 : 1983 SCC (L&S) 495, *Devaki Nandan Prasad* v. *State of
     Bihar*                                               542*a*

34. (1983) 1 SCR 205 (Can SC), *R. (Can.)* v. *Saskatchewan Wheat Pool*     525*d*

35. (1981) 1 SCC 627 : 1981 SCC (Cri) 228, *Khatri (2)* v. *State of Bihar*     542*b*

36. AIR 1980 Del 147, *Isherdas Sahni & Bros.* v. *Delhi Admn.*     514*b*, 514*c-d*, 515*a-b*

37. 1978 AC 728 : (1977) 2 WLR 1024 : (1977) 2 All ER 492 (HL), *Anns* v.
     *Merton London Borough Council* (**held, overruled**)     525*f*, 525*f-g*, 526*a*,
                                                          526*c-d*, 540*a-b*, 540*b*

38. (1971) 1 WLR 749 : (1971) 2 All ER 1240 (CA), *Lloyde* v. *West Midlands
     Gas Board*                                           539*g*

39. 1970 AC 282 : (1969) 3 WLR 732 : (1969) 3 All ER 756 (HL), *Henderson*
     v. *Henry E. Jenkins & Sons*                         539*g*

40. AIR 1965 SC 1039 : (1965) 2 Cri LJ 144, *Kasturi Lal Ralia Ram Jain* v.
     *State of U.P.*                                      538*f-g*, 538*g-h*, 539*e-f*, 547*c-d*

41. 1964 AC 1129 : (1964) 2 WLR 269 : (1964) 1 All ER 367 (HL), *Rookes* v.
     *Barnard*                                            546*b-c*

42. AIR 1962 SC 933, *State of Rajasthan* v. *Vidhyawati*          538*f-g*

43. (1948) 1 KB 223 : (1947) 2 All ER 680 (CA), *Associated Provincial
     Picture Houses Ltd.* v. *Wednesbury Corpn.*          540*d*, 540*e-f*

44. 1941 AC 74 : (1940) 4 All ER 527 (HL), *East Suffolk Rivers Catchment
     Board* v. *Kent*                                     525*e*

45. 1932 AC 562 : 1932 All ER Rep 1 (HL), *Donoghue* v. *Stevenson*     539*f-g*, 540*a*

46. (1878) 3 App Cas 430 (HL), *Geddis* v. *Bann Reservoir Proprietors*     524*c-d*

47. (1868) LR 3 HL 330 : (1861-73) All ER Rep 1 (HL), *Rylands* v. *Fletcher*     533*d-e*,
                                                          534*c*, 539*f-g*



SCC Online Web Edition, Copyright © 2015
Page 25      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

The Judgments* of the Court were delivered by

a   **R.V. RAVEENDRAN, J.**— These appeals are filed against the judgment dated 24-4-2003[1] of a Division Bench of the Delhi High Court in the Uphaar Cinema tragedy. CAs Nos. 7114-15 of 2003 is filed by Municipal Corporation of Delhi (for short "MCD"). CA No. 7116 of 2003 is filed by the licensing authority (Commissioner of Police). CA No. 6748 of 2004 is filed by M/s Ansal Theatre and Clubotels (P) Ltd., the owners of Uphaar Cinema Theatre (for short "the theatre owner" or "the licensee").

b   **2.** These appeals relate to the fire at Uphaar Cinema Theatre in Green Park, South Delhi on 13-6-1997, resulting in the death of 59 patrons and injury to 103 patrons. During the matinee show of a newly released film on 13-6-1997, the patrons of the cinema hall, which was full, were engrossed in the film. Shortly after the interval, a transformer of Delhi Vidyut Board installed in the ground floor parking area of Uphaar Cinema, caught fire. The

c   oil from the transformer leaked and found its way to the passage outside where many cars were parked. Two cars were parked immediately adjoining the entrance of the transformer room. The burning oil spread the fire to nearby cars and from there to the other parked cars.

**3.** The burning of (*i*) the transformer oil, (*ii*) the diesel and petrol from

d   the parked vehicles, (*iii*) the upholstery material, paint and other chemicals of the vehicles, and (*iv*) foam and other articles stored in the said parking area generated a huge quantity of fumes and smoke which consisted of carbon monoxide and several poisonous gases. As the ground floor parking was covered all round by walls, and the air was blowing in from the entry and exit points, the smoke and noxious fumes/smoke could not find its way out into

e   the open atmosphere and was blown towards the staircase leading to the balcony exit. On account of the chimney effect, the smoke travelled up. Smoke also travelled to the air conditioner ducts and was sucked in and released into the auditorium. The smoke and the noxious fumes stagnated in the upper reaches of the auditorium, particularly in the balcony area. By then the electricity went off and the exit signs were also not operating or visible.

f   **4.** The patrons in the balcony who were affected by the fumes, were groping in the dark to get out. The central gangway in the balcony that led to the entrance foyer could have been an effective and easy exit, but it was closed and bolted from outside, as that door was used only for entry into the balcony from the foyer. The patrons therefore groped towards the only exit situated on the left side top corner of the balcony. The staircase outside the balcony exit which was the only way out was also full of noxious

g   fumes and smoke. They could not get out of the staircase into the foyer as the door was closed and locked. This resulted in death of 59 persons in the

---

*   **Ed.:** Radhakrishnan, J. partly disagreeing with Raveendran, J. In the certified copy the opinions of Raveendran, J. (pp. 1-63) and Radhakrishnan, J. (pp. 64-82) have been printed sequentially though with independent para numbering, and the signatures of both the learned Judges appear

h       only once at the end on p. 82.

1   *Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234

SCC Online Web Edition, Copyright © 2015
Page 26     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------

balcony and stairwell due to asphyxiation by inhaling the noxious fumes/ smoke. 103 patrons were also injured in trying to get out.

**5.** The first respondent is an association of the victims of Uphaar Tragedy *a* (for short "the Victims Association" or "the Association"). The members of the Association are either those who were injured in the fire or are relatives/legal heirs of those who were killed in the fire. The Association filed a writ petition before the Delhi High Court. They highlighted the shocking state of affairs existing in the cinema building at the time of the incident and the inadequate safety arrangements made by the owners. They described the *b* several violations by the owners of the statutory obligations placed on theatre owners under law for prevention of fire hazards in public places. They highlighted the acts of omission and commission by the public authorities concerned, namely, Delhi Vidyut Board ("the DVB", for short), MCD, Delhi Fire Force and the licensing authority. They alleged that these authorities not only failed in discharge of their statutory obligations, but acted in a manner *c* which was prejudicial to the public interest by failing to observe the standards set under the statute and the rules framed for the purpose of preventing fire hazards; that they issued licences and permits in complete disregard of the mandatory conditions of inspection which were required to ensure that the minimum safeguards were provided in the cinema theatre. They pointed out that most of the cinema theatres were and are being *d* permitted to run without any proper inspection and many a time without the required licences, permissions and clearances. They therefore sought adequate compensation for the victims of the tragedy and punitive damages against the theatre owner, the DVB, MCD, Delhi Fire Force and the licensing authority for showing callous disregard to their statutory obligations and to the fundamental and indefeasible rights guaranteed under Article 21 of the *e* Constitution of India of the theatre-going public, in failing to provide safe premises, free from reasonably foreseeable hazards.

**6.** They claimed compensation and other reliefs as under:

(*a*) award damages of Rs 11.8 crores against the respondents, jointly and severally, to the legal heirs of the victims who lost their lives (listed in Annexure B of the writ petition) through the Association with the direction to equally distribute the same to the first degree heirs of all the *f* victims;

(*b*) award damages of Rs 10.3 crores against the respondents, jointly and severally, to the injured (listed in Annexure C to the writ petition) to be distributed evenly or in such manner as may be considered just and proper;

(*c*) award punitive damages of Rs 100 crores to the Association for *g* setting up and running a Centralised Accident and Trauma Services and other allied services in the city of Delhi; and to direct the Union of India to create a fund for that purpose;

(*d*) to monitor the investigation from time to time, to ensure that no person guilty of any of the offences is able to escape the clutches of law *h* and that the investigation is carried out as expeditiously as possible in a free and fair manner; and


SCC Online Web Edition, Copyright © 2015
Page 27    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

(*e*) direct the Union of India to ensure that no cinema hall in the country is allowed to run without licence granted after strictly observing all the mandatory conditions prescribed under the laws and to further direct them to stop the operation of all cinema halls and to permit the operation only after verification of the existence of a valid licence/permit by the licensing authority, under the Cinematograph Act.

### Relevant legal provisions

**7.** The Cinematograph Act, 1952 provides for regularisation of exhibition of cinemas. Section 10 provides that a cinema theatre cannot be run without obtaining licence from the licensing authority. Section 11 provides that the licensing authority shall be the District Magistrate. After the coming into force of the Commissioner of Police system in Delhi in 1978, the Commissioner of Police was notified as the licensing authority under the proviso to Section 11 of the Act. Licences to be granted to a cinema theatre under Section 10 could be either annual or temporary. All cinema theatres in Delhi were required to get their licences renewed annually by moving an application in writing to the licensing authority. While granting renewal, the licensing authority was required to satisfy itself that the licensee had complied with the provisions of the Cinematograph Act and the Delhi Cinematograph Rules framed thereunder.

**8.** When the cinema theatre was constructed in the year 1973, the Delhi Cinematograph Rules, 1953 were regulating the procedure of granting licences, inspection and conditions of licences. After the coming into force of the Commissioner of Police system, the Delhi Cinematograph Rules, 1981 came into force. Rule 3 provides that licence shall be granted in respect of a building which is permanently equipped for cinematograph exhibition and in respect of which the requirements set forth in the First Schedule to the Rules were fulfilled. The First Schedule to the Rules laid down the specifications with which compliance must be made before any annual licence was granted in respect of any building. Besides other things, the Schedule lays down specifications regarding number of persons accommodated in the cinema hall and the manner in which the seats can be provided therein.

**9.** The 1953 Rules insofar as they are relevant for accommodation, sitting, the width of gangways, stairways, exits, are extracted below:

(1) *Accommodation*.—The total number of spectators accommodated in the building shall not exceed twenty per hundred square feet of the area available for sitting and standing or twenty per 133.5 square feet of overall area of the floor space in the auditorium.

\*                    \*                    \*

(2) *Seating*.—(1) *The seating in the building shall be arranged so that there is free excess to exits.*

(3) *Gangway*.—(1) Gangway not less than forty-four inches wide shall be provided in the building as follows:

(*a*) Down each side of the auditorium.

SCC Online Web Edition, Copyright © 2015
Page 28      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

508                     SUPREME COURT CASES                (2011) 14 SCC

(*b*) Down the centre of the seating accommodation at intervals of not more than twenty-five feet.

(*c*) Parallel to the line of the seating so as to provide direct access to exits, provided that not more than one gangway for every ten rows shall be required.

(2) All gangways, exits and the treads of steps and stairways shall be maintained with non-slippery surfaces.

\*               \*               \*

(4) The exits and the gangways and passages leading to exits shall be kept clear of any obstruction other than rope barriers provided in accordance with sub-rule (6). *On no account shall extra seats be placed in the gangways or spectators be allowed to stand in the gangways at the time of performances in such a way as to block or effectively reduce their width.*

\*               \*               \*

(**4**) *Stairways*.—(1) There shall be at least two stairways each not less than four feet wide to provide access to any gallery or upper floor in the building which is intended for use by the public.

\*               \*               \*

(5) No stairways shall discharge into a passage or corridor against or across the direction of exit.

(**5**) *Exits*.—(1) Every public portion of the building shall be provided with an *adequate number of clearly indicated exits placed in such positions and so maintained as to afford the audience ample means of safe and speedy egress.*

*(2) In the auditorium there shall be at least one exit from every tier, floor, or gallery for every hundred persons accommodated or part thereof:*

*Provided further that an exit on or by way of stage or platform shall not be reckoned as one of exits required by this rule.*

*(3) Every exit from the auditorium shall provide a clear opening space of not less than seven feet high and five feet wide.*

*(4) Exits from the auditorium shall be suitably spaced along both sides and along the back thereof and shall deliver into two or more different thoroughfares or open space from which there are at all times free means of rapid dispersal.*

(5) Every passage or corridor leading from an exit in the auditorium to a final place or exit from the building shall be of such width as will in the opinion of the licensing authority enable the persons who are likely to use it in an emergency to leave the building without danger of crowding or congestion. At no point shall any such passage or corridor be less than five feet wide and it shall not diminish in width in the direction of the final place of exit.

(6) The combined width of the final place of exit from the building shall be such that there are at least five feet of exit width for every hundred persons that can be accommodated in the building.

(7) All exit doors shall open outwards and shall be so fitted that when opened they do not obstruct any gangway, passage, corridor, stairway or landing.



SCC Online Web Edition, Copyright © 2015
Page 29    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------------------------------

*(8) All exit doors and doors through which the public have to pass on the way to the open air shall be available for exit during the whole time that the public are in the building and during such time shall not be locked or bolted.*

(9) All exits from the auditorium and all doors or openings (other than the main entrance) intended for egress from the building shall be clearly indicated by the word "EXIT" in block letters, which shall not be less than seven inches high and shall be so displayed as to be clearly visible in the light as well as in the dark.

(10) All other doors or openings shall be so constructed as to be clearly distinguishable from exits. They may be indicated by the words "NO THOROUGHFARE" arranged as in the figure below, but no notice bearing the words "NO EXIT" shall be used in any part of the building.

**(6)** *Parking arrangements*.—(1) Such arrangements shall be made for the parking of motor cars and other vehicles in the vicinity of the buildings as the licensing authority may require.

*(2) No vehicle shall be parked or allowed to stand in such a way as to obstruct exits or impede the rapid dispersal of persons accommodated, in the event of fire or panic.*

**(7)** *Fire precautions*.—(1) Fire extinguishing appliances suitable to the character of the building and of a patron, class and capacity approved by the licensing authority shall be provided as prescribed by him; these appliances shall be disposed to his satisfaction so as to be readily available for use in case of fire in any part of the building.

(2) There shall always be sufficient means of dealing with the fire readily available within the enclosure and these shall include a damp blanket, a portable chemical fire extinguisher and two buckets of dry sand.

*(3) All fire extinguishing appliances shall at all times be maintained in proper working order and available for instant use, and all chemical fire extinguishers shall be capable of withstanding a pressure of not less than 250 lbs. square inch.*

(4) During an exhibition all fire extinguishing appliances shall be in charge of some person or persons specially appointed for this purpose. Such persons need not be employed exclusively in looking after the fire appliances but also they must not be given any other work during an exhibition which would take them away from the building or otherwise prevent them from being immediately available in case of danger or alarm of fire.                                                    (emphasis supplied)

**Inquiry reports**

**10.** Immediately after the incident, the Lt. Governor constituted an Enquiry Committee under Mr Naresh Kumar (DC, South) to investigate into the incident. He secured several reports and in turn submitted an exhaustive report on the calamity. When the investigation was transferred to CBI on

SCC Online Web Edition, Copyright © 2015
Page 30    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

26-7-1997, they also secured several reports. The Court-appointed Commissioners also gave a report. These reports, enumerated below, were considered by the High Court:

    (*i*) Report dated 16-6-1997 issued by Delhi Fire Service.

    (*ii*) Report dated 25-6-1997 of Mr K.L Grover, Electrical Inspector (Labour Department) submitted to Mr Naresh Kumar.

    (*iii*) Report dated 25-6-1997 submitted by Mr R.K. Bhattacharya, Executive Engineer (Building), South Zone, MCD to Mr Naresh Kumar.

    (*iv*) Report dated 26-6-1997 submitted by the Fire Research Laboratory, Central Building Research Institute to Mr Naresh Kumar.

    (*v*) Reports dated 27-6-1997 and 11-8-1997 of the Central Forensic Science Laboratory to Station House Officer.

    (*vi*) Report dated 29-6-1997 by Mr K.V. Singh, Executive Engineer (Electrical), PWD to Mr Naresh Kumar.

    (*vii*) Report dated 2-7-1997 by Mr M.L. Kothari, Electrical Department, IIT affirming the observations of Mr K.V. Singh.

    (*viii*) Panchnama dated 2-8-1997 prepared by Sr. Engineer, PWD.

    (*ix*) Inspection-cum-scrutiny report dated 11-8-1997 by Engineering Department of MCD.

    (*x*) Toxicology report dated 18-9-1997 by AIIMS.

    (*xi*) Joint inspection report dated 7-10-1997 by the representative of licensing authority, MCD, Delhi Fire Service, Electrical Inspector, and General Manager of Uphaar Cinema.

    (*xii*) Naresh Kumar Report.

    (*xiii*) Court Commissioner's Report dated 30-11-2000.

### *Decision of the High Court*

**11.** The High Court after exhaustive consideration of the material including the aforesaid reports, recorded statements and other material, allowed the writ petition by order dated 24-4-2003[1]. In the said order, the High Court identified the causes that led to the calamity and persons responsible therefor. It held the theatre owner, the DVB, MCD and the licensing authority responsible for the fire tragedy. It exonerated the Delhi Fire Force. We summarise below the acts/omissions attributed to each of them by the High Court.

### *Acts/Omissions by the DVB*

**12.** The DVB violated several provisions of the Electricity Act and the Rules. It had not obtained the approval of the Electrical Inspector for installation of the transformer as required under the Rules. The Rules required that the floor of the transformer room should be at a higher level than the surrounding areas and there should be a channel for draining of oil

---

1 *Assn. of Victims of Uphaar Tragedy v. Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234

SCC Online Web Edition, Copyright © 2015
Page 31      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

*a*

with a pit so that any leaking oil would not spread outside, increasing the fire hazard, and also to ensure that water did not enter the transformer. The transformer had to be checked periodically and subjected to regular maintenance and should have appropriate covers. The connecting of wires should be by crimping and not by hammering. The negligence on the part of the DVB in maintaining the transformers and repairs led to the root cause of the incident, namely, the starting of the fire.

*b*

### Acts/Omissions of the owner

**13.** Though the starting of the fire in the transformer happened due to the negligence of the DVB, but if the owner had taken the necessary usual precautions and security measures expected of a theatre owner, even if the transformer had caught fire, it would not have spread to nearby cars or other stored articles nor would the balcony and staircases have become a death trap on account of the fumes.

*c*

**14.** The following acts/omissions were attributed to the theatre owner:

**14.1.** *Parapet wall*: The owner had violated the municipal bye-laws by making several unauthorised alterations in the structure which all contributed to the incident. In particular, the violation by the owner in raising a parapet wall which was shown to be of three feet height in the sanctioned plan till the roof level had disastrous effect when the fire broke out. The stilt floor plan (sanctioned in 1972) showed that what was sanctioned was a three feet high parapet wall along the ramp which was situated to the rear of the transformer room. If the said parapet wall had been constructed only to a height of three feet as shown in the sanctioned plan, the entire space above it would have been open and in the event of any fire in the transformer room or anywhere in the stilt floor, the fumes/smoke could have dispersed into the atmosphere. But at some point of time in or around 1973, the licensee had raised the said three feet wall up to the ceiling height of twelve feet with the result the stilt floor (parking area) stood converted into a totally enclosed area. But for the construction of the parapet wall to ceiling height, the fumes/smoke from the transformer room and from the parking area where the cars were burning, would have gone out of the stilt floor into the open atmosphere. The unauthorised raising of this wall prevented the smoke from getting dispersed and forced it to seek a way up through the stairwell causing the chimney effect and also entered the balcony through the air conditioning system resulting in the concentration of the smoke in the balcony area of the theatre and the stairwell itself, thereby playing a major role in spreading the fire/smoke to balcony area and stairwell. The Court found that the apparent intention of raising the height of the wall from three to twelve feet was to use the area between the wall and the transformer room for commercial purposes.

*d*

*e*

*f*

*g*

*h*

**14.2.** *Closing one exit in balcony and reducing the width of gangways*: Making alterations in the balcony, contrary to the Cinematograph Rules by

SCC Online Web Edition, Copyright © 2015
Page 32      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------------

512                     SUPREME COURT CASES              (2011) 14 SCC

closing the gangway/aisle on one side and closing/blocking one of the exits
by construction of an owner's box in front of the right side exit (the details of
these alterations are given in paras 18 to 23 below). The said acts impeded
the free and quick exit of the occupants of balcony as everyone had to use the
exit on the left side. The delay made them victims of asphyxiation due to the
poisonous/noxious gases.

*14.3. Illegal parking in stilt floor*: The stilt floor where the three
electrical rooms (generator room, HT room and LT room) were situated, had
an earmarked parking space for 15 cars. The sanctioned plan clearly
contemplated a passageway for movement of cars of a width of about 16 ft.
The sanctioned plan required that the area in front of the three electrical
rooms should be left free as a part of that passageway and no parking was
contemplated in front of the said three rooms. However, the licensee was
permitting the patrons to park their cars in a haphazard manner, particularly
in the central passage. Instead of restricting the cars to be parked in that floor
to 15 and leaving the central passage, in particular the passage in front of the
three electrical rooms free for manoeuvring the cars, the owner permitted the
entire passage to be used for parking the vehicles, thereby increasing the
parking capacity from 15 to 35. This made exiting of vehicles difficult and
until and unless the vehicles in the passage were removed, other parked
vehicles could not get out. It also made it difficult for any patron to use the
said area as an exit in an emergency. Parking of vehicles in front of the three
electrical rooms increased the fire hazard. If the passageway between two
parked row of cars in the stilt floor had been kept free of parking as per the
sanctioned plan and consequently if no cars had been parked in front of the
transformer room, the fire in the transformer room would not have spread to
the cars and the entire calamity could have been avoided. On that day, a
Contessa car parked next to the transformer room in the passageway first
caught fire. Though the sanctioned parking plan showed that the stilt floor
was to be used for parking only fifteen cars with a middle passageway of
fifteen feet width left free for movement of cars, the parking area was used
for parking as many as 35 cars. As the parking area was overcrowded with
haphazardly parked cars, the entire passageway meant for movement of cars
was blocked. Not following the provisions of the Electricity Act and the
Electricity Rules in regard to the construction of the transformer room with
required safeguard and permitting haphazard parking of large number of
vehicles, particularly near the transformer room started the fire and spread it.

*14.4.* If the owners had not unjustly and by misrepresenting the facts,
obtained an interim stay in the year 1983 which continued up to the date of
the incident and as a consequence though the irregularities and violations of
safety measures had been noticed and brought to its notice, they had not
rectified them and the continued violations resulted in the incident.

SCC Online Web Edition, Copyright © 2015
Page 33      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases


### *Acts/Omissions of MCD*

*a*  **15.** The sanctioned plan issued in 1972 to the licensee was for construction of a three feet high parapet wall. Though the licensee raised the said wall up to ceiling height of 12 feet in violation of the Rules, MCD failed to point out this violation between 1994 to 1997 and take action against the theatre owners.

*b*  **16.** MCD was required to give an NOC after inspecting the building, certifying that there was no violation of the building bye-laws or unauthorised construction, every year, from the year 1994 so that licence should be renewed. MCD failed to make such inspections. On the other hand it gave an NOC for grant of licence in the year 1996.

