UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUDHA ISMAIL JAM, et al.,<br><br>     Plaintiffs,<br><br>       v.<br><br>INTERNATIONAL FINANCE<br>CORPORATION,<br><br>     Defendant. | Civil Action No. 15-612 (JDB) |

## MEMORANDUM OPINION

Located in a coastal region of Gujarat, India, the coal-fired Tata Mundra Power Plant was constructed in order to supply much-needed power for India's continued economic growth.  But according to plaintiffs, who live, fish, and farm in the shadow of the Plant, its main legacy has been environmental and social harm—to the marine ecosystem, to the quality of the air, to plaintiffs' health, and to their way of life.  Plaintiffs believe that the International Finance Corporation (IFC), which provided $450 million for construction of the Plant, is primarily responsible for their injuries.  They have sued IFC in this Court seeking several forms of equitable relief or, in the alternative, compensatory and punitive damages.  IFC now moves to dismiss on several grounds, most notably that it is immune from this suit under the International Organizations Immunities Act.  Because the Court agrees that IFC is immune from this suit, it will dismiss plaintiffs' complaint in its entirety, without reaching IFC's other arguments.

## BACKGROUND

IFC is an international organization with 184 member countries, including the United States and India.  Def.'s Mot. to Dismiss [ECF No. 10-1] at 3.  As described in its Articles of

1

Agreement, IFC's purpose is "to further economic development by encouraging the growth of productive private enterprise in member countries."  Ex. 1 to Zeidan Decl. [ECF No. 10-8] (Articles of Agreement) Art. I.  To fulfill that purpose, IFC may invest in privately run projects for which "sufficient capital is not available on reasonable terms."  Id.  The project at the center of this case, development of the Tata Mundra Power Plant, was carried out by Coastal Gujarat Power Limited (CGPL), a subsidiary of Tata Power, an Indian power company.  IFC loaned CGPL $450 million for the development of the Plant.  Total project cost was estimated to be $4.14 billion. Compl. [ECF No. 1] ¶¶ 56, 47.

Internal IFC policies demand careful attention to the environmental and social impacts of IFC-financed projects.   IFC's "Performance Standards on Environmental and Social Sustainability" create a framework for the assessment, avoidance, minimization, and mitigation of environmental and social risks.  See Ex. 5 to Herz Decl. [ECF No. 22-5] (2012 Performance Standards) at ¶¶ 1–8.  "IFC will only finance investment activities that are expected to meet the requirements of the Performance Standards within a reasonable period of time."  Ex. 2 to Herz Decl. [ECF No. 22-5] (2012 Policy on Environmental and Social Sustainability) ¶ 22.  When IFC does invest in a project, the resulting loan agreement requires the client to comply with the Performance Standards and other related policies.  See 2012 Policy on Environmental and Social Sustainability ¶ 24.  Thus, "managing environmental and social risks and impacts in a manner consistent with the Performance Standards [becomes] the responsibility of the client."  Id. ¶ 7.  But IFC retains responsibility for monitoring and supervising its clients' efforts.  Id.  "If the client fails to comply with its environmental and social commitments," then "IFC will work with the client to bring it back into compliance."  Id. ¶ 24.  "Persistent delays in meeting [those commitments] can lead to loss of financial support from IFC."  Id. ¶ 22.

From the earliest stages of its involvement, IFC recognized that the development of the Plant entailed significant—and possibly irreversible—environmental and social risks. See Ex. 7 to Zeidan Decl. [ECF No. 10-14] (Compliance Advisory Ombudsman Assessment Report) at 4–5. Hence, before closing the deal on IFC's $450 million investment, IFC and CGPL developed an Environmental and Social Action Plan in an attempt to manage the risks they had identified. Compl. ¶¶ 49–51. Ultimately, the Action Plan was incorporated into the loan agreement, along with IFC's Performance Standards and other environmental guidelines. See Ex. 1 to Karim Decl. [ECF No. 10-5 & -6] (Schedule I to Loan Agreement) at 91–92 (requiring CGPL to comply with the "Environmental and Social Requirements"); see also id. at 13–14 (defining "Environmental and Social Requirements").

