# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BUDHA ISMAIL JAM, *et al.*, | ) | |
| *Plaintiffs,* | ) | |
| *v.* | ) | Civil Action No. 1:15-CV-00612-JDB |
| INTERNATIONAL FINANCE CORPORATION, | ) | |
| *Defendant.* | ) | |

## DEFENDANT INTERNATIONAL FINANCE CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION TO DISMISS THE COMPLAINT

June 19, 2019

OF COUNSEL:

Jeffrey T. Green (D.C. Bar No. 426747)
Matthew J. Letten (D.C. Bar No. 1047224)
1501 K Street, N.W.
SIDLEY AUSTIN LLP
Washington, D.C. 20005
(202) 735-8500

Francis A. Vasquez, Jr. (D.C. Bar No. 408561)
Dana E. Foster (D.C. Bar No. 489007)
Maxwell J. Kalmann (D.C. Bar No. 1033899)
Jordan E. Helton (D.C. Bar No. 1619082)
701 Thirteenth Street, N.W.
WHITE & CASE LLP
Washington, D.C. 20005
(202) 626-3600

*Counsel for International Finance Corporation*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

I.      IFC WAS CREATED BY INTERNATIONAL TREATY AND IS DESIGNATED AS
        AN "INTERNATIONAL ORGANIZATION" UNDER U.S. LAW ................................. 3

II.     PLAINTIFFS' COMPLAINT CONCERNS ALLEGED ENVIRONMENTAL DAMAGE
        CAUSED BY A POWER PLANT IN GUJARAT, INDIA .................................. 3

III.    THE COMPLIANCE ADVISOR OMBUDSMAN OFFICE FIELDS COMPLAINTS; IT
        CANNOT MANUFACTURE LEGAL OBLIGATIONS FOR IFC ................................. 7

ARGUMENT ................................................................................................................. 9

I.      THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS'
        CLAIMS ................................................................................................................. 9

        A.      Plaintiffs' Claims Do Not Fit Within The FSIA's "Commercial Activity"
                Exception To IFC's Immunity .............................................................. 10

                1.      The Conduct Upon Which Plaintiffs' Suit Is Based Is The Construction
                        And Operation Of The Tata Mundra Power Plant In Gujarat, India; It Is
                        Not The Approval Of A Loan In Washington ......................................... 11

                2.      IFC's Discretionary Decisions Whether To Enforce Its Policies Are Not
                        Commercial Activities Under the FSIA.................................................... 15

        B.      IFC Has Not Waived Its Immunity To Plaintiffs' Claims .................................... 19

II.     THIS COURT MUST DISMISS THE COMPLAINT FOR FAILURE TO JOIN
        INDISPENSABLE PARTIES .......................................................................... 22

        A.      Three Necessary Parties Are Currently Absent From This Case.......................... 22

        B.      This Court Lacks Jurisdiction To Join The Absent Parties To This Case ............ 24

        C.      The Absent Parties Are Indispensable To This Case............................................ 25

III.    THIS COURT MUST DISMISS THE COMPLAINT FOR FAILURE TO STATE A
        CLAIM UNDER RULE 12(b)(6) ...................................................................... 27

        A.      Plaintiffs Have Failed To State A Claim For Breach Of Contract........................ 27

        B.      Plaintiffs Have Failed To State A Claim For "Lender Liability" With Respect To
                Their Non-Contractual Claims.............................................................. 30

i

C.      Plaintiffs Have Failed To State A Claim For Nuisance Under Federal Common Law, District Of Columbia Law, Or Indian Law ................................................... 33

IV.     THIS COURT MUST DISMISS THE COMPLAINT UNDER THE DOCTRINE OF *FORUM NON CONVENIENS* ........................................................................................ 35

A.      The Indian Courts Provide An Alternative Forum For Plaintiffs' Lawsuit ......... 36

B.      The Private Interest Factors Weigh Strongly In Favor Of Dismissal .................. 38

C.      The Public Interest Factors Weigh Strongly in Favor of Dismissal .................... 41

CONCLUSION ................................................................................................................................ 43

## TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Acosta Orellana v. CropLife Int'l*,
   711 F. Supp. 2d 81 (D.D.C. 2010) ...............................................................................34

*Acton Co. of Mass. v. Bachman Foods, Inc.*,
   668 F.2d 76 (1st Cir. 1982) ........................................................................................26

*Advanta Corp. v. Dialogic Corp.*,
   No. C 05-2895, 2006 U.S. Dist. LEXIS 28214 (N.D. Cal. May 2, 2006) ..............36

*Aguinda v. Texaco Inc.*,
   303 F.3d 470 (2d Cir. 2002) ................................................................................38, 43

*Am. Elec. Power Co. v. Connecticut*,
   564 U.S. 410 (2011) ....................................................................................................33

*Anderson v. D.C. Housing Auth.*,
   923 A.2d 853 (D.C. 2007) ..........................................................................................29

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero)*,
   600 F.3d 171 (2d Cir. 2010) .......................................................................................18

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ..............................................................................................24, 25

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
   480 U.S. 102 (1987) ....................................................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................................27

*Atherton v. D.C. Office of the Mayor*,
   567 F.3d 672 (D.C. Cir. 2009) ...................................................................................27

*Atkinson v. Inter-American Dev. Bank*,
   156 F.3d 1335 (D.C. Cir. 1998) ...................................................................................1

*B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*,
   516 F.3d 18 (1st Cir. 2008) ...................................................................................23, 26

*Beamon v. Brown*,
   125 F.3d 965 (6th Cir. 1997) ......................................................................................38

*Belize Soc. Dev. Ltd. v. Government of Belize*,
   5 F. Supp. 3d 25 (D.D.C. 2013) .................................................................................29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................27

*Blanco v. Banco Indus. de Venez., S.A.*,
    997 F.2d 974 (2d Cir. 1993)................................................................38

*BH Sutton Mezz LLC v. Sutton 58 Assocs. LLC*,
    No. 16-10455, 2016 Bankr. LEXIS 4113 (Bankr. S.D.N.Y. Dec. 1, 2016) ..........................31

*Cangemi v. United States*,
    No. 12-CV-3989, 2017 U.S. Dist. LEXIS 52012 (E.D.N.Y. Mar. 31, 2017)..........................33

*Carnival Cruise Lines, Inc. v. Shute*,
    499 U.S. 585 (1991)............................................................................28

*Chambers v. NASA Fed. Credit Union*,
    222 F. Supp. 3d 1 (D.D.C. 2016).................................................28, 29

*Cherokee Nation of Okla. v. Babbitt*,
    117 F.3d 1489 (D.C. Cir. 1997)........................................................22, 23

*Chigurupati v. Daiichi Sankyo Co.*,
    480 F. App'x 672 (3d Cir. 2012) ......................................................36

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*,
    212 F. Supp. 2d 30 (D.D.C. 2002)....................................................42

*District of Columbia v. Beretta, U.S.A., Corp.*,
    872 A.2d 633 (D.C. 2005) .................................................................34

*District of Columbia v. Fowler*,
    497 A.2d 456 (D.C. 1985) .................................................................34

*Doe v. Wal-Mart Stores, Inc.*,
    572 F.3d 677 (9th Cir. 2009) ............................................................30

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)...............................................................37, 38, 43

*FAMM Steel, Inc. v. Sovereign Bank*,
    571 F.3d 93 (1st Cir. 2009)..........................................................31, 32

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
    12 F.3d 1270 (3d Cir. 1993)..............................................................15

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983)............................................................................16

*Flores v. So. Peru Copper Corp.*,
  253 F. Supp. 2d 510 (S.D.N.Y. 2002) ...................................................................43

*Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*,
  944 A.2d 1055 (D.C. 2008) ..............................................................................29

*Freeman v. Nw. Acceptance Corp.*,
  754 F.2d 553 (5th Cir. 1985) ............................................................................23

*Gorman v. Ameritrade Holding Corp.*,
  293 F.3d 506 (D.C. Cir. 2002) ..........................................................................24

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ........................................................................24

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501 (1947) ................................................................................ *passim*

*Holland v. Islamic Republic of Iran*,
  496 F. Supp. 2d 1 (D.D.C. 2005) ......................................................................34

*Illinois v. Milwaukee (Milwaukee I)*,
  406 U.S. 91 (1972) ..........................................................................................33

*In re Aluminum Warehousing Antitrust Litigation*,
  No. 13-md-2481, 2014 U.S. Dist. LEXIS 119074 (S.D.N.Y. Aug. 25, 2014) .......................18

*In re Lloyd's Am. Trust Fund Litig.*,
  954 F. Supp. 656 (S.D.N.Y. 1997) .....................................................................38

*In re TJX Cos. Retail Sec. Breach Litig.*,
  524 F. Supp. 2d 83 (D. Mass. 2007) ..............................................................29, 30

*In re Union Carbide Corp. Gas Plant Disaster at Bhopal*,
  809 F.2d 195 (2d Cir. 1987) .................................................................... *passim*

*Indus. Tech. Venture v. Pleasant T. Rowland Revocable Trust*,
  688 F. Supp. 2d 229 (W.D.N.Y. 2010) ...........................................................31, 32

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) ........................................................................................33

*\*Jam v. Int'l Fin. Corp.*,
  139 S. Ct. 759 (2019) .............................................................................. *passim*

*Jam v. Int'l Fin. Corp.*,
  860 F.3d 703 (D.C. Cir. 2017) ....................................................17, 19, 20, 21

*Jam v. Int'l Fin. Corp.*,
   138 S. Ct. 2026 (2018) ...................................................................................19, 21

*Jam v. Int'l Fin. Corp.*,
   No. 17-1011, 2018 WL 509826 (Jan. 19, 2018) ...................................................21

*Jonathan Woodner Co. v. Breeden*,
   665 A.2d 929 (D.C. 1995) ...............................................................................34

*Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*,
   483 F.2d 1098 (5th Cir. 1973) ......................................................................31, 32

*Laker Airways, Inc. v. British Airways, PLC*,
   182 F.3d 843 (11th Cir. 1999) .........................................................................23

*Leutwyler v. Office of Her Majesty Queen Rania Al Abdullah*,
   184 F. Supp. 2d 277 (S.D.N.Y. 2001)................................................................15

*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
   558 F. Supp. 2d 21 (D.D.C. 2008) ................................................................35, 39

*MBI Grp., Inc. v. Credit Foncier Du Cameroun*,
   616 F.3d 568 (D.C. Cir. 2010).................................................................. *passim*

*McDonald's USA, LLC v. Craft*,
   263 F. Supp. 3d 56 (D.D.C. 2017)....................................................................34

*\*Mendaro v. World Bank*,
   717 F.2d 610 (D.C. Cir. 1983)...............................................................1, 19, 20

*Milanovich v. Costa Crociere, S.p.A.*,
   954 F.2d 763 (D.C. Cir. 1992)......................................................................28, 29

*Nat'l Westminster Bank USA v. Century Healthcare Corp.*,
   885 F. Supp. 601 (S.D.N.Y. 1995).................................................................31, 32

*Native Village of Kivalina v. ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012) ...........................................................................33

*Neo Sack, Ltd. v. Vinmar Impex, Inc.*,
   810 F. Supp. 829 (S.D. Tex. 1993) ....................................................................36

*NLRB v. Deena Artware, Inc.*,
   361 U.S. 398 (1960).......................................................................................16

*NLRB v. Doug Neal Mgmt. Co.*,
   620 F.2d 1133 (6th Cir. 1980) ..........................................................................26

*Nyambal v. Int'l Monetary Fund*,
   772 F.3d 277 (D.C. Cir. 2014) ..................................................................21, 22

*O'Bryan v. Holy*,
   556 F.3d 361 (6th Cir. 2009) ..............................................................................15

*OBB Personenverkehr AG v. Sachs*,
   136 S. Ct. 390 (2015) ............................................................................... *passim*

*Odhiambo v. Republic of Kenya*,
   764 F.3d 31 (D.C. Cir. 2014) ..............................................................................10

*Osseiran v. Int'l Fin. Corp.*,
   552 F.3d 836 (D.C. Cir. 2009) .............................................................................20

*Pa. State Emps. Credit Union v. Fifth Third Bank*,
   398 F. Supp. 2d 317 (M.D. Pa. 2005) .................................................................29

*Permanent Mission of India to the U.N. v. City of New York*,
   551 U.S. 193 (2007) ............................................................................................10

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981) ................................................................................. *passim*

*Poole v. Brown*,
   706 F. Supp. 74 (D.D.C. 1989) ............................................................................39

