**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BUDHA ISMAIL JAM, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 15-612 (JDB)** |
| **INTERNATIONAL FINANCE CORPORATION,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Residents of Gujarat, India and other local community stakeholders seek to hold the International Finance Corporation ("IFC"), an international organization, liable for property damage, environmental destruction, loss of livelihood, and threats to human health arising from the construction and operation of the coal-fired Tata Mundra Power Plant in Gujarat, India. This Court previously dismissed plaintiffs' suit based on binding D.C. Circuit precedent that international organizations enjoy absolute immunity under the International Organizations Immunities Act ("IOIA"). The D.C. Circuit affirmed this Court's decision, but the Supreme Court reversed and remanded the case, holding that international organizations do not enjoy absolute immunity; instead, they enjoy the same immunity as is enjoyed by foreign governments under the Foreign Sovereign Immunities Act ("FSIA").

Back before this Court, IFC has filed a renewed motion to dismiss plaintiffs' complaint. IFC raises the same grounds for dismissal as before but now argues that IFC is immune from suit even under the more limited immunity granted to foreign governments under the FSIA. Plaintiffs counter that IFC is not immune because the suit falls under the FSIA's commercial activity exception. For the reasons explained below, this Court concludes that the commercial activity

exception does not apply here because plaintiffs have failed to establish that their suit is based upon conduct carried on in the United States.  Accordingly, IFC is immune from this suit and plaintiffs' complaint will be dismissed.

## BACKGROUND

IFC is a public international organization with 185 member countries, including the United States and India, that seeks "to further economic development by encouraging the growth of productive private enterprise in member countries, particularly in the less developed areas." Articles of Agreement, Ex. 4 to Decl. of Leslie Sturtevant ("Sturtevant Decl.") [ECF No. 40-9] Art. I; Def. IFC's Mem. of Law in Supp. of its Renewed Mot. to Dismiss the Compl. ("Def.'s Mot.") [ECF No. 40-1] at 3.  IFC finances "private enterprises which would contribute to the development of its member countries by making investments, without guarantee of repayment by the member government concerned, in cases where sufficient private capital is not available." Def.'s Mot. at 19.

IFC is committed to investing in "sustainable projects" and ensuring that "the costs of economic development do not fall disproportionately on those who are poor or vulnerable, that the environment is not degraded in the process, and that natural resources are managed efficiently and sustainably."  IFC's 2006 Policy on Social & Environmental Sustainability, Ex. 2 to Decl. of Richard Herz ("Herz Decl.") [ECF No. 45-7] at 2.  The organization's "Performance Standards on Social & Environmental Sustainability" create a framework for the assessment, avoidance, and mitigation of environmental and social risks.  IFC's 2006 Performance Standards on Social & Environmental Sustainability, Ex. 3 to Herz Decl. [ECF No. 45-8] at i.

Under IFC internal policy, "managing social and environmental risks and impacts in a manner consistent with the Performance Standards is the responsibility of the client," but "IFC

seeks to ensure that the projects it finances are operated in a manner consistent with the requirements of the Performance Standards."  IFC's 2006 Policy on Social and Environmental Sustainability at 1.  As a result, "IFC's social and environmental review of a proposed project is an important factor in its decision to finance the project or not, and will determine the scope of the social and environmental conditions of IFC financing."  Id.  Additionally, after making an investment, IFC will "monitor" its investment by requiring the borrower to submit periodic Monitoring Reports on the project's social and environmental performance, conduct site visits, and review the project's performance.  See id. at 5.  If the client fails to comply with its social and environmental commitments, then IFC will work with the client to bring it back into compliance to the extent feasible, and if the client fails to reestablish compliance, IFC will exercise remedies where appropriate.  Id. at 5–6.

This case arises out of IFC's investment in the coal-fired Tata Mundra Power Plant project, located on the Kutch coast of Gujarat, India, where traditional agricultural and fishing communities depend on the natural environment.  Compl. [ECF No. 1] ¶¶ 1–3.  The project was carried out by Coastal Gujarat Power Limited ("CGPL"), which is a subsidiary of Tata Power, an Indian power company.  Id. ¶ 2.  IFC loaned CGPL $450 million to develop the plant, which was estimated to cost $4.14 billion in total.  Id. ¶¶ 2, 47.

Before investing in the Tata Mundra Power Plant project, IFC recognized that the development of the Plant had "potential significant adverse social and/or environmental impacts that were diverse, irreversible or unprecedented."  Id. ¶ 48; Compliance Advisory Ombudsman Audit Report ("Audit Report"), Ex. 14 to Sturtevant Decl. [ECF No. 40-19] at 4–5.  IFC conducted an environmental and social review of the project in which it identified a number of performance gaps that needed to be addressed to ensure the project was carried out in accordance with IFC

standards.  Compl. ¶¶ 50–51; Audit Report at 16.

