**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BUDHA ISMAIL JAM, *et al.*,<br>　　　Plaintiffs,<br><br>　　v.<br><br>INTERNATIONAL FINANCE<br>CORPORATION,<br>　　　Defendant. | Civil Action No. 15-cv-00612 (JDB) |

**PLAINTIFFS' MOTION TO AMEND THE COMPLAINT UNDER RULE 15 OR, IN
THE ALTERNATIVE, UNDER RULES 15 AND 59(e)**

**TABLE OF CONTENTS**

I. INTRODUCTION ...........................................................................................................................1

II. BACKGROUND .............................................................................................................................3

    A. Relevant procedural history ...................................................................................................3

    B. Factual background ................................................................................................................4

III. LEGAL STANDARDS ...................................................................................................................5

    A. Standard for granting leave to amend upon a dismissal without prejudice. ..........................5

    B. Standard for granting leave to amend upon a dismissal with prejudice. ...............................6

    C. Standard for granting motion for reconsideration. .................................................................6

IV. ARGUMENT ...................................................................................................................................7

    A. The Court should grant Plaintiffs leave to amend. ................................................................7

        1. Plaintiffs allege that the loan itself was negligent. .........................................................8

        2. IFC's failure to ensure that the plant was designed, built and operated so as not to harm Plaintiffs was a failure by IFC management in the United States. ....................10

    B. Alternatively, the Court should grant reconsideration. ........................................................15

    C. If Plaintiffs' allegations or the facts in the record are inadequate, Plaintiffs seek limited discovery. ............................................................................................................................16

V. CONCLUSION ..............................................................................................................................18

I.  INTRODUCTION

The Court granted IFC's motion to dismiss, finding IFC is immune under the Foreign Sovereign Immunities Act (FSIA) because Plaintiffs did not specifically allege that IFC committed its tortious conduct in the United States. Memorandum Opinion ("Opinion"), ECF No. 61 at 22-23. But Plaintiffs *can* allege IFC's tortious acts, decisions and omissions were made at their headquarters here in Washington, D.C. Given this, Plaintiffs seek leave to amend their Complaint, in line with the Federal Rules' guiding principle that cases should be decided on the merits, not the pleadings.[1]

Plaintiffs move to amend under Rule 15, or if necessary, under Rules 15 and 59(e), of the Federal Rules of Civil Procedure. The Opinion did not specify whether dismissal was with or without prejudice, but jurisdictional dismissals, like this one, are without prejudice. Accordingly, Rule 15(a)'s liberal standard applies. Regardless, if dismissal was with prejudice, Plaintiffs seek leave under Rules 59(e) and 15(a) to alter the judgment to a dismissal without prejudice that allows Plaintiffs to amend their Complaint. Amendment is warranted under Rule 59(e) since a dismissal with prejudice would have been error, not least because Plaintiffs can allege other facts that can cure the deficiencies the Opinion found in the Complaint.

First, the Opinion found that Plaintiffs did not specifically allege that IFC's approving the loan itself was a negligent act. ECF No. 61 at 18. Thus, the Opinion held, the only negligent conduct the Complaint alleged was IFC's subsequent "failure to ensure that the plant was designed, constructed, and operated with due care so as not to harm plaintiffs' property, health, and way of life." ECF No. 61 at 23. Plaintiffs can allege facts showing that approving the loan was itself a negligent act. These include facts, among others, that the IFC knew, at the time the loan was approved, that the project itself presented a substantial likelihood of harm to families such as Plaintiffs, and that the project had an inadequate action plan to address these known environmental

---

[1] IFC does not consent to this motion.

1

...

and social impacts, and that some of the harms could not be fully prevented by later IFC action. There is no dispute IFC's Board approved the loan here in Washington, D.C. – an act that included consideration of the risks and plans to mitigate them. Furthermore, IFC upper management and staff undertook significant review of the project risks, project documentation, and the action plan in D.C. prior to Board approval. Upper management in D.C. approved the investment knowing the harm the project would cause and without proper mitigation measures in place.

Second, even if Plaintiffs could not allege that the loan was a negligent act, they can specifically allege that IFC's subsequent failure to prevent and mitigate harms to Plaintiffs occurred here. *Cf.* ECF No. 61 at 20. IFC's failures were failures of IFC management here in Washington, D.C. Plaintiffs can allege facts showing that IFC's failure to ensure CGPL's compliance with the loan agreement's provisions, its approval of negligent designs and construction plans, its failure to adequately monitor or supervise the plant and its decision to make subsequent disbursements all occurred in the United States. Thus, Plaintiffs can allege sufficient facts to survive IFC's motion.

