## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BUDHA ISMAIL JAM,
Sanghad, Taluka Anjar
Dist. Kutch, Gujarat, India,

KASHUBHAI ABHRAMBHAI MANJALIA,
209-1 Muslimwas
Sanghad, Taluka Anjar
Dist. Kutch, Gujarat, India,

SIDIK KASAM JAM,
Sanghad, Talkua Anjar
Dist. Kutch, Gujarat, India,

RANUBHA JADEJA,
Navinal, Taluka Mundra
Dist. Kutch, Gujarat, India,

on behalf of themselves and all others similar
situated;

NAVINAL PANCHAYAT,
Navinal, Taluka Mundra
Dist. Kutch, Gujarat, India 370405,

 and

MACHIMAR ADHIKAR SANGHARASH
SANGATHAN (MASS),
Bhadreshwar, Taluka Mundra
Dist. Kutch, Gujarat, India,

   *Plaintiffs,*

  v.

INTERNATIONAL FINANCE
CORPORATION
2121 Pennsylvania Avenue, NW
Washington, D.C., 20433

   *Defendant*

**[PROPOSED AMENDED] CLASS
ACTION COMPLAINT FOR
DAMAGES AND EQUITABLE
RELIEF**

Civil Action No. 15-cv-00612 (JDB)

**COMPLAINT**

**TABLE OF CONTENTS**

I.   SUMMARY OF THE ACTION ....................................................................................1

II.  PLAINTIFFS AND DEFENDANT ...............................................................................5

III. THE TATA MUNDRA PROJECT, ENABLED AND FINANCED BY THE IFC,
     HAS SIGNIFICANTLY HARMED THE LIVES AND LIVELIHOODS OF
     MEMBERS OF TRADITIONAL LOCAL COMMUNITIES ........................................6

     A.  Plaintiffs' communities have depended on their natural resources for
         generations ...........................................................................................................6

     B.  The massive Tata Mundra coal-fired power plant was built among these
         traditional communities.........................................................................................8

         1.  The Plant burns millions of tons of coal annually...........................................9

         2.  The Plant takes in enormous quantities of seawater, and discharges
             heated water into the sea through a huge outfall channel .................................9

     C.  The IFC, whose goals are to end extreme poverty and increase shared
         prosperity, funded the Tata Mundra Plant and enabled its construction....................11

         1.  The IFC was formed to fight poverty and promote development through
             private-sector projects....................................................................................11

         2.  The IFC's investment enabled the Tata Mundra Project, which it
             recognized would have significant negative environmental and social
             impacts ........................................................................................................12

         3.  The IFC disbursed its loan despite changes to the design and operating
             conditions that contributed to negative impacts. ............................................16

     D.  The Tata Mundra Plant has fundamentally altered the local environment with
         harmful effects on local communities.....................................................................18

         1.  Construction and design of the Plant, particularly the intake and outfall
             channels, has substantially harmed local communities and resulted in
             both economic and physical displacement.......................................................18

         2.  Dredging of and discharge from the cooling system's outfall channel has
             substantially changed the local marine ecosystem and led to a drastic
             decline in the fish catch local fishing communities rely upon. ........................19

i

3. Construction and design of the Plant has restricted access to grazing lands and traditional fishing grounds and increased the time and cost of travel........21

4. Air pollution has already substantially affected the quality of the air; certain pollutants are already present in levels that are dangerous to human health, in violation of IFC standards and Indian air quality standards........................................................................................................22

5. Coal dust and fly ash frequently contaminate agriculture, fish laid out to dry, homes and property, and threaten human health.....................................24

6. Salt water intrusion into the groundwater has destroyed vital sources of drinking and irrigation water........................................................................25

E. The IFC's Obligations in Financing Development Projects .......................................26

F. After Plaintiff MASS filed a complaint with the CAO, it found that the IFC failed to ensure that the Tata Mundra Project met environmental and social requirements intended to protect communities and the environment.........................34

G. IFC failed to meet its obligations. ............................................................................39

IV.   THE IFC IS RESPONSIBLE FOR THE HARM FROM THE TATA MUNDRA PROJECT....................................................................................................................44

V.   THE IFC IS NOT IMMUNE FROM SUIT .....................................................................48

A. From the beginning of the Tata Mundra Project's development, evaluation and supervision of the project, and the ultimate authority over the terms under which the project could go forward occurred in IFC's Washington, D.C. headquarters. .......48

B. Despite knowing that a project of this nature would cause damage if not properly designed and operated, IFC still made the decision to finance the project based on information that IFC knew or should have known was incorrect and/or insufficient to understand what mitigation measures needed to be put in place to prevent harm to the Plaintiffs and others similarly situated. ........................53

C. After Board approval of the Tata Mundra Project, IFC's monitoring and supervision of the Project's environmental and social performance and the decision to continue to disburse the loan despite worsening performance occurred in IFC's Washington, D.C. headquarters. .................................................56

D. In addition to the normal monitoring and supervising activities, high-level IFC staff based in Washington, D.C., scrutinized and exercised control over the Tata Mundra Project because of the CAO process that was began early in the Project. ................................................................................................................63

VI.     EACH PLAINTIFF HAS BEEN HARMED BY THE TATA MUNDRA
        PROJECT...................................................................................................................70

VII.    CLASS ACTION ALLEGATIONS: PLAINTIFFS REPRESENT A CLASS OF
        INDIVIDUALS HARMED BY THE TATA MUNDRA PROJECT. .............................79

VIII.   THIS COURT HAS JURISDICTION AND IS THE PROPER VENUE. .......................85

IX.     PLAINTIFFS ARE ENTITLED TO RELIEF ON MULTIPLE CLAIMS. .....................85

X.      DEMAND FOR JURY TRIAL......................................................................................99

XI.     PRAYER FOR RELIEF ...............................................................................................99

## COMPLAINT

1.      Plaintiffs, by their attorneys, bring this action both individually and on behalf of all other persons similarly situated, against Defendant International Finance Corporation ("IFC"), for compensatory damages, punitive damages and injunctive relief relating to property damage, environmental destruction, loss of livelihoods, and threats to human health arising from the Tata Mundra Ultra Mega Power Plant (the "Tata Mundra Plant," "the Plant," "Tata Mundra Project," or "the Project") in Kutch District in Gujarat, India. The IFC financed the Tata Mundra Plant and enabled its construction, despite knowing that the coal-fired power plant would cause significant harm to surrounding communities, and failed to mitigate that harm, in violation of applicable laws, industry standards, and their own standards. The IFC's own ombudsman has found that the IFC failed to take necessary steps to prevent the harms it knew were likely to occur, has failed to remedy the harm that has already occurred, and that the IFC remains out of compliance with its obligations.

## I.      SUMMARY OF THE ACTION

2.      This case arises out of the irresponsible and negligent conduct of the International Finance Corporation in appraising, financing, advising, supervising and monitoring its significant loan to enable the development of the Tata Mundra Project in Gujarat, India. The IFC invested $450 million in Coastal Gujarat Power Limited (CGPL), a subsidiary of Tata Power, an Indian company, to develop the 4,150 mega-watt coal-fired Tata Mundra Plant. Without the IFC's funding, the Tata Mundra Project could not have gone forward.

3.      The Tata Mundra Plant is located in an ecologically rich, but fragile, portion of the Kutch coast in Gujarat, India. The area is home to traditional agricultural and fishing communities who rely upon their natural environment for their survival: the land for farming and

1

animal rearing; the groundwater for irrigation and drinking water; the fish and other coastal marine resources for their income; and upon clean air to breathe. Despite knowing of these communities and their vulnerability due to their interconnectedness with and dependence on their local environment, the IFC provided necessary funding for the Project – without which, the Tata Mundra Project could not have gone forward – and failed to take sufficient steps or exercise due care to prevent and mitigate harms to the property, health, livelihoods, and way of life of many of the people who live near the Tata Mundra Plant.

4.      Before committing to finance the Project, the IFC identified the Project as one that was "expected to have significant adverse social and/or environmental impacts that are diverse, irreversible, or unprecedented." The IFC even recognized that the Project would harm the environment and local communities if sufficient steps were not taken to address critical issues, including, but not limited to: (1) selecting an appropriate cooling system; (2) the large volume of seawater intake and impacts on marine environment and fish; (3) cumulative air quality impacts of the Project and another nearby power plant; (4) the adequacy of the air pollution control measures; (5) land influx management; (6) livelihood restoration; (7) and "GHG [greenhouse gas] emissions and climate change adaptation." From the outset, the IFC also identified "improper mitigation or insufficient community engagement" as having the potential to trigger "unacceptable environmental impacts." The harms discussed in this complaint were both foreseeable and, in large part, actually foreseen by the IFC.

5.      Despite knowing that unacceptable environmental impacts and harms were likely, the IFC approved funding for the Project without taking reasonable steps to prevent the harms it specifically foresaw. The IFC subsequently failed to enforce provisions of the loan agreement requiring CGPL (the borrower) to take preventive and remedial steps to prevent the foreseeable

harm to Plaintiffs and the local environment. These provisions were specifically intended to protect the Plaintiffs, other Class members, and the environment. The IFC's actions and omissions fell below accepted industry standards in project finance, violated the IFC's own internal policies and standards, and breached the duties the IFC assumed to protect local communities and the environment in undertaking to finance the Project. And the IFC knew or should have known that the harms alleged by Plaintiffs herein would result.

6.      The Named Plaintiffs and other members of the Proposed Class include impoverished fishing communities and local farmers who have had their way of life fundamentally threatened or destroyed by the Tata Mundra Plant.

7.      The thermal pollution discharged into the sea by the Tata Mundra Plant's cooling system has fundamentally degraded the local marine ecosystem where traditional fishing communities have fished for generations, resulting in the decline of critical fish stocks and other marine resources, and threatening Plaintiffs' means of supporting themselves and their families. Construction of the Tata Mundra Plant and the intake and outfall channels has closed off access routes to traditional fishing grounds, substantially increased the travel time and costs for fishing families, and caused sea water intrusion into the groundwater along the Mundra-Mandvi area where Plaintiffs and other members of the Proposed Class live.

8.      Due to the increasing salinity, farmers can no longer use their groundwater to irrigate, nor for drinking water, and local villages must now purchase fresh water elsewhere. Farmers have had to shift the crops they grow, or rely only on the crops they are able to produce during the short monsoon season, when irrigation is not required. Farm laborers have had to find new ways to support themselves, often leaving their families for extended periods of time to find work in Mumbai or elsewhere.

9.      Because of the Tata Mundra Plant and its coal conveyor system, which brings coal to the Plant from a port nearly 9 miles (14 kilometers) away, coal dust and fly ash periodically cover homes, property, burial sites, crops, salt resources, and fish laid out to dry before they are processed for sale. The dust and ash contaminates drying fish, reducing their value, damages agricultural production, and threatens human health.

10.      Because of the presence of the Plant, the air quality of the area has been substantially degraded. Certain air pollutants, in particular, particulate matter, are already regularly exceeding limitations required by Indian law and by the conditions on IFC's funding and involvement in the Project. In the last two years, since the Tata Mundra Plant began operating, there has been an increase in cases of asthma and other respiratory problems, especially among the elderly and the young. Children who play near the outfall channel have experienced skin conditions after emerging from the water.

11.      The loss of resources and productive agricultural lands resulting from the construction and operation of the Tata Mundra Plant has forced many people away from their traditional livelihoods, including fishing, animal husbandry, salt-panning and agriculture.

12.      The IFC states that its mission is to "carry out investment and advisory activities with the intent to 'do no harm' to people and the environment." The Tata Mundra Plant is thus a mission failure. The project has already done substantial harm to local people and the environment, and if compensatory, remedial and preventive measures are not promptly taken, Plaintiffs will be further injured, their livelihoods destroyed, and the local environment irreparable harmed, all in further violation of the IFC's mission.

## II.     PLAINTIFFS AND DEFENDANT

13.     Plaintiffs Budah Ismail Jam, Kashubhai Abhrambhai Manjalia, Sidik Kasam Jam, and Ranubha Jadeja are citizens and residents of Gujarat, India. They bring this action individually and on behalf of their families and all others similarly situated.

14.     Plaintiff Machimar Adhikar Sangharsh Sangathan (Association for the Struggle for Fisherworkers' Rights) ("MASS") is a non-profit with its principal place of business in Bhadreshwar village in Mundra Taluka, Kutch District of Gujarat, India. MASS is a local trade union, registered in 2011 under the Trade Union Act of India, and a constituent of the National Fisherworkers Forum (NFF), a national federation of state-level trade unions of traditional fishworkers. MASS has authority to bring, and brings this action on its own behalf and on behalf of its members who have been harmed.

15.     Plaintiff Navinal Panchayat (Village) is a local government entity with authority to file civil actions in order to protect the public rights and interests of their community. This case is brought pursuant to the Panchayat's legal authority to represent the public interest of the Navinal community. Navinal Panchayat brings this case on its own behalf to recover expenses it has incurred, as *parens patriae* on behalf of its citizens and residents, many of whom own property that has been damaged and imminently threatened by damage caused by the Tata Mundra Power Plant, and to prevent future harm. Navinal Panchayat's office and principle place of business is in Village Navinal, Taluka-Mundra, Kutch District, Gujarat, India 370405.

16.     Defendant International Finance Corporation is an international organization, established by Articles of Agreement among its members, which includes the United States, and is a member of the World Bank Group. The IFC's principal place of business and international

headquarters are, and at all relevant times were, located at 2121 Pennsylvania Avenue, NW,

Washington, D.C., 20433.

### III.   THE TATA MUNDRA PROJECT, ENABLED AND FINANCED BY THE IFC, HAS SIGNIFICANTLY HARMED THE LIVES AND LIVELIHOODS OF MEMBERS OF TRADITIONAL LOCAL COMMUNITIES.

**A.  Plaintiffs' communities have depended on their natural resources for generations.**

17.     Traditional communities have long resided in the Mundra-Mandvi coastal area,

where the Tata Mundra Plant now stands. The area has one of the highest concentrations of rural

people along the Kutch coast. It is ecologically diverse, featuring unique inter-tidal mudflats,

mangroves and marine life. It supports the lives and livelihoods of traditional fishing

communities, animal rearing and farming communities, and salt-panning activities.

18.     The Kutch coastline is vital to the livelihoods of its rural population, which

depend upon its natural resources. Further inland, much of the Kutch district is made up of salt

deserts – rendering the coastline even more critical.

19.     Navinal village is located near the Tata Mundra Plant, made up of about 800

homes and about 3,000 residents. About half of these are full-time residents. Navinal residents

depend primarily upon farming, animal rearing and fishing as their livelihoods. An estimated 40

families in Navinal rely upon fishing. There are an estimated 350 farms in the Panchayat.

20.     One Plaintiff, Mr. Jadeja, is a farmer whose plots are located in Navinal village.

21.     For generations, fisherfolk have traveled from inland villages to fishing harbors

(known as "bunders") along the Kutch coastline where they spend 8-9 months each year,

including the Tragadi and Kotadi bunders. Traditionally, the men do the fishing – often on boats,

but some also fish on foot, wading into the water from the shoreline – and the women separate,

clean and dry the fish, which are then sold to traders. During the monsoon season, the families

usually return to their inland villages until the fishing season begins again. The people of the Tragadi and Kotadi bunders are entirely dependent upon this seasonal fishing to support themselves, and are deeply impoverished.

22.      About 70 families, totaling about 350 people, reside at Tragadi bunder each year. Many families have been coming to Tragadi each year for many years, and some for generations. Tragadi bunder used to have a well with fresh drinking water that would last most of the fishing season. About 50 families come to Kotadi bunder each year, primarily from Sanghad and Vandi villages.

23.      Three of the Plaintiffs are traditional fishermen from the Tragadi and Kotadi bunders. Mr. Budah Jam resides with his family at Tragadi bunder for approximately 8-9 months each year during the fishing season. Mr. Manjalia also resides with his family at Tragadi bunder for approximately 8 months each year during the fishing season. Mr. Sidik Jam resides with his family at Kotadi bunder for approximately 8 months out of the year during the fishing season. They belong to the minority Wagher community and maintain distinct and traditional cultural and social institutions.

24.      In addition to the individual Plaintiffs, hundreds of members of MASS fish in affected areas and their catch has suffered.

25.      Residents of the villages in the Mundra-Mandvi area, including Navinal village, also fish at the bunders, but do not reside there like the seasonal fishing families. The village residents also practice shore-based foot fishing, known as *Pagadiya*, in the creeks and along the coast. They usually sell the fresh fish to the market, rather than processing and drying the fish at the bunder. Residents of the villages have also relied upon farming, animal husbandry and salt panning.

26.     The coastal area – now fundamentally altered and degraded by the Tata Mundra Plant – was one of the few in Kutch with groundwater fit for drinking and irrigation, making agriculture even more important in this area. Residents cultivated crops such as cotton, coconut, wheat, millet and dates, among others. The region became well known for having high quality dates in particular.

**B. The massive Tata Mundra coal-fired power plant was built among these traditional communities.**

27.     The Tata Mundra Plant is a massive coal-fired power plant located just inland from the Kutch coast, which takes in and discharges enormous amounts of seawater for its cooling system. The plant is located right next to Tragadi and Kotadi bunders and Navinal village.

28.     The Tata Mundra Project obtained its initial environmental clearance from the Government of India in March 2007. The project originally planned for a 4,000 MW "ultra mega" power plant, but was later expanded to 4,150 MW. The project planned to use imported coal and "supercritical" technology. The plant was developed by Coastal Gujarat Power Limited (CGPL), a subsidiary of Tata Power, an Indian company, with substantial financial investment from the IFC.

29.     Located near the Tata Mundra Plant is the Mundra Port. In addition to the port facilities, there is also another coal-fired power plant, owned and operated by Adani Power (the "Adani Plant"), another Indian company. Adani received initial permits and clearance for the Adani Plant in 2007.  Construction on the Adani Plant took place around the same time as the construction of the Tata Mundra Plant.  Both power plants have received international attention due to their environmental impacts.

30.     The Tata Mundra Plant is located just over a mile (approximately 2 km) away from the Adani Plant. The Tata Mundra Plant shares coal port facilities as well as an intake channel for cooling water with the Adani Plant.

*(1) The plant burns millions of tons of coal annually.*

31.     The Tata Mundra Plant burns approximately 12-13 million tons of coal each year.

32.     The Tata Mundra Plant has a temporary coal storage area at the port facilities where coal is stored before being transported to the Plant. The port coal storage area has several piles, providing a total of 300,000 tons of storage capacity. The coal is transported to the Tata Mundra Plant from the coal handling facility at the West port on a nearly 9 mile long coal conveyor belt, which is only partially covered. Coal is then stored on the Tata Mundra site in two piles in the uncovered coal stockyard.

