UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUDHA ISMAIL JAM, et al., **Plaintiffs,** v. INTERNATIONAL FINANCE CORPORATION, **Defendant.** | Civil Action No. 15-612 (JDB) |

## MEMORANDUM OPINION

On February 14, 2020, the Court dismissed plaintiffs' complaint against defendant International Finance Corp. ("IFC") under the Foreign Sovereign Immunities Act ("FSIA"). Plaintiffs have now moved to amend their complaint, seeking to add additional allegations about IFC's decision-making process. IFC and the United States, as an interested party, oppose the motion. For the reasons that follow, the Court will deny the motion as futile.

**I.   Background**

In April 2015, plaintiffs filed this action against IFC, an international organization that focuses on ending poverty in developing countries by funding private-sector projects, for its alleged contributions to "property damage, environmental destruction, loss of livelihoods, and threats to human health" arising from the construction and operation of the coal-fired Tata Mundra Power Plant in Gujarat, India. Compl. [ECF No. 1] ¶¶ 1, 42–43. Plaintiffs asserted various claims against IFC, including negligence, negligent supervision, nuisance, and trespass. See id. ¶¶ 294–345. A long period of litigation then ensued, involving an initial dismissal by this Court under then-binding D.C. Circuit precedent that international organizations enjoy absolute immunity from suit, an affirmance by the D.C. Circuit, and then a trip to the Supreme Court, which reversed that

1

D.C. Circuit precedent and concluded that international organizations enjoy only the same immunity as foreign sovereigns enjoy today under the FSIA. See Jam v. Int'l Fin. Corp., 139 S. Ct. 759, 767, 772 (2019). When the case eventually returned here, this Court on February 14 again dismissed on immunity grounds, concluding that the suit did not fall within the FSIA's commercial activity exception because it was not "'based upon' activity . . . that was carried on in (or performed in) the United States." See Jam v. Int'l Fin. Corp., 442 F. Supp. 3d 162, 171 (D.D.C. 2020). Plaintiffs' motion to amend followed. See Pls.' Mot. to Amend the Compl. Under Rule 15 or, in the Alternative, Under Rules 15 and 59(e) ("Mot. to Amend") [ECF No. 63] at 1.

## II. Discussion

### A. Legal Standard

As a preliminary matter, the parties disagree as to what standard the Court should apply in deciding the motion to amend. IFC argues that the Court's February 14 decision was a final judgment, so the Court should apply the rigorous Fed. R. Civ. P. 59(e) standard. See Def. Int'l Fin. Corp.'s Mem. in Opp'n to Pls.' Mot. to Amend the Complaint Under Rules 59(e) and 15 ("Opp'n") [ECF No. 64] at 4–5. "Motions under Fed. R. Civ. P. 59(e) are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." Odhiambo v. Republic of Kenya, 947 F. Supp. 2d 30, 34 (D.D.C. 2013) (quotation omitted). Plaintiffs, on the other hand, contend that the February 14 decision was not a final judgment, so they need only satisfy the "comparatively lenient requirements for filing an amended pleading under Rule 15(a)." Agrocomplect, AD v. Republic of Iraq, 262 F.R.D. 18, 21 (D.D.C. 2009); see Mot. to Amend at 5–6. The Court need not resolve this dispute. As will be explained below, plaintiffs' motion fails even under the more relaxed Rule 15(a) standard.

Rule 15 governs the amendment of pleadings. Parties may amend their pleadings once as a matter of right, if they do so within a specified timeframe, usually 21 days. Fed. R. Civ. P. 15(a)(1). Once the time for amendment as a matter of right has lapsed, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Ordinarily, courts "should freely give leave when justice so requires." Id. Courts may, however, deny leave to amend based on "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the] amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

### B. Futility

"A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." Hettinga v. United States, 677 F.3d 471, 480 (D.C. Cir. 2012); see Bell v. United States, 301 F. Supp. 3d 159, 165 (D.D.C. 2018) ("Where . . . the proposed amended complaint would not survive a motion to dismiss, leave to amend appropriately is denied."). IFC argues that plaintiffs' proposed amended complaint would not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1) because the proposed amended complaint, like the original complaint, does not fall within the FSIA's commercial activity exception. See Opp'n at 15. The Court agrees.[1]

### a. Identifying the Gravamen

As the Court explained in its prior opinion, the commercial activity exception, "as applied to international organizations, withholds immunity when an action is based upon (1) 'a commercial

---

[1] Because the Court resolves the motion on futility grounds, it does not address IFC's other arguments, including the contention that allowing plaintiffs to amend at this stage of litigation would be unduly prejudicial. See Opp'n at 13.