### *Acts/Omissions of the licensing authority*

*c*  **17.** The licensing authority owed a duty to ensure that the cinema theatre complied with all the requirements of the Cinematograph Act and the Rules and to obtain the necessary NOCs from MCD, Delhi Fire Force and Electrical Inspector. If there was any violation, it ought not to have renewed the licence. The licensing authority failed to note the violations/deviations and take remedial action. Even though a stay order had been issued by the High Court on 28-6-1983, in a writ petition challenging the suspension of *d*  licences, the said stay order did not come in the way of the licensing authority making appropriate inspections and if necessary to take action to suspend the licence or seek modification of the interim order. The licensing authority did not discharge its statutory functions and went on issuing temporary permits for periods of two months each, for a period of more than 13 years when the Rules clearly contemplated that temporary permits could *e*  not be renewed for a period of more than six months.

### *Conclusions of the High Court*

### *Closing of one balcony exit and narrowing of gangway*

*f*  **18.** We may only refer to the unauthorised closure of an exit from balcony and reduction of width of gangways by addition of seats in greater detail to have a complete picture. Uphaar Cinema was inaugurated on 27-4-1973. In the year 1975, there was a general cut of 10% value of the cinema ticket rates fixed by the Delhi Administration. The licensees made a representation to the Delhi Administration alleging that the expenses had gradually gone up during the course of years after the rates were fixed and that even the existing rates were inadequate to meet the operating costs. The *g*  representation of the Association of Motion Pictures Exhibitors was considered and the Delhi Administration agreed to relax the Rules and allowed the licensees to have additional seats (in addition to the existing seats) in their cinema halls to make good the loss caused to the licensees by the reduction in the rates by 10%.

*h*  **19.** Uphaar Cinema was permitted to add 43 seats in balcony and 57 seats in the main hall, as per a Notification dated 30-9-1976 issued by the licensing authority. As a consequence, 43 seats were added in the balcony and 57 seats

SCC Online Web Edition, Copyright © 2015
Page 34    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
----------------------------------------------------------------------------------------------------------------------------

were added in the main hall of Uphaar Theatre. The Chief Fire Officer inspected the theatre and submitted a report that the addition of seats was a fire hazard. The Lt. Governor therefore issued a Notification dated 27-7-1979 cancelling with immediate effect the earlier notifications by which relaxation had been granted to the licensees (including Uphaar Cinema) by allowing them to increase the number of seats. The said Notification dated 27-7-1979 was challenged by the licensees by filing a writ petition in the Delhi High Court.

20. The said writ petition was disposed of by a Division Bench of the High Court by its judgment dated 29-11-1979 (reported in *Isherdas Sahni & Bros.* v. *Delhi Admn.*[2]) holding that the Delhi Administration could not have granted such relaxations if such relaxations would have contravened the Rules to an extent as to increase the risk of fire hazard or to expose the spectators to unhealthy conditions. The High Court further held that the opinion and advice of the fire and health authorities had to be taken before grant of any relaxation. The High Court noted the following view of the Chief Fire Officer showing reluctance to advise relaxation in the Rules as the safety of the visitors to the theatres would be affected thereby: (*Isherdas case*[2], AIR p. 151, para 8)

"8. 'Even under the normal circumstances the exit facilities are seriously hampered by people rushing and *it is felt that in case of panicky situation of a minor nature, the people will be put to great difficulty which may even result in stampede*. In the circumstances, I feel that it would not be advisable to allow extra seats required by the managements. In a few theatres, however, the difficulty may not be so acute. If at all any relaxation has to be considered under unavoidable circumstances, our reaction to the proposals put forward by the management of a few cinema houses may kindly be seen in the enclosure.' "

(emphasis supplied)

The High Court also noted that the Chief Fire Officer later modified and toned down his report when he was informed by the Delhi Administration that additional seats were permitted to compensate the loss on account of reduction in cinema fares. The High Court noted that ultimately the Delhi Administration, Chief Fire Officer and Municipal Corporation agreed to some relaxation and disposed of the petitions directing the Delhi Administration to apply their mind and decide how many of the additional seats were in accordance with the Rules and could be permitted to be retained. The effect of the order was that only those additional seats which contravened the Rules had to be removed and cancellation of the Notification dated 30-9-1976 did not result in automatic removal of all additional seats.

21. In the meanwhile by order dated 6-10-1978, the Entertainment Tax Officer permitted Uphaar Cinema to install a box with eight seats for use without tickets (for complimentaries). This was not however specifically brought to the notice of the licensing authority nor his permission sought. These additional seats were not sanctioned by the licensing authority. In

2 AIR 1980 Del 147


SCC Online Web Edition, Copyright © 2015
Page 35      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

MCD v. UPHAAR TRAGEDY VICTIMS ASSN. *(Raveendran, J.)*      515

pursuance of such permission the licensee closed the exit on the right side of the balcony for installing the box with eight seats. The central access was used exclusively for entry. As a result the only exit from the balcony was the one at the extreme left top corner of the balcony.

a

22. After the decision dated 29-11-1979[2], a show-cause notice was issued to reconsider the addition of 100 seats and by order dated 22-12-1979, the DCP (Licensing) held that six additional seats in the balcony (Seat No. 8 in rows A to F) and 56 additional seats in the main hall were blocking the gangway and causing obstruction to the egress of patrons and directed their removal so that the original vertical gangway could be restored. However on a subsequent application dated 29-7-1980 by the licensee, by order dated 4-10-1980, the licensing authority permitted installation of 15 additional seats in the balcony, that is, two additional rows of 3 seats each in front of the exit in balcony, addition of one seat against back wall next to Seat No. 38 and eight additional seats by adding one seat in each of rows A to H. As a result (*i*) the seating capacity which was 287 plus Box of 14 went up to 302 plus two Boxes (14 + 8); (*ii*) the right side exit was closed and a box of 8 seats was added; (*iii*) the right side vertical gangway was closed and a new gangway was created between Seats Nos. 8 and 9; (*iv*) the width of the gangways leading to exit from balcony was reduced.

b

c

23. What is significant is while obtaining permission of the licensing authority for increasing the capacity from 287 to 302, it was not informed about addition of one box of 8 seats and closing of one exit. As per the 1953 Rules, there should be one exit for every 100 seats. Under the 1981 Rules, this became minimum of one exit for every 150 persons. Originally there was one central entry/exit point between the foyer to the balcony and two exits at the two top corners of the balcony. After the modifications and increase in seats, the central door became an exclusive entry from the foyer; the right side corner of the balcony was permanently closed by installation of the special box of eight seats and there was only one exit for the entire balcony with a capacity of 302 persons, situated at the left side top corner of the balcony. This was the major cause for the tragedy, as when lights went off and fumes surrounded, the balcony became a death trap. The left (west) exit from the balcony led to the staircase leading to the parking area. Patrons from the balcony who entered the entire stairwell also died, as it was full of noxious fumes entering from the stilt parking area on account of the chimney effect. The patrons were denied access to the right (east) exit because of the installation of the private box and the closing of right (east) exit, which would have otherwise provided an access to the other staircase with lift well which led to the ticket foyer outside the parking area and was therefore free from noxious fumes/smoke. The report shows that the exit light, ground light, side light, emergency lights and public address system were all non-functional, adding to the delay, confusion and chaos, making it very difficult to get out of the balcony which was dark and full of smoke/fumes.

d

e

f

g

h

2 *Isherdas Sahni & Bros. v. Delhi Admn.*, AIR 1980 Del 147

SCC Online Web Edition, Copyright © 2015
Page 36          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**24.** The High Court held that the theatre owner (licensee), the DVB, MCD and the licensing authority being responsible for the incident were jointly and severally liable to compensate the victims. The High Court directed payment of compensation to the legal heirs of 59 patrons who died, and also to the 103 persons who were injured. The High Court determined a uniform compensation of Rs 18 lakhs payable in the case of deceased who were aged more than 20 years, and 15 lakhs each in the case of those deceased who were less than 20 years of age. It also awarded a compensation of Rs 1,00,000 to each of the 103 injured. It also awarded interest at 9% per annum on the compensation from the date of filing of the writ petition to the date of payment. The High Court apportioned the liability inter se among the four in the ratio of 55% payable by the theatre owners and 15% each payable by the Delhi Vidyut Board, MCD and the licensing authority. The High Court directed that while paying compensation the ex gratia amount wherever paid (Rs 1,00,000 in the case of death, Rs 50,000 in case of grievous injuries and Rs 25,000 for simple injuries) should be deducted. The High Court directed that the licensee shall pay Rs 2,50,00,000 (rupees two-and-half crores) as punitive damages (being the income earned from installing extra 52 seats unauthorisedly during the period 1979 to 1996. The said amount was ordered to be paid to the Union of India for setting up a Central Accident Trauma Centre.

**25.** The High Court approved the recommendations of the Naresh Kumar Committee which were extracted in detail in the judgment of the High Court. The High Court also made the following recommendations: (*Uphaar Tragedy case*[1], ACJ pp. 1726-27, para 111 : DLT pp. 345-46, para 119)

"(*A*) … several requests by the fire authorities for adequate maintenance and timely upgradation of the equipment have floundered in the bureaucratic quagmire. When lives of citizens are involved the requirement of those dealing in public safety should be urgently processed and no such administration process of clearance in matters of public safety should take more than 90 days. The entertainment tax generates sufficient revenue for the administration to easily meet the financial requirements of bodies which are required to safeguard public health.

(*B*) … considering the number of theatres and auditoria functioning in the city, sufficient staff to inspect and enforce statutory norms should be provided by the Delhi Administration.

(*C*) … the Delhi Police should only be concerned with law and order and entrusting of responsibility of licensing of cinema theatres on the police force is an additional burden upon the already overburdened city police force.

(*D*) … the inspection and enforcement of the statutory norms should be in the hands of one specialised multidisciplinary body which should

1 *Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234



SCC Online Web Edition, Copyright © 2015
Page 37      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

deal with all aspects of the licensing of public places. It should contain experts in the field of, (*a*) fire prevention; (*b*) electric supply; (*c*) law and order; (*d*) municipal sanctions; (*e*) urban planning; (*f*) public health; and (*g*) licensing. Such a single multidisciplinary body would ensure that the responsibility of public safety is in the hands of a body which could be then held squarely responsible for any lapse and these would lead to a situation which would avoid the passing of the buck. The existing position of different bodies looking after various components of public safety cannot be continued. A single body would also ensure speedier processing of applications for licences reducing red tape and avoidable complications and inevitable delay.

(*E*) All necessary equipment should be provided to ambulances and the fire brigade including gas masks, searchlights, map of water tanks located in the area including the existence of the location of the underground water tanks. Such water tank locations should be available to the firemen working in the area. The workshop for the fire tenders service and maintenance should also be fully equipped with all spares and other equipment and requisition made by the fire brigade should receive prompt and immediate attention. There should also be adequate training imparted to the policemen to control the crowd in the event of a disaster as it is found that onlookers are a hindrance to the rescue operations. Similarly, all ambulances dealing with the disaster management should be fully equipped."

**26.** The Delhi Vidyut Board has accepted the judgment and has deposited 15% of the total compensation. The theatre owner, Delhi Police and MCD have not accepted the judgment and have filed these appeals. CAs Nos. 7114-15 of 2003 has been filed by MCD denying any liability. The licensing authority has filed CA No. 7116 of 2003 contending that the theatre owners should be made liable for payment of the entire compensation. The theatre owner has filed CA No. 6748 of 2004 urging two contentions, namely, their share of liability should have been far less than 55% and the rates of compensation fixed were excessive.

**27.** At the outset it should be noted that the causes of the calamity have been very exhaustively considered by the High Court and it has recorded a categorical finding about the negligence and the liability on the part of the licensee and the DVB. On the examination of the records, we agree with the High Court that such a catastrophic incident would not have happened if the parapet wall had not been raised to the roof level. If the said wall had not been raised, the fumes would have dispersed in the atmospheric air. Secondly, if one of the exits in the balcony had not been blocked by construction of an owner's box and if the right side gangway had not been closed by fixing seats, the visitors in the balcony could have easily dispersed through the other gangway and exit into the unaffected staircase. Thirdly, if the cars had not been parked in the immediate vicinity of the transformer room and appropriate pit had been made for draining of transformer oil, the oil would not have leaked into the passage nor would the burning oil lighted

SCC Online Web Edition, Copyright © 2015
Page 38        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



518                   SUPREME COURT CASES           (2011) 14 SCC

the cars, as the fire would have been restricted only to the transformer room. Even if one of the three causes for which the theatre owner was responsible, was absent, the calamity would not have occurred. The licensee could not point out any error in those findings. Ultimately, therefore, the contention of the licensee before us was not to deny liability but only to reduce the quantum of liability fastened by the High Court and to increase the share of the liability of the three statutory authorities.

**28.** The DVB, as noticed above, has not challenged the decision of the High Court. Therefore, we do not propose to reconsider and re-examine or reassess the material considered and the finding recorded with reference to the licensee and the DVB. Therefore the incident is not disputed. The deaths and injuries are not in dispute. The identity of persons who died and who were injured is not in dispute. The fact that the licensee and the DVB are responsible is not in dispute. The limited questions that arise are: whether MCD and the licensing authority could have been made liable to pay compensation and whether the percentage of liability of the licensee should be reduced from 55%?

**29.** On the contentions urged the following questions arise for consideration:

   (*i*) Whether MCD and the licensing authority could be made liable to pay compensation to the victims?

   (*ii*) What should be the apportionment of liability?

   (*iii*) Whether the compensation awarded is excessive?

   (*iv*) Whether the award of punitive damages of Rs 2.5 crores against the licensee was justified?

We will deal with Questions (*i*) and (*ii*) together and Questions (*iii*) and (*iv*) together as they are interconnected.

***Contentions of MCD***

**30.** MCD submitted that the writ petition focuses on the violations by the licensee, the negligence on the part of the DVB, Delhi Fire Force and the licensing authority; no specific role was assigned to MCD in regard to the incident; that the writ petition deals with the responsibilities of the owners (licensees) (Paras 2 to 6 and 15); Delhi Vidyut Board (Para 7); licensing authority—Delhi Police (Paras 8 to 14) and seeks to make them liable. The role of the Delhi Fire Services (Para 16) is referred to. The role of licensing authority, Delhi Police (Para 17), role of medical facilities managed by health authorities (Paras 18 to 20) and the cover-up operations by the owners and the role of the licensing authority; that except a general averment that various instrumentalities of State including MCD are liable to pay damages, no specific averment of allegation has been made against MCD.

**31.** It is also submitted that Mr Naresh Kumar, Deputy Commissioner (South), NCT who was appointed by the Lt. Governor immediately after the incident to conduct an enquiry, had submitted a report which also primarily deals with the omissions and commissions of the licensee, the licensing


SCC Online Web Edition, Copyright © 2015
Page 39        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------

authority, Delhi Fire Force, Delhi Vidyut Board and does not fix any specific responsibility on MCD. Similarly the report of the Commissioners appointed by the Delhi High Court (consisting of an Advocate and Professors from engineering institutions) submitted their report dated 30-11-2000 which also does not fix any liability on MCD.

*a*

**32.** MCD next pointed out that even the impugned judgment of the Delhi High Court while exhaustively covering the roles of the licensee, Delhi Vidyut Board, the licensing authority, Delhi Fire Force, makes only a passing reference to MCD. The High Court holds MCD liable only on the ground that it did not take any action in regard to the unauthorised raising of parapet wall adjoining the transformer from three feet height to roof level. According to the Delhi High Court on account of the raising of the height of the parapet wall in the year 1973, the noxious fumes/smoke from the burning of the transformer oil, diesel and the fuel in the tanks of the cars and the burning of cars themselves could not escape into open atmosphere, and as a consequence, the noxious fumes and smoke funnelled into the stairwell to reach the air conditioning ducts providing air conditioning to the balcony and the landing near the balcony exit, resulting in asphyxiation of 57 patrons. It is submitted that except the reference to the parapet wall there is absolutely no reference to the role of MCD. It is contended that in 1973 it had no role to play to check the construction as at that time, it was the responsibility of the Executive Engineer, PWD. And by the time it came into the picture in 1994 replacing the Executive Engineer, PWD, the structure was in existence for more than two decades and therefore there was no question of MCD objecting to the said wall.

*b*

*c*

*d*

**33.** MCD submitted that it could easily demonstrate from the relevant enactment and the Rules that it had no role to play in regard to the raising the height of the parapet wall by the theatre owner, nor had it any liability for such action by the theatre owner and as a consequence they should have been exonerated. It was pointed out that under the Cinematograph Act, the licensing authority grants a cinematograph licence enabling a theatre owner to run cinema shows in the theatre. The Cinematograph Rules, 1953 contemplated the licensing authority obtaining clearances/consents from the Executive Engineer, PWD and Electrical Inspector. Even the Delhi Cinematograph Rules of 1981 contemplated certificates/consents being obtained by the licensing authority from the Public Works Department, Electrical Inspector and Chief Fire Officer every year before renewing the licence. Even in regard to the design and construction of the cinema theatre, the Rules under the Cinematograph Act applied and prevailed and the municipal bye-laws did not contain any provision as to the construction of cinema theatre but on the other hand, clearly provided that the matter will be governed by the Cinematograph Rules. Thus, MCD had no role to play either in construction of the cinema theatre or in the grant of licence or periodical renewal thereof.

*e*

*f*

*g*

**34.** It was only on 3-5-1994 by virtue of amendment of the Delhi Cinematograph Rules, 1981, substituted in place of the Executive Engineer

*h*

SCC Online Web Edition, Copyright © 2015
Page 40      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------

of PWD, that MCD was required to give a report in regard to the structure/building which was one of the requirements for the licensing authority to grant or renew any cinema licence. From 1994, the limited role of MCD was to furnish a report regarding the structures and whether there were any deviations. But in fact its reports could not even be acted upon by the licensing authority, in view of the order of stay obtained by the licensee against the licensing authority on 28-6-1983, made absolute on 25-3-1986. In view of such stay, the licensing authority was not issuing any licences but was only granting temporary bimonthly permits for running of the theatre. Even the report given by MCD pointing out the various defects/violations was not of any assistance to the licensing authority. This was because in the year 1993 itself, the licensing authority had made an application for vacating the interim stay but on account of the time taken by the licensees for filing objections thereto and thereafter for hearing, the application was not heard even on the date of the incident and thereafter the entire matter became infructuous. In the circumstances it is submitted that MCD had no role to play even in the matter of inspection and giving of reports regarding condition of the premises.

**35.** As far as the parapet wall is concerned it is contended that it had not sanctioned any plan for increasing the height of the parapet wall from 3 ft to roof level. It was contended that even if it had granted any licence for construction or given any report or no-objection certificate, in exercise of its statutory functions, it could not be made liable for any compensation on the ground of grant of such licence or NOC or report in regard to the parapet wall, as no knowledge can be attributed to the Corporation about the possible consequences of raising the height of parapet wall.

**36.** Lastly, it was contended by MCD that when in exercise of its statutory powers of regulating the constructions of buildings within its jurisdictional area or in complying with the request of the licensing authority for any report as per the Cinematograph Rules, it acts bona fide and in accordance with the relevant rules and bye-laws, in the absence of mala fides, it cannot be made liable even if there were any errors or irregularities or violations. It was submitted that it cannot also be made liable for any violation by the theatre owner in putting up the construction in accordance with the plan sanctioned by MCD or any violation of the rules or licence terms or negligence in running the cinema theatre.

**37.** It was contended by the Victims' Association that the liability of the Municipal Corporation arises from the fact that it was one of the authorities which was required to give reports/no-objection certificates (NOCs) to the licensing authority every year, for construction and grant of renewal of licence. As admitted by MCD itself the responsibility of granting a certificate in regard to the condition of the structure of the building and the violations in construction thereof was entrusted to MCD on 3-5-1994. It was contended that if the Municipal Corporation had discharged its functions as was expected of them by thorough inspection of the theatre building and pointed out to the licensing authority any violations or deviations or unauthorised constructions, the temporary permit for running the theatre which was being


SCC Online Web Edition, Copyright © 2015
Page 41 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

issued by the licensing authority, could have been stopped and the calamity could have been averted.

*a*  **38.** It was pointed out that on the other hand, when the licensing authority sought its report/NOC, by its communication dated 11-3-1996, seeking inspection and report, MCD represented by its Administrative Officer sent a report dated 25-9-1996 to the Deputy Commissioner of Police, (licensing authority) stating that it had no objection for the renewal of annual cinematograph licence of Uphaar Theatre. It was submitted that the purpose

*b*  of seeking a no-objection certificate from the Municipal Corporation was not an empty formality; and that if statutory authorities like MCD, ignore the relevance and importance of such no-objection certificate and routinely grant such certificates, as if it is a formality to be complied with mechanically, the licensing process would become a mockery. It was contended that statutory authorities like MCD should function diligently relating to public safety and

*c*  if they fail to do so, they should be held liable for the consequences.

**39.** We agree with MCD that it had no role to play in regard to increasing the height of the parapet wall. The sanction for licence to construction granted in 1972 was in regard to a three feet high parapet wall. The height of the said wall was increased by the theatre owners in or about 1973. MCD was not the inspecting authority till 1994. There was no structural change,

*d*  modification or deviation after 1994. When MCD inspected the theatre, it would have seen a theatre which was running for more than 20 years and that there was no recent change. In the circumstances, MCD cannot be found fault with for not complaining about the wall.

**40.** The Delhi Cinematograph Rules, 1981 as originally framed had no role for MCD in the grant of licences by the licensing authority. Rule 14

*e*  provided that before granting or renewing an annual licence the licensing authority shall call upon: (*i*) the Executive Engineer, PWD, to examine the structural features of the building and report whether the rules thereto had duly been complied with; (*ii*) the Electrical Inspector to examine the electrical equipments used in the building and report whether they complied with the requirements of the Electricity Act and the Rules thereunder and

*f*  whether all precautions had been taken to protect the spectators and employees from electric shock and to prevent the introduction of fire in the building through the use of electrical equipments; and (*iii*) the Chief Fire Officer to ensure that proper means of escape and safety against fire and to report whether proper fire extinguishing appliances have been provided. All defects revealed by such inspections were required to be brought to the notice

*g*  of the licensee and the licensing authority who may refuse to grant or renew the licences unless and until they are remedied to its satisfaction. In fact, even for granting a temporary licence, Rule 15 required the licensing authority to call upon the Executive Engineer, PWD, to inspect the building and report whether it is structurally safe for cinematographic exhibition.