Plaintiffs include fishermen and farmers who live and work near the Plant, suing on behalf of themselves and others similarly situated; a local trade union (MASS) dedicated to protection of fisherworkers' rights; and the local government of a nearby village. See Compl. ¶¶ 13–15. In plaintiffs' view, CGPL and IFC have failed to honor their commitments. They point to a host of negative environmental and social impacts allegedly caused by the operation of the Plant: hot water from the cooling system has substantially altered the marine environment, depressing the fish catch near the shore; the water intake channel has leaked saltwater into the groundwater, thereby making it unsuitable for drinking or irrigation; emissions have significantly degraded local air quality; local fisherman and farmers have been displaced. See Pls.' Opp'n [ECF No. 22] at 3–5; see also Compl. ¶¶ 74–115. Plaintiffs feel that, when these individual impacts are considered in the aggregate, their "way of life [has been] fundamentally threatened or destroyed by the Tata Mundra Plant." Compl. ¶ 6.

Plaintiffs blame IFC for the injuries they have suffered.  In their view, if IFC had "follow[ed] its own policies and enforce[d] the conditions of the loan agreement," the negative environmental and social impacts caused by the Plant could have been avoided, minimized, or mitigated.  Compl. ¶ 191; see id. ¶¶ 176–92.  Based on that conviction, plaintiffs filed a complaint with IFC's Compliance Advisor Ombudsman (CAO).  See Ex. 6 to Zeidan Decl. [ECF No. 10-13].  The CAO is IFC's "independent recourse and accountability mechanism . . . for environmental and social concerns."  Ex. 3 to Zeidan Decl. [ECF No. 10-10] (CAO Operational Guidelines) at 4.  But the CAO's compliance function is focused on IFC's environmental and social performance, not on the performance of IFC's clients.  Id. at 22.  CAO compliance investigations focus on whether IFC has "fail[ed] to address environmental and/or social issues as part of [its] review process," and whether that failure has "resulted in outcomes that are contrary to the desired effect of the [IFC's] policy provisions."  Id. at 24.  The final investigation report, which is made available on the CAO's website, will detail any identified policy violations.  Id. at 25.  However, the CAO is not a court, has "no authority with respect to judicial processes," and creates no "legal enforcement mechanism."  Id. at 4.  Thus, the CAO cannot compel IFC to right its wrongs, or to provide remedies to individuals who have been harmed by IFC-financed projects.

Plaintiffs understand that well.  The CAO investigation into their complaint concluded that IFC had failed adequately to consider the environmental and social risks to which plaintiffs would be exposed as a result of the Plant's development.  See Ex. 11 to Zeidan Decl. [ECF No. 10-18] (CAO Audit Report) at 4.  In the CAO's estimation, IFC then compounded that error by failing to perform an environmental and social impact assessment "commensurate with project risk," and by failing to "address [subsequent] compliance issues during [project] supervision."  Id.; see also id. at 50–53 (summarizing the key compliance findings).  IFC responded with a letter challenging

4

some of the CAO's conclusions,  see Ex. 12 to Zeidan Decl. [ECF No. 10-19], and with a statement laying out a ten-item action plan to address any compliance shortcomings,  see Ex. 13 to Zeidan Decl. [ECF No. 10-20].  But the CAO was unimpressed.   In a subsequent monitoring report, it explained  that "a number of its findings  suggest the need for a rapid, participatory and expressly remedial approach to assessing and addressing project impacts raised by [plaintiffs]."   Ex. 14 to Zeidan Decl. [ECF No. 10-21] at 5.  In the eyes of the CAO, the action plan proposed by IFC and CGPL fell short of that mark.  Id.  The matter remains open for continued  monitoring.   Def.'s Mot. to Dismiss  at 7.