*Post-Effective Date Comm. of the Estate of East End. Dev., LLC v. Amalgamated
Bank*,
   No. 8-12-76181-reg, 2017 Bankr. LEXIS 949 (Bankr. E.D.N.Y. Apr. 4, 2017)....................31

*Primax Recoveries, Inc. v. Lee*,
   260 F. Supp. 2d 43 (D.D.C. 2003) ..................................................................22, 23

*Provident Tradesmens Bank & Trust Co. v. Patterson*,
   390 U.S. 102 (1968) ......................................................................................25, 26

*Ramakrishna v. Besser Co.*,
   172 F. Supp. 2d 926 (E.D. Mich. 2001) ..............................................................36

*Republic of the Philippines v. Pimentel*,
   553 U.S. 851 (2008) ............................................................................................25

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ................................................................................. *passim*

*Sequihua v. Texaco, Inc.*,
   847 F. Supp. 61 (S.D. Tex. 1994) ........................................................................44

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007)................................................................35

*Smith v. District of Columbia*,
  674 F. Supp. 2d 209 (D.D.C. 2009).....................................27

*Song fi, Inc. v. Google Inc.*,
  72 F. Supp. 3d 53 (D.D.C. 2014).........................................28

*The Bremen*,
  407 U.S. 1 (1972)..................................................................29

*TJGEM LLC v. Republic of Ghana*,
  26 F. Supp. 3d 1 (D.C. Cir. 2013).......................................25

*Tioga Pub. Sch. Dist. # 15 v. U.S. Gypsum Co.*,
  984 F.2d 915 (8th Cir. 1993) ...............................................34

Tooley *v. Napolitano*,
  556 F.3d 836 (D.C. Cir. 2009)..............................................27

*Torres v. So. Peru Copper Corp.*,
  965 F. Supp. 899 (S.D. Tex. 1996) .......................................44

*Tucci v. District of Columbia*,
  956 A.2d 684 (D.C. 2008) .....................................................34

*United States ex rel. v. Diabetes Treatment Ctrs. Of Am., Inc.*,
  238 F. Supp. 2d 258 (D.D.C. 2002)......................................21

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
  33 F.3d 1232 (10th Cir. 1994) ..............................................17

*Valdes v. Leisure Res. Grp., Inc.*,
  810 F.2d 1345 (5th Cir. 1987) ..............................................31

*Vila v. Inter-Am. Invest. Corp.*,
  570 F.3d 274 (D.C. Cir. 2009)........................................20, 21

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)...............................................................24

Court Orders & Filings

Mem. Op., ECF No. 31 .................................................................... *passim*

U.S. Supreme Court Order List, 584 U.S. 2 (May 21, 2018) .........................1

Oral Arg. Tr., *Jam v. Int'l Fin. Corp.*, No. 17-1011 (Oct. 31, 2018) .......................................13, 14

Petition for a Writ of Certiorari, *Jam v. Int'l Fin. Corp.*,
  No. 17-1011, 2018 WL 509826 (Jan. 19, 2018) ....................................................................21


Treaties, Statutes, Rules & Executive Orders

IFC Articles, Dec. 5, 1955, 7 U.S.T. 2197, 264 U.N.T.S. 117 ............................................. *passim*

22 U.S.C. § 282 .........................................................................................................................3

22 U.S.C. § 288a(b) ..................................................................................................................19

28 U.S.C. § 1330(a) ..................................................................................................................43

28 U.S.C. § 1604 ......................................................................................................................10

28 U.S.C. § 1605(a)(2) .................................................................................................10, 11, 13

28 U.S.C. § 1605(a)(5) .............................................................................................................14

Exec. Order No. 10680, 21 Fed. Reg. 7647 (1956) ...................................................................3

Fed. R. Civ. P. 12(b)(1) .............................................................................................................9

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... *passim*

Fed. R. Civ. P. 19(a)(1) ......................................................................................................22, 23

Fed. R. Civ. P. 19(a)(2) ............................................................................................................26

Fed. R. Civ. P. 19(b) ..........................................................................................................22, 25

Fed. R. Civ. P. 45(c)(1)(A) ......................................................................................................40

Other Authorities

David B. Hunter, *International Law and Public Participation in Policy-Making at
  the International Financial Institutions,
  in International Financial Institutions and International Law* (D. Bradlow &
  D. Hunter, eds. 2010) ............................................................................................................7

G. Nelson Smith III, *Nuisance and Trespass Claims in Environmental Litigation:
  Legislative Inaction and Common Law Confusion*, 36 Santa Clara L. Rev. 39
  (1995) ...............................................................................................................................11, 12

Matthew Bender, 1 *Lender Liability Law and Litigation* § 1.02(1) ...............................................31

Restatement (Second) of Conflict of Laws § 187(2)(a) (Am. Law Inst. 1988) ............................28

Restatement (Second) of Contracts § 302(1) (Am. Law Inst. 1981) .............................................29

William H. Rodgers, Jr., *Environmental Law* (2d ed. 1994) .........................................................12

## INTRODUCTION

Three years ago, this Court dismissed Plaintiffs' Complaint because it found that IFC was immune from suit under the International Organizations Immunities Act ("IOIA"), and specifically, that the IOIA provided virtually absolute immunity from suit under *Atkinson v. Inter-American Dev. Bank*, 156 F.3d 1335 (D.C. Cir. 1998).  Mem. Op. at 5-7, ECF No. 31.  The Court did not address IFC's other arguments for dismissal.  *Id.* at 5.  On appeal, the Supreme Court held that the IOIA does not provide virtually absolute immunity from suit as sovereigns enjoyed in 1945, but rather confers immunity from suit that is largely coextensive with the Foreign Sovereign Immunities Act of 1976 ("FSIA").  *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019).  Although the IOIA immunity standard has been altered, the Supreme Court's decision does not change the outcome for Plaintiffs; their Complaint must be dismissed in its entirety because this Court still lacks subject-matter jurisdiction over Plaintiffs' claims.[1]

The Supreme Court appears to be in agreement.  Echoing views of the United States at oral argument, the Supreme Court noted "'serious doubts' whether [Plaintiffs'] suit, which largely concerns alleged tortious conduct in India, would satisfy the 'based upon' requirement" of the commercial-activity exception.  *Id.*  The gravamen of Plaintiffs' case—pollution allegedly resulting from the design and operation of the Tata Mundra plant—occurred exclusively in India and has no nexus to the United States.  And because IFC has not waived its immunity as to Plaintiffs' claims, this Court should dismiss Plaintiffs' suit on this ground, and need not go further.

Beyond immunity from suit, there are three additional bases upon which this Court can dismiss Plaintiffs' Complaint.  ***First***, Plaintiffs have failed to join at least three indispensable

---

[1] The Supreme Court declined to take jurisdiction over any questions regarding the application of IFC's Articles of Agreement or the holding of *Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983).  U.S. Supreme Court Order List, 584 U.S. 2 (May 21, 2018).

parties to this suit: the power plant owner/operator, the owner/operator of an adjacent power plant, and the Government of India.  Plaintiffs allege that each of these entities has a significant role—far more significant than IFC's involvement as one of a number of lenders—in the claimed damages.  ***Second***, for each of the several causes of action listed in the Complaint, Plaintiffs have failed to adequately plead a cause of action under Rule 12(b)(6).  ***Finally***, the doctrine of *forum non conveniens* requires dismissal of Plaintiffs' Complaint.  India is the locus of the alleged conduct and harm in this case, and of all the evidence concerning liability, causation, and damages.  India's courts are both an available and a preferable forum for this dispute.  Plaintiffs should not impose the burden and expense of resolving wholly foreign matters upon a U.S. court.

Included with this motion are the following submissions:

- The Declaration of Leslie Sturtevant, dated June 19, 2019, describing IFC's investment project cycle, the functions of the Office of the Compliance Advisor/Ombudsman ("CAO"), and the complaint submitted to CAO by Plaintiff MASS in connection with the Tata Mundra power project ("Sturtevant Decl.");

- The Declaration of Mr. Karim Suratgar, dated June 19, 2019, addressing the English law applicable to claims for breach of contract raised by purported third-party beneficiaries ("Suratgar Decl."); and

- The Affidavit of Gauri Rasgotra, dated June 19, 2019, addressing the availability of the Indian courts to hear Plaintiffs' claims and the viability of Plaintiffs' claims under Indian law ("Rasgotra Aff.").

## **BACKGROUND**

The circumstances giving rise to this case are well known to the Court, so IFC will forego a lengthy discussion and only highlight those facts relevant here.

2

I.     **IFC WAS CREATED BY INTERNATIONAL TREATY AND IS DESIGNATED AS AN "INTERNATIONAL ORGANIZATION" UNDER U.S. LAW**

IFC is a public international organization owned by its 185 member countries, including the United States (a founding member) and the Republic of India, who collectively determine its policies.   IFC's development mandate on behalf of its member states is "to further economic development by encouraging the growth of productive private enterprise in member countries, particularly in the less developed areas, thus supplementing the activities of the International Bank for Reconstruction and Development . . . ."   *See* Sturtevant Decl. Ex. 4, arts. I, III.   In fiscal year 2018, IFC invested $23.3 billion, including $11.7 billion mobilized from other investors, in 366 projects in 74 developing countries, nearly $7.4 billion of which was invested in infrastructure projects that helped generate power for 79 million people in desperate need of electricity.

IFC was established in 1956 by its IFC Articles of Agreement, an international treaty under 7 U.S.T. 2197.   *See* Sturtevant Decl. Ex. 4.   That year, the President of the United States designated IFC as a public international organization entitled to enjoy the privileges, exemptions, and immunities conferred by the IOIA.   Exec. Order No. 10680, 21 Fed. Reg. 7647 (1956). Congress also codified IFC's Articles into U.S. law.   22 U.S.C. § 282.

To join IFC, a country must be a member of the World Bank, have signed IFC's Articles of Agreement, and have deposited with the World Bank Group's Corporate Secretariat an Instrument of Acceptance of IFC's Articles of Agreement.   *See* Sturtevant Decl. Ex. 4, arts. II(1), IX(2).

II.    **PLAINTIFFS' COMPLAINT CONCERNS ALLEGED ENVIRONMENTAL DAMAGE CAUSED BY A POWER PLANT IN GUJARAT, INDIA**

Plaintiffs are (i) residents and citizens of Gujarat, India; (ii) a non-profit organization located in Gujarat, India; (iii) and a local governmental entity located in Gujarat, India.   Compl.

3

¶¶ 13-15.  Plaintiffs have no commercial relationship with IFC.  Mem. Op. at 9, ECF No. 31.

The Complaint, which centers on the construction and operation of two power plants in Gujarat,

India, alleges that the plants damaged Plaintiffs' employment, health, livelihood, or property.

One of the plants, the Tata Mundra Ultra Mega Power Plant ("Tata Mundra"), was designed and

constructed—and is owned and operated—by Coastal Gujarat Power Limited ("CGPL"), a

subsidiary of Tata Power Limited.  *Id.* ¶ 28.  Both CGPL and Tata Power are Indian companies.

*Id.*  The project was approved by the Government of India.  *Id.*  Development and construction of

Tata Mundra cost a projected $4.14 billion.  *Id.* ¶ 47.

   After conducting several site visits and completing its internal assessment of the project,

in April 2008 IFC approved the loan and distributed funds to CGPL.  The power plant had

several sources of financing.  As one of a number of lenders, IFC agreed to loan $450 million to

CGPL for the project.  *Id.* ¶ 2; Suratgar Decl. Ex. 1 at 6 (providing, under Section 3.01, that IFC

agreed to lend $450 million for the project).  At around the same time that construction began on

the Tata Mundra Plant, another plant was being built nearby by Adani Power, a separate Indian

company with which IFC has no commercial relationship.  Compl. ¶¶ 29-30.

   Plaintiffs "point to a host of negative environmental and social impacts allegedly caused

by operation of the Plant" in the region in and around Gujarat, India.  Mem. Op. at 3, ECF No.