Hence, before closing the deal on IFC's $450 million investment, IFC and CGPL developed an Environmental and Social Action Plan to address those gaps, and the plan was incorporated into IFC's loan agreement with CGPL along with other environmental guidelines. Compl. ¶ 51; see also Loan Agreement Between CGPL & IFC ("Loan Agreement"), Ex. 1 to Decl. of Karim Suratgar [ECF No. 40-4] at 91–92.  The loan agreement was negotiated in Mumbai, India, approved by IFC's board of directors at IFC's headquarters in Washington, D.C., and then executed back in India.  Sturtevant Decl. [ECF No. 40-5] ¶¶ 12, 17–21; Compl. ¶¶ 196–97.

Under the agreement, CGPL was required to design, construct, and operate the plant in accordance with IFC's environmental and social requirements, as well as other industry standards, and to implement diligently the Environmental and Social Action Plan.  See Compl. ¶ 122; Loan Agreement at 91–92.  Disbursement of the funds was contingent on IFC's approval of the project's construction plan, schedule, and budget.  Loan Agreement at 74–75.  Finally, the loan agreement provided IFC some authority over the project after the funds were disbursed.  For example, IFC retained a right to access and inspect the project site and records, to conduct an independent audit to ensure compliance with its environmental and social requirements and, if necessary, to take corrective action.  Id. at 91–92.

Plaintiffs in this case are: fishermen and farmers who live and work near the plant, suing on behalf of themselves and others similarly situated; a local trade union dedicated to the protection of fisherworkers' rights; and the local government of a nearby village.  See Compl. ¶¶ 6, 13–15. Plaintiffs claim that the Tata Mundra Power Plant project has damaged their property, health, and way of life.  See id. ¶¶ 7–11.  For example, plaintiffs allege that the plant's cooling system has discharged thermal pollution into the sea, degrading the local marine ecosystem and resulting in

the decline of critical fish stocks and other marine resources.  Id. ¶ 7.  The intake and outfall channels of the plant have also closed off access routes to traditional fishing grounds and caused sea water to contaminate the groundwater such that the groundwater can no longer be used by farmers for irrigation or as drinking water.  Id. ¶¶ 7–8.  Additionally, the plant's coal conveyor system causes coal dust and fly ash to periodically cover homes, burial sites, crops, salt resources, and fish laid out to dry, damaging agricultural production, polluting the air, and causing respiratory problems among the local population.  Id. ¶ 9.

Plaintiffs claim their case arises out of "the irresponsible and negligent conduct of the International Finance Corporation in appraising, financing, advising, supervising and monitoring its significant loan to enable the development of the Tata Mundra Project in Gujarat, India."  Id. ¶ 2.  For support, Plaintiffs point to IFC's Compliance Advisor Ombudsman's ("CAO's") audit of the project, which concluded that IFC's environmental and social assessments did not adequately consider the project's impact on the local fisherman, and that IFC failed to address environmental and social compliance issues during its supervision of the project.  Id. ¶¶ 153–55; Audit Report at 4.

Plaintiffs allege that IFC, despite knowing that the project would likely inflict serious environmental and social harm to the property, health, and livelihood of people living near the plant, chose to fund the project without taking reasonable steps to prevent or mitigate those foreseeable harms.  Compl. ¶¶ 3–5.  According to plaintiffs, IFC is "intimately involved in and has substantial control over the decisions concerning construction, design, and operation of the projects it funds," but IFC failed to ensure the Tata Mundra Plant was constructed and operated with due care for the environment and local community.  Id. ¶¶ 116–17.  That conduct, plaintiffs contend, gives rise to valid claims for negligence, negligent supervision, public nuisance, private

nuisance, trespass, and breach of contract.   See id. ¶¶ 294–332.   As remedies, plaintiffs seek various forms of injunctive relief or, in the alternative, compensatory and punitive damages.   See id. ¶¶ 333–45.

IFC first moved to dismiss this case on grounds of immunity, forum non conveniens, failure to join indispensable third parties, and failure to state a claim upon which relief can be granted. See Def. IFC's Mot. to Dismiss the Compl. [ECF No. 10] at 1–2.   This Court, relying on binding D.C. Circuit precedent, dismissed the case on the ground that the IOIA granted international organizations "virtually absolute immunity," and the D.C. Circuit affirmed that decision.   See Jam v. Int'l Fin. Corp., 172 F. Supp. 3d 104, 108 (D.D.C. 2016), aff'd, 860 F.3d 703 (D.C. Cir. 2017). However, the Supreme Court reversed and remanded the case, explaining that the IOIA confers on international organizations the same immunity that foreign governments enjoy today under the FSIA and not the "virtually absolute immunity" that foreign governments enjoyed as a matter of international comity at the time the IOIA was enacted.   Jam v. Int'l Fin. Corp., 139 S. Ct. 759, 770 (2019).

On remand, IFC has filed a renewed motion to dismiss plaintiffs' complaint, raising the same four grounds for dismissal as before, but this time arguing that IFC is immune even under the more limited immunity that foreign governments enjoy today under the FSIA.   See Def.'s Mot. at 1–2.   Plaintiffs oppose the motion and, on the question of immunity, argue that IFC is not immune because this suit falls under the FSIA's commercial activity exception.   Pls.' Mem. of Law in Opp'n to Def.'s Renewed Mot. to Dismiss the Compl. ("Opp'n Br.") [ECF No. 45] at 11–18.   Because this Court concludes that that commercial activity exception does not apply and that IFC therefore is immune from this suit, the Court need not address IFC's alternative arguments for dismissal.