Plaintiffs learned some of these facts only after the Complaint was filed, through the Loan Agreement that IFC disclosed in the course of this litigation. This agreement was not public prior to this litigation. The fact that Plaintiffs could not have made these allegations at the outset supports amendment here.

The Loan Agreement, and other documents supporting Plaintiffs' new allegations, were also in the record before the Court; Plaintiffs did not specifically draw attention to these facts because they were not responsive to the argument IFC made. While the best course is to permit amendment so that the Court can consider *all* of the facts supporting jurisdiction, Plaintiffs in the alternative seek reconsideration, under Rule 59(e) or 60(b) if necessary, so the Court may address facts in the

record that the Opinion did not consider.[2]

The facts identified herein in the record and the proposed amended complaint are more than sufficient to provide the information the Court found lacking and show that IFC is not immune. If the Court disagrees, however, Plaintiffs request limited jurisdictional discovery on the narrow issue of where the acts and decisions the Court identified actually took place. This is warranted because all of the facts as to where IFC engaged in particular acts and made particular decisions are in IFC's custody and control. Indeed, IFC submitted declarations stating certain acts occurred in India, but they never addressed, let alone denied, that their tortious conduct occurred in the United States. Surely, they would have if they could.

In short, the proposed amended complaint clearly alleges that IFC engaged in two independent categories of negligent act, and that both were committed here.

## II.   BACKGROUND

### A. Relevant procedural history

Plaintiffs sued IFC for its negligence in financing the Tata Mundra power plant project, despite knowing that the plant would harm local families such as Plaintiffs, and failing to mitigate the harms. IFC moved to dismiss, arguing among other things that it is absolutely immune from suit. IFC did *not* argue that its tortious conduct occurred outside the United States, so Plaintiffs did not amend their complaint as a matter of course under Rule 15(a)(1)(B) to present additional responsive facts.[3]

On remand, IFC moved to dismiss on grounds that it cannot be sued under the commercial

---

[2] In all other respects, Plaintiffs' motion assumes the Opinion is correct, but Plaintiffs preserve all arguments for appeal.
[3] Plaintiffs saw no reason to amend in response to the original Motion to Dismiss, but did seek an extension of the time to amend as a matter of course. ECF No. 15. The Court denied the motion, but stated that "nothing in this Order precludes plaintiffs from seeking leave to amend their complaint, if and when the litigation reaches a stage where such amendment would be helpful." ECF No. 19 at 2.

activities exception to the FSIA. ECF No. 40-1 at 10-18. In so doing, IFC argued that this suit is based solely upon the acts of its borrower, CGPL, in India, not IFC's acts. ECF No. 40-1 at 10-15. Here again, IFC did *not* argue that *IFC*'s own tortious conduct occurred outside the United States, and so, here again, Plaintiffs did not amend their complaint.

This Court rejected IFC's claim that the gravamen must be the "place of injury" or the "last act" in the causal chain. ECF No. 61 at 10-13. The Court, however, dismissed, finding Plaintiffs did not specifically allege that IFC committed its tortious conduct in the United States. *Id.* at 19-20. Plaintiffs filed this motion so that they can allege facts this Court found were not alleged in the Complaint.

  B. **Factual background**

The record contains many of the facts Plaintiffs seek to amend into the Complaint, as indicated below. Some of these facts are found in the Loan Agreement and other documents in the record, such as IFC policies and manuals. ECF Nos. 40-4, 40-7, 40-8, 22-5, 40-19, 40-20, 40-21, 40-23. To the extent allegations Plaintiffs seek to amend in are not based on facts already in the record, they are pled pursuant to the facts and reasonable inferences drawn from Plaintiffs' diligent, in-depth investigation; some facts are alleged on information and belief.

In support of its motion, IFC submitted the Declaration of Leslie Sturtevant, IFC's Deputy General Counsel in Washington, D.C., describing IFC's lending application and approval process. ECF No. 40-5. While the Declaration takes care to note the limited acts IFC undertook in India, it is conspicuously silent about where IFC made the key decisions upon which Plaintiffs actually base their claims.