33.     Bottom ash and fly ash is stored in slurry form in an ash pond.

*(2) The plant takes in enormous quantities of seawater, and discharges heated water into the sea through a huge outfall channel.*

34.     The Tata Mundra Plant utilizes a once-through condenser cooling system, which is unusual for a power plant of this size. Seawater is brought into the shared intake channel, which diverges and sends water to both plants. After passing through the Tata Mundra Plant in order to cool the Plant, the water is then discharged back to the sea through an outfall channel.

35.     Although the Tata Mundra Plant shares an intake channel with the Adani Plant, the Tata Mundra Plant requires substantially more cooling water because it uses a once-through cooling system, instead of a closed cooling system like the Adani Plant. As a result, the majority of the intake channel water is diverted to the Tata Mundra Plant, and a much smaller amount is diverted to the Adani Plant.

36.     The intake channel is more than two miles long (nearly 4 km) and nearly 500 feet

(150 meters) across. The environmental clearance for the intake channel requires it to be lined to

protect against salt water intrusion into the groundwater, but a 2013 report prepared for the

Indian Ministry of Environment and Forests found that the channel was not lined, in violation of

this condition of the clearance. The report further noted that "the soil in the area is permeable and

without safeguards it will lead to contamination" and recommended that the intake channel

"must be reconstructed/repaired so that it has impervious lining at the bottom and sides."

37.     The outfall channel is 4 miles long (nearly 7 km) and 250 meters across. When all

five units of the Plant are operating, the hot water condenser cooling discharge has a discharge of

630,000 cubic meters per hour, or 175 cubic meters per second (6,175 cubic feet per second). By

comparison, this is almost half of last year's mean discharge of the entire Potomac River near

Washington, D.C., which has been reported at 13,590 cubic feet per second.

38.     The cooling system is designed to allow the water discharged back into the local

marine environment to be as much as 7° C, or 12.6 ° F, hotter than ambient seawater

temperatures.

39.     Seawater is also treated at a desalination facility at the power plant using reverse

osmosis. Although CGPL has recently said it will start disposing of the sludge from the

desalinization facility, it has been discharging it into the sea through the outfall, thus increasing

the salinity of the discharge water.

40.     Tragadi bunder is located directly next to the outfall channel of the Tata Mundra

Plant, approximately 3km (less than 2 miles) away from the Plant itself. The hot water from the

outfall is discharged next to Tragadi bunder.

41.     Kotadi bunder is located along the shared intake channel, on the Tata Munda side. The coal conveyor belt runs along part of the intake channel, approximately halfway between Kotadi bunder and the Plant. The Kotadi bunder community had previously been located on the other side of what is now the intake channel, closer to the present location of the Adani Plant, known now as "old Kotadi" bunder. When construction commenced on the intake channel, however, some were forced under threat by agents of the Adani Plant to shift to the other side, closer to Tata Mundra. Others were given small amounts of money to leave.

**C.  The IFC, whose goals are to end extreme poverty and increase shared prosperity, funded the Tata Mundra Plant and enabled its construction.**

*(1) The IFC was formed to fight poverty and promote development through private-sector projects.*

42.     The IFC was founded in 1956 and is currently owned by 184 member countries. Unlike other units of the World Bank Group, which give loans to governments, the IFC generally finances private corporations. According to its website, the IFC "is the largest global development institution focused exclusively on the private sector in developing countries."

43.     The IFC's two "overarching goals" are to "[e]nd extreme poverty by 2030" and "[b]oost shared prosperity – in every developing country." According to the IFC's Articles of Agreement, the purpose of the IFC "is to further economic development by encouraging the growth of productive private enterprise in member countries, particularly in the less developed areas." The IFC's "mission is to fight poverty . . . ; to help people help themselves and their environment by providing resources, sharing knowledge, building capacity and forging partnerships in the public and private sectors. IFC believes that sound economic growth, grounded in sustainable private investment, is crucial to poverty reduction." Thus, "[c]entral to

IFC's development mission are its efforts to carry out investment and advisory activities with the intent to 'do no harm' to people and the environment."

44.     The IFC also commits "to ensuring that the costs of economic development do not fall disproportionately on those who are poor or vulnerable, that the environment is not degraded in the process, and that renewable natural resources are managed sustainably." And, the IFC believes that "regular engagement with stakeholders about matters that directly affect them plays an important role in avoiding or minimizing risks and impacts to people and the environment."

45.     Given these institutional goals and purposes, the IFC has developed a Sustainability Framework, which dictates the conditions of IFC involvement in projects and the obligations of both the borrower and the IFC to ensure that the Project promotes positive development objectives while protecting local communities and the environment.

> *(2) The IFC's investment enabled the Tata Mundra Project, which it recognized would have significant negative environmental and social impacts.*

46.     According to the IFC's Articles of Agreements, the IFC only invests in projects where there would otherwise be insufficient private capital. Specifically, Article III §3(i) provides that the IFC "shall not undertake any financing for which in its opinion sufficient private capital could be obtained on reasonable terms." Thus the projects the IFC invests in are only those which would not and could not proceed but for IFC's funding.

47.     The IFC began evaluating the possibility of investing in the Tata Mundra Project in 2007. The total project cost was estimated to be around $4.14 billion.

48.     From the outset, the IFC recognized that the Tata Mundra Project would likely cause substantial environmental and social harm to local communities, including Plaintiffs and other members of the Proposed Class. The project was designated an "environmental and social category A project," which "signif[ies] that it has potential significant adverse social and/or

environmental impacts that are diverse, irreversible, or unprecedented." By March 2008, the IFC had specified the issues that justified this classification, including "the adequacy of the selection of cooling system, large volume of seawater intake and impacts on marine environment/fishery, cumulative air quality impacts of the project" and the nearby Adani Power Plant project, "adequacy of air pollution control measures, land influx management, livelihood restoration, GHG [greenhouse gas] emissions and climate change adaptation." The IFC also specifically identified "improper mitigation or insufficient community engagement" as likely to trigger "opposition from project-affected communities or unacceptable environmental impacts."

49.    In other documents prior to approval of the loan, the IFC noted the potential for "significant social and environmental risks if [the Project was] not well managed and mitigated."

50.    Prior to approval of the loan, the IFC conducted an environmental and social review of the proposed investment, which it is required to do, as explained in Section III.E. This review included an evaluation of project-related documentation, including, for example, environmental impact assessments that had been conducted. It also included documentation that showed local fishing communities, including the bunder fishing communities, had raised concerns about the impacts of the proposed project as early as 2006.

51.    The IFC identified a number of environmental and social performance gaps during this process that were necessary to address in order to ensure that the Project was carried out in accordance with the IFC social and environmental standards – a necessary condition of IFC funding – as explained below in Section III.E. Measures to close those gaps were defined, agreed to with CGPL, and documented in an Environmental and Social Action Plan (ESAP), dated November 2007. That ESAP was incorporated into the loan agreement and made a necessary condition of the loan agreement.

52.     The ESAP included provisions that were specifically intended to protect and benefit the environment and Plaintiffs and other similarly situated people, including, but not limited to, implementation of various environmental and social mitigation measures and development and implementation of "specific measures including livelihood restoration, community development, and long-term stakeholders engagement process."

53.     The Loan Agreement also expressly incorporated other environmental and social safeguards intended to protect local communities and the environment as binding covenants, including, but not limited, to:

(a) The IFC's Environmental and Social Performance Standards, which are explained further in Section III.E;

(b) The Thermal Power: Guidelines for New Plants in the World Bank Group's *Pollution Prevention and Abatement Handbook* (1998) (the "Thermal Power Guidelines");

(c) The World Bank Group Environmental, Health and Safety Guidelines (2007) (the "EHS Guidelines");

(d) Provisions allowing supervision and monitoring by IFC;

(e) Other mitigation and preventive measures the client was required to take, and other conditions of the loan which, on information and belief, were also intended to benefit and protect local communities and the environment.

54.     In October 2007, the IFC made its first appraisal visit to the site to consider involvement in the Project and evaluate whether there was sufficiently broad support for the proposed business activity in the community ("Broad Community Support"). The IFC conducted

interviews with individuals and representatives from villages around the area during which it discussed a wide range of risks, potential impacts and issues that would need to be addressed.

55.     In January 2008 and March 2008, the IFC conducted its second and third visits to evaluate Broad Community Support. In March, the IFC signed off on a finding of Broad Community Support.

56.     On April 8, 2008, the IFC's Board approved $450 million in the form of a straight senior loan. The loan is for twenty years, with repayment starting only after six years. It is the longest tenure loan for the IFC; most IFC loans have final maturities of up to 12 years. The loan agreement was signed on April 24, 2008.

57.     The Tata Mundra Project would not have happened without the IFC's financing.

58.     The IFC said that it had "a strong role to play in filling the financing needs of the [Tata Mundra] project." The IFC explained its role as critical in terms of its ability to provide "very long maturities." It explained that "local banks… are unable to meet entire debt needs due to exposure limits[,]" and "[i]nternational commercial banks have limited appetite for long maturities because of refinancing risks and poor creditworthiness of state-owned offtakers. The IFC would play a "catalytic role" and IFC financing will "help attract the financing of other multilateral agencies like [the Asian Development Bank], export credit agencies like Korean Exim and other foreign and local banks[,]" and the IFC's "support of this project will improve the confidence and reduce the risk perception of banks and financial institutions in this project."

59.     IFC has also noted that it "played a key role in financial structuring on behalf of all lenders." According to the IFC, its long-term financing in fact "helped the project get finance from other international and Indian institutions[,]" and "IFC's continued commitment to the project will help ensure its success."

15

60.     The IFC has publicly and repeatedly said that its involvement in this project would ensure the protection of local communities and the environment. For example, it stated from the beginning that there would be "strong additionality to be derived from IFC's involvement with the project in terms of improving its environmental and social performance and its impact on the local communities."

61.     According to the IFC, it "has played a critical role in the Tata Mundra Project, both by investing and providing guidance on environment and social practices."

> *(3) The IFC disbursed its loan despite changes to the design and operating conditions that contributed to negative impacts.*

62.     In September 2008, the IFC conducted its first supervision visit to the Tata Mundra Project. Following this, in December 2008, the first disbursement of funds was made.

63.     The IFC's second supervision visit was in February 2009, followed by a third visit in July 2009, and a fourth in November 2009.

64.     In January 2009, clearance was obtained from the government for the shared intake channel.

65.     The design for the Plant was then altered substantially in 2009 to accommodate the lengthening of the cooling water outfall channel. This resulted in a relocation of the outfall channel from what was originally envisioned. In March 2010, CGPL received regulatory clearance for the new outfall channel location.

66.     IFC's fifth and sixth supervision visits took place in May and December of 2010.

67.     In April 2011, CGPL received an amendment to its environmental clearance allowing it to increase the Plant from 4,000 MW to 4,150 MW and to change from a rail system to a conveyor system for coal transport, among other changes.

16

68.     Three additional IFC supervisions visits took place between November 2011 and September 2012.

69.     In addition to design changes, changes to the coal source should have been foreseen. Tata Mundra was designed to burn high-grade, low-ash Indonesian coal, which is cleaner than Indian coal. Tata's bid for the Project was extremely low and dependent on its continued ability to obtain coal from Indonesia, where it owned stakes in coal mines, at a relatively cheap price.

70.     In 2011, the Indonesian government set a minimum price for exported coal. This substantially increased the cost of coal for the Tata Mundra Project, and the Plant has operated at a substantial loss for its entire existence.

71.     Tata/CGPL has already violated numerous loan covenants with other lenders and had to ask lenders for waivers from fines on multiple occasions.  Despite promises that the Project would result in cheap power for India's poor, the company has now sought to pass its financial problems on to consumers, and has sought regulatory permission to increase prices.

72.     The plant has now switched to finding new sources of coal. It has already had to use cheaper and lower grade sources, which have a higher ash content and are dirtier to burn. In a 2012 interview, for example, a Tata company representative stated that the Tata Mundra Plant was "already burning 50 per cent of very low-grade coal – which is much more than our original plan."

73.     Tata Power's viability as a company has been threatened by the losses incurred from the Tata Mundra Plant. In March 2015, Tata Power's CEO Anil Sardana stated that it only continues "to supply power from the Mundra project because of our commitments" but that it "is

in great financial stress." He said they had been asking the government for support to deal with the Indonesian coal price change, and that "if nothing is done, the project will collapse."

**D. The Tata Mundra Plant has fundamentally altered the local environment with harmful effects on local communities.**

*(1) Construction and design of the Plant, particularly the intake and outfall channels, has substantially harmed local communities and resulted in both economic and physical displacement.*

74.     Construction of the intake and outfall channels required substantial dredging and the destruction of mangroves, sand dunes and other features of the coastline. The mud and other material from dredging was dumped into the Modwa and Kotadi creeks in the intertidal areas.

75.     Kotadi residents were forced to relocate to "new" Kotadi bunder during construction of the intake channel, across the channel from "old" Kotadi bunder. Massive dredging pipes run across Kotadi bunder directly adjacent to where the seasonal fishing communities reside and dry and process the fish they catch. Although the dredging is done primarily by Adani's machines, the dredging is done for the intake channel which is used by both Adani and Tata Mundra. The dredging pipes frequently burst, spreading the contents near the homes and fish processing areas on Kotadi bunder.

76.     Thermal pollution from the outfall channel has led to declining fish catch. Both Kotadi and Tragadi fishermen have suffered from the collapse of the fish stocks. Fish species that they used to catch are now absent; others remain only in much reduced numbers.

77.     This has made it necessary for Kotadi and Tragadi fishermen to travel much further out to sea, and the substantial ship traffic servicing the Tata Mundra and Adani Plants around the intake channel interferes with fishing practices near the shore. Anchors are lost and nets left in the water are cut and destroyed by tug boats as well as coal ships.

78.     Fishermen who used to fish in the Kotadi and Modwa creeks can no longer practice foot fishing now that the dredging material has been dumped there.  The intake channel is so deep and with such a steep drop off that it is no longer possible for fishermen at Kotadi bunder to practice shore-based foot fishing either. Construction of both channels also required the acquisition of significant areas of the sand bars that constituted Tragadi and Kotadi bunders, including areas that were used for homes and areas used for economic activity, including fish drying.

79.     There is now less space on Tragadi bunder for Tragadi bunder residents than there used to be and old Kotadi bunder no longer exists.

80.     The outfall channel has dramatically changed the coastal area around Tragadi bunder, cutting away substantial areas of land and critical features of the ecosystem.

81.     In addition to the impacts from dredging activity, the Modwa creek, which is a spawning ground for fish and shrimp species, has also been affected by the outflow from the outfall channel into the sea, which crosses the creek and causes changes in the temperature, velocity and circulation of the water.

82.     The livelihoods and way of life of fishing communities are increasingly threatened by the depletion of fish stocks and other vital marine resources they have depended on for generations. Most have not and do not have access to formal education and do not know what other jobs they could find to support their families when there is no fish left to catch.

> (2) *Dredging of and discharge from the cooling system's outfall channel has substantially changed the local marine ecosystem and led to a drastic decline in the fish catch local fishing communities rely upon*

83.     The dredging of the Tata Mundra Plant's outfall channel, and the discharge of a huge volume of super-heated, possibly chemically contaminated water has fundamentally altered

the makeup of the local marine environment and decimated important species that fishing communities rely upon.

84.　　The construction and dredging of the outfall channel has physically altered the coastline and offshore environment in ways that have contributed to a decline of fish populations offshore. The outfall channel replaced a shallow coastal environment, protected by barrier beaches and mangroves, with a fast-moving, deep channel of superheated water.

85.　　Modeling projection reviewed by the IFC suggested that the thermal plume from the outfall channel would "extend a distance of kilometers into the shallow waters of the gulf and surrounding estuaries" which "suggest[s] inadequate mixing/cooling, with significant risks of ecological impact."

86.　　The maximum sea surface temperature in the Gulf of Kutch in peak summer is reportedly not greater than 30.85ºC, or 87.53ºF. On information and belief, in 2012, with only 800MW (less than 20%) of the Plant operational, the temperature in the outfall channel 600 meters from the outfall point was measured to be between 32ºC and 33ºC, or 89.6ºF and 91.4ºF.

87.　　CGPL does not continuously record the temperature of the water at the discharge point at the end of the outfall channel, but limited data provided to the Asian Development Bank's (ADB) compliance body and contained in a recent report showed temperatures of 5°C (or 9ºF) above the ambient level.

88.　　Aquatic organisms are dependent on certain temperature ranges for optimal health. Even small changes in temperature in the water can cause organisms to be stressed and die.

89.     The resulting changes to the waters around the Tata Mundra Plant have contributed to a significant decline in fish catch over the past three years, and will continue to do so.

90.     In addition to the thermal pollution, local communities are concerned about the chemical pollution from the outfall channel, including, but not limited to, residual chlorine and heavy metals. The Tragadi bunder community has occasionally noticed water discharged from the Plant appears frothy, and/or has a strong odor.

91.     With the exception of an air quality monitoring board at the entrance of the site, which is not always functional, environmental data – including data on the temperature and chemical composition of the outfall effluent – has not been reported to local communities, including Plaintiffs and the members of the Proposed Class.

92.     Documentation of the Project indicates that CGPL undertakes significant dilution in order to meet water quality standards with regard to at least iron (Fe).  The iron-bearing sludge from the desalinization process is diluted with warm water from condenser cooling and then discharged in the outfall channel.  Industry standards require that dilution not be used as the means of meeting pollution standards. The Thermal Power Guidelines expressly provide that required effluent levels "should be achieved daily without dilution."

93.     On information and belief, discharge of iron has already had, and will have an adverse impact on fauna, will enter the human food chain, and harm human health.

> *(3) Construction and design of the Plant has restricted access to grazing lands and traditional fishing grounds and increased the time and cost of travel*

94.     Enclosure of the premises and construction of the intake and outfall channels have obstructed access to cattle grazing land and traditional fishing grounds.

21

95.     Although CGPL constructed a new road around the Plant which allows access to the fishing bunders, the longer travel routes increase both the time and the expense for people traveling to the fishing areas. Some seasonal fishing families as well as fishermen from the local villages have to travel much further now to reach the fishing grounds.

96.     The distance to Tragadi bunder is longer, and the cost to travel there is more than twice as much as it was before.

97.     The distance from Navinal Panchayat to old Kotadi bunder was approximately a mile (under 2 km). Now, the travel distance is approximately 15.5 miles (25 km).

98.     Although CGPL and IFC state that some individuals have been compensated for these increased costs, the Tragadi and Kotadi bunder fishing communities and residents from Navinal village who fish at the bunders have not been compensated.