3

activity carried on in the United States' by an international organization or (2) 'an act performed in the United States in connection with a commercial activity' of the international organization 'elsewhere.'" Jam, 442 F. Supp. 3d at 170–71 (quoting 28 U.S.C. § 1605(a)(2)).  The first step in determining whether the exception applies, therefore, is to "consider whether the action is 'based upon' activity 'carried on' or 'performed' in the United States." Id.  To make that determination, courts must look to "the basis or foundation of a claim, those elements that, if proven, would entitle a plaintiff to relief, and the gravamen of the complaint." OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 395 (2015) (internal quotation marks, citations, and alterations omitted).

At the motion-to-dismiss stage, the parties had each proposed competing bright-line rules for how to identify the gravamen of the complaint.  Plaintiffs argued for a narrow approach focused only on IFC's affirmative lending activity.  See Jam, 442 F. Supp. 3d at 173–74.  IFC, in contrast, advocated for an equally narrow approach focused exclusively on the last act that "actually injured" plaintiffs.  See id. at 172–73.  The Court rejected both of these approaches.  As to plaintiffs' approach, the Court emphasized that it is not only "IFC's direct, affirmative conduct" that is relevant to the gravamen analysis—instead, the "design, construction, and operation of the power plant in India" must also be considered when identifying the gravamen, since that conduct is equally critical to the success of plaintiffs' claims. Id. at 173–74.  The Court continues to reject plaintiffs' approach.

The Court does, however, wish to clarify its view of IFC's approach.  IFC's bright-line rule that the conduct that "actually injured" plaintiffs is always the gravamen remains incorrect.  But the Court's February 14 opinion perhaps understated the importance of that conduct to the gravamen analysis as a whole.  It is worth emphasizing that the Supreme Court's two main decisions expounding on the gravamen analysis, and subsequent caselaw interpreting those

4

decisions, make clear that in the typical case—though not in every case—the conduct that "actually injured" a plaintiff will constitute the gravamen of a complaint.

The Supreme Court's first foray into the gravamen analysis was in Saudi Arabia v. Nelson, 507 U.S. 349 (1993). There, Scott Nelson was recruited and hired by the Saudi government in the United States to work in a state-owned hospital in Saudi Arabia. Id. at 351–52. After he traveled to Saudi Arabia and commenced work at the hospital, Nelson discovered safety defects and reported them to hospital management. Id. In retaliation, Saudi government officials unlawfully detained, tortured, and beat him. Id. at 352–53. He and his wife later sued Saudi Arabia and the hospital in U.S. federal court, alleging "an array of intentional tort claims, including battery, unlawful detainment, and torture," as well as a claim that Saudi Arabia had failed to warn him of the dangers of his employment when it recruited him in the United States. Jam, 442 F. Supp. 3d at 172. To satisfy the FSIA's requirement that a suit against a foreign sovereign be "based upon" commercial activity in the United States, the Nelsons argued that their suit was based upon Saudi Arabia's recruitment, signing of an employment contract, and employment of Nelson in the United States. See Nelson, 507 U.S. at 358.

The Supreme Court rejected that argument, pointing out that while those alleged activities may have "led to the conduct that eventually injured the Nelsons," they were not the basis of the suit. Id. The activities in the United States "alone entitle[d] the Nelsons to nothing under their theory of the case." Id. As a result, the Court concluded that the suit was instead based on "the tortious conduct itself": the detention, torture, and beating in Saudi Arabia. Id. Because such tortious conduct is not itself commercial activity, the Court determined that the suit did not fall within the commercial activity exception. Id. at 361. Moreover, although the Court did not dispute that the Nelsons' failure-to-warn claim did have a United States hook, the Court thought that

5

attenuated claim was a "semantic ploy" to artificially manufacture U.S. jurisdiction, the acceptance of which would allow "a plaintiff to recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn." Id. at 363.[2]