*h*  **41.** The said 1981 Rules were amended by the Cinematograph Amendment Rules, 1994 by a Notification dated 3-5-1994. By virtue of the

SCC Online Web Edition, Copyright © 2015
Page 42          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-----------------------------------------------------------------------------------------------------------

522                         SUPREME COURT CASES              (2011) 14 SCC

said amendment wherever the term "Executive Engineer" appeared it was to
be substituted by the words "local body concerned". The term "local body
concerned" was also defined as referring to MCD, DDA, NDMC,
Cantonment Board, as the case may be in whose jurisdiction the place of
cinematographic exhibition was situated. Therefore on and after 3-5-1994,
the report/certificate of MCD about the structural features of the building and
whether the Rules in that behalf had been duly complied with, was a
condition precedent for renewing the annual licence or even granting a
temporary lease by the licensing authority. This showed that as far as the
structural features and deviations and defects are concerned, the licensing
authority relied upon MCD, for expert opinion after 3-5-1994. The question
is: whether MCD can be made liable to compensate the victims of the fire
tragedy on the ground that it was required to give an inspection report or on
the ground that it gave a no-objection certificate on 25-9-1996 for renewal of
licence for 1996-1997?

***Contentions of the licensing authority***

**42.** The licensing authority contended that the High Court committed an
error in holding it responsible for having contributed to the spreading of fire
and smoke by its acts of omission and commission and consequently making
it liable to pay compensation. The licence was granted initially in the year
1973. At that time the District Magistrate was the licensing authority. The
power to grant licence and renew it yearly was transferred from the District
Magistrate to the Deputy Commissioner of Police (Licensing) on 25-3-1986.
The licensing authority was not an expert on cinema theatres nor technically
qualified to assess whether a licence of a cinema theatre should be renewed
or not. He was required to obtain the reports/NOCs from PWD (from MCD
from the year 1994), Delhi Fire Force and Electrical Inspector. On the basis
of such reports and on personal inspections, the licensing authority was
required to consider and decide whether a theatre owner was entitled to a
licence or renewal of licence to exhibit cinematograph films in the theatre.
The licensing authority was empowered to cancel the licence or refuse to
renew it (if he was considering an application for renewal) if the applicant for
licence did not fulfil the requirements. The theatre owners had filed a writ
petition and obtained an interim order of stay in the year 1983 against the
cancellation/suspension of their cinematographic licence. While making the
interim order absolute on 25-3-1986, the High Court had made it clear that if
there were any violations by the theatre owner, the licensing authority was at
liberty to take such steps as were necessary to ensure that the violations or
deviations were set right. The said interim order made it clear that if there
were any violations, it can also move the High Court for vacating the interim
order. The licensing authority moved an application on 19-4-1993 citing
several serious violations committed by the licensee. But the High Court did
not vacate the stay. Therefore the licensing authority had to issue temporary
licences in spite of any irregularities. Therefore the licensing authority could
not be held responsible.

SCC Online Web Edition, Copyright © 2015
Page 43 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**43.** While sparking in the Delhi Vidyut Board transformer due to negligence in maintenance, started the fire, the impact of this fire would not have been so tragic: (*i*) if the cars had not been parked in front of and very close to the transformer in a haphazard manner; (*ii*) if adequate exits had been provided on both sides of the balcony; (*iii*) if the owners of the theatre had not closed top right exit of the balcony to provide a private box for the owners resulting in an exit only on one side of the balcony; (*iv*) if the owners had not constructed an illegal wall the poisonous fumes would not have been funnelled towards the balcony; and as every second's delay in exiting to safer environment was vital, if the exits had been located on both sides of the balcony, precious minutes would have been saved in getting out and loss of several innocent lives avoided. It should be remembered that none of the patrons from the main hall (ground floor) of the cinema died or were injured. Even those who were on the second floor escaped. It was only the occupants of the balcony who were affected and the deaths were due to asphyxiation on account of the noxious fumes/smoke. The theatre owner and the DVB have been held liable.

**44.** The question is: whether the licensing authority and MCD can be held liable for improper discharge of statutory functions?

***The legal position***

**45.** In *Rabindra Nath Ghosal* v. *University of Calcutta*[3] this Court held: (SCC p. 483, para 9)

"*9.* The courts having the obligation to satisfy the social aspiration of the citizens have to apply the tool and grant compensation as damages in a public law proceedings. Consequently when the court moulds the relief in proceedings under Articles 32 and 226 of the Constitution seeking enforcement or protection of fundamental rights and grants compensation, it does so under the public law by way of penalising the wrongdoer and fixing the liability for the public wrong on the State which has failed in its public duty to protect the fundamental rights of the citizens. *But it would not be correct to assume that every minor infraction of public duty by every public officer would commend the court to grant compensation in a petition under Articles 226 and 32 by applying the principle of public law proceeding. The Court in exercise of extraordinary power under Articles 226 and 32 of the Constitution, therefore, would not award damages against public authorities merely because they have made some order which turns out to be ultra vires, or there has been some inaction in the performance of the duties unless there is malice or conscious abuse.* Before exemplary damages can be awarded it must be shown that some fundamental right under Article 21 has been infringed by arbitrary or capricious action on the part of the public functionaries and that the sufferer was a helpless victim of that act.*"* (emphasis supplied)

3 (2002) 7 SCC 478

SCC Online Web Edition, Copyright © 2015
Page 44    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



**46.** This Court in *Rajkot Municipal Corpn.* v. *Manjulben Jayantilal Nakum*[4] dealing with a case seeking damages under law of torts for negligence by municipality, held as follows: (SCC p. 601, para 63)

> "*63.* The conditions in India have not developed to such an extent that a Corporation can keep constant vigil by testing the healthy condition of the trees in the public places, roadsides, highways frequented by passers-by. There is no duty to maintain regular supervision thereof, though the local authority/other authority/owner of a property is under a duty to plant and maintain the tree. The causation for accident is too remote. Consequently, there would be no common law right to file suit for tort of negligence. It would not be just and proper to fasten duty of care and liability for omission thereof. It would be difficult for the local authority, etc. to foresee such an occurrence. Under these circumstances, it would be difficult to conclude that the appellant has been negligent in the maintenance of the trees planted by it on the roadsides."

**47.** In *Geddis* v. *Bann Reservoir Proprietors*[5], the House of Lords held: (AC pp. 455-56)

> "… For I take it, without citing cases, that is now thoroughly well established that *no action will lie for doing that which the legislature has authorised, if it be done without negligence, although it does occasion damage to anyone*; but an action does lie for doing that which the legislature has authorised, if it be done negligently."    (emphasis supplied)

**48.** In *X (Minors)* v. *Bedfordshire County Council*[6] the House of Lords held that in cases involving enactments providing a framework for promotion of social welfare of the community, it would require exceptionally clear language to show a parliamentary intention that those responsible for carrying out the duties under such enactment should be liable in damages if they fail to discharge their statutory obligations.

**49.** It was held: (*Bedfordshire case*[6], AC p. 739)

> "… a common law duty of care cannot be imposed on a statutory duty if the observance of such a common law duty of care would be inconsistent with or have a tendency to discourage the due performance by the local authority of its statutory duties."

**50.** In *R.* v. *Governor of Parkhurst Prison, ex p Hague*[7], the House of Lords held that the legislature had intended that the Prison Act, 1952 should deal with the administration and management of prisons, but had not intended to confer on prisoners a cause of action in damages. The Prison Rules, 1964 were regulatory in nature to govern prison regime, but not to protect prisoners against loss, injury, or damage nor to give them any right of action.

4 (1997) 9 SCC 552
5 (1878) 3 App Cas 430 (HL)
6 (1995) 2 AC 633 : (1995) 3 WLR 152 : (1995) 3 All ER 353 (HL)
7 (1992) 1 AC 58 : (1991) 3 WLR 340 : (1991) 3 All ER 733 (HL)

SCC Online Web Edition, Copyright © 2015
Page 45      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

**51.** In *Just* v. *British Columbia*[8], the Canadian Supreme Court considered the question whether the Department of Highways is liable for payment of damages to a person who was hit by a boulder on a highway on the ground that it was the duty of the Department to maintain the highway in a safe and secure manner. The Canadian Supreme Court held:

"Prior to the accident the practice had been for the Department of Highways to make visual inspections of the rock cuts on Highway. These were carried out from the highway unless there was evidence or history of instability in an area in which case the rock engineer would climb the slope. In addition there were numerous informal inspections carried out by highway personnel as they drove along the road when they would look for signs of change in the rock cut and for rocks in the ditch…. In order for a *private duty to arise in this case, the plaintiff would have to establish that the Rockwork Section, having exercised its discretion as to the manner or frequency of inspection, carried out the inspection without reasonable care or at all. There is no evidence or indeed allegation in this regard* … I would therefore dismiss the appeal." (emphasis supplied)

**52.** In *Holland* v. *Saskatchewan*[9] the Canadian Supreme Court held:

"*The law to date has not recognized an action for negligent breach of statutory duty. It is well established that mere breach of a statutory duty does not constitute negligence [R. (Can.) v. Saskatchewan Wheat Pool*[10]]. The proper remedy for breach of statutory duty by a public authority, traditionally viewed, is judicial review for invalidity.*"

(emphasis supplied)

**53.** In *Union of India* v. *United India Insurance Co. Ltd.*[11] this Court held: (SCC pp. 703-04, para 30)

"*30.* … But in *East Suffolk Rivers Catchment Board* v. *Kent*[12], Lord Romer had stated: (AC p. 102)

'*… Where a statutory authority is entrusted with a mere power it cannot be made liable for any damage sustained by a member of the public by reason of a failure* to exercise that power.*'

(emphasis supplied)

In *Anns* v. *Merton London Borough Council*[13] this principle was somewhat deviated from. As stated earlier the plaintiff in *Anns*[13] had sued for losses to flats in a new block which had been damaged by subsidence caused by inadequate foundations. The contention that the Council was negligent in the exercise of statutory powers to inspect foundations of new buildings giving rise to a claim for economic damage

8 (1989) 2 SCR 1228 (Can SC)
9 2008 SCC 42 : (2008) 2 SCR 551 (Can SC)
10 (1983) 1 SCR 205 (Can SC)
11 (1997) 8 SCC 683
12 1941 AC 74 : (1940) 4 All ER 527 (HL)
* **Ed.**: The word "failure" is emphasised in original also.
13 1978 AC 728 : (1977) 2 WLR 1024 : (1977) 2 All ER 492 (HL)

SCC Online Web Edition, Copyright © 2015
Page 46          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

-------------------------------------------------------------------------------------------------------

526                      SUPREME COURT CASES                  (2011) 14 SCC

suffered was upheld. This principle was however not accepted in *Murphy*[14] to the extent economic losses were concerned. According to Lord Hoffman, *Anns*[13] was not overruled in *Murphy* v. *Brentwood District Council*[14] so far as physical injury resulting from omission to exercise statutory powers was concerned. A duty of care at common law can be derived from the authority's duty in public law to 'give proper consideration to the question' whether to exercise power or not. *This public law duty cannot by itself give rise to a duty of care. A public body almost always has a duty in public law to consider whether it should exercise its powers but that did not mean that it necessarily owed a duty of care which might require that the power should be actually exercised. A mandamus could require future consideration of the exercise of a power. But an action for negligence looked back at what the authority ought to have done.* Question is as to when a public law duty to consider exercise of power vested by statute would create a private law duty to act, giving rise to a claim for compensation against public funds. One simply cannot derive a common law 'ought' from a statutory 'may'. The distinction made by Lord Wilberforce in *Anns*[13] between 'policy' and 'operations' is an inadequate tool with which to discover whether it was appropriate to impose a duty of care or not. But leaving that distinction, it does not always follow that the law should superimpose a common law duty of care upon a discretionary statutory power. *Apart from exceptions relating to individual or societal reliance on exercise of statutory power—it is not reasonable to expect a service to be provided at public expense and also a duty to pay compensation for loss occasioned by failure to provide the service. An absolute rule to provide compensation would increase the burden on public funds.*"                 (emphasis supplied)

**54.** It is evident from the decisions of this Court as also the decisions of the English and Canadian Courts that it is not proper to award damages against public authorities merely because there has been some inaction in the performance of their statutory duties or because the action taken by them is ultimately found to be without authority of law. In regard to performance of statutory functions and duties, the courts will not award damages unless there is malice or conscious abuse. The cases where damages have been awarded for direct negligence on the part of the statutory authority or cases involving doctrine of strict liability cannot be relied upon in this case to fasten liability against MCD or the licensing authority. The position of the DVB is different, as direct negligence on its part was established and it was a proximate cause for the injuries to and death of victims. It can be said that insofar as the licensee and the DVB are concerned, there was contributory negligence.

**55.** The position of licensing authority and MCD is different. They were not the owners of the cinema theatre. The cause of the fire was not

14 *Murphy* v. *Brentwood District Council*, (1991) 1 AC 398 : (1990) 3 WLR 414 : (1990) 2 All ER 908 (HL)
13 *Anns* v. *Merton London Borough Council*, 1978 AC 728 : (1977) 2 WLR 1024 : (1977) 2 All ER 492 (HL)

SCC Online Web Edition, Copyright © 2015
Page 47    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------

*a*   attributable to them or anything done by them. Their actions/omissions were not the proximate cause of the deaths and injuries. The licensing authority and MCD were merely discharging their statutory functions (that is granting licence in the case of the licensing authority and submitting an inspection report or issuing an NOC by MCD). In such circumstances, merely on the ground that the licensing authority and MCD could have performed their duties better or more efficiently, they cannot be made liable to pay compensation to the victims of the tragedy. There is no close or direct

*b*   proximity to the acts of the licensing authority and MCD on the one hand and the fire accident and the death/injuries of the victims. But there was close and direct proximity between the acts of the licensee and the DVB on the one hand and the fire accident resultant deaths/injuries of victims. In view of the well-settled principles in regard to public law liability, in regard to discharge of statutory duties by the public authorities which do not involve mala fides

*c*   or abuse, the High Court committed a serious error in making the licensing authority and MCD liable to pay compensation to the victims jointly and severally with the licensee and the DVB.

**56.** We make it clear that the exoneration is only in regard to monetary liability to the victims. We do not disagree with the observations of the High Court that the performance of duties by the licensing authority and by MCD

*d*   (in its limited sphere) was mechanical, casual and lackadaisical. There is a tendency on the part of these authorities to deal with the files coming before them as requiring mere paperwork to dispose it. They fail to recognise the object of the law or rules, the reason why they are required to do certain acts and the consequences of non-application of mind or mechanical disposal of the application/requests which come to them. As rightly observed by Naresh

*e*   Kumar's Report, there is a lack of safety culture and lack of the will to improve performance. The compliance with the procedure and rules is mechanical. We affirm the observations of the High Court in regard to the shortcoming in the performance of their functions and duties by the licensing authority and to a limited extent by MCD. But that does not lead to monetary liability.

*f*   ***Re: Questions (iii) and (iv)***

**57.** The licensee argued that the entire liability should be placed upon the DVB. It was contended that the DVB had installed a transformer of a capacity of 1000 kV without obtaining the statutory sanction/approval and without providing all the safety measures which it was duty-bound to provide under the relevant Electricity Rules, and therefore, the DVB alone should be

*g*   responsible for the tragedy. This contention has no merit. In fact none in the main hall (ground floor of the theatre) died. Those on the second floor also escaped. It is only those in the balcony caught in noxious fumes, who died of asphyxiation. The deaths were on account of the negligence and greed on the part of the licensee in regard to installation of additional seats, in regard to closing of an exit door, parking of cars in front of transformer room by

*h*   increasing parking from 15 to 35 and other acts. We, therefore, reject the contention that the DVB should be made exclusively liable to pay the

SCC Online Web Edition, Copyright © 2015
Page 48 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

compensation. We have already held that the licensing authority and MCD are not liable. Therefore, the liability will be 85% of the licensee and 15% of the DVB.

**58.** We may next consider whether the compensation awarded in this case is proper and in accordance with the principles of public law remedy. As noticed above, the High Court has awarded compensation to the legal heirs of 57 deceased victims at the rate of Rs 18 lakhs where the deceased was aged more than 20 years and Rs 15 lakhs where the deceased was aged 20 years or less. It awarded Rs 1 lakh for each of the 103 injured. In regard to the death cases, the High Court adopted the following rationale: each person who was sitting in the balcony class where the rate of admission was Rs 50 per ticket, can be assumed to belong to a strata of society where the monthly income could not be less than Rs 15,000. Deducting one-third for personal expenses, the loss of dependency to the family would be Rs 10,000 p.m. or Rs 1,20,000 per annum. Applying a common multiplier of 15 in all cases where the deceased was more than 20 years, the compensation payable would be Rs 18 lakhs. The High Court deducted Rs 3 lakhs and awarded compensation at a flat rate of Rs 15,00,000 where the deceased was 20 years or less. The High Court also awarded interest at 9% per annum on the compensation amount from the date of filing of the writ petition (14-7-1997) to the date of payment.

**59.** Having awarded the said amounts the High Court proceeded to hold as follows: (*Uphaar Tragedy case*[1], ACJ p. 1717, para 101: DLT p. 335, para 110)

"*101[110].* We have arrived at the compensation on the basis of our estimation of the income of the victims of the unfortunate incident as we had no means to know their exact income. We, therefore, leave it open to the injured as well as relatives of the deceased to claim compensation based on the exact income of the victims by filing a suit or any other proceeding as may be permissible in law and if a suit or any other proceedings claiming such compensation are initiated within one year of this judgment, the same shall not be dismissed only on the ground of limitation. The amount directed by us to be payable under this judgment shall be *adjusted* against the amount which may ultimately be granted in favour of such persons in the proceedings mentioned above."

(emphasis supplied)

**60.** The contention of the licensee is what could be awarded as a public law remedy is only a nominal interim or palliative compensation and if any claimants (legal heirs of the deceased or any injured) wanted a higher compensation, they should file a suit for recovery thereof. It was contended that as what was awarded was an interim or palliative compensation, the High Court could not have assumed the monthly income of each adult who died as being not less than Rs 15,000 and then determining the compensation by applying the multiplier of 15 was improper. This gives rise to the following question: whether the income and multiplier method adopted to

1 *Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234

SCC Online Web Edition, Copyright © 2015
Page 49 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------

finally determine compensation can be arrived at while awarding tentative or palliative compensation by way of a public law remedy under Article 226 or 32 of the Constitution?

**61.** *Rudul Sah* v. *State of Bihar*[15] was one of the earliest decisions where interim compensation was awarded by way of public law remedy in the case of an illegal detention. This Court explained the rationale for awarding such interim compensation thus: (SCC p. 148, para 12)

"*12.* This order will not preclude the petitioner from bringing a suit to recover appropriate damages from the State and its erring officials. The order of compensation passed by us is, as we said above, in the nature of a palliative. We cannot leave the petitioner penniless until the end of his suit, the many appeals and the execution proceedings. A full-dressed debate on the nice points of fact and law which takes place leisurely in compensation suits will have to await the filing of such a suit by the poor Rudul Sah."

**62.** In *Nilabati Behera* v. *State of Orissa*[16] this Court observed: (SCC pp. 768-69, para 34)

"*34.* … Therefore, when the court moulds the relief by granting 'compensation' in proceedings under Article 32 or 226 of the Constitution seeking enforcement or protection of fundamental rights, it does so under the public law by way of penalising the wrongdoer and fixing the liability for the public wrong on the State which has failed in its public duty to protect the fundamental rights of the citizen. The payment of compensation in such cases is not to be understood, as it is generally understood in a civil action for damages under the private law but in the broader sense of providing relief by an order of making 'monetary amends' under the public law for the wrong done due to breach of public duty, of not protecting the fundamental rights of the citizen. The compensation is in the nature of 'exemplary damages' awarded against the wrongdoer for the breach of its public law duty and is independent of the rights available to the aggrieved party to claim compensation under the private law in an action based on tort, through a suit instituted in a court of competent jurisdiction or/and prosecute the offender under the penal law."

**63.** In *Sube Singh* v. *State of Haryana*[17] this Court held: (SCC p. 180*c-d*)

"It is now well settled that the award of compensation against the State is an appropriate and effective remedy for redressal of an established infringement of a fundamental right under Article 21, by a public servant. The quantum of compensation will, however, depend upon the facts and circumstances of each case. Award of such compensation (by way of public law remedy) will not come in the way of the aggrieved person claiming additional compensation in a civil court, in

15 (1983) 4 SCC 141 : 1983 SCC (Cri) 798
16 (1993) 2 SCC 746 : 1993 SCC (Cri) 527 : AIR 1993 SC 1960
17 (2006) 3 SCC 178 : (2006) 2 SCC (Cri) 54

SCC Online Web Edition, Copyright © 2015
Page 50          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

the enforcement of the private law remedy in tort, nor come in the way of the criminal court ordering compensation under Section 357 CrPC. Award of compensation as a public law remedy for violation of the fundamental rights enshrined in Article 21 of the Constitution, in addition to the private law remedy under the law of torts, was evolved in the last two-and-a-half decades."

**64.** Therefore, what can be awarded as compensation by way of public law remedy need not only be a nominal palliative amount, but something more. It can be by way of making monetary amounts for the wrong done or by way of exemplary damages, exclusive of any amount recoverable in a civil action based on tortious liability. But in such a case it is improper to assume admittedly without any basis, that every person who visits a cinema theatre and purchases a balcony ticket should be of a high income group person. In the year 1997, Rs 15,000 per month was rather a high income. The movie was a new movie with patriotic undertones. It is known that zealous movie-goers, even from low income groups, would not mind purchasing a balcony ticket to enjoy the film on the first day itself. To make a sweeping assumption that every person who purchased a balcony class ticket in 1997 should have had a monthly income of Rs 15,000 and on that basis apply a high multiplier of 15 to determine the compensation at a uniform rate of Rs 18 lakhs in the case of persons above the age of 20 years and Rs 15 lakhs for persons below that age, as a public law remedy, may not be proper.

**65.** While awarding compensation to a large group of persons, by way of public law remedy, it will be unsafe to use a high income as the determinative factor. The reliance upon *Nilabati Behera*[16] in this behalf is of no assistance as that case related to a single individual and there was specific evidence available in regard to the income. Therefore, the proper course would be to award a uniform amount keeping in view the principles relating to the award of compensation in public law remedy cases reserving liberty to the legal heirs of the deceased victims to claim an additional amount wherever they were not satisfied with the amount awarded. Taking note of the facts and circumstances, the amount of compensation awarded in public law remedy cases, and the need to provide a deterrent, we are of the view that the award of Rs 10 lakhs in the case of persons aged above 20 years and Rs 7.5 lakhs in regard to those who were 20 years or below as on the date of the incident, would be appropriate. We do not propose to disturb the award of Rs 1 lakh each in the case of injured. The amount awarded as compensation will carry interest at the rate of 9% per annum from the date of the writ petition as ordered by the High Court, reserve liberty to the victims or the LRs of the victims as the case may be to seek higher remedy wherever they are not satisfied with the compensation. Any increase shall be borne by the licensee (theatre owner) exclusively.

**66.** Normally, we would have let the matter rest there. But having regard to the special facts and circumstances of the case we propose to proceed

---

16 *Nilabati Behera v. State of Orissa*, (1993) 2 SCC 746 : 1993 SCC (Cri) 527


SCC Online Web Edition, Copyright © 2015
Page 51      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

MCD v. UPHAAR TRAGEDY VICTIMS ASSN. *(Raveendran, J.)*      531

*a*      step further to do complete justice. The calamity resulted in the death of 59 persons and injury to 103 persons. The matter related to a ghastly fire incident of 1997. The Victims' Association has been fighting the cause of victims for more than 14 years. If at this stage, we require the victims to individually approach the civil court and claim compensation, it will cause hardship, apart from involving huge delay, as the matter will be fought in a hierarchy of courts. The incident is not disputed. The names and identity of the 59 persons who died and 103 persons who were injured are available and

*b*      is not disputed.