Seeking the relief they cannot obtain from the CAO, plaintiffs  have filed a complaint in this Court.  Their case is focused on "the irresponsible  and negligent  conduct of the International Finance Corporation in appraising,  financing, advising,  supervising and monitoring  its significant loan to enable the development  of the Tata Mundra Project in Gujarat, India."  Compl. ¶ 2.  That conduct, plaintiffs contend, gives rise to valid claims for negligence, negligent supervision, public nuisance,  private nuisance,  trespass, and breach of contract.  See id. ¶¶ 294–332.  As remedies, plaintiffs seek various  forms of injunctive  relief running  against IFC or, in the alternative, compensatory  and punitive  damages.  See id. ¶¶ 333–45.  IFC has responded with a motion to dismiss.  At the threshold, IFC believes plaintiffs'  suit is barred by the International Organizations Immunities  Act (IOIA), 22 U.S.C. § 288 et seq.  Alternatively,  IFC asks the Court to dismiss on grounds of forum non conveniens or for failure to join indispensable  third parties.  Finally,  IFC argues that some of the counts in plaintiffs'  complaint  fail to state a claim upon which relief can be granted.  See Def.'s Mot. to Dismiss  at 1–2.  As the Court agrees that IFC is immune  from plaintiffs'  suit, it will address only IFC's threshold immunity  argument.

## LEGAL STANDARD

IFC's immunity claim seeks dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  As "[f]ederal courts are courts of limited jurisdiction[,] . . . [i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting" it.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted).  Thus, plaintiffs must establish jurisdiction by a preponderance of the evidence.  See Gordon v. Office of the Architect of the Capitol, 750 F. Supp. 2d 82, 87 (D.D.C. 2010).  In making this determination, "the Court must accept as true all of the factual allegations contained in the complaint," but those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 86–87 (internal quotation marks and citations omitted).

## DISCUSSION

"It is well established that statutes like the IOIA that grant immunity to foreign nations and international organizations limit the District Court's jurisdiction over parties that are entitled to such protection."  Weinstock v. Asian Dev. Bank, 2005 WL 1902858, at *3 (D.D.C. July 13, 2005). "The International Organizations Immunities Act applies to those international organizations which the President designates as entitled to [its] benefits . . . ."  Osseiran v. Int'l Finance Corp., 552 F.3d 836, 838 (D.C. Cir. 2009).  IFC is among those organizations that have been so designated.  Id. (citing Exec. Order No. 10,680, 21 Fed. Reg. 7,647 (Oct. 2, 1956)).  Under the IOIA, IFC generally "enjoy[s] the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."  22 U.S.C. § 288a(b).  "When Congress enacted the IOIA in 1945, foreign sovereigns enjoyed—contingent only upon the State Department's making an immunity request to the court—'virtually absolute immunity.'"  Atkinson v. Inter-Am. Dev. Bank,

156 F.3d 1335, 1340 (D.C. Cir. 1998) (quoting <u>Verlinden B.V. v. Cent. Bank of Nigeria</u>, 461 U.S. 480, 486 (1983)).   The IOIA thus confers that same absolute immunity upon international organizations like IFC. <u>Id.</u> at 1341.   Immunity may be waived, however, "for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. § 288a(b).

IFC's Articles of Agreement contain such a waiver provision.   Titled "Position of the Corporation with Regard to Judicial Process," it reads:

> Actions may be brought against the Corporation only in a court of competent jurisdiction in the territories of a member in which the Corporation has an office, has appointed an agent for the purpose of accepting service of process, or has issued or guaranteed securities. No actions shall, however, be brought by members or persons acting for or deriving claims from members.   The property and assets of the Corporation shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Corporation.

Articles of Agreement, Art. VI, § 3.[1]   Based on the broad language of this waiver, one might conclude that IFC retained immunity only from suits by its members. The D.C. Circuit, however, has instructed courts to read such waivers more narrowly, with careful attention to "the interrelationship between the functions of the [IFC] set forth in the Articles of Agreement and the underlying purposes of international immunities." <u>Mendaro v. World Bank</u>, 717 F.2d 610, 615 (D.C. Cir. 1983).