31.  Plaintiffs allege:  (i) CGPL's efforts to dilute wastewater have been insufficient to counteract

chemical pollution of local water sources (Compl. ¶ 92); (ii) CGPL's construction of an

enclosure around the plant has required locals to spend more time and money traveling to fishing

areas (*id.* ¶¶ 94-98); (iii) construction and operation of the intake and outfall channel that

discharges plant wastewater has contributed to thermal pollution, obstructed access to fisheries,

reduced fish catch or affected crop yield, forced removal of residents, and salinated groundwater

4

and the soil (*id.* ¶¶ 36, 39, 74-82, 110-15); (iv) "coal storage piles," emission stacks, coal conveyor belt, coal stockyard, and ash ponds have degraded the air quality of the area and have caused health problems through contaminated air and food (*id.* ¶¶ 10, 32, 102-09); (v) ship traffic servicing the area around the intake channel has "interfere[d] with fishing practices near the shore" and damaged anchors and nets (*id.* ¶¶ 77, 239); and (vi) increased pollution has caused an increase in respiratory issues and other health problems (*id.* ¶¶ 103-04).

Plaintiffs' Complaint includes several allegations involving unaffiliated non-party Adani Power. Plaintiffs allege that some of their injuries flowed from the construction and operation of the intake and outfall channels, and that Adani Power, not IFC-borrower CGPL, dredged the intake channel. *Id.* ¶¶ 30, 75. Plaintiffs allege that residents of the Kotadi bunder were forced to relocate during the construction of the channel as a result of threats from Adani Power. *Id.* ¶ 41. Plaintiffs allege that the Tata Mundra Plant shares coal port facilities with the Adani Plant (*id.* ¶ 30), and both plants are responsible for the ship traffic servicing the plants around the intake channel (*id.* ¶¶ 77, 239). Plaintiffs claim that many of the alleged health issues were caused by both plants, describing alleged health impacts as manifesting "in the area around the CGPL and Adani Power plants." *Id.* ¶ 103; *see also id.* ¶¶ 104, 256.

Each of the alleged causes of Plaintiffs' claimed "negative environmental and social impacts" occurred solely in India. Plaintiffs acknowledge that CGPL designed, constructed, and has operated the plant and its critical functions in India. *Id.* ¶¶ 28, 169. In addition to its references to the Adani Plant, Plaintiffs' Complaint identifies the source of the alleged injuries as "the operation of the Tata Mundra Power Plant, including, but not limited to, damage caused by air pollution and particulate matter from the Plant, [and] effluent heat discharged by the Plant." *Id.* ¶ 281.

Plaintiffs allege that IFC is responsible for these impacts on a theory of lender liability because "[t]he Tata Mundra Project would not have gone forward without IFC funding, and thus the harm to the Plaintiffs would not have occurred without IFC funding."  *Id.* ¶ 176.  Plaintiffs claim that IFC violated its own internal Performance Standards on Environmental and Social Sustainability and that IFC's negligence in financing and supervising its loan to CGPL allowed CGPL to pollute or disrupt Plaintiffs' environment.  Mem. Op. at 9, ECF No. 31; *see also, e.g.*, Compl. ¶ 169 ("IFC negligently, recklessly, and/or intentionally allowed [CGPL] to design, construct, and operate a cooling system intended to discharge wastewater at a temperature of up to 7ºC (12.6ºF) above the ambient water temperature.").

Plaintiffs allege that the CAO concluded that IFC violated these internal policies—a conclusion that IFC rejects.  Mem. Op. at 4, ECF No. 31 (citing Zeidan Decl. Ex. 12, ECF No. 10-19); Compl. ¶¶ 160-75.  Plaintiffs allege that IFC would have prevented their alleged harms if IFC had complied with its policies and used its contract "leverage" to force CGPL's compliance with the Performance Standards, which were incorporated into the lending agreement with CGPL.  Compl. ¶ 138 (suggesting that IFC should have "terminate[d] the obligations to make disbursements and/or declare the loan to be due and payable, and/or . . . cancel[led] the loan").[2]

Plaintiffs assert that IFC is not immune from this Court's jurisdiction under the IOIA because, "[i]n loaning money for the Tata Mundra Project, the IFC engaged in substantial commercial activity in the United States, in Washington, D.C., and engaged in conduct in the United States in connection with commercial activity outside the United States."  *Id.* ¶ 195. Specifically, Plaintiffs allege that the decision to fund construction of CGPL's plant, the

---

[2]  As the Court noted, according to the Standards and related policies, "managing environmental and social risks and impacts in a manner consistent with the Performance Standards becomes the responsibility of the client" borrower.  Mem. Op. at 2 (alteration in original omitted) (quoting Herz Decl. Ex. 5, 2012 Policy on Environmental and Social Sustainability ¶ 7, ECF No. 22-5).

disbursement of funds to CGPL, and IFC's responses to the CAO, all constitute "commercial activity" in the United States upon which their suit is based. *Id.* ¶¶ 197-99.

## III. THE COMPLIANCE ADVISOR OMBUDSMAN OFFICE FIELDS COMPLAINTS; IT CANNOT MANUFACTURE LEGAL OBLIGATIONS FOR IFC

In June 2011, one of Plaintiffs filed a complaint with the Compliance Advisor Ombudsman ("CAO"). Sturtevant Decl. ¶ 80. The CAO complaint identified the same issues with the construction activities and future operation of the power plant as Plaintiffs identified in the Complaint. *Compare* Sturtevant Decl. Ex. 9, *with* Compl. ¶¶ 74-115.

The CAO is a complaint mechanism for IFC. Sturtevant Decl. ¶ 28. It responds to complaints from project-affected communities. *Id.* ¶ 33. As explained by Ms. Sturtevant, the CAO process is a "problem-solving complaint mechanism" designed by IFC to serve a dispute-resolution function between project-affected communities and project owners and to verify IFC's own environmental and social performance. *Id.* ¶¶ 32-40. Any individuals or communities "who believe they are affected, or potentially affected, by the environmental and/or social impacts of an IFC or MIGA project" may filed a complaint with the CAO. *Id.* ¶ 41.

The CAO is one of many mechanisms established by international organizations to "provide local people with an opportunity to seek oversight of the institution's compliance with applicable environmental and social policies" against the background of such organizations' "immunity from national judicial proceedings." David B. Hunter, *International Law and Public Participation in Policy-Making at the International Financial Institutions*, *in International Financial Institutions and International Law* 199, 231-32 (D. Bradlow & D. Hunter, eds. 2010).

The CAO's first response to complaints is for CAO to screen the complaint and conduct an assessment. *See* Sturtevant Decl. ¶¶ 43-49. In January 2012, the CAO issued an assessment

report in which it concluded that the parties, *i.e.*, Plaintiff MASS and CGPL, would benefit from the collaborative dispute-resolution process provided by the CAO.  *Id.* ¶¶ 81-82.  The dispute-resolution tools suggested by the CAO ranged from "information sharing, to a review of company documentation by mutually agreed independent experts, to participatory monitoring." *Id.* ¶ 81.  The CAO stated that "these tools may have been helpful in addressing concerns expressed by the fisher folk regarding the medium and long term impacts of plant operations on marine life and their fish stock."  *Id.*

Specifically, CAO stated that CGPL and Plaintiff MASS "could work together to identify who among the bandar's users may not have been adequately compensated and may require additional assistance or compensation.  Open dialogue between the company and the fisher folk could equally help enhance benefits, such as provision of health services or schooling for the fishing communities."  *Id.*  According to the CAO, Plaintiff MASS and CGPL both recognized that "part of the threat to the livelihoods of the wider Mundra coast's fisher folk stems from sources beyond Tata Power in the wider industrialization of the coast, and thus cannot be resolved by the company and community alone."  *Id.*

Despite the CAO dispute-resolution team's efforts and recommendation, Plaintiff MASS "decided against a collaborative process and requested that the complaint be transferred to CAO's compliance function."  *Id.* ¶ 82.  The CAO's compliance function focuses on whether IFC, at the project level, has complied with its environmental and social policies.  *Id.* ¶¶ 57-59. CAO has no authority with respect to judicial processes, and it is neither a court of appeal nor a legal enforcement mechanism.  *Id.* ¶¶ 33-34.  CAO has no authority to disperse awards or grant restitution.  It is not a claims tribunal.

In July 2012, CAO issued an appraisal report for the audit of IFC.  *Id.* ¶ 85.  In the report, the CAO noted, "the coastline around Mundra is undergoing a rapid industrial transformation" involving the CGPL power plant and "the development of the Adani Group's Mundra Port and Special Economic Zone."  *Id.*

In October 2012, in accordance with CAO's operational guidelines, CAO developed Terms of Reference for an audit of IFC's environmental and social performance with respect to the CGPL project.  *Id.* ¶ 86.  In August 2013, CAO issued an audit report.  *Id.* ¶ 87.  In it, CAO found that IFC was out of compliance with a number of its internal policies.  *Id.*  In September 2013, IFC responded to the CAO's audit.  *Id.* ¶ 88.  In November 2013, IFC issued a statement regarding the audit that included a 10-point action plan to work cooperatively with CGPL and the Gujarat fishing communities to address their concerns.  *Id.*

On January 14, 2015, CAO issued its first monitoring report.  *Id.* ¶ 89.  CAO decided to keep the audit open for monitoring.  *Id.*  On January 20, 2015, IFC responded to the monitoring report.  *Id.* ¶ 90.  In the response, IFC "agree[d] with CAO's decision to continue its monitoring of the Project through November 2015, as at this stage the key studies that form part of the action plan have not yet been completed."  *Id.*

## ARGUMENT

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS

Plaintiffs' Complaint must be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure because this Court lacks subject-matter jurisdiction over Plaintiffs' claims.  Under the IOIA, IFC is entitled to immunity from suit unless Plaintiffs prove that an exception under the FSIA applies to its particular suit.  Plaintiffs have not and cannot establish an applicable

exception to IFC's immunity under the FSIA, as applied through the IOIA.  Further, IFC has not waived its immunity as to Plaintiffs' claims.

### A.   Plaintiffs' Claims Do Not Fit Within The FSIA's "Commercial Activity" Exception To IFC's Immunity

Under the IOIA, IFC enjoys immunity from the jurisdiction of U.S. courts unless Plaintiffs establish that their claims fall within one of the FSIA's enumerated exceptions to that immunity.  *Jam*, 139 S. Ct. at 772 (holding that immunity from suit under the IOIA is generally coextensive with the FSIA and its exceptions); *Permanent Mission of India to the U.N. v. City of New York*, 551 U.S. 193, 197 (2007) (citing 28 U.S.C. § 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)) ("Under the FSIA, a foreign state is presumptively immune from suit unless a specific exception applies.").

Recognizing IFC's presumptive immunity, Plaintiffs attempt to invoke the FSIA's commercial-activity exception.  Compl. ¶¶ 193-211.  Under the commercial-activity exception, a foreign state, or an international organization in this case, maintains its immunity from suit unless "the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."  28 U.S.C. § 1605(a)(2).[3]  To satisfy the exception, a suit must be "based upon" an activity that is carried on or performed in the United States.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993); *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 37 (D.C. Cir. 2014) (concluding "that 'based upon' means the same thing in both clauses" of § 1605(a)(2)).  This is a stringent test that is not satisfied by ordinary or even artful pleading. *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015).  An action can only be held to

---

[3]  The exception also applies when the action is based upon "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  § 1605(a)(2).  Plaintiffs do not allege that IFC's actions caused a direct effect in the United States. *See, e.g.*, Compl. ¶ 195.

be "based upon" "particular conduct" if that conduct constitutes the "gravamen" of the suit.  *Id.*

That is, the U.S. commercial activity must be "the particular conduct on which the [plaintiff's]

action is 'based.'"  *Id.* at 395 (alterations in original) (quoting *Nelson*, 507 U.S. at 356).  Put

another way, the commercial activity must be the conduct that "actually injured" the plaintiff.

*Id.* at 396.  Moreover, if the impugned conduct is not "commercial" and not connected to a

commercial activity, the commercial-activity exception does not apply.  § 1605(a)(2).