## LEGAL STANDARD

IFC claims immunity and seeks to dismiss this suit for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Such a claim "presents a threshold challenge to the Court's jurisdiction" and obligates the Court "to determine whether it has subject-matter jurisdiction in the first instance." Curran v. Holder, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted). "Federal courts are courts of limited jurisdiction . . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). That party must establish jurisdiction by a preponderance of the evidence. See Gordon v. Office of the Architect of the Capitol, 750 F. Supp. 2d 82, 87 (D.D.C. 2010). In assessing jurisdiction, "the Court must accept as true all of the factual allegations contained in the complaint," but those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 86–87 (internal quotation marks and citations omitted). The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

IFC argues it is immune from suit under the IOIA. See Def.'s Mot. at 9–22. Under that statute, international organizations "enjoy the same immunity from suit . . . as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity." 22 U.S.C. § 288a(b). The IOIA "continuously link[s] the immunity of international organizations to that of foreign governments, so as to ensure ongoing parity between the two." Jam, 139 S. Ct. at 768. Therefore, at this time, "the Foreign Sovereign Immunities Act governs the immunity of

international organizations." Id. at 772.

The FSIA provides foreign governments—and therefore also international organizations—presumptive immunity from suit, subject to several statutory exceptions. See 28 U.S.C. § 1604. "[T]he plaintiff bears the initial burden to . . . produc[e] evidence that an exception applies, and once shown, the sovereign bears the ultimate burden of persuasion to show the exception does not apply." Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013) (citations omitted). However, "[i]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations," as is the case here, "then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff. Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000); see also SACE S.p.A. v. Republic of Paraguay, 243 F. Supp. 3d 21, 32 (D.D.C. 2017). IFC thus "bears the burden of proving that the plaintiff's allegations do not bring [the] case within a statutory exception to immunity." Phoenix Consulting, 216 F.3d at 40.

In this case, plaintiffs allege that their suit falls within the FSIA's commercial activity exception. That exception, as applied to international organizations, withholds immunity when an action is based upon (1) "a commercial activity carried on in the United States" by an international organization or (2) "an act performed in the United States in connection with a commercial activity" of the international organization "elsewhere." 28 U.S.C. § 1605(a)(2); see also Jam, 139 S. Ct. at 772.[1] An activity is "carried on in the United States" if the activity has "substantial contact with the United States." 20 U.S.C. § 1603(e). Thus, to determine whether the exception applies, courts must first consider whether the action is "based upon" activity "carried on" or "performed"

---

[1] Plaintiffs do not suggest that this case falls under the commercial activity exception's third category: an action based upon an act that occurred "outside the territory of the United States in connection with a commercial activity of [an international organization] elsewhere and that . . . causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

in the United States, and then must consider the commercial nature of that activity.  See 28 U.S.C. § 1605(a)(2).

The Court's analysis here starts and ends with that first question: whether plaintiffs' suit is "based upon" activity—commercial or otherwise—that was carried on in (or performed in) the United States. [2]  Plaintiffs argue that their suit is based upon "IFC's tortious conduct"—"its lending to a private corporation and associated acts"—that "occurred right here in the United States." Opp'n Br. at 12.  IFC counters that the suit is in fact based upon the "construction and operation of the Tata Mundra Plant" in Gujarat, India because that is what "actually injured" plaintiffs. Def.'s Mot. at 11, 13.  Likewise, the United States as an interested party argues that "although the plaintiffs name IFC as the only defendant and attempt to focus on IFC's lending decisions in the United States, the 'gravamen' or 'core' of the lawsuit is the allegedly tortious conduct in India that caused the plaintiffs' harm."  Statement of Interest of the United States of America ("U.S. Statement of Interest") [ECF No. 47] at 2.

As explained below, this Court does not fully adopt either of the parties' positions, but ultimately concludes that plaintiffs' suit is based upon IFC's failure to ensure the plant was designed, constructed, and operated with due care so as not to harm plaintiffs' property, health, and way of life.  And while plaintiffs allege that the loan agreement was approved by IFC's board of directors in Washington, D.C., plaintiffs have not established that the gravamen of the complaint—IFC's subsequent failure to supervise and monitor construction and operation of the Tata Mundra Power Plant project and ensure its compliance with numerous environmental and social sustainability requirements in the loan agreement—was carried on in the United States.

---

[2] Because the Court resolves this case on immunity grounds, and specifically on whether plaintiffs' suit is based upon conduct carried on or performed in the United States, this Court does not address whether plaintiffs' suit is based upon commercial conduct, nor does it consider IFC's alternative grounds for dismissal.

**A. Identifying the Gravamen**

To identify the particular conduct on which an action is based, courts must look to "the basis or foundation for a claim, those elements that, if proven, would entitle a plaintiff to relief, and the gravamen of the complaint." OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 395 (2015) (internal quotation marks, citations, and alterations omitted). The fact than an activity "led to the conduct that eventually injured" plaintiffs or "would establish a single element of a claim" is insufficient to demonstrate that the suit is "based upon" that activity. Id. at 395 (internal quotation marks omitted); see also Saudi Arabia v. Nelson, 507 U.S. 349, 357–58 (1993). Courts should not "individually analyz[e] each of the [plaintiffs'] causes of action," but should instead "zero[] in on the core," "essentials," or "gravamen" of the suit. Sachs, 136 S. Ct. at 396–97. "[A]ny other approach," the Supreme Court has warned, "would allow plaintiffs to evade the Act's restrictions through artful pleading." Id.