The Declaration states that IFC management approved the project. *Id.* ¶¶ 10-11. The Declaration does not say where management made its decision, but IFC management is based in (and made this decision in) Washington, D.C. The Declaration further states that IFC then

negotiated the project's terms in Mumbai, India, and IFC's Board of Directors approved the project, finding it fit within IFC policies. *Id.* ¶¶ 11-12, 17, 19. It does not say where the Board made its decision; the Board did so in Washington, D.C. The Declaration notes the Loan Agreement was signed in India. *Id.* ¶¶ 20-21. The Declaration does not describe IFC's process for supervising this or any other project to ensure that loan provisions designed to protect local people were adhered to. Thus, it does not say where IFC approved project design or made its decision to continue disbursing funds without enforcing those loan provisions. It did so in Washington, D.C. *See infra.*

### III.  LEGAL STANDARDS

The standard applicable to a motion to amend after dismissal depends on whether dismissal was with or without prejudice. The Opinion and the Order did not specify, ECF No. 61, ECF No. 62, but the dismissal was for lack of jurisdiction. ECF No. 61 at 7. Thus, under Rule 41(b), the dismissal was necessarily without prejudice. *Blue Water Balt. v. Pruitt*, 293 F. Supp. 3d 1, 5 (D.D.C. 2017); *Rollins v. Wackenhut Servs.*, 703 F.3d 122, 132 (D.C. Cir. 2012) (Kavanaugh, J., concurring).

**A.  Standard for granting leave to amend upon a dismissal without prejudice.**

Since the dismissal was without prejudice, the familiar Rule 15 standard applies. *Sodexo Operations, LLC v. Not-For-Profit Hosp. Corp.*, 210 F. Supp. 3d 138, 142-43 (D.D.C. 2016). Under Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (internal quotation marks omitted).

Since leave is liberally granted, "the party opposing amendment bears the burden of coming forward with a colorable basis for denying leave to amend." *Sodexo Operations*, 210 F. Supp. 3d at 143. "'In the absence of any apparent or declared reason — such as undue delay, bad faith or

dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party,'" leave should be granted. *Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**B.  Standard for granting leave to amend upon a dismissal with prejudice.**

Although Plaintiffs do not believe the Court could or intended to dismiss with prejudice, in an abundance of caution, Plaintiffs alternatively move under the procedure for amending after dismissal with prejudice, moving both under Rule 59(e) to alter or amend the judgment to allow amendment and Rule 15(a) to amend. *See Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1128 (D.C. Cir. 2015). Courts must grant Rule 59(e) motions if dismissal with prejudice was erroneous. *Id.* at 1128-29. A complaint that omits certain essential facts warrants dismissal, but not dismissal with prejudice. *Belizan*, 434 F.3d at 583. And a court should adequately explain why it dismissed with prejudice. *Id.* at 580. Thus, the trial court must "determine[] that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Id.* at 583 (internal quotation omitted). Unless that "high bar" against dismissals with prejudice was met, this Court must grant Plaintiffs' Rule 59(e) motion. *Brink*, 787 F.3d at 1128-29.

**C.  Standard for granting motion for reconsideration.**

Plaintiffs alternatively move for reconsideration to consider facts in the record that the Opinion did not address. Plaintiffs need not amend in facts that are already in the record.

A court may revise an order that does not fully adjudicate plaintiffs' rights. Fed. R. Civ. P. 54(b). Since the dismissal here was of the complaint and without prejudice, it is such an order, so Rules 59(e) and 60(b) do not apply. *Cobell v. Jewell*, 802 F.3d 12, 26 (D.C. Cir. 2015); *Breen v. Chao*, 304 F. Supp. 3d 9, 20-21 (D.D.C. 2018). This Court has "broad" discretion to reconsider its own ruling "as justice requires"; that is, if there are "good reasons for doing so." *Breen*, 304 F. Supp. 3d at 21 (internal quotation omitted). Justice may require reconsideration where the decision lies outside the

6

issues the parties presented or where the Court did not consider data that might be expected to change the outcome. *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005).

In an abundance of caution in case the dismissal was with prejudice, Plaintiffs alternatively move for reconsideration under Rule 59(e) or Rule 60(b). Both allow this Court to reconsider a decision premised on factual error. *Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 83 (D.D.C. 2015).

### IV.     ARGUMENT

#### A. The Court should grant Plaintiffs leave to amend.

Because there is no basis for denying leave to amend here, IFC cannot meet its burden and leave should be granted. This is particularly so because this Court dismissed the *complaint*, not the action. ECF No. 61 at 1-2 (noting IFC moved "to dismiss plaintiffs' complaint" and holding "plaintiffs' complaint will be dismissed."). Where a court dismisses the complaint without prejudice, "the plaintiff is free to amend his pleading." *Ciralsky v. CIA*, 355 F.3d 661, 666 (D.C. Cir. 2004).[4] Leave to amend would not be futile, because Plaintiffs can allege facts that would meet the legal standard the Court announced.