> *(4) Air pollution has already substantially affected the quality of the air; certain pollutants are already present in levels that are dangerous to human health, in violation of IFC standards and Indian air quality standards.*

99.     The air quality around the Tata Mundra Plant is not in compliance with IFC standards, which are binding on the client, nor with Indian National Ambient Air Quality Standards (NAAQS).

100.    The 24-hour average Indian NAAQS PM-10 (particulate) standard is violated in at least seven nearby villages and at the Tata Mundra Plant's main gate.

101.    Recent data on $SO_2$ and $NO_2$ provided by CGPL has been questioned by both the IFC and the ADB's complaint mechanisms as reflecting unrealistically low results – somehow indicating that the air quality had *improved* since the Plant began operating – and the CAO strongly suggested there was a need for independent monitoring. On information and belief, the

presence of these air pollutants has significantly increased since the Plant began operating and will continue to increase.

102.    Despite having an air quality monitoring board set up at the entrance of the Plant, communities report that it is often turned off or broken. The CAO noted that on its own visit to the site the numbers did not fluctuate over a period of hours and thus do not appear to be reflecting the air quality in real time.

103.    Residents have complained of an increase in health problems over the past three years, since the Plant began operating, including, but not limited to, an increase in respiratory problems, especially in the elderly and children. A 2013 report by the Conservation Action Trust, *Coal Kills: An Assessment of Death and Disease Caused by India's Dirtiest Energy Source,*[1] evaluated pollution from Indian coal-fired power plants, especially fine particulate matter (PM10), nitrogen oxides (NOx) and sulfur oxides (SOx); estimated the dispersion of pollutants from large power plants around India, including the CGPL plant; and mapped the results onto populations in order to estimate the likely effects of on mortality and morbidity. The report alleged significant health costs arising from pollution-related premature deaths, respiratory effects, and restricted working days, including an estimated 100-120 premature deaths per year in the area around the CGPL and Adani Power plants.

104.    In the course or preparing a separate report, *The Increasing Human Cost of Coal Power: Supplementary Report to the 'Real Cost of Power'* (July 2013)[2], a team of independent experts who visited the site and the local communities spoke with a doctor who estimated that the villages in the area have seen an increase of roughly 20% in children's respiratory diseases

---

[1] The report is available at http://cat.org.in/files/reports/Coal%20Kills%20-%20An%20Assessment%20of%20Death%20and%20Disease%20caused%20by%20India's%20Dirtiest%20Energy%20Source.pdf.

[2] The report is available at: http://www.banktrack.org/manage/ems_files/download/the_increasing_human_cost_of_coal_power/suplimentary_report_final.pdf.

over the past two years. The experts noted it was difficult to find an independent doctor, and that

the one they were able to speak to asked to remain anonymous for fear of retaliation from Tata

and/or Adani for speaking about the matter.

>    *(5) Coal dust and fly ash frequently contaminate agriculture, fish laid out to dry,*
>    *homes and property, and threaten human health.*

105.    Coal dust, fly ash and other coal combustion byproducts escape the Tata Mundra

Plant site from multiple sources, including: CGPL's coal storage piles at the port facilities; from

the 14 km long coal conveyor belt that transports coal to the site; from the Tata Mundra Plant's

coal stockyard pile on site, where the coal sits outside uncovered; through the emission stacks

during the coal burning process; and from the ash ponds.

106.     During at least part of the year, significant coal dust and fly ash is deposited in

local villages and the bunders, depending on the direction and strength of the wind and when the

coal conveyor belt is running.

107.    The coal dust, fly ash and other coal combustion byproducts are frequently visible

as residue and dust on the exteriors of local property, houses, buildings, persons, burial sites,

trees, salt resources, and even on fish laying out to dry. It contaminates agriculture and interferes

with crop production, negatively affecting the quality and quantity of crops, and contaminates

fish laid out to dry, affecting the quality and value of the fish, at times necessitating the fish be

thrown out.

108.    Coal ash and fly ash is known to usually contain toxic heavy metals such as

cadmium, lead, selenium, and mercury.

109.    Residents have complained of health problems including respiratory problems and

skin irritation, among others. Residents have complained to the IFC and CGPL directly.

> *(6) Salt water intrusion into the groundwater has destroyed vital sources of drinking and irrigation water.*

110.    Sea water has intruded into the groundwater around the Tata Mundra Plant, as a result of the intake and outfall channel, from which salt water leaches into the soil and into the groundwater.

111.    Drinking water at Tragadi bunder is now too saline for human consumption. Tragadi bunder residents must now obtain fresh water from CGPL. CGPL only provides 5000 litres/day for 70 families of approximately 350 people. This leads to conflict between residents over water.

112.    Approximately half of the farmland in Navinal village is already suffering from the salt water intrusion. Farmers who used to use private wells on their land for drinking water and irrigation can no longer use the water for either purpose.

113.    Affected farmers have had to switch from cash crops – such as fruits, and especially dates – to crops that are easier and cheaper to grow, but that sell for less. Other farmers can no longer grow crops during the dry season at all, and can only produce crops during the monsoon season when irrigation is unnecessary.

114.    The loss of resources and productive agricultural lands has already forced some away from their traditional livelihoods. Many farmers have lost the ability to grow marketable crops on their land and farm laborers have had to find temporary work as day laborers. Others travel to Mumbai or other large cities to find work, leaving their families for the majority of each year.

115.    The Navinal Panchayat can no longer provide sufficient drinking water to residents from within the Panchayat and must purchase water from outside the Panchayat to bring in.

### E.  The IFC's Obligations in Financing Development Projects

116.     The IFC assumes greater obligations, responsibilities and duties to its clients and also to third parties who may be affected by the projects it finances as compared to traditional lenders. The IFC does not take a hands-off approach to its investments; it is intimately involved in and has substantial control over the decisions concerning construction, design, and operation of the projects it funds.

117.     The duties, obligations and responsibility the IFC assumes include, but are not limited to, the IFC's Social and Environmental Sustainability Policy, which "defines the IFC's responsibility for supporting project performance" and "define[s] the outcomes that IFC must achieve," and the Disclosure Policy which "defines IFC's obligations to disclose information about itself as an institution and its activities."  Also relevant to the IFC's obligations, duties and responsibilities are the Performance Standards on Environmental and Social Sustainability (the "Performance Standards"), which "define clients' roles and responsibilities for managing their projects and the requirements for receiving and retaining IFC support."  Although the Performance Standards stipulate the outcomes and other requirements that the IFC's clients must meet, the IFC has an affirmative obligation to ensure from the outset that the projects it funds are capable of complying with the Performance Standards, ensure that the project is in compliance before disbursement of funds, monitor the project throughout the duration of the loan to ensure the client maintains compliance with those standards, and, where necessary, take remedial action where the standards are breached.

118.     The Performance Standards were adopted in 2006 following indications that the prior Safeguard Policies "were not adequate to the complex project situations on the ground[,]" and "increasing public criticism of some projects that did not have the development outcomes

26

wanted." The IFC thus adopted a new, more robust policy framework for environmental and

social standards that was intended to better protect local communities and the environment and

ensure positive development outcomes consistent with the IFC's mission and purpose. These

were subsequently updated in 2012.

119.    There are eight Performance Standards that specifically require compliance with

IFC policy on different subjects: PS1: Assessing and Managing Environmental and Social Risks

and Impacts: PS2: Labor and Working Conditions; PS3 Resource Efficiency and Pollution

Prevention; PS 4: Community Health, Safety and Security; PS5: Land Acquisition and

Involuntary Resettlement; PS6: Biodiversity Conservation and Sustainable Management of

\Living Natural Resources; PS 7: Indigenous Peoples; PS 8: Cultural Heritage.

120.    As described by the IFC, Performance Standards 2 through 8 "establish objectives

and requirements to avoid, minimize, and where residual impacts remain, to compensate/offset

for risks and impacts to workers, Affected Communities, and the environment."

121.    There are additional, more specific standards and industry specific documents that

are also made binding covenants. Most relevant for the Tata Mundra Project are the Thermal

Power: Guidelines for New Plants in the *Pollution, Prevention and Abatement Handbook*

(PPAH) (1998) ("Thermal Power Guidelines"), and the World Bank Group Environmental,

Health and Safety Guidelines (2007) ("EHS Guidelines").  Where host country regulations differ

from the levels and measures presented in the EHS Guidelines, projects are required to achieve

whichever is more stringent.

122.    Compliance with the Performance Standards, the Thermal Power Guidelines, the

EHS Guidelines, and relevant provisions of national law are expressly made "the conditions for

IFC's involvement" in the projects it finances. Compliance with these standards is a condition

that is incorporated into the loan agreement. The purpose of these policies and other "conditions" is to protect the environment and local communities potentially affected by the project and to ensure that the IFC's investments and loans fulfill its organizational mission and goals.

123.    The IFC's environmental and social standards, policies, and guidelines – including, but not limited to, the IFC's Performance Standards, Sustainability Policy, Thermal Power Guidelines, and  EHS Guidelines – have become the industry standard in international project finance in developing countries. Even if the IFC were to abolish these policies, it would still be bound by the same standards, because they are the industry standard for project finance and thus define the IFC's legal obligations.

124.    The Performance Standards in particular are regularly referred to as the "global benchmark" for environmental and social risk management. Most other major international financial institutions, including development banks, commercial banks, and public lenders, as well as many investors, have either expressly adopted the IFC's relevant policies and standards, or adopted their own that substantively mirror the IFC's. The IFC's Sustainability Framework has been largely adopted and incorporated into the Equator Principles, "a risk management framework, adopted by financial institutions, for determining, assessing and managing environmental and social risk in projects . . . [that] is primarily intended to provide a minimum standard for due diligence to support responsible risk decision-making." At least 80 international financial institutions have adopted the Equator Principles, covering "over 70 percent of international Project Finance debt in emerging markets."

125.    The IFC identifies one of its roles in private sector development in developing countries as "[s]etting standards and supporting sector-wide standard setting initiatives focused on management of environmental and social risks and impacts by private sector companies and

financial institutions." IFC also recognizes its role in "identifying and disseminating private sector GIIP [Good International Industry Practice] in the area of financial, environmental and social sustainability."

126.    Prior to committing to finance a project, the IFC is required—by its own policies and consistent with industry standard – to review potential projects against the Performance Standards and conduct appropriate environmental and social due diligence of proposed investment activity. As part of its due diligence, the IFC is required to conduct an Environmental and Social Review of a potential project that is "appropriate to the nature and scale of the project and commensurate with its risks and impacts." According to the IFC, this specifically includes, but is not limited to, activities such as: (1) "reviewing all available information, records, and documentation related to the environmental and social risk and impacts of the business activity"; (2) "conducting site inspections and interviews of client personnel and relevant stakeholders"; (3) "analyzing the business activity's environmental and social performance in relation to the requirements of the Performance Standards and provisions of the [EHS] Guidelines" and where "appropriate"  "other internationally recognized sources"; and (4) "identifying any gaps therewith, and corresponding additional measures and actions beyond those identified by the client's in-place management practices" that are identified as necessary "to ensure the business activity meets the Performance Standards."

127.    IFC's due diligence includes consideration of third party risks – which is defined to include risks related to the activities of "a contract or primary supplier" or "an operator of an associated facility"—and certain risks "may require IFC to refrain from supporting the proposed business activity."

29

128.    Actions that are identified as necessary to ensure the activity meets the Performance Standards are laid out in an "Environmental and Social Action Plan" ("ESAP"), which is expressly incorporated into the loan agreement, and are made "necessary conditions of IFC's investment." IFC loan agreements also ultimately require other provisions for environmental and social reporting, and supervision by IFC staff or representatives.

129.    After the initial appraisal stage, but before a loan is approved, an environmental and social category is assigned to an investment project. Projects are assigned a category of A, B, or C in descending order of environmental and social sensitivity. "Category A" indicates that the project is "expected to have significant adverse social and/or environmental impacts that are diverse, irreversible, or unprecedented."

130.    With Category A projects, like Tata Mundra, the IFC takes on additional due diligence, supervision, monitoring and remedial obligations. This includes undertaking its own investigations to ensure the borrower/client complies with particular Performance Standards that pertain to potentially affected communities. For example, the IFC must undertake site visits, investigations, and direct conversations with potentially affected communities to ensure the client's process of informing and consulting with the nearby communities resulted in "Broad Community Support (BCS) for the business activity by affected communities[,]" and to continue to monitor the client's community engagement process through the supervision phase. The IFC must specifically ensure the client's community engagements involve "free, prior informed consultation leading to broad community support." Through this process, the IFC gets directly involved in discussions with local communities about the impacts of projects, and makes representations to the communities about the potential impacts of projects and plans for minimizing, mitigating and/or preventing harms.

131.    After the appraisal/due diligence stage, the project team and the IFC departmental management "must be confident that the client is able and willing to meet IFC standards" in order for the project to proceed.

132.    Negotiations over the terms and conditions of IFC participation in the project are then commenced. This includes conditions of disbursement and covenants, performance and monitoring requirements, agreement of action plans, and resolution of any outstanding issues. Many of these conditions are specifically intended to ensure that the project does not harm local communities and the environment.

133.    The project is then submitted to the IFC's Board of Directors for consideration and approval. The documents are reviewed by the Board and a meeting is held to discuss the project. After Board approval, the IFC and the borrowing company sign the legal agreement, which "includes the client's agreement to comply with the applicable Performance Standards … and to provide regular monitoring reports. The legal agreement will also covenant the client's Action Plan."

134.    The IFC has an obligation and responsibility to assist the client/borrower to develop measures sufficient to "avoid, or where avoidance is not possible, minimize, mitigate," and, where residual impacts remain, "to compensate for adverse impacts" caused by a project.

135.    IFC funds are usually paid out in stages, on condition of certain steps being completed as agreed to in the legal agreement, including social and environmental action items identified prior to final Board approval of the loan, and compliance with other environmental and social standards written into the agreement. The IFC is required to ensure the borrower is in compliance with IFC standards and the environmental and social conditions incorporated into the loan agreement before disbursing funds. "Persistent delays" in meeting the requirements of the

Performance Standards or other environmental and social obligations "can lead to loss of financial support from IFC."

136.    Following project approval, IFC has a duty to monitor and supervise the loan and to ensure the client's compliance with environmental and social obligations and conditions. This duty continues throughout the life of the loan, until the project is closed. The IFC is also required to track the project's contribution to development against key indicators identified at the start of the investment cycle.

137.    The IFC's monitoring and supervision obligations are implemented in part by conducting supervisory site visits, establishing the client's degree of compliance with all conditions and covenants prior to all disbursements, ESAP implementation, identifying poorly performing projects, and, where the client fails to comply with its environmental and social commitments, clearly communicating risks and probable consequences if client fails to comply with environmental and social requirements. Where a client still fails to comply with its environmental and social commitments, the IFC is responsible for "initiat[ing] remedies if the client fails to reestablish compliance."

138.    Where the client fails to meet its commitments, the IFC has substantial authority and leverage that can be used to enforce the conditions of the loan. For example, failure to meet the conditions of the loan agreement can lead to default, give the IFC the power to terminate the obligations to make disbursements and/or declare the loan to be due and payable, and/or to cancel the loan. For example, the IFC recently publicly threatened to cancel a loan to a Honduran company if it failed to comply with its environmental and social obligations, stating "[s]hould [the company] fail to meet these commitments, IFC stands prepared to exercise all remedies

available, including canceling the loan." IFC policy makes clear that the IFC is responsible for initiating all remedies necessary to ensure compliance.

139.    Together, the IFC's commitment to conduct robust due diligence, to monitor, supervise, and to exercise remedies for the benefit and protection of local communities and the environment, establishes an affirmative duty to adequately assess, monitor and supervise the project's compliance and to intervene when necessary to prevent and/or mitigate damage arising from noncompliance and ensure those injured have access to an appropriate remedy, including compensation.

140.    The IFC takes on a unique relationship with the companies and projects it finances and maintains a higher degree of involvement in, responsibility for and control over the projects it finances than an ordinary lender. It does so to ensure compliance with its Performance Standards and other environmental and social commitments and obligations incorporated into the loan agreement throughout the duration of the loan.  In so doing, the IFC also takes on duties and responsibilities toward certain third parties affected, or potentially affected, by the projects it finances.

141.    The IFC has a complaint mechanism that can review whether the IFC is complying with its obligations with respect to a particular project: the Office of the Compliance Advisor Ombudsman (CAO). The CAO's "mandate is to assist" the IFC "in addressing complaints from people affected" by IFC projects "in a manner that is fair, objective, and constructive and to enhance the environmental and social outcomes of those projects."

142.    If a complaint is deemed "eligible for assessment," the CAO Ombudsman team may first attempt to engage with the IFC, company, and the affected communities "to discuss option for resolution" of the issues. If dispute resolution does not work, the case may be

33

transferred to the Compliance office, which considers whether an audit of the IFC's role in the project is warranted.

143.    A CAO compliance audit considers whether "the actual social or environmental outcomes of a project are consistent with or contrary to the desired effect" of the IFC "social and environmental policy provisions" or whether a failure by IFC to address social or environmental issues "resulted in outcomes that are contrary to the desired effect of the policy provisions." It assesses "the application of relevant policy provisions and related guidelines and procedures to determine whether IFC [is] in compliance."

144.    The "audit criteria are the conditions for IFC's involvement," which are described as including the IFC's Sustainability Policy, the Performance Standards, the Guidelines on Thermal Power, the EHS Guidelines, and relevant provisions of national law.

145.    The findings are ultimately published, and the CAO can decide to leave the case open to monitor the IFC's response to the findings.

146.    The CAO does not have any enforcement power. Its "powers" are limited to issuing recommendations and findings.

**F.  After Plaintiff MASS filed a complaint with the CAO, it found that the IFC failed to ensure that the Tata Mundra Project met environmental and social requirements intended to protect communities and the environment.**

147.    Plaintiff MASS advocates on behalf of traditional fishing communities along the Kutch coastline who are affected, or will be affected, by industrial development projects, including the Tata Mundra Plant. MASS's membership is made up of members of local fishing communities.

148.    MASS advocates for the rights of fishworkers through a range of activities, including advocacy before governmental bodies. For the past several years, MASS has been

working on behalf of fishing families to try to get the IFC and CGPL to address the impacts of the Tata Mundra Plant on the fishing communities and take steps to prevent further harm. MASS has done extensive research on the impacts of the Tata Mundra Project and has helped to inform and educate local fishing communities. MASS met with company officials as well as with IFC officials to raise the issues faced by the fishing communities.

149.    On June 11, 2011, MASS filed a complaint with the CAO, which deemed the complaint "eligible for assessment." The CAO visited the site three times in August and October 2011 and held meetings with MASS and other fishworkers at the site and in the vicinity of the Project, and with company representatives.