The Supreme Court's analysis in the more recent Sachs decision closely tracks that in Nelson. In Sachs, "a U.S. citizen [Sachs] sued an Austrian state-owned railway operator after she fell in Austria from a train station platform onto the tracks where a moving train crushed her legs." Jam, 442 F. Supp. 3d at 172. She brought a number of claims against the railway, including negligence, strict liability, and breach of implied warranty. Sachs, 136 S. Ct. at 393. Like the Nelsons, Sachs also brought a failure-to-warn claim, this time for the railway's failure to warn her of dangerous conditions at the Austrian train station when it sold her (through an agent) a railway pass in the United States. Id. She then argued that, under the FSIA, her suit was "based upon" commercial activity in the United States: the railway's sale of the pass to her. Id.

The Supreme Court disagreed. Just as the Nelsons were not entitled to anything for the Saudi government's recruitment activity alone, Sachs was entitled to nothing for the sale of the railway ticket, because "there [was] nothing wrongful about the sale of the Eurail pass standing alone." Id. at 396. After all, "without the existence of the unsafe boarding conditions [in Austria], there would have been nothing to warn [plaintiff] about when she bought the Eurail pass." Id. Whichever way the Court sliced it, "all of [plaintiff's] claims turn[ed] on the same tragic episode in Austria," so the "conduct constituting the gravamen of [her] suit plainly occurred abroad." Id. Quoting Justice Holmes, the Court noted that "the 'essentials' of a personal injury narrative will be found at the 'point of contact'—'the place where the boy got his fingers pinched.'" Id. at 397.

---

[2] The Court was not persuaded to change its mind on this point by a partial dissent from Justice Kennedy that argued, similar to plaintiffs' argument here, that the failure-to-warn claim "complain[s] of a negligent omission made during the recruitment of a hospital employee in the United States" and was therefore "based upon" that omission. Id. at 371 (Kennedy, J., concurring in part and dissenting in part).

The Court also reiterated Nelson's concern about "artful pleading," warning against "giv[ing] jurisdictional significance to [a] feint of language, thereby effectively thwarting the [FSIA's] manifest purpose." Id. at 396–97 (internal quotation marks omitted).

In short, Sachs and Nelson both focused on "'the core of [the plaintiffs'] suit[s],' i.e., 'the . . . acts that actually injured them.'" Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A., 895 F.3d 194, 206 (2d Cir. 2018) (quoting Sachs, 136 S. Ct. at 396). Importantly, this was not a single-element test focused on the injury element of the plaintiffs' tort claims. In rejecting a one-element approach, the Sachs Court noted that application of such a test would "necessarily require[] a court to identify all the elements of each claim in a complaint before that court may reject those claims for falling outside" the commercial activity exception. Sachs, 136 S. Ct. at 396; but see Jam, 442 F. Supp. 3d at 173 (characterizing an "actual injury" test as "effectively a one-element approach to identifying the gravamen of a suit" (internal quotation marks omitted)). Neither Sachs nor Nelson did any such thing, declining to undertake a "claim-by-claim, element-by-element analysis" of the asserted causes of action. Sachs, 136 S. Ct. at 396. Instead, "[r]ather than individually analyzing each of the [plaintiffs'] causes of action," the Court "zeroed in on the core of their suit"—the "acts that actually injured them." Id.

To be sure, Sachs emphasized that it was not imposing a strict rule that the gravamen is always the conduct that "actually injured" a plaintiff, adding in a brief footnote that "[d]omestic conduct with respect to different types of commercial activity may play a more significant role in other suits." Id. at 397 n.2. But the clear thrust of both Sachs and Nelson is that in the usual case, the conduct that "actually injured" the plaintiff—that pinched the boy's fingers—will be the gravamen, and in any event will always be an important factor to consider when identifying the gravamen. Federal courts around the country have interpreted Sachs accordingly. See, e.g.,

7

Devengoechea v. Bolivarian Repub. of Venezuela, 889 F.3d 1213, 1223 (11th Cir. 2018) (noting that, to "identify the conduct on which [plaintiff] bases his suit," the court must look to "the conduct that actually injured" him, and "therefore that makes up the gravamen of [his] lawsuit"); Petersen Energía, 895 F.3d at 206 (same); Berg v. Kingdom of the Netherlands, 2020 WL 2829757, at *14 (D.S.C. Mar. 6, 2020) (same); Sequeira v. Repub. of Nicaragua, 2018 WL 6267835, at *6 (C.D. Cal. Aug. 24, 2018) (same); Sarkar v. Petroleum Co. of Trinidad & Tobago Ltd., 2016 WL 3568114, at *8 (S.D. Tex. June 23, 2016) (same).