**67.** Insofar as death cases are concerned the principle of determining compensation is streamlined by several decisions of this Court. (*See* for example *Sarla Verma* v. *DTC*[18].) If three factors are available the compensation can be determined. The first is the age of the deceased, the second is the income of the deceased and the third is number of dependants

*c*      (to determine the percentage of deduction for personal expenses). For convenience the third factor can also be excluded by adopting a standard deduction of one-third towards personal expenses. Therefore just two factors are required to be ascertained to determine the compensation in 59 individual cases. First is the annual income of the deceased, two-thirds of which becomes the annual loss of dependency; and second, the age of the deceased

*d*      which will furnish the multiplier in terms of *Sarla Verma*[18]. The annual loss of dependency multiplied by the multiplier will give the compensation. As this is a comparatively simple exercise, we direct the Registrar General of the Delhi High Court to receive applications in regard to death cases, from the claimants (legal heirs of the deceased) who want a compensation in excess of what has been awarded, that is, Rs 10 lakhs/Rs 7.5 lakhs. Such applications

*e*      should be filed within three months from today. He shall hold a summary inquiry and determine the compensation. Any amount awarded in excess of what is hereby awarded as compensation shall be borne exclusively by the theatre owner. To expedite the process the claimants concerned and the licensee with their respective counsel shall appear before the Registrar

*f*      without further notice. For this purpose the claimants and the theatre owner may appear before the Registrar on 10-1-2012 and take further orders in the matter. The hearing and determination of compensation may be assigned to any Registrar or other Senior Judge nominated by the learned Chief Justice/Acting Chief Justice of the Delhi High Court.

**68.** As far as the injured are concerned if they are not satisfied with the

*g*      sum of Rs 1 lakh which has been awarded it is open to them to approach the civil court for claiming higher compensation and if they do so within 3 months from today, the same shall be entertained and disposed of in accordance with law. It is not possible to refer the injury cases for summary determination like death cases, as the principles are different and determination may require a more detailed enquiry.

*h*

18 (2009) 6 SCC 121 : (2009) 2 SCC (Cri) 1002 : (2009) 2 SCC (Civ) 770

SCC Online Web Edition, Copyright © 2015
Page 52      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

*Re: Punitive damages*

**69.** We may next deal with the question of award of punitive damages of Rs 2,50,00,000 against the licensee. Before examining whether such punitive damages could be awarded at all, we have to notice the apparent mistake in arriving at the sum of Rs 2.5 crores. The High Court has stated that the licensee should be made liable to pay punitive damages to the extent of profit which it would have earned by selling tickets in regard to extra seats unauthorisedly and illegally sanctioned by the authorities and installed by the licensee. The High Court has not stated the arithmetical calculation of arriving at Rs 2,50,00,000 but it has indicated that the said sum has been assessed as the income earned by them by selling tickets for additional 250 seats between 1979 and 1996. The High Court has apparently calculated the ticket revenue at the rate of Rs 50 per ticket for 52 additional seats for three shows a day to arrive at a sum of Rs 7800 per day. For 17 years, this works out to Rs 4,83,99,000. Presumably, the High Court deducted Rs 2,33,99,000 towards entertainment tax, etc., to arrive at Rs 2.5 crores as profit from these additional seats.

**70.** Initially the seats were 250. Forty-three additional seats were sanctioned on 30-9-1976. Subsequently, the additional seats were cancelled. However, the Delhi High Court permitted the continuance of such number of seats which were permissible as per Rules. Therefore, all the 52 seats cannot be held to be illegal. What were illegal seats were the 15 seats that were added by securing an order dated 4-10-1980. The remaining 37 seats were found to be valid by the authorities. Therefore, if at all the licensee is to be made liable to reimburse the profits earned from illegal seats, it should be only in regard to these 15 seats and the eight seats in the Box which was the cause for closing one of the exits. Insofar as the eight seats in the owner's Box, though it is alleged that they were intended to be used only as complimentary seats, for the purpose of award of punitive damages, they are treated on a par with other balcony seats. The High Court also wrongly assumed that the ticket value to be Rs 50 from 1979 to 1996, because it was Rs 50 in the year 1997 for a balcony seat. Another erroneous assumption made is that for all shows on all the days, all these additional seats would be fully occupied. On a realistic assessment, (at a net average income of Rs 12 per seat with average 50% occupancy for 23 seats) the profits earned from these seats for 17 years would at best be Rs 25,00,000. Be that as it may.

**71.** We may next consider the appropriateness and legality of award of punitive damages. In this context, we may refer to the decision in *M.C. Mehta* v. *Union of India*[19] wherein this Court considered the question as to what should be the measure of liability of an enterprise which is engaged in a hazardous or inherently dangerous industry, if by reason of an accident occurring in such industry, persons die or are injured. This Court held: (SCC pp. 420-21, paras 31-32)

"*31.* … in a modern industrial society with highly developed scientific knowledge and technology where hazardous or inherently

19 (1987) 1 SCC 395 : 1987 SCC (L&S) 37



SCC Online Web Edition, Copyright © 2015
Page 53        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

dangerous industries are necessary to carry out part of the developmental programme, this rule evolved in the 19th century at a time when all these developments of science and technology had not taken place cannot afford any guidance in evolving any standard of liability consistent with the constitutional norms and the needs of the present day economy and social structure. We need not feel inhibited by this rule which was evolved in the context of a totally different kind of economy. Law has to grow in order to satisfy the needs of the fast-changing society and keep abreast with the economic developments taking place in the country. As new situations arise the law has to be evolved in order to meet the challenge of such new situations. Law cannot afford to remain static. We have to evolve new principles and lay down new norms which would adequately deal with the new problems which arise in a highly industrialised economy. We cannot allow our judicial thinking to be constricted by reference to the law as it prevails in England or for the matter of that in any other foreign country. We no longer need the crutches of a foreign legal order. We are certainly prepared to receive light from whatever source it comes but we have to build our own jurisprudence and we cannot countenance an argument that merely because the law in England does not recognise the rule of strict and absolute liability in cases of hazardous or inherently dangerous activities or the rule laid down in *Rylands* v. *Fletcher*[20] as developed in England recognises certain limitations and exceptions, we in India must hold back our hands and not venture to evolve a new principle of liability since English courts have not done so. We have to develop our own law and if we find that it is necessary to construct a new principle of liability to deal with an unusual situation which has arisen and which is likely to arise in future on account of hazardous or inherently dangerous industries which are concomitant to an industrial economy, there is no reason why we should hesitate to evolve such principle of liability merely because it has not been so done in England. We are of the view that an enterprise which is engaged in a hazardous or inherently dangerous industry which poses a potential threat to the health and safety of the persons working in the factory and residing in the surrounding areas owes an absolute and non-delegable duty to the community to ensure that no harm results to anyone on account of hazardous or inherently dangerous nature of the activity which it has undertaken. The enterprise must be held to be under an obligation to provide that the hazardous or inherently dangerous activity in which it is engaged must be conducted with the highest standards of safety and if any harm results on account of such activity, the enterprise must be absolutely liable to compensate for such harm and it should be no answer to the enterprise to say that it had taken all reasonable care and that the harm occurred without any negligence on its part. … Such hazardous or inherently dangerous activity for private profit can be tolerated only on condition that the enterprise engaged in such hazardous

20 (1868) LR 3 HL 330 : (1861-73) All ER Rep 1 (HL)

SCC Online Web Edition, Copyright © 2015
Page 54    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------

or inherently dangerous activity indemnifies all those who suffer on
account of the carrying on of such hazardous or inherently dangerous
activity regardless of whether it is carried on carefully or not. This
principle is also sustainable on the ground that the enterprise alone has
the resource to discover and guard against hazards or dangers and to
provide warning against potential hazards. We would therefore hold that
where an enterprise is engaged in a hazardous or inherently dangerous
activity and harm results to anyone on account of an accident in the
operation of such hazardous or inherently dangerous activity resulting,
for example, in escape of toxic gas the enterprise is strictly and
absolutely liable to compensate all those who are affected by the accident
and such liability is not subject to any of the exceptions which operate
vis-à-vis the tortious principle of strict liability under the rule in *Rylands*
v. *Fletcher*[20].

*32.* We would also like to point out that the measure of compensation
in the kind of cases referred to in the preceding paragraph must be
correlated to the magnitude and capacity *of the enterprise because such
compensation must have a deterrent effect.* The larger and more
prosperous the enterprise, the greater must be the amount of
compensation payable by it for the harm caused on account of an
accident in the carrying on of the hazardous or inherently dangerous
activity by the enterprise."                              (emphasis supplied)

**72.** What has been awarded is not exactly punitive damages with
reference to the magnitude or capacity of the enterprise. All that the High
Court pointed out was that the licensee has installed additional seats illegally.
That illegality contributed to the cause for the death and injuries, as they
slowed down the exiting of the occupants from the balcony. If people could
have got out faster (which they could have if the gangway was wider as
before, and if there had been two exits as before, instead of only one) many
would not have died of asphyxiation. Therefore the licensee is not only liable
to pay compensation for the death and injuries, but should, in the least be
denied the profits/benefits out of their illegal acts. In that sense it is not really
punitive, but a kind of negative restitution. We therefore uphold in principle
the liability of the licensee to return and reimburse the profits from the
illegally installed seats, but reduce it from Rs 2.5 crores to Rs 25 lakhs for
the reasons stated in the earlier paragraphs. The award of the said sum, as
additional punitive damages, covers two aspects. The first is because the
wrongdoing is outrageous in utter disregard of the safety of the patrons of the
theatre. The second is the gravity of the breach requiring a deterrent to
prevent similar further breaches.

***General observations and suggestions***

**73.** Parliament has enacted the Disaster Management Act, 2005.
Section 1(3) thereof provides that it shall come into force on such dates as the
Central Government may by notification in the Official Gazette appoint; and

20 (1868) LR 3 HL 330 : (1861-73) All ER Rep 1 (HL)


SCC Online Web Edition, Copyright © 2015
Page 55        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------



different dates may be appointed for different provisions of the Act for different States, and any reference to commencement in any provisions of the *a* Act in relation to any State shall be construed as a reference to the commencement of that provision in that State. All the provisions of the Act have not been brought into effect in all the States. Having regard to the object of the Act, bringing the Act into force promptly would be in public interest. Insofar as Delhi is concerned, by the Notification dated 19-3-2008, the Government of NCT of Delhi has established the Delhi Disaster Management *b* Authority for the National Capital Territory of Delhi. A disaster management helpline number has been made operational. Emergency operating centre and relief centres have been established. A State Disaster Response Force has been established. Several volunteers have been given training in disaster management. Attempts are being made to hold regular mock drills in regard to various types of disasters (like earthquakes, flood, fire, road accidents, *c* industrial and chemical disasters, terrorists attacks, gas leaks, etc.). Steps are taken to contact the public in regard to several natural and manmade disasters.

**74.** The key to successfully meeting the consequences of disasters is preparedness. There can be no complacency. Human tendency is to be awake and aware in the immediate aftermath of a disaster. But as the days pass, *d* slowly the disaster management equipment and disaster management personnel are allowed to slip away from their readiness. Only when the next disaster takes place, is there a sudden awakening. In regard to preparedness to meet disasters there could be no let-up in the vigil. The expenditure required for maintaining a high state of alert and readiness to meet disasters may appear to be high and wasteful regarding "non-disaster periods" but the *e* expenditure and readiness is absolutely must. Be that as it may.

**75.** While affirming the several suggestions by the High Court, we add the following suggestions to the Government for consideration and implementation:

*f*
(*i*) Every licensee (cinema theatre) shall be required to draw up an emergency evacuation plan and get it approved by the licensing authority.

(*ii*) Every cinema theatre shall be required to screen a short documentary during every show showing the exits, emergency escape routes and instructions as to what to do and what not to do in the case of fire or other hazards.

(*iii*) The staff/ushers in every cinema theatre should be trained in fire *g* drills and evacuation procedures to provide support to the patrons in case of fire or other calamity.

(*iv*) While the theatres are entitled to regulate the exit through doors other than the entry door, under no circumstances, the entry door (which can act as an emergency exit) in the event of fire or other emergency) should be bolted from outside. At the end of the show, the ushers may *h* request the patrons to use the exit doors by placing a temporary barrier across the entry gate which should be easily movable.

SCC Online Web Edition, Copyright © 2015
Page 56      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

(*v*) There should be mandatory half-yearly inspections of cinema theatres by a senior officer from the Delhi Fire Services, Electrical Inspectorate and the licensing authority to verify whether the electrical installations and safety measures are properly functioning and take action wherever necessary.

(*vi*) As the cinema theatres have undergone a change in the last decade with more and more multiplexes coming up, separate rules should be made for multiplex cinemas whose requirements and concerns are different from stand-alone cinema theatres.

(*vii*) An endeavour should be made to have a single-point nodal agency/licensing authority consisting of experts in structural engineering/building, fire prevention, electrical systems, etc. The existing system of police granting licences should be abolished.

(*viii*) Each cinema theatre, whether it is a multiplex or stand-alone theatre should be given a fire safety rating by the Fire Services which can be in green (fully compliant), yellow (satisfactorily compliant), red (poor compliance). The rating should be prominently displayed in each theatre so that there is awareness among the patrons and the building owners.

(*ix*) The Delhi Disaster Management Authority, established by the Government of NCT of Delhi may expeditiously evolve standards to manage the disasters relating to cinema theatres and the guidelines in regard to ex gratia assistance. It should be directed to conduct mock drills in each cinema theatre at least once in a year.

**Conclusions**

**76.** In view of the foregoing, we dispose of the appeals as follows:

**76.1.** CAs Nos. 7114-15 of 2003 filed by Municipal Corporation of Delhi is allowed and that part of the order dated 24-4-2003[1] of the Delhi High Court holding MCD jointly and severally liable to pay compensation to the victims of the Uphaar fire tragedy, is set aside.

**76.2.** CA No. 7116 of 2003 filed by the licensing authority is allowed and that part of the order dated 24-4-2003[1] of the Delhi High Court holding the licensing authority jointly and severally liable to pay compensation to the victims of the Uphaar fire tragedy, is set aside.

**76.3.** The writ petition filed by the Victims' Association on behalf of the victims to the extent it seeks compensation from MCD and the licensing authority is rejected.

**76.4.** The licensee (appellant in CA No. 6748 of 2004) and the Delhi Vidyut Board are held jointly and severally liable to compensate the victims of the Uphaar fire tragedy. Though their liability is joint and several, as between them, the liability shall be 85% on the part of the licensee and 15% on the part of the DVB.

1 *Assn. of Victims of Uphaar Tragedy* v. *Union of India*, 2003 ACJ 1631 (Del) : (2003) 104 DLT 234

SCC Online Web Edition, Copyright © 2015
Page 57    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

**76.5.** CA No. 6748 of 2004 is allowed in part and the judgment of the High Court is modified as under:

(*a*) The compensation awarded by the High Court in the case of death is reduced from Rs 18 lakhs to Rs 10 lakhs (in the case of those aged more than 20 years) and Rs 15 lakhs to Rs 7.5 lakhs (in the case of those aged 20 years and less). The said sum is payable to legal representatives of the deceased to be determined by a brief and summary enquiry by the Registrar General (or nominee of the learned Chief Justice/Acting Chief Justice of the Delhi High Court).

(*b*) The compensation of Rs 1 lakh awarded by the High Court in the case of each of the 103 injured persons is affirmed.

(*c*) The interest awarded from the date of the writ petition on the aforesaid sums at the rate of 9% per annum is affirmed.

(*d*) If the legal representatives of any deceased victim are not satisfied with the compensation awarded, they are permitted to file an application for compensation with supporting documentary proof (to show the age and the income), before the Registrar General, Delhi High Court. If such an application if filed within three months, it shall not be rejected on the ground of delay. The Registrar General or such other member of the higher judiciary nominated by the learned Chief Justice/Acting Chief Justice of the High Court shall decide those applications in accordance with paragraphs above and place the matter before the Division Bench of the Delhi High Court for consequential formal orders determining the final compensation payable to them.

(*e*) The injured victims who are not satisfied with the award of Rs 1 lakh as compensation, may approach the civil court in three months, in which event the claims shall not be dismissed on the ground of delay.

(*f*) While disbursing the compensation amount, any ex gratia payment made by the Central Government/Delhi Government shall not be taken into account. But other payments on account shall be taken note of.

(*g*) As a consequence, if the DVB has deposited any amount in excess it shall be entitled to receive back the same from any amount in deposit or to be deposited.

(*h*) The punitive damages ordered to be paid by the licensee, to the Union of India (for being used for setting up a Central Accident Trauma Centre) is reduced from Rs 2.5 crores to Rs 25 lakhs.

(*i*) The decisions of the High Court and this Court having been rendered in a public law jurisdiction, they will not come in the way of any pending criminal proceedings being decided with reference to the evidence placed in such proceedings.


SCC Online Web Edition, Copyright © 2015
Page 58      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**K.S.P. Radhakrishnan, J.** (*partly disagreeing*)*— I fully endorse the reasoning as well as the conclusions reached by my esteemed Brother. All the same, I would like to add a few thoughts which occurred to my mind on certain issues which arose for consideration in these matters.

78. Private law causes of action, generally enforced by the claimants against public bodies and individuals, are negligence, breach of statutory duty, misfeasance in public office, etc. Negligence as a tort is a breach of legal duty to take care which results in damage or injury to another. Breach of statutory duty is conceptually separate and independent from other related torts such as negligence though an action for negligence can also arise as a result of cursory and mala fide exercise of statutory powers. Right of an aggrieved person to sue in ordinary civil courts against the State and its officials and private persons through an action in tort and the principles to be followed in considering such claims are well settled and require no further elucidation.

79. We are in these appeals concerned with the claims resulting in the death of 59 patrons and injury to 103 patrons in a fire erupted at Uphaar Cinema Theatre, South Delhi on 13-6-1997.

80. We are primarily concerned with the powers of the constitutional courts in entertaining such monetary claims raised by the victims against the violation of statutory provisions by the licensing authorities, licensees, and others affecting the fundamental rights guaranteed to them under the Constitution. The constitutional courts in such situations are expected to vindicate the parties constitutionally, compensate them for the resulting harm and also to deter future misconduct. The constitutional courts seldom exercise their constitutional powers to examine a claim for compensation merely due to violation of some statutory provisions resulting in monetary loss to the claimants. Most of the cases in which courts have exercised their constitutional powers are when there is intense serious violation of personal liberty, right to life or violation of human rights.

81. But, even in private law remedy against the State and its instrumentalities, they claim immunity on the plea that they are discharging sovereign functions, even in cases where there is violation of personal liberty. This Court in *State of Rajasthan* v. *Vidhyawati*[21], rejected claim of State sovereign immunity and upheld the award of compensation in tort for the death of a pedestrian due to the rash and negligent driving of a government jeep.

82. In *Kasturi Lal Ralia Ram Jain* v. *State of U.P.*[22], drawing distinction between sovereign and non-sovereign functions, the Apex Court rejected the plea of arrest in violation of the U.P. Police Regulations on the ground that the arrest was made as a part of the sovereign powers of the State. *Kasturi Lal*[22] was a Constitution Bench judgment. However, in *N. Nagendra Rao & Co.* v. *State of A.P.*[23], a three-Judge Bench of this Court drew a distinction

---

* **Ed.:** As per the certified copy this opinion is also signed by Raveendran, J. on p. 82 thereof.

21   AIR 1962 SC 933

22   AIR 1965 SC 1039 : (1965) 2 Cri LJ 144

23   (1994) 6 SCC 205 : 1994 SCC (Cri) 1609 : AIR 1994 SC 2663

SCC Online Web Edition, Copyright © 2015
Page 59      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

between the sovereign and non-sovereign functions of the State and held as follows: (SCC p. 235, para 25)

*a*

"25. ... No legal or political system today can place the State above law as it is unjust and unfair for a citizen to be deprived of his property illegally by negligent act of officers of the State without any remedy. From sincerity, efficiency and dignity of the State as a juristic person, propounded in the nineteenth century as sound sociological basis for State immunity the circle has gone round and the emphasis now is more

*b*

on liberty, equality and the rule of law. The modern social thinking of progressive societies and the judicial approach is to do away with archaic State protection and place the State or the Government on a par with any other juristic legal entity. Any watertight compartmentalisation of the functions of the State as 'sovereign and non-sovereign' or 'governmental and non-governmental' is not sound. It is contrary to modern jurisprudential thinking. The need of the State to have extraordinary

*c*

powers cannot be doubted. But with the conceptual change of statutory power being statutory duty for the sake of the society and the people, the claim of a common man or ordinary citizen cannot be thrown out merely because it was done by an officer of the State even though it was against law and negligent. Needs of the State, duty of its officials and right of the citizens are required to be reconciled so that the rule of law in a welfare

*d*

State is not shaken."

**83.** The Court further held: (*N. Nagendra Rao & Co. case*[23], SCC p. 235, para 25)

"25. ... The determination of vicarious liability of the State being linked with the negligence of his officers, if they can be sued personally

*e*

for which there is no dearth of authority, and the law of misfeasance in discharge of public duty having marched ahead, there is no rationale for the proposition that even if the officer is liable the State cannot be sued."

The Court further opined that the ratio of *Kasturi Lal*[22] is available in those rare and limited cases where the statutory authority acts as a delegate of such functions for which it cannot be sued in a court of law. The Court opined that

*f*

the same principle would not be available in large number of other activities carried on by the State by enacting a law in its legislative competence.

**84.** The general principles of law enunciated in *Rylands* v. *Fletcher*[20], *Donoghue* v. *Stevenson*[24], however, still guide us. In several situations, where officials are dealing with hazardous or explosive substance, the maxim res ipsa loquitur applies. Reference may be made to the decision in *Lloyde* v.

*g*

*West Midlands Gas Board*[25], *Henderson* v. *Henry E. Jenkins & Sons*[26].

23 *N. Nagendra Rao & Co. v. State of A.P.*, (1994) 6 SCC 205 : 1994 SCC (Cri) 1609
22 *Kasturi Lal Ralia Ram Jain v. State of U.P.*, AIR 1965 SC 1039 : (1965) 2 Cri LJ 144
20 (1868) LR 3 HL 330 : (1861-73) All ER Rep 1 (HL)

*h*

24 1932 AC 562 : 1932 All ER Rep 1 (HL)
25 (1971) 1 WLR 749 : (1971) 2 All ER 1240 (CA)
26 1970 AC 282 : (1969) 3 WLR 732 : (1969) 3 All ER 756 (HL)

SCC Online Web Edition, Copyright © 2015
Page 60       Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

**85.** The principles laid down in *Donoghue* v. *Stevenson*[24], which highlighted the neighbour principle as a test to determine whether a potential duty of care exists, however is held to be not applicable to all fact situations. Lord Wilberforce enunciated a dual test in *Anns* v. *Merton London Borough Council*[13], of existence of proximity and reasonable foreseeability and a failure to take care that causes harm to the claimant. The House of Lords, however, in *Murphy* v. *Brentwood District Council*[14], however, overruled *Anns*[13] on the ground that there was no duty to take care on the legal authority to prevent power economic loss occurring. The House of Lords, however, in *Caparo Industries Plc.* v. *Dickman*[27] laid down three tests i.e. the claimants must show that harm was reasonably foreseeable, the relationship between the parties was proximate and that the imposition of liability would be just, fair and reasonable.