"'Since the purpose of the immunities accorded to international organizations is to enable the organizations to fulfill their functions, applying the same rationale in reverse, it is likely that most organizations would be unwilling to relinquish their immunity without receiving a corresponding benefit which would further the organization's goals.'" <u>Atkinson</u>, 156 F.3d at 1338

---

[1] IFC's waiver provision is identical to that of its parent entity, the World Bank, <u>Osseiran</u>, 552 F.3d at 839, and nearly identical to that of the Inter-American Investment Corporation, <u>Vila v. Inter-Am. Inv. Corp.</u>, 570 F.3d 274, 278 (D.C. Cir. 2009).

(quoting Mendaro, 717 F.2d at 617).  Waivers should be more broadly construed only "when the waiver would arguably enable the organization to pursue more effectively its institutional goals." Vila, 570 F.3d at 278–89 (internal quotation marks omitted).  On the other hand, "'when the benefits accruing to the organization as a result of the waiver would be substantially outweighed by the burdens caused by judicial scrutiny of the organization's discretion to select and administer its programs, it is logically less probable that the organization actually intended to waive its immunity.'"  Id. at 279 (quoting Mendaro, 717 F.2d at 617).  The relevant question is thus "whether a waiver of immunity to allow this type of suit, by this type of plaintiff, would benefit the organization over the long term."  Osseiran, 552 F.3d at 840.  Hence, immunity "should be construed as not waived unless the particular type of suit would further [IFC's] objectives." Atkinson, 156 F.3d at 1338.

As a general matter, "promises founded on good faith alone are worth less than obligations enforceable in court."  Osseiran, 552 F.3d at 187.  International organizations, which must often participate in the marketplace in order to fulfill their chartered functions, may therefore waive their immunity from certain kinds of suits to enhance their credibility in dealings with certain counterparties.  The World Bank, for example, waives its immunity for suits arising out of its "commercial transactions with the outside world," brought by "its debtors, creditors, bondholders, and those other potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its chartered objectives."  Mendaro, 717 F.2d at 615, 618.  IFC has waived immunity for a suit by a prospective buyer of an IFC investment, who brought promissory estoppel and breach of confidentiality claims after the deal soured.  Osseiran, 552 F.3d at 840–41.  And the Inter-American Investment Corporation was not immune from the unjust enrichment claim of an

independent consultant who had provided advisory services to the organization without being paid. Vila, 570 F.3d at 276–78.

Plaintiffs believe their suit fits comfortably within this precedent. Because their suit arises from IFC's "external activities and relationships with host communities," and because IFC "could not function without credible policies and promises" to those communities, plaintiffs argue that a waiver would benefit IFC here. Pls.' Opp'n at 22. But plaintiffs' argument glosses over some material differences between those waiver of immunity cases and this one. International organizations have previously waived immunity for suits brought by individual plaintiffs with whom the organization had a direct commercial relationship. Here, on the other hand, plaintiffs are a would-be class of fishermen and farmers, and two institutional plaintiffs that represent their interests—none of whom have a commercial relationship with IFC. See Compl. ¶¶ 6, 13–15. Nor is this the type of suit for which waiver has previously been found. In both Osseiran and Vila, the underlying claims invoked principles of contract law. See Vila, 570 F.3d at 276. Plaintiffs' claims, however, sound primarily in tort. See Compl. ¶¶ 294–324 (asserting claims for negligence, negligent supervision, public nuisance, private nuisance, and trespass); see also Banco de Seguros del Estado v. Int'l Finance Corp., 2007 WL 2746808, at *5–6 (S.D.N.Y. Sept. 20, 2007) (IFC did not waive immunity for negligent supervision claim by third-party). True, plaintiffs do bring one claim for breach of contract. See Compl. ¶¶ 325–32. But it is a stretch to characterize that claim, as plaintiffs attempt to do, as one arising purely from IFC's external activities. Plaintiffs' own complaint characterizes the suit as one that "arises out of" IFC's "irresponsible and negligent conduct . . . in appraising, financing, advising, supervising and monitoring its significant loan" to CGPL. Id. ¶ 2. By focusing on IFC's internal decision-making processes, the suit invites—indeed, demands—"judicial scrutiny of the [IFC's] discretion to select and administer its programs." Vila,