For two reasons, Plaintiffs' claims do not fit within the FSIA's commercial-activity

exception.  ***First***, Plaintiffs' case—alleging harm caused by the construction and operation of a

power plant in Gujarat, India—is "based upon" alleged tortious conduct and injuries in India.[4]

***Second***, the complained-of activity at issue is not commercial in nature.

1.     **The Conduct Upon Which Plaintiffs' Suit Is Based Is The Construction And Operation Of The Tata Mundra Power Plant In Gujarat, India; It Is Not The Approval Of A Loan In Washington**

The first sentence of the Complaint states that this suit "aris[es] from the Tata Mundra

Ultra Mega Power Plant . . . in Kutch District, Gujarat, India."  Compl. ¶ 1.  Plaintiffs' causes of

action—private nuisance, public nuisance, trespass, negligence, and quasi-contract—likewise

center around harms and personal injuries allegedly suffered in India due to CGPL's

"construction and operation of the Tata Mundra Plant."  *E.g.*, *id.* ¶¶ 11, 76, 107, 109, 111, 247;

*see supra* Background, Part II.  Plaintiffs' claims for trespass and nuisance under D.C. law

underscores that this case centers around environmental torts based in India.  *See* G. Nelson

Smith III, *Nuisance and Trespass Claims in Environmental Litigation: Legislative Inaction and*

---

[4] Plaintiffs acknowledge another source of the alleged environmental damage to the region, the Adani Plant.  *See, e.g.*, Compl. ¶¶ 29 ("[T]here is also another coal-fired power plant, owned and operated by Adani Power (the 'Adani Plant'), another Indian company. . . .  Construction on the Adani Plant took place around the same time as the construction of the Tata Mundra Plant."), 30 ("The Tata Mundra Plant is located just over a mile (approximately 2 km) away from the Adani Plant.  The Tata Mundra Plant shares coal port facilities as well as an intake channel for cooling water with the Adani Plant.").

*Common Law Confusion*, 36 Santa Clara L. Rev. 39, 40 (1995) (noting that federal environmental statutes "are based in the common law remedies of nuisance and trespass"); William H. Rodgers, Jr., *Environmental Law* 113 (2d ed. 1994) ("Nuisance theory and case law is the common law backbone of modern environmental . . . law."). Plaintiffs spend eight pages identifying the sources of their claims:

- The intake and outflow channels of the Plant substantially harmed Modwa, Tragadi, and Kotadi communities. Compl. ¶¶ 74-82.

- The Plant's cooling system has substantially changed the Gulf of Kutch marine ecosystem. *Id.* ¶¶ 83-93.

- The Plant has restricted access to grazing lands and Tragadi and Kotadi bunder fishing grounds. *Id.* ¶¶ 94-98.

- Air pollution from the Plant has substantially affected the air quality around the Plant. *Id.* ¶¶ 99-104.

- Coal dust and fly ash from the Plant contaminated property surrounding the Plant. *Id.* ¶¶ 105-09.

- The intake and outflow channels of the Plant have contaminated the ground water for the Tragadi bunder and Navinal village. *Id.* ¶¶ 110-15.

Despite the indisputable geographic core of Plaintiffs' claims, Plaintiffs attempt to portray their wholly foreign, environmental tort claims as being based on events allegedly occurring in Washington, D.C., *i.e.*, IFC's approval of a loan to CGPL and IFC's "responses to allegations of harm *caused by the Project* . . . and to the findings of the CAO." Compl. ¶¶ 196-99 (emphasis added). But Plaintiffs' effort to cast these actions as the core of their suit fails.

First, under the FSIA, courts do not perform a technical "claim-by-claim, element-by-element analysis" to determine if a suit is "based upon" U.S. conduct, as they must when employing "choice-of-law analysis" to locate the situs of a claim. *Sachs*, 136 S. Ct. at 396. Under the commercial-activity exception, the task is much simpler and more direct. "Rather than individually analyzing each . . . cause[] of action," courts "zero[] in" on the particular "acts that

*actually injured*" the plaintiff.  *Id.* (emphasis added).[5]  As in *Sachs*, the alleged U.S.-based conduct here—deciding to lend money *before* the alleged harm and responding to allegations of harm *after* they occurred—did not ***actually*** injure Plaintiffs and was not wrongful "standing alone."  *Id.*  No matter how Plaintiffs attempt to frame their case, the activities in India remain at its foundation.  Without CGPL's construction and operation of the Plant in Gujarat, India—tortious or not—there would have been no risk of harm for IFC to "avoid[], minimize[], or mitigate[]."  Mem. Op. at 4, ECF No. 31.  In other words, the Plant's activity in India is the activity that "actually injured" Plaintiffs.  *Id.*; *see Sachs*, 136 S. Ct. at 396 ("Without the existence of the unsafe boarding conditions in Innsbruck, there would have been nothing to warn Sachs about when she bought the Eurail pass.").  Plaintiffs' case is fundamentally an environmental nuisance and trespass suit—the underlying conduct and injuries of which manifested wholly within India.  These torts, "and not the arguably commercial activities that preceded their commission, form the basis" for Plaintiffs' suit.  *Sachs*, 136 S. Ct. at 396 (quoting *Nelson*, 507 U.S. at 358); *see, e.g.*, Compl. ¶¶ 74-82, 94-98, 102-15, 182, 247; *see also Sachs*, 136 S. Ct. at 397 ("[T]he essentials of a personal injury narrative will be found at the point of contact . . . .  Regardless of whether Sachs seeks relief under claims for negligence, strict liability for failure to warn, or breach of implied warranty, the essentials of her suit for purposes of § 1605(a)(2) are found in Austria." (internal quotation marks omitted)).

At oral argument before the Supreme Court in this case, the Office of the Solicitor General acknowledged that "the gravamen of this suit as we understand it is . . . tortious conduct that occurred in India, injuries that occurred in India."  Oral Arg. Tr. at 26-27, *Jam v. Int'l Fin. Corp.*, No. 17-1011 (Oct. 31, 2018); *see also Jam*, 139 S. Ct. at 772 (noting the United States'

---

[5]   Indeed, this Court rightly eschewed a claim-by-claim analysis when it concluded that Plaintiffs' contract claim is secondary to their tort claims.  Mem. Op. at 9, ECF No. 31 ("Plaintiffs' claims, however, sound primarily in tort.").

"serious doubts" about whether Plaintiffs' could satisfy the "based upon" requirement).[6]   The Supreme Court also appeared to recognize that the gravamen of Plaintiffs' suit is tortious activity in India that cannot satisfy the commercial-activity exception.  *Jam*, 139 S. Ct. at 772.

Second, any other conclusion "would allow plaintiffs to evade the [FSIA's] restrictions through artful pleading."  *Sachs*, 136 S. Ct. at 396.   The Supreme Court has warned against plaintiffs who seek to invoke the commercial-activity exception by "recast[ing] virtually any claim of intentional tort as a failure to warn."  *Id.* at 396 (ellipses in original omitted) (quoting *Nelson*, 507 U.S. at 363).   This would permit plaintiffs to evade the restrictions that Congress placed on tort claims brought against sovereigns, which must relate to "personal injury or death, or damage to or loss of property, occurring in the United States" in order to proceed.  28 U.S.C. § 1605(a)(5).   The plaintiff in *Nelson* disfavored Saudi Arabia, and pleaded his Saudi-based intentional tort claims as a U.S.-based, failure-to-warn case.  *Nelson*, 507 U.S. at 353-54, 363. The plaintiff in *Sachs* disfavored Austria, and so labeled her Austria-based product liability claims as a U.S.-based negligence case based on the sale of a train ticket in California.  *Sachs*, 136 S. Ct. at 393, 396.  Artful pleading aside, the Supreme Court concluded that each case was

---

[6] "Mr. Ellis:  . . . . number one, just to be clear, we -- they do have a great deal of immunity.  I mean, foreign, foreign -- international organizations and foreign states are presumptively immune.  And I would agree with almost everything that -- maybe everything that -- that my friend said about why the commercial activity exception, even with regard to IFC and -- and most -- more importantly, with regard to the vast sweep of these organizations, is not going to eliminate immunity.  I would add one more, is that even a case like this, we have serious doubts, I think -- we think, in fact, from what we know, this suit isn't going to be able to go forward regardless of the answer to the question presented, because in addition to having -- to being connected in some way to commercial activity, there must be a much stronger nexus.  It must be based on commercial activity that occurs in the United States.  We think the Court's decision in OBB makes clear that the way you apply that is to ask:  What's the gravamen of this suit?  It's not enough to have some attenuated connection, but what's the gravamen?  And the gravamen of this suit as we understand it is -- is tortious conduct that occurred in India, injuries that occurred in India."  Oral Arg. Tr. at 25, *Jam v. Int'l Fin. Corp.*, No. 17-1011 (Oct. 31, 2018).

incompatible with the FSIA's "manifest purpose." *Sachs*, 136 S. Ct. at 397; *Nelson*, 507 U.S. at 349, 363.

Plaintiffs have followed the same path as Mr. Nelson and Ms. Sachs.  Like in *Nelson* and *Sachs*, they did not file suit in the jurisdiction in which the torts occurred; instead, they molded their foreign, environmental tort class action claims into a failure-to-supervise case against one of a number of lenders and filed suit in here in Washington.  That is, Plaintiffs are attempting to evade the geographic limitations of the FSIA's tort exception—which is limited to claims related to damage or loss of property *occurring in the United States*—by attempting to invoke the commercial-activity exception for damage *occurring in India*.  This attempt at artful pleading simply does not work.  *See Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1290 (3d Cir. 1993) (dismissing class-action claims including negligence, trespass, and nuisance against Dutch company due to its loan for a negligently constructed and maintained office tower that burned down because "these claims did not arise from the loan transaction"); *see also O'Bryan v. Holy See*, 556 F.3d 361, 380 (6th Cir. 2009) (quoting *Leutwyler v. Office of Her Majesty Queen Rania Al Abdullah*, 184 F. Supp. 2d 277, 299 (S.D.N.Y. 2001)) ("[T]o allow plaintiffs to obtain jurisdiction under the commercial activity exception through a semantic ploy would allow them to obtain jurisdiction over a claim that Congress did not intend to be brought against a foreign sovereign." (internal quotation marks omitted)).  Therefore, Plaintiffs cannot invoke the commercial-activity exception.

### 2. IFC's Discretionary Decisions Whether To Enforce Its Policies Are Not Commercial Activities Under the FSIA

Even if IFC's policy and lending decisions formed the core of Plaintiffs' claims—which they do not—these decisions are not "commercial activities" under the FSIA.

Plaintiffs trace their injuries to two post-loan-execution activities by IFC: (1) IFC's monitoring, supervising, and enforcing the Performance Standards on Environmental and Social Sustainability ("IFC E&S Standards") (*see, e.g.*, Compl. ¶¶ 5, 62-73, 167-70, 297-99 (Count I), 303-06 (Count II), 327-29 (Count VII)),[7] and (2) IFC's responses to CAO reports about whether IFC staff complied with IFC E&S Standards (*see* Compl. ¶ 199).   Neither are "commercial activities" of IFC under the FSIA.

Most critically, CGPL's construction and operation of the Plant was not "commercial activity" attributable to IFC.   IFC did not, and could not, have management power or control over CGPL.   In fact, the IFC Articles of Agreement prohibit IFC from "assum[ing] responsibility for managing any enterprise in which it has invested."   IFC Articles of Agreement art. III, § 3(iv).   Even at its furthest reach, the FSIA only imputes the acts of a separate juridical entity that is "so extensively controlled by its *owner*," the FSIA defendant.   *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983) (emphasis added) (citing *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402-04 (1960)).   IFC does not and could not own CGPL or Tata Power, and Plaintiffs do not allege that IFC so extensively controlled either entity that the *Bancec* rule is overcome here.

Further, IFC's discretionary decisions about whether or how to implement the E&S Standards that it asks its borrowers to follow—even when the E&S Standards were incorporated into the IFC Loan Agreement—are not "commercial activities" under the FSIA.

**First**, although Plaintiffs allege that IFC violated its so-called duty or obligation "to adequately monitor and supervise the environmental impacts of the plant," or "to take adequate

---

[7] Plaintiffs do not allege that monitoring and supervision are among the acts IFC performed in the United States.  In fact, they allege that IFC conducted its "supervision visits" in India, not in the United States.  Compl. ¶¶ 62-63, 66, 68.  Allegations pertaining to IFC's monitoring and supervision, therefore, cannot form the basis for Plaintiffs' invocation of the commercial-activity exception.  Nonetheless, IFC will address these allegations out of an abundance of caution.

steps to ensure Plant compliance with the environmental and social conditions" (Compl. ¶¶ 136-37, 175, 178, 190-91, 296, 300, 304-06, 327-28, 331), the IFC Loan Agreement actually does not impose such a duty *on IFC*; rather, *CGPL* undertook the duty to ensure compliance with the IFC E&S Standards by providing periodic reports. *See* Suratgar Decl. Ex. 1 at 91 (Section 5.1(i)), 104 (Section 5.2(z)(i)(B), (ii), (iii)), 114 (Section 5.5(c)(v)); *see also infra* Argument, Part III.A. Any violation of the IFC E&S Standards by CGPL provides IFC with various contractual enforcement options, but does not *require* IFC to do anything in response. *See id.* at 124-25 (Section 6.3).   In short, IFC's discretionary decisions to monitor or supervise CGPL's compliance with the E&S Standards were not required by, and did not arise from, the IFC Loan Agreement.  *Cf. United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994) (concluding that defendant's failure to provide a bill of lading did not fall within the commercial activity exception because plaintiffs' losses did not derive from the contract).  As this Court already concluded in its first dismissal, these decisions (and the CAO proceedings concerning them) arose from IFC's own internal, discretionary judgments pursuant to its own internal policies.  *See* Mem. Op. 9, ECF No. 31, Mar. 24, 2016 (concluding that Plaintiffs' suit "focus[es] on IFC's internal decision-making processes"); Sturtevant Decl. ¶ 58 ("The focus of CAO Compliance is on IFC and MIGA, not their client.").   IFC's internal decisions concerning its own administrative programs and policies—not required by the IFC Loan Agreement—are necessarily not commercial.  *See Jam v. Int'l Fin. Corp.*, 860 F.3d 703, 707 (D.C. Cir. 2017) (noting that "there is a superficial similarity" between "the commercial activities test that appellants would urge us to accept" and *Mendaro*'s distinction between internal and external activities).