IFC and the United States argue that the Supreme Court's two decisions in Nelson and Sachs stand for the proposition that the last act that "actually injured" plaintiffs—regardless of whose act it was—constitutes the gravamen of the suit. See Def.'s Mot. at 11; U.S. Statement of Interest at 7; Tr. of Mot. Hearing [ECF No. 56] at 5:18–20. At the hearing on the renewed motion to dismiss, IFC went even further, alleging that the gravamen of a tort claim is always at the place of the injury. Tr. of Mot. Hearing at 62:17–20; 64:1–5; 71:14–16.

But neither Nelson nor Sachs establishes such hardline rules. In Nelson, a U.S. citizen sued Saudi Arabia and its state-owned hospital for personal injuries he suffered after being tortured, beaten, and unlawfully detained by Saudi government officials in retaliation for reporting safety defects at a Saudi hospital. 507 U.S. at 351–53. In addition to an array of intentional tort claims, including battery, unlawful detainment, and torture, Nelson alleged that Saudi Arabia

negligently failed to warn him of the dangers of his employment when recruiting him in the United States.  Id. at 353–54.  The Supreme Court held that even though Saudi Arabia recruited and hired Nelson in the United States, those commercial activities did not "form the basis" of his suit.  Id. at 358.  Instead, the suit was based upon the "tortious conduct itself," which took place in Saudi Arabia.  Id.

Similarly, in Sachs a U.S. citizen sued an Austrian state-owned railway operator after she fell in Austria from a train station platform onto the tracks where a moving train crushed her legs.  136 S. Ct. at 393.  She brought negligence, strict liability, and breach of implied warranty claims, including a failure-to-warn claim based on the railway company's failure to alert her to the dangerous conditions at the train station when it sold her a railway pass in the United States.  Id.  Sachs argued her suit was "based upon" commercial activity carried on in the United States, namely the railway's sale of the pass in the United States through a U.S.-based travel agent.  Id.  The Supreme Court disagreed and held that "the conduct constituting the gravamen of Sachs's suit plainly occurred abroad" as "[a]ll of her claims turn on the same tragic episode in Austria, allegedly caused by wrongful conduct and dangerous conditions in Austria."  Id. at 396.

IFC correctly notes that, in Sachs, the Supreme Court relied on Justice Holmes's observation that the "essentials of a personal injury narrative will be found at the point of contact."  Id. at 397 (internal quotation marks omitted).  But the Supreme Court did not say that the gravamen of any tort claim will always be found at the "point of contact" or "place of injury."  See Sachs, 136 S. Ct. at 397 (stating only that "[a]t least in this case, that insight holds true"). In fact, the Supreme Court expressly cautioned that the reach of its decision in Sachs "was limited" and that "[d]omestic conduct with respect to different types of commercial activity may play a more

significant role in other suits."  Id. at 397 n.2. [3]

Further, the fact that the Supreme Court in both Nelson and Sachs focused on the conduct that "actually injured" plaintiffs does not mean that, as IFC argues, the "last act" in the causal chain is always the conduct that constitutes the gravamen of a suit.  IFC concedes that, under its reading of Nelson and Sachs, foreign states and international organizations would be immune from any suit in which there is an intervening cause that occurred abroad, even if all of the defendant's relevant conduct occurred in the United States.  See Tr. of Mot. Hearing at 5:16–24.  This approach would effectively immunize state-owned enterprises and international organizations operating in the United States from a large swath of causes of action, including failure-to-protect claims, negligent hiring or supervision claims, defective design claims, or any negligence claim with an intervening cause, so long as the "last act" ultimately occurred outside the United States.

Nothing in Sachs or Nelson supports this bold proposition.  The Supreme Court did not reject Sachs's and Nelson's failure-to-warn claims because the act that most immediately proceeds the injury always constitutes the gravamen of a tort claim; instead, it rejected those failure-to-warn claims because they were a mere semantic reframing of plaintiffs' primary claims resting on the defendants' negligent and intentional tortious conduct abroad.  See Sachs, 136 S. Ct. at 396–97; Nelson, 507 U.S. at 361–62.  The failure-to-warn claims were brazen efforts to artificially shift the gravamen of a complaint about a foreign government's conduct abroad to the United States through artful pleading.  See id.  Moreover, a tort claim cannot always be "based upon" the last act in the causal chain of a tort because that is effectively a "one-element approach" to identifying

---

[3] Imagine, for example, if CGPL contracted with IFC to actively monitor and adjust the power plant's cooling levels from a computer system in the United States, but IFC's technicians negligently mis-adjusted the cooling levels, causing a fire at the plant.  If plant workers injured by the fire brought a tort action against IFC, that action may be based upon IFC's technicians' particular conduct in the United States even though the plant workers were physically injured in India.

the gravamen of a suit, which the Supreme Court has expressly rejected.  See Sachs, 136 S. Ct. at

396.  Instead, the Supreme Court instructed courts to avoid an element-by-element analysis and

make a more holistic assessment as to what particular conduct constitutes the "core" of the suit.