Even if amendment is governed by Rule 59(e), the motion should be granted because the high bar to dismissing with prejudice and precluding amendment was not met. Defendants never put Plaintiffs on notice that they were challenging the adequacy of Plaintiffs' allegations that the tortious conduct occurred in the United States. "Dismissing an action after giving the plaintiff only one opportunity to state his case is ordinarily unjustified." *Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307 (5th Cir. 2014); *see also Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 30 (1st Cir. 2000)

---

[4] Accordingly, the dismissal may not even be a final judgment that is appealable, because the grounds for dismissal do not clearly indicate that no amendment of the complaint could cure the defects the Court identified. *Id.* and n.1. And because dismissal was without prejudice, "there [i]s nothing about that dismissal that would [] bar[] the plaintiff from correcting the complaint's defects and filing a new lawsuit." *Id.* at 671. But the proper and most efficient course, and that which would avoid needlessly creating any statute of limitations issues, is to permit Plaintiffs to amend.

(before dismissing, court must afford plaintiff an "opportunity to address the issue").

Moreover, the Opinion held that Plaintiffs did not plead certain essential facts, and made no determination that Plaintiffs "could not possibly" plead such facts. Additional facts consistent with the complaint will cure the deficiency this Court found. *See infra.* Thus, if a combined Rule 59(e)/Rule 15 motion is required, this Court should grant it for much the same reasons it did so in *City of Dover v. United States EPA*, 40 F. Supp. 3d 1 (D.D.C. 2013). There, this Court held that it had clearly erred in dismissing plaintiffs' complaint with prejudice because the Court had suggested an alternative legal theory that plaintiffs should have been permitted to test, and because it had not explained why it had dismissed with prejudice. *Id.* at 7. Similarly here, the Opinion suggested the types of facts that would suffice: facts showing the loan itself was negligent and/or that IFC's subsequent failure to ensure that the plant did not harm Plaintiffs was a failure by IFC management in the United States. And, if it intended to dismiss with prejudice, it did not explain why it did so.[5] Since a movant who satisfies Rule 59(e) "ha[s] also met the liberal amendment standard under Rule 15(a)(2)," *City of Dover*, 40 F. Supp. 3d at 7, amendment is warranted here.

**1. Plaintiffs allege that the loan itself was negligent.**

The Opinion found:

Plaintiffs do allege that IFC negligently "provided integral funding for the Project even though it knew or had reason to know that the harms alleged would occur," Compl. ¶ 187, but they do not make specific allegations that approving the funding—by itself—was a negligent act. The negligent conduct at the center of plaintiffs' complaint is not the approval of the loan, but rather the subsequent failure "to take sufficient steps or exercise due care to

---

[5] In *City of Dover*, the Court granted the motion even though the plaintiff initially failed to plead the claims it sought to add, and then did not add those claims after defendants moved to dismiss. *Id.* at 7. Plaintiffs here did not make similar missteps. Many of the facts Plaintiffs seek to amend in were derived from documents which were unavailable to Plaintiffs until after they filed their Complaint, when IFC submitted them. ECF Nos. 40-4, 40-7, 40-8. And Plaintiffs had no reason to amend after IFC moved to dismiss, because IFC never argued that it committed its tortious conduct outside the United States. *See Rollins*, 703 F.3d at 132 (Kavanaugh, J., concurring) (Rule 15(a) allows plaintiff to amend by right within 21 days of a Rule 12 motion, to ensure plaintiff has an opportunity to avoid dismissal based on a "readily corrected error that *the defendant has identified*" (emphasis added)).

> prevent and mitigate harms to the property, health, [and] livelihoods" of those who live near the plant. Id. ¶ 3.

ECF No. 61 at 18.

Plaintiffs intended Paragraph 187, along with a number of other paragraphs, to make clear that IFC's funding standing alone was a negligent act.[6] The proposed amended complaint does so, providing "specific allegations that approving the funding—by itself—was a negligent act."