150.    The complaint was subsequently transferred to the compliance arm of the CAO for appraisal. In 2012, the Compliance Office determined that a number of issues merited further enquiry.

151.    Among the issues raised in the complaint were: failure of the IFC to identify the bunder fishing communities as "project affected people" during preparation of the Project; physical and economic displacement; impacts from coal ash and other airborne pollution on public health and fish drying; impacts on marine environment and long term decline in fish stocks due to the construction and operation of the Plant, and especially the cooling system; failure to consider the simultaneous expansion of the Mundra port and Adani Plant as an "associated development" or to consider the investment in the context of "cumulative impacts of related developments"; social impacts of increases in the cost of power beyond that which was projected; failure to consider technically and financially feasible design alternatives to minimize environmental and social impacts; and adequacy of the IFC's supervision of environmental and social aspects of the Project.

152.     The CAO focused its audit on the following questions: Whether IFC exercised due diligence in reviewing CGPL's environmental and social assessments; whether IFC gave adequate consideration to the cumulative impacts of Adani power and the construction of the Mundra West Port in its environmental and social review; whether IFC's assessment of community support for the Project was adequate; whether the Performance Standards governing resettlement was correctly applied with regard to the seasonal fishing settlements and fish drying areas; whether IFC exercised due diligence in its review of CGPL's reporting on regulatory and lender environmental and social requirements; and whether IFC has been sufficiently proactive in engaging with CGPL to remedy environmental and social issues that have been identified in project supervision.

153.     In February 2013, the CAO Audit Panel visited the site, at which point construction was not yet complete and the Plant was operating at only partial capacity—it did not begin operating at full commercial capacity until March 2013. The CAO's Audit report was finalized in August 2013 and released in October 2013. The CAO team has not visited since the Tata Mundra Plant began operating at full capacity.

154.     The CAO Audit Report found "[e]vidence that validates key aspects of the MASS complaint." In particular, the CAO found that the IFC's review of the borrower's environmental and social assessments was not commensurate with project risk and that the IFC had failed to address compliance issues during the supervision phase. Further conclusions and findings included the following:

(a)  IFC "did not meet the due diligence requirements set out in the Sustainability Policy." IFC failed to ensure that its client's environmental and social

assessments adequately considered the risks and impacts of the Project on the fishing communities, especially the Kotadi and Tragadi bunder communities;

(b) IFC "failed to assure itself" that the client's environmental and social assessments were based on "effective consultation" with directly affected fishing communities; despite the fact that fishing communities were identified in the environmental and social assessment process as "project affected community users," the IFC "did not pay adequate attention to verifying whether pre-project consultation requirements were met" in relation to them;

(c) Indications that households living on the bunders had been displaced both physically and economically by the Project;

(d) Critical shortcomings in IFC's review and supervision of the impacts of the Project on the airshed and marine environment. In particular, IFC's review of the client's marine impact assessments was not commensurate with risk;

(e) IFC did not ensure that the thermal plume from the seawater outfall would comply with the $3^{\circ}$ C criterion, which is required by the IFC EHS Guidelines. The CAO noted that "[p]rojections that the thermal plume from CGPL's outfall channel will extend a distance of kilometers into the shallow waters of the gulf and surrounding estuaries suggest inadequate mixing/cooling, with significant risk of social and ecological impact." And, "[t]hese risks are heightened by claims that the plume will intersect with components of the ecosystem which the Complainants assert are important to their livelihoods."

(f)     Cumulative non-lethal, but potentially harmful, effects of submarine noise, light, and heat and other aquatic disturbance from the Project on the local marine environment were not adequately considered in the assessment process;

(g)     IFC failed to ensure that CGPL correctly applied the Thermal Power Guidelines "to an airshed that should have been classified as degraded." If the IFC had properly classified the airshed and applied the Thermal Power Guidelines, it "would have required stricter emissions limits of the client."

(h)     IFC did not sufficiently assess the cumulative impact and environmental and social risk emerging from the Project's association with the Mundra Port and SEZ, including the Adani Plant, which "needed to be better assessed and mitigation measures developed commensurate to the client's level of influence."

155.    The IFC responded by rejecting most of the CAO's findings.

156.    In January 2015, the CAO produced a Monitoring Report—*Monitoring of IFC's Response to: CAO Audit of IFC Investment in Coastal Gujarat Power Limited, India* that addressed the IFC's response to the Audit Report. The Monitoring Report concluded that the IFC had failed to effectively respond to the findings of the Audit Report and failed to remedy the injuries to local communities, which includes Plaintiffs and other members of the Proposed Class. In particular, the CAO noted "the need for a rapid, participatory and expressly remedial approach to assessing and addressing project impacts raised by the complainants." Among its conclusions were that the IFC had failed to address the CAO's findings regarding the application of pollution control standards – specifically, with respect to degraded airsheds and thermal effluent from the outfall channel. It had also failed to address the possible displacement issues.

157.    Throughout this process, MASS has worked closely with the CAO Ombudsman and its Compliance office. Following publication of the Audit Report, MASS continued to engage in direct advocacy with the World Bank Group, calling on the World Bank Group President to take appropriate action to address the findings and remedy harms.

158.    In July 2013, MASS, along with an official of the Navinal Panchayat, among others, also filed a complaint with the Compliance Review Panel (CRP), the complaint mechanism of the Asian Development Bank (ADB), which had also invested in the Project. The ADB has nearly identical standards and policies to those of the IFC that govern its project finance activities. The CRP's investigation took place in September 2014, after the Plant had been fully functioning for approximately 16 months The CRP's report, released in April 2015, addressed similar complaints, found similar—or stronger evidence—of harms already felt by local communities, and noted future harms likely to occur if mitigative and preventive measures are not taken, consistent with findings of the CAO.

159.    To date, the IFC has failed to take sufficient steps to correct its own failings, failed to ensure that the Project complies with the IFC and CGPL's environmental and social obligations, failed to remedy or compensate for Plaintiffs' injuries and failed to take steps to prevent further future injury to Plaintiffs and the other members of the Proposed Class. There is no adequate, effective process for redress, and Plaintiffs have no available options for relief but to turn to this Court.

**G.  IFC failed to meet its obligations.**

160.    As detailed above, the IFC had a duty to prevent predicted harms and foreseeable harms, and those that it should have foreseen had it conducted the appropriate due diligence required prior to commitment.

161.    The IFC failed to conduct appropriate due diligence commensurate with the scale and risk of the project.

162.    Despite the fact that the fishing communities were identified as "project affected community resource users" at least as early as 2007, the IFC failed to ensure that these communities were actually effectively engaged in consultation and failed to verify whether the pre-project consultation requirements were met, as it was required to do.

163.    The IFC failed to ensure sufficient measures were incorporated into the loan agreement, or otherwise present at the time of approval of the loan agreement, to prevent foreseeable harms and/or mitigate those harms, despite recognizing the risk of substantial harm if such measures were not taken. This included the two-page Environmental and Social Action Plan, which was incorporated into the loan but failed to set forth effective measures to prevent foreseen harms.

164.    IFC also failed to enforce the loan provisions and conditions that were intended to protect local communities and the environment, and has failed to take remedial action to remedy those harms and ensure compliance with the loan provisions and conditions. Despite the worsening conditions IFC continued to make disbursements.

165.    Despite acknowledging that the "adequacy of the selection of the cooling system" was one of the major issues that justified classifying the Project as a Category A project, with potentially "significant adverse social and/or environmental impacts" that are "irreversible or unprecedented[,]" the IFC failed to require detailed consideration of alternative cooling system designs and options. Indeed, the Compliance Review Panel's report (evaluating the ADB, not the IFC) noted that "Comments prepared on the [Cumulative Environmental Impact Assessment] noted that adoption of a once through cooling system was unusual for a power plant of this size

40

and raised the questions whether the once through cooling system was appropriate." The Thermal Power Guidelines list "consideration of the recirculating cooling systems where thermal discharge to water bodies may be of concern" as an emission control practice that will lead to compliance with the Guidelines. The CAO found that the IFC's weak environmental and social review process "meant that required opportunities to consider alternative project designs to avoid or minimize [environmental and social] impacts were missed."

166.     Despite acknowledging "adequacy of the selection of the cooling system," the "large volume of sea water intake," and "impacts on marine environment/fishery" among the issues justifying the Category A designation, the IFC executed a loan agreement and disbursed funds without a final design for the cooling system and without a final design for the location of intake and outfall channels in place. On information and belief, the IFC also executed the loan agreement without any imposing meaningful conditions on what that design should ultimately look like, or any specifications on how potential impacts and risks should and must be identified, mitigated, and prevented once it the design was selected.

167.     Even if impacts could not be fully identified prior to finalization of the design and outfall channel location, the IFC should have ensured that a robust impact assessment would be conducted once the expected design was selected and the intended location was identified, that an appropriate design and location for the intake and outfall channels would be selected that would cause the least harm to the environment and local communities, and that adequate preventive and mitigation measures would be taken.

168.     Because the IFC knew, and should have known, that the design of the intake and outfall channels and associated mitigation plans would have a tremendous negative impact on local communities, the IFC should have ensured the design and location it approved was

41

appropriate to the nature of the risks. Instead, the IFC approved the flawed and harmful design and location of both the intake and outfall channels, and allowed construction to occur without proper assessment of impacts or adequate preventive and mitigation measures.

169.     Despite recognizing the risks posed by the cooling system and the impacts on the marine environment and fisheries, the IFC also failed to ensure that the cooling system selected would comply with the IFC requirements regarding temperature of wastewater discharged. The IFC EHS Guidelines require that the temperature of wastewater prior to discharge not exceed ambient temperature by more than 3°C at the point where the discharge water mixes with the sea. As the CAO made clear, in this case, "the EHS Guidelines have been incorporated into the IFC's legal agreement as covenanted 'Environmental and Social Requirements' and thus are binding." Yet the IFC at no point appears to have instructed the client to comply with this limit, nor provided any justification for why the client should be allowed to exceed that limit. The limit is not mentioned in the various environmental impact assessments, even though the IFC was involved in some of them.

170.     IFC negligently, recklessly, and/or intentionally allowed the client to design, construct, and operate a cooling system intended to discharge wastewater at a temperature of up to 7°C (12.6°F) above the ambient water temperature. The Plant is not in compliance with binding conditions of the contract, and the IFC is not in compliance with its own obligations to ensure that projects comply with all environmental and social conditions and to take measures necessary to obtain compliance and exercise remedies.

171.     The IFC also failed to ensure that the cooling system, and especially the design of the intake and outfall channels, would minimize salt water intrusion into the groundwater, in an area where fresh water is scarce. On information and belief, the IFC knew or should have known

that failing to properly line the channels would result in harmful salt water intrusion, failed to ensure that this was done, and acted despite knowing that it would not be done.

172.    Despite recognizing that the likely air quality impacts and need for adequate air pollution control measures justified the classification of the Project as one with potentially "significant adverse social and/or environmental impacts" that are "irreversible or unprecedented[,]" the IFC failed to ensure that coal-handling systems were sufficient to minimize and mitigate the impacts on the environment and on local communities, and failed to ensure that emissions from the Plant would not further degrade the local air quality to levels dangerous to human health and the environment.

173.    The CGPL-IFC "loan agreement requires CGPL to meet both the World Bank's Thermal Power Guidelines (1998) and the General EHS Guidelines (2007)," and, as the CAO noted, "[t]his is consistent with IFC representations to its Board that IFC would add value to this project *by requiring adherence to its own air emission 'guideline limits' and Performance Standards*, which are held out as being 'more stringent than Government of India requirements.'" (Emphasis added). The loan agreement also makes both sets of Guidelines "covenanted" requirements "without providing for exceptions." If the IFC had abided by and enforced these Guidelines, the airshed around the Plant would have been designated as "degraded," which would have triggered the no net increase requirement for particulates and $SO_2$ on large thermal power plants in degraded airsheds.

174.    The CAO found that the IFC's treatment of the airshed and air quality standards was not only "noncompliant" but also "at odds with a stated rationale for its involvement in the project as presented to the Board: namely, improved E&S performance through compliance with standards that are more stringent than national requirements." Indeed, the IFC states publicly on

its website that its involvement in this project "will result in lower emissions of air pollutants (sulfur dioxide, particulate matter) … because of the more stringent IFC guidelines than those required by [the Government of India's] standards."

175.    Because the IFC failed to properly classify the airshed, abide by the applicable environmental and social standards on air quality that it said repeatedly that it would follow, and failed to ensure that CGPL complied with the binding contractual provisions, as well as the Indian NAAQs, the Plaintiffs and Class members have been exposed to air pollution hazardous to human health, which will worsen if steps are not taken to mitigate and prevent future harm.

176.    The IFC has failed to adequately and effectively monitor the Project's impacts and supervise the client's performance to ensure it meets the environmental and social obligations contained in the contract, and has failed to exercise remedies to bring the client into compliance and to remedy harm already done to communities and the environment.

## IV.    THE IFC IS RESPONSIBLE FOR THE HARM FROM THE TATA MUNDRA PROJECT.

177.    The Tata Mundra Project would not have gone forward without IFC funding, and thus the harm to the Plaintiffs would not have occurred without IFC funding.

178.    The IFC's involvement in financing the Tata Mundra Power Plant far exceeded the scope of the conventional role of a mere lender of money. This was so in its actions prior to committing to the Project, in committing to loan the money on condition of compliance with environmental and social conditions, in disbursing the loan money, and in supervising the loan.

179.    Before committing to loan the money, the IFC was actively involved in determining the scope of the Tata Mundra Project, the conditions of the Project, and evaluating firsthand the likely impacts and harms the Plant might cause. Before agreeing to lend the money, the IFC required certain assurances, and other steps be taken, and/or made conditions of

receiving IFC funding, which were then incorporated into the loan agreement. The IFC also ensured the right to, and took on the responsibility to, monitor and supervise the implementation of those conditions. As a result of all these actions, the IFC voluntarily assumed duties and responsibilities with respect to the environmental and social effects of the Tata Mundra Project.

180.    The IFC knew or reasonably should have known that Plaintiffs and members of the Proposed Class would be harmed by the Tata Mundra Project if steps were not taken to prevent and mitigate the effects of the Plant on the environment and local communities.

181.    The Tata Mundra Plant, and especially its emissions, coal dust and fly ash; the thermal and chemical pollution discharged from the outfall channel; and the salt water intrusion into the water table has been the subject of frequent complaints from residents in the neighboring areas.

182.    Plaintiffs' real and personal property has been and continues to be physically invaded by coal dust, fly ash, and other air contaminants.

183.    The dust, ash, and other air contaminants that entered Plaintiffs' property originated from the IFC-funded Tata Mundra Plant, where they are generated as a result of an IFC-funded and IFC-approved process of generating electricity from coal.

184.    The thermal and chemical pollution of the waters where Plaintiffs and members of the Proposed Class fish, and from which they derive their living, has resulted in a decline in the fish catch and other marine resources on which they rely. This has harmed and continues to harm their livelihoods and cause economic loss, resulting in harm that is peculiar to them in their capacity as fishermen and different in kind to the harm done to the community at large.

185.    The thermal and chemical pollution originated from the IFC-funded Tata Mundra Plant, and was generated and discharged as a result of an IFC-funded and IFC-approved and/or ratified cooling system.

186.    The construction and design of the outfall and intake channels of the IFC-funded Tata Mundra Plant has caused or contributed to sea water intrusion into the groundwater table, contaminating the freshwater used for drinking and irrigation.

187.    Defendant funded a substantial portion of the construction of the Tata Mundra facilities; facilitated, promoted and/or recruited additional funding and sources of funding; exercised substantial control over the way in which the Plant facilities were designed and constructed and the preventive and mitigation measures required and actually taken; and continues to exercise substantial control over how the Plant facilities are operated and what preventive, mitigation, and remedial measures are taken.

188.    Defendant intentionally, recklessly, willfully, grossly, and negligently: provided integral funding for the Project even though it knew or had reason to know that the harms alleged would occur; failed to ensure the Tata Mundra Plant was properly constructed; failed to ensure that the Plant was properly maintained and operated; caused the invasion of Plaintiffs' property by air contaminants and other airborne pollutants on a frequent and recurring basis; caused and continues to cause the thermal and chemical pollution of the waters where certain Plaintiffs and Subclass members derive their living; caused and continues to cause salt water intrusion into the aquifer local people use for drinking water and irrigation; failed to require and/or otherwise ensure that adequate technology was installed to properly control emissions of coal combustion byproducts, thermal and chemical discharge from the outfall channel, and salt water intrusion

into the local aquifer; and failed to ensure the proper handling, transport, and storage of coal at the port facility and at the Plant.

189.     In doing what is alleged herein, the IFC acted in intentional, reckless, willful, and negligent disregard of Plaintiffs' health, property, livelihoods, and other rights.

190.     As a direct and proximate result of IFC's unlawful and tortious conduct as alleged herein, Plaintiffs and the other members of the Proposed Class have suffered and will continue to suffer harm, including property damage, harm to their livelihoods, and harm to their health.

191.     In failing to leverage its economic position over CGPL and its contractual rights to undertake adequate monitoring, ensure client compliance with environmental and social conditions, and/or otherwise terminate its financing of the Project, IFC breached its obligations under the contract, the Performance Standards, and the Sustainability policy to the direct detriment of Plaintiffs, as well as similarly situated members of the Proposed Class. As a result, the Plaintiffs have suffered damage to their property, health, livelihoods, and way of life.

192.     The conditions endured by Plaintiffs in violation of the law, the policies of the IFC, and the contract between the IFC and CGPL are the result of the IFC's failure to follow its own policies and enforce the conditions of the loan agreement, and/or the result of the IFC ignoring the requirements of its own policies and the conditions of the loan agreement. Despite knowing of the possibility of substantial harm, and having classified the Project as one posing risk of substantial harm, the IFC still failed to adequately monitor and supervise of compliance with its policies, standards, and binding contractual conditions.

193.     The IFC's conduct as alleged herein violates the laws of the District of Columbia, United States federal common law, Indian law, and the laws of any other jurisdiction that might apply.

## V.      THE IFC IS NOT IMMUNE FROM SUIT.

194.    The IFC generally enjoys the same immunity as foreign governments. However, just like foreign governments, the IFC is subject to suit for foreseeable injuries to third parties caused by its commercial activity carried out from the United States.

195.    The IFC "is focused exclusively on the private sector[,]" and in loaning money for the Tata Mundra Project, the IFC acted as a private actor in the market, not as a regulator.

196.    In loaning money for the Tata Mundra Project, the IFC engaged in substantial commercial activity in the United States, in Washington, D.C., and engaged in conduct in the United States in connection with commercial activity outside the United States.