### b. The Gravamen of the Proposed Amended Complaint

With that refined understanding of how to identify the gravamen in mind, the Court is nearly ready to undertake an assessment of the gravamen of the proposed amended complaint here. That analysis, however, is intertwined with what is essentially a question of first impression that the Court touched on only briefly in its February 14 opinion: what is a court to do under the FSIA where the conduct that "actually injured" the plaintiffs was not primarily that of a named defendant, but rather that of a third party?[3]

IFC and the United States have argued that this is such a case, and that Sachs and Nelson compel the conclusion that a suit can be "based upon" the conduct of a third party, if that conduct is what "actually injured" the plaintiffs within their theory of the case. See, e.g., Statement of Interest of the United States ("First U.S. Statement") [ECF No. 47] at 6, 8–9. As support, they point to the language in Nelson that the suit there was not based upon Saudi Arabia's recruitment activity within the United States, which "alone entitle[d] [plaintiffs] to nothing under their theory

---

[3] One other judge in this District appears to have concluded that third-party conduct can constitute the gravamen of a suit. See Renjie Zhan v. World Bank, 2019 WL 6173529, at *2 (D.D.C. Nov. 20, 2019) (concluding that the gravamen of a suit against the World Bank was non-party China's "tortious actions in China and against Chinese citizens"), appeal docketed, No. 19-7166 (Dec. 27, 2019). However, this Court does not think much can be drawn from that case, as neither party seems to have briefed the issue, and the court reached its conclusion with little analysis.

of the case," Nelson, 507 U.S. at 358, and the language in Sachs that there was "nothing wrongful about the sale of the Eurail pass standing alone," Sachs, 136 S. Ct. at 396. Using that same logic, IFC and the United States contend that there was nothing wrongful about either IFC's funding of the Tata Mundra Plant or IFC's alleged failure to enforce certain provisions of the loan agreement standing alone—recovery on any claims for that conduct is derivative of, and depends on, subsequent tortious activity in India by Coastal Gujarat Power Limited ("CGPL"), the Indian power company that constructed and operated the plant. See First U.S. Statement at 6–7. The United States points out that while IFC's conduct may have "led to the conduct that eventually injured" plaintiffs, merely being a distant link in the causal chain is insufficient to invoke the commercial activity exception. See First U.S. Statement at 7; Nelson, 507 U.S. at 358. According to IFC and the United States, the conduct that actually injured plaintiffs here was the construction and operation of the plant in India, done mainly by CGPL. See First U.S. Statement at 7–9; Def. IFC's Reply Mem. of Law in Further Supp. of its Renewed Mot. to Dismiss [ECF No. 48] at 2–6.

The Court agrees with IFC and the United States that, for purposes of the FSIA, a suit can be based primarily upon the conduct of a third party, although that determination will depend heavily on the facts and circumstances of each case. This does not mean that courts should employ a freeform approach to identifying the gravamen where they look outside the four corners of the pleadings and independently determine who the "real" defendant is in some theoretical or metaphysical sense. Plaintiffs are, of course, the "master[s] of the[ir] complaint," and can choose to assert whatever claims against whichever defendants they wish. Caterpillar Inc. v. Williams, 482 U.S. 386, 398–99 (1987). But the Supreme Court's guidance in both Sachs and Nelson is that courts should, in the usual FSIA case, look to the conduct that "actually injured" plaintiffs. And this Court can find nothing in either of those cases suggesting that courts should restrict the

gravamen analysis to just the named defendants' conduct where it is clear from the face of a plaintiff's complaint that the conduct that actually injured her was in large part that of a third party.[4]

Indeed, while neither case addressed the issue explicitly, both the reasoning of the Supreme Court's opinions and the warnings against giving jurisdictional significance to feints of language support considering the conduct of a third party, at least in a case like the present one. Nothing in Sachs, for example, suggests that the result would have been any different if all relevant facts were the same, except that the Austrian railway and the ticket-seller had been two different state-owned entities,[5] and Sachs had sued the ticket-seller instead of the railway for failure to warn. Under that hypothetical, the Court's reasoning in its gravamen analysis would continue to hold true. It would remain the case that "[w]ithout the existence of the unsafe boarding conditions in [Austria], there would have been nothing to warn Sachs about when she bought the [railway] pass." Sachs, 136 S. Ct. at 396. The core of the suit would likewise remain the "wrongful conduct and dangerous conditions in Austria, which led to injuries suffered in Austria." Id.