**86.** Later, in *X (Minors)* v. *Bedfordshire County Council*[6], Lord Browne-Wilkinson stated that an administrative act carried out in the exercise of a statutory discretion can only be actionable in negligence if the act is so unreasonable that it falls outside the proper ambit of that discretion. In effect, this would require that the act to be unlawful in the public law sense under the *Wednesbury*[28] principle.

**87.** The House of Lords further held in *Barrett* v. *Enfield London Borough Council*[29] that: (AC p. 586 D-E)

"… where a plaintiff claims damages for personal injuries which he alleges have been caused by decisions negligently taken in the exercise of a statutory discretion, and provided that the decisions do not involve issues of policy which the courts are ill-equipped to adjudicate upon, it is preferable for the courts to decide the validity of the plaintiff's claim by applying directly the common law concept of negligence than by applying as a preliminary test the public law concept of *Wednesbury*[28] unreasonableness to determine if the decision fell outside the ambit of the statutory discretion."

**88.** Later, the House of Lords speaking through Lord Slynn stated as follows: (*Phelps case*[30], AC p. 653 A-B)

"… the House decided in *Barrett* v. *Enfield London Borough Council*[29] that the fact that acts which are claimed to be negligent are carried out within the ambit of a statutory discretion is not in itself a

24  1932 AC 562 : 1932 All ER Rep 1 (HL)
13  1978 AC 728 : (1977) 2 WLR 1024 : (1977) 2 All ER 492 (HL)
14  (1991) 1 AC 398 : (1990) 3 WLR 414 : (1990) 2 All ER 908 (HL)
27  (1990) 2 AC 605 : (1990) 2 WLR 358 : (1990) 1 All ER 568 (HL)
 6  (1995) 2 AC 633 : (1995) 3 WLR 152 : (1995) 3 All ER 353 (HL)
28  *Associated Provincial Picture Houses Ltd.* v. *Wednesbury Corpn.*, (1948) 1 KB 223 : (1947) 2 All ER 680 (CA)
29  (2001) 2 AC 550 : (1999) 3 WLR 79 : (1999) 3 All ER 193 (HL)
30  *Phelps* v. *Hillingdon London Borough Council*, (2001) 2 AC 619 : (2000) 3 WLR 776 : (2000) 4 All ER 504 (HL)


SCC Online Web Edition, Copyright © 2015
Page 61       Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases

a    reason why it should be held that no claim for negligence can be brought
in respect of them. It is only where what is done has involved the
weighing of competing public interests or has been dictated by
considerations on which Parliament could not have intended that the
courts would substitute their views for the views of ministers or officials
that the courts will hold the issue is non-justiciable on the ground that the
decision was made in the exercise of a statutory discretion."

b    Both *Barrett*[29] and *Phelps*[30], it may be noted, have highlighted the fact that a
public body may be liable for acts done which fell within its ambit of
discretion without the claimant also having to show that the act done was
unlawful in the public law sense, so long as the decision taken or act done
was justiciable.

**89.** The above decisions would indicate that in England also there is a lot
of uncertainty when claims are raised against public bodies for negligence or
c    violation of statutory duties. It is worth noticing that the Law Commission,
UK in its consultation paper on "Administrative Redress" proposed that
Judges should apply a "principle of modified corrective justice" when
deciding negligence claims against public bodies. [Law Commission
Consultation Paper No. 187 (2008).] The Law Commission consequently
proposed the introduction of a new touchstone of liability: "serious fault".
d    The Law Commission's most far-reaching reform proposals relate to
"court-based redress" which suggests "the creation of a specific regime for
public bodies" based around a number of common elements such as Judges
would apply a standard of "serious fault" in both judicial review and
negligence proceedings.

**90.** Richard Mullender in an essay on *Negligence, Public Bodies and
e    Ruthlessness*[31], argues for a reform of negligence law (as it applies to public
bodies) that is different from that proposed by the Law Commission, such as
application of the proportionality principle at the third stage of the duty of
care test applied in *Caparo Industries case*[27].

**91.** Development taking place in UK has been highlighted only to show
f    the uncertainty that one faces while deciding claims against public bodies
and its officials. But when we look at the issues from the point of violation of
fundamental rights, such as personal liberty, deprivation of life, etc. there is
unanimity in approach by the courts in India, UK and USA and various other
countries, that the constitutional courts have a duty to protect those rights and
mitigate the damage caused. Violation of such rights is often described as
g    constitutional torts.

29  *Barrett* v. *Enfield London Borough Council*, (2001) 2 AC 550 : (1999) 3 WLR 79 : (1999) 3 All
    ER 193 (HL)
30  *Phelps* v. *Hillingdon London Borough Council*, (2001) 2 AC 619 : (2000) 3 WLR 776 : (2000) 4
    All ER 504 (HL)
h    31  (2009) 72 Modern Law Review 961-98
27  *Caparo Industries Plc*. v. *Dickman*, (1990) 2 AC 605 : (1990) 2 WLR 358 : (1990) 1 All ER 568
    (HL)

SCC Online Web Edition, Copyright © 2015
Page 62                Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-------------------------------------------------------------------------------------------------------------------

**92.** The concept of constitutional tort and compensatory jurisprudence found its expression in *Devaki Nandan Prasad* v. *State of Bihar*[32] where the petitioner's claim for pension was delayed for over twelve years. This Court awarded Rs 25,000 as against authorities after having found that the harassment was intentional, deliberate and motivated.

**93.** Liability to compensate for infringement of fundamental rights guaranteed under Article 21 was successfully raised in *Khatri (2)* v. *State of Bihar*[33] (*Bhagalpur Blinded Prisoners case*).

**94.** In *Rudul Sah* v. *State of Bihar*[15], this Court found that the petitioner's prolonged detention in the prison after his acquittal was wholly unjustified and illegal and held that Article 21 will be denuded of its significant content if the power of the Supreme Court was limited to passing orders of release from illegal detention. The Court ordered that to prevent violation of that right and secure due compliance with the mandate of Article 21, it has to mulct its violators in the payment of monetary compensation. The Court held that right to compensation is thus some palliative for the unlawful acts of instrumentalities of the State which act in the name of public interest and which present for their protection the powers of the State as shield. Reference may also be made to the judgments of this Court in *Sebastian M. Hongray* v. *Union of India*[34], *Bhim Singh* v. *State of J&K*[35], *Saheli* v. *Commr. of Police*[36], *Inder Singh* v. *State of Punjab*[37], *Radha Bai* v. *UT of Pondicherry*[38], *LDA* v. *M.K. Gupta*[39], *Delhi Domestic Working Women's Forum* v. *Union of India*[40], *Gudalure M.J. Cherian* v. *Union of India*[41] and *Sube Singh* v. *State of Haryana*[17], etc.

**95.** Specific reference may be made to the decision of this Court in *Nilabati Behera* v. *State of Orissa*[16], wherein this Court held that the concept of sovereign immunity is not applicable to the cases of violation of fundamental rights and summarised as follows: (SCC pp. 762-63, para 17)

> "*17.* … 'a claim in public law for compensation' for contravention of human rights and fundamental freedoms, the protection of which is guaranteed in the Constitution, is an acknowledged remedy for

32 (1983) 4 SCC 20 : 1983 SCC (L&S) 495
33 (1981) 1 SCC 627 : 1981 SCC (Cri) 228
15 (1983) 4 SCC 141 : 1983 SCC (Cri) 798
34 (1984) 3 SCC 82 : 1984 SCC (Cri) 407 : AIR 1984 SC 1026
35 (1985) 4 SCC 677 : 1986 SCC (Cri) 47 : AIR 1986 SC 494
36 (1990) 1 SCC 422 : 1990 SCC (Cri) 145 : AIR 1990 SC 513
37 (1995) 3 SCC 702 : 1995 SCC (L&S) 857 : (1995) 30 ATC 122 : 1995 SCC (Cri) 586 : AIR 1995 SC 1949
38 (1995) 4 SCC 141 : 1995 SCC (L&S) 942 : (1995) 30 ATC 196 : AIR 1995 SC 1476
39 (1994) 1 SCC 243 : AIR 1994 SC 787
40 (1995) 1 SCC 14 : 1995 SCC (Cri) 7
41 1995 Supp (3) SCC 387 : 1995 SCC (Cri) 925
17 (2006) 3 SCC 178 : (2006) 2 SCC (Cri) 54
16 (1993) 2 SCC 746 : 1993 SCC (Cri) 527



SCC Online Web Edition, Copyright © 2015
Page 63     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

a
enforcement and protection of such rights, and such a claim based on strict liability made by resorting to a constitutional remedy provided for the enforcement of a fundamental right is 'distinct from, and in addition to, the remedy in private law for damages for the tort' resulting from the contravention of the fundamental right. The defence of sovereign immunity being inapplicable, and alien to the concept of guarantee of fundamental rights, there can be no question of such a defence being available in the constitutional remedy. It is this principle which justifies
b
award of monetary compensation for contravention of fundamental rights guaranteed by the Constitution, when that is the only practicable mode of redress available for the contravention made by the State or its servants in the purported exercise of their powers, and enforcement of the fundamental right is claimed by resort to the remedy in public law under the Constitution by recourse to Articles 32 and 226 of the Constitution…."
c
**96***. Courts have held that due to the action or inaction of the State or its officers, if the fundamental rights of a citizen are infringed then the liability of the State, its officials and instrumentalities, is strict. The claim raised for compensation in such a case is not a private law claim for damages, under which the damages recoverable are large. The claim made for compensation
d
in public law is for compensating the claimants for deprivation of life and personal liberty which has nothing to do with a claim in a private law claim in tort in an ordinary civil court.

**97.** This Court in *Union of India* v. *Prabhakaran Vijaya Kumar*[42], extended the principle to cover public utilities like the Railways, electricity
e
distribution companies, public corporations and local bodies which may be social utility undertakings not working for private profit. In *Prabhakaran*[42] a woman fell on a railway track and was fatally run over and her husband demanded compensation. The Railways argued that she was negligent as she tried to board a moving train. Rejecting the plea of the Railways, this Court held that her "contributory negligence" should not be considered in such
f
untoward incidents—the Railways has "strict liability". A strict liability in torts, private or constitutional do not call for a finding of intent or negligence. In such a case the highest degree of care is expected from private and public bodies, especially when the conduct causes physical injury or harm to persons. The question as to whether the law imposes a strict liability on the State and its officials primarily depends upon the purpose and object of the
g
legislation as well. When activities are hazardous and if they are inherently dangerous the statute expects the highest degree of care and if someone is injured because of such activities, the State and its officials are liable even if they could establish that there was no negligence and that it was not intentional. Public safety legislations generally fall in that category of breach

h
* **Ed.**: Para 96 corrected vide Official Corrigendum No. F.3/Ed.B.J./33/2012 dated 7-6-2012.
42 (2008) 9 SCC 527 : (2008) 3 SCC (Cri) 813


SCC Online Web Edition, Copyright © 2015
Page 64          Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

of statutory duty by a public authority. To decide whether the breach is actionable, the Court must generally look at the statute and its provisions and determine whether legislature in its wisdom intended to give rise to a cause of action in damages and whether the claimant is intended to be protected.

**98.** But, in a case, where life and personal liberty have been violated, the absence of any statutory provision for compensation in the statute is of no consequence. Right to life guaranteed under Article 21 of the Constitution of India is the most sacred right preserved and protected under the Constitution, violation of which is always actionable and there is no necessity of statutory provision as such for preserving that right. Article 21 of the Constitution of India has to be read into all public safety statutes, since the prime object of public safety legislation is to protect the individual and to compensate him for the loss suffered. Duty of care expected from State or its officials functioning under the public safety legislation is, therefore, very high, compared to the statutory powers and supervision expected from the officers functioning under the statutes like the Companies Act, the Cooperative Societies Act and such similar legislations. When we look at the various provisions of the Cinematograph Act, 1952 and the Rules made thereunder, the Delhi Building Regulations and the Electricity laws the duty of care on officials was high and liabilities strict.

*Constitutional torts—Measure of damages*

**99.** The law is well settled that a constitutional court can award monetary compensation against the State and its officials for its failure to safeguard fundamental rights of citizens but there is no system or method to measure the damages caused in such situations. Quite often the courts have a difficult task in determining damages in various fact situations. The yardsticks normally adopted for determining the compensation payable in private tort claims are not as such applicable when a constitutional court determines the compensation in cases where there is violation of fundamental rights guaranteed to its citizens.

**100.** In *D.K. Basu* v. *State of W.B.*[43], a Constitution Bench of this Court held that there is no straitjacket formula for computation of damages and we find that there is no uniformity or yardstick followed in awarding damages for violation of fundamental rights. In *Rudul Sah case*[15] this Court used the terminology "palliative" for measuring the damages and the formula of "ad hoc" was applied. In *Sebastian Hongray case*[34] the expression used by this Court for determining the monetary compensation was "exemplary" costs and the formula adopted was "punitive". In *Bhim Singh case*[35], the expression used by the Court was "compensation" and the method adopted was "tortious formula". In *D.K. Basu* v. *State of W.B.*[43] the expression used

---

43  (1997) 1 SCC 416 : 1997 SCC (Cri) 92
15  *Rudul Sah* v. *State of Bihar*, (1983) 4 SCC 141 : 1983 SCC (Cri) 798
34  *Sebastian M. Hongray* v. *Union of India*, (1984) 3 SCC 82 : 1984 SCC (Cri) 407
35  *Bhim Singh* v. *State of J&K*, (1985) 4 SCC 677 : 1986 SCC (Cri) 47

SCC Online Web Edition, Copyright © 2015
Page 65    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
---------------------------------------------------------------------------------------------

by this Court for determining the compensation was "monetary compensation". The formula adopted was "cost to cost" method. Courts have

*a*  not, therefore, adopted a uniform criterion since no statutory formula has been laid down.

**101.** Constitutional courts all over the world have to overcome these hurdles. Failure to precisely articulate and carefully evaluate a uniform policy as against State and its officials would at times tend the court to adopt rules which are applicable in private law remedy for which courts and statutes have

*b*  evolved various methods, such as loss of earnings, impairment of future earning capacity, medical expenses, mental and physical suffering, property damage, etc. Adoption of those methods as such in computing the damages for violation of constitutional torts may not be proper.

**102.** In *Delhi Domestic Working Women's Forum* v. *Union of India*[40] the Apex Court laid down parameters in assisting the victims of rape including

*c*  the liability of the State to provide compensation to the victims and held as follows: (SCC p. 20, para 15)

"*15.* (*7*) It is necessary, having regard to the directive principles contained under Article 38(1) of the Constitution of India to set up Criminal Injuries Compensation Board. Rape victims frequently incur substantial financial loss. Some, for example, were too traumatised to

*d*  continue in employment.

(*8*) Compensation for victims shall be awarded by the court on conviction of the offender and by the Criminal Injuries Compensation Board whether or not a conviction has taken place. The Board will take into account the pain, suffering and shock as well as loss of earnings due to pregnancy and the expenses of child birth if it occurred as a result of

*e*  the rape."

**103.** Legal liability in damages exists solely as a remedy out of private law action in tort which is generally time-consuming and expensive, and hence when fundamental rights are violated the claimants prefer to approach constitutional courts for speedy remedy. The constitutional courts, of course, shall invoke their jurisdiction only in extraordinary circumstances when

*f*  serious injury has been caused due to violation of fundamental rights, especially under Article 21 of the Constitution of India. In such circumstances the Court can invoke its own methods depending upon the facts and circumstances of each case.

***Constitutional torts and punitive damages***

**104.** Constitutional courts' actions not only strive to compensate the

*g*  victims and vindicate their constitutional rights, but also to deter future constitutional misconduct without proper excuse or with some collateral or improper motive. The constitutional courts can in appropriate cases of serious violation of life and liberty of the individuals award punitive damages. However, the same generally requires the presence of malicious intent on the

*h*  side of the wrongdoer i.e. an intentional doing of some wrongful act.

40 (1995) 1 SCC 14 : 1995 SCC (Cri) 7

SCC Online Web Edition, Copyright © 2015
Page 66        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



**105.** Compensatory damages are intended to provide the claimant with a monetary amount necessary to recoup/replace what was lost, since damages in tort are generally awarded to place the claimants in the position he would have been in, had the tort not taken place; which are generally quantified under the heads of general damages and special damages. Punitive damages are intended to reform or to deter the wrongdoer from indulging in conduct similar to that which formed the basis for the claim. Punitive damages are not intended to compensate the claimant which he can claim in an ordinary private law claim in tort. Punitive damages are awarded by the constitutional court when the wrongdoer's conduct was egregiously deceitful.

**106.** Lord Patrick Devlin in the leading case on the point *Rookes* v. *Barnard*[44] delineated certain circumstances which satisfy the test for awarding punitive damages such as the conduct must have been oppressive, arbitrary, or unconstitutional, the conduct was calculated to make profit for the wrongdoer and that the statute expressly authorises awarding of punitive damages. The above principles are, however, not uniformly followed by the English courts though the House of Lords in a decision in *Attorney General* v. *Blake*[45] awarded punitive damages when it was found that the defendant had profited from publishing a book and was asked to give an account of his profits gained from writing the book. In this case where the wrongdoer was made to give up the profits made, through restitution for wrongs, certainly the claimant gained damages.

**107.** In the United States, in a few States, punitive damages are determined based on statutes. But often criticisms are raised because of the high imposition of punitive damages by the courts. The Supreme Court of United States has rendered several decisions limiting the awards of punitive damages through the due process of law clauses of the Fifth and Fourteenth Amendments. In *BMW of North America Inc.* v. *Gore*[46] the Court ruled that the punitive damages must be reasonable, as determined based on the degree of reprehensibility of the conduct, the ratio of punitive damages to compensatory damages and any criminal or civil penalties applicable to the conduct. In *Philip Morris USA* v. *Williams*[47], the Court ruled that the award of punitive damages cannot be imposed for the direct harm that the misconduct caused to others, but may consider harm to others as a function of determining how reprehensible it was. There is no hard-and-fast rule to measure the punitive damages to determine such a claim. In United States in number of cases the Court has indicated that the ratio 10:1 or higher between punitive and compensatory damages is held to be unconstitutional.

**108.** Several factors may gauge on a constitutional court in determining the punitive damages such as contumacious conduct of the wrongdoer, the nature of the statute, gravity of the fault committed, the circumstances, etc.

44  1964 AC 1129 : (1964) 2 WLR 269 : (1964) 1 All ER 367 (HL)
45  (2001) 1 AC 268 : (2000) 3 WLR 625 : (2004) 4 All ER 385 (HL)
46  134 L Ed 2d 809 : 517 US 559 (1996)
47  166 L Ed 2d 940 : 549 US 346 (2007)

SCC Online Web Edition, Copyright © 2015
Page 67     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases



MCD v. UPHAAR TRAGEDY VICTIMS ASSN. *(Radhakrishnan, J.)*      547

Punitive damages can be awarded when the wrongdoers' conduct "shocks the conscience" or is "outrageous" or there is a wilful and "wanton disregard" for safety requirements. Normally, there must be a direct connection between the wrongdoer's conduct and the victim's injury.

***Need for legislation***

**109.** Need for a comprehensive legislation dealing with tortious liability of the State and its instrumentalities has been highlighted by this Court and the academic world on various occasions and it is high time that we develop a sophisticated jurisprudence of public law liability. Due to lack of legislation, the courts dealing with the cases of tortious claims against the State and its officials are not following a uniform pattern while deciding those claims, and this at times leads to undesirable consequences and arbitrary fixation of compensation amount.

**110.** The Government of India on the recommendations of the First Law Commission introduced two Bills on the government liability in torts in the years 1965-1967 in the Lok Sabha but those Bills lapsed. In *Kasturi Lal case*[22], this Court has highlighted the need for a comprehensive legislation which was reiterated by this Court in various subsequent decisions as well.

**111***. Public authorities are now made liable in damages in UK under the Human Rights Act, 1998. Section 6 of the Human Rights Act, 1998 makes a public authority liable for damages if it is found to have committed breach of human rights. The Court of Appeal in England in *Anufrijeva* v. *Southwark London Borough Council*[48], attempted to answer certain important questions as to how damages should be awarded for breach of human rights and how should damages be assessed. Further, such claims are also dealt by Ombudsmen created by various statutes: they are independent and impartial officials, who investigate complaints of the citizens in cases of maladministration. Experience shows that majority of the Ombudsmen's recommendations are complied with in practice, though they are not enforceable in courts. The European Court of Justice has developed a sophisticated jurisprudence concerning liability in damages regarding liability of public bodies for the loss caused by administrative acts.

**112.** We have highlighted all these facts only to indicate that rapid changes are taking place all over the world to uphold the rights of the citizens against the wrong committed by statutory authorities and local bodies. Despite the concern shown by this Court, it is unfortunate that no legislation has been enacted to deal with such situations. We hope and trust that utmost attention would be given by the legislature for bringing in appropriate legislation to deal with claims in public law for violation of fundamental rights guaranteed to the citizens, at the hands of the State and its officials.

———

22 *Kasturi Lal Ralia Ram Jain* v. *State of U.P.*, AIR 1965 SC 1039 : (1965) 2 Cri LJ 144
   * **Ed.:** Para 111 corrected vide Official Corrigendum No. F.3/Ed.B.J./60/2011 dated 18-11-2011.
48 2004 QB 1124 : (2004) 2 WLR 603 : (2004) 1 All ER 833 (CA)

Declaration of Ritin Rai

Exhibit 12

SCC Online Web Edition, Copyright © 2015
Page 1    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-----------------------------------------------------------------------------------------------------------------------

transmission machinery as it is an appliance or device by which the motion of a primary mover is transmitted. In fact, an analogy between the transmission of electricity and transmission of LPG can be drawn. The movement or transfer of electrical energy takes place over an interconnected group of lines and associated equipment between points of supply and points at which it is transformed for delivery to consumers or is delivered to other electric systems. Transmission is considered to end when the energy is transformed for distribution to the consumer.

**38.** In many countries transmission of LPG also takes place in a similar manner from a large fixed tank. In case of LPG stored in a cylinder the mechanism of transmission is essentially the same as the gas travels from the cylinder where it is stored to the gas cooking stove. While transmission of electricity involves a switch, transmission of LPG involves a valve mechanism or a regulator to ensure smooth flow. Hence, LPG is a source of energy which is mechanically transmitted by way of the tube attached to the machinery.