570 F.3d at 279 (internal quotation marks omitted).  Waiver of immunity is highly unlikely in such circumstances.  See Mendaro, 717 F.2d at 617.

Nonetheless, in assessing the claim that immunity has been waived, the Court remains obliged to weigh the benefits and costs that a waiver may entail.  Vila, 570 F.3d at 281.  On the cost side of the ledger, the Court may appropriately consider the litigation costs inherent in defending this type of suit.  See Atkinson, 156 F.3d at 1339.  In cases where the D.C. Circuit has found a waiver, the organization has failed to come forward with robust arguments about costs. See Osseiran, 552 F.3d at 841 ("International Finance identifies no unique countervailing costs . . . ."); Vila, 570 F.3d at 281 (The Inter-American Investment Corporation "has not identified countervailing costs that are distinguishable from the costs associated with a claim for promissory estoppel.").  But here, IFC argues that waiver would "produce a considerable chilling effect on IFC's capacity and willingness to lend money in developing countries," by opening "a floodgate of lawsuits by allegedly aggrieved complainants from all over the world."  Def.'s Reply [ECF No. 23] at 9–10.  Litigation of this kind, in other words, would "open [IFC] to disruptive interference with its lending policies."  Vila, 570 F.3d at 281 (internal quotation marks and brackets omitted).  Since this type of suit is aimed at IFC's internal decision-making process, the Court has little reason to doubt IFC's assessment of its concerns.

But plaintiffs take issue with IFC's cost contentions.  IFC will only incur this cost, plaintiffs' argument goes, if it persists in providing loans "irrespective of the environmental and human toll."  See Pls.' Opp'n at 26.  To avoid litigation, IFC can simply "choose projects and partners that follow IFC policy and obey the law."  Id. at 27.  If it fails to do so, some suits may be filed.  But because each of these suits would seek only to encourage "IFC's management to do what the IFC already requires," plaintiffs assert, the suits would actually benefit IFC and further

its development goals.  Id. at 26.  Thus, in plaintiffs' view, the "costs" identified by IFC are not costs at all.  Id.

Plaintiffs cannot so easily blur the boundaries between cost and benefit.  The D.C. Circuit has identified "judicial scrutiny of the organization's discretion to select and administer its programs" as a burden or cost, without regard to whether the underlying litigation is meritorious or in some other sense deserved.  See Mendaro, 717 F.2d at 617.  This Court will not completely dismiss the possibility that a waiver could provide some incentive for IFC to adhere more scrupulously to its policies, over and above the pressure already applied by the CAO.  But that marginal benefit must be weighed against the relevant costs which, in suits like this by these kinds of plaintiffs, remain quite substantial.

Plaintiffs also offer a more modest theory regarding the benefits of waiver in cases where the CAO has identified a compliance failure but IFC has failed to deliver a remedy.  See Pls.' Opp'n at 25–26.  IFC-funded projects are likely to be more successful when they garner support from local communities, plaintiffs argue.  If, however, IFC can breach its environmental and social policies without providing redress to those who are negatively impacted, that support will be difficult to secure.  Local communities "may hesitate to do business with an entity insulated from judicial process," Vila, 570 F.3d at 279 (internal quotation marks omitted), and may instead decide to "fight [IFC] projects tooth and nail," Pls.' Opp'n at 22.  Waiver of immunity, plaintiffs contend, is the solution to this problem.  By creating a legal avenue for the redress of environmental and social harms, IFC can credibly assuage any doubts that local communities may harbor about hosting IFC-funded projects.[2]  See id. at 21–26.