**Second**, IFC's post-execution attempts to enforce the IFC E&S Standards are monitoring activities that are also not commercial.  Courts have consistently held that regulatory enforcement performed by foreign states or their agencies and instrumentalities, even in the context of a commercial transaction with the FSIA defendant, is not "commercial" conduct.  *See In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481, 2014 U.S. Dist. LEXIS 119074, at *60 (S.D.N.Y. Aug. 25, 2014) (finding the London Metal Exchange's policies governing load-in and load-out procedures "are a form of market regulation implemented by the [Exchange], and are therefore regulatory, not commercial, in nature"); *id.* at *62 ("[N]ot all contractual arrangements are commercial in nature.  There are numerous instances in which a public organ might use a contractual arrangement to fulfill its public function."); *Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero)*, 600 F.3d 171, 177-78 (2d Cir. 2010) (dismissing a negligent supervision claim against a state-owned social security insurer because the insurer's monitoring of compliance with regulatory mandates was not commercial).

This general rule applies with equal force to IFC.  *Jam*, 139 S. Ct. at 768 (concluding that the IOIA "ensure[s] ongoing parity" between the foreign states and international organizations as to immunity from suit).  IFC uses the E&S Standards to shape development projects in the private market towards environmentally sustainable goals, serving a quintessentially public concern.  Thus, IFC's decisions pertaining to monitoring, supervision, and enforcement of the E&S Standards—to which Plaintiffs attempt to connect all of their alleged injuries—are not commercial.

Because Plaintiffs cannot establish that the commercial-activity exception applies to IFC's conduct in applying its E&S Standards, IFC remains immune, and the Court should dismiss this case for lack of subject-matter jurisdiction under the IOIA.

### B.        IFC Has Not Waived Its Immunity To Plaintiffs' Claims

As this Court has previously held, IFC has not waived its immunity to Plaintiffs' claims. *See* Mem. Op. at 13, ECF No. 31; *see also* 22 U.S.C. § 288a(b); *Jam*, 860 F.3d at 708.  That holding was undisturbed on appeal.  *Jam v. Int'l Fin. Corp.*, 138 S. Ct. 2026 (2018) (mem.) (limiting grant of cert. to the question of the IOIA's scope of immunity).

Under *Mendaro v. World Bank*, IFC remains immune unless it "intended to waive its immunity."  *Mendaro*, 717 F.2d at 617.  As *Mendaro* held, through its Articles of Agreement, IFC is subject to suit only as to the claims of "debtors, creditors, bondholders, and those other potential plaintiffs to whom [it] would have to subject itself to suit in order to achieve its chartered objectives."  *Id.* at 615; *see also* IFC Articles of Agreement art. VI, § 3.[8]

Under the Articles, IFC's object and purpose "is to further economic development" by, among other things, assisting "in financing the establishment, improvement and expansion of productive private enterprises which would contribute to the development of its member countries by making investments, without guarantee of repayment by the member government concerned, in cases where sufficient private capital is not available on reasonable terms."  IFC Articles of Agreement art. I.  IFC's members specifically empowered the organization to "guarantee securities in which it has invested in order to facilitate their sale" and to "buy and sell securities it has issued or guaranteed or in which it has invested."  *Id.* at art. III, § 6(iii)-(iv).  IFC would not be able to achieve these aims if beneficiaries or commercial counterparties could not sue to enforce IFC's contracts and guarantees.  *Mendaro*, 717 F.2d at 618.  IFC's Articles of Agreement thus preserve IFC's immunity from suit except to the extent necessary to enable IFC's mandated functions.

---

[8] As stated below, IFC reserves the right to assert its charter-based immunity if necessary.

To allow Plaintiffs' claims to proceed via waiver would stand in direct conflict with the D.C. Circuit's uninterrupted line of precedent limiting non-contractual claims by third parties without a direct commercial relationship with the international organization. *See, e.g.*, *Vila v. Inter-Am. Invest. Corp.*, 570 F.3d 274, 279-80 (D.C. Cir. 2009) (finding waiver as to a suit seeking "a remedy based on the failure of [an] agreement with the IIC to meet the requirements of a formal contract" with the plaintiff); *Osseiran v. Int'l Fin. Corp.*, 552 F.3d 836 (D.C. Cir. 2009) (finding waiver of immunity as to suits on "sales agreements result[ing] from negotiations" with IFC); *Mendaro*, 717 F.2d at 611 (rejecting an employee sexual harassment and discrimination claim as it did not arise out of the international organization's "external commercial contracts and activities").

This Court and the D.C. Circuit have previously held that IFC has not waived its immunity to Plaintiffs' suit. *Jam*, 860 F.3d at 708; Mem. Op. at 13, ECF No. 31. This Court explained that while international organizations had previously waived immunity for suits in which the plaintiff had a "direct commercial relationship" with the international organization, here Plaintiffs have no such relationship. Mem. Op. at 9, ECF No. 31. According to this Court, neither do Plaintiffs bring "the type of suit for which waiver has previously been found," as Plaintiffs' claims "sound primarily in tort." *Id.* In addition, the Court found that Plaintiffs failed to meet the burden of "point[ing] to a benefit that would justify opening the courthouse doors to a new type of plaintiff, bringing a new and very broad type of suit, more costly than those that have previously been allowed and aimed squarely at IFC's discretion to select and administer its own projects." *Id.* at 12. Thus, this Court held that IFC had not waived its immunity in this suit. *Id.* at 13.

The D.C. Circuit unanimously affirmed. It noted that "claims that implicate internal operations of an international organization"—as is the case here—"are especially suspect because claims arising out of core operations, not ancillary business transactions, would threaten the policy discretion of the organization." *Jam*, 860 F.3d at 708 (citing *Vila*, 570 F.3d at 286-89). The D.C. Circuit rejected Plaintiffs' arguments and found that their third-party tort claims "implicate internal operations of an international organization" and "threaten the policy discretion of the organization." *Id.* at 708. The D.C. Circuit explained that "[s]hould [Plaintiffs'] suit be permitted, every loan the IFC makes to fund projects in developing countries could be the subject of a suit in Washington." *Id.* "[I]f the IFC's internal compliance report were to be used to buttress a claim against the IFC, [the Court] would create a strong disincentive to international organizations using an internal review process." *Id.*

In granting cert., the Supreme Court declined to review this aspect of the D.C. Circuit's decision and it remains law of the case. *See, e.g. United States ex rel. v. Diabetes Treatment Ctrs. Of Am., Inc.*, 238 F. Supp. 2d 258, 262 (D.D.C. 2002) (declining to reconsider an issue due to its status as law of the case); *see also* Petition for a Writ of Certiorari, *Jam v. Int'l Fin. Corp.*, No. 17-1011, 2018 WL 509826 (Jan. 19, 2018) (seeking cert. regarding (1) the IOIA's scope of immunity; and (2) the "basic rules governing" IOIA immunity, including the prevailing analysis for assessing waivers of immunity); *Jam*, 138 S. Ct. at 2026 (limiting grant of cert. to the first question). As this Court's holding stands as law of the case, this Court need not reevaluate Plaintiffs' arguments regarding waiver.

Because IFC remains immune from suit under the IOIA, this Court need not separately rely upon the Articles of Agreement as an independent basis to dismiss Plaintiffs' claims, although doing so would be proper. *See Jam*, 139 S. Ct. at 771; *Nyambal v. Int'l Monetary*

*Fund*, 772 F.3d 277, 281 (D.C. Cir. 2014) (noting that international organizations enjoy "dual protections" of IOIA immunity and treaty-based immunity).  IFC reserves the right to assert such charter-based immunity if necessary.

## II.  THIS COURT MUST DISMISS THE COMPLAINT FOR FAILURE TO JOIN INDISPENSABLE PARTIES

Under Rule 19, an absent party is indispensable if without it (1) "complete relief" cannot be accorded among those already parties, or (2) the absent party "claims an interest relating to the subject of the action and is so situated that disposing of the action in [that party's] absence may" either "(i) as a practical matter impair or impede [that] person's ability to protect the interest; or (ii) leave [the remaining] part[ies] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1).  If the absent party is indispensable, the Court must determine whether it can proceed without the indispensable party "in equity and good conscience."  *Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1496 (D.C. Cir. 1997) (citing Fed. R. Civ. P. 19(b)); *Primax Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43, 50 (D.D.C. 2003) (citing Fed. R. Civ. P. 19(b)).

### A.  Three Necessary Parties Are Currently Absent From This Case

The Complaint describes three parties who were in fact directly responsible for the Tata Mundra plant's construction and operations.  First, the coal-fired power plants constructed and operated by CGPL and Adani were the source of all the alleged pollution that purportedly has injured Plaintiffs.  *See* Compl. ¶¶ 74-115.  Another party, the Government of India, also had supervisory and regulatory responsibilities with respect to the environmental practices of CGPL and Adani, much as Plaintiffs allege IFC had supervisory and monitoring responsibilities.  *See id.* ¶¶ 28, 64-65, 67 ("The Tata Mundra Project obtained its initial environmental clearance from the Government of India in March 2007. . . . In January 2009, clearance was obtained from the

government for the shared intake channel. . . . In March 2010, CGPL received regulatory clearance for the new outfall channel location. . . . In April 2011, CGPL received an amendment to its environmental clearance allowing it to increase the Plant from 4,000 MW to 4,150 MW and to change from a rail system to a conveyor system for coal transport, among other changes.").

These parties are necessary because, in their absence, "complete relief" cannot be accorded among those already parties.  Fed. R. Civ. P. 19(a)(1)(A); *Cherokee Nation*, 117 F.3d at 1496 n.8; *Primax Recoveries*, 260 F. Supp. 2d at 50.  Should the Court find IFC liable, IFC itself would have claims against the absent parties.  Absent parties are deemed "necessary" within the meaning of Rule 19(a)(1) when, as here, their alleged conduct is central to the plaintiffs' causes of action.  While not all joint tortfeasors are indispensable parties under Rule 19, dismissal is proper where the alleged joint tortfeasor was an "active participant" in the harmful conduct attributed to the defendant.  *See B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 27 (1st Cir. 2008) ("Given that Kellogg Caribbean was a central player—perhaps even the primary actor—in the alleged breach, the practical course here . . . is to proceed in a forum where the absentee may be joined."); *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) ("According to Laker's complaint, ACL would certainly be considered an active participant in the allegations. . . .  We determine, therefore, that ACL is a necessary party and should be joined, if feasible."); *Freeman v. Nw. Acceptance Corp.*, 754 F.2d 553, 559 (5th Cir. 1985) ("First Commercial is clearly a person 'to be joined if feasible' under Rule 19(a) . . . . First Commercial was more than an active participant in the conversion alleged by the Freemans; it was the primary participant.").  Here, CGPL, Adani Power, and the Government of India all played a more active and direct role in the operations of the Tata Mundra plant, and thus are necessary parties.

**B.      This Court Lacks Jurisdiction To Join The Absent Parties To This Case**

According to the Complaint, the three absent parties are not subject to the jurisdiction of this Court.   CGPL and Adani are both Indian companies.   Compl. ¶¶ 28-29.   When CGPL contracted with IFC, it did so in a loan governed by English law containing a forum selection clause identifying English courts as the preferred forum.   *See* Suratgar Decl. Ex. 1 at 17 (Section 8.02(a)(i)).   It thus made no contact with the United States or District of Columbia, and thus had no reason to anticipate being haled into this Court.   *See GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)) ("[T]he defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there.").