Id.

     While IFC's rigid "place of injury" or "last act" tests are not the proper way to identify the

gravamen of a suit, neither is plaintiffs' approach.  Plaintiffs argue that a large percentage of the

conduct alleged in the complaint—namely, how the design, construction, and operation of the

power plant in India has harmed plaintiffs' property, health, and livelihoods—should be excluded

from the gravamen analysis on the ground that courts must consider only the sovereign (or

international organization) defendant's conduct, not the conduct of third parties, in identifying the

gravamen of the suit.  It is true that the gravamen arises from plaintiffs' claims as articulated in

their complaint—"the particular conduct on which the action is based."  See id. at 395.  But here,

plaintiffs' claim is that IFC is responsible for the harmful design, construction, and operation of

the power plant in a variety of ways.  See Compl. ¶¶ 160–92.  Because plaintiffs seek to hold IFC

responsible for conduct that occurred in India, that conduct is relevant to identifying the "core" of

the suit even if IFC was not physically constructing or operating the plant in India.  Moreover, the

gravamen of a complaint—the conduct a suit is based upon—may be a failure to act.  The fact that

plaintiffs allege IFC is responsible for the negligent design, construction, and operation of the plant

through its omissions—its failure to act as opposed to its affirmative conduct—does not mean that

the negligent design, construction, and operation of the plant should be excluded from the

gravamen analysis.

     Plaintiffs point to cases where, they argue, courts have focused solely on the sovereign

defendant's acts in determining the gravamen of the complaint, even if third-party conduct was the

primary, or even the most immediate, cause of a plaintiff's injury.  For example, in <u>Callejo v.</u> <u>Bancomer, S.A.</u>, plaintiffs sued a previously-private-but-now-nationalized Mexican bank that had reclaimed their certificates of deposits ("CDs") in devalued foreign currency rather than in U.S. dollars to comply with Mexico's new government regulations.  764 F.2d 1101, 1104–05 (5th Cir. 1985).  The Mexican bank argued that the "suit was based upon the Mexican exchange regulations since, but for these regulations, it would not have breached the terms of the CDs."  <u>Id.</u> at 1109. The Fifth Circuit, however, held that the analysis "must focus on the named defendant's acts . . . and not on the separate acts of other sovereign instrumentalities or agencies."  <u>Id.</u>  Because the act complained of was the bank's breach of its obligations to plaintiffs and not Mexico's promulgation of regulations, the bank's conduct formed the basis of the suit.  <u>Id.</u> at 1108–09.

But <u>Callejo</u> simply stands for the uncontroversial claim that, to identify what conduct a suit is "based upon," courts must look to "the act complained of."  <u>Id.</u> at 1109.  Here, the act complained of throughout the vast majority of plaintiffs' complaint <u>is</u> the negligent design, construction, and operation of the power plant in India.  That conduct, not the loan transaction, is at the heart of plaintiffs' alleged injuries.  Those activities in India are not a separate, contributing cause to plaintiffs' injuries; they are activities that, according to plaintiffs, IFC is directly responsible for and that are central to plaintiffs' claims for relief.  <u>See, e.g.</u>, Compl. ¶ 295 ("Defendant had substantial control over the design and construction of the Plant and continues to maintain substantial control over how the Plant is operated and under what conditions.").  The fact that IFC may be responsible for that wrongful conduct through its omissions, or that a third party like CGPL played a more direct role in designing, constructing, and operating the plant, does not change the fact that plaintiffs' complaint against IFC is—at least in large part—based upon that conduct (whether acts or omissions) in India.

Similarly, plaintiffs rely on <u>Crystallex Int'l Corp. v. Venezuela</u>, where a Venezuelan state-owned oil company, operating out of Venezuela, allegedly directed its subsidiaries in Delaware to transfer $2.8 billion to the parent oil company as a dividend, with the fraudulent intent to evade potential creditors.  <u>See</u> 251 F. Supp. 3d 758, 762–63, 766 (D. Del. 2017).  The court reasoned that the suit was based upon the Venezuelan oil company's particular act of directing the transfers with fraudulent intent, even though the transfers themselves occurred in the United States, because an identical transfer of the funds—absent the fraudulent intent of the oil company directing the transfers—would not give rise to a claim.  <u>Id.</u> at 766.

But the court in <u>Crystallex</u> did not, as plaintiffs suggest, ignore the transfers that occurred in the United States simply because they were "undertaken by another entity."  <u>See</u> Opp'n Br. at 14 n.6.  Rather, the court, in assessing the gravamen, expressly considered the fact that the transfers occurred in the United States, but then ultimately concluded that the "core" of the suit was the oil company's act of directing the transfers with fraudulent intent because "if the same, identical Transfers were carried out <u>without</u> fraudulent intent, there would be no cognizable claim that could be brought."  <u>Crystallex Int'l Corp.</u>, 251 F. Supp. 3d at 766.  There may be cases, like <u>Crystallex</u>, where the last act that directly injures plaintiffs (there, the transfer of $2.8 billion out of the United States) is not the gravamen of the complaint, but that does not mean that, when determining the gravamen of a particular suit, courts should overlook conduct that plaintiffs allege the sovereign government or international organization is responsible for just because that conduct involves a third party.