Plaintiffs can allege that when IFC approved the loan, allowing the project to go forward, it not only knew the project presented serious environmental and social risks, it also knew that at least some of the harms IFC foresaw could not be completely prevented by subsequent oversight by IFC or mitigation efforts. Proposed Amended Complaint ("AC") ¶¶ 216-217. As Plaintiffs previously alleged, the Tata Mundra Project was a Category A project, meaning it was likely to have "social and/or environmental impacts that are diverse, irreversible, or unprecedented." Compl. ¶¶ 129. Plaintiffs can further allege that IFC often deals with projects that may have "significant adverse S&E impacts that are diverse, irreversible, or unprecedented, *and that can be only partially addressed through mitigation measures*" and that the Tata Mundra Project was such a project. AC ¶ 217. If impacts cannot fully be addressed through mitigation measures, that means they are unavoidable – and will *necessarily* result from financing the project.

Moreover, despite knowing the high risks of harm associated with this project, IFC did poor

---

[6] *See .e.g.* Compl. ¶ 1 ("IFC financed the Tata Mundra Plant and enabled its construction, despite knowing that the coal-fired power plant would cause significant harm to surrounding communities…"); *id.* ¶ 300 ("Defendant was negligent in one, some and/or all of the following ways, among others: in funding the Tata Mundra Plant."); *id.* ¶ 3 ("Despite knowing of these communities and their vulnerability due to their interconnectedness with and dependence on their local environment, **the IFC provided necessary funding for the Project – without which, the Tata Mundra Project could not have gone forward –** and failed to take sufficient steps or exercise due care to prevent and mitigate harms to the property, health, livelihoods, and way of life of many of the people who live near the Tata Mundra Plant." (emphasis added)); *id.* ¶ 48 ("From the outset, the IFC recognized that the Tata Mundra Project would likely cause substantial environmental and social harm to local communities, including Plaintiffs and other members of the Proposed Class."); *id.* ¶ 154 (described *infra*).

9

due diligence; thus, IFC approved the loan without adequate consideration of the risks. Compl. ¶ 154. And despite the risks from an inadequate cooling system and the intake channel, IFC approved the loan without final plans for either. Compl. ¶¶ 64-65, 165. Plaintiffs can also allege that by approving the loan with inadequate due diligence, IFC was without sufficient information to develop or assess effective mitigation strategies. AC ¶ 220. IFC lacked adequate baseline data in a variety of areas impacted by the project, including about the marine environment and the circumstances of affected fishing communities. AC ¶¶ 222-225. Without baseline data of what conditions were before the project's construction, IFC could not ensure that it would be mitigating harm to those impacted. AC ¶ 221. And the negligent decision to approve the loan was made in Washington. AC ¶ 215.

   2. **IFC's failure to ensure that the plant was designed, built and operated so as not to harm Plaintiffs was a failure by IFC management in the United States.**

       a. **Plaintiffs allege that IFC's oversight of the design, construction, and operation of the Tata Mundra Power Plant and its compliance with the environmental and social requirements happened in the United States.**

The Opinion found:

> The complaint does not allege that IFC's direct involvement in the design, construction, and operation of the power plant occurred in Washington, D.C. For example, it does not allege that IFC's failure to ensure CGPL's compliance with the loan agreement's provisions, or its approval of certain negligent designs or construction plans, or its failure to adequately monitor or supervise the plant were "carried on" in the United States.

ECF No. 61 at 20.

Plaintiffs can allege that IFC's supervision and approval of the negligent design and operation of the plant was carried on in the United States. AC ¶¶ 197-215, 226-250. Plaintiffs can also allege that IFC's responses to the problems at the plant, including its decision not to force compliance or take other action to mitigate the harms, occurred in the United States, as described in Section IV.A.2.c. *supra*. Indeed, because this was a Category A project with high risk, IFC management in Washington exercised even greater oversight and control than for normal projects,

10

including with respect to subsequent disbursements, and through the monitoring and supervision stages. AC ¶ 199.

Under the Loan Agreement, CGPL provided all required notifications, information, and documentation to IFC management in D.C. AC ¶ 227. This included the information that allowed IFC to conduct its environmental and social due diligence and monitoring. AC ¶ 230. As conditions of first disbursement, CGPL was required to provide to IFC in Washington such documents as the Construction Plan; the Social Management Plan; the Environmental Management Plan; and Reports from the Independent Engineer on topics such as "the design for receiving coal from the port[], the appropriateness of the technology/configuration for the Project … and the basic design and design criteria for the Project." AC ¶ 231. This included plans for the inadequate cooling system and the intake channel, which were not final when IFC approved the loan.

As conditions of all other disbursements, CGPL was required to provide IFC's headquarters in Washington, D.C. with Construction Progress Report indicating that construction "is proceeding in accordance with the Construction Schedule, the Construction Plan and the Construction Budget" or if not, explaining "with supporting evidence that the variances could not reasonably be expected to have a Material Adverse Effect." AC ¶ 233. CGPL was also required to provide IFC's headquarters with a Certification, "in form and substance satisfactory to" IFC that CGPL was in compliance with the Environmental and Social Requirements and the Environmental Management Plan. AC ¶ 233.