**A. From the beginning of the Tata Mundra Project's development, evaluation and supervision of the project, and the ultimate authority over the terms under which the project could go forward occurred in IFC's Washington, D.C. headquarters.**

197.    The IFC's lending and business operations are controlled by the 25 members of the Board of Directors, who work at the IFC's headquarters in Washington, D.C. According to the IFC, the directors "meet regularly at World Bank Group headquarters in Washington, DC, where they review and decide on investment projects and provide overall strategic guidance to IFC management." Each proposed project for financing must be presented for consideration and approval by its Board of Directors and no loan can go forward to commitment and disbursement of funds without Board approval, which is determined from IFC headquarters in Washington, D.C.

198.    The IFC is a centralized organization. Management and the Board in Washington D.C. headquarters have ultimate authority over IFC's operations. Sometimes narrow authority is delegated to regional offices, but otherwise that authority remains with headquarters in Washington, D.C.

199.    The IFC made the critical decisions relevant to whether to finance the Tata

Mundra Project, and under what conditions, in Washington, D.C., including, but not limited to,

the ultimate decisions to approve the investment and sign the loan agreement. Because the Tata

Mundra project was given the highest-risk categorization (Category A), greater oversight and

control was exercised by management at IFC headquarters from the beginning, including with

respect to each subsequent disbursement of the loan, as well as throughout the monitoring and

supervision stages.

200.    At the time IFC was evaluating the Tata Mundra project as a potential IFC

project, the IFC's Environmental and Social Development Department (CES[3]) (later renamed the

Environmental, Social, and Governance Department), was the key department involved from the

start in scoping, evaluating, and preparing potential projects. The Investment Support Group of

CES (CESIG or later known as CESI) is "responsible for the [environmental and social] due

diligence for IFC's investments."[4] CESIG/CESI Managers are responsible for approving key

project decisions about environmental and social (E&S) performance throughout the project

cycle.

201.    CES is located at the IFC's headquarters in Washington, D.C. The Director of

CES is also located at IFC's headquarters in Washington, D.C. CES staff participate in both the

environmental and social due diligence during project development and in monitoring and

supervising the E&S performance of IFC projects after Board approval, from their offices at IFC

headquarters in Washington, D.C.  The CESIG/CESI Manager for the Tata Mundra project was

based at the IFC's headquarters in Washington, D.C.

---

[3] The acronyms used in this section are those used by IFC when describing its internal policies.
[4] ECF No. 22-5 at 197.

202.     The IFC's environmental and social analysis and decision-making throughout the entire project cycle for every project is recorded in the Environmental and Social Review Document (ESRD).[5] The various project documents are saved in the IFC's internal database.[6] On information and belief, this internal database is centrally administered from the IFC's headquarters in Washington, D.C.

203.     In 2007, when the Project was in development, the IFC was piloting a strategy to decentralize some decision-making in Asia, whereby more project authority would be gradually delegated to regional offices. However, such delegation of authority explicitly excluded high-risk projects, such as this one. IFC headquarters in Washington, D.C., retained project authority with respect to Category A projects, such as the Tata Mundra Power Plant.[7] For these high-risk projects, the E&S staff based in Washington, D.C., worked with the specific industry department (i.e. the Agribusiness Department, Global Manufacturing and Services Department, Infrastructure Department, etc.) leading the project to perform E&S due diligence.

204.     The work to evaluate and prepare a potential loan for review by the Board is primarily done out of the Washington, D.C., headquarters of the IFC, and this was the case for this project.

205.     During early review of high social and environmental risk and controversial projects such as the Tata Mundra Project, a Corporate Investment Committee meets in Washington, D.C., to discuss the project's issues and decide whether it will go forward to the appraisal portion of the project cycle. The Corporate Investment Committee is made up of high-level Washington, D.C.-based management including the vice-presidents of various departments

---

[5] ECF No. 22-5 at 198.
[6] ECF No. 22-5 at 199.
[7] ECF No. 22-5 at 207-208.

as well as IFC's CEO. IFC E&S staff working on the early review of the project also attend the meeting to answer the Committee's questions.[8] The CESIG/CESI Manager and Director of CES are briefed on the environmental and social issues raised in the meeting in order to understand the risks involved in the project and the CES resources that will need to be dedicated to the project.[9] The CESIG/CESI Manager and Director of CES are both based in Washington, D.C. On information and belief, the Corporate Investment Committee met in Washington, D.C., to approve the Tata Mundra Project for appraisal despite its high-risk nature.

206.    If the Corporate Investment Committee authorizes the project to go forward despite its risks, IFC E&S staff have the responsibility to review the project information, identify existing E&S gaps, and ensure that the Environmental and Social Action Plan, Broad Community Support (BCS), and risk categorization of the project (i.e. whether it is a Category A project, like the Tata Mundra Project) are all sufficient.[10]

207.    Sometimes IFC E&S staff conduct site visits as a part of project appraisal. Appraisal findings are recorded in a "Back to Office report" and circulated to the project team members including the CESIG/CESI Manager[11] in D.C. IFC conducted an appraisal mission of CGPL in October 2007.

208.    "[W]here projects have or may have, significant adverse S&E impacts that are diverse, irreversible, or unprecedented, and that can be only partially addressed through mitigation measures," the IFC E&S Staff will hold Peer Review Meetings. Peer Review Meetings are chaired by a CESIG/CESI Manager in IFC's Washington, D.C., headquarters.[12]

---

[8] ECF No. 22-5 at 213.
[9] ECF No. 22-5 at 213.
[10] ECF No. 22-5 at 216.
[11] ECF No. 22-5 at 217.
[12] ECF No. 22-5 at 208.

The Investment Officers, Industry Engineers, and CES specialists all attend the Peer Review Meeting and the Director of CES is notified of the Peer Review Meeting.[13] The purpose of these meetings is to resolve issues presented by difficult projects.[14] On information and belief, a Peer Review Meeting was held in Washington, D.C., for the Tata Mundra Project to discuss its high-risk nature.

209.     Additionally, before the proposed project can go to the Board for a vote, an Investment Review Meeting (IRM) is held where IFC upper management approve the project. The meeting includes the responsible industry Director (in this case the Infrastructure Department), the investment team, as well as members of the legal department and E&S, among others, all of which are typically based in Washington, D.C. The "issues, risks, and impacts along with their mitigation measures" of the project are discussed at the IRM,[15] which takes place in IFC's headquarters in Washington, D.C.

210.     The highest levels of IFC management are involved in this decision to approve the project. Lars Thunell, the CEO of IFC at the time, was personally involved in approving the Tata Mundra project. In this position at IFC, he was based in Washington, D.C.

211.     IFC upper management in Washington are also directly involved in determining whether there is Broad Community Support (BCS) for the project. The Director of CES is also responsible for "providing clearance to confirm that BCS has been achieved."[16] The adequacy of the BCS is subsequently checked and confirmed by the Director of the responsible industry

---

[13] ECF No. 22-5 at 231.
[14] ECF No. 22-5 at 231.
[15] ECF No. 22-5 at 221.
[16] ECF No. 22-5 at 223.

department – in this case the Director of the Infrastructure Department – at the IRM[17] in Washington, D.C.

212.     Additionally, before a Category A project like Tata Mundra is submitted to the Board for consideration, IFC E&S staff prepare the Environmental and Social Clearance Memorandum which is approved by the CESIG/CESI Manager.[18] As stated above, the CESIG/CESI Manager for the Tata Mundra Project is based in D.C. The memorandum must include the information about Broad Community Support decisions.[19]

213.     On information and belief, an Investment Review Meeting was held in Washington, D.C., to approve the Tata Mundra investment prior to Board approval, despite knowledge of the high risk of harm, and insufficient due diligence, community support, and mitigation measures in place.

214.     Complaints about social or environmental issues at this stage are brought to the attention of the CESIG/CESI Manager, as well as the Corporate Relations Department,[20] which is also based in IFC's headquarters in Washington, D.C.

215.     After the IFC's involvement in the potential project is publicly disclosed, the Board then votes in Washington, D.C., on whether to approve financing of the project. This happened for the Tata Mundra Project in April 2008.

**B.   Despite knowing that a project of this nature would cause damage if not properly designed and operated, IFC still made the decision to finance the project based on information that IFC knew or should have known was incorrect and/or insufficient to understand what mitigation measures needed to be put in place to prevent harm to the Plaintiffs and others similarly situated.**

---

[17] ECF No. 22-5 at 223.
[18] ECF No. 22-5 at 236.
[19] ECF No. 22-5 at 236.
[20] ECF No. 22-5 at 235.

216.    As already noted, the Tata Mundra Project was designated as a Category A project, meaning it would have "social and/or environmental impacts that are diverse, irreversible, or unprecedented." Despite knowing the Project was a high-risk project and identifying significant specific harms likely to result from the project were expected to result in significant adverse social and/or environmental harms, the IFC provided keystone funding to enable the project to go forward.

217.    IFC acknowledges that it often deals with projects that may have "significant adverse S&E impacts that are diverse, irreversible, or unprecedented, and *that can be only partially addressed through mitigation measures*." The Tata Mundra Project was such a project. Thus, the IFC financed the project knowing, from the outset, that mitigation measures could not fully prevent the project's adverse impacts.

218.    At the time the loan was approved, the IFC set out its mitigation measures for this expansive, high-risk project in a two page Environmental and Social Action Plan (ESAP). The short and vague Plan did not adequately address the myriad of identified risks of harm presented by the Tata Mundra Project and was written in terms that made it difficult to monitor compliance. Without meaningful plans to mitigate and/or prevent the identified harms, IFC upper management and the Board, based in Washington, D.C., nonetheless moved forward with approving the project.

219.    Despite the lack of a meaningful ESAP or other plans to mitigate the harms presented by the plant, at all times, the IFC retained its power to make changes within the project and enforce compliance with IFC's Performance Standards and other World Bank guidelines written into the Loan Agreement and prevent and/or mitigate harm to the Plaintiffs.

220.     Additionally, knowing the high risk of harm associated with this project, the IFC did poor due diligence prior to approving the project, meaning that the IFC was without sufficient information to develop effective mitigation strategies.

221.     IFC approved the loan despite lacking baseline data in a variety of areas impacted by the project. Without baseline data, the IFC could not ensure that it would be mitigating harm to those impacted by the project. Useful baseline data cannot be replicated after a project has begun construction and operation.

222.     For example, despite the fact that the Project's impacts on the livelihood of fisherfolk had been raised when the project was first being developed, the reports contain no baseline data on those fisherfolk who reside seasonally on the Tragadi and Kotadi bunders. On this point, the CAO later noted that the "IFC has engaged with this project based on the understanding that it will have no or negligible negative impact on the communities living seasonally on the bunders" and further "[n]ot[ed] the absence of a baseline study or impact assessment that pays detailed attention to the circumstances of these communities."[21]

223.     IFC also declared that the local community was supportive of the project and confirmed Broad Community Support for the Project before approval of the loan by the Board, as required by IFC policy. However, consultations with communities occurred before the final decisions for the design of the cooling system were made, and therefore, the fishing communities whose livelihoods would be permanently impacted by the operation of the Project were simply ignored.[22]

224.     Despite knowing that these fishing communities had concerns about the projects and were a vulnerable population, and knowing that the project could affect their health and

---

[21] ECF No. 40-19 at 39.
[22] ECF No. 40-19 at 38-40.

livelihoods in irreversible ways, IFC still failed to collect the most basic data required for meaningful due diligence, declared there was Broad Community Support, and approved the loan.[23]

225.     IFC's due diligence prior to approval of the loan was deficient in other ways as well. The Rapid Marine Environmental Impact Assessment – the study done prior to approval of the loan – was flawed in several important aspects including failing to consider the full impacts of the power plant on marine life near the project. IFC staff who reviewed the impact assessment had no specific expertise in marine science.[24] The IFC again failed to request any detailed baseline data about the marine environment in the project-affected area to be able to understand the Project's impact on the marine ecosystem.[25]

**C.  After Board approval of the Tata Mundra Project, IFC's monitoring and supervision of the Project's environmental and social performance and the decision to continue to disburse the loan despite worsening performance occurred in IFC's Washington, D.C., headquarters.**

226.     After the IFC commits to a project, IFC monitors and supervises the project and the client's compliance with the Loan Agreement and IFC E&S policies. IFC management in Washington has ultimate responsibility for this monitoring and supervision of projects like the Tata Mundra project. This includes deciding what to do when monitoring and supervision reveals that the project is out of compliance with IFC policies or other conditions in the Loan Agreement and is harming or will harm communities.

227.     Under the terms of the CGPL Loan Agreement, "[a]ny notice, demand, request or other communication to be given or made under" the Loan Agreement, must be delivered to IFC at its Washington, D.C., headquarters, and made to the attention of "Director, Infrastructure

---

[23] ECF No. 40-19 at 19-20.
[24] ECF No. 40-19 at 26-27.
[25] ECF No. 40-19 at 30.

Department," as well as to the "Director, Department of Financial Operations," both of whom work out of IFC headquarters.[26]

228.    The Director of the Infrastructure Department when IFC committed to the project was Rashad Kaldany. In this position, he was based in IFC's Washington, D.C., headquarters.

229.    Although *copies* of communications must also be sent to the IFC's New Delhi office, the Loan Agreement is explicit that this in no way removes the primary obligation to send the communications directly to IFC's Washington, D.C., headquarters.[27] This is because the Tata Mundra project was a Category A project and, due to its high risk classification, authority over the project was retained in Washington, D.C.

230.    Under the Loan Agreement, CGPL is required to send a significant amount of information – information that allows IFC to conduct its environmental and social due diligence and monitoring – to IFC headquarters in Washington, D.C., at regular intervals, and in particular, prior to each disbursement of the loan tranches for review of whether conditions for disbursement are met.

231.    The Loan Agreement lays out specific conditions of disbursement. As conditions of first disbursement, CGPL was required to provide to IFC in Washington:

      (a) The Construction Schedule, Construction Plan, Construction Budget, and other related documents;[28]

      (b) The Social Management Plan, Environmental Management Plan, and Resettlement Plan;[29]

---

[26] ECF No. 40-4 at 159-160 (Common Terms Schedule at 8.2(a)).
[27] ECF No. 40-4 at 159-161 (Common Terms Schedule at 8.2(a)).
[28] ECF No. 40-4 at 106-107 (Common Terms Schedule at 4.1(b)).
[29] ECF No. 40-4 at 108 (Common Terms Schedule at 4.1(i)).

(c) Certifications regarding the Title and Land Use Rights of the project site and project assets;[30]

(d) "[E]vidence . . . that the Borrower has made adequate arrangements for the supply of water required for the Project;"[31]

(e) Reports from the Independent Engineer on topics requested by IFC including, for example, "the coal supply and transportation plans (including the design for receiving coal from the port), the appropriateness of the technology/ configuration for the Project . . . and the basic design and design criteria for the Project" and "the design specifications and milestones, the performance tests and completion undertakings and the performance guarantees for the Project;"[32]

(f) "[E]vidence" of the competency of its contractors.[33]

232.    All of these documents, which are sent to headquarters in Washington, D.C., must be "in form and substance satisfactory" to the IFC.[34]

233.    As conditions of all subsequent disbursements, CGPL was require to provide and send to the IFC's headquarters in Washington, D.C.:

(a) Construction Progress Report "indicating that: . . . construction of the Project is proceeding in accordance with the Construction Schedule, the Construction Plan and the Construction Budget," or if not, CGPL was required to give an explanation "with supporting evidence that the variances could not reasonably be expected to have a Material Adverse Effect."[35]

---

[30] ECF No. 40-4 at 111 (Common Terms Schedule at 4.1(q)).
[31] ECF No. 40-4 at 112 (Common Terms Schedule at 4.1(t)).
[32] ECF No. 40-4 at 112 (Common Terms Schedule at 4.1(u)).
[33] ECF No. 40-4 at 113 (Common Terms Schedule at 4.1(w)).
[34] ECF No. 40-4 at 106-113 (Common Terms Schedule at 4.1).
[35] ECF No. 40-4 at 116 (Common Terms Schedule at 4.2(g)(i)(A)).

(b) The Independent Engineer's Certificate "in form and substance satisfactory to" IFC, that that the Construction Progress Report is true and the project is moving along on schedule.[36]

(c) Certification, "in form and substance satisfactory to" IFC, that CGPL and its employees, agents, contractors, and subcontractors are in compliance with the Environmental and Social Requirements and the Environmental Management Plan.[37]

234.   The adequacy the information and documents CGPL was required to submit as a condition of disbursement was determined by environmental and social staff in Washington, D.C. "Waivers" of any of the social and environmental conditions, as well as any new conditions negotiated and agreed with the client, needed to be documented in the ESRD and "cleared" by the CESIG/CESI Manager.[38] As stated above, the CESIG/CES Manager for the Tata Mundra Project was located in Washington, D.C.

235.   On information and belief, the decision whether to disburse each tranche of the loan was made by the IFC in Washington, D.C. In addition to the fact that E&S staff in D.C. review the documentation sent to IFC in Washington to ensure that the conditions of disbursement are fulfilled, the Loan Agreement specifies that disbursements are made only upon request by CGPL and that disbursement request is "deliver[ed] to IFC."[39] CGPL's Requests for Disbursement must be sent to IFC's Washington, D.C., headquarters, to the Director of the Infrastructure Department and copied to a Manager in the Financial Operations Unit.[40] This

---

[36] ECF No. 40-4 at 117 (Common Terms Schedule at 4.2(h)).
[37] ECF No. 40-4 at 118-119 (Common Terms Schedule at 4.2(q)).
[38] ECF No. 22-5 at 246.
[39] ECF No. 40-4 at 15 (Loan Agreement at 3.02).
[40] ECF No. 40-4 at 206, 210 (Schedule 2).

Manager is also located in Washington, D.C. The fax number given in the Loan Agreement as the contact point for the Financial Operations Unit is a D.C. number.[41] CGPL's acknowledgement that it received the loan disbursement is subject to the same delivery requirements.[42]

236.     Determinations about whether any of the environmental and social (or other) conditions of the Loan Agreement have been breached, and whether the IFC should enforce the E&S commitments in the Loan Agreement, were made by the IFC's legal department, which is based in Washington, D.C.

237.     The loan disbursements to CGPL were made in U.S. dollars,[43] and on information and belief came from funds held within the United States. All payments made to the IFC under the Loan Agreement go to IFC's bank of choice in New York and are made in U.S. dollars.[44]

238.     Throughout the construction of the project, CGPL was required to send IFC in Washington, D.C., a Monthly Construction Progress Report.[45] In addition, CGPL was required to send IFC a Revised Construction, Plan, and Budget as well as an Operations Report on a quarterly basis.[46] As stated above, these reports – as with all communications and documentation CGPL is required to send under the Loan Agreement – must be sent to the Director of the Infrastructure Department stationed at the IFC's headquarters in Washington, D.C.