This Court is mindful of the Supreme Court's repeated admonitions that courts should not give "jurisdictional significance" to "feint[s] of language," nor should they "allow plaintiffs to evade the [FSIA's] restrictions through artful pleading." Id. at 396–97. The point of the gravamen

---

[4] The Court takes no position on how the determination that the conduct of a third party is the gravamen of a suit interacts with Fed. R. Civ. P. 19, regarding the joinder of required parties. The point here is not that an actually-injuring third party must be named as a defendant—rather, it is that the decision whether or not to name that third party as a defendant is not itself of jurisdictional significance in the FSIA context.

[5] In fact, the lower court decision in Sachs dwelled extensively on the nature of the principal-agent relationship between the Austrian railway and the Massachusetts-based ticket-seller, and whether the ticket-seller's conduct could be imputed to the railway, ultimately concluding that it could. See Sachs v. Republic of Austria, 737 F.3d 584, 587, 591–98 (9th Cir. 2013) (en banc). For purposes of its gravamen analysis, the Supreme Court assumed that such imputation was permissible. See Sachs, 136 S. Ct. at 395. But because Sachs had sued the railway, which had actually injured her, not the ticket-seller, which had not (and moreover was not a sovereign entity presumptively entitled to immunity under the FSIA), the issue now before this Court did not arise. Here, IFC and the United States argue that plaintiffs have sued the entity that did not actually injure them (IFC), which would be analogous to suing the ticket-seller in Sachs.

analysis is to look past the technicalities of plaintiffs' claims and the precise details of how they framed their pleading and "zero[] in on the core of their suit." Id. at 396; see Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering System Co., 807 F.3d 806, 814 (6th Cir. 2015) ("Courts must look past artful pleading to determine the underlying reality of the core activities being challenged, to determine if the gravamen of the complaint truly falls within one of the exceptions Congress wrote into the FSIA."). In general, permitting a plaintiff in an FSIA action to switch jurisdiction off and on, merely by adding or removing named defendants, would give rise to exactly the sort of evasion of the FSIA's restrictions about which Sachs and Nelson warned.

Here, the Court has no real doubt that, had plaintiffs named CGPL as a second defendant and asserted claims against CGPL, the gravamen of that action would have been in India.[6] All of CGPL's conduct—as alleged in plaintiffs' complaint and proposed amended complaint—was in India, and it clearly had a much larger and more direct role in the plant's construction and operation, and hence in the alleged harms to plaintiffs, than did IFC, which played only a small part in the whole affair. The claims against IFC are, by necessity, more attenuated than any claims against CGPL would be, just as the failure-to-warn claims in Sachs and Nelson were quite attenuated relative to the other claims plaintiffs asserted. Indeed, the Seventh Circuit has noted that Sachs relied—if only implicitly—on the rationale that claims for conduct extending far back on the "chain of causation" leading to an ultimate injury cannot be the basis for jurisdiction—

---

[6] It is true, of course, that Sachs suggested that "the gravamina of different claims may occur in different locations." Devengoechea, 889 F.3d at 1223; see Sachs, 136 S. Ct. at 397 n.2 ("[W]e consider here only a case in which the gravamen of each claim is found in the same place."). But while it might be the case that a complaint presenting various claims with no factual commonality could have more than one gravamen, that is not the situation here. Just as in Sachs, plaintiffs' claims here (as well as any hypothetical claims against CGPL) all have a commonality: the construction and operation of the plant. Their claims "turn on this circumstance." Devengoechea, 889 F.3d at 1223. This is so even if some of the claims, such as the negligent supervision claim, would also require plaintiffs to prove additional facts. That was true of the failure-to-warn claim in Sachs, but the Court nonetheless determined that the action had only one gravamen. See Sachs, 136 S. Ct. at 396–97. So, too, in Nelson only one gravamen was identified, although the failure to warn claim there would likewise have required additional facts to be proven. Nelson, 507 U.S. at 357–58.

particularly where those claims are asserted against an entity that did not actually injure the plaintiff. See Noboa v. Barceló Corporación Empresarial, SA, 812 F.3d 571, 572–73 (7th Cir. 2016); see also Nelson, 507 U.S. at 358 (deeming it insufficient for gravamen purposes that activities "led to the conduct that eventually injured the Nelsons"). Accordingly, whether the concern is framed as one of feints of language or too much attenuation, this Court is extremely wary of permitting plaintiffs to manufacture jurisdiction under the FSIA by choosing not to name a defendant.