**39.** In our view, the use of LPG satisfies the definition of power as it is mechanically transmitted and is not something generated by human or animal agency. Since the establishments of the appellants involve a manufacturing process with the aid of LPG, which can now be termed as power, the establishments of the appellants can be termed as factories, and therefore, the ESI Act will apply to these establishments.

**40.** In view of the above discussion, we see no grounds to interfere with the impugned judgment of the High Court. Accordingly, the appeals are dismissed. No order as to costs.

———

### (2009) 9 Supreme Court Cases 70

(BEFORE MARKANDEY KATJU AND A.K. GANGULY, JJ.)

NEW INDIA ASSURANCE COMPANY
    LIMITED                        ..        *Appellant*;

*Versus*

ZUARI INDUSTRIES LIMITED AND OTHERS    ..    *Respondents.*

Civil Appeal No. 4436 of 2004†, decided on September 1, 2009

**A. Consumer Protection — Services — Insurance — Fire accident — Flashover due to electrical short-circuit causing damage to boiler and other equipment — Repudiation of claim on ground that no sustained fire caused said damage — Legality — Sustained fire, if necessary for claiming loss under fire insurance policy — Held, duration of fire is not relevant — As long as there is fire which caused the damage, claim is maintainable even if the fire is for a fraction of a second — Further, clause in policy in question was not qualified by the term "sustained" — Consumer Protection Act, 1986, Ss. 2(1)(g) & (o)**

† From the Judgment and Order dated 26-3-2004 of the National Consumer Disputes Redressal Commission, New Delhi in OP No. 196 of 2001

SCC Online Web Edition, Copyright © 2015
Page 2      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**B. Deeds and Documents — Insurance policy — Construction of words and phrases — Held, court cannot add words to a statute or document but must read it as it is**

*a*

Respondent Company made two claims of Rs 1,35,17,709 for material loss due to the damage to the boiler and other equipments, and Rs 19,11,10,000 for loss of profit for the period their plant remained closed before the Insurance Company on the ground that consequent upon a short-circuiting in the main switchboard in their plant receiving electricity from the State Electricity Board, a flashover occurred producing overcurrents which generated excessive heat stopping power supply resulting in excessive supply of water/steam into the boiler, causing damage to the boiler. Insurance Company contended that the loss to the boiler and other equipments was not caused by the fire, but due to thermal shock caused due to stoppage of electricity. The National Consumer Commission allowed the claim. Contending that fire was not the proximate cause resulting in the damage, and that there was no fire in the first place Insurance Company had filed present appeal.

*b*

*c*

The question before the Supreme Court was whether sustained fire is sine qua non to make insurance claim for damages caused by fire.

Dismissing the appeal, the Supreme Court

*Held* :

*d*

The duration of the fire is not relevant. As long as there is a fire which caused the damage the claim is maintainable, even if the fire is for a fraction of a second. Admittedly, there was fire and flashover caused the damage. The term "fire" in Clause (1) of Fire Policy C in the present case is not qualified by the word "sustained". It is well settled that the court cannot add words to a statute or to a document and must read it as it is. Hence repudiation of the policy on the ground that there was no "sustained fire" is not justified. A perusal of the fire policy in question shows that the word used therein is "fire" and not "sustained fire". Hence the stand of the Insurance Company in this connection is not acceptable.                                                                (Paras 9 and 13)

*e*

**C. Consumer Protection — Insurance — Fire accident — Proximate cause — Meaning — Proximate cause is not the cause which is nearest in time or place — It is the active and efficient cause that sets in motion a chain of events that brings about the ultimate result without the intervention of any other force — Tort Law — Causation — "Proximate cause" — What is**
                                                                           **(Paras 14 to 22)**

*f*

*Lynn Gas and Electric Co.* v. *Meriden Fire Insurance Co.*, 33 NE 690 : 158 Mass 570; *Krenie C. Frontis et al.* v. *Milwaukee Insurance Co.*, 242 A 2d 749 : 156 Conn 492; *Farmers Union Mutual Insurance Co.* v. *Blankenship*, 231 Ark 127 : 328 SW 2d 360 : 76 ALR 2d 1133; *Leyland Shipping Co. Ltd.* v. *Norwich Union Fire Insurance Society Ltd.*, (1917) 1 KB 873 (CA); *Etherington and Lancashire and Yorkshire Accident Insurance Co., Re*, (1909) 1 KB 591 : (1908-10) All ER Rep 581 (CA), *approved*

*g*

*Yorkshire Dale Steamship Co. Ltd.* v. *Minister of War Transport*, (1942) AC 691 : (1942) 2 All ER 6 (HL), *relied on*

*Everett* v. *London Assurance*, (1865) 34 LJCP 299 : 11 Jur NS 546 : 13 WR 862, *disapproved*

*h*


Case 1:15-cv-00612-JPB   Document 24-1   Filed 11/10/15   Page 264 of 288

72                    SUPREME COURT CASES              (2009) 9 SCC

**D. Insurance — Insurance policy — Ambiguity in the terms of insurance — Resolving of, in whose favour — Reiterated, in case of ambiguity in a contract of insurance, said ambiguity should be resolved in favour of claimant and against insurance company — Deeds and Documents — Insurance policy — Interpretation of** (Para 22)

*General Assurance Society Ltd.* v. *Chandmull Jain*, AIR 1966 SC 1644, *relied on*

**E. Insurance — Fire insurance — Exclusion clause — "Short-circuiting in an electrical appliance damaging said electrical appliance" and "fire as a result of short-circuiting in said electrical appliance damaging other items" — Scope of exclusion explained**

A perusal of Exclusion Clause (*g*) shows that the main part of the exclusion clause which protects the insurer from liability under the policy covers loss of damage to any electrical machinery, appliance, etc. which themselves are a total loss or a damage or damaged due to short-circuiting, self-heating or leakage of electricity. However, the proviso to the said clause included within the scope of the fire policy for whatever damage or destruction caused by the fire to any other appliances. If for example the short-circuiting results in damage in a television set through fire created by short-circuiting in it, the claim for said television set is excluded under the fire policy. However, if from the same fire there is a damage to the rest of the house or other appliances, the same is included within the scope of the fire policy by virtue of the proviso. In other words, if the proximate cause of the loss or destruction to any other including other machines, apparatus, fixtures, fittings, etc. or part of the electrical installation is due to the fire which is started in an electrical machine or apparatus, all such losses because of the fire in other machinery or apparatus are covered by the policy. (Para 11)

N-D/43648/C

Advocates who appeared in this case :
  Ms Meenakshi Midha (for Pranab Kumar Mullick), Advocate, for the Appellant;
  K.K. Venugopal, Senior Advocate [Sanjeev K. Kapoor, Vishal Gupta (for M.A. Chinnasamy) and Animesh Sinha (for B.K. Satija), Advocates] for the Respondents.

*Chronological list of cases cited*                              *on page(s)*
  1.  242 A 2d 749 : 156 Conn 492, *Krenie C. Frontis et al.* v. *Milwaukee Insurance Co.*                                            77*f-g*
  2.  AIR 1966 SC 1644, *General Assurance Society Ltd.* v. *Chandmull Jain*      79*a*
  3.  231 Ark 127 : 328 SW 2d 360 : 76 ALR 2d 1133, *Farmers Union Mutual Insurance Co.* v. *Blankenship*                            78*a*
  4.  (1942) AC 691 : (1942) 2 All ER 6 (HL), *Yorkshire Dale Steamship Co. Ltd.* v. *Minister of War Transport*                     78*c-d*
  5.  (1917) 1 KB 873 (CA), *Leyland Shipping Co. Ltd.* v. *Norwich Union Fire Insurance Society Ltd.*                                78*b*
  6.  (1909) 1 KB 591 : (1908-10) All ER Rep 581 (CA), *Etherington and Lancashire and Yorkshire Accident Insurance Co.*, Re         78*e*
  7.  33 NE 690 : 158 Mass 570, *Lynn Gas and Electric Co.* v. *Meriden Fire Insurance Co.*                                          77*c-d*, 77*e*
  8.  (1865) 34 LJCP 299 : 11 Jur NS 546 : 13 WR 862, *Everett* v. *London Assurance*                                                79*b*


SCC Online Web Edition, Copyright © 2015
Page 4      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

---

NEW INDIA ASSURANCE CO. LTD. v. ZUARI INDUSTRIES LTD. *(Katju, J.)*      73

The Judgment of the Court was delivered by

*a*    **MARKANDEY KATJU, J.**— This appeal has been filed against the impugned judgment of the National Consumer Disputes Redressal Commission, New Delhi dated 26-3-2004 in Original Petition No. 196 of 2001.

**2.** Heard Ms Meenakshi Midha, learned counsel for the appellant and Shri K.K. Venugopal and Shri Nageswara Rao, learned counsel for the respondent. The facts of the case were that the complainant (the respondent

*b*    in this appeal) had taken insurance policies from the appellant on 1-4-1998 in respect of its factory situated in Jauhri Nagar, Goa. One policy was a fire policy and the other was a consequential loss due to fire policy.

**3.** On 8-1-1999 at about 3.20 p.m. there was a short-circuiting in the main switchboard installed in the sub-station receiving electricity from the State Electricity Board, which resulted in a flashover producing overcurrents.

*c*    The flashover and overcurrents generated excessive heat. The paint on the panel board was charred by this excessive heat producing smoke and soot and the partition of the adjoining feeder developed a hole. The smoke/soot along with the ionised air travelled to the generator compartment where also there was short-circuiting and the generator power also tripped. As a result, the

*d*    entire electric supply to the plant stopped and due to the stoppage of electric supply, the supply of water/steam to the waste heat boiler by the flue gases at high temperature continued to be fed into the boiler, which resulted in damage to the boiler.

**4.** As a result the respondent complainant approached the Insurance Company informing it about the accident and making its claim. Surveyors

*e*    were appointed who submitted their report but the appellant Insurance Company vide letter dated 4-9-2000 rejected the claim. Hence the petition before the National Commission. The respondent claimant made two claims (*i*) Rs 1,35,17,709 for material loss due to the damage to the boiler and other equipments, and (*ii*) Rs 19,11,10,000 in respect of loss of profit for the period the plant remained closed.

*f*    **5.** The stand of the appellant Insurance Company was that the loss to the boiler and other equipments was not caused by the fire, but by the stoppage of electric supply due to the short-circuiting in the switchboard. It was submitted that the cause of the loss to the boiler and the equipments was the thermal shock caused due to stoppage of electricity and not due to any fire. It was submitted that the proximate cause has to be seen for settling an

*g*    insurance claim, which in the present case, was the thermal shock caused due to stoppage of electricity. However, the National Commission allowed the claim of the respondent and hence this appeal.

**6.** Ms Meenakshi Midha who argued this case with great ability submitted that the loss to the boiler and to the equipments did not occur due to any fire. Hence she submitted that the claim of damages did not fall under

*h*    the cover of the insurance policy. She submitted that for a claim relating to fire insurance policy to succeed it is necessary that there must be a fire in the

SCC Online Web Edition, Copyright © 2015
Page 5      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source:  Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------

first place. In the absence of fire the claim cannot succeed. She submitted that in the present case (*1*) there was no fire, and (*2*) in any case it was not the proximate cause of the damage. On the other hand, Shri K.K. Venugopal, *a* learned Senior Counsel, supported the judgment of the National Commission and stated that the judgment was correct.

**7.** We have therefore to first determine whether there was a fire. Admittedly there was a short-circuit which caused a flashover. *Wikipedia* defines flashover as follows:

> "A flashover is the near simultaneous ignition of all combustible *b* material in an enclosed area. When certain materials are heated they undergo thermal decomposition and release flammable gases. Flashover occurs when the majority of surfaces in a space are heated to the autoignition temperature of the flammable gases."

In this connection, it is admitted that the short-circuit in the main switchboard caused a flashover. *c*

**8.** The Surveyor, Shri M.N. Khandeparkar in his report has observed:

> "Flashover, can be defined as a phenomenon of a developing fire (or radiant heat source) radiant energy at wall and ceiling surfaces within a compartment…. In the present case, the paint had burnt due to the said flashover…. Such high energy levels, would undoubtedly, have resulted *d* in a fire, causing melting of the panel board…."

The other Surveyor, P.C. Gandhi Associates has stated that "Fire of such a short duration cannot be called a 'sustained fire' as contemplated under the policy."

**9.** In our opinion the duration of the fire is not relevant. As long as there is a fire which caused the damage the claim is maintainable, even if the fire is *e* for a fraction of a second. The term "fire" in Clause (1) of Fire Policy C is not qualified by the word "sustained". It is well settled that the court cannot add words to a statute or to a document and must read it as it is. Hence repudiation of the policy on the ground that there was no "sustained fire" in our opinion is not justified. We have perused the fire policy in question which is Annexure P-1 to this appeal. The word used therein is "fire" and not *f* "sustained fire". Hence the stand of the Insurance Company in this connection is not acceptable.

**10.** Shri K.K. Venugopal invited our attention to Exclusion Clause (*g*) of the insurance policy which stated that the insurance does not cover:

> "(*g*) Loss of or damage to any electrical machine, apparatus, fixture *g* or fitting (including electric fans, electric household or domestic appliances, wireless sets, television sets and radios) or to any portion of the electrical installation, arising from or occasioned by over running, excessive pressure, short-circuiting, arcing, self-heating or leakage of electricity from whatever cause (lightning included), *provided that this exemption shall apply only to the particular electrical machine* *h* *apparatus, fixtures, fittings or portion of the electrical installation so affected and not to other machines, apparatus, fixtures, fittings or portion*

SCC Online Web Edition, Copyright © 2015
Page 6     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------

*of the electrical installation which may be destroyed or damaged by fire
so set up.*"                                              (emphasis supplied)

a     **11.** A perusal of Exclusion Clause (*g*) shows that the main part of the
exclusion clause which protects the insurer from liability under the policy
covers loss of damage to any electrical machinery, apparatus, fixture or
fittings including wireless sets, television sets, radio and so on which
themselves are a total loss or a damage or damaged due to short-circuiting,
arcing, self-heating or leakage of electricity. However, the proviso to the said
b     clause through inclusion of any other machinery, apparatus, fixtures or
fittings being destroyed or damaged by the fire which has affected any other
appliances such as television sets, radio, etc. or electrical machines or
apparatus are clearly included within the scope of the fire policy for whatever
damage or destruction caused by the fire. If for example the short-circuiting
results in damage in a television set through fire created by short-circuiting in
c     it the claim for it is excluded under the fire policy. However, if from the same
fire there is a damage to the rest of the house or other appliances, the same is
included within the scope of the fire policy by virtue of the proviso. In other
words, if the proximate cause of the loss or destruction to any other including
other machines, apparatus, fixtures, fittings, etc. or part of the electrical
installation is due to the fire which is started in an electrical machine or
d     apparatus all such losses because of the fire in other machinery or apparatus
are covered by the policy.

     **12.** The main question before us now is whether the flashover and fire
was the proximate cause of the damage in question. To understand this we
have to first know the necessary facts. The Insurance Company pointed out
the chain or sequence of events as under:
e
     "Short-circuiting takes place in Incomer 2 of the main switchboard
     receiving electricity from the State Electricity Board possibly due to the
     entry of a vermin.

                                    ↓

     Short-circuiting results in a flashover.
f                                   ↓

     Short-circuiting and flashover produced overcurrents to the tune of
     8000 A, which in turn produced enormous heat. The overcurrents and the
     heat produced resulted in the expansion and ionisation of the surrounding
     air.

                                    ↓
g
     The electricity supply from the State Electricity Board got tripped.

                                    ↓

     The paint of the panel board was charred by the enormous heat
     produced above and the MS partition of the adjoining feeder connected
     to the generator power developed a hole. It also resulted in formation of
h     smoke/soot.

                                    ↓


SCC Online Web Edition, Copyright © 2015
Page 7      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

The smoke/soot and the ionised air crossed over the MS partition and entered into the compartment receiving electricity from the generator.

↓

Consequently the generator power supply also got tripped.

↓

The tripping of purchased power and generator power resulted in total stoppage of electricity supply to the plant.

↓

The power failure resulted in stoppage of water/steam in the waste heat boiler.

↓

The flue gases at high temperature continued to enter the boiler, which resulted in thermal shock causing damage to the boiler tubes."

**13.** In this connection, it may be noted that in its written submission before the National Commission the appellant has admitted that there was a flashover and fire. The relevant portion of the written statement of the appellant before the National Commission is as follows:

(*a*) Para 1 of the preliminary objections wherein it is stated:

On 8-1-1999 there was a short-circuiting … which resulted in flashover….

… The cause of loss to the boiler and equipment is the thermal shock caused due to stoppage of electricity…. The stoppage of electricity was due to the fire … short-circuiting results in a flashover….

(*b*) Para 3(*iv*) of the preliminary objections wherein it is stated:

… Due to this flashover and overcurrents excessive heat energy was generated which resulted in the evolution of marginal fire….

(*c*) Para 3(*vi*) of the preliminary objections wherein it is stated:

… The surveyors observed that the experts in all the reports submitted by the complainant admitted that a flashover took place….

(*d*) Para 3(*viii*) of the preliminary objections wherein it is stated:

… Fire of extremely short duration followed and preceded by short-circuit….

(*e*) Para 7 of the reply wherein it is stated:

… It is correct that on 8-1-1999 short-circuit occurred on Incomer 2 of the 3.3 kV main switchboard in the electrical sub-station which resulted in a flashover….

(*f*) Para 10 of the reply wherein it is stated:

… Due to this flashover and overcurrents excessive heat energy was generated which resulted in the evolution of marginal fire….

(*g*) Para 21 of the reply wherein it is stated:

SCC Online Web Edition, Copyright © 2015
Page 8     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

NEW INDIA ASSURANCE CO. LTD. v. ZUARI INDUSTRIES LTD. *(Katju, J.)*     77

> … A reference of fire, as opposed to sustained fire, in the opinion of M/s P.C. Gandhi & Associates has been made….

> … It is in this context that M/s P.C. Gandhi & Associates have referred to the possible fire after the flashover being of a very short duration.

Thus it is admitted in the written statement of the appellant before the National Commission that it was the flashover/fire which started the chain of events which resulted in the damage.

**14.** Apparently there is no direct decision of this Court on this point as to the meaning of proximate cause, but there are decisions of foreign courts, and the predominant view appears to be that the proximate cause is not the cause which is nearest in time or place but the active and efficient cause that sets in motion a train or chain of events which brings about the ultimate result without the intervention of any other force working from an independent source.

**15.** Thus, in *Lynn Gas and Electric Co.* v. *Meriden Fire Insurance Co.*[1] the Supreme Court of Massachusetts was concerned with a case where a fire occurred in the wire tower of the plaintiff's building, through which the wires of electric lighting were carried from the building. The fire was speedily extinguished, without contact with other parts of the building and contents, and with slight damage to the tower or its contents. However, in a part of the building remote from the fire and untouched thereby, there occurred a disruption by centrifugal force of the flywheel of the engine and their pulleys connected therewith, and by this disruption the plaintiff's building and machinery were damaged to a large extent.

**16.** It was held in *Lynn Gas and Electric Co.*[1] that the proximate cause was not the cause nearest in time or place, and it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end. The question always is: was there an unbroken connection between the wrongful act and the injury, a continuous operation? In other words, did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or there was some new and independent cause intervening between the wrong and the injury?

**17.** The same view was taken in *Krenie C. Frontis et al.* v. *Milwaukee Insurance Co.*[2] The facts in that case were that the plaintiffs owned the northerly half of a building that shared a common wall with a factory next door. A fire broke out in the factory and damaged that building. Minimal fire damage occurred to the plaintiffs' building. However, due to the damage next door, the building inspector ordered the removal of the three upper stories of the factory building, which left the common wall insufficiently supported. Due to the safety issue, the inspector ordered the third and fourth floors of the plaintiffs' building to be demolished. On this fact it was held that the fire was the active and efficient cause that set in motion a chain of events which

1  1893 Mass LEXIS 345 : 33 NE 690 : 158 Mass 570
2  1968 Conn LEXIS 629 : 242 A 2d 749 : 156 Conn 492


SCC Online Web Edition, Copyright © 2015
Page 9      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

brought about the result without the intervention of any new and independent source, and hence was the proximate cause of the damage.

**18.** In *Farmers Union Mutual Insurance Co.* v. *Blankenship*[3] the *a* claimant's goods were damaged after a fire originated in his place of business. The goods were not damaged by the flames but by a gaseous vapour caused by the use of a fire extinguisher in an effort to put out the fire. On these facts the Supreme Court of Arkansas upheld the claim of the claimant.

**19.** In *Leyland Shipping Co. Ltd.* v. *Norwich Union Fire Insurance* *b* *Society Ltd.*[4] the facts of the case were that a ship was insured against perils of the sea during the First World War by a time policy containing a warranty against all consequences of hostilities. The ship was torpedoed by a German submarine twenty-five miles from Havre. With the aid of tugs she was brought to Havre on the same day. A gale sprang up, causing her to bump against the quay and finally she sank. The House of Lords upheld the claim *c* for damages observing that the torpedoing was the proximate cause of the loss even though not the last in the chain of events after which she sank.

**20.** In *Yorkshire Dale Steamship Co. Ltd.* v. *Minister of War Transport*[5], during the Second World War a ship in convoy was sailing carrying petrol for use of the armed forces. There was an alteration of the course of the ship to avoid enemy action and an unexpected and unexplained tidal set carried away *d* the ship and she was stranded at about 2.45 a.m. It was held that the loss was the direct consequence of the warlike operation on which the vessel was engaged.

**21.** In *Etherington and Lancashire and Yorkshire Accident Insurance Co., Re*[6] by the terms of the policy (an accident) the Insurance Company *e* undertook that if the insured should sustain any bodily injury caused by violent, accidental, external and visible means, then, in case such injuries should, within three calendar months of the causing of such injury, directly cause the death of the insured, damages would be paid to his legal heirs. There was a proviso in the policy that this policy only insured against death where the accident was the proximate cause of the death. The assured while *f* hunting had a fall and the ground being very wet he was wetted to the skin. The effect of the shock lowered the vitality of his system and being obliged to ride home afterwards, while wet, still further lowered his vitality. As a result he developed pneumonia and died. The Court of Appeal upheld the claim holding that the accident was the proximate cause of death.

**22.** In the present case, it is evident from the chain of events that the fire *g* was the efficient and active cause of the damage. Had the fire not occurred, the damage was also would not have occurred and there was no intervening agency which was an independent source of the damage. Hence we cannot

---

3  1959 Ark LEXIS 474 : 231 Ark 127 : 328 SW 2d 360 : 76 ALR 2d 1133
4  (1917) 1 KB 873 (CA)
5  (1942) AC 691 : (1942) 2 All ER 6 (HL)
6  (1909) 1 KB 591 : (1908-10) All ER Rep 581 (CA)

*h*

SCC Online Web Edition, Copyright © 2015
Page 10 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

agree with the conclusion of the surveyors that the fire was not the cause of the damage to the machinery of the claimant. Moreover, in *General Assurance Society Ltd.* v. *Chandmull Jain*[7] it was observed by a Constitution Bench of this Court that in case of ambiguity in a contract of insurance the ambiguity should be resolved in favour of the claimant and against the insurance company.