---

[2] Plaintiffs also argue that waiver would help IFC maintain the support of donor governments like the United States.  See Pls.' Opp'n at 24.  But the United States government has adequate tools at its disposal to make its view on IFC's immunity known directly—specifically, the "President retains authority to modify, condition, limit, and even

Although plaintiffs' argument makes some intuitive sense, it is ultimately insufficient to support a finding of waiver here. As an initial matter, the Court hesitates to extend the "credibility" theory upon which plaintiffs rely outside the context of commercial transactions, where it was initially developed and has been exclusively applied. But even if the Court were to stretch that theory to reach this case, plaintiffs would not prevail. The preceding analysis has left plaintiffs with a daunting task. To support a finding of waiver, they must point to a benefit that would justify opening the courthouse doors to a new type of plaintiff, bringing a new and very broad type of suit, more costly than those that have previously been allowed and aimed squarely at IFC's discretion to select and administer its own projects. Plaintiffs' benefit argument simply cannot bear that substantial weight. Immunity "should be construed as <u>not waived</u> unless the particular type of suit would <u>further</u> [IFC's] objectives." <u>Atkinson</u>, 156 F.3d at 1338. Any "ties go to the organization." <u>Vila</u>, 570 F.3d at 286 (Williams, J., dissenting). In the Court's view, for all the reasons reviewed above, suits like plaintiffs' are likely to impose considerable costs upon IFC without providing commensurate benefits. Hence, IFC has not waived its immunity to this suit.

The Court can deal quickly with plaintiffs' remaining arguments, which urge several changes to the D.C. Circuit's immunity jurisprudence. First, plaintiffs believe <u>Atkinson</u> was incorrectly decided. Citing the Third Circuit's decision in <u>OSS Nokalva, Inc. v. European Space Agency</u>, 617 F.3d 756 (3d Cir. 2010), plaintiffs argue that the IOIA was intended to incorporate subsequent changes to the law of foreign sovereign immunity (like the Foreign Sovereign Immunities Act's commercial activity exception), rather than to preserve the understanding of foreign sovereign immunity that prevailed in 1945. <u>See</u> Pls.' Opp'n at 19–20. Plaintiffs also argue, citing several FSIA decisions by the Supreme Court, that <u>Atkinson</u> mischaracterized the pre-1945

---

revoke the otherwise absolute immunity of a designated organization," <u>Atkinson</u>, 156 F.3d at 1341. In this setting, the Court thinks it unwise to speculate as to the United States government's views on IFC's immunity.

law by holding that it had provided absolute immunity for foreign sovereigns. See id. at 14–19. Finally, they intend to argue on appeal that Mendaro's "corresponding benefit" test, which structured the preceding analysis, "unduly narrows the plain meaning of the IFC's waiver." Id. at 21 n.12.

But as plaintiffs recognize, this Court cannot overturn Mendaro or Atkinson. Nor will it authorize an end-run around Atkinson, which the D.C. Circuit said less than two years ago "remains vigorous as Circuit law." Nyambal v. Int'l Monetary Fund, 772 F.3d 277, 281 (D.C. Cir. 2014). This Court's role is to apply Circuit law, not to "reconsider" it. Cf. Steven Herz, International Organizations in U.S. Courts: Reconsidering the Anachronism of Absolute Immunity, 31 Suffolk Transnat'l L. Rev. 471 (2008) (making plaintiffs' arguments). Perhaps the D.C. Circuit will adopt plaintiffs' suggested approach to questions concerning waivers of international organization immunity. This Court, however, cannot do so. And plaintiffs' invitation to the Court to undertake such a revision of controlling case law simply underscores the conclusion that, under that precedent, plaintiffs' waiver claim fails.

## CONCLUSION

Because IFC has not waived its immunity from this suit, its motion to dismiss will be granted, and plaintiffs' complaint will be dismissed in its entirety. A separate Order has issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: March 24, 2016