Moreover, Plaintiffs do not even allege that Adani has done any business with IFC, with any entity located in the United States or the District of Columbia, or has purposefully availed itself of the benefits and privileges of conducting any activities in this country.   *See Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 109-13 (1987) (finding a lack of personal jurisdiction where the plaintiffs had "not demonstrated any action by [the defendant] to purposefully avail itself of the [relevant] market").   Therefore, there is no indication that either CGPL or Adani has the requisite minimum contacts with the United States or the District of Columbia necessary to support personal jurisdiction.   *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002) (finding lack of specific jurisdiction because plaintiff's claim did not "arise out of any business transacted between the parties in the District").

Finally, the Government of India is a sovereign entity, which cannot be subject to this Court's jurisdiction absent an FSIA exception.   *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989) ("[T]he

FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court. . . .").

Under established precedent, where a foreign sovereign is a required party for the purposes of

Rule 19, and such party is not subject to any FSIA exception, the case must be dismissed.

*Republic of the Philippines v. Pimentel*, 553 U.S. 851, 867 (2008) ("A case may not proceed

when a required-entity sovereign is not amenable to suit."); *TJGEM LLC v. Republic of Ghana*,

26 F. Supp. 3d 1, 7 (D.C. Cir. 2013) (citing *Pimentel*, 553 U.S. at 867) (same).

### C.   The Absent Parties Are Indispensable To This Case

When, as is the case here, the joinder of necessary parties under Rule 19(a) is impossible

for lack of jurisdiction, the Court must finally determine "whether, in equity and good

conscience, the action should proceed among the existing parties or should be dismissed."  Fed.

R. Civ. P. 19(b). In *Provident Tradesmens Bank & Trust Co. v. Patterson*, the Supreme Court

ruled that "Rule 19(b) suggests four 'interests' that must be examined in each case to determine"

whether to dismiss an action:

> First, the plaintiff has an interest in having a forum. . . . Second, the defendant
> may properly wish to avoid multiple litigation, or inconsistent relief, or sole
> responsibility for a liability he shares with another. . . . Third, there is the interest
> of the outsider whom it would have been desirable to join. . . . Fourth, there
> remains the interest of the courts and the public in complete, consistent, and
> efficient settlement of controversies.

390 U.S. 102, 109-111 (1968). Here, these factors indicate that this action cannot proceed

without the absent parties.

*First*, Plaintiffs' interest in having a forum is protected even in the case of dismissal.  The

Supreme Court has noted that "the strength of this interest obviously depends upon whether a

satisfactory alternative forum exists."  *Provident Tradesmens Bank*, 390 U.S. at 109.  Here, an

alternative forum exists in India.  *See infra*, Argument, Part IV.

**Second**, IFC clearly "wish[es] to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability" that it may share with the absent parties.  *Provident Tradesmens Bank*, 390 U.S. at 110.  IFC's interest in avoiding sole responsibility for the alleged harmful acts of absent parties is self-evident.  In addition, as discussed in the Rule 19(a)(2) analysis, the absence of such parties subjects IFC to the risk of incurring multiple or inconsistent obligations.  Should the Court find it potentially liable, IFC would assert claims against the absent parties, including, *inter alia*, to recover contribution from those parties.

**Third,** the interests of the absent outsiders further point toward dismissal of Plaintiffs' actions.  IFC is unlikely to protect the absent parties' interests to the extent that they are inconsistent with its own.  And, while a judgment in their absence will not have binding legal effect on them, the absent parties still have a strong interest in being present when Plaintiffs' claims are adjudicated.  *See B. Fernandez & Hnos.*, 516 F.3d at 24 ("Even if . . . [the absent party] would not be legally bound [by the prior ruling], an adverse ruling would be a persuasive precedent in a subsequent proceeding, and would weaken . . . [the absent party's] bargaining position for settlement purposes" (quoting *Acton Co. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76, 78 (1st Cir. 1982))); *NLRB v. Doug Neal Mgmt. Co.*, 620 F.2d 1133, 1139 (6th Cir. 1980) ("It is not necessary that an absent person would be bound by the judgment in a technical sense. It is enough that as a practical matter his rights will be affected."); *see also Provident Tradesmens Bank*, 390 U.S. at 110 (noting the effects that a judgment can have on nonparties, even without res judicata).

**Fourth**, considerations of consistency and efficiency indicate that these actions should be dismissed and brought instead in a foreign court, likely in the courts of India.  Because the non-joined parties were active participants in the conduct at the center of Plaintiffs' claims, a trial in

their absence—in a jurisdiction with little or no connection to the parties, events, and evidence at issue—would unnecessarily burden this Court and prolong the litigation.

## III.   THIS COURT MUST DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)

Each of Plaintiffs' claims must be dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The allegations in the Complaint have failed to establish any "'plausible' scenario" under which Plaintiffs are entitled to relief.  *See Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009)).  "A complaint is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Smith v. District of Columbia*, 674 F. Supp. 2d 209, 211 (D.D.C. 2009) (Bates, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To withstand challenge under Rule 12(b)(6), Plaintiffs must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

### A.   Plaintiffs Have Failed To State A Claim For Breach Of Contract

Plaintiffs' contract claim (Count VII)—as alleged "third-party beneficiaries" (Compl. ¶¶ 325-32)—fails as a matter of law and must be dismissed.  For at least two reasons, Plaintiffs have no right to sue under the IFC Loan Agreement.

*First*, Plaintiffs are not intended third-party beneficiaries because the IFC Loan Agreement explicitly excludes third-party rights under English law.  The IFC Loan Agreement's choice-of-law clause states that it "is governed by and shall be construed in accordance with the laws of England."  Suratgar Decl. ¶ 6 & Ex. 1 at 17 (Section 8.02(a)).  The IFC Loan Agreement expressly excludes all liability to third-party beneficiaries under the applicable English statute.

Namely, the IFC Loan Agreement expressly provides that "[a] Person who is not a party to the Senior Loan Agreement has *no rights*, including under the Contract (Rights of Third Parties) Act 1999 under English Law, to enforce any term of the Senior Loan Agreement."  Suratgar Decl. ¶ 8 & Ex. 1, Schedule 1 at 136 (emphasis added).  Under the Contract (Rights of Third Parties) Act 1999, third parties lack any right to "enforce a term of the contract . . . if on a proper construction of the contract it appears that the parties did not intend the term to be enforceable by the third party."  *Id.* ¶ 12 (quoting Contract (Rights of Third Parties) Act 1999 §§ 1-2).

As explained by Mr. Suratgar, English law thus permits the contracting parties to "exclude any liability to [a] third party that [they] might otherwise have had" under that contract by including express "wording to this effect."  *Id.* ¶ 15 (citation omitted).  The effect of such a clause in the present case, as Mr. Suratgar opines, is to prevent any recovery under the IFC Loan Agreement based on the third-party beneficiary theory advanced by Plaintiffs.  *Id.* ¶¶ 15-17.

Under the "reasonable relationship" test, which the District of Columbia applies to choice-of-law provisions, the parties' chosen law need only bear a reasonable relationship to the transaction *or at least one the parties. See Song fi, Inc. v. Google Inc.*, 72 F. Supp. 3d 53, 61 (D.D.C. 2014); Restatement (Second) of Conflict of Laws § 187(2)(a) (Am. Law Inst. 1988). This test is applied liberally in order to effectuate the freedom of contract and to honor the choice of the parties.  *See Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 768 (D.C. Cir. 1992) (noting that plaintiffs seeking to set arise a choice-of-law clause face a "heavy burden of proof" (quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592 (1991))).  In this case, IFC has a substantial relationship to England that satisfies the reasonable relationship test.  IFC has an office in London and regularly conducts business there, and the United Kingdom is one of IFC's member States with permanent presence on its Board of Directors.  *See Chambers v. NASA Fed.*

28

*Credit Union*, 222 F. Supp. 3d 1, 7 (D.D.C. 2016) (Bates, J.) (applying Maryland choice-of-law clause "[b]ecause the Credit Union has branches in Maryland").

Choice-of-law provisions are binding unless the application of the clause would violate the "strong public policy of the forum in which suit is brought." *Milanovich*, 954 F.2d at 768 (quoting *The Bremen*, 407 U.S. 1, 15 (1972)); *Belize Soc. Dev. Ltd. v. Government of Belize*, 5 F. Supp. 3d 25, 36 n.13 (D.D.C. 2013) (honoring contractual choice of English law because "[p]recedent from this Circuit and others favors application of the law that the parties to a contract agreed would apply").

Upholding the express terms of the IFC Loan Agreement under English law would not violate D.C. public policy.  In fact, the laws of England and D.C. are in accord with respect to the exclusion of third-party beneficiaries.  District of Columbia courts have indicated that a provision disclaiming third-party rights is enforceable and bars claims by alleged third-party beneficiaries, even if other parts of the agreement contain indicators of intent to grant a third-party benefit.  *See, e.g.*, *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064-65 (D.C. 2008) (applying Restatement (Second) of Contracts § 302 to enforce a provision excluding third-party rights); *see also Anderson v. D.C. Housing Auth.*, 923 A.2d 853, 862-63 (D.C. 2007) (concluding that claim by alleged third-party beneficiary "must be rejected on its face because of the plain language in the . . . contract limiting her ability to claim such status").[9]

---

[9] Many states also recognize the right of contracting parties to exclude all liability to third-party beneficiaries.  *See* Restatement (Second) of Contracts § 302(1) (Am. Law Inst. 1981) (recognizing liability to third-party beneficiaries "[u]nless otherwise agreed between promisor and promisee"); *see, e.g.*, *In re TJX Cos. Retail Sec. Breach Litig.*, 524 F. Supp. 2d 83, 88 (D. Mass. 2007) ("[C]ontracting parties should be able to control who may sue on the contract."); *Pa. State Emps. Credit Union v. Fifth Third Bank*, 398 F. Supp. 2d 317, 324 (M.D. Pa. 2005) (same).

**Second**, IFC did not undertake a contractual *duty* under the IFC Loan Agreement "to adequately monitor and supervise the environmental impacts of the plant," or "to take adequate steps to ensure Plant compliance with the environmental and social conditions."  Compl. ¶ 331. Rather, the IFC Loan Agreement obliges CGPL to permit an audit of its compliance with the Environmental and Social Requirements upon IFC's notice or request (Suratgar Decl. Ex. 1 at 90 (Section 5.1(f)(i))), and to provide IFC with regular updates on the plant's compliance with the Requirements (*id.* at 114 (Section 5.5(c)(v))).  CGPL—not IFC—undertook the duty to ensure compliance with the Environment and Social Requirements.  *See id.* at 91 (Section 5.1(i)), 104 (Section 5.2(z)(i)(B), (ii), (iii)).  Any default by CGPL with respect to the Environmental and Social Requirements would only provide IFC with several *options* by which to respond; that is, the IFC Loan Agreement does not oblige IFC to do anything in response.  *See id.* at 124-25 (Section 6.3).  Because IFC did not undertake a duty to inspect the plant—much less an obligation to act if CGPL violate the Environmental and Sustainability Requirements—Plaintiffs cannot sue IFC for breach of this alleged duty.  Put simply, a third party has no greater rights under a contract than those of the promisee.  *Doe v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009) ("Because . . . Wal-Mart made no promise to monitor the suppliers, no such promise flows to Plaintiffs as third-party beneficiaries.").

Accordingly, because the plain language of the IFC Loan Agreement protects IFC from any contractual liability to Plaintiffs or any other third party, Plaintiffs' claim for breach of contract must be dismissed under Rule 12(b)(6).

### B.   Plaintiffs Have Failed To State A Claim For "Lender Liability" With Respect To Their Non-Contractual Claims

Plaintiffs' non-contractual claims likewise fail because the Complaint does not allege sufficient facts to establish IFC's liability as a *lender* for the actions of the *borrower*.