Therefore, in identifying and locating the gravamen of the complaint, this Court will not follow IFC's approach and look <u>solely</u> at the place of injury or where the last act that actually caused the injury occurred, nor will it adopt plaintiffs' approach and look only at IFC's direct,

affirmative conduct.  Instead, this Court adopts a more holistic approach and "zero[s] in on the core," "essentials," or "gravamen" of the suit, considering "the basis or foundation" for plaintiffs' claims.  Sachs, 136 S. Ct. at 396–97.

### B. The Gravamen of Plaintiffs' Complaint

Having reviewed plaintiffs' complaint, the Court concludes that the "gravamen," or "core," of the suit is the alleged failure to ensure that the design, construction, and operation of the plant complied with all environmental and social sustainability standards laid out in the loan agreement, as well as the alleged failure to take sufficient steps to prevent and mitigate harms to the property, health, and way of life of people who live near the Tata Mundra plant.  See Compl. ¶¶ 3–4, 159, 303.  Specifically, this includes IFC failing "to enforce conditions of the loan agreement intended for the protection of affected communities and the environment," "designing and/or approving remedial, mitigation, and preventive steps that were inadequate," "monitoring and supervision of the Plant's compliance," and "failing to take steps to remediate and mitigate harms that have already occurred" or "to ensure adequate compensation for those affected."  Compl. ¶ 300.

This conduct—or lack thereof—is at the core of plaintiffs' negligence, negligent supervision, nuisance, and trespass claims because it is the conduct that plaintiffs allege "actually injured" them.  See Compl. ¶¶ 3–4, 159, 300–03; see also Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 177 (2d Cir. 2010) (holding negligent supervision lawsuit was based upon acts of "alleged negligent supervision," including "hiring, training, employment, and supervision of employees").  Furthermore, the particular conduct a suit is based upon is often found at the "point of contact," see Sachs, 136 S. Ct. at 397, and here, IFC's failure to ensure the plant project was designed, constructed, and operated with due care focuses on IFC's failure to act at the Tata Mundra Power Plant and in the surrounding community in India—which is the point of

16

contact, or "place of injury," for the torts alleged in plaintiffs' complaint.  Therefore, IFC's active involvement in "[p]roject design and management, including, for example, approval of construction plans" as well as its failure "to adequately supervise the Project and mitigate [its] risks" is the gravamen of plaintiffs' negligence claims.  Opp'n Br. at 32.

And it is this same conduct—namely, IFC's failure to ensure that the design, construction, and operation of the plant comply with all of the loan agreement's environmental and social sustainability standards—that plaintiffs allege constitutes a breach of IFC's contractual obligations to plaintiffs.  See Compl. ¶ 331.  Therefore, such conduct also constitutes the gravamen of plaintiffs' third-party breach-of-contract claim.  See Devengoechea v. Bolivarian Republic of Venezuela, 889 F.3d 1213, 1223 (11th Cir. 2018) (holding, in action against Venezuela seeking the return of historically significant items, that the "failure to return the [items] constitutes the alleged breach" and is therefore the "conduct that actually injured" plaintiff and the "gravamen" of plaintiff's breach-of-contract claim).

Plaintiffs argue that the gravamen of the complaint is instead IFC's authorization of the loan agreement with CGPL.  Opp'n Br. at 15–16.  But IFC's board of directors' mere approval of the loan is not the conduct that "actually injured" plaintiffs.  Sachs, 136 S. Ct. at 396.  It may be true that "[w]ithout the IFC's funding, the Tata Mundra Project could not have gone forward," Compl. ¶ 2, but it is also true that, absent the Saudi hospital's recruitment of Nelson in the United States, he would not have been tortured and that, absent the Austrian railway company's sale of a railway pass to Sachs in the United States, she would not have fallen from the train station platform onto the tracks.  The fact that a plaintiff would not have a claim but for some activity in the causal chain does not mean the suit is "based upon" that activity.  See Nelson, 507 U.S. at 358 (acknowledging Saudi hospital's recruiting activities "led to the conduct that eventually injured"

the employee, but determining that those activities were "not the basis for [his] suit"); Sachs, 136 S. Ct. at 395 (explaining that "the mere fact that" an event "establish[es] a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that" event).

Plaintiffs do allege that IFC negligently "provided integral funding for the Project even though it knew or had reason to know that the harms alleged would occur," Compl. ¶ 187, but they do not make specific allegations that approving the funding—by itself—was a negligent act.  The negligent conduct at the center of plaintiffs' complaint is not the approval of the loan, but rather the subsequent failure "to take sufficient steps or exercise due care to prevent and mitigate harms to the property, health, [and] livelihoods" of those who live near the plant.  Id. ¶ 3.  The approval of the loan without IFC's subsequent negligence is akin to the transfer of money without the Venezuelan oil company's fraudulent intent in Crystallex, see 251 F. Supp. 3d at 76,  or the sale of the railway ticket without the Austrian railway company's "unsafe boarding conditions" in Sachs, see 136 S. Ct. at 396.  There is "nothing wrongful about the [approval of the loan] standing alone."  Id.