Throughout the construction of the project, CGPL was required to send IFC in Washington, D.C. a Monthly Construction Progress Report. AC ¶ 238. CGPL was also required to send IFC a Revised Construction, Plan, and Budget as well as an Operations Report on a quarterly basis. AC ¶ 238. All of these reports – as with all communications and documentation CGPL was required to send under the Loan Agreement – were required to be sent to the Director of the Infrastructure

11

Department stationed at IFC's headquarters in Washington, D.C. AC ¶ 238.

CGPL was also required to send Annual and Quarterly Environmental and Social Monitoring Reports to IFC management in Washington. AC ¶ 240. These Reports detail "any material adverse impact relating to any environmental or social matter . . . any material written communication with any Authority relating to any environmental or social matter . . . [or] any Environmental or Social Claim." AC ¶ 240. Thus, for example, they would have included reports of the Gujarat Pollution Control Board's many show cause notices to CGPL for breaching air and water pollution limits. AC ¶ 241.

CGPL also submitted Annual Monitoring Reports (AMRs) for review by IFC E&S staff in Washington, D.C. The AMRs noted that air pollution levels were above national and IFC standards. IFC staff then update the Environmental and Social Risk Rating (ESRR). This Rating system is used to calculate the social and environmental risk of a project and is used to identify project non-compliance with the client's E&S commitments. AC ¶¶ 242-243.

The reason that all of this documentation was submitted to IFC headquarters in D.C. was that all of the decisions on the adequacy of the documentation, and decisions to be made in response, were made by IFC environmental and social staff and management in Washington, D.C. AC ¶ 234. Thus, IFC's approval of the plant's design and environmental and social management occurred in Washington, D.C. AC ¶¶ 239, 242.

Here supervision occurred at the highest levels in Washington. Where, as here, an IFC client fails to implement their Environmental and Social Action Plans or E&S commitments in their Loan Agreement, the E&S staff refer the project to the CESIG/CESI Manager and the Investment Department in Washington, D.C. AC ¶ 246.

In 2009, IFC's Management Team, including IFC's Executive Vice President and CEO, Vice Presidents, and General Counsel and which is in charge of IFC's "close oversight of investment

decisions," created the Corporate Risk Committee based in IFC's headquarters. The Committee receives "quarterly reports on environmental and social performance and risks associated with IFC operations." This is a "risk-based supervision program" whereby these reports highlight the poorly performing projects. AC ¶ 247. Additionally, the Board of Directors – based in Washington, and with the ultimate authority over IFC's actions – is kept informed "at regular intervals" of performance and client's compliance with their contractual obligations. AC ¶ 248.

Moreover, projects that have a poor Environmental and Social Risk Rating, that have attracted criticism or other members of the public, or that have an open CAO case – all of which was true of the Tata Mundra Project – are placed on a "High Risk List" by IFC headquarters and are subjected to stricter and more regular scrutiny. AC ¶ 257.

Thus, senior IFC management in Washington directly supervised IFC's actions with respect to the Project.

### b. IFC decided, *in the United States*, to continue disbursements.

The Opinion found that "even if post-approval disbursements of funds could be considered part of IFC's failure to ensure proper design, construction, and operation of the plant, plaintiffs never allege that the decision to make those subsequent disbursements occurred in the United States." ECF No. 61 at 21.

Plaintiffs can allege that the decision to disburse each tranche of the loan was made in Washington, D.C. AC ¶ 235. CGPL's requests for disbursal were sent to IFC in Washington. AC ¶ 235. And as has just been noted, all of the information and documents that CGPL had to provide to IFC before IFC could disburse each tranche of the loan were sent to and approved by IFC in Washington D.C. AC ¶ 227. These documents include plans and certifications for construction and environmental and social management. AC ¶¶ 231, 233. The determination of whether the requirements for disbursal were satisfied was made by environmental and social staff in Washington,

D.C. AC ¶ 234.

### c. Plaintiffs clarify that IFC's "responses" to complaints about the project includes IFC's decisions not to take action to prevent or mitigate harms, and allege that IFC decided how to respond in Washington, D.C.