239.     As noted above, the plant's design was not final when the loan was approved. At least in part because this was a Category A project, IFC approved the construction design in Washington, D.C.

---

[41] ECF No. 40-4 at 160 (Common Terms Schedule at 8.2(a)).
[42] ECF No. 40-4 at 211 (Schedule 3).
[43] ECF No. 40-4 at 12.
[44] ECF No. 40-4 at 21 (Loan Agreement at 3.09).
[45] ECF No. 40-4 at 145 (Common Terms Scheudle at 5.5(c)(i)).
[46] ECF No. 40-4 at 144-145 (Common Terms Schedule at 5.5(b)(ii) and (iii)).

240.     CGPL was also required to send Annual and Quarterly Environmental and Social Monitoring Reports to IFC management in Washington, D.C. The Annual and Quarterly Reports include, among other things, details on "any material adverse impact relating to any environmental or social matter . . . any material written communication with any Authority relating to any environmental or social matter . . . [or] any Environmental or Social Claim."[47]

241.     On information and belief, this documentation included reports of CGPL's encounters with the Indian government over its failure to comply with Indian law limits on pollution. Over the years the Project has been in operation, the Gujarat Pollution Control Board has issued many show cause notices to CGPL for breaching air and water pollution limits.

242.     IFC policy also requires clients, including CGPL, to submit Annual Monitoring Reports (AMRs) for review. These Reports were reviewed in Washington, D.C.

243.     IFC E&S staff are charged with reviewing the Annual Monitoring Reports. Upon receiving and reviewing the Annual Monitoring Report, IFC staff update the Environmental and Social Risk Rating (ESRR).[48] This rating system is used to calculate the social and environmental risk of a project and is used to identify project non-compliance with the client's E&S commitments.[49] The ESRR score is recorded in the ESRD.[50]

244.     The CAO specifically found in this case that problems were flagged in the AMRs. The AMRs "submitted by CGPL to IFC" in 2009, 2010, 2011, and 2012 noted that air pollution levels "have consistently been above national and IFC standards, again indicating that the project airshed should be considered degraded according to the Thermal Power Guidelines (1998)."[51]

---

[47] ECF No. 40-4 at 146 (Common Terms Schedule at 5.5(v)).
[48] ECF No. 40-4 at 247-248.
[49] ECF No. 22-5 at 149.
[50] ECF No. 40-4 at 247-248.
[51] ECF No. 40-19 at 34.

245.     Additionally, the Finance Department, based in Washington, D.C., writes quarterly reports to upper management on the status of investments, which include information on clients' environmental and social compliance. On information and belief, the Finance Department included the Tata Mundra Project in its quarterly reports.

246.     If a client fails to implement their Environmental and Social Action Plans or E&S commitments in their Loan Agreement, the E&S staff refer the project to the CESIG/CESI Manager and the Investment Department in Washington, D.C. Additionally, E&S staff report problematic projects to the Director of CES, based in Washington, D.C., who would then bring those issues to other members of management to decide the course of action.

247.     IFC's Management Team is made up of IFC's Executive Vice President and CEO, Vice Presidents, and General Counsel and is in charge of IFC's "decision-making and strategic planning, including close oversight of investment decisions." In 2009, the Management Team created the Corporate Risk Committee based in IFC's Washington, D.C., headquarters. CES is required to send the Committee "quarterly reports on environmental and social performance and risks associated with IFC operations." This system was a "risk-based supervision program" whereby these reports highlight the poorly performing projects. The CES Quality Assurance team was responsible for this quarterly reporting to the Corporate Risk Committee.

248.     Additionally, the Board of Directors – based in Washington, D.C. and with the ultimate authority over IFC's actions – were kept informed "at regular intervals" of performance and the client's compliance with their contractual obligations.

249.     The person within the IFC with authority to decide what actions to take with respect to controversial projects causing environmental and social harms is the Vice President of

Operations, based in Washington, D.C. Decisions to pull out of a project, however, must be made by the Investment Committee – made up of the same members of upper management who attend the Investment Review Meeting – in Washington, D.C.

250.    The IFC maintains centralized control and supervision over projects, like the Tata Mundra Project, which are known to be high-risk and likely to cause harm to local communities. Regular reports of the environmental and social performance of these high-risk projects are reviewed by upper management based in Washington, D.C., who have the authority to take corrective action. In the case of the Tata Mundra Project, senior IFC management in Washington was well aware of the environmental and social problems with the Project before these problems were raised at the CAO, and they were in charge of deciding how (or whether) to act in response to those problems. Nonetheless, they decided on a course of action that caused harm to the Plaintiffs.

**D. In addition to the normal monitoring and supervising activities, high-level IFC staff based in Washington, D.C., scrutinized and exercised control over the Tata Mundra Project because of the CAO process that was began early in the Project.**

251.    The IFC's responses to allegations of harm caused by the Project – including the injuries alleged herein – and to the findings of the CAO, were decided, directed and/or approved from the headquarters in Washington, D.C. IFC's responses to the allegations include more than just its responses *to* the CAO and to the CAO Audit Report. IFC headquarters also decided, directed and/or approved IFC's failure to act to ameliorate or avoid the harms being suffered near the plant.

252.    As soon as a complaint is lodged with the CAO, the IFC's legal department, which is based in Washington, D.C., is closely involved in IFC's response at all stages of the

CAO process, as well as other senior management. On information and belief, this happened

with respect to the Tata Mundra Project and associated CAO complaint.

253.     The CAO is the IFC's primary compliance mechanism, and it is entirely based in

Washington, D.C., where all its staff are located.

254.     The Loan Agreement explicitly incorporates the CAO and defines the CAO's role

as "(i) to respond complaints by persons who have been or are likely to be directly affected by

the social or environmental impacts of IFC projects; and (ii) to oversee audits of IFC's social and

environmental performance, particularly in relation to sensitive projects, and to ensure

compliance with IFC's social and environmental policies, guidelines, procedures and systems."[52]

255.     The very purpose of CAO is to "[a]ddress the concerns of individuals or

communities affected by [IFC] projects," and "[e]nhance the social and environmental outcomes

of [IFC] projects."

256.     According to IFC policy, if during the supervision phase of a project, a complaint

is filed and accepted by the CAO, IFC E&S staff must report to upper management, including

the Director of CES and the CESIG/CESI Manager.[53] As stated above, the Director of CES and

the CESIG/CESI Manager are both located in Washington, D.C. The E&S staff are required

under IFC policy to "cooperate" with the CAO and work on IFC's response to the CAO's

findings.[54] The CESIG/CES Manager is responsible for "[r]eviewing CES input for responses to

CAO investigations" and submitting comments.[55] The response is cleared by the Director of

CES. Responses also must be cleared by IFC's Vice President of Operations. As stated above,

these positions are based in Washington, D.C.

---

[52] ECF No. 40-4 at 9-10.
[53] ECF No. 22-5 at 249.
[54] ECF No. 22-5 at 249-250.
[55] ECF No. 22-5 at 251.

257.    Additionally, projects which have a poor Environmental and Social Risk Rating, or "have attracted negative . . . attention" by civil society or other members of the public, or have an open CAO case – all criteria which the Tata Mundra Project met – are placed on a "High Risk List" by CES and are required to undergo stricter scrutiny on a more regular basis ("quarterly at a minimum"). The CES Quality Assurance Team is responsible for preparing quarterly reports for review by senior management in Washington, D.C., about projects on the High Risk List.

258.    Plaintiff MASS submitted its first complaint to the CAO in June 2011. The CAO deemed it eligible for assessment that same month.

259.    The CAO's acceptance of the complaint put IFC senior management in Washington, D.C. directly on notice of the Plaintiffs' claims and gave them ample opportunity to correct the harmful aspects of the Project. IFC senior management decided to ignore the claims of harm caused by the project despite their ability to take actions to mitigate damage to the Plaintiffs.

260.    The IFC provided written responses to the CAO. Those written responses reflect the inadequate institutional response to the problems that was the result of decisions and failures to act by IFC management in D.C. On information and belief, the responses to the CAO were approved by IFC's Vice President of Operations and IFC's CEO as well.

261.    The IFC's one-paragraph Response to the CAO's Assessment Report in February 2012 was signed by the Director, Asia and Pacific Infrastructure and Natural Resources, based in India.[56]

---

[56] ECF No. 40-16.

262.     The IFC's Response to the CAO Audit in September 2013, was signed by IFC's William Bulmer, Director of CES, based in IFC's headquarters in Washington, D.C., as well as the Director, Asia and Pacific Infrastructure and Natural Resources, based in India.[57]

263.     Jin-Yong Cai, then the Executive Vice President and CEO of IFC, issued the IFC's statement and action plan in November 2013.[58] Jin-Yong Cai was based in IFC's headquarters in Washington, D.C., until he left the IFC.

264.     IFC's response to the CAO's Monitoring Report in January 2015 was issued by the Director of Global Infrastructure & Natural Resources, Bernie Sheahan, and the Director, Transactional Risk Solutions, Morgan Landy.[59] Both positions were based at IFC's headquarters in Washington, D.C.

265.     While two of the IFC's responses were signed by IFC employees located in regional offices, this does not mean that that those people formulated IFC's response to the CAO alone. Upper management in Washington, D.C., including the Vice President of Operations and staff in the IFC's CEO's office, were involved in formulating the response and ultimately had the authority to clear the response to the CAO.

266.     While the CAO investigations were progressing, Plaintiff MASS was also in direct contact with IFC management including the President of the World Bank Group (along with his Chief of Staff), the Executive Vice President and CEO of the IFC, the Director of CES, and the Director of CES Communications, all based in Washington, D.C.

267.     Throughout the years of the CAO process, representatives of Plaintiff MASS interacted with CAO staff based in Washington, D.C. While at points, the CAO has conducted

---

[57] ECF No. 40-20 at 12.
[58] ECF No. 40-21 at 2.
[59] ECF No. 40-23 at 2.

visits to the project site, most of their work has been done from desk research in Washington, D.C.

268.    Many civil society organizations were also urging IFC to address the issues with this project; they met directly with IFC staff in Washington, D.C., particularly the Corporate Relations Department as well as the Vice President for the Asia Pacific and the Director of CES. Additionally, civil society met with IFC Board members directly to discuss the harm caused by the project.

269.    Civil society organizations who regularly work with the IFC to improve its policies and environmental and social responses are based in D.C. precisely because Washington, D.C., is where the IFC has the authority to compel change in project environmental and social performance.

270.    Liability for the IFC's role in the Tata Mundra Project is consistent with and supports the IFC's mission and purpose. Given that the IFC's internal ombudsman has concluded that the IFC abjectly failed to meet its own standards, the IFC's goals of reducing poverty while doing no harm to local people are best met by allowing redress for those injured.

271.    As described above, the IFC included numerous provisions and requirements intended to protect local people and the environment in its loan agreement for the Tata Mundra Project.

272.    Although the CAO found that the IFC had breached numerous obligations and duties with respect to the Tata Mundra Project, the CAO has no remedial power and no authority to enforce its findings or compel the IFC to act. As the CAO stated in the Audit Report: "CAO is neither a court of appeal nor a legal enforcement mechanism, nor is CAO a substitute for international court systems or court systems in host countries." Since the IFC has rejected the

CAO's findings in this case, the CAO can only "keep the audit open and monitor the situation until actions taken by IFC[ ] assure CAO that the IFC[ ] will move back into compliance. CAO will then close the audit." The CAO expressly warns that "[i]t is important that complainants should have realistic expectations about what the CAO can deliver in response to a complaint" and suggests that "organizations which support complainants explain fully … the limits on such action."

273.     The IFC's "mission is to fight poverty," and the IFC believes that "sound economic growth, grounded in sustainable private investment, is crucial to poverty reduction." "Central to IFC's development mission are its efforts to carry out investment and advisory activities with the intent to 'do no harm' to people and the environment[.]"

274.     As part of its mission, the IFC commits "to ensuring that the costs of economic development do not fall disproportionately on those who are poor or vulnerable, that the environment is not degraded in the process, and that renewable natural resources are managed sustainably."

275.     The IFC's former CEO and Executive Vice President Jin-Yong Cai has explained that "environmental, social, governance, and political risks . . . are equal to financial or credit risks in their potential to impede our development mission."

276.     Former CEO Cai has also explained that, "[t]o meet the goals of ending poverty and boosting shared prosperity, [the IFC] must safeguard the environmental and social interests of all people who could be affected by our projects."

277.     Under the IFC's own policy and procedures, in order to be able to loan money to development projects in pursuit of its development mission, the IFC must ensure there is broad community support for the project. If potentially affected communities object to a project and

refuse to consent to it, the IFC cannot go forward with the project. Generally, obtaining

community support requires consultations where risks are discussed, and promises are made

about how the harms will be prevented, mitigated and compensated.

278.    Obtaining community support requires that communities have reason to trust that

the IFC will follow through with promises and representations made, and that if the promises and

representations the communities relied upon are broken, that there will be some meaningful

avenue for redress. Community support is less likely if the community does not trust the IFC and

if community members do not have any recourse if the IFC does not live up to its environmental

and social obligations.

279.    The United States government is the IFC's single largest shareholder. The United

States has the largest voting power (22% of total voting power) among IFC's member countries

on its Board of Directors. The United States share of voting power is three times the share of

Japan, the member with the second largest voting power.

280.    In 2014, the U.S. Congress, in section 7029(e) of the 2014 Consolidated

Appropriations Act, directed the Secretary of the Treasury to instruct the US executive director

of each international financial institution "to seek to ensure that each such institution responds to

the findings and recommendations of its accountability mechanisms by providing just

compensation or other appropriate redress to individuals and communities that suffer violations

of human rights, including forced displacement, resulting from any loan, grant, strategy or policy

of such institution."

281.    Section 7029(a) of the 2014 Consolidated Appropriations Act notes the goals and

purposes of international financial institutions, including the IFC, and further provides that none

of the funds appropriated under the Act "should be made as payment to any international

financial institution unless the Secretary of the Treasury certifies … that such institution has a policy and practice of requiring independent, outside evaluations of each project and program loan or grant … and the impact of such loan, grant, or activity on achieving the institution's goals, including reducing poverty and promoting equitable economic growth, consistent with effective safeguards."

## VI.   EACH PLAINTIFF HAS BEEN HARMED BY THE TATA MUNDRA PROJECT.

Plaintiff Budha Ismail Jam

282.   Plaintiff Budha Ismail Jam is 56 years old. He is a patel (leader) of Tragadi bunder and the Vice President of MASS.

283.   Mr. Budha Jam has been fishing on Tragadi bunder for 17 years.  He and his family catch, process and sell fish. This supports Mr. Jam, his wife, five sons, five daughters-in-law and 10 grandchildren.

284.   Since 2011, when the Plant started operating, Mr. Budha Jam's fish catch has drastically declined, especially in the last three years. This year has been the worst so far. Before 2011, Mr. Jam and his family used to catch large shrimp and tiger prawns; now they only catch small shrimp and no tiger prawns. They also used to catch pomfret and other more valuable fish, but now only catch fish that are worth less.

285.   In addition to catching and selling fish, Mr. Budha Jam used to earn income for his family by purchasing fish from other local fisherman on the bunder and selling that fish. But because of the decline in the fish catch, he does not buy and sell fish anymore; he and his family only catch and sell.

286.   Mr. Budha Jam and his family used to fish by wading out from the beach as well as by boat, but they cannot fish by foot anymore, because there are no worthwhile fish to catch

close to the Tragadi bunder shore anymore. They used to fish in boats about 3-4 km off the coast. Now they must travel about 8km off the coast.

287.    The declining fish catch may force Mr. Budha Jam and his family to move next year to a different bunder that is further away. Eventually, all 70 families on the bunder may have to leave and fish somewhere else. Mr. Budha Jam is afraid that might cause tension with the residents of other bunders.

288.    Mr. Budha Jam can see steam coming off the outfall channel in the mornings and at night. It never feels like winter on the bunder anymore since hot water started flowing from the outfall; it is always warm.

289.     Mr. Budha Jam's grandchildren recently have had skin problems on their legs from playing in the water near the outfall discharge. That did not happen before the Tata Mundra Plant came in. People on the bunder did not have much illness before.

290.    Before the fish catch crashed, Mr. Budha Jam and his family used to earn approximately 500,000 rupees/year (5 lakh or nearly $8,000 dollars). Now, he and the other 21 members of his family earn about 150,000 rupees/year or approximately $2,400 dollars/year.

291.    Mr. Budha Jam does not know how he could support his family other than by fishing.

292.    The drinking well at Tragadi bunder is now too salty to drink. Mr. Budha Jam has to rely on the water the company brings them. But it is never enough. It is only around 5,000 litres/day for 70 families. This creates tension between families.

293.    Because of the construction of the outfall channel, there is less land at the bunder and less space for the residents and their fish processing activity.

294.     Mr. Budha Jam and his family practice dry fishing. The fish he catches are laid out to dry on bamboo racks before being processed. At some points in the year, ash and/or dust lands on the fish and contaminates it.

295.     The increased distance to the bunder since the Plant was built makes it more expensive to get there and it takes more time. Mr. Budha Jam and his family have not been compensated by CGPL or Defendant these costs.

Plaintiff Kashubhai Abhrambhai Manjalia

296.     Plaintiff Manjalia is 40 years old. He has been coming to Tragadi bunder to fish for about 20 years, and comes for approximately 8 months each year. Mr. Manjalia works with his son catching fish and selling it.

297.     Before three or four years ago, the fish catch was good. But the last three years, the fish catch has been declining. Mr. Manjalia's own personal fish catch has declined approximately fifty percent, and each year has been worse than the last.

298.     Although certain fish fetch a higher price now than they used to, that does not offset the decline in the fish catch. Before three years ago, Mr. Manjalia used to make 2-3 lakh rupees (about $3,200 to $4,800) during the fishing season, but now makes only 1-1.5 lakh (about $1,600 to $2,400).

299.     Mr. Manjalia does not believe he can move to another bunder that is further away from the Plant next year. Despite the declining fish catch, he expects to return to Tragadi bunder, because other bunders that have not yet been affected do not have space for new families.

300.     Mr. Manjalia has to pay more in transportation costs now. The road to the bunder is now substantially longer due to the construction of the Plant and the outfall channel. It now costs more than twice as much to reach the bunder.

301.     Mr. Manjalia and his family practice dry fishing, so the fish are laid out to dry on racks before being processed. Ash and/or dust sometimes falls on the fish, contaminating it.

302.     The increased ship traffic near the Plant is also a problem. He cannot fish close to the area anymore. His fishing nets have been cut by ships twice and he has lost two anchors because of the ship. As a result of that damage alone, Mr. Manjalia lost almost 1 lakh rupees (about $1,600).