And the Court does not think that this is one of those unusual cases where something other than the conduct that actually injured the plaintiffs constitutes the gravamen of the complaint, as may have been contemplated by Sachs's enigmatic statement that "[d]omestic conduct with respect to different types of commercial activity may play a more significant role in other suits." Sachs, 136 S. Ct. at 397 n.2. This Court can perhaps envision circumstances where that statement would come into play—where a sovereign's or international organization's conduct, while not actually injuring the plaintiff, was nonetheless so significant and closely tied to the eventual injury that it constitutes the gravamen of the complaint. Although the Court is loath to speculate on scenarios not presented in this case, the Sachs footnote could potentially apply in, for instance, an action asserting products-liability claims, where a sovereign entity (or international organization) manufactures a fatally defective drug inside the United States and sells it to another sovereign entity, who then sells it to a consumer abroad. In that scenario, it would be difficult to discern which conduct "actually injured" the consumer and was the basis for the suit under the standard Sachs and Nelson test, given that both domestic conduct (the manufacturing of the deadly drug) and foreign conduct (the sale of the drug) might bear similar levels of responsibility for the injury. To determine what the gravamen would be in a case where it is not clear which conduct actually

injured the plaintiff, a court may well have to forego the actual injury analysis and instead conduct a fact-specific analysis of the relative importance of the domestic and foreign conduct to the eventual injury, as the Sachs footnote might suggest.[7]

But this Court has no need to analyze any further how that hypothetical would play out, because the present case just isn't one where the Sachs footnote is applicable. Here, it is clear what conduct actually injured plaintiffs: construction and operation of the Tata Mundra Power Plant in India. Many of plaintiffs' claims, on their face, allege that IFC failed to do certain things inside the United States. See, e.g., Compl. ¶ 299 (alleging that IFC "fail[ed] to take reasonable steps to prevent harms to Plaintiffs"); ¶ 306 (alleging that IFC "has failed and continues to fail to exercise due care and monitor, supervise[,] and control CGPL"). But as the Supreme Court concluded with respect to the failure-to-warn claims in Sachs and Nelson, and as the Court has emphasized in a related context, claims for failures or omissions in the United States resulting in an injury abroad are particularly suspect when used as the basis for jurisdiction and should "flash[] the yellow caution light," because "it will virtually always be possible to assert that the . . . activity that injured the plaintiff [abroad] was the consequence of faulty training, selection or supervision—or even less than that, lack of careful training, selection or supervision—in the United States." Sosa v. Alvarez-Machain, 542 U.S. 692, 702 (2004) (quoting Beattie v. United States, 756 F.2d 91, 119 (D.C. Cir. 1984) (Scalia, J., dissenting)).[8] Indeed, this case is factually

---

[7] The possibility that the Sachs footnote will apply in future cases also alleviates to some extent the concern the Court articulated in its February 14 opinion that an "actual injury" test would "immunize state-owned enterprises and international organizations . . . from a large swath of causes of action" involving "an intervening cause that occurred abroad." Jam, 442 F. Supp. 3d at 173.

[8] Sosa concerned the Federal Tort Claims Act ("FTCA"). Under the FTCA, federal courts generally have jurisdiction over claims against the United States for injuries caused by U.S. government employees. See Sosa, 542 U.S. at 700. The FTCA withholds jurisdiction, however, for "[a]ny claim arising in a foreign country." Id. (quoting 28 U.S.C. § 2680(k)). Some courts of appeals had, over time, developed what is known as the "headquarters doctrine," whereby the foreign country exception did not apply to acts and omissions occurring in the United States but having operative effect in another country. See id. at 701. But in 2004, in Sosa, the Supreme Court rejected the headquarters doctrine, out of concern that claims for conduct occurring abroad, such as legal malpractice claims, negligent medical

analogous to Sachs: even though plaintiffs have asserted claims alleging omissions in the United States, ultimately, "[a]ll of [their] claims turn on the same tragic episode in [India], allegedly caused by wrongful conduct and dangerous conditions in [India], which led to injuries suffered in [India]." Sachs, 136 S. Ct. at 396.