**23.** Learned counsel for the appellant relied on the decision of the British High Court in *Everett* v. *London Assurance*[8]. By the terms of the policy the premises in question was insured against "such loss or damage by fire to the property". It was held by the High Court that this did not cover damage resulting from the disturbance of the atmosphere by the explosion of a gunpowder magazine a mile distant from the premises insured. We are in respectful disagreement with the said judgment as the predominant view of most courts is to the contrary.

**24.** For the reasons given above we see no merit in this appeal and it is dismissed. There shall be no order as to costs.

———

**(2009) 9 Supreme Court Cases 79**

(BEFORE S.B. SINHA AND DEEPAK VERMA, JJ.)

MADAN KUMAR SINGH (DEAD) THROUGH LR.          . .          Appellant;

*Versus*

DISTRICT MAGISTRATE, SULTANPUR
AND OTHERS          . .          Respondents.

Civil Appeals No. 5165 of 2009[†] with No. 5166 of 2009[‡],
decided on August 7, 2009

**A. Consumer Protection Act, 1986 — S. 2(1)(d) — "Consumer" and "commercial purpose" — Definitions of, interpreted — Appellant purchasing a truck to earn his livelihood by means of self-employment, held, notwithstanding appointment of a driver to ply the said truck, appellant would still be a consumer — Words and Phrases — "Consumer", "commercial purpose"**

Allowing the appeal with costs, the Supreme Court

*Held* :

Appellant herein would fall in the category of a "consumer" as he had bought the truck for consideration which was paid by him. It was bought to be used exclusively for the purpose of earning his livelihood by means of self-employment. Even if he was to employ a driver for running the aforesaid truck, it would not have changed the matter in any case, as even then the

7 AIR 1966 SC 1644
8 (1865) 34 LJCP 299 : 11 Jur NS 546 : 13 WR 862
† Arising out of SLP (C) No. 20515 of 2005. From the Judgment and Order dated 18-5-2005 of the National Consumer Disputes Redressal Commission, New Delhi in Revision Petition No. 929 of 2003
‡ Arising out of SLP (C) No. 11210 of 2006

Declaration of Ritin Rai

Exhibit 13

SCC Online Web Edition, Copyright © 2015
Page 1        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**38.** The fundamental duties enjoined on citizens under Article 51-A should also guide the legislative and executive actions of elected or non-elected institutions and organisations of the citizens including the municipal bodies.

a

**39.** The resolution by the Municipal Board, Rishikesh to amend its bye-laws for banning public dealing and trade of non-vegetarian food items in the municipal town of Rishikesh along with adjoining towns of Haridwar and Muni ki Reti has been taken in deference to the religious and cultural

b   demands of a large number of residents and pilgrims who the three towns visit regularly and periodically on auspicious and festive days. It is stated on behalf of the Municipal Board that major source of revenue and employment in the three towns is from the continuous inflow of tourists and floating population of pilgrims. Maintenance of clean and congenial atmosphere in all religious places which are spread over all the three towns is in common

c   interest of the residents, pilgrims and visitors. Continuous floating population of pilgrims benefit the inhabitants of the towns by providing them various sources of earning livelihood and employment. Tourists and pilgrims are the major sources of revenue for the local municipal bodies and the inhabitants of the three towns. Geographical situation and peculiar culture of the three towns justify complete restriction on trade and public dealing in non-

d   vegetarian food items including eggs within the municipal limits of the towns. The High Court rightly upheld it to be a reasonable restriction. Trade in all kinds of food items — vegetarian or non-vegetarian — in adjoining towns and villages outside the municipal limits of the three towns remains unrestricted and there is no substantial harm caused to those engaged in such trade.

e   **40.** For the aforesaid reasons, the impugned bye-law notified by the Municipal Board, Rishikesh cannot be held to be violative of Article 19(1)(*g*) of the Constitution. With this addition, I respectfully agree with the opinion of learned Brother Shivaraj V. Patil, J. and with his conclusion that this appeal be dismissed.

———

f

### (2004) 3 Supreme Court Cases 415

(BEFORE S.N. VARIAVA AND H.K. SEMA, JJ.)

PRAMOD MALHOTRA AND OTHERS                 . .     Petitioners;

*Versus*

g   UNION OF INDIA AND OTHERS                 . .     Respondents.

Writ Petition (C) No. 119 of 2001[†], decided on February 26, 2004

**A. Banks — Banking Regulation Act, 1949 — Ss. 23, 22, 45(7) & (2) and 36-AA(2) — RBI granting licence under S. 23 to open a new branch, to a pre-existing bank which, due to certain irregularities in its functioning and poor financial condition, had till then not been granted licence under S. 22**

h   **— Persons relying on the said licence depositing their money in the said new**

† Under Article 32 of the Constitution of India

SCC Online Web Edition, Copyright © 2015
Page 2        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

------------------------------------------------------------------------------------------------

branch — RBI, in case of insolvency of such a bank, if liable to pay compensation to such persons — RBI, initially, requiring the bank to cure the specified irregularities in its functioning and to raise additional capital to the specified extent but the bank failing to comply with RBI's instructions — RBI effecting changes, under S. 36-AA, in the bank's Board and the Government passing an order of moratorium under S. 45(2) — Ultimately, the Government notifying a scheme to amalgamate the said bank with another bank — The Scheme postulating to pay to the depositors interest at a rate lesser than the contractual rate — Dissatisfied depositors seeking RBI to be made liable to compensate the depositors on account of alleged failure of RBI to perform its statutory duty to monitor the bank and safeguard the depositors' interest — In performing its statutory functions, held, RBI has to balance general public interest with the interest of banks and financial institutions — Hence, in the said circumstances, RBI could not have, at the stage of issuing licence to open a new branch, taken a decision to close the bank particularly when it was a major bank in a small State (Sikkim) — Hence, notwithstanding the question of propriety of issuance of a licence under S. 23 to a bank which had till then not been granted a licence under S. 22, held, that would not be sufficient to fasten liability on RBI to repay the deposits together with interest at the contractual rate — Moreover, relationship of RBI with the depositors of the bank, held, was not such as would justify to hold RBI liable in negligence — Further held, grant of compensation to individuals for violation of statutory duty has not been recognised in India — More so when there was no allegation of bad faith — Tort — Damages/Compensation

B. **Constitution of India — Arts. 300 and 21 — Statutory authority or body — Violation of statutory duty — Held, does not render the statutory authority liable to compensate the affected individuals — Case-law under Art. 21 held inapplicable — Constitution of India — Art. 21 — Damages/ Compensation — Breach of statutory duty causing financial loss — Held, not covered by case-law under Art. 21**

A company, registered in Sikkim in 1985 and engaged in banking business, got its name changed to Sikkim Banking Ltd. (for short "SBL") on 22-10-1987. On 11-12-1987, the Banking Regulation Act, 1949 (for short "the Act") became applicable to Sikkim. In view of Section 22 thereof, SBL applied for a licence. RBI neither granted the licence nor issued any notice to SBL denying the grant of licence. SBL, therefore, continued its banking business by virtue of the first proviso to Section 22(2). In 1996, RBI pointed out certain operational deficiencies in the working of SBL and asked SBL to cure the same and to raise an additional capital of Rs 50 crores. RBI made it clear that only after complying with the said instructions, a licence could be issued to SBL. In 1997, RBI again pointed out certain shortcomings and deficiencies in SBL's working. Immediately thereafter, RBI authorised SBL to open a branch in Delhi. Pursuant to advertisements issued by SBL offering interest @ 14% p.a., the petitioners herein deposited their money in that branch. In 1998, RBI found that SBL had incurred a net loss of Rs 56.22 crores. Thereafter, RBI effected certain changes in SBL's Board. As a result of a special audit, the Government of India was informed that funds had been siphoned out to the tune of Rs 57.50 crores. On 8-3-1999, on the advice of RBI, the Government of India passed an order of moratorium under Section 45(2) and on 21-12-1999, notified under Section 45(7)


SCC Online Web Edition, Copyright © 2015
Page 3      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

PRAMOD MALHOTRA v. UNION OF INDIA                417

of the Act an Amalgamation Scheme by which SBL was amalgamated with Union Bank of India (for short UBI). Under the Scheme all the depositors were
a to be paid on pro rata basis. Thus, they were getting only 9.037% on their deposits and were required to surrender their FDRs in return. The petitioners filed a writ petition in the Delhi High Court challenging the Scheme. However, pursuant to an order of the Supreme Court directing all matters connected with the amalgamation of SBL to be filed only before it, they withdrew that petition and filed the instant writ petition. The petitioners submitted that the various provisions of the Act cast a duty upon RBI to properly monitor banking
b companies and to safeguard the interest of the depositors. They added that even though for nine long years RBI had not issued a licence to SBL because it had found operational deficiencies in SBL's working and had found its financial position not up to the mark specified by RBI, it still allowed SBL to open a branch in Delhi by granting a licence under Section 23. That relying on the licence issued by RBI, the persons who deposited their money in the Delhi branch of SBL, presumed that such a licence had been issued only because SBL's
c functioning was sound and its management good. That therefore, RBI was liable to return all the deposits in full to the depositors who had suffered damage due to non-exercise of power by RBI.

Dismissing the writ petition, the Supreme Court

*Held* :

d     RBI undoubtedly performs a statutory function and the general public interest has to be kept in mind by RBI. But that is not the only thing they have to keep in mind. They also have to balance general public interest with the interests and needs of banks and financial institutions. They cannot easily close down a banking institution merely because there are a few irregularities. They have to keep in mind the implications of closing a bank or a financial institution. The closing of a bank or financial institution has its impact not just on that
e bank/financial institution and its customers and debtors but also on the future of financial services in that region. Thus competing interests have to be weighed and balanced. At that stage it would not have been an easy decision for RBI to have closed SBL when it was a major bank in a small State like Sikkim. One may criticize the decision of RBI to grant SBL a licence to open a branch in Delhi when the licence under Section 22 had not yet been granted. But still that
f would not be sufficient to foist liability on RBI to repay all depositors. What the petitioners want is to foist on RBI liability for the default of SBL. RBI did not have day-to-day management or control on SBL. Also the relationship of RBI with creditors or depositors of SBL is not such that it would be just or reasonable to impose a liability in negligence on RBI.                                    (Para 25)

*Yuen Kun-yeu v. Attorney General of Hong Kong*, (1987) 2 All ER 705 : 1988 AC 175 :
g      (1987) 3 WLR 776 (PC); *Davis v. Radcliffe*, (1990) 2 All ER 536 : (1990) 1 WLR 821
       (PC); *Murphy v. Brentwood District Council*, (1991) 1 AC 398 : (1990) 2 All ER 269,
       908, *relied on*

*Anns v. Merton London Borough*, 1978 AC 728 : (1977) 2 All ER 492 : (1977) 2 WLR 1024
       (HL), *distinguished*

*Union of India v. United India Insurance Co. Ltd.*, (1997) 8 SCC 683, *explained* and
       *impliedly distinguished*

*Nilabati Behera v. State of Orissa*, (1993) 2 SCC 746 : 1993 SCC (Cri) 527; *Sutherland*
h      *Shire Council v. Heyman*, (1985) 60 Aus LR 1; *Ramana Dayaram Shetty v. International
       Airport Authority of India*, (1979) 3 SCC 489, *considered*

-------------------------------------------------------------------------------------------------------------------

418                          SUPREME COURT CASES                    (2004) 3 SCC

Even otherwise, there was absolutely no averment regarding bad faith. No
case was made out on the basis of public misfeasance. As regards the allegation
of violation of statutory duties, it has to be held that compensation for violation
of a statutory duty to enable individuals to recoup financial loss has never been
recognized in India. The petitioners having chosen on their own to deposit
amounts with SBL cannot claim to recover against RBI. In such a case the loss
has to be allowed to fall where it falls.                           (Para 26)

*Three Rivers DC* v. *Bank of England*, (2000) 3 All ER 1 : (2000) 2 WLR 1220 (HL) and
(2001) 2 All ER 513 (HL), *relied on*

**Suggested Case Finder Search Text** (*inter alia*) :

┌──────────────────────────────────────────────────────────────┐
│ ("statutory duty" or "statutory duties") near (breach or violat*) │
└──────────────────────────────────────────────────────────────┘

**C. Penal Code, 1860 — Ss. 25 and 409 — Adroit financial manipulations
— Finding the police and CBI to be not equipped to deal with cases of, hope
expressed that Government would set up a cell having expertise to unravel
and trace such frauds — Criminal Procedure Code, 1973, S. 156    (Para 28)**

H-M/Z/29693/C

Advocates who appeared in this case :

Soli J. Sorabjee, Attorney General, L.N. Rao, Additional Solicitor General and K.N.
Bhat, Senior Advocate (Uday U. Lalit, Prashant Kumar, Prasenjit Keswani, Joseph
Pookkatt, Rohan Thawani, Kuldeep Parihar, H.S. Parihar, S. Wasim A. Qadri, Nikhil
Sakhardande, Saurabh Kirpal, Ms Sushma Suri, O.P. Gaggar, Ms Shipra Ghose,
Ranjan Mukherjee, Suchit Mohanty and Parijat Sinha, Advocates, with them) for the
appearing parties.

*Chronological list of cases cited*                                    *on page(s)*

1. (2000) 3 All ER 1 : (2000) 2 WLR 1220 (HL) and (2001) 2 All ER 513
   (HL), *Three Rivers DC* v. *Bank of England*                        427*d*
2. (1997) 8 SCC 683, *Union of India* v. *United India Insurance Co. Ltd.*  422*d*
3. (1993) 2 SCC 746 : 1993 SCC (Cri) 527, *Nilabati Behera* v. *State of Orissa*  425*a-b*
4. (1991) 1 AC 398 : (1990) 2 All ER 269, 908, *Murphy* v. *Brentwood District
   Council*                                                           424*c*
5. (1990) 2 All ER 536 : (1990) 1 WLR 821 (PC), *Davis* v. *Radcliffe*  426*g*, 427*f*, 428*b-c*
6. (1987) 2 All ER 705 : 1988 AC 175 : (1987) 3 WLR 776 (PC), *Yuen Kun-
   yeu* v. *Attorney General of Hong Kong*                            426*a*, 428*b-c*
7. (1985) 60 Aus LR 1, *Sutherland Shire Council* v. *Heyman*           425*b-c*
8. (1979) 3 SCC 489, *Ramana Dayaram Shetty* v. *International Airport
   Authority of India*                                                425*d*
9. 1978 AC 728 : (1977) 2 All ER 492 : (1977) 2 WLR 1024 (HL), *Anns* v.
   *Merton London Borough*              424*b-c*, 424*c-d*, 425*c-d*, 427*c-d*, 428*c*

The Judgment of the Court was delivered by

**S.N. VARIAVA, J.**— This writ petition has been filed challenging a
scheme framed by Reserve Bank of India (for short RBI). Mr Lalit very fairly
stated at the beginning that he is not challenging the Scheme and that the
only prayer he is pressing is prayer (*g*), which reads as follows:

"(*g*) Issue a writ or order in the nature of mandamus directing the
respondents to repay the petitioners and other fixed-deposit holders of
the erstwhile Sikkim Bank Ltd. in full, including the principal along with
the contract rate of interest (14% p.a.)."

SCC Online Web Edition, Copyright © 2015
Page 5    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

**2.** At this stage, the facts may be briefly set out:

a     On 2-8-1985 Sikkim Banking Overseas Corporation Limited got itself registered as a company in Sikkim. On 22-10-1987 its name was changed to Sikkim Banking Limited (for short SBL). On 11-12-1987 the Banking Regulation Act (for short the Act) became applicable to Sikkim. Section 22 of the Act reads as follows:

"22. *Licensing of banking companies.*—(1) Save as hereinafter provided, no company shall carry on banking business in India unless it holds a licence issued in that behalf by the Reserve Bank and any such licence may be issued subject to such conditions as the Reserve Bank may think fit to impose.

b

(2) Every banking company in existence on the commencement of this Act, before the expiry of six months from such commencement, and every other company before commencing banking business in India, shall apply in writing to the Reserve Bank for a licence under this section:

c     Provided that in the case of a banking company in existence on the commencement of this Act, nothing in sub-section (1) shall be deemed to prohibit the company from carrying on banking business until it is granted a licence in pursuance of this section or is by notice in writing informed by the Reserve Bank that a licence cannot be granted to it:

d     Provided further that the Reserve Bank shall not give a notice as aforesaid to a banking company in existence on the commencement of this Act before the expiry of the three years referred to in sub-section (1) of Section 11 or of such further period as the Reserve Bank may under that sub-section think fit to allow.

(3) Before granting any licence under this section, the Reserve Bank may require to be satisfied by an inspection of the books of the company or otherwise that the following conditions are fulfilled, namely—

e

(*a*) that the company is or will be in a position to pay its present or future depositors in full as their claims accrue;

(*b*) that the affairs of the company are not being, or are not likely to be, conducted in a manner detrimental to the interests of its present or future depositors;

f     (*c*) that the general character of the proposed management of the company will not be prejudicial to the public interest or the interest of its depositors;

(*d*) that the company has adequate capital structure and earning prospects;

g     (*e*) that the public interest will be served by the grant of a licence to the company to carry on banking business in India;

(*f*) that having regard to the banking facilities available in the proposed principal area of operations of the company, the potential scope for expansion of banks already in existence in the area and other relevant factors the grant of the licence would not be prejudicial to the operation and consolidation of the banking system consistent with monetary stability and economic growth;

h

SCC Online Web Edition, Copyright © 2015
Page 6        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

420                    SUPREME COURT CASES              (2004) 3 SCC

(*g*) any other condition, the fulfilment of which would, in the opinion of the Reserve Bank, be necessary to ensure that the carrying on of banking business in India by the company will not be prejudicial to the public interest or the interests of the depositors.

(3-A) Before granting any licence under this section to a company incorporated outside India, the Reserve Bank may require to be satisfied by an inspection of the books of the company or otherwise that the conditions specified in sub-section (3) are fulfilled and that the carrying on of banking business by such company in India will be in the public interest and that the Government or law of the country in which it is incorporated does not discriminate in any way against banking companies registered in India and that the company complies with all the provisions of this Act applicable to banking companies incorporated outside India.

(4) The Reserve Bank may cancel a licence granted to a banking company under this section—

(*i*) if the company ceases to carry on banking business in India; or

(*ii*) if the company at any time fails to comply with any of the conditions imposed upon it under sub-section (1); or

(*iii*) if at any time, any of the conditions referred to in sub-section (3) and sub-section (3-A) is not fulfilled:

Provided that before cancelling a licence under clause (*ii*) or clause (*iii*) of this sub-section on the ground that the banking company has failed to comply with or has failed to fulfil any of the conditions referred to therein, the Reserve Bank, unless it is of opinion that the delay will be prejudicial to the interest of the company's depositors or the public, shall grant to the company on such terms as it may specify, an opportunity of taking the necessary steps for complying with or fulfilling such condition.

(5) Any banking company aggrieved by the decision of Reserve Bank cancelling a licence under this section may, within thirty days from the date on which such decision is communicated to it, appeal to the Central Government.

(6) The decision of the Central Government where an appeal has been preferred to it under sub-section (5) or of the Reserve Bank where no such appeal has been preferred shall be final."

**3.** SBL applied for licence. It appears that RBI did not issue any notice informing SBL that the licence could not be granted.

**4.** Therefore, even though the licence was not granted, SBL continued to carry on banking business by virtue of the proviso of sub-section (2).

**5.** In 1996 RBI pointed out certain operational deficiencies in the working of SBL. SBL was called upon to cure those deficiencies before a licence could be issued to it. Thereafter RBI advised SBL to raise additional capital to the extent of Rs 50 crores by way of a rights preferential issue. RBI made it clear that it would consider issue of a licence to SBL only after the capital was so raised. SBL managed to raise capital to an extent of Rs 15.18 crores, out of which approximately Rs 5.80 crores was by means of diversion of SBL's own funds.


SCC Online Web Edition, Copyright © 2015
Page 7     Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

-------------------------------------------------------------------------------------------------------------------------------

**6.** In February-March 1997 RBI conducted financial inspection of SBL and found several shortcomings and deficiencies in its functioning. Yet on 25-6-1997 RBI authorized SBL to open a branch in Delhi at the Metropolitan Centre, 37 DLF, Kirti Nagar, New Delhi. All the petitioners are depositors/co-depositors in this branch of SBL. It appears that they deposited pursuant to advertisements issued by SBL offering a higher rate of interest than other banks.

**7.** In a special scrutiny conducted in 1998 RBI found that non-performing assets or bad debts were Rs 58.26 crores, whereas provision was for only Rs 1.52 crores. This meant that SBL had incurred a net loss of Rs 56.22 crores. Ultimately by a letter dated 15-12-1998 RBI issued a show-cause notice to the Managing Director Shri A.M. Mustafi under Section 36-AA(2) and pending reply prohibited him from acting as the Managing Director. In January 1999 RBI removed Shri A.M. Mustafi and appointed three additional Directors on SBL's Board. Thereafter special audit was carried out. As a result of the audit the Government of India was informed about the poor state of affairs in SBL. The Government of India was informed that funds had been siphoned out to the tune of Rs 57.50 crores.

**8.** On 8-3-1999, on the advice of RBI, the Government of India passed an order of moratorium under Section 45(2) of the Act. SBL filed a writ petition in the High Court of Sikkim challenging the order of moratorium. However, the petition was dismissed on 2-9-1999. The special leave petition filed against the order has also been dismissed.

**9.** On 21-12-1999 the Government of India issued an order notifying a Scheme of Amalgamation under Section 45(7) of the Act. By this Scheme SBL was amalgamated with Union Bank of India (for short UBI). Under the Scheme all the depositors were to be paid on pro rata basis. It is an admitted position that the depositors are only getting 9.037% on their deposits and they are required to surrender their fixed deposit receipts in return.

**10.** The petitioners filed a writ petition in the Delhi High Court challenging the Scheme. However, pursuant to an order of this Court dated 26-4-2000, wherein it was directed that all matters connected with the amalgamation of SBL with UBI must be filed only in this Court, that petition was withdrawn and this petition has been filed.

**11.** Mr Lalit submitted that under the Act RBI has got wide powers to control banking companies. He submitted that RBI is to ensure that the affairs of banking companies are not being or are not likely to be conducted in a manner detrimental to the interests of the depositors. He submitted that RBI had not issued a licence to SBL because it found deficiencies in its working and yet on 25-6-1997 it permitted SBL to open a branch in Delhi. He referred to Section 23 of the Act whereby no banking company can open a new place of business without prior permission of RBI. He pointed out that before granting such permission RBI must be satisfied about the financial condition and history of the company, the general character of its management, the adequacy of its capital structure and earning prospects. He


SCC Online Web Edition, Copyright © 2015
Page 8      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------

submitted that every banking company has compulsorily to display the licence issued by RBI at a prominent place. He submitted that the whole purpose is that the public would know whether to deal with a particular bank or not. He submitted that if a licence is granted by RBI then the public would presume that the financial condition of the company and the general character of its management are good and that the company had an adequate capital structure and earning prospects. He submitted that in this case RBI was already aware, before it granted permission to open a branch, that SBL had not been able to raise the sum of Rs 50 crores as directed by RBI; that it could raise its capital only to the extent of Rs 15.18 crores of which Rs 5.80 crores was by siphoning off the bank's own funds; that there were several irregularities in its functioning and that it had advised SBL to rectify its irregularities. He submitted that yet RBI granted the licence to open a branch thereby enabling SBL to dupe innocent depositors. He submitted that even though RBI became aware by 1998 that non-performing assets were to the tune of Rs 58.26 crores and that there was a short provision of Rs 55.72 crores RBI allowed SBL to issue advertisements seeking deposits offering high rate of interest and did not warn the public about the poor financial condition of SBL.