Several jurisdictions recognize that lenders may be held liable for the actions of borrowers only where they have "assumed *actual, participatory and total control* of the debtor." *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 104-05 (1st Cir. 2009) (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1105 (5th Cir. 1973)) (emphasis added); *Indus. Tech. Venture v. Pleasant T. Rowland Revocable Trust*, 688 F. Supp. 2d 229, 239-40 (W.D.N.Y. 2010) (same); *Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y. 1995) (same); *Post-Effective Date Comm. of the Estate of East End. Dev., LLC v. Amalgamated Bank*, No. 8-12-76181-reg, 2017 Bankr. LEXIS 949, at *12 (Bankr. E.D.N.Y. Apr. 4, 2017) (same); *BH Sutton Mezz LLC v. Sutton 58 Assocs. LLC*, No. 16-10455, 2016 Bankr. LEXIS 4113, at *51 (Bankr. S.D.N.Y. Dec. 1, 2016) (same); *see also* Matthew Bender, 1 *Lender Liability Law and Litigation* § 1.02(1). Absent the *actual exercise of control and dominance*, however, a lender cannot be held liable for the actions of a borrower. "[E]ven when the creditor 'takes an active part in the management of the debtor corporation, this is not by itself sufficient.' . . . '[T]he subservient corporation [must] in reality ha[ve] *no separate, independent existence of its own.*'" *FAMM Steel*, 571 F.3d at 104-05 (quoting *Krivo*, 483 F.2d at 1105) (emphasis added); *see also Valdes v. Leisure Res. Grp., Inc.*, 810 F.2d 1345, 1355 (5th Cir. 1987) (finding as a matter of law that even a lender's "veto power" over "each and every one of [the borrower's] business expenditures . . . . does not amount to domination or control").

All of Plaintiffs' non-contractual claims allege harms caused by the construction and operation of the Tata Mundra Power Plant and the Adnai Power Plant. In the case of the Tata Mundra Power Plant, IFC's role was limited to acting as a lender to CGPL. Although Plaintiffs have pled that IFC was "intimately involved in and has substantial control over the decisions" of CGPL (Compl. ¶ 116), Plaintiffs have manifestly failed to plead facts showing that IFC

controlled and dominated the activities of CGPL to the extent necessary for lender liability. Whereas Plaintiffs allege that IFC acted unlawfully by sitting on the sidelines, there can be no lender liability unless the lender "'assumed *actual, participatory and total control* of the debtor.'" *FAMM Steel*, 571 F.3d at 105 (quoting *Krivo*, 483 F.2d at 1105) (emphasis added); *Indus. Tech. Venture*, 688 F. Supp. 2d at 239 (same); *Nat'l Westminster Bank USA*, 885 F. Supp. at 603 (same). Even taken as true, Plaintiffs' allegations do not give rise to IFC's liability for the actions of CGPL.

Neither do Plaintiffs establish that many of their alleged harms arose entirely, or even predominantly, from the Tata Mundra Plant, undercutting any argument that IFC could have prevented their harms in the first place. *See infra* Argument, Part IV. According to the Complaint, the Adani Power Plant caused much of the harm to Plaintiffs, either wholly or in part. *See* Compl. ¶¶ 30, 41, 75, 77, 103-04, 239, 256. Yet Plaintiffs do not allege or show that IFC has a commercial relationship or lending agreement with Adani. Nonetheless, Plaintiffs not only allege that IFC is responsible for harms caused wholly or in part by Adani, but also seek an order from this Court commanding IFC to use unspecified "leverage" against Adani, or, for example, to force IFC to force CGPL to force Adani to line the intake channel. *Id.* ¶ 343.

For its part, Indian law imposes an even stricter standard with respect to lender liability. Under Indian law, there is "no legal basis for asserting these claims against a lender, such as IFC, to an allegedly offending property owner or facility operator." Rasgotra Aff. ¶¶ 67-89. After individually reviewing the decisions of the Supreme Court of India and the National Green Tribunal addressing negligence, nuisance, and trespass, Ms. Rasgotra concludes that Indian law does not permit such causes of action against a lender who has loaned money to the directly responsible tortfeasor. *See id.* ¶¶ 67-76 (negligence), 77-84 (nuisance), 85-88 (trespass).

Accordingly, each of the tort claims raised by Plaintiffs against IFC must also be dismissed under Indian law.

For these additional reasons, Plaintiffs' non-contractual claims must each be dismissed under Rule 12(b)(6) for failure to state a claim.

### C.   Plaintiffs Have Failed To State A Claim For Nuisance Under Federal Common Law, District Of Columbia Law, Or Indian Law

Finally, Plaintiffs have failed to state a claim for private or public nuisance under applicable law.  According to Plaintiffs, "[t]he IFC's conduct as alleged herein violates the laws of the District of Columbia, United States federal common law, Indian law, and the laws of any other jurisdiction that might apply."  Compl. ¶ 192.  But Plaintiffs' allegations do not support a claim for nuisance under any of these bodies of law.

***First***, the federal common law of nuisance is inapplicable in this case because the federal common law of nuisance governing water pollution and air pollution is premised on "ambient or interstate" effects within the United States.  *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) (quoting *Illinois v. Milwaukee* (*Milwaukee I*), 406 U.S. 91, 103 (1972)) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law."); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) ("[T]he control of interstate pollution is primarily a matter of federal law . . . .").  Thus, federal common law can apply to lawsuits based on harmful conduct occurring in one state that gives rise to harmful "transboundary" effects in another state.  *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855-56 (9th Cir. 2012); *see, e.g.*, *Cangemi v. United States*, No. 12-CV-3989, 2017 U.S. Dist. LEXIS 52012, at *11 (E.D.N.Y. Mar. 31, 2017) (granting motion for reconsideration and dismissing plaintiffs' federal common law nuisance claim because, *inter alia*, "this case concerns a local dispute, not an interstate problem").  Here, where the pollution occurred only in

India and affected only citizens and residents of India, the federal common law of nuisance has no applicability.  *See Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 20 (D.D.C. 2005) ("[F]ederal common law should only be employed in the rarest of circumstances.").

**Second**, the District of Columbia does not recognize a cause of action for nuisance that is not based "on some underlying tortious conduct, such as negligence."  *Tucci v. District of Columbia*, 956 A.2d 684, 697 (D.C. 2008) (citing *District of Columbia v. Fowler*, 497 A.2d 456, 462 (D.C. 1985)); *see also McDonald's USA, LLC v. Craft*, 263 F. Supp. 3d 56, 63-64 (D.D.C. 2017) (dismissing nuisance claim because defendant had not pleaded a plausible underlying tort claim).  As the D.C. Court of Appeals has held, "nuisance is a type of damage and not a theory of recovery in and of itself."  *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 646 (D.C. 2005) (quoting *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 934 (D.C. 1995)).  Moreover, nuisance claims are not viable in the District of Columbia where the defendant lacks "control of the instrumentality alleged to constitute a nuisance, since without control a defendant cannot abate the nuisance."  *Beretta*, 872 A.2d at 648  (quoting *Tioga Pub. Sch. Dist. # 15 v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993)).  Here, Plaintiffs' allegations do not support the conclusion that IFC exercised control over the Tata Mundra project or the activities of CGPL.   Similarly, IFC's alleged failure to intervene in CGPL's industrial practices is not consistent with a finding of the constructive equivalent of physical presence at the project site.  *See Beretta*, 872 A.2d at 648-49; *see also Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 103 (D.D.C. 2010).   Accordingly, Plaintiffs' claims for nuisance under D.C. law must be dismissed under Rule 12(b)(6).

**Finally**, as explained by Ms. Rasgotra, Indian law provides that claims for public and private nuisance may be brought only "against the operator of the plant, not the plant's lenders." Rasgotra Aff. ¶ 82.  Accordingly, although Plaintiffs may bring claims against CGPL, Adani, or

other polluters for actions that "cause[] pollution, nuisance and damage to the environment," under Indian law "a lender would not be liable under these circumstances." *Id.* ¶¶ 83-84.

Whether Plaintiffs' claims are considered under federal law, District of Columbia law, or Indian law, therefore, Plaintiffs' claims for nuisance must be dismissed under Rule 12(b)(6).

## IV.  THIS COURT MUST DISMISS THE COMPLAINT UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

Because the complained-of conduct and all of the alleged harm occurred in India, this Court must also dismiss the Complaint in its entirety under the doctrine of *forum non conveniens*. *See MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 27 (D.D.C. 2008) (Bates, J.) ("'[A] district court has discretion to respond at once to a defendant's *forum non conveniens* plea, and need not . . . first . . . resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) . . . .'" (quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007))).

A court may dismiss a suit for *forum non conveniens* if a defendant identifies an available, adequate alternative forum that, upon weighing certain factors, is the preferred location for the suit.  *See MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010).  Where, as here, none of the plaintiffs is a U.S. resident, their choice of the United States as a forum deserves less deference.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981) (finding that "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable").

Because the Indian courts are an available and adequate forum, and because both the private and public interest factors weigh heavily in favor of the Indian courts as the proper forum, this Court must dismiss the Complaint in its entirety.

**A.      The Indian Courts Provide An Alternative Forum For Plaintiffs' Lawsuit**

In the first step of the *forum non conveniens* analysis, this Court must determine whether

there is "an alternative forum that is both available and adequate" to hear Plaintiffs' claims. *See*

*MBI*, 616 F.3d at 571.   Federal courts have routinely concluded that Indian courts provide an

adequate forum for the litigation of claims.

As the Second Circuit observed in *In re Union Carbide Corp. Gas Plant Disaster at*

*Bhopal*, the judiciary is "a developed, independent and progressive one" that has "competently

dealt with complex technological issues."   809 F.2d 195, 199 (2d Cir. 1987).   Moreover, "[t]he

tort law of India, which is derived from common law and British precedent, was . . . suitable for

resolution of legal issues arising in cases involving highly complex technology."   *Id.*   Similar

conclusions have been reached in numerous cases.   *Chigurupati v. Daiichi Sankyo Co.*, 480 F.

App'x 672, 674 (3d Cir. 2012) ("[T]he District Court did not abuse its discretion in concluding

that India was an adequate alternative forum."); *Advanta Corp. v. Dialogic Corp.*, No. C 05-

2895, 2006 U.S. Dist. LEXIS 28214, at *11-15, *19-20 (N.D. Cal. May 2, 2006) (finding that

India is an adequate forum despite the plaintiff's allegations and dismissing for *forum non*

*conveniens*); *Ramakrishna v. Besser Co.*, 172 F. Supp. 2d 926, 931 (E.D. Mich. 2001) (same);

*Neo Sack, Ltd. v. Vinmar Impex, Inc.*, 810 F. Supp. 829, 832-34 (S.D. Tex. 1993) (same).

Ms. Gauri Rasgotra, who is a qualified expert on Indian law and the Indian judicial

system, confirms these courts' analyses.[10]   As Ms. Rasgotra explains, the Indian courts provide

an available, adequate alternative forum, with a well-developed and independent judiciary that is

well-suited to addressing complex legal and technical issues.   *See* Rasgotra Aff. ¶¶ 21-31.   In

particular, a specialized forum known as the National Green Tribunal, which the Indian

---

[10] Ms. Rasgotra's averments in her affidavit are solely regarding jurisdiction and to demonstrate that any cause of action Plaintiffs may have arose in India.  Rasgotra Aff. ¶ 38.  She does not opine on the merits of any of IFC's potential defenses.

Government established in 2010, is available to "hear[] all cases relating to environmental protection . . . including enforcement of any legal right relating to the environment." *Id.* ¶ 36. The National Green Tribunal is staffed with "judicial members and experts from scientific and technical disciplines," and can seek the assistance of court-appointed "technical expert[s] with specialized knowledge and experience on a case-by-case basis." *Id.* ¶ 43. The National Green Tribunal also is directed by statute to follow "internationally recognized environmental principles of sustainable development, the polluter-pays principle and the precautionary principle in rendering any decision." *Id.* ¶ 53. Accordingly, by virtue of its technical expertise and particularized knowledge regarding environmental harms, India's National Green Tribunal is not only an *adequate* alternative forum—in many ways it is actually the *superior* forum for adjudicating the specific types of claims brought by the Plaintiffs in this case.

Moreover, the National Green Tribunal will be able to adjudicate Plaintiffs' claims more expeditiously than would this Court. As Ms. Rasgotra explains, the National Green Tribunal was designed specifically by the Government of India to ensure "'effective and expeditious disposal of cases,'" and is statutorily mandated to "dispose of cases within six months from the date of filing." *Id.* ¶ 40 (quoting The National Green Tribunal Act, 2010 (No. 19 of 2010) Preamble & §§ 18-19). Ms. Rasgotra also cites empirical data which confirms that the National Green Tribunal is presently handling hundreds of cases each year. *Id.* ¶ 41. The speed and efficiency with which the National Green Tribunal would be able to address Plaintiffs' claims is to be contrasted with environmental class action litigation in the United States, which has been known to drag on for a decade or more. The litigation of the 1989 *Exxon Valdez* incident, for example, took twenty years to resolve. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 476-82 (2008) (describing the four-phase class action proceedings in which the defendant's liability and

compensation were assessed over a twenty-year period). The National Green Tribunal also is committed to "Accessible Environmental Justice," permits "any representative body or organization to file an application for relief," and exempts "economically weak persons or their representative organizations from filing the prescribed court fee." Rasgotra Aff. ¶ 54. All of the putative class members described in the Complaint would thus be able to participate meaningfully in the litigation.