In one sentence of the lengthy complaint, plaintiffs do assert that IFC failed to ensure sufficient measures were incorporated into the loan agreement to prevent foreseeable harms, see Compl. ¶ 163, but that assertion is not supported by specific facts and is in direct tension with the thrust of plaintiffs' complaint: that IFC had the power to protect plaintiffs by enforcing provisions in the loan agreement but failed to do so.  Plaintiffs explain, at great length, how there were robust measures in the loan agreement requiring CGPL to act with due regard for the environment and the local community, but that IFC failed to enforce those requirements.  See id. ¶ 51–53. According to plaintiffs, IFC identified a number of environmental and social performance gaps in the project proposal, developed measures to close those gaps, and then documented them in an

Environmental and Social Action Plan that was made a necessary condition of the loan agreement. Id.  Moreover, IFC's loan agreement with CGPL required CGPL to comply with "the Performance Standards, the Thermal Power Guidelines, the EHS Guidelines, and relevant provisions of national law."  Id. ¶ 122.  Plaintiffs allege that if CGPL failed to meet these conditions, IFC had "the power to terminate the obligations to make disbursements and/or declare the loan to be due and payable, and/or cancel the loan."  Id. ¶ 138.

In other words, the gravamen of the complaint is not that IFC's board of directors, in approving the loan, wrote CGPL a blank check without imposing any conditions to ensure protection of the environment and the local population.  It is instead that IFC—after approving the loan—failed to enforce the conditions of the loan agreement designed to protect the environment and local population.  These alleged failures of oversight by IFC are focused on conduct or inaction in India, not the United States.  According to plaintiffs, IFC directly oversaw and participated in the negligent design, construction, and operation of the plant in India and failed to take steps to mitigate the foreseeable risks in India.  Thus, based on plaintiffs' own allegations, the Court concludes that the particular conduct that lies at the core of this suit is not the act of approving the loan, but is instead IFC's subsequent failure to ensure the Tata Mundra Power Plant was designed, constructed, and operated in accordance with the robust environmental and social sustainability standards in the loan agreement.

### C. The Location of the Gravamen of Plaintiffs' Complaint

Having identified the gravamen of plaintiffs' complaint as IFC's failure to ensure the Tata Mundra Power Plant was designed, constructed, and operated with due care so as not to harm plaintiffs' property, health, and way of life, the Court now considers whether such conduct was "carried on" in the United States for the purpose of applying the FSIA's commercial activity

exception. The Court concludes that plaintiffs have not established that such conduct was "carried on" in the United States.  IFC's failure to protect plaintiffs from the plant in India is the gravamen of the suit, and that failure to act in India does not have "substantial contact" with the United States.[4]

The complaint does not allege that IFC's direct involvement in the design, construction, and operation of the power plant occurred in Washington, D.C.  For example, it does not allege that IFC's failure to ensure CGPL's compliance with the loan agreement's provisions, or its approval of certain negligent designs or construction plans, or its failure to adequately monitor or supervise the plant were "carried on" in the United States.  In fact, the record suggests such conduct likely occurred in India.  IFC signed the initial Mandate letter with CGPL through its office in New Delhi, India; conducted various site visits in Gujarat, India, to identify potential issues and evaluate community support; and then negotiated and signed the loan agreement with CGPL in Mumbai, India.  Sturtevant Decl. ¶¶ 16–17, 20–21, 91.  Further, IFC's Director of Infrastructure & Natural Resources of Asia, who first responded to the CAO's assessment report and who was a signatory on IFC's response to the CAO's audit, was located in New Delhi, India.  Id. ¶ 84.  Given these facts, this Court cannot simply presume that IFC's direct involvement in the Tata Mundra Power Plant—whether that involvement was a failure to act or the approval of harmful designs—occurred in the United States.

Although plaintiffs' briefing assumes all of IFC's tortious conduct occurred here in the United States, see Opp'n Br. at 12, plaintiffs' complaint alleges only that (1) "critical decisions

---

[4] If this suit is not based upon IFC's failure to act to ensure that the plant was constructed and operated with due care but is instead based upon the actual construction and operation of the power plant itself, which directly injured plaintiffs, see Def.'s Mot. at 11, then the gravamen of the complaint is even more certainly in India.  The power plant's contamination of the groundwater, its dissemination of ash, and its effect on local fisherman—indeed, all of the alleged harms to plaintiffs' property, health, and livelihood—occurred in India.

relevant to whether to finance the Tata Mundra Project, and under what conditions, were made in Washington, D.C.," (2) that "the disbursement was made in U.S. dollars and came from funds held within the United States," and (3) that "IFC's responses to allegations of harm caused by the Project—including the injuries alleged herein—and to the findings of the CAO, were decided, directed and/or approved from the headquarters in Washington, D.C." Compl. ¶¶ 197–99.