As the Opinion noted, Plaintiffs alleged that "'IFC's responses to allegations of harm caused by the Project . . . and to the Findings of the CAO were decided, directed, and/or approved from the headquarters in Washington, D.C.'" ECF No. 61 at 21 (quoting Compl. ¶ 199) (omission in original). The Opinion, however, found that this "is a general and ambiguous allegation insufficient to shift the gravamen of the complaint to the United States," because "[i]t is not clear what plaintiffs mean by 'responses to allegations of harm' and the Court can only speculate as to what kind of conduct (e.g., express deliberations or tacit approval) actually took place in the United States." Id. at 21-22. The Court understood "IFC's responses" to be "letter[s] that defended IFC's approach to environmental and social risk management for the Tata Mundra project and announced that IFC will consider certain suggestions raised by the CAO." ECF No. 61 at 22. Plaintiffs' proposed amended Complaint addresses these concerns.

Plaintiffs' amended complaint makes clear that the reference to IFC's "responses" to being notified by the CAO and others, including the Plaintiffs, of the harms being caused by the plant refers to *all* of the IFC's institutional responses. AC ¶ 251. IFC's "responses" include, but are broader than, the letters IFC wrote back to CAO. IFC's overall response was a decision to *do nothing* to ameliorate and avoid the harms. Plaintiffs can allege this was a decision made by IFC management in Washington D.C. AC ¶ 251.

Senior management in D.C. was aware of the problems at the Tata Mundra plant, even before these problems were raised at the CAO. AC ¶ 250. The CAO's acceptance of the complaint further put IFC senior management on notice of the Plaintiffs' allegations. AC ¶ 259. When, during the supervision phase of a project, a complaint is filed and accepted by the CAO, IFC E&S staff

must report this to upper IFC management in Washington, D.C. AC ¶ 256.

Plaintiff MASS was also in direct contact with IFC management, including the President of the World Bank (along with his Chief of Staff), the Executive Vice President and CEO of IFC, and other management, all based in Washington, D.C. AC ¶ 266. And many civil society organizations were urging IFC to address the issues with this project; they met with IFC and IFC Board members in Washington, D.C. AC ¶ 268. The reason for this is that this is where all the relevant decisions were made.

The person within IFC with authority to decide what actions to take with respect to controversial projects causing environmental and social harms is the Vice President of Operations in Washington, D.C. AC ¶ 249. Determinations about whether the IFC should enforce the E&S commitments in the Loan Agreement would have been made by the IFC's legal department, which is based in Washington, D.C. AC ¶ 236. IFC senior management decided not to take actions to mitigate the damage to the Plaintiffs, despite their ability to do so. AC ¶¶ 259.

IFC's written responses to the CAO reflect the inadequate institutional response to the problems that was the result of decisions and failures to act by IFC management in D.C. AC ¶ 260. The responses to the CAO, like the overall response to complaints about the plant, were approved by management in Washington, including by IFC's Vice President of Operations. AC ¶ 260.

**B. Alternatively, the Court should grant reconsideration.**

Reconsideration is warranted here both because the decision lies outside the issues the parties presented and because facts in the record demonstrate tortious conduct in the United States. *See Singh*, 383 F. Supp. 2d at 101. Because IFC did not previously argue that IFC's tortious acts took place outside the U.S., Plaintiffs did not previously call the Court's attention to this evidence, and the Opinion did not consider the evidence that those acts occurred here.

The Opinion found that the "record suggests" IFC's failure to ensure CGPL's compliance

15

with the loan agreement, IFC's approval of negligent plant designs and its failure to adequately supervise the plant "likely occurred in India," based on record evidence that IFC engaged in *other* conduct there; and that given this, the "Court cannot simply presume" IFC's conduct occurred in the United States. ECF No. 61 at 20. But the Opinion overlooked record evidence that IFC's failure to act and approval of harmful designs did, in fact, occur in the United States. All of this evidence is referenced in footnotes in the amended complaint. *See* AC ¶¶ 197-269 & nn. 4-59.

### C. If Plaintiffs' allegations or the facts in the record are inadequate, Plaintiffs seek limited discovery.

IFC knows where it undertook all of the relevant conduct. And that information is uniquely within IFC's control; Plaintiffs' allegations largely cover internal IFC processes that are not transparent to the outside. The viability of Plaintiffs' case should not turn on whether they can uncover for themselves nonpublic information IFC has at its fingertips. Accordingly, if Plaintiffs' amended complaint or the facts already in the record are deemed insufficient, or if IFC disputes the allegations, Plaintiffs are entitled to limited discovery, narrowly tailored to determining the location of the acts and omissions at issue. Plaintiffs seek a corporate representative deposition under Rule 30(b)(6) or, at a minimum, the depositions of Leslie Sturtevant, who has already submitted a declaration, and anyone else that may submit evidence to rebut Plaintiffs' allegations.