Plaintiff Sidik Kasam Jam

303.     Mr. Sidik Jam has been coming to fish at new Kotadi bunder for about the last seven years. Before that, he sometimes fished at the old Kotadi bunder, and sometimes at Tragadi bunder. He stopped fishing at old Kotadi bunder and started fishing at new Kotadi bunder when construction of the intake channel began and everyone was forced to leave old Kotadi bunder. He has been fishing at new and old Kotadi bunders for 17 years.

304.     Mr. Sidik Jam is a member of MASS. He supports himself and his family by fishing, usually by going out to sea from Kotadi bunder and selling what he catches.

305.     The fish catch has declined significantly off of Kotadi bunder. It began declining in about 2011 and is much worse this fishing season than last.

306.     Fishermen at Kotadi bunder used to catch lobster, tiger prawns, Indian salmon, and gol as well as Bombay duck. Now, they only rarely catch any lobster, tiger prawn or gol.

307.     Before the catch began to decline, Mr. Sidik Jam used to catch about 1600 kg of Bombay duck each year. Now, he catches more like 800 kg. Before the fish catch started declining, Mr. Jam would catch lobster, golden anchovy, Indian salmon, pomfret and tiger prawns. Now, he rarely catches any of these things, and instead only catches Bombay duck and other small fish.

308.    Mr. Sidik Jam and others at the bunder used to foot fish as well, before they were forced to move away from old Kotadi to new Kotadi. They can no longer fish by foot – they have not been able to do so since the intake channel was built, because it is so deep they cannot wade out into the water anymore.

309.    Mr. Sidik Jam and others at Kotadi currently fish about 7-8 km offshore, at a different place than where the people from Tragadi bunder fish. They cannot fish as close offshore now as they used to because the fish catch is down and because of the tug boats and the ships bringing in coal to the Tata Mundra Plant and the Adani Plant, which will cut and destroy nets.

310.    Four years ago he made around 1 – 1.5 lakh (100,000 to 150,000 rupees or about $1,600 to $2,400). Now, gets 75,000 rupees to 1 lakh in income (about $1,200 to $1,600).

311.    Through his fishing, Mr. Jam supports his wife, two sons, a daughter-in-law and an infant grandchild.

312.    If the fish catch does not improve, Mr. Sidik Jam will be forced to find work doing labor in Sanghad village, where his family lives during the monsoon season, approximately 80 km away, in order to support his family. He believes other fisherman at Kotadi will be forced to do labor as well. In the worst case, his family and/or others on the bunder will be forced to beg for money.

313.    Dust blows towards the bunder when the conveyor is running. The coal dust also settles on the fish, which are laid out to dry, which contaminates it.  Asthma has increased and older people are the worst affected. Mr. Sidik Jam's wife now has asthma, but she did not have it before the Tata Mundra Plant started operating.

314.    There is constant dredging activity in the intake channel. Large pipes carrying the dredged up muck run across Kotadi bunder near where Mr. Sidik Jam and his family and the other families live and process their fish. These pipes occasionally burst, spreading mud and other muck around their homes and fish processing sites.

Plaintiff Ranubha Jadeja

315.    Mr. Jadeja is a farmer in Navinal. He lives and his farms are in Navinal Panchayat. He is 50 years old and has lived in Navinal his whole life.

316.    Mr. Jadeja owns two separate farm plots in Navinal. One ("Plot #1") is located closer to the Tata Mundra Plant and the shore than the other ("Plot #2"). He has title to the farm lands and a home in Navinal, which is separate from the farm lands.

317.    Agricultural production is down on his land. Before the power plants were built, Mr. Jadeja had good yields on his lands. He used to grow dates, coconuts, cotton, castor, millet and wheat. Production started going down about three to four years ago and it has been particularly bad the last three years.

318.    The most significant problem for his farm land is that the groundwater has been growing increasingly saline. He drilled three bore holes on Plot #1 and all were saline. Before three years ago, the water was not saline, and he could drink it.

319.    On Plot #1, Mr. Jadeja used to use groundwater from the farm to irrigate crops but cannot do so anymore, because the water is too salty. Because it is now too expensive to grow fruit and other crops on Plot #1, he no longer does so. He has switched to growing only fodder for cattle, which is less expensive to grow. He uses it for his own cattle – he has six cows and five buffalo. He does not sell it. He can only grow during the short monsoon season when

irrigation is unnecessary. He cannot grow anything on Plot #1 during the dry season. Mr. Jadeja no longer earns any money from planting crops on Plot #1.

320.    Plot #2 is further from the sea and the Plant; the groundwater has not been affected as badly as at Plot #1, but it too is saline. As of now, he can still irrigate Plot #2 with the groundwater, but he does not know how much longer that will be possible. He is able to grow some fruits, but the quality of the fruit has declined.

321.    Coal dust and/or ash has also come on to his land. It gets on the crops and causes problems with production.

322.    Mr. Jadeja used to graze his cattle on common land in Navinal Panchayat. But now, dust and/or ash on the grazing land has ruined the grazing; Mr. Jadeja does not take his cattle to the grazing land anymore. Mr. Jadeja now has to grow his own fodder to feed his cattle.

323.    Mr. Jadeja's income from planting crops has been greatly reduced.

324.    Like Mr. Jadeja, his neighbors near Plot #1 can only grow crops during the monsoon season. They too no longer have water for irrigation. Some farms are not making any money. Now, during the dry season, farmworkers and some farm owners work as laborers, set up shops, try to start small businesses, leave for Mumbai or elsewhere to find work, or find some other way to support themselves.

325.    There had been increasing health problems in his area.

326.    Mr. Jadeja's mother has asthma now, but she did not have it before Tata and Adani came. She got it two years ago.

327.    Mr. Jadeja is heavily in debt for Plot #1, which has been destroyed by salt water intrusion. He owes 1,500,000 rupees (about $30,000). But he only earns in total about 200,000 rupees/year (about $4,000).

Plaintiff Navinal Panchayat

328.    Navinal Panchayat (village) is located near the Tata and Adani plants.

329.    There are approximately 3,000 residents in Navinal, of which roughly 1,500 spend approximately half of their time in Mumbai or elsewhere to work for long periods, but keep a house and/or land in the Panchayat. Full time Navinal residents depend primarily upon farming, animal rearing and fishing as their livelihoods.

330.    An estimated 40 families in Navinal rely upon fishing. Some fishermen fish at Kotadi bunder, which is not within the Panchayat, but is nearby. Of the Panchayat residents who fish at Kotadi bunder, some of them used to live on the bunder during the fishing season, but now they fresh fish rather than dry fish – they do not process the fish at the bunder after they catch it, but instead sell it fresh to the market each day. These fisherman come back to village at night and their families do not move to the bunders during fishing season.

331.    Some Panchayat residents used to fish from government land in Kotadi creek, which flowed toward the bunder. When the companies built the intake channel, however, they dumped the mud into the creek. Now, it is just a small stream; boats cannot pass through, and it is no longer suitable for foot fishing.

332.    Before the intake channel was built, the travel distance from the village to the bunder was about 1.5km. Now that the creek is destroyed, and now that Kotadi bunder is located on the other side of the intake channel, the travel distance is about 25km to get to the bunder.

333.    The design of the intake channel causes sea water to seep into the groundwater.

334.    The salinity is advancing inland. Residents have been forced to go to parts of the village farther away from shore to get groundwater, but even there the salinity is reaching the water. Salinity started rising three to four years ago. The water level is dropping.

335.    There are approximately 250 farmers and 350 farms in the Navinal Panchayat. These farms are on private land that farmers either own or rent. In addition to the 250 farmers, there are 100 families who work on the farms.

336.    Before the Tata Mundra Plant, farmers used to grow, and in some cases still grow or try to grow, cotton, wheat, castor, pearl millet, dates, mangos, bananas, and coconuts. Farmers also graze cows and buffalo.

337.    Virtually all, if not all, of the farmers in the Panchayat have been harmed by the Tata Mundra Plant in some way.

338.    Approximately half of the farms in the Panchayat have been harmed by increased groundwater salinity. The Panchayat expects that, in future, all farms will be harmed.

339.    On the worst hit farms, farmers are unable to grow many if not all of the crops they used to grow before the groundwater became saline. And they can only grow corps during the short rainy season, when irrigation is not required.

340.    All or virtually all farms in the Panchayat have been harmed by fly ash and/or coal dust, particularly the former. Ash and dust falling on crops has harmed both the quantity and quality of production, particularly of millet, wheat and cotton. In addition, dates, which are famous in the area, are being destroyed by ash falling on the flowers, drastically reducing date crops. The harms are greater the closer to the Plant one gets.

341.    As a result of the increased salinity of the groundwater, the Panchayat has been forced to pay more for drinking water. Until two years ago, the Panchayat would draw drinking water from a well in the Panchayat. But now they must buy drinking water from outside the Panchayat because the groundwater in Navinal is too saline. That is more expensive. The Panchayat believes that the salinity of the water they are buying is also increasing.

78

342.     Respiratory diseases and problems, in particular asthma, are increasing. There has also been an increase in kidney problems and other health problems from drinking water with high salinity.

Plaintiff MASS

343.     MASS has a small number of full-time staff, and the resources required both in staff time and money, for the level of advocacy and assistance needed on the Tata Mundra Project has been significant. MASS members spend a significant amount of time collecting data, conducting trainings and information sharing in the villages, and organizing and attending meetings in both India and the U.S. These efforts have required a significant amount of money as well.

344.     This significant diversion of MASS's resources in both staff time and finances, has impeded MASS's ability to provide services to the other groups and individuals that it serves.

345.     MASS's membership is made up of members of local fishing communities along the Kutch coastline. MASS has approximately 1,000 members. Approximately half of those members have been harmed by the Tata Mundra Plant.

346.     Specifically, these members have suffered from the effects of the Tata Mundra Plant on the local marine environment, especially the decline in fish catch and the dust and/or ash that lands on the fish, and have and/or will experience harm to their health from the Plant.

347.     MASS has authority to represent its members in this suit.

**VII.     CLASS ACTION ALLEGATIONS: PLAINTIFFS REPRESENT A CLASS OF INDIVIDUALS HARMED BY THE TATA MUNDRA PROJECT.**

348.     Plaintiffs Budah Ismail Jam, Kashubhai Abhrambhai Manjalia, Sidik Kasam Jam and Ranubha Jadeja bring this action on behalf of themselves and all other persons similarly

situated, pursuant to F.R.C.P. 23 (b)(1)(B) and (b)(2) and/or F.R.C.P. 23 (b)(3), in the alternative.

349.   Plaintiffs seek to certify a class for purposes of determining liability and obtaining appropriate injunctive, declaratory, compensatory, punitive, and other relief.

350.   This action satisfies the numerosity, commonality, typicality, adequacy and superiority requirements of Rule 23(a) and (b).

351.   Plaintiffs seek to represent a class consisting of all individuals who, since the commencement of construction on the IFC-funded Tata Mundra Plant to the present, have regularly resided in the villages and/or the fishing harbors located near the Tata Mundra Plant, and whose property, interest in or use of property, livelihoods and economic interests, and health has been affected by the construction of and the operation of the Tata Mundra Plant, and who will continue to suffer harm from the operation of the Tata Mundra Power Plant, including, but not limited to, damage caused by air pollution and particulate matter from the Plant, effluent and heat discharged by the Plant, and contamination of the soil and groundwater around the Tata Mundra power plant.

352.   Plaintiffs propose that the Class be composed of the following Subclasses:

(a) The Category I Subclass, which consists of members of the fishing communities who reside on the Tragadi and Kotadi fishing bunders near the Tata Mundra Plant during the fishing season each year, as well as the fishermen who reside year-round in the villages around the Plant but regularly fish at the bunders and/or the Kotadi and Modwa creeks. Approximately 70 families, with approximately 350 people, reside on Tragadi bunder during the fishing season; approximately 50 families, with approximately 250 people,

reside on Kotadi bunder; and approximately over 400 people fish in the creeks and at the bunders, but do not reside there. These fishing communities, and the fishermen who fish in the creeks and at the bunders, but do not reside there, have suffered from the pollution of the waters from which they derive their livelihoods. They have also suffered other harms including health impacts from air pollution and physical and economic displacement. Plaintiffs Budah Ismail Jam, Kashubhai Abhrambhai Manjalia and Sidik Kasam Jam are the named representatives of this Subclass. Their claims are typical of the Subclass as they are fishermen who reside at the bunders and rely upon the waters near the bunders and the creeks to derive their livelihoods.

(b)   The Category II Subclass, which consists of all individuals who reside in Navinal, Shiracha and Mota Kandagra Panchayats and rely on the land to grow crops and/or the groundwater for irrigation and/or for drinking water. In particular, this Subclass includes farmers whose property is affected by the increasing salinity of the groundwater and effects of coal ash and/or dust on crop production, and who are unable to grow crops of the same type and/or quality now, or are only able to grow crops during the monsoon season when irrigation is unnecessary, and/or are unable to grow crops at all now and have had to find new livelihoods. This class also includes farm laborers who derive their livelihood from their ability to work the farm land, and have been affected by one or more of the ways that the farm owners have been affected, and other people who rely on the groundwater in their village. This Subclass has also been affected and will be affected by health impacts from the air pollution and drinking high salinity water. Plaintiff Ranubha

Jadeja is the named representative of this Subclass. His claims are typical of the Subclass as he is a farmer himself who has suffered harms including the inability to rely on groundwater to irrigate his land or for drinking water.

353.   *Numerosity—FRCP 23(a)(1).* The members of the Class are so numerous that joinder of all members is impracticable. The exact number and identities of all Class members is currently unknown. Upon information and belief, the Class includes approximately 430 fishermen or fishing families that do not live on the bunders, 50 families that live at Kotadi, 70 families, totaling about 350 people that live at Tragadi bunder, 400-500 farmers or farming families from Shiracha and Mota Kandagra Panchayats, 250 farmers in Navinal, and others in Siracha, Mota Kandagra and Navinal Panchayats who rely on groundwater to drink. The identity of the Class members is ascertainable and can be determined based on available records. There is also risk of serious injury to additional properties and the health of additional individuals in the future.

354.   *Commonality—FRCP 23(a)(2) and 23(b)(3).* The Named Plaintiffs' injuries arise from a set of facts and circumstances common to that of the Subclasses they seek to represent. The questions of law and fact common to the Subclasses predominate over questions affecting only individual Subclass members, and include, but are not limited to, the following:

   (a) Whether Defendant was negligent, grossly negligent and/or reckless in conducting its required due diligence, in drafting the conditions of the loan, in the disbursement of funds, and in its supervision and monitoring of the IFC-funded Tata Mundra Power Plant;

   (b) Whether Defendant's actions were a substantial cause of the Category I and Category II Subclasses' injuries alleged herein, including, for example, whether

82

heat and/or other pollution from the outflow channel has harmed the fishery and

whether the Plant has caused salt water intrusion into the aquifer;

(c) Whether Defendant's conduct created a public and/or private nuisance;

(d) Whether the IFC has voluntarily taken on environmental and social obligations

to local people through its policies, standards and contracts;

(e) Whether members of the Class were third party beneficiaries to the loan

agreement and whether the IFC breached the contract;

(f) Whether Defendant may be liable for compensatory and/or punitive damages and

the measure of such damages;

(g) Whether the Class members are entitled to declaratory relief;

(h) Whether Class members are entitled to injunctive relief to prevent further injury.

355.    *Typicality—FRCP 23(a)(3).* The Named Plaintiffs' claims are typical of the

claims of the Proposed Class, in so far as Plaintiffs and all Class members, have been or will be

affected by the IFC-funded Tata Mundra Plant, and thus the same wrongful conduct of the

Defendant alleged herein. The factual bases of IFC's negligent misconduct resulting in economic

harm, property harm, harm to health, and other injuries to Plaintiffs is common to all Class

members. The damages and relief sought by the Named Plaintiffs are also typical of their

respective Subclasses because the injuries suffered, future anticipated injuries, related costs, and

additional consequential losses are similar for all members of each Subclass.

356.    *Common Relief—FRCP 23(b)(2).* Defendant has acted and/or failed to act, and

continues to act and/or fail to act on grounds generally applicable to the Proposed Class, making

injunctive and/or declaratory relief appropriate with respect to the Class as a whole.

357.   *Adequacy—FRCP 23(a)(4) and 23(g)(1).* The Named Plaintiffs are able to, and will, fairly and adequately protect the interests of each Subclass because they fit within the definition for each respective Subclass, and their interests do not conflict with the interests of the members of the Subclass they seek to represent. The Named Plaintiffs will adequately represent the class in that their personal interest in the outcome of the case ensures that they will maintain an active awareness and involvement in the litigation so as to protect their own interests and those of the Class. The Named Plaintiffs are represented by counsel with extensive experience in transnational environmental tort litigation and class action litigation. The Named Plaintiffs and Class Counsel intend to prosecute this action vigorously for the benefit of the entire Class, and can fairly and adequately protect the interests of all of the members of the Class.

358.   *Superiority—FRCP 23(b)(3).* A class action is the best method for the fair, just and efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable, economically and otherwise, and individual litigation would be unduly burdensome to the courts and parties. The economic situation of the vast majority of the Class members prohibits them from being able to pursue litigation individually. Without the ability to proceed as a class action, the Class would have no reasonable remedy and would continue to suffer losses. A class action in this cases presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

359.   *Issue Certification and/or Subclasses—FRCP 23(b)(1), (b)(2), (c)(4) and (c)(5):* On motion of a party and/or in the discretion of the Court, one or more of the issues or claims set forth in this Complaint may be certified under the provisions of FRCP 23(b)(1),(b)(2), and/or (c)(4) and subclasses designated under FRCP 23(c)(5).

## VIII.   THIS COURT HAS JURISDICTION AND IS THE PROPER VENUE.

360.     This Court has jurisdiction over all claims by virtue of 22 U.S.C. § 282f, which provides that any action brought against the IFC "shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of any such action."

361.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiffs and Defendant and because the amount in controversy exceeds $75,000.

362.     The Court has personal jurisdiction over Defendant because Defendant has its headquarters and principle place of business in the District of Columbia, conducts substantial business within the District of Columbia, and has such continuous and systematic contacts with the District of Columbia as to render it essentially at home here. The Court also has personal jurisdiction over the Defendant because, on information and belief, the IFC made key decisions about whether to finance the Tata Mundra Project and under what conditions in Washington, D.C.

363.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant resides in this District, does business in this District, and/or owns property within this District.

## IX.   PLAINTIFFS ARE ENTITLED TO RELIEF ON MULTIPLE CLAIMS.

### COUNT I
### NEGLIGENCE
### (All Named Plaintiffs and All Class Members)

364.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

365.    Defendant enabled the Tata Mundra Plant to be built by providing necessary funding to the Project, providing financial guarantees to make the Project more appealing to other funders, and promoting the Project and its role in the Project to recruit other funders. Defendant had substantial control over the design and construction of the Plant and continues to maintain substantial control over how the Plant is operated and under what conditions.