For these reasons, the Court refines its definition of the gravamen of plaintiffs' original complaint. The February 14 opinion defined the gravamen as "IFC's failure to ensure the Tata Mundra Power Plant was designed, constructed, and operated with due care so as not to harm plaintiffs' property, health, and way of life." Jam, 442 F. Supp. 3d at 177. The Court now revises that gravamen to focus on what actually injured plaintiffs: the construction and operation of the Tata Mundra Power Plant in India.

To reiterate, in reaching this conclusion, the Court has looked only at the conduct alleged within the four corners of the complaint. The complaint itself clearly identifies the construction and operation of the plant as the ultimate source of plaintiffs' injuries. All of the harms to plaintiffs alleged therein, such as "property damage, environmental destruction, loss of livelihoods, and threats to human health," Compl. ¶ 1, flow directly from the plant's construction and operation and the dangerous and harmful conditions in the surrounding area that followed, like the "discharge[] into the sea" of thermal pollution, id. ¶ 7, the spread of coal dust and fly ash, id. ¶ 9, the discharge of air pollutants and particulate matter into the air, id. ¶ 10, and the "burn[ing of] approximately 12–13 million tons of coal each year," id. ¶ 31.[9] Plaintiffs cannot succeed on their

---

care claims, or slip-and-fall cases, could all be "repackaged as . . . claims based on a failure to train, failure to warn, the offering of bad advice, or the adoption of a negligent policy." Id. at 702. While Sosa was interpreting the FTCA, not the FSIA, the decision nonetheless reinforces the guidance in Sachs and Nelson that courts should be hesitant to conclude that jurisdiction exists based on claims involving conduct (omissions inside the United States) that is derivative of, but several steps removed from, the conduct that actually injured a plaintiff overseas.

[9] The plaintiff-specific harms that the complaint identifies, too, arise directly from the construction and operation of the plant. See, e.g., id. ¶ 214 ("Since 2011, when the Plant started operating, Mr. Budha Jam's fish catch has drastically declined, especially in the last three years."); ¶ 232 (noting that "increased ship traffic near the Plant

claims, "[u]nder any theory of the case that [they] present[]," Sachs, 136 S. Ct. at 396, without this allegedly harmful conduct—most of it done by CGPL in India. See, e.g., Compl. ¶ 297 (on negligence claim, arguing that IFC should have known that CGPL would operate the plant in a manner to "cause coal dust, ash[,] and other coal combustion byproducts to be deposited on the surrounding villages and fishing harbors"); ¶ 303 (on negligent supervision claim, arguing that IFC should have known that "CGPL failed and continued to fail to take reasonable and sufficient steps to prevent, mitigate, and remediate harm to Plaintiffs"); ¶ 311 (on public nuisance claim, arguing that "building and operating the enormous coal-fired power plant at issue is and was unreasonably dangerous to local people and the local environment"); ¶ 317 (same for private nuisance claim); ¶ 321 (on trespass claim, arguing that operation of the plant has resulted in the discharge of "particles and pollutants" onto plaintiffs' property). And because all of that conduct was in India—just as the gravamen in Sachs was the dangerous conditions in Austria and the gravamen in Nelson was Saudi conduct in Saudi Arabia—the complaint fails to satisfy the commercial activity exception's requirement that an action be based upon conduct "carried on" or "performed" in the United States. 28 U.S.C. § 1605(a)(2).

Given this clarification of the gravamen of the action, none of the new allegations in the proposed amended complaint change the Court's calculus. There are two main sets of new allegations. The first set consists of more specific facts in support of plaintiffs' claim that it was negligent for IFC to execute the loan agreement and invest in the Tata Mundra project in the first place. See Proposed Am. Compl. [ECF No. 63-1] ¶¶ 216–25. Plaintiffs allege, for example, that IFC, "[d]espite knowing the Project was a high-risk project and identifying significant specific

---

is . . . a problem," because plaintiff Manjalia "cannot fish close to the area anymore"); ¶ 243 (noting that "Mr. Sidik Jam's wife now has asthma, but she did not have it before the Tata Mundra Plant started operating").