**12.** Mr Lalit relied upon the case of *Union of India* v. *United India Insurance Co. Ltd.*[1] This was a case where a bus, whilst crossing an unmanned railway crossing, was hit by a train. As a result thereof forty passengers and the driver were killed and many other passengers were injured. A large number of claims were filed before the Motor Accidents Claims Tribunal. The Tribunal in some of those cases held that the driver of the bus was negligent and passed awards against the owner of the bus and the Insurance Company. The Tribunal dismissed the claims against the Railways on the ground that there was no negligence on the part of the driver of the railway engine or on the part of the Railway Administration. On appeals, the High Court held that the Railways was also liable.

**13.** The Union of India then filed appeals to this Court. This Court framed the following questions for consideration: (SCC pp. 693-94, para 5)

   "*5. (1)* What are the common law duties of a motor vehicle driver at a railway level crossing? Whether, on facts, the bus driver was negligent?

   (*2*) Whether, under the 'doctrine of imputation' the negligence of the driver in which the passengers travelled could be imputed to the passengers by the Railways as part of the defence for the purpose of raising a plea of contributory negligence of the passengers?

   (*3*) Whether under the law of torts the claimants in rail-motor collisions can claim that the obligations of the Railways under the statute as well as under common law will run concurrently? What are the *common law duties* of the Railways at level crossings and whether the Railways is bound to take cognizance of the increase in the volume of

1 (1997) 8 SCC 683



SCC Online Web Edition, Copyright © 2015
Page 9      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

traffic and ought to have installed gates and kept a watchman at the level crossing?

(*4*) Whether a public authority upon whom powers are conferred by statute to exercise discretion for benefit of the public can be said to be under a duty of care so that omission to exercise that power could be treated as negligence at common law giving a right to compensation? If not, whether there are any exceptions to the rule that a statutory 'may' can never give rise to a common law 'ought'? What is the effect of the omission of the Railways to exercise power under Sections 13(*c*) and (*d*)?

(*5*) Whether the Motor Accidents Claims Tribunal has jurisdiction under Section 110(1) of the Motor Vehicles Act, 1939 read with Section 110-B thereof [corresponding to Sections 165 and 168(1) respectively of the Motor Vehicles Act, 1988] to adjudicate a claim against the Railway Administration when a motor vehicle is hit by a railway train and whether the Tribunal can pass an award under Section 110-B against the Railways also, in addition to an award against the owner of the vehicle, driver and the insurer?"                    (emphasis in original)

**14.** For our purposes Questions 3 and 4 above are relevant. Whilst considering these questions it was noticed that in India, unlike as in England, no duties were directly imposed on the Railway Administration to erect gates or employ watchmen etc. at level crossings if the railway line was cutting across a public road. It was noticed that the only provision was Section 13 of the Railways Act which reads as follows:

"13. *Fences, screens, gates and bars.*—The Central Government may require that, within a time to be specified in the requisition or within such further time as it may appoint in this behalf,—

(*a*) boundary marks or fences be provided or renewed by a Railway Administration for a railway or any part thereof and for roads constructed in connection therewith;

(*b*) any works in the nature of a screen near to or adjoining the side of any public road constructed before the making of a railway be provided or renewed by a Railway Administration for the purpose of preventing danger to passengers on the road by reason of horses or other animals being frightened by the sight or noise of the rolling stock moving on the railway;

(*c*) suitable gates, chains, bars, stiles or handrails be erected or renewed by a Railway Administration at places where a railway crosses a public road on the level;

(*d*) persons be employed by a Railway Administration to open and shut such gates, chains or bars."

This Court held that in view of this provision there was no direct obligation on the Railway Administration and there was no statutory duty of the Railway Administration unless a requisition was made by the Government. It was held that the above anomaly has naturally compelled the courts to fall back upon the common law duties resting on the Railways which would impose special responsibilities on the Railways to keep accidents to the


SCC Online Web Edition, Copyright © 2015
Page 10    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

minimum. It was held that these common law duties were enforceable concurrently with the statutory duties of the Union under Section 13 or independently of it. This Court then went on to consider what were the *a* common law duties of the Railways at level crossings and held that there was a duty to take care to see that accidents did not occur. This Court therefore confirmed the findings of the High Court that the Railways must be deemed to be negligent in not converting the unmanned level crossings into manned crossings. This Court then went on to consider whether omission to perform statutory duties can or cannot give rise to action in private law and if it *b* cannot, ordinarily, whether there are any exceptions. This Court strongly relied upon the case of *Anns* v. *Merton London Borough*[2]. In this case the local authority did not properly scrutinize building plans, which resulted in cracking of walls. The local authority was held liable for the loss which resulted from its failure to perform its statutory duties. At this stage itself it must be mentioned that in the case of *Murphy* v. *Brentwood District Council*[3] *c* it has been held that the principle laid down in *Anns case*[2] cannot be applied to economic losses. Based upon the principles laid down in *Anns case*[2] this Court held that two conditions must be proved for passing a duty of care on the exercise of statutory power viz. first, that it would have been irrational not to have exercised the power so that there was a public duty to act and secondly, that the policy of the statute must have been to require *d* compensation to be paid to persons who would suffer damages because the power conferred was not exercised at all or not exercised when it was generally expected to be exercised. This Court then held that these two conditions were fulfilled inasmuch as Section 13 required the Central Government to send a requisition to the Railways to build suitable gates, chains, bars, walls erected by the Railway Administration. This Court held *e* that it was irrational not to have exercised the power as there was a public duty to do so. This Court then went on to hold that Section 13 impliedly required compensation to be paid to the persons who would suffer damages because the power was not exercised when it should have been exercised.

**15.** Strongly relying upon this case, Mr Lalit submitted that the various provisions of the Act cast a duty upon RBI to properly monitor banking *f* companies and to safeguard the interest of the depositors. He submitted that one of the parameters, whilst considering when to grant licence, is to check whether all deposits would be returned in full. He submitted that even though for nine long years RBI had not issued a licence to SBL because it found irregularities in its functioning, it still allowed SBL to open a branch by granting a licence under Section 23. He submitted that this was done even *g* when RBI had known from 1996 onwards that there were deficiencies and irregularities in the functioning of SBL. He submitted that even though RBI had called upon SBL to raise its share capital and SBL had failed to do so, the licence was issued. He submitted that in this case both the conditions,

*h*

2  1978 AC 728 : (1977) 2 All ER 492 : (1977) 2 WLR 1024 (HL)
3  (1991) 1 AC 398 : (1990) 2 All ER 269, 908

SCC Online Web Edition, Copyright © 2015
Page 11      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

namely, the statutory duty to act and impliedly, the requirement to pay
compensation to persons who suffer damages by virtue of non-exercise of the
power, were present. He submitted that RBI must return all the deposits in
full.

**16.** Mr Lalit also relied upon the case of *Nilabati Behera* v. *State of
Orissa*[4]. He submitted that it has been held in this case that the award of
compensation in a proceeding under Article 32 or Article 226 is a remedy
available in public law, based on strict liability for contravention of
fundamental rights to which the principle of sovereign immunity did not
apply, even though it may be available as a defence in private law in an action
based on tort.

**17.** Mr Lalit fairly pointed out the case of *Sutherland Shire Council* v.
*Heyman*[5]. In this case the local authority, whose duty was to inspect buildings
was sought to be sued when a house was damaged due to inadequate
foundation for the same. The High Court of Australia did not accept the
principles in *Anns case*[2]. However, Mr Lalit submitted that even in this case it
has been held that the public authority may be subject to a common law duty
of care when it exercises a statutory power or performs a statutory duty.

**18.** Mr Lalit also relied upon the case of *Ramana Dayaram Shetty* v.
*International Airport Authority of India*[6]. In this case the question was
regarding grant of licence to run a restaurant-cum-snack bar at the
International Airport at Bombay. The decision of the Airport Authority was
challenged and the Court was considering what were the constitutional
obligations on the part of the State when it takes any action in its statutory or
executive authority. It is in this context that it was held that an executive
authority must be rigorously held to the standards by which it professed its
actions to be judged and it must scrupulously observe those standards on pain
of invalidation of an act in violation of them.

**19.** Mr Lalit submitted that, in this case, all persons who deposited with
the Delhi branch of SBL relied on the licence issued by RBI. He submitted
that they presumed that such a licence had been issued only because SBL
functioning is sound and its management good. Mr Lalit submitted that on
the above principles this Court must direct RBI to pay all the depositors in
full.

**20.** Mr Sorabjee submitted, and in our view correctly, that the Indian
cases relied upon by Mr Lalit are all cases which relate to infringement of
life and liberty under Article 21 i.e. where a person has been injured or killed.
It is in those type of cases that the abovementioned principles have been
applied in India. Mr Sorabjee pointed that Mr Lalit was not able to show any
case where these principles have been applied to financial transactions
undertaken by individuals with open eyes in the hope of making larger
profits. He submitted that except for a few stray averments in the petition

4 (1993) 2 SCC 746 : 1993 SCC (Cri) 527
5 (1985) 60 Aus LR 1
6 (1979) 3 SCC 489


SCC Online Web Edition, Copyright © 2015
Page 12      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------

there was no averment that by issuing licence RBI represented that SBL was sound and creditworthy.

21. Mr Sorabjee relied upon the case of *Yuen Kun-yeu* v. *Attorney* a *General of Hong Kong*[7]. In this case the Commissioner of Deposit-Taking Companies in Hong Kong had regulatory functions in relation to deposit-taking businesses in Hong Kong by virtue of the Deposit-Taking Companies Ordinance, 1976. The Commissioner was sought to be made liable for losses incurred by depositors in a deposit-taking company which b went into liquidation. It was claimed that that Company had been run fraudulently, speculatively and to the detriment of depositors and that even though the Commissioner had reasons to suspect that the Company was being so run he had failed to take any action to protect the depositors. It was claimed that the depositors had relied upon the fact of registration as indicating that the Company was a fit and proper body and that the Company was under the supervision of the Commissioner. It was claimed that the c Commissioner knew or ought to have known that the affairs of the Company were being conducted fraudulently, speculatively and to the detriment of the depositors and that he should never have registered the Company or should have revoked its registration. Thus the facts of this case are almost identical to the present case and the submissions are also the same. The High Court of Hong Kong struck out the claim on the basis that it disclosed no cause of d action. The Privy Council held that the abovementioned factors were not sufficient to establish duty of care in negligence. It was also held that there was no close and direct relationship or proximity between the parties enough to give rise to such a duty. It was held that rarely would the further question whether public policy required liability for breach of such a duty be considered. It was held that even though it was reasonably foreseeable that if e an uncreditworthy company were to be registered or allowed to remain on the register, persons who deposited money with it would be at risk of losing their money, mere foreseeability of that harm did not by itself create sufficient proximity between the Commissioner and would-be depositors for a duty of care to arise. It was held that the Commissioner had no control over the day-to-day management of the Company and that the Ordinance did not give f far-reaching and stringent supervisory powers so as to warrant an assumption that all registered companies were sound and fully creditworthy. It was held that in any case the Commissioner cannot reasonably be expected to know that would-be depositors would rely on the fact of registration as a guarantee of the soundness of the Company.

22. Mr Sorabjee relied upon the case of *Davis* v. *Radcliffe*[8]. In this case g the plaintiff had deposited £ 7000 with a bank in Isle of Man. That Bank was licensed, under the Banking Act, for a number of years. The licence was revoked only in June 1982. In August 1982 the Bank collapsed with a deficit in excess of £ 40 million. An action was brought against the Isle of Man

h

7 (1987) 2 All ER 705 : 1988 AC 175 : (1987) 3 WLR 776 (PC)
8 (1990) 2 All ER 536 : (1990) 1 WLR 821 (PC)


SCC Online Web Edition, Copyright © 2015
Page 13      Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

Finance Board and the Treasurer claiming damages for loss of amounts deposited with the Bank on the allegation that it was caused by the negligence of the defendants in carrying out their duties under the Banking Act. The alleged duties were the duties in issuing a licence and/or the duty to refuse or to revoke a licence or to suspend or discontinue the business of a bank and to inspect the books and documents of a bank. It was claimed that the Board and the Treasurer owed their depositors a duty to carry out their statutory functions in relation to licensing and supervision of the Bank in such a manner that the depositors' funds were safe and properly managed. Thus, the facts of this case were also identical to the facts of the present case. Such a claim was not accepted. It was held that relationship between the plaintiffs and defendants was not such that it would be just and reasonable to impose the liability in negligence for the loss suffered by the plaintiffs. It was held that the Board and the Treasurer were exercising typical functions of modern Government in the general public interest which included balancing of competing considerations. It was held that the defendants did not possess sufficient control over the management of the Bank to warrant imposition of liability. The principles laid down in *Anns case*[2] were held not applicable to financial transactions.

**23.** Mr Sorabjee also relied upon the case of *Three Rivers DC* v. *Bank of England*[9]. This again was a case wherein Bank of England had granted a licence to BCCI to carry on business as a deposit-taking institution. BCCI collapsed in 1991 owing to fraud on a vast scale. Several thousand depositors brought proceedings against Bank of England seeking recovery of their sums when BCCI collapsed. In that case it was pleaded that the officers of Bank of England had acted in bad faith by licensing BCCI when they knew that to do so was unlawful and that the officers had shut their eyes to what was happening with BCCI after granting the licence and had failed to take steps to close BCCI at least by the mid-1980s. On a preliminary issue the trial Judge struck out the claim. The House of Lords held that this could not have been done at the preliminary stage and remitted the matter back for trial. But, while so doing, it accepted the principles laid down in the case of *Davis* v. *Radcliffe*[8]. Thereafter in the same case, while remitting the matter back, the House of Lords held that the essential elements should be as follows: (All ER p. 526, para 42)

> "First, there must be an unlawful act or omission done or made in the exercise of power by the public officer. Second, as the essence of the tort is an abuse of power, the act or omission must have been done or made with the required mental element. Third, for the same reason, the act or omission must have been done or made in bad faith. Fourth, as to standing, the claimants must demonstrate that they have a sufficient interest to sue the defendant. Fifth, as causation is an essential element of the cause of action, the act or omission must have caused the claimants' loss."

9 (2000) 3 All ER 1 : (2000) 2 WLR 1220 (HL) and (2001) 2 All ER 513 (HL)

SCC Online Web Edition, Copyright © 2015
Page 14 Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------------------------

**24.** Mr Sorabjee submitted that in the present case there are no averments. He submitted that even if there were averments these are not matters which could be gone into in writ jurisdiction as it would require extensive evidence. He submitted that these are matters in which the Court could not pass any order in exercise of its writ jurisdiction.

**25.** We have heard the submissions of both the parties. Whilst we sympathise with the depositors for their loss, we are unable to accept the submission of Mr Lalit that the principles laid down in cases relating to breach of Article 21 rights can be applied to cases of loss caused in financial transactions undertaken by individuals with open eyes. In our view the principles laid down in the cases of *Yuen Kun-yeu* v. *Attorney General of Hong Kong*[7] and *Davis* v. *Radcliffe*[8] are fully applicable. In our view the principles laid down in *Anns case*[2] have no application to financial transactions. RBI is undoubtedly performing a statutory function. Undoubtedly, the general public interest has to be kept in mind by RBI. But that is not the only thing they have to keep in mind. They also have to balance general public interest with the interests and need of banks and financial institutions. They cannot easily close down a banking institution merely because there are a few irregularities. They have to keep in mind the implications of closing a bank or a financial institution. The closing of a bank or financial institution has its impact not just on that bank/financial institution and its customers and debtors but on the future of financial services in that region. Thus competing interests have to be weighed and balanced. In the hindsight it is easy to point fingers. However, at that stage it would not have been an easy decision for RBI to have closed SBL when it was a major bank in a small State like Sikkim. One may criticize the decision of RBI to grant SBL a licence to open a branch in Delhi when the licence under Section 22 had not yet been granted. But still that will not be sufficient to foist liability on RBI to repay all depositors. What the petitioners want is to foist on RBI liability for the default of SBL. Such liability will be rarely imposed. RBI did not have day-to-day management or control on SBL. Also the relationship of RBI with creditors or depositors of SBL is not such that it would be just or reasonable to impose a liability in negligence on RBI.

**26.** Even otherwise, we find that there are no proper averments. There is absolutely no averment regarding bad faith. It was fairly admitted by Mr Lalit that there is no case made out on the basis of public misfeasance. He fairly stated that at the highest the case could only be that of a violation of statutory duties. However, as observed above, compensation for violation of a statutory duty to enable individuals to recoup financial loss has never been recognized in India. In our view the petitioners having chosen on their own to deposit amounts with SBL cannot claim to recover against RBI. In such a case the loss has to be allowed to fall where it falls.

**27.** Under the circumstances, we find no substance in the writ petition. The same stands dismissed with no order as to costs.

**28.** Before parting with the case, we would like to note that financial frauds are on the rise. We find that the police and CBI are not equipped to

SCC Online Web Edition, Copyright © 2015
Page 15        Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases
-----------------------------------------------------------------------------------------------------------------------

*a*  deal with such cases involving adroit financial manipulations. It is hoped that the Government would now set up a special cell, which has the expertise to unravel such frauds and trace the frauds. Such a cell must have all the powers necessary for investigating, including powers of search and seizure but also be authorised to prosecute the defaulters.

———

**(2004) 3 Supreme Court Cases 429**

*b*  (BEFORE V.N. KHARE, C.J. AND S.B. SINHA AND S.H. KAPADIA, JJ.)

STATE OF KERALA AND ANOTHER                 . .        Appellants;

*Versus*

CHANDRAMOHANAN                          . .        Respondent.

Criminal Appeal No. 240 of 1997[†], decided on January 28, 2004

*c*  **A. Scheduled Castes and Scheduled Tribes (Prevention of Atrocities) Act, 1989 — S. 3(1)(xi) — Charge under — Determination of a member of Scheduled Tribe — Change of status upon conversion — Accused-respondent seeking to quash charges under the SC/ST Act on the ground that the victim's parents had converted to Christianity — Held, a member of a tribe despite his change in religion may remain a member of the tribe if he continues to follow the tribal traits and customs — Further held, the question whether the person remained a member of a tribe after conversion and continued to follow the customs and traditions of the tribe must be determined at trial — High Court's order quashing the charge set aside and matter remanded to the trial court — Constitution (Scheduled Tribes) Order, 1950 — Constitution of India, Arts. 341 & 342**

*d*

*e*  **B. Constitution of India — Art. 13 — Government circulars — Not law within the meaning of Art. 13**

The accused-respondent was charged for molesting a young girl and since her father belonged to the Mala Aryan community, a Scheduled Tribe in Kerala, an additional charge under Section 3(1)(xi) of the Scheduled Castes and Scheduled Tribes (Prevention of Atrocities) Act, 1989 was also brought against him. When the Chief Judicial Magistrate took cognizance of the misdemeanours, *f*  the respondent filed a petition under Section 482 CrPC to quash the charge under the SC/ST Act. The High Court held that since the parents of the victim had converted to Christianity over 200 years ago, they therefore ceased to be members of a Scheduled Tribe and quashed the charges framed under the SC/ST Act. In the Supreme Court, the matter came up before a Division Bench and was then referred to be heard by a three-Judge Bench.

*g*  The question before the Supreme Court was whether a person on conversion to another religion continues to remain a member of his tribe.

Allowing the appeal, the Supreme Court

*Held* :

The question as to whether a person is a member of the tribe or has been accepted as such, despite his conversion to another religion, is essentially a

*h*  † From the Judgment and Order dated 19-3-1996 of the Kerala High Court in Crl. MC No. 516 of 1994 : **1996 AIHC 5513**

SCC Online Web Edition, Copyright © 2015
Page 13    Thursday, September 17, 2015
Printed For: Mr. Ritin Rai
SCC OnLine Web Edition: http://www.scconline.com
TruePrint™ source: Supreme Court Cases

174                    SUPREME COURT CASES                (1980) 4 SCC

contempt in case of report by the sub-Divisional Magistrate of wilful breach by any officer.

**24.** We are sure that the State Government will make available by way of loans or grants sufficient financial aid to the Ratlam Municipality to enable it to fulfil its obligations under this Order. The State will realise that Article 47 makes it a paramount principle of governance that steps are taken 'for the improvement of public health *as amongst its primary duties'.* The Municipality also will slim its budget on 'low priority items and elitist projects to use the savings on sanitation and public health. It is not our intention that the ward which has woken up to its rights alone need be afforded these elementary facilities. We expect all the wards to be benefited without litigation. The pressure of the judicial process, expensive and dilatory, is neither necessary nor desirable if responsible bodies are responsive to duties. Cappilletti holds good for India when he observes :[6]

> Our judicial system has been aptly described as follows :
>
>> Admirable though it may be, (it) is at once slow and costly. It is a finished product of great beauty, but entails an immense sacrifice of time, money and talent.
>
> This "beautiful" system is frequently a luxury, it tends to give a high quality of justice only when, for one reason or another, parties can surmount the substantial barriers which it erects to most people and to many types of claims.

Why drive common people to public interest action? Where directive principles have found statutory expression in Do's and Dont's the court will not sit idly by and allow municipal government to become a statutory mockery. The law will relentlessly be enforced and the plea of poor finance will be poor alibi when people in misery cry for justice. The dynamics of the judicial process has a new 'enforcement' dimension not merely through some of the provisions of the criminal procedure code (as here), but also through activated tort consciousness. The officers in charge and even the elected representatives will have to face the penalty of the law if what the Constitution and follow up legislation direct them to do are defied or denied wrongfully. The wages of violation is punishment, corporate and personal.

**25.** We dismiss this petition subject to the earlier mentioned modifications.

---

### (1980) 4 Supreme Court Cases 174

(Before A. C. Gupta and N. L. Untwalia, JJ.)

SADA KAUR                                        .. Appellant ;

*Versus*

BAKHTAWAR SINGH AND OTHERS                       .. Respondents.

Civil Appeal No. 1057 of 1970†, decided on July 24, 1980

**Custom — Punjab custom — Varies from district to district, tehsil to tehsil and pargana to pargana — Held, there is no special**

---

6. Access to Justice—A World Survey, Vol. 1, ed. by M. Cappelletti and B. Garth, pp. 123-124
†From the Judgment and Order dated November 3, 1969 of the Punjab & Haryana High Court in R.S.A. No. 1456 of 1964