Finally, whether or not the National Green Tribunal or other Indian courts can provide each of the procedural or substantive advantages available in the United States—such as a class action mechanism or particular causes of action—is irrelevant to the *forum non conveniens* analysis. It is well established that the absence of a class action mechanism does not render a foreign forum "inadequate." *See Aguinda v. Texaco Inc.*, 303 F.3d 470, 478 (2d Cir. 2002) (quoting *Blanco v. Banco Indus. de Venez., S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) ("[T]he unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate."); *Gas Plant Disaster at Bhopal*, 809 F.2d at 199; *In re Lloyd's Am. Trust Fund Litig.*, 954 F. Supp. 656, 673 (S.D.N.Y. 1997); *see also Beamon v. Brown*, 125 F.3d 965, 969-70 (6th Cir. 1997). Similarly, as the Supreme Court held in *Reyno*, "[t]he possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry." 454 U.S. at 247; *see also MBI*, 558 F. Supp. 2d at 30; *Poole v. Brown*, 706 F. Supp. 74, 75 n.5 (D.D.C. 1989).

Accordingly, this Court should conclude that Indian courts are an available and adequate alternative forum, as other U.S. courts have held in the past.

### B.    The Private Interest Factors Weigh Strongly In Favor Of Dismissal

The second step in the *forum non conveniens* analysis is to weigh the private interest factors. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). These private interests include

"ease of access to sources of proof;" "availability of compulsory process for attendance of unwilling" witnesses; "the cost of obtaining attendance of willing" witnesses; the "possibility of view of premises" by the court if needed; and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* Here, all five of the private interest factors weigh heavily in favor of dismissal.

**First**, as in *Gas Plant Disaster at Bhopal*, 809 F.2d at 199-200, the vast majority of material witnesses and documents bearing on causation, liability, and alleged damages is located solely in India. *See* Compl. ¶¶ 6 (describing plaintiffs as "impoverished fishing communities and local farmers"), 7-11 (describing alleged harm to the marine ecosystem, groundwater, property, and air quality in Gujarat, India), 13-15 (identifying Plaintiffs as (1) citizens and residents of Gujarat, India, (2) a non-profit in Gujarat, India, and (3) a local government entity in Gujarat, India), 29-30 (describing the Tata Mundra plant's proximity to another coal-fired plant that is not the subject of this lawsuit), 54-55 (describing IFC's activities in India), 62-68 (describing IFC's visits to the project and alterations to the design of the plant, all in India), 74-82 (describing alleged harm to Modwa, Tragadi, and Kotadi residents), 147-59 (describing IFC's alleged conduct in India), 212-77 (describing alleged harm to Plaintiffs, all in India).

In particular, the allegedly negligent "[c]onstruction of the intake and outfall channels" at the Tata Mundra plant, the alleged "[t]hermal pollution from the outfall channel," the alleged "chemical pollution from the outfall channel," the alleged "collapse of the fish stocks," the alleged "obstruct[ion of] access to cattle grazing land and traditional fishing grounds," the alleged "air quality around the Tata Mundra Plant," the alleged "increase in health problems" and particularly "respiratory problems" experienced by local communities, the alleged "[s]ea water . . . leach[ing] into the soil and into the groundwater," and the alleged "loss of resources

and productive agricultural lands" could only be proven or disproven by evidence and witnesses located in India.  *See* Compl. ¶¶ 74, 76, 90, 94, 99, 103, 110, 114.  Evaluating IFC's actual involvement in the Tata Mundra plant's operations will turn heavily on the nine alleged "supervision visits" made by IFC representatives to the site of the Tata Mundra Project between 2008 and 2012.  *See* Compl. ¶¶ 62-68.

Indeed, according to Plaintiffs, to make any assessment of the environmental situation, the CAO was required to visit the site multiple times.  *See* Compl. ¶ 149.  To gather admissible proof and witness testimony relating to Plaintiffs' allegations, the parties would similarly be obliged to conduct considerable evidentiary discovery in India at incalculable expense.

***Second***, none of the material witnesses is subject to compulsory process.  India is far beyond the 100-mile subpoena power exercised by this Court.  *See* Fed. R. Civ. P. 45(c)(1)(A).

***Third***, the costs of bringing willing witnesses from Gujarat, India to Washington would be expensive.  Beyond the travel costs, Indian nationals would be required to secure travel visas to the United States, which are not easy to obtain.  The witnesses will require Gujarati-English interpreters in order to present live testimony to this Court.  Conversely, there is no comparable burden in conducting the matter in India.  Plaintiffs identify no material witnesses residing in Washington.  Even if some exist and would need to appear in-person before the Indian court, far fewer witnesses from the United States would need to travel to India than vice versa.

***Fourth***, site visits for a "view of premises" by the Court either at the Tata Mundra Plant or the numerous allegedly polluted areas of Gujarat would likewise be expensive and difficult. *See MBI*, 616 F.3d at 576 (citing *Gilbert*, 330 U.S. at 508).

***Finally***, "all other practical problems that make trial of a case easy, expeditious and inexpensive" weigh heavily in favor of India's National Green Tribunal as the proper forum.  *Id.*

(citing *Gilbert*, 330 U.S. at 508).  Besides being located in the same country as the Tata Mundra plant, the Plaintiffs, and all of the potential class members, the National Green Tribunal is directed by statute to ensure "'effective and expeditious disposal of cases,'" and "dispose of cases within six months from the date of filing."  Rasgotra Aff. ¶ 40 (quoting The National Green Tribunal Act, 2010 (No. 19 of 2010) Preamble & §§ 18-19).  The National Green Tribunal also is staffed with "judicial members and experts from scientific and technical disciplines," who are deeply familiar with the subject matter of this case.  *Id.* ¶ 43.  The National Green Tribunal thus will be able to focus quickly and effectively on the critical issues in Plaintiffs' case, whereas a U.S. court would be obliged to spend considerable time familiarizing itself both with the subject matter of the case and with the geographic, social, and environmental factors affecting this particular community in Gujarat, India.  The Indian court system, moreover, is far better able to accommodate the particular local languages that are likely spoken by the fact witnesses and alleged victims in the present case, including Gujarati and Kutchi.  *Id.* ¶ 52.  Because such languages are not widely spoken in the United States, a U.S. court would have considerable difficulties understanding the testimony of witnesses, and translation costs would impose an additional burden on the parties.

For all of the foregoing reasons, India is the proper forum for this case.

**C.**     **The Public Interest Factors Weigh Strongly in Favor of Dismissal**

The public interest factors point to the same result.  These factors include the "'local interest in having localized controversies decided at home'; the possibility of holding the trial in a forum 'at home with the [] law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself'; and avoiding the imposition of jury duty on 'people of a community which has no relation to the litigation' and other 'administrative difficulties' that flow from foreign litigation congesting local courts."  *MBI*,

616 F.3d at 576 (citing *Gilbert*, 330 U.S. at 508-09); *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 39 (D.D.C. 2002).

In this case, all of the public interest factors likewise weigh in favor of litigation in the Indian courts. Just as in *Gas Plant Disaster at Bhopal*, "all relevant events occurred in India. The victims . . . are citizens of India and located there. The witnesses are almost entirely Indian citizens. The Union of India has a greater interest than does the United States in facilitating the trial and adjudication of the victims' claims. . . . India has a stronger countervailing interest in adjudicating the claims in its courts according to its standards rather than having American values and standards of care imposed upon it." *See* 809 F.2d at 201. Indeed, the enactment of the National Green Tribunal Act in 2010 demonstrates that "India's commitment to provide an expeditious and expert remedy against environmental violations" has remained strong during the subsequent decades. Rasgotra Aff. ¶ 37. Moreover, unlike in *Gas Plant Disaster at Bhopal*, where the defendant was a U.S. corporation, the party primarily responsible for the alleged tortious conduct in the present case is itself an Indian company, CGPL. Compl. ¶ 28. Moreover, Plaintiffs have alleged violations of the Indian National Ambient Air Quality Standards (*see* Compl. ¶¶ 99-100, 174), a regulatory framework that India undoubtedly has a greater interest in enforcing. The first factor, India's own local interest in resolving this dispute, thus weighs heavily in favor of dismissal.

The second factor, the prospect of "unnecessary problems in conflict of laws, or in the application of foreign law," *see Reyno*, 454 U.S. at 241 n.6 (citing *Gilbert*, 330 U.S. at 509), likewise weighs in favor of dismissal. Plaintiffs themselves acknowledge uncertainty regarding the conflict-of-law analysis in their Complaint, invoking "the laws of the District of Columbia, United States federal common law, Indian law, and the laws of any other jurisdiction that might

apply." Compl. ¶ 192.  This uncertainty, when added to the potential applicability of Indian law, weighs heavily in favor of litigation in India.

The third factor is irrelevant, because like sovereigns, international organizations are immune from trial by jury.  28 U.S.C. § 1330(a).  The fourth factor clearly weighs in favor of dismissal.  *See Reyno*, 454 U.S. at 241 n.6 (citing *Gilbert*, 330 U.S. at 509). By any measure, the class action proposed by Plaintiffs would be a long, drawn-out dispute.  As noted above, class actions over environmental harm have been known to stretch out for decades.  *See Exxon Shipping Co.*, 554 U.S. at 476.  Burdening this Court with a case of this size and complexity would be particularly unfair, given that all of the alleged harm purportedly occurred on the other side of the world in a foreign country with its own functioning judicial system.  Accordingly, the relevant public interest factors weigh heavily in favor of dismissal of this case.

*   *   *   *   *

To summarize, the Indian courts provide an adequate and available alternative forum, and the private and public interest factors all weigh heavily in favor of litigation in India; therefore, the result should be identical to that reached in numerous other class actions based on allegations of industrial activity causing environmental injury abroad.  *See Aguinda*, 303 F.3d at 480; *Gas Plant Disaster at Bhopal*, 809 F.2d at 206; *Flores v. So. Peru Copper Corp.*, 253 F. Supp. 2d 510, 544 (S.D.N.Y. 2002); *Torres v. So. Peru Copper Corp.*, 965 F. Supp. 899, 908 (S.D. Tex. 1996), *aff'd* 113 F.3d 540 (5th Cir. 1997); *Sequihua v. Texaco, Inc.*, 847 F. Supp. 61, 65 (S.D. Tex. 1994).  That is, this case must be dismissed in its entirety based on *forum non conveniens*.

<u>CONCLUSION</u>

Plaintiffs' Complaint must be dismissed in its entirety.   First, the Court lacks subject-matter jurisdiction because the FSIA's commercial-activity exception is inapplicable to this case, IFC has not waived its immunity to Plaintiffs' claims, and IFC enjoys immunity under its

43

Articles of Agreement.  Second, Plaintiffs have failed to join three indispensable parties, whose involvement in the alleged conduct is far more direct than IFC's.  Third, each of the alleged causes of action has been insufficiently pleaded under Rule 12(b)(6).  Finally, Plaintiffs have alleged that Indian entities have caused harm to Indians by actions committed entirely in India, such that an Indian court—the National Green Tribunal—should consider these claims under the doctrine of *forum non conveniens*.  For all of these reasons, this Court should thus grant IFC's Renewed Motion to Dismiss the Complaint.

Dated:  June 19, 2019

Respectfully submitted,

/s/ Francis A. Vasquez, Jr.
Francis A. Vasquez, Jr. (D.C. Bar No. 442161)
Dana E. Foster (D.C. Bar No. 489007)
Maxwell J. Kalmann (D.C. Bar No. 1033899)
Jordan E. Helton (D.C. Bar No. 1619082)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 626-3600
Facsimile: (202) 639-9355
fvasquez@whitecase.com

Jeffrey T. Green (D.C. Bar No. 426747)
Matthew J. Letten (D.C. Bar No. 1047224)
1501 K Street, N.W.
SIDLEY AUSTIN LLP
Washington, D.C. 20005
(202) 735-8500

*Counsel for International Finance Corporation*