Plaintiffs' first two allegations as to IFC's conduct carried on in the United States do not pertain to the gravamen of plaintiffs' suit, as identified by this Court. Instead, they relate only to the loan transaction. Additionally, even if post-approval disbursements of funds could be considered part of IFC's failure to ensure proper design, construction, and operation of the plant, plaintiffs never allege that the decision to make those subsequent disbursements occurred in the United States. The mere transfer of funds from the United States is not enough to establish "substantial contact" between the United States and the gravamen of the complaint. See Crystallex, 251 F. Supp. 3d at 769 (finding no "substantial contact" between fraudulent direction of transfer and the United States even though funds were directed to be transferred out of the United States); Broadfield Fin., Inc. v. Ministry of Fin. of Slovak Republic, 99 F. Supp. 2d 403, 406 (S.D.N.Y. 2000) (holding transfers of money through New York bank accounts insufficient to establish relationship between sovereign defendant's commercial activity and the United States); see also In re Papandreou, 139 F.3d 247, 253 (D.C. Cir. 1998) ("[S]ubstantial contact . . . requires more than the minimum contacts sufficient to satisfy due process in establishing personal jurisdiction.").

Plaintiffs' third allegation—that "IFC's responses to allegations of harm caused by the Project . . . and to the Findings of the CAO were decided, directed, and/or approved from the headquarters in Washington, D.C."—is a general and ambiguous allegation insufficient to shift the

gravamen of the complaint to the United States.  Compl. ¶ 199.  It is not clear what plaintiffs mean by "responses to allegations of harm" and the Court can only speculate as to what kind of conduct (e.g., express deliberations or tacit approval) actually took place in the United States.  Such an abstract allegation of relatively minor conduct in the United States does not establish that IFC's oversight failures in India involved "substantial contact" with the United States.  See Mar. Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1108–09 (D.C. Cir. 1982) (holding that a contractual arrangement that involved two business meetings in the United States did not have "substantial contact" with United States, particularly because the record contained no specific facts about the meetings so the court could only "speculate" as to their "scope and importance.").

Even assuming that the phrase "IFC's responses to allegations of harm" is a reference to IFC's written responses to the CAO's assessment report and audit, see Exs. 11 & 15 to Sturtevant Decl. [ECF Nos. 40-16, 40-20], those memoranda are not themselves the gravamen of plaintiffs' complaint—the particular conduct that actually injured plaintiffs.  Moreover,  plaintiffs simply allege that IFC's responses were, at minimum, approved by someone in Washington, D.C.  The mere fact that someone in the United States approved a letter that defended IFC's approach to environmental and social risk management for the Tata Mundra project and announced that IFC will consider certain suggestions raised by the CAO is not sufficient to establish that plaintiffs' complaint is based upon conduct carried on in the United States.

*     *     *

Thus, even accepting all of plaintiffs' allegations as true, plaintiffs have not established that this lawsuit is "based upon" conduct "carried on" in the United States as is required for application of the commercial activity exception to the FSIA.  Plaintiffs' suit is based upon IFC's

failure to ensure that the plant was designed, constructed, and operated with due care so as not to harm plaintiffs' property, health, and way of life.  That is the <u>gravamen</u> of the complaint.  And plaintiffs have not established that such conduct was carried on in the United States; instead, it was focused in India, where the plant is and the harms occurred.  Because plaintiffs bear the "initial burden" to establish that an exception to IFC's presumptive immunity under the FSIA applies, <u>Bell Helicopter</u>, 734 F.3d at 1183, and they have failed to satisfy that burden, IFC's immunity remains intact and the Court will dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1).[5]

## CONCLUSION

For the reasons explained, this Court concludes that plaintiffs' lawsuit does not fall within the FSIA's commercial activity exception because the suit is not, at its core, based upon activity— commercial or otherwise—carried on or performed in the United States.  Accordingly, IFC is immune from suit, and this Court will grant IFC's motion to dismiss for lack of subject matter jurisdiction.  A separate order will be issued on this date.


_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  <u>February 14, 2020</u>

---

[5] Plaintiffs also argue that even if the commercial activity exception does not apply, IFC has waived its immunity.  But this Court's prior decision rejected that argument, reasoning that waiver requires there to be a "corresponding benefit" that would "further the organization's goals," but suits like plaintiffs' would likely "impose considerable costs upon IFC without providing commensurate benefits."  <u>Jam</u>, 172 F. Supp. 3d at 109–12 (citing <u>Mendaro v. World Bank</u>, 717 F.2d 610, 617 (D.C Cir. 1983)).  The D.C. Circuit affirmed that decision, reasoning that "claims that implicate internal operations of an international organization are especially suspect because claims arising out of core operations, not ancillary business transactions, would threaten the policy discretion of the organization" and "[t]hat notion applies here."  <u>Jam</u>, 806 F.3d at 708.  Contrary to plaintiffs' arguments, <u>see</u> Opp'n Br. at 23–24, the Supreme Court's decision in <u>Jam</u> interpreting the IOIA did not overturn the D.C. Circuit's corresponding benefits test for waivers of immunity in international treaties, nor does the Supreme Court's interpretation of the IOIA provide any information as to what the drafters of the IFC Articles of Agreement intended.  Accordingly, this Court continues to conclude that IFC did not waive its immunity in this case.