Plaintiffs' proposed amendments are based on Plaintiffs' best understanding of the facts, drawn from what materials are publicly available and consultation with experts. Some of these allegations are made on information and belief, which is "acceptable where the facts are within the possession of the defendant." *United States ex rel. Scollick v. Narula*, No: 14-cv-01339-RCL, 2017 U.S. Dist. LEXIS 119530, at *35-36 (D.D.C. July 31, 2017). As the Fifth Circuit has explained:

> [W]hen discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint. *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015) ("Several Courts of Appeals accept allegations 'on information and belief' when the facts at issue are

> peculiarly within the defendant's possession."). As the Second Circuit has stated, "[t]he *Twombly* plausibility standard, which applies to all civil actions, . . . does not prevent a plaintiff from 'pleading facts alleged upon information and belief' where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible . . . ." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted).

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018).

In support of their motion to dismiss, however, IFC also submitted evidence outside the pleadings. With respect to jurisdictional facts, this may entitle Plaintiffs to discovery. Discovery is generally available "where issues arise as to jurisdiction." *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 n.13 (1978). And where "circumstantial evidence" indicates that the facts may support jurisdiction, it would be "an abuse of discretion for the District Court to dismiss . . . without jurisdictional discovery." *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 426 (D.C. Cir. 1991); *see also El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 672-76 (D.C. Cir. 1996) (holding that it was abuse of discretion to deny discovery where, even though the plaintiff's "jurisdictional allegations are insufficient, he has sufficiently demonstrated that it is possible that he could supplement them through discovery").

Jurisdictional discovery is not barred in cases where the defendant asserts immunity under the Foreign Sovereign Immunities Act, and should be allowed "if it is possible that the plaintiff could demonstrate the requisite jurisdictional facts sufficient to constitute a basis for jurisdiction." *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 274 (D.D.C. 2008) (internal quotation marks omitted); *see also Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (holding that where FSIA jurisdictional facts are disputed, plaintiffs are entitled to discovery). Here, Plaintiffs have shown a likelihood of demonstrating sufficient jurisdictional facts.

Nor is discovery barred by the "inviolability" of the IFC's archives, *see* 22 U.S.C. § 288a(c), for two reasons. First, the IFC has voluntarily provided both documents and testimony – in the form of the Sturtevant Declaration – to establish jurisdictional facts. This either waives the IFC's

immunity as to these points or, at a minimum, requires the Court to disregard them if the IFC will not waive its immunity. IFC cannot, as it already has, voluntarily submit evidence as a sword to nullify jurisdiction and then claim the inviolability of its archives as a shield. Second, while Plaintiffs have found no cases under the IOIA specifically interpreting the archives provision, it should not extend to testimony.[7] Thus the Court could permit a Rule 30(b)(6) deposition, as well as depositions of Ms. Sturtevant and anyone else who submits testimony on IFC's behalf.

## V. CONCLUSION

Important immunity determinations should be made on their merits. Accordingly, this Court should grant Plaintiffs leave to amend their Complaint so that it can consider all of the facts showing IFC committed its tortious conduct at its headquarters in Washington, D.C.

Dated: March 12, 2020

Respectfully submitted,

/s/ Richard L. Herz

Richard L. Herz (*pro hac vice*)*
Marco B. Simons (D.C. Bar No. 492713)
Michelle C. Harrison (D.C. Bar No. 1026592)
EARTHRIGHTS INTERNATIONAL
1612 K St. NW Suite 800
Washington, DC 20006

*Counsel for Plaintiffs*

---

[7] While the IOIA also has a provision providing that employees "shall be immune from suit and legal process relating to acts performed by them in their official capacity," this provision is also subject to waiver. 22 U.S.C. § 288d(b). Moreover, immunity from suit is not the same thing as testimonial immunity. *E.g.*, *Gilchrist v. Bd. of Review*, 2004 OK 47 ¶ 7 n.13 (2004) ("There are various types of immunities – testimonial immunity, immunity from suit (legislative, executive, judicial, or diplomatic), immunity from civil liability, immunity from prosecution . . . ."). This Court does not need to rely on "legal process" such as a subpoena to compel testimony from a litigant; it can simply order the deposition and, if IFC refuses, draw adverse inferences.
*Based in CT; admitted in NY; does not practice in DC's courts.

18