366.    Defendant owed a duty to Plaintiffs and the other members of the Proposed Class to exercise reasonable care in conducting its due diligence of the Tata Mundra Project, in providing the keystone loan and in influencing and approving the designs, parameters, and construction of the Plant. Defendant also owed a duty to Plaintiffs and the other members of the Proposed Class to exercise reasonable care in considering, developing, and approving preventive and mitigation measures, in ensuring compliance with all environmental and social obligations prior to disbursing funds, in supervising and monitoring the loan and the operation of the Plant, and in ensuring the provisions of the loan agreement intended to protect communities and the environment were met and that the client maintained compliance with the loan conditions.

367.    Defendant knew or should have known that:

> (a)   The manner in which the Tata Mundra Plant stored, transported and burned coal would cause coal dust, ash and other coal combustion byproducts to be deposited on the surrounding villages and fishing harbors;

> (b)   The cooling system would discharge enormous quantities of thermal pollution, in excess of the IFC's 3°C limit, into a fragile ecosystem, from which Defendant knew certain Named Plaintiffs and the Category I Subclass

derive their livelihoods, and that such thermal pollution would substantially alter the local marine resources and especially fisheries;

(c)   The location of and construction of the intake and outtake channels would cause physical and economic displacement of Named Plaintiffs and the Category I Subclass;

(d)   Emissions from the Plant would substantially degrade the air quality of the area surrounding the Tata Mundra Plant, resulting in levels of air pollutants dangerous to human health;

(e)   Construction of the Plant, and especially the construction, design and depth of the outfall and intake channels, in an area where groundwater is scarce, and the soil is permeable, would substantially increase the risk of and/or rate of salt water intrusion into the groundwater.

368.   IFC failed to ensure that appropriate, effective measures to deal with these problems were actually utilized and failed to enforce contract provisions that required effective measures to be taken.

369.   IFC breached its duty of care by failing to take reasonable steps to prevent harms to Plaintiffs and members of the Proposed Class, as detailed in this complaint.

370.   Defendant was negligent in one, some and/or all of the following ways, among others: in funding the Tata Mundra Plant; in approving technology that was inadequate to prevent the degradation of the air quality around the Tata Mundra Plant and failing to put emission limits in place; in approving of coal handling measures that were insufficient to contain fugitive coal dust; in approving of the selection of a once through cooling system, without requiring consideration of alternative designs, and without ensuring that thermal

discharge would not exceed 3ºC; in approving of the location and design of the intake and outfall channels that would result in the economic and physical displacement of individuals and communities, and increase the risk of salt water intrusion into the groundwater; in failing to enforce conditions of the loan agreement intended for the protection of affected communities and the environment; in designing and/or approving remedial, mitigation, and preventive steps that were inadequate to prevent the harms described above and the economic impact on the Named Plaintiffs and the Proposed Class; in its monitoring and supervision of the Plant's compliance; in failing to take steps to remediate and mitigate harms that have already occurred to the local environment and marine resources; and in failing to ensure adequate compensation for those affected.

371.    As a direct and proximate result of Defendant's funding and other conduct and omissions in breach of its duty of care, Plaintiffs and other members of the Proposed Class have suffered and will suffer injuries to their interests in and use and enjoyment of their real and personal property, to their businesses/livelihoods and to their health. Plaintiffs and the other members of the Class are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

## COUNT II
## NEGLIGENT SUPERVISION
### (All Named Plaintiffs and All Class Members)

372.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

373.    Defendant IFC knew or reasonably should have known that CGPL had failed and continued to fail to take reasonable and sufficient steps to prevent, mitigate and remediate harm to Plaintiffs and the members of the Proposed Class, as required by the loan agreement, and that

this conduct would directly and proximately result in injury to Plaintiffs and the members of the Proposed Class.

374.    Defendant IFC had and continues to have the express authority to supervise and monitor the Plant's operation to determine compliance with the environmental and social conditions and effects, and has the authority to prohibit and control and/or regulate CGPL so as to prevent the acts and omissions from occurring that have already harmed, and continue to harm, local communities, including the individual Named Plaintiffs and members of the Proposed Class.

375.    Defendant IFC knew or reasonably should have known that unless it intervened to protect the Individual Named Plaintiffs and members of the Proposed Class, properly monitored, supervised, controlled, regulated and/or prohibited the conduct of CGPL that CGPL would perceive its acts and omissions as being ratified and condoned.

376.    The IFC has failed and continues to fail to exercise due care and monitor, supervise and control CGPL. As a direct and proximate result of the IFC's failure to exercise due care, Plaintiffs and the members of the Proposed Class have suffered injuries entitling them to damages in an amount to be determined at trial.

**COUNT III**
**PUBLIC NUISANCE**
**(Plaintiffs MASS, Budha Jam, Manjalia, Sidik Jam, Ranubha and All Class Members)**

377.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

378.    Defendant's conduct and the resulting contamination and destruction of the environment in and around the Tata Mundra Plant has created a public nuisance which endangers and will continue for many years in the future to endanger the property, safety, health,

89

livelihoods, and comfort of a large number of persons residing in the surrounding villages and bunders. The following conditions all constitute a nuisance for which Defendant is responsible:

    (a) Continued thermal and chemical pollution of the local marine environment from the outfall channel discharge into the waters from which Named Plaintiffs and Category I Subclass derive their livelihoods;

    (b) Frequent and recurring fugitive coal dust from the coal storage yards and coal conveyor system;

    (c) Frequent and recurring fly ash, bottom ash and other coal combustion by products and air pollutants emitted from the Plant that land on homes, property, persons, plants, trees, fish laid out to dry and pollute the air;

    (d) Noise pollution from the Plant and the coal conveyer;

    (e) The contamination of the groundwater from salt water intrusion.

379.    The Named Plaintiffs and members of the Proposed Class have suffered a special and peculiar harm of a kind different than that suffered by others living in the residential areas surrounding the Plant in that:

    (a) Plaintiffs Budha Jam, Manjalia, Sidik Jam, MASS on behalf of its members, and the other members of the Category I Subclass derive their livelihoods from the affected waters and the injuries to their businesses/livelihoods from the pollution and contamination of the affected waters is peculiar to them as fisherpeople and goes beyond the harm to the members of the community around the Tata Mundra Plant at large.

    (b)  Plaintiff Jadeja and the other members of the Category II Subclass have had their property diminished or destroyed, and suffered from a substantial and

unreasonable interference with their use and enjoyment of the land, and/or lost

the livelihoods from the destruction of the land, and/or loss of clean drinking

water, which is distinct from the harm to the members of the community

around the Tata Mundra Plant at large.

380.    Plaintiff MASS has suffered a special and peculiar harm of a kind different than

that suffered by others living in the residential areas surrounding the Plant in that a

disproportionate amount of staff time and finances have been diverted to advocacy on Tata

Mundra, frustrating MASS's core mission of empowering the fishermen of the Kutch coast both

by disempowering many of those fishermen, and by impairing MASS's ability to provide

services to the other groups that it serves. Moreover, Defendant's conduct and the resulting

contamination and destruction of the environment in and around the Tata Mundra Plant directly

conflicts with the MASS's mission.

381.    Building and operating the enormous coal-fired power plant at issue is and was

unreasonably dangerous to local people and the local environment. Defendant's conduct was

unreasonable, negligent, reckless and/or intentional. Plaintiffs and the members of the Proposed

Class are entitled to recover compensatory and punitive damages in amounts to be ascertained at

trial and have standing to seek injunctive relief to abate this public nuisance and to require all

reasonable measures to be taken to eliminate and/or mitigate this continuing public nuisance.

### COUNT IV
### PUBLIC NUISANCE
### (Plaintiff Navinal Panchayat)

382.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing

paragraphs as if fully set forth herein.

383.    Defendant's conduct and the resulting contamination and destruction of the environment in and around the Tata Mundra Plant has created a public nuisance which endangers and will continue for many years in the future to endanger the property, safety, health, livelihoods, and comfort of a large number of persons residing in Navinal village. The following conditions all constitute a nuisance for which Defendant is responsible:

> (a) Frequent and recurring fugitive coal dust from the coal storage yards and coal conveyor system;
>
> (b) Frequent and recurring fly ash, bottom ash and other coal combustion by products and air pollutants emitted from the Plant that land on homes, property, persons, plants, trees, fish laid out to dry and pollute the air;
>
> (c) Noise pollution from the Plant and the coal conveyer;
>
> (d) The contamination of the groundwater from salt water intrusion.

384.    Building and operating the enormous coal-fired power plant at issue is and was unreasonably dangerous to local people and the local environment. Defendant's conduct was unreasonable, negligent, reckless and/or intentional. Plaintiff Navinal Panchayat is entitled to recover compensatory and punitive damages in amounts to be ascertained at trial and has standing to seek injunctive relief to abate this public nuisance and to require all reasonable measures to be taken to eliminate and/or mitigate this continuing public nuisance.

**COUNT V**
**PRIVATE NUISANCE**
**(All Named Plaintiffs and All Class Members)**

385.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

386.     Defendant's conduct has caused non-trespassory (as well as trespassory) invasions of Plaintiffs' and Class members' private use and enjoyment of their land and property that have resulted in damage to their property.

387.     Building and operating the enormous coal-fired power plant at issue is and was unreasonably dangerous to local people and the local environment. Defendant's conduct has been unreasonable in that it has caused severe annoyance, harm, inconvenience and damage to the property of Plaintiffs and the members of the Proposed Class.

388.     Defendant's conduct was unreasonable, negligent, reckless and/or intentional, and Plaintiffs and the members of the Proposed Class are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

**COUNT VI**
**TRESPASS**
**(All Named Plaintiffs and All Class Members)**

389.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

390.     Defendant's unreasonable, negligent, reckless and/or intentional acts and omissions have resulted in the discharge of particles and pollutants which spread through the air and onto the real and personal property in which the Individual Plaintiffs and the other members of the Proposed Class hold a beneficial interest.

391.     The particles and pollutants that were caused to be deposited on the real and personal property of the Plaintiffs and other members of the Proposed Class constitute an unreasonable interference with Plaintiffs' possessory use of their respective properties.

392.     Defendant's unreasonable, negligent, reckless and/or intentional acts and omissions have resulted in salt-water infusion from the Plant into the aquifer and thus onto the

real property in which the Plaintiff Mr. Jadeja and the other members of the Proposed Class hold a beneficial interest.

393.    Such acts and omissions constitute a trespass upon the property interests of the Plaintiffs and the other Class members

394.    Plaintiffs and the members of the Proposed Class are entitled to recover compensatory and punitive damages from the trespass caused by the Defendant in amounts to be ascertained at trial.

## COUNT VII
## BREACH OF CONTRACT (Third Party Beneficiary)
## (All Plaintiffs and All Class Members)

395.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

396.    Defendant IFC and CGPL entered into a contract that contained the terms and conditions of IFC's loan to CGPL to develop the Tata Mundra Project. This loan agreement contained provisions and conditions that were specifically intended to benefit and protect certain categories of third parties, including the Individual Named Plaintiffs and the other members of the Proposed Class.

397.    The contract conditions focused on environmental and social measures to prevent impacts to local communities and the environment, mitigate impacts, protect and restore livelihoods, and remediate other harms that might result were specifically intended to protect and benefit local communities, including Plaintiffs and the Proposed Class. The contract provisions contained obligations owed by CGPL to Plaintiffs and the Proposed Class members as well as obligations owed by IFC. And, IFC gave Plaintiffs and the Proposed Class reason to believe that IFC would in fact comply with its obligations to supervise and monitor implementation, enforce

the provisions intended to protect and benefit them, and, where necessary, provide remedies to them where they suffered harm.

398.    The IFC's obligations to supervise and monitor implementation of the environmental and social conditions of the loan was expressly intended to protect the affected communities, including the Named Plaintiffs and the other members of the Proposed Class.

399.    IFC publicly and repeatedly stated that its involvement would ensure the protection of local communities and the environment, participated in meetings with representatives from the communities to discuss environmental and social risks, and made representations that it would enforce the conditions intended to protect local communities, including Plaintiffs, and the environment.

400.    Plaintiffs knew that the loan provisions were intended to protect them, believed that IFC would enforce the provisions of the contract intended to protect them, and relied on that knowledge and belief.

401.    In failing to leverage its economic power and operative control over CGPL and the Project to adequately monitor and supervise the environmental impacts of the Plant and the impact of the Plant on Plaintiffs and the members of the Proposed Class; to take adequate steps to ensure Plant compliance with the environmental and social conditions applicable to the Project; to enforce and otherwise ensure promised mitigation measures were taken; and/or terminate its business relationships with Plant, IFC breached its contractual obligations to Plaintiffs.

402.    Defendant IFC knew that Plaintiffs and the members of the Proposed Class would benefit from their contract and knew that Plaintiffs and the other members of the Proposed Class could be harmed, and would be harmed, by any breach of the contract by Defendant. Defendant

IFC breached these contractual obligations to Plaintiffs and Class members, which resulted in direct harm to them. Plaintiffs and the members of the Class are entitled to damages as third party-beneficiaries because Plaintiffs suffered damages as a result of the breach.

**COUNT VIII**
**MEDICAL MONITORING**
**(All Plaintiffs and All Class Members)**

403.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

404.    As a result of Defendant's unreasonable, intentional, reckless and/or negligent conduct, the Plaintiffs and the putative classes have, on information and belief, been exposed to dangerous levels of air pollutants, including particulate matter, $SO_2$ and $NO_2$, as well as other hazardous pollutants, including but not limited to salt in their drinking water, and continue to be exposed to these pollutants.

405.    As a result of such exposure, and their continued exposure, the Plaintiffs and the members of the Proposed Class are at an increased risk of respiratory problems, other illnesses and premature death.

406.    Early detection and treatment of these diseases is medically necessary and advisable.

407.    Medical monitoring is sought for all Plaintiffs, members of the Proposed Class members, and members of MASS.

408.    The Plaintiffs are entitled to a court-ordered medical monitoring program for the early detection and treatment of various illnesses that they may develop as a result of exposure to the contaminants and pollutants to which they have been exposed as a consequence of Defendant's conduct, acts and omissions.

**COUNT IX**
**INJUCTIVE RELIEF**
**(All Plaintiffs and All Class Members)**

409.     Plaintiffs repeat and reallege each and every allegation set forth in the foregoing

paragraphs as if fully set forth herein.

410.     Defendant's unreasonable, negligent, reckless and/or intentional acts and

omissions, as set forth above, have resulted in the discharge of pollutants into the air, the

groundwater, the sea, and onto the property of the Individual Named Plaintiffs, Navinal

Panchayat, members of MASS, and the other members of the Proposed Class. This has resulted

in contamination, damage to property, destruction of livelihoods, contamination of the water and

air around the Tata Mundra Plant, and exposure to toxic chemicals hazardous to human health.

411.     At all relevant times, Defendant caused injury to the property interests, economic

livelihoods, and health of the Individual Named Plaintiffs, the other members of the Proposed

Class, MASS and its members and the Navinal Panchayat and its citizens. Defendant's conduct

has also frustrated the ability of Plaintiff MASS to provide the services that fall under its core

mission by draining its resources to focus its time on Tata Mundra, at the expense of the others

that MASS seeks to serve. Plaintiffs have no adequate remedy at law for these harms.

412.     In the absence of equitable or injunctive relief, Plaintiffs will be irreparably

harmed.

413.     Accordingly, Plaintiffs seek equitable and injunctive relief to remedy the

contamination and spoliation of their properties and overall habitable environment, the

destruction of their livelihoods, and other harms. Injunctive relief should include directing the

IFC to enforce all relevant conditions in the loan agreement terms and exercise all rights, options

and/or other leverage practicable to:

(a) Ensure that the coal ash pond, the coal storage yards at the Mundra port and at the Plant site are covered to reduce fugitive coal dust;

(b) Ensure that the coal conveyer belt is fully enclosed with piping technology for all 14 km to prevent fugitive coal dust;

(c) Ensure that stack emissions do not exceed allowable capacity and particulate emission limits, per applicable laws and regulations, including changes in technology of the Plant if necessary to ensure no net increase requirements are met, consistent with the Thermal Power Guidelines;

(d) Have the Plant retrofitted with a closed cycle cooling system, or other system, that will be less damaging to the environment and ensure the outflow comply with the 3ºC limit required by the loan agreement;

(e) Ensure that chemicals are not discharged in the outfall, and that dilution is not used as a means of complying with water quality standards;

(f) Ensure the outfall channel is sufficiently lined to prevent sea water intrusion into the groundwater and use all leverage possible to encourage Adani and CGPL to line the intake channel to prevent further sea water intrusion;

(g) Ensure meaningful and prompt measures are taken to remediate harm that has already been done to the local marine environment;

(h) Encourage both Adani and Tata to discontinue dredging activity on Kotadi bunder adjacent to where some members of the Class reside;

414.    Plaintiffs also seek such equitable and injunctive relief as the Court may find appropriate, according to proof.

415.    In the alternative, if injunctive relief is determined to be impracticable or

otherwise denied, Plaintiffs seek a damages remedy in lieu of an injunction.

## X.    DEMAND FOR JURY TRIAL

416.    Plaintiffs demand a trial by jury on all issues so triable.

## XI.    PRAYER FOR RELIEF

417.    WHEREFORE, Plaintiffs respectfully request the Court to:

(a) Enter judgment in favor of each of the Plaintiffs and the members of the

Proposed Class on all counts of the Complaint;

(b) Declare that Defendant has violated the laws of the various states, including the

District of Columbia, the federal common law, and/or the law of India;

(c) Award Plaintiffs and the members of the Proposed Class damages, including

compensatory and punitive damages in an amount greater than $75,000;

(d) Grant each of the Plaintiffs and the members of the Proposed Class appropriate

injunctive, equitable and/or declaratory relief, and medical monitoring;

(e) Award each of the Plaintiffs and the members of the Proposed Class the costs of

suit including reasonable attorneys' fees and;

(f) Award each of the Plaintiffs and the members of the Proposed Class such other

and further relief as the Court deems just under the circumstances.

Dates: March 12, 2020                    Respectfully submitted,

*/s/ Richard L. Herz*
Richard L. Herz (*pro hac vice*)[60]
Marco B. Simons (D.C. Bar No. 492713)
Michelle C. Harrison (D.C. Bar No. 1026592)
EARTHRIGHTS INTERNATIONAL

---

[60] Based in CT; admitted in NY; does not practice in DC's courts.

1612 K St. NW Suite 800
Washington, DC 20006

*Counsel for Plaintiffs*