15

harms likely to result from the project . . . [,] provided keystone funding to enable the project to go forward." Id. ¶ 216. The second set of new allegations concern where IFC's decision-making activity took place. For instance, plaintiffs allege that "IFC's monitoring and supervision of the Project's environmental and social performance and the decision to continue to disburse the loan despite worsening performance occurred in IFC's Washington, D.C., headquarters." Id. at 56.

These new allegations do not undercut the gravamen of plaintiffs' action, as the Court has defined it. They relate only to IFC's conduct. And while IFC's conduct may have led to the injuries that plaintiffs suffered, so too may have the Austrian railway's failure to warn in Sachs, or the Saudi government's failure to warn in Nelson. But the Supreme Court deemed that insufficient in those cases, and this Court does as well. As the United States put it, the new allegations "do not change the critical facts of this case: that an Indian company built and operated a power plant in India that allegedly caused Indian plaintiffs environmental and social harms in India." Second Statement of Interest of the United States [ECF No. 68] at 3.[10] The gravamen of the proposed amended complaint remains the construction and operation of the plant, primarily carried out by CGPL. That conduct took place in India.[11] Hence, the proposed amended complaint

---

[10] Plaintiffs have moved for leave to file a response to the United States's Second Statement of Interest. See Pls.' Mot. to File Resp. to Second Statement of Interest of the United States of America [ECF No. 70] at 1. IFC opposes the motion. Id. Because the United States's Second Statement of Interest contains arguments that do not appear in IFC's opposition brief, the Court will grant plaintiffs' motion for leave to file a response, and has considered that response.

[11] Although none of their briefs have addressed the FSIA's "substantial contact" requirement, the Court notes that plaintiffs have also failed to establish that their suit is based upon activity with "substantial contact" with the United States. See Odhiambo v. Republic of Kenya, 764 F.3d 31, 36 (D.C. Cir. 2014); 28 U.S.C. § 1603(e). D.C. Circuit precedent makes clear that a plaintiff's action must be "'based upon' the aspect of the [international organization's] commercial activity that establishes substantial contact with the United States." Odhiambo, 764 F.3d at 37. In other words, the activity establishing substantial contact with the United States must be encompassed within the conduct that makes up the gravamen. Here, as this Court has explained, the gravamen of plaintiffs' action is the construction and operation of the plant in India. That is what the action is "based upon." Because that conduct does not itself establish contacts with the United States, plaintiffs have not satisfied the substantial contact requirement.

fails to satisfy the commercial activity exception and would not survive a motion to dismiss. The Court will therefore deny leave to amend the complaint as futile. See Hettinga, 677 F.3d at 480.

As a final note, the Court recognizes that application of the FSIA's commercial activity exception to international organizations, as mandated by the Supreme Court's decision in this case, is fraught with difficulty and can lead to seemingly odd results. As Justice Breyer noted in his lone dissent, "[t]he core functions of [international] organizations are at least arguably 'commercial' in nature," as they primarily exist "to promote international development by investing in foreign companies and projects across the world." Jam, 139 S. Ct. at 778–79 (Breyer, J., dissenting). Given the nature of these organizations, it may turn out that the commercial activity exception, as applied to international organizations located in the United States, will largely swallow the general rule that they "are presumptively immune from suit," id. at 766 (majority opinion). Even so, the commercial activity exception's requirements still have some teeth. As a result, under the FSIA, the fact that an entity bears some possible moral blameworthiness for an injury, or might have faced liability in the United States if all the relevant conduct had occurred domestically, is not sufficient to create jurisdiction. The entity's conduct must also have been what the suit is "based upon," 28 U.S.C. § 1605(a)(2)—i.e., the gravamen of the action. Here, IFC's conduct is not what the suit is based upon, and the Court is bound to withhold jurisdiction, regardless of IFC's alleged blameworthiness. For better or worse, that is how immunity often plays out.

## CONCLUSION

For the foregoing reasons, the Court will deny plaintiffs' motion to amend their complaint. A separate order will be issued on this date.

/s/
JOHN D. BATES

Dated: August 24, 2020

